# IN THE UNITED STATES DISTRICT COURT
# IN AND FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,       )
                                     )

       Plaintiff,             )     Civil Action No.: 06-456 SLR
                                     )

            v.                )
                                     )

STATE OF DELAWARE,          )
DEPARTMENT OF PUBLIC SAFETY,   )
                                     )
       Defendant.        )

## STATE OF DELAWARE'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**DEPARTMENT OF JUSTICE
STATE OF DELAWARE**

STEPHANI J. BALLARD, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorney for Defendant

DATED:  January 29, 2008

# **TABLE OF CONTENTS**

Page

TABLE OF CITATIONS ............................................................................................ iii

NATURE AND STAGE OF THE PROCEEDINGS ................................................... 1

SUMMARY OF ARGUMENT ................................................................................... 2

STATEMENT OF FACTS ......................................................................................... 3

    1.   Corporal Dempsey withholds and gives false information to State Troopers responding to her home as a result of her placement of a 911 call at 1:00 a.m. on October 26, 2003 . 3

    2.   Dempsey's boyfriend, Brian Maher, also a State Trooper, promptly and truthfully reports the incident to his superior officer, Captain Hawkins, who ascertains and follows Corporal Dempsey's wishes with regard to the disposition of the matter ..................... 5

    3.   The matter is reopened in April 2004 as a result of inquiries made by a third party. An investigation is promptly commenced. Dempsey, Corporal Maher, Captain Hawkins and Major Randall Hughes are charged and disciplined internally as a result of their involvement in, and reporting of, the October 2003 incident ....................................... 7

    4.   Corporal Dempsey avails herself of her right to a hearing on the charges before a three-member Trial Board, which recommends termination. Dempsey appeals this recommendation and her punishment is reduced to demotion and suspension ........... 10

    5.   Plaintiff files charges with the EEOC, which issues a "no cause" finding on her complaints of gender discrimination ......................................................................... 12

ARGUMENT ............................................................................................................ 14

    I.     SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF DEFENDANT AS THERE IS NO EVIDENCE WHATSOEVER IN THE RECORD TO SUPPORT PLAINTIFF'S ALLEGATIONS OF GENDER DISCRIMINATION IN VIOLATION OF TITLE VII. THE STATE DISCIPLINED CORPORAL DEMPSEY, WITH FULL DUE PROCESS, BASED UPON HER MISCONDUCT AND NO ADVERSE ACTION WAS TAKEN AGAINST CORPORAL DEMPSEY BECAUSE OF HER GENDER ............................................................................................................. 14

       A.  Standard of Review ..................................................................................... 14

       B.  Dempsey Cannot Establish a Prima Facie Case of Gender Discrimination ................ 15

1. Dempsey has adduced no evidence in discovery showing that any male Troopers were more favorably treated by the State as a result of their gender. Further, Dempsey's purported "comparators" in this matter were not similarly situated ...16

2. Dempsey's disciplinary action was imposed following a formal administrative disciplinary hearing, including an administrative appeal by which Dempsey successfully had her discipline reduced ................................................................21

C. The State Had A Legitimate Non-Discriminatory Reason to Demote and Otherwise Discipline Dempsey for her Misconduct--Making False Statements to Troopers Effecting An Emergency Response and Criminal Investigation on Her Behalf .........................22

D. There Is No Evidence By Which A Reasonable Fact-finder Could Find that the Disciplinary Action Taken Against Corporal Dempsey for Making False Statements Was A Pretext For Gender Discrimination ........................................................................24

E. Summary Judgment Must Be Granted On The Issue Of Damages, As Plaintiff Has Suffered No Loss Of Back Pay For Which Title VII Damages Could Be Awarded ...27

II.    SUMMARY JUDGMENT MUST BE GRANTED AS TO COUNT II, A STATE LAW CLAIM, AS THIS COURT IS WITHOUT JURISDICTION OVER THIS CLAIM, AND IT WOULD BE BARRED IN ANY EVENT UNDER DELAWARE STATE LAW .......................................................................................................................28

CONCLUSION ...............................................................................................................30

## TABLE OF CITATIONS

**Case Name**                                                                                                   **Page**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ..................................................................14

Bequeath v. L.B. Foster Co., 367 F.Supp. 2d 779 (W.D. Pa. 2005) .............................................15

Bonenberger v Plymouth Township, 132 F.3d 20 (3d Cir. 1997)...................................................29

Brady v. Maryland, 373 U.S. 83 (1963)........................................................................................23

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .............................................................................14

Lujan v. National Wildlife Fed'n, 497 U.S. 871 (1990) .................................................................15

Maull v. Division of State Police, 141 F.Supp. 2d 463 (D.Del. 2001) .................15, 16, 22, 24, 25

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)..................................................... passim

Neely v. Samis, 183 F.Supp. 2d 672 (D.Del. 2002)......................................................................28

Protos v. Volkswagen of America, Inc., 797 F.2d 129 (3d Cir. 1986),
     cert denied, 479 U.S. 972 (1986) ......................................................................................28

Scheidemantle v. Slippery Rock University State System of Higher Educ.,
     470 F.3d 535 (3d Cir. 2006)...............................................................................................15

Shirley v. James River Corp., 1996 WL 250044 (D. Del. 1996)......................................15, 16, 24

Taylor v. Proctor and Gamble, 184 F.Supp. 2d 402 (D.Del. 2002) ...................................22, 23, 25

Woloszyn v. County of Lawrence, 396 F.3d 314 (3d Cir. 2005)...................................................15

**Statutes, Rules and Other Authorities**

United States Constitution, Eleventh Amendment ..................................................................2, 28

28 U.S.C. §1367(c)(3)...................................................................................................................29

42 U.S.C. §1981a .....................................................................................................................27-28

42 U.S.C. §2000e ...........................................................................................................................1

42 U.S.C. §2000e-2(g)..................................................................................................................27

11 <u>Del. C.</u> Ch. 92 ...........................................................................................................10, 21

11 <u>Del.C.</u> §9200(c)(3) ..............................................................................................................21

11 <u>Del.C.</u> §9200(c)(4) ..............................................................................................................21

11 <u>Del.C.</u> §9200(c)(9)(11) .......................................................................................................21

11 <u>Del.C.</u> §9205 ......................................................................................................................22

19 <u>Del.C.</u> §2304 ......................................................................................................................29

29 <u>Del.C.</u> §8203(6) ..................................................................................................................11

Federal Rule of Civil Procedure 56.........................................................................................1

Federal Rule of Civil Procedure 56(c) .........................................................................14, 15, 30

Federal Rule of Civil Procedure 56(e) ...................................................................................14

## <u>NATURE AND STAGE OF THE PROCEEDINGS</u>

Plaintiff, Elizabeth C. ("Christy") Dempsey is a Delaware State Trooper holding the rank of Corporal.  (A-244).  Plaintiff filed the complaint in this matter on July 26, 2006, against her employer, State of Delaware, Department of Public Safety, Division of State Police, (DSP) alleging that DSP violated Title VII of the Civil Rights Act, 42 U.S.C. §2000e, *et. seq.*, by intentionally discriminating against her on the basis of gender.  (Docket Index #1 (D.I. 1)(A-94).  Plaintiff also added a Second Count for "Breach of the Covenant of Good Faith and Fair Dealing" which, although Plaintiff did not invoke this Court's supplemental jurisdiction, purports to be a state law claim. Defendant answered plaintiff's complaint on September 15, 2006, denying all wrongdoing.  (D.I. 5) (A-107).

This is Defendant's Opening Brief in support of its Motion for Summary Judgment, pursuant to F.R.C.P. 56, which has been simultaneously filed with the Court.  There are no genuine issues of material fact and the State is entitled to judgment as a matter of law for the reasons set forth herein.

## <u>SUMMARY OF ARGUMENT</u>

In this case, Plaintiff has alleged claims of discrimination pursuant to Title VII. The record contains no evidence from which a reasonable jury could find in plaintiff's favor as to her claims of gender discrimination and, in fact, affirmatively supports a conclusion that there was no discrimination and no liability on Defendant as a matter of law. Plaintiff fails all three prongs of the <u>McDonnell-Douglas</u> burden shifting test, in that:

- Plaintiff fails to identify any similarly situated male comparators who were more favorably treated/less harshly disciplined for similar misconduct;
- The State had a legitimate, non-discriminatory reason to discipline Dempsey for making false statements to and withholding information from Troopers investigating Dempsey's own emergency call about a burglary at her home in the early morning hours;
- There is no evidence that any action taken by the State employer was a pretext for gender discrimination; and
- Plaintiff has suffered no damages which are compensable under Title VII.

Plaintiff's state law claim of "breach of covenant" against her State employer is barred as a matter of law by Eleventh Amendment immunity, as well as the state law bar of the exclusivity provision of the Delaware Workers' Compensation Act. This Court should also abstain from exercising jurisdiction over a state law claim in the absence of a viable federal claim.

2

## STATEMENT OF FACTS

**1.** **Corporal Dempsey withholds and gives false information to State Troopers responding to her home as a result of her placement of a 911 call at 1:00 a.m. on October 26, 2003.**

The instant case arose out of events that took place in the early morning hours of Sunday October 26, 2003. On the preceding Saturday evening, Plaintiff, (Corporal) Elizabeth C. Dempsey (who goes by the name "Christy"), had gone out with some friends, including a friend from out of town, Kevin Keller, who was employed as a police officer in Texas. (A-389, 406, 409). Mr. Keller was at Dempsey's home around 1:00 a.m. after they had returned from dinner. Both Keller and Dempsey had been drinking that evening. (A-389, 412).

At the time, Dempsey was also dating a fellow State Trooper, Corporal Brian Maher. (A-69). Dempsey had called Maher earlier in the evening to say that she would not be seeing him that night. (A-541). Maher (who had also been drinking) proceeded to Dempsey's home and called her when he was outside. (A-391, 409, 416). Maher then began banging on Dempsey's door, and ultimately broke a window in an attempt to gain access to Dempsey's house. (A-392-93). While this was going on, Keller (who was behind a locked door with Dempsey) became fearful and told Dempsey to call 911. (A-419, 422). Dempsey first said that the person (Maher) would go away, but did ultimately call the Kent County emergency dispatch center. (A-392-93, 419-20, 422-26). The 911 Operator sent out a broadcast that there was a subject trying to break into Dempsey's home and Dempsey had armed herself with her gun. (A-55). Sergeant Michael Houdek was working the desk at Troop 3 and when he heard the call, he told the 911 center to dispatch as many available units as possible. (A-55-56).

Dempsey told the 911 operator that someone had broken into her house and she "didn't have a clue" who it was. (A-385). She also said she was home alone, which was not true, as Keller was

present. (A-386). When Dempsey was on the phone with 911, Maher apparently overheard and fled. (A-426). Dempsey called the 911 center back a second time before troopers arrived at her house to advise that the troopers could slow their response and "don't even need to come. I mean I don't even know who it was." (A-387-88). Dempsey admits she knew at the time she placed the call that Brian Maher was the person at her home. (A-561).

Three Delaware State Troopers, traveling separately, raced to Dempsey's house upon receiving a 1:00 a.m. "burglary in progress" call for a fellow trooper. (*See* A-453). As the Troopers tried to investigate, Plaintiff withheld material information about the "burglary" she had reported and gave a series of false statements to the troopers. (A-24, 248-54). Corporal Mark Csapo was in charge of the investigation and noted that Dempsey reported she had arrived home alone and was alone at the time of the alleged incident, which was false, because Keller was with her the entire time. (A-248-51). Dempsey reported that she contacted Keller after the break in and asked him to come over, which was false. Id. Dempsey told Cpl. Csapo that she heard glass breaking while she was in the bedroom. Id. However, she told Cpl. Walter Gygrynuk, another responding trooper, that she was not home when the incident occurred; she came home and found glass on the floor. (A-252). Dempsey then changed her story to Gygrynuk when he overheard her telling another trooper she heard the glass shatter. (A-252). In response to Cpl. Gygrynuk's attempt to find out who may have broken in, Dempsey stated she had no boyfriend, or male friend who thought he was her boyfriend, which was false. (A-252).

Dempsey did not disclose to the three responding officer the fact that there was someone else in her apartment while they were there (Keller, behind the closed bedroom door), until the investigation was well underway. (A-252, 565). Gygrynuk entered the bedroom and found Keller sitting on the bed. Trooper Alex Argo--the first responder--noted that Dempsey was very hesitant to

4

let him go up the stairs to her apartment. (A-254, 363). He also noted that Dempsey's statements changed throughout the interview. Id.

After she made the 911 calls, but before police arrived, Dempsey had told Kevin Keller to stay in the bedroom and not come out. (A-432-34). She told Keller that she did not want him to talk to the police and that she would "come up with something." (A-434). At first, Keller complied, telling Csapo that Dempsey had called him over after the incident. Later, however, while being given a ride to his sister's, Keller told Cpl. Csapo the truth about what had transpired at Dempsey's apartment. (A-436-39). He said that he and Dempsey were at the residence together the entire time and that he knew the alleged intruder was a friend of Dempsey who was a DSP trooper. (A-248-51). It was obvious to Keller that Dempsey knew who the intruder was at the time of the incident.

**2. Dempsey's boyfriend, Brian Maher, also a State Trooper, promptly and truthfully reports the incident to his superior officer, Captain Hawkins, who ascertains and follows Corporal Dempsey's wishes with regard to the disposition of the matter.**

The DSP Trooper who was involved in the incident at Dempsey's home was Corporal Brian Maher, who was dating Dempsey at the time. (A-69-70). After Dempsey called 911, Maher left her house and began driving home. (A-71). As he was driving, he placed a phone call to Captain Robert Hawkins, the troop commander for the area in which the incident had taken place. (A-71). Maher first called Hawkins' Troop, Troop 3, and spoke to the desk Sergeant, Michael Houdek, to get Hawkins' phone number. (A-59). Maher knew he had done something wrong and knew he had to report it. (A-71-72). Maher told Hawkins he had been at Dempsey's house and had a verbal altercation and had broken a window. (A-72). Maher asked Hawkins if he should go to Troop 3, but Hawkins called Maher back and told him to go home and he would get back to him on the situation. (A-72, 73).

Hawkins next called Troop 3 to get some more information, and spoke to Sgt. Houdek, the

night shift commander.  (A-6).  Houdek told him about the burglary call to Dempsey's house and said that the responding troopers said that something did not seem right about the call.  (A-6).  Houdek, in a second call, told Hawkins the suspect may have been a trooper.  Id.  Hawkins told Houdek Brian Maher was involved, and instructed Houdek to have Cpl. Csapo write up a report based on how it was reported to the troopers at the scene, and Hawkins would review it the next day. (A-7, 12).  Hawkins also advised Houdek that the Criminal Investigations (CI) unit would follow up on the incident.  (A-8).

Later that same Sunday (after the incident in the early morning hours), Brian Maher went to Dempsey's house and began fixing the window.  (A-76).  Around that same time, Captain Hawkins called Plaintiff to discuss what had happened[1] and find out what she wanted done with the case.  (A-9-10).  Dempsey told Hawkins:

> [S]he didn't want anything done, it was a misunderstanding.  I explained to her that I can do everything from arrest [Maher] to call him up and tell him to never see you again, never bother you again . . . .
>
> *        *        *        *        *
>
> I said, "The ball is in your court.  You tell me what you want to do, and I'll do it." . . . She told me she didn't want him arrested; it was a big misunderstanding.  She didn't want anything done.

(A-10, 24).

At some point on Sunday, Captain Hawkins called his superior officer, Major Randall Hughes, and advised him of the incident at Dempsey's residence (A-11).  Hawkins believes that he told Major Hughes that Brian Maher was the person who attempted to break in to Dempsey's, that Dempsey did not want anything done, and that Troop 3 CI was going to handle the situation in-

---

1  The record is unclear as to whether this conversation took place on Sunday (Oct. 26) or Monday, but all agree it was on one of those two days.

house. (A-11). Major Hughes' recollection differs somewhat, in that he recalls receiving the phone call from Hawkins, but recalls being told only that there was an incident at Dempsey's residence, that Troop 3 was looking into it, that she was aware of who the perpetrator was, and that she did not desire prosecution. (A-32-33). After confirming Dempsey was okay, Hughes allowed Captain Hawkins to handle the incident. Id. Hughes testified that he was not told that another trooper had been involved during this phone call. (A-34, 40). He did not learn of this until April 2004. (A-35, 40).

The next day, Monday October 27, 2003, Captain Hawkins assigned the case to Sergeant Chuck Mullett of Troop 3 Criminal Investigations for follow up. (A-263). A meeting took place among Hawkins, Mullett and Lt. Donaway, and Mullett changed the disposition of the report to "unfounded," noting that the victim (Dempsey) "desires no futher action in this case . . . Victim feels that no crime was committed." (A-8, 18-19; A-253).

Both Captain Hawkins and Major Hughes acknowledged, in hindsight, that they did not follow proper protocol with the handling of the incident, since it was an apparent domestic situation involving troopers, which should have been handled according to a particular DSP policy. (A-10-11, 24; A-41, 42). The matter was handled the way it was due to Plaintiff, Corporal Dempsey's, request that no action be taken. (A-25; A-41).

**3.    The matter is reopened in April 2004 as a result of inquiries made by a third party. An investigation is promptly commenced. Dempsey, Corporal Maher, Captain Hawkins and Major Randall Hughes are charged and disciplined internally as a result of their involvement in, and reporting of, the October 2003 incident.**

Nothing further took place with regard to the October 26, 2003 incident until April 2004. During that time, Plaintiff Dempsey never asked that the matter be pursued or reopened and, in fact, met Captain Hawkins at a social function she was attending with Brian Maher in November 2003,

and thanked him for his handling of the situation. (A-26). In April 2004, the Troop Commander of Troop 5, Captain Glenn Dixon, approached Major Hughes at a DUI ceremony and brought up the incident and the involvement of Dempsey and Brian Maher; Dixon was upset and accusatory. (A-33-34, 35). Hughes was shocked at what Dixon said because he did not know Maher had been involved. (A-34-35). Hughes contacted Hawkins immediately, and Hawkins maintained that he had advised Hughes of Maher's involvement (in October), and they disagreed on this point. (A-35). Once Hughes learned of Maher's involvement, he notified his own supervisor, the Lieutenant Colonel, of what Dixon had told him, and they immediately initiated criminal and internal affairs investigations into the matter. (A-35, 43).

The criminal investigation proceeded first and was conducted by Sgt. Robert Hudson. (A-40; A-255-272). Sgt. Hudson interviewed Maher and Dempsey, along with Major Hughes, Captain Hawkins, Sgt. Houdek, Sgt. Mullett, the three responding troopers, and Kevin Keller (Dempsey's friend who had been in the apartment). (A-255-272). Trooper Argo was also asked to prepare a supplemental report. (A-254). Hudson's report was turned over to the Attorney General's office for review of potential charges against Brian Maher in connection with the break-in. Maher pled to a misdemeanor charge of Criminal Trespass, and successfully completed a court-issued Probation before Judgment, which resulted in a dismissal of the charges against him. (A-324-25). Dempsey testified that Maher's prosecution was "without [her] approval." (A-539-40).

DSP also conducted an Internal Affairs investigation into the conduct of everyone involved in the October 2003 incident, including taking recorded statements from the persons interviewed by Sgt. Hudson, and others. Internal Affairs noticed Plaintiff, Cpl. Dempsey with potential violations of DSP Rule and Regulation ("R&R") #15 (making a false statement or false written or verbal report) and Job Performance Standard ("JPS") #14 (domestic incident). (A-331-32; A-209, 212). Internal

Affairs noticed Cpl. Brian Maher with potential violations of R&R #4 (conduct unbecoming an officer) and JPS #14 (domestic incident). (A-312-13; A-207, 212). Internal Affairs also notified the following troopers that they were the subject of investigation, and of the potential internal charges against them: Sgt. Mullett; Lt. Greg Donaway; Sgt. Houdek; Captain Hawkins, and Major Hughes. (*See* A-286-311).

As discussed in detail below, Plaintiff, Corporal Dempsey invoked her right to a three-member Divisional Trial Board which adjudicated the charges against her, followed by her appeal to the Secretary of the Department of Safety and Homeland Security. Cpl. Brian Maher opted for a hearing before the Superintendent, which constituted a no contest plea to the charges he was facing, followed by the Superintendent's determination of appropriate punishment. As a result of this hearing, the following discipline was imposed:

1. Maher was reduced in rank from Master Corporal to Corporal (a three-rank demotion);
2. 80 hour suspension with option to forfeit vacation;
3. 40 hour suspension without option to forfeit vacation;
4. Maher was placed on probation for one year.

(A-326). Maher accepted this discipline and did not appeal further.

As a result of the investigation into the conduct of Captain Hawkins, an allegation of violation of R&R #5 (neglect of duty) was unfounded, but an allegation of violation of JPS #12 (neglect of duty) was substantiated. (A-309). Internal Affairs recommended, and then-Lt. Colonel Thomas MacLeish approved, the imposition of Summary Discipline[2] against Hawkins, consisting of 24 hours suspension with the option to forfeit vacation. (A-310-11). As a result of the investigation into the conduct of Major Hughes, an allegation of violation of R&R #5 (neglect of duty) was unfounded, but an allegation of violation of JPS #12 (neglect of duty) was substantiated. (A-301).

_____
2 A Trooper's acceptance of summary discipline is the equivalent of a guilty plea to the charge. Summary discipline

Internal Affairs recommended, and then-Lt. Colonel Thomas MacLeish approved, the imposition of Summary Discipline against Hughes, consisting of 16 hours with the option to forfeit vacation. (A-302-03).

Charges of neglect of duty and poor judgment against Sgt. Michael Houdek were unfounded after investigation, (D-630, A-296), as were charges of poor judgment against Lt. Donaway and Sgt. Mullett. (A-290; 293).

> **4. Corporal Dempsey avails herself of her right to a hearing on the charges before a three-member Trial Board, which recommends termination. Dempsey appeals this recommendation and her punishment is reduced to demotion and suspension.**

As noted above, Cpl. Dempsey had been charged with violations of DSP Rule and Regulation #15 (making a false statement or false written or verbal report) and Job Performance Standard #14 (domestic incident). The allegations were substantiated by the IA investigation, resulting in formal charges being brought against Dempsey. (A-334-36). The notice of charges advised Dempsey of her right, under the Law Enforcement Officers' Bill of Rights, 11 *Delaware Code*, Ch. 92, to have a Divisional Trial Board, consisting of three officers, hear her case. (A-335). Dempsey obtained counsel and requested a trial board. (A-344-45). Any officer requesting a trial board is provided with a "strike list" by which they may strike potential officers who might sit on the board. (A-225-26). Through counsel, Cpl. Dempsey exercised this right and struck officers, including one female Captain, from the list. (A-348).

Dempsey's Trial Board hearing took place on December 1, 2004, and continued to a second day on January 13, 2005. Plaintiff and DSP were represented by counsel. Evidence, including tapes of the 911 calls; the testimony of the three responding troopers, Kevin Keller and Plaintiff herself was presented. (*See* A-353-72). As to the charge of violation of JPS #14 (failure to report a

---

is only available for charges of a less serious nature than those which would require a trial board. (A-230).

domestic incident), the trial board found the charge to be unsubstantiated, based upon the nature of the relationship between Dempsey and Maher. (A-366-67). The trial board did substantiate Dempsey's violations of R&R #15 (making false statements). The Board found that "Dempsey made a series of false statements when she called 911 and to the Troopers investigating her criminal complaint," noting many of the specific false statements in the written decision. (A-367-68). In addition to the false statements, the Board noted that Plaintiff's 911 call and her failure to disclose the presence of another individual in the residence put the responding troopers in potential danger. (A-369-70).

The three-member Trial Board unanimously recommended that Dempsey be suspended with pay with intent to terminate. (A-370). The Board noted that the trustworthiness and credibility of an officer is a critical component of their ability to perform the duties of law enforcement. Dempsey's conviction of false statements "seriously compromise[d]" her ability to testify as a witness in a criminal case." (A-370). Acting Superintendent Thomas MacLeish reviewed the Trial Board's decision and concurred with their findings and recommendation, and ordered that termination of Corporal Dempsey was appropriate and warranted.[3] (A-372).

A Trooper facing suspension has the right of appeal to the Secretary, and Cpl. Dempsey (still represented by counsel) exercised this right. (A-228-30; A-375). By state statute, only the Secretary can terminate an employee of the Division. 29 Del.C. §8203(6). The Secretary's decision on appeal is the final administrative action. (A-228). A hearing was held before Secretary David Mitchell on May 18, 2005. The Secretary issued a written decision wherein he found that there was substantial evidence to support the Trial Board's finding that Dempsey had violated DSP R&R #15. (A-377-

---

3 The Superintendent has the power to "sustain, increase or reduce the recommended action" of the Trial Board. (A-228).

80).   However, in his discretion, he found that the proposed penalty of termination was not proportionate to the severity of the infraction under the circumstances.  Id.  He remanded the matter to the DSP Superintendent to impose the following penalties:

1. Dempsey to be reduced in rank [from Corporal to Trooper First Class];
2. 15 days suspension without pay—10 days (80 hours) with option to forfeit vacation;  5 days (40 hours) without option to forfeit vacation;
3. Dempsey to be placed on probation for one year.

 (A-379).

Dempsey served her reduced disciplinary sentence and, upon the successful completion of her probation, she was restored to her prior rank, and has remained employed by DSP.  (A-233).  She received back pay for the entire period when she was suspended without pay pending appeal to the Secretary.  (A-234).  Based upon legal advice given to DSP, there was some confusion over the dates when Cpl. Dempsey's one year demotion should begin and end, an issue which affected her rate of pay for that time period.  (A-240-42).  That issue was resolved with the revision of Cpl. Dempsey's personnel records and the adjustment of a $200 pay differential to Cpl. Dempsey.  Id.  This settlement of the back pay issue was approved in August 2006 by Dempsey's Trial Board counsel and copied to her counsel in this litigation.  (A-240-42).  Dempsey has been made entirely whole as to all back wages, and has remained employed by DSP since her full reinstatement to rank.  Id.

**5.  Plaintiff files charges with the EEOC which issues a "no cause" finding on her complaints of gender discrimination.**

On or about April 6, 2005, Plaintiff filed a Charge of Discrimination with the EEOC/Delaware Department of Labor.  She claimed that the Trial Board's penalty of suspension pending termination constituted gender discrimination, and referenced Brian Maher as a comparator.[4]  (A-382).  Following an investigation, the Delaware Department of Labor, on February 28, 2006,

issued a "no cause determination" finding no reasonable cause to believe that DSP engaged in gender discrimination against Cpl. Dempsey.  (A-384).  "It appears that the Charging Party was not disparately treated because of her gender.  Rather, the Respondent was moved to take the action they did in response to the Charging Party's misconduct."  Id.  The determination noted that Brian Maher received similar discipline and that the other persons involved in the investigation [Hughes/Hawkins] were reprimanded appropriately based upon the severity of their misconduct.  Id.

---

4  Dempsey filed her Charge prior to the appeal to the Secretary, and his reduction of  her discipline.

**ARGUMENT**

I.    **SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF DEFENDANT AS THERE IS NO EVIDENCE WHATSOEVER IN THE RECORD TO SUPPORT PLAINTIFF'S ALLEGATIONS OF GENDER DISCRIMINATION IN VIOLATION OF TITLE VII.   THE STATE DISCIPLINED CORPORAL DEMPSEY, WITH FULL DUE PROCESS, BASED UPON HER MISCONDUCT AND NO ADVERSE ACTION WAS TAKEN AGAINST CORPORAL DEMPSEY BECAUSE OF HER GENDER.**

A.    **Standard of Review.**

Federal Rule of Civil Procedure 56(c) provides that a party is entitled to summary judgment and judgment shall be entered forthwith, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

Summary judgment is inappropriate only if the dispute of material fact is "genuine", meaning "such that a reasonable jury could return a verdict for the nonmoving party" on the issue. Id.  The moving party (Defendant, here) may satisfy the requirements of Rule 56(c) by showing the Court that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  That showing is amply made herein.

In response, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, . . . [but] must set forth *specific fact*s that indicate a genuine material issue for trial." Fed. R. Civ. P. 56(e) (emphasis added).  A non-moving party does not meet its responsive burden, and may not successfully oppose a summary judgment motion, by resting upon mere allegations or

denials contained in the pleadings, or by simply reiterating those allegations or denials in an affidavit. Bequeath v. L.B. Foster Co., 367 F.Supp. 2d 779, 784 (W.D. Pa. 2005), *citing* Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990). To avoid summary judgment, the Plaintiffs' burden is to "introduce evidence from which a rational finder of fact could find in [their] favor." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). If the nonmoving party cannot make this showing, with reference to actual facts of record, the moving party is entitled to judgment as a matter of law. F.R.C.P. 56(c).

### B.    Dempsey Cannot Establish a Prima Facie Case of Gender Discrimination.

To establish a *prima facie* case of gender discrimination under Title VII, the plaintiff must satisfy the three-step, burden-shifting inquiry laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). This Court has adapted the McDonnell Douglas test to claims of disparate discipline and has held that, in such cases, the plaintiff must establish: (1) she is a member of the Title VII protected class; (2) that the prohibited conduct for which she was disciplined was comparable in seriousness to misconduct of [similarly situated] employees ["comparators"] outside the protected class, and (3) disciplinary measures taken against Plaintiff were more severe than those enforced against the other similarly situated employees. Shirley v. James River Corp., 1996 WL 250044 (D. Del. 1996); Maull v. Division of State Police, 141 F.Supp. 2d 463 (D.Del. 2001). *See also* Scheidemantle v. Slippery Rock University State System of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006).

Dempsey's status as a female places her within a Title VII protected class. However, Dempsey cannot establish a *prima facie* case because there is no evidence in the record to show that the Delaware State Police treated any similarly situated male Troopers more favorably, or otherwise to support an inference that the State took disciplinary action against Dempsey because of her

15

gender.

      **1.**      **Dempsey has adduced no evidence in discovery showing that any male Troopers were more favorably treated by the State as a result of their gender.  Further, Dempsey's purported "comparators" in this matter were not similarly situated.**

In her charge to the EEOC and her Complaint in this Court, Dempsey suggests that the Troopers who investigated and followed up upon the October 26, 2003 incident are "comparators" because they "were aware" that the suspect in the break-in reported by Dempsey was Brian Maher, but failed to put his name on the reports and were not disciplined, or were not disciplined as harshly, as Dempsey.  (See A-94, A-382).  She specifically names the three responding Troopers: Argo, Csapo and Gygrynuk, as well as Sgt. Houdek, Sgt, Mullett, Captain Hawkins, and Major Hughes. Id. Dempsey also suggests that Brian Maher is a comparator, as his discipline for the "break-in" incident, following a guilty plea to his charges at a Superintendent's hearing, was not as harsh as Dempsey's discipline following the trial board on her charges of making false statements.[5]

For "comparators" to be validly considered in a Title VII action, the acts of the non-protected class (here, male) employees must be of "comparable seriousness" or "sufficiently similar" to the misconduct of Plaintiff, if the lesser discipline imposed on those employees is being proffered as proof of discriminatory intent.  See Maull, supra, 141 F.Supp.2d at 479; Shirley, supra at *5. Comparison of discipline between employees who engaged in dissimilar behavior is "not a valid exercise."  Shirley at *5.  The mere fact that one employee is female and another is male obviously does not, by itself, meet Plaintiff's Title VII burden of stating a prima facie case.[6]

None of Dempsey's purported "comparators" in the October 26, 2003 incident engaged in

_____

5  It is important to note that Dempsey's ultimate discipline, following the Secretary's reduction of penalty after her appeal was virtually identical to Maher's (although the nature of the charges against each of them, of course, remain entirely different in nature).  (A-377-79).

6  Despite recruitment and retention efforts, it is common knowledge that law enforcement is still a field significantly

conduct sufficiently similar to her own that they could be considered "comparators" for Title VII purposes. As a predicate to this discussion, it should be noted that all of the Troopers Dempsey identifies as comparators in the October 26, 2003 incident were investigated simultaneously, in the same Internal Affairs investigation as was Dempsey herself. However, that investigation drew different conclusions as to the culpability (or lack thereof) of each trooper based upon the different conduct and role of each in the events of that date. None of the male troopers Dempsey would rely on as comparators are in any way "similarly situated" to herself for purposes of evaluating disciplinary action taken, or not taken, against them.

## The Responding Troopers: Argo, Csapo & Gygrynuk

Starting with the three Troopers who responded to the 911 call to Dempsey's home, Internal Affairs interviewed these troopers but did not bring any internal charges against them. (See A-451-526). Thus, they were not found to have committed any misconduct, nor were they disciplined. There is no evidence whatsoever in the record to show that these troopers' gender played any part in Internal Affairs decision not to charge them with Divisional violations. Rather, that decision was a perfectly legitimate one on the face of the record, when all these troopers did was respond, as ordered, to an emergency call placed by Dempsey, and write up their reports for approval by their superiors. Argo, Csapo and Gygrynuk were doing no more than performing their job duties. Obviously, such action is not remotely similar to Plaintiff Dempsey's actions of making false reports to the 911 center, making false statements to the responding troopers, and failing to disclose material safety information (the presence of another person in the home) when they did their investigation at her residence.

---

more heavily populated by male than by female employees.

**The Troop 3 chain of command : Houdek, Hawkins & Hughes**

Dempsey's next purported comparator, the responding troopers' immediate supervisor, Sgt. Houdek, was noticed on potential internal charges of neglect of duty and poor judgment in connection with his handling of the matter, but the charges against him were unfounded. (A-294-96). Sgt. Houdek's role in the events of October 26, 2003 is not at all similar to Plaintiff's. Sgt. Houdek was told by his superior, Captain Hawkins, to have Cpl. Csapo write up a report of the incident based upon evidence obtained at the scene, and was told the matter was to be turned over to Criminal Investigations. (A-7, 8, 12; A-60). Sgt. Houdek's action in the matter consisted of supervising the responding Troopers, approving their reports, and following the direction of his supervisor (Hawkins) with respect to the disposition of the matter. He was investigated by Internal Affairs for these activities but not charged with misconduct. His actions are not "sufficiently [or at all] similar" to Plaintiff Dempsey's actions of making false statements and withholding material information in an emergency crime report and investigation she initiated. Houdek is not a valid comparator to Dempsey.

Captain Hawkins and Major Hughes also are not valid comparators to Dempsey. Their roles in the events of October 26, 2003 were responsive and supervisory in nature. Captain Hawkins took the call from Brian Maher about the incident and proceeded to ascertain and follow the Plaintiff, Cpl. Dempsey's, wishes as to how to handle the matter—she was vehement that she wanted nothing done. Captain Hawkins referred the matter to CI, which unfounded the report, resulting in no further action, as Cpl. Dempsey herself had requested. Captain Hawkins freely admits that he was not aware of, and did not follow the existing DSP policy as to domestic incidents involving troopers. Captain Hawkins was investigated by IA, noticed on charges, and was disciplined for a substantiated charge of neglect of duty. (A-309-11). Major Hughes' only role in the events of October 23, 2003 was

receiving a call from Captain Hawkins, advising that there had been an incident at Dempsey's residence, that she did not desire prosecution and that it would be handled at the Troop. Captain Hawkins' and Major Hughes' recollection differ as to whether Hawkins mentioned that Brian Maher was the alleged suspect, but this fact is immaterial to the analysis of whether Hughes can be a valid comparator. Hughes, after confirming that Dempsey was okay, told Hawkins to go ahead and handle the situation. His misconduct, like Hawkins', was also not properly following DSP procedure as to how an apparent domestic situation involving at least one trooper should be documented. Major Hughes was investigated by IA, noticed on charges, and was disciplined for a substantiated charge of neglect of duty. (A-297-302).

Major Hughes' and Captain Hawkins' misconduct each consisted of not properly following a DSP policy. This is significantly different conduct from Cpl. Dempsey's misconduct of making false statements and withholding material information in a crime report and investigation she initiated. Hughes and Hawkins are also not similarly situated valid comparators to Dempsey.

**Corporal Brian Maher**

Finally, Brian Maher is clearly not similarly situated to Dempsey. His misconduct was the actual attempt to see Dempsey and enter her home on October 26, 2003. He immediately realized the wrongfulness, and potential illegality of this conduct and notified his superior, Captain Hawkins, of what had transpired within minutes of leaving Dempsey's premises. He asked Captain Hawkins what he should do and obeyed a command to report home. However ill-advised his actions were on the night of October 26, 2003, they involved no deception or false statements toward DSP. As a result of the investigations by DSP in April 2004, Maher was not only disciplined internally for his actions--he was prosecuted criminally. The IA charges against Maher were conduct unbecoming an officer and failing to report a domestic incident. Maher pled guilty to both. The actions and charges

19

against Maher are entirely different in nature from the actions and charges against Dempsey, which were based upon her making false statements and withholding material information in a criminal investigation.  The nature of the actions aside, Maher also cannot be considered a comparator to Dempsey because no "disparate discipline" was imposed.  Dempsey's reduced discipline following her appeal was virtually identical to the discipline imposed on Maher following his no contest plea to the Superintendent.  Maher's discipline was actually harsher, because he suffered a three-step demotion, rather than Dempsey's one step demotion.

Plaintiff also states in her Complaint that she was aggrieved by being reassigned to Troop 4 rather than Troop 7 when she returned to work following her successful appeal to the Secretary. (Compl. ¶ 34-36, A-99-100).  Brian Maher had been assigned to Troop 7 at the time of the incident and thereafter.  Both troops are in Sussex County.  Plaintiff cannot make out a *prima facie* case of discrimination from the fact of her transfer because, first of all, it was not a disciplinary action.  No trooper has the right to any particular troop assignment, and a trooper may be transferred at any time, to any unit, for operational needs.  The DSP Divisional Manual provides that "all members of the Division are subject to reassignment, at any time . . . to any location in the State of Delaware."  (A-231).  Dempsey herself, in responses to requests for admission, admits that "DSP Troopers are not guaranteed to be assigned to a specifically requested troop or a specifically requested rotation/shift." (A-183).  Colonel MacLeish advised Dempsey in writing that she was being assigned to Troop 7 due to "operational and manpower" needs. (A-235-36).  There is no evidence in the record remotely suggesting that there was any gender-based reason for the assignment.

In summary, not a single Trooper involved in the October 26, 2003 incident/follow-up, whom Dempsey holds out as disciplinary comparators, was involved with or charged with making false statements or with any acts or violations substantially similar to Dempsey's.  As such, they cannot be

considered comparators for purposes of her Title VII *prima facie* case.

> **2.    Dempsey's disciplinary action was imposed following a formal administrative disciplinary hearing, including an administrative appeal by which Dempsey successfully had her discipline reduced.**

There is no other evidence in the record from which any inference of gender discrimination could be drawn with respect to the investigation of and disciplinary proceedings brought against Dempsey and the other male troopers. A formal Internal Affairs investigation was commenced in April 2004 at the request of Major Hughes, after he spoke to Captain Dixon. Prior to that time, Dempsey had been more than happy to allow the matter to remain closed, as she requested from the beginning. (A-88; A-26). Once the matter was re-opened, an IA investigation was conducted—as to all principals, including Dempsey--in full compliance with all applicable DSP procedures and with the Law Enforcement Officers' Bill of Rights (LEOBOR), 11 <u>Del.C.</u> Ch. 92.

The male troopers who were charged with internal misconduct all elected to plead guilty to the various charges facing them (neglect of duty/poor judgment) and accept their discipline. Cpl. Dempsey, as was her right, but in contrast to her purported comparators, chose to contest the charges that she had violated DSP Rules and Regulations in connection with allegedly making false statements during the October 26, 2003 investigation. Accordingly, she was, while represented by counsel, afforded her full statutory and due process rights under LEOBOR. The due process procedural safeguards which were followed in this case included:

(1)    Formal written notice of the potential violations she was facing (A-331-33), 11 <u>Del.C.</u> §9200(c)(4);

(2)    An authorized Internal Affairs investigator who had no involvement with the underlying matters (A-222), 11 <u>Del.C.</u> §9200(c)(3);

(3)    Review of the completed investigation by IA and the Deputy Superintendent; formal written notification of charges, right to counsel and strike list (A-224-26; 334-37), 11 <u>Del.C.</u> §9200(c)(9)(11); Notably a female Captain was included as a potential trial board member,

but Dempsey struck her name from the list.[7] (A-348-49; A-183);

(4)     A two day trial board hearing was held, giving Dempsey the opportunity to present whatever evidence she wished, after which the impartial three-member trial board deliberated and unanimously reached a verdict, finding the charge of violation of JPS #14 (failure to report a domestic incident) not substantiated, but finding the violation of R&R #15 (making false statements) to be substantiated, and recommending, with a detailed written rationale, the penalty of termination for that offense.   11 Del.C. §9205. (A-226-27; A-353-72). Notably the trial board found (relying on a 1998 AG's opinion) that the conduct of making false statements undermines the credibility of a trooper as a witness in a criminal trial, and undermines the public trust in the integrity of police officers. (A-370-71; A-373);

(5)     The trial board's recommended penalty was reviewed and approved by the Superintendent. (A-228; A-372);

(6)     Dempsey, being dissatisfied with the trial board/Superintendent's decision, availed herself of her right to appeal and, while the violation was upheld, Dempsey got her penalty reduced to demotion, probation and suspension of time.  (A-228-29; A-375-80).

There is not a shred of evidence in the record of this case that any person involved with Dempsey's discipline acted in an improper or gender-biased manner, or that Dempsey was deprived of any rights in connection with the regular, statutorily and procedurally established manner in which the charges against her were adjudicated.

C.    **The State Had A Legitimate Non-Discriminatory Reason to Demote and Otherwise Discipline Dempsey for her Misconduct—Making False Statements to Troopers Effecting An Emergency Response and Criminal Investigation on Her Behalf.**

Even assuming *arguendo* Dempsey had established a *prima facie* case of gender discrimination (which she did not), the State employer has "articulated a legitimate, non-discriminatory reason" for disciplinary action taken against Dempsey.  Maull, *supra*, 141 F. Supp. 2d at 482.  Under the McDonnell Douglas burden shifting framework, once the employer articulates a legitimate, non-discriminatory reason for its action, the presumption of discrimination which would

_____

7 "An inference of discrimination is less plausible when the decision-maker is a member of the same protected class as the plaintiff."  Taylor v. Proctor and Gamble, 184 F.Supp. 2d 402, 413 (D.Del. 2002).

have arisen had Dempsey established a *prima facie* case "drops away." Proctor and Gamble, *supra*,

184 F.Supp. 2d at 408-09. Here, there can be no doubt that the trial board's articulated rationale for

the decision it made to terminate Dempsey following her hearing (a penalty ultimately reduced by the

Secretary to demotion), was legitimate and non-discriminatory. The Board wrote:

> When a police officer lies and withholds material information during a criminal
> investigation, it violates the public trust and has enormous consequences for the
> criminal justice system. In a letter dated February 3, 1998 to [former DSP Colonel]
> Attorney General M. Jane Brady wrote that [caselaw] require[s] the disclosure (as
> Brady materials) of any information . . . that might be relevant to an officer's
> credibility. . . . This constitutional requirement seriously compromises Dempsey from
> ever testifying as a witness in a criminal case.

(A-370).

Certainly, the reliance on the former-Attorney General's letter about police officer credibility

and Brady material[8], which was written five years before the incident in question constitutes a

legitimate basis for the trial board's decision. Given the State's articulation of this legitimate, non-

discriminatory reason, the McDonnell Douglas test provides that the burden shifts back to the

Plaintiff to proffer sufficient evidence for a fact-finder to conclude that the legitimate, non-

discriminatory reason was not true, but was actually a "pretext" for illegal discrimination. Proctor

and Gamble, 184 F.Supp. 2d at 408-09. Moreover, it is not enough that the fact-finder disbelieve the

employer's reason—there must still be sufficient evidence for a reasonable fact-finder to believe that

*intentional discrimination* (here, gender discrimination) was the motivation for the adverse

employment action. Id.

---

8 Brady v. Maryland, 373 U.S. 83 (1963).

### D.     There Is No Evidence In The Record By Which A Reasonable Fact-finder Could Find that the Disciplinary Action Taken Against Corporal Dempsey for Making False Statements Was A Pretext For Gender Discrimination.

As discussed above, to avoid summary judgment, the plaintiff must point to some "record evidence from which a factfinder could reasonably either disbelieve the proffered [legitimate] reason, or believe that an invidious discriminatory reason was more likely than not a motivating or determinative factor in the disciplinary decision." <u>Shirley</u>, *supra* at *5. It is obviously insufficient to simply show that the disciplined Plaintiff is a member of a protected class. <u>Id</u>. There is not a shred of evidence in the record in this case that any decisionmaker at DSP, including the members of the trial board, who imposed Dempsey's initial discipline, acted with invidious intent to engage in gender discrimination. Plaintiff cannot rely on her purported "comparators" as pretext evidence as, not being similarly situated, they do not establish a *prima facie* case of discrimination (the first prong of <u>McDonnell Douglas</u>). At the pretext level, the test is even more stringent, and Plaintiff's purported "comparator" evidence must therefore fail to meet her "pretext" burden also. *See* <u>Maull</u>, 141 F. Supp. 2d at 483.

The only other argument Plaintiff appears to make is her claim that Captain Hawkins and Major Hughes did not abide by DSP policy in terms of the reporting of domestic incidents involving troopers, suggesting that some discrimination might be inferred from this fact. Both of these troopers admit that they did not properly follow the policy, and both accepted discipline for that mistake. However, Plaintiff's reliance on a "failure to follow policy" theory must fail in this case because of the complete lack of evidence that the failure to follow policy was the result of gender-based animus, or was gender-based in any way at all. Evidence that a Defendant failed to follow its disciplinary policies (and the policy in question here is not a "disciplinary" policy) is only sufficient to establish pretext when such evidence comes with a backdrop suggesting [class-based] animus.

24

Proctor and Gamble, 184 F.Supp. 2d at 416 (*citing* Maull).  It is also worth noting that the Trial Board found that the evidentiary record before it was insufficient to conclude that the relationship between Maher and Dempsey would have triggered the domestic violence laws or the DSP domestic incident reporting policy.  (A-366-67).

The facts of the case are that a male trooper (Maher) and a female trooper (Dempsey) were in a dating relationship when the October 26, 2003 incident occurred.  There can be no doubt that both Maher and Dempsey both wanted the embarrassing October 26, 2003 incident to be closed and done with—Dempsey perhaps more so because, unlike Maher, she had not been honest with her employer about her role in it.  Plaintiff herself admits that she told Captain Hawkins the day of or after the October 26, 2003 incident, that she did not want any further action taken by DSP with regard to the incident.  (A-182).  She said the same thing to the criminal investigator when the matter was reopened in April 2004.  (A-399).

Brian Maher testified about Dempsey's desire that the matter remain closed, and her happiness that that was the case until Captain Dixon learned about it in April 2004:

> Q.  . . .  When [the incident] was reopened in March or April of 2004, were you still dating?
> A.  Yes.
> Q.  At any point during those six months or so, did Christy ever express concern that not enough had been done with regard to the incident?
> A.  No.
> Q.  Or that she wanted the state police to do something they hadn't done with regard to the incident?
> A.  No.
> Q.  Was it your impression that she was satisfied with how it had played out?
> A.  At that point?
> Q.  At that point.
> A.  Yes.

*        *        *        *        *

Q.   Now, when you heard this investigation, your investigation was going to be reopened in March or April of 2004, did you discuss this with Christy?
A.   Yes.
Q.   Did she appear to want the investigation to be reopened at that point?
A.   No.
Q.   Was she upset?
A.   Yes.
Q.   Can you describe the conversation you had with her about it?
A.   To the best of my recollection, her and I both wanted this to be over with and done with.  We continued to see each other.  I know she didn't want people to pry into her personal life and this to be a public issue, meaning divisionally.  So I know that we -- her wishes and my wishes at the time were that it just be over with and that we could carry on with our lives.

(A-88, 91-92).

To the extent DSP management initially acceded to the wishes of the troopers and did not take further action with regard to the incident, it certainly inured to the benefit of both Maher and Dempsey—male and female—equally.  The fatal flaw in Dempsey's case is that there is no evidence whatsoever in the record to support an inference that any of the decision-makers in her disciplinary action harbored any gender-based animus toward Dempsey, not to mention the fact that the supervisors who reviewed the October 26, 2003 incident acted specifically in accordance with Plaintiff's wishes.

Dempsey's claim also ignores the many procedural safeguards, checks and balances and variety of decision makers in the DSP disciplinary system which would defeat any attempt at pretext discrimination.  Dempsey's case was investigated by an impartial Internal Affairs investigator; the concluded investigation was reviewed at case review by the Lt. Colonel with legal counsel; Dempsey elected to have her charges be heard by a three-member impartial Divisional Trial Board, which heard the evidence in an adversarial process where Dempsey was represented by counsel and had the opportunity to present evidence and cross-examine witnesses.  The Trial Board made unanimous findings of fact and conclusions of law that Dempsey was guilty of making false statements

regarding the reporting and investigation of the October 26, 2003 incident. Dempsey offers no evidence to suggest that any of the three members of her Trial Board harbored a gender-based animus. Dempsey offers no evidence to infer that Acting-Colonel MacLeish, who reviewed and concurred in the trial board's findings and recommended penalty, was prejudiced. Finally, Dempsey offers no evidence from which one could infer that the ultimate decision-maker, Secretary Mitchell, took action on the basis of her gender, in imposing the final disciplinary action. Indeed, on appeal to Secretary Mitchell, Dempsey's penalty was reduced from termination to demotion, probation and suspension. Clearly, for Dempsey, the procedural process worked, and worked a final outcome to her benefit.

### E.    Summary Judgment Must Be Granted On The Issue Of Damages, As Plaintiff Has Suffered No Loss Of Back Pay For Which Title VII Damages Could Be Awarded.

In addition to the failure of Plaintiff's case at every prong of the McDonnell Douglas test, there is no evidence in the record by which a reasonable fact finder could award damages, even if liability existed. A Title VII plaintiff, upon a finding of liability, may receive back pay and/or injunctive relief (which is not requested here), along with compensation for certain other actual damages for which plaintiff provides proof. 42 U.S.C. §2000e-2(g); 42 U.S.C. §1981a. Following the Superintendent's decision to accept the Trial Board's recommended penalty of termination, Dempsey was suspended without pay pending her appeal to the Secretary.[9] (A-372). When the Secretary reduced Dempsey's penalty, she was owed back pay for the time period of that suspension. DSP has fully compensated Dempsey for all back pay owed, including adjusting for the corrected dates of her demotion, which was part of the penalty imposed by the Secretary. (See A-240-42). Since that time, Dempsey has remained employed with DSP at full rank, so there have been no lost

wages.  Plaintiff has adduced no evidence of any actual damages in this case beyond the (temporary) back pay loss, which has since been compensated.  In short, Dempsey has been made entirely financially whole in this matter.

It is well-settled that punitive damages are not available under Title VII as to government employers.  42 U.S.C. §1981a(b)(1); *see also* <u>Protos v. Volkswagen of America, Inc.</u> 797 F.2d 129, 138-39 (3d Cir. 1986), *cert denied*, 479 U.S. 972 (1986).  Thus, to the extent Plaintiff requests punitive damages in her Complaint, they are not available to her under Title VII against her State government employer, and therefore could not be awarded by a jury.  Thus, summary judgment for Defendant on the issue of damages is also appropriate.

## II. SUMMARY JUDGMENT MUST BE GRANTED AS TO COUNT II, A STATE LAW CLAIM, AS THIS COURT IS WITHOUT JURISDICTION OVER THIS CLAIM, AND IT WOULD BE BARRED IN ANY EVENT UNDER DELAWARE STATE LAW.

In Count II of her Complaint, Plaintiff attempts to make a claim for "breach of the covenant of good faith and fair dealing."  This is a claim which would sound, if at all, in State law.  Given that Plaintiff's employer in this case is the State of Delaware, the Eleventh Amendment would also bar this court from assuming jurisdiction over the claim, even as a pendent matter.  "The Eleventh Amendment limits federal judicial power to entertain lawsuits against a State and, in the absence of congressional abrogation or consent, a suit against a state agency [in federal court] is proscribed."  <u>Neeley v. Samis</u>, 183 F. Supp. 2d 672, 678 (D. Del. 2002).  Even if the Eleventh Amendment did not bar this Court's assumption of jurisdiction, the Court should decline to do so for reasons of judicial economy and the primacy of state court jurisdiction over state law claims.  To the extent the Court finds that no federal constitutional claim is stated against the State employer, the Court should

---

9 Dempsey was never, at any point, actually terminated/separated from the Division of State Police.

decline to exercise supplemental jurisdiction over purely state law claims, including the state law "wrongful death" claim.  28 U.S.C. §1367(c)(3); <u>Bonenberger v. Plymouth Township</u>, 132 F.3d 20 (3d Cir. 1997).

Furthermore, even in State Court, Plaintiff's claim for breach would be barred by the exclusivity provision of Delaware's workers' compensation law.  19 <u>Del.C.</u> §2304 provides that an employee may not sue her employer for injury arising out of the course and scope of employment except through the administrative mechanisms established by the Delaware Workers' Compensation Act.

## **CONCLUSION**

For the foregoing reasons, there are no genuine issues of material fact and no basis upon which a reasonable fact-finder could find in Plaintiff's favor on her Title VII claim for gender discrimination.  Nor can or should this Court exercise jurisdiction over Plaintiff's purported state law "breach of covenant" claim.  The Defendant/Employer, State of Delaware/Division of State Police is therefore entitled to judgment as a matter of law as to all claims asserted against it in this action.

State Defendant respectfully requests this Honorable Court grant Summary Judgment in its favor as to all Counts, pursuant to Rule 56(c).

**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**


By:___/s/ Stephani J. Ballard_____
STEPHANI J. BALLARD (I.D. #3481)
Deputy Attorney General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
DATED:  January 29, 2008          **Attorney for Defendant**

30

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

ELIZABETH C. DEMPSEY,       )
                                   )
        Plaintiff,         )     Civil Action No.: 06-456 SLR
                                   )
          v.            )
                                   )
STATE OF DELAWARE,       )
DEPARTMENT OF PUBLIC SAFETY,  )
                                   )
        Defendant.     )

## <u>CERTIFICATE OF MAILING AND/OR DELIVERY</u>

The undersigned certifies that on January 29, 2008, she caused the attached, *State of Delaware's Opening Brief in Support of its Motion for Summary Judgment*, to be electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Jeffrey K. Martin, Esquire
Martin & Wilson, P.A.
1508 Pennsylvania Avenue, Suite 1C
Wilmington, DE 19806

                                      /s/ Stephani J. Ballard
                                      Stephani J. Ballard, I.D. #3481
                                      Deputy Attorney General
                                      Carvel State Office Building
                                      820 N. French Street, 6th Floor
                                      Wilmington, DE  19801
                                      (302)577-8400
                                      Attorney for Defendant

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 250044 (D.Del.)
(Cite as: Not Reported in F.Supp.)

C
Shirley v. James River Corp.
D.Del.,1996.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
William T. **SHIRLEY**, Jr., Plaintiff,
v.
**JAMES RIVER** CORPORATION, a Delaware/
Nevada Corporation, Defendant.
No. CIV.A. 95-14 MMS.

April 11, 1996.

Michael P. Maguire, Wilmington, Delaware; for plaintiff.
Sheldon N. Sandler, and Omar Y. McNeill, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; for defendant.

*MEMORANDUM OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

### I. INTRODUCTION

*1 Plaintiff William T. Shirley ("Shirley" or "plaintiff") has filed suit against defendant James River Corporation ("James River" or "defendant"), alleging he was discriminated against because of his race in violation of Title VII, 42 U.S.C. 2000e*et seq.*. Plaintiff alleges that defendant subjected him to disciplinary action more severe than that imposed on a white co-worker for allegedly similar misconduct. In response to plaintiff's Title VII claim, defendant moved for summary judgment. Docket Item ("D.I.") 16.

On April 10, 1996, the Court entertained oral argument on defendant's motion. For the reasons that follow, the Court will grant James River's motion for summary judgment.

### II. FACTUAL BACKGROUND

The facts in this suit are essentially undisputed. Plaintiff, an African-American male, was hired by James River in August, 1989. Appendix to Defendant's Opening Brief, D.I. 18, Deposition of William T. Shirley, A2. On September 3, 1993, plaintiff and a co-worker, Kevin Burbage ("Burbage"), were in the break room at James River's New Castle County facility. *Id.* at A16.As plaintiff walked past Burbage, who was seated at a table, Burbage warned, "watch out for the flying beer cans."*Id.* at A3. This comment, a reference to a previous incident involving plaintiff and another employee, did not amuse plaintiff. *Id.* Plaintiff returned to where Burbage was seated, and as he addressed Burbage, he "plucked" a paper cup situated on the table in front of Burbage. *Id.* at A4. Water from the cup splashed on Burbage. *Id.* at A4-5.

Plaintiff turned and exited the break room as Burbage shouted a retort. Burbage followed plaintiff onto the production floor and ultimately threw a can of iced tea towards plaintiff, which landed at plaintiff's feet. *Id.* at A6-8. After a heated verbal exchange, Burbage spit on plaintiff before retreating to a different area. *Id.* at A6-11. After a short while, Burbage returned and attempted to conciliate; plaintiff refused Burbage's attempt to shake hands and apologize. *Id.* at A14-15.Plaintiff, who remained angry for the rest of his shift, did not register a complaint about the spitting incident with any of his supervisors. *Id.* at A18.

When he finished work that day, plaintiff stopped to have a beer with some friends. *Id.* at A17.He fumed about being spit upon for the remainder of the day, and did not sleep well that night. *Id.* at A20.Although he was not scheduled to work the next morning, he knew that Burbage was due to finish his shift at 7 a.m. *Id.* at A23.Plaintiff located a two to three foot long pick-ax handle at his home; with this weapon in hand, he decided to drive to the James River facility and wait for Burbage by the employee exit. *Id.* His sole aim was to attack Burbage. *Id.* at A22.

When Burbage came out, plaintiff called to him and said, "you are never going to spit on nobody

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 250044 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Page 2

again."*Id.* at A23.Plaintiff immediately started beating Burbage with the ax handle, hitting him on the legs and back six or seven times until Burbage fell to the ground. *Id.* at A24-25.Plaintiff then fled the scene. *Id.* at A27-28.Burbage was transported to a hospital emergency room because of the attack. D.I. 18, Affidavit of Deborah Stauffer at ¶ 2. Ultimately, plaintiff turned himself in to the police, was convicted of several assault-related offenses, and received a two year sentence of probation as his punishment. D.I. 18, Shirley Deposition at A30-31.

**\*2** James River viewed plaintiff's assault on Burbage as a premeditated, vicious and repeated attack with a dangerous weapon. D.I. 18, Stauffer Affidavit at ¶ 5. According to James River, this was the first violent act of one employee attacking and hitting another with a dangerous weapon. *Id.* Because of the attack, James River terminated plaintiff on September 17, 1993.*Id.* at 2. This was the first time plaintiff was disciplined for anything. D.I. 22, Affidavit of William T. Shirley at ¶ 6. In his deposition, plaintiff admitted that his termination was not unexpected, and that his attack on Burbage was a more "severe" act than Burbage's spitting on him. D.I. 18 at A-34.

James River also suspended Burbage for thirty days without pay for spitting on and throwing the beverage can at plaintiff. *Id.* at ¶ 4. A thirty day suspension is the most severe form of discipline meted out by James River, except for termination. *Id.* Because Burbage had prior disciplinary problems, James River also made Burbage's return to work contingent upon an assessment and, if warranted, treatment by a psychologist. *Id.*

Burbage's disciplinary problems lie at the core of plaintiff's discrimination suit. The record shows that starting in 1986, Burbage clashed several times with his co-workers. In November, 1986, he was suspended for three days for horseplaying while he and a fellow worker were each driving a forklift. Appendix to Plaintiff's Answer Brief, D.I. 22 at 6. In September, 1988, he engaged in a shoving match with a black employee and both were suspended.*Id.* at 8. In 1992, Burbage also harassed a female employee by running a press machine at high speed while offering no assistance and verbally insulting her. *Id.* at 5, 22.He was counseled for his behavior. *Id.* Finally, Burbage engaged in a unwitnessed confrontation with another employee, the true facts of which have never been resolved. Burbage accused his co-worker of wielding a knife at him and the co-worker accused Burbage of similarly wielding a machine shaft; both denied these allegations. After both employees were threatened with disciplinary suspension, Burbage and the other employee apologized and worked out their differences. *Id.* at 17.Plaintiff alleges that James River "disciplined or discharged" Burbage for his previous misbehavior, plaintiff would not have suffered Burbage's "antagonism" that provoked plaintiff to attack Burbage. Complaint, D.I. 1 at ¶ 7. Stated differently, plaintiff argues that James River sanctioned more leniently a similarly situated employee, Burbage, because he was white.

### III. ANALYSIS

#### A. Standard at Summary Judgment

Under the Federal Rules of Civil Procedure, the Court shall grant a motion for summary judgment if it determines "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed. R. Civ. P. 56(c). The moving party has the initial burden of demonstrating that it should prevail under Rule 56(c), *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986), which can be accomplished by simply pointing out to the Court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986); *see also Peters Township Sch. Dist. v. Hartford Accident & Indem. Co.,* 833 F.2d 32, 34 (3d Cir. 1987). In opposition, the nonmoving party must come forward with evidence supporting a claim that there is a genuine issue of material fact in dispute which requires resolution by the trier of fact. *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968). An issue is genuine "if the evidence is such that a reasonable jury could

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 3
Not Reported in F.Supp., 1996 WL 250044 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

return a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Where, as here, the facts are undisputed, and the issues presented are legal, rather than factual, the case may be well suited for resolution by judgment as a matter of law. Fed. R. Civ. P. 56(c); *Associated Hardware Supply Co. v. Big Wheel Distrib. Co.,* 355 F.2d 114, 199 (3d Cir. 1966).

**B. Race Discrimination under Title VII**

**\*3** Title VII prohibits discrimination in employment on the basis of race.[FN1] To prevail on his claim that a similarly situated employee was treated differently because of race, plaintiff must first "carry the initial burden under the statute of establishing a prima facie case of unlawful discrimination."*Fuentes v. Perksie,* 32 F.3d 759, 763 (3d Cir. 1994) (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)). In the absence of direct evidence of intentional discrimination, a prima facie case raises the inference that the employer's discriminatory intent motivated the action being challenged by the plaintiff. *Weldon v. Kraft, Inc.,* 896 F.2d 793, 796 (3d Cir. 1990); *Jones v. Gerwens,* 874 F.2d 1534, 1538 (11th Cir. 1989).

In *McDonnell Douglas,* the United States Supreme Court set forth the now familiar paradigm for a plaintiff to make out a prima facie case under Title VII.[FN2]Although the Court initially developed the prima facie model in the context of a discriminatory hiring claim, the Court has subsequently emphasized that the formulation is flexible and must be adapted to the particular facts at hand. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253 n.6 (1981). In a discriminatory discharge context, the Third Circuit Court of Appeals has held that a plaintiff proves a prima facie case by showing that he was fired from a job for which he was qualified while others in the racial class not protected under Title VII were treated more favorably. *See Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 638 (3d Cir. 1993); *Bellissimo v. Westinghouse Elec. Corp.,* 764 F.2d 175, 180 (3d Cir. 1985), *cert. denied,*475 U.S. 1035 (1986); *Al-*

*ston v. Rice,* 825 F.Supp. 650, 656 (D. Del. 1993). Courts have thus adapted the *McDonnell Douglas* elements to fit varied employment discrimination scenarios; some courts have even precisely defined the prima facie elements plaintiff must establish when alleging discrimination in disciplinary measures. Consideration of these cases is useful in evaluating whether others at James River, such as Kevin Burbage, were treated more favorably and disciplined less severely than plaintiff because of race.

Several circuit courts of appeal have agreed that the most important variables in the disciplinary context are the "nature of the offenses committed and the nature of the punishments imposed."*Jones,* 874 F.2d at 1539-40 (quoting *Moore v. City of Charlotte,* 754 F.2d 1100, 1105 (4th Cir.), *cert. denied,*472 U.S. 1021 (1985)); *see also Green v. Armstrong Rubber Co.,* 612 F.2d 967, 968 (5th Cir.), *cert. denied,*449 U.S. 879 (1980). When considering whether plaintiff has been disciplined more severely on the basis of race, courts have evaluated whether the plaintiff has established (1) that he is a member of the class protected under Title VII, (2) "that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees."*Cook v. CSX Transp. Corp.,* 988 F.2d 507, 511 (4th Cir. 1993).

**\*4** If plaintiff can carry his evidentiary burden by proving a prima facie case, the employer may rebut this inference of discrimination by articulating a legitimate, nondiscriminatory reason for the unfavorable employment decision.*Fuentes,* 32 F.3d at 763. Once the employer introduces evidence that would permit the conclusion that there was a nondiscriminatory reason for its action, plaintiff must then show, by a preponderance of the evidence, that the employer's proffered explanation is pretextual. *Id.* At trial, the onus would be on plaintiff to convince the factfinder *both* that the reason James River proffered was false, *and* that discrimination was the real reason for its action. *Fuentes,* 32 F.3d at 763 (quoting *St. Mary's Honor*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 250044 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 4

Ctr. v. Hicks, 509 U.S. 502, 512, 113 S.Ct. 2742, 2752 (1993)). Plaintiff retains the ultimate burden at trial of proving that race discrimination played a role in James River's decisionmaking process; that is, plaintiff's being an African-American had a determinative influence on the company's decision to discipline plaintiff by firing him. See Miller v. CIGNA Corp., 47 F.3d 586, 596 (3d Cir. 1995) (in banc).

At summary judgment, however, plaintiff need not go so far. Torre v. Casio, Inc., 42 F.3d 825, 830 (3d Cir. 1994). At this preliminary stage, plaintiff may prevail by either 1) adducing evidence, circumstantial or direct, that invidious discrimination was more probable than not a determinative cause of the adverse employment decision, or 2) discrediting James River's proffered reasons, again, either by direct or circumstantial evidence. Id. In the case sub judice, plaintiff does not succeed under either avenue of proof.

Plaintiff admits that he expected to be terminated for premeditatedly beating a co-worker with a weapon. D.I. 18 at 32-33. Further, in his answering brief, he concedes that "his firing was not pretextual but was for the injury inflicted on Mr. Burbage."D.I. 21 at 5. He also admits that Burbage's spitting on him was not as severe an act as plaintiff's planned physical beating of Burbage. D.I. 18 at 34. Instead, he argues that James River's disciplinary actions against Burbage for Burbage's prior similar instances of misconduct were less severe because of his race.

James River has argued that it disciplined Burbage differently than plaintiff because Burbage's acts never rose to the egregious level of the plaintiff's misconduct. The record shows that Burbage had a history of intermittent minor disputes with other employees, each occurrence involving a different coworker, blacks and whites. Although plaintiff has alleged that Burbage's confrontations were against minorities, the record reveals Burbage was not so selective: he had two incidents involving black co-workers and three involving whites. D.I. 18, Stauffer Affidavit at ¶ 3.

Unlike plaintiff's act, none of Burbage's incidents involved premeditation or repeated blows with a weapon. Moreover, none of Burbage's actions resulted in another employee's requiring medical attention for any harm inflicted.

*5 In sorting out plaintiff's claim of disparate discipline under Title VII, the Court must balance the need to compare only discipline imposed for like offenses with the reality that the comparison will inevitably not involve exactly the same type of work-related offenses under the same sets of circumstances. Cook, 988 F.2d at 511. However, the record demonstrates that plaintiff has failed to establish that a white employee, Burbage, was treated more favorably than he. Burbage's prior instances of malfeasance simply do not equate in severity with plaintiff's; consequently, plaintiff has failed to show sufficient similarity of the seriousness of misconduct. Comparison of disciplinary measures between the two employees' dissimilar behavior, therefore, is not a valid exercise. Accordingly, the Court holds that plaintiff has failed to prove a prima facie case of racial discrimination by James River.

Even if the Court generously assumed arguendo that plaintiff carried his burden and established a prima facie case of discrimination, he would not defeat defendant's summary judgment motion. Because James River has come forward with a legitimate, nondiscriminatory reason for its disciplinary actions, the plaintiff must point to some record evidence from which a factfinder could reasonably either disbelieve the proffered reason or believe that an invidious discriminatory reason was more likely than not a motivating or determinative factor in James River's disciplinary decisions. Fuentes, 32 F.3d at 764. Plaintiff has not made the slightest attempt to do either, other than point out that plaintiff is black and Burbage is white. He has not shown any evidence raising the slightest inference of racial animus on defendant's part. After considering all of the record facts in the light most favorable to plaintiff, the Court concludes that plaintiff has not presented any evidence that James River discriminated against him by treat-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 250044 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Page 5

ing him less favorably or by treating a white fellow employee more favorably on the basis of race.

## IV. CONCLUSION

For the above stated reasons, the Court holds that plaintiff has failed to show that there are any genuine issues of material fact in this case that can only be resolved by a factfinder. Plaintiff has failed to make out a prima facie case of racial discrimination under Title VII and has similarly failed to adduce any evidence that defendant's proffered legitimate reason for its actions was unworthy of credence. He also has not pointed to any evidence from which a factfinder could reasonably conclude that race was more likely than not a motivating or determinative cause of defendant's disciplinary actions. Accordingly, summary judgment will be granted in favor of defendant. An appropriate order will be entered.

FN1. Title VII provides, in relevant part:
(a) It shall be an unlawful employment practice for an employer--
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ....
42 U.S.C. § 2000e-2.

FN2. The *McDonnell Douglas* Court opined:
The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
411 U.S. at 802.
D.Del.,1996.

Shirley v. James River Corp.
Not Reported in F.Supp., 1996 WL 250044 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.