**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ELIZABETH C. DEMPSEY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 06-456 SLR |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF DELAWARE, | ) | |
| DEPARTMENT OF PUBLIC SAFETY, | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX TO STATE OF DELAWARE'S OPENING BRIEF IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**DEPARTMENT OF JUSTICE
STATE OF DELAWARE**

STEPHANI J. BALLARD, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorney for Defendant

DATED:  January 29, 2008

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Deposition of Captain Robert C. Hawkins .......................................................................A000001

Deposition of Major Randall Hughes ............................................................................A000028

Deposition of Sergeant Michael C. Houdek ...................................................................A000045

Deposition of Brian Maher ........................................................................................A000067

Complaint dated July 27, 2006 ...................................................................................A000094

Answer of Defendant, State of Delaware Department of Public Safety dated
    September 15, 2006 ...........................................................................................A000107

Scheduling Order dated October 24, 2006......................................................................A000120

Stipulation and Order of Confidentiality dated March 21, 2007 .......................................A000124

Defendant's Responses to Plaintiff's First Set of Interrogatories dated April 9, 2007.......A000131

Defendant's Responses to Plaintiff's First Request for Admissions dated April 9, 2007 ..A000150

Defendant's Responses to Plaintiff Elizabeth C. Dempsey's First Request for
    Production of Documents dated April 9, 2007 .......................................................A000159

Plaintiff's Responses to Defendant's First Set of Requests for Admissions dated
    August 13, 2007 ...............................................................................................A000179

Plaintiff's Responses to Defendant's 1st Set of Interrogatories Directed to
    Plaintiff dated September 24, 2007......................................................................A000185

Plaintiff's Responses to Defendant's First Request for Production Directed to
    Plaintiff dated September 24, 2007......................................................................A000197

Order Amending Scheduling Order dated November 9, 2007 ..........................................A000203

## DOCUMENTS PRODUCED BY DEFENDANT IN DISCOVERY

Delaware State Police Rules and Regulations .................................................................A000205

Delaware State Police Complaint and Disciplinary Procedures ........................................A000214

Delaware State Police Transfer Policy ..........................................................................A000231

Personnel File and Demotion Documents for Elizabeth C. Dempsey ...............................A000233

Crime and Investigation Reports for October 26, 2003 Incident........................................A000248

Final Dispositions from Internal Affairs Case Number 12-04............................................A000273

Internal Affairs documents for Sergeant Charles R. Mullett, Lt. Gregory W.
    Donaway, Sergeant Michael Houdek, Major Randall L. Hughes,
    Captain Robert C. Hawkins  ...................................................................................A000286

Internal Affairs Documents for Cpl/3 Brian D. Maher......................................................A000312

Results of Superintendent's Hearing for Cpl/3 Brian D. Maher.........................................A000326

Final Disposition of Internal Affairs Case Number 12-04 for Cpl/3 Brian D. Maher........A000328

Internal Affairs Documents for Cpl. Elizabeth C. Dempsey ..............................................A000331

Final Disposition of Internal Affairs Case Number 12-04 for Cpl. Elizabeth C.
    Dempsey ...............................................................................................................A000342

Correspondence regarding Trial Board for Elizabeth C. Dempsey ...................................A000344

Decision of Divisional Trial Board in the matter of Corporal
    Elizabeth C. Dempsey...........................................................................................A000353

Letter from M. Jane Brady, Attorney General to Colonel Alan D. Ellingsworth,
    Dated February 3, 1998, re: Disclosure of Internal Affairs Investigations.............A000373

E-mail from James Paige re: Results of Divisional Hearing for Cpl.
    Elizabeth C. Dempsey...........................................................................................A000374

Letter from Robert C. McDonald, Esq. re: Elizabeth C. Dempsey's appeal
    from the findings of the Trial Board .....................................................................A000375

Letter from William G. Bush, IV re: Oral arguments for Corporal Dempsey's
    appeal ...................................................................................................................A000376

Secretary's Decision on Appeal........................................................................................A000377

E-mail from Captain Paul Smentkowski re: Duty Status
    for TFC Elizabeth C. Dempsey..............................................................................A000381

EEOC Charge of Discrimination filed by Elizabeth C. Dempsey .....................................A000382

No Cause Finding and Right to Sue Notice.......................................................................A000384

Transcript of Dempsey 911 calls ..................................................................A000385

Sgt. Hudson's Interview of Elizabeth C. Dempsey ...........................................A000389

Internal Affairs Interview of Kevin A. Keller .................................................A000401

Internal Affairs Interview of Alexander Argo .................................................A000451

Internal Affairs Interview of Walter Gygrynuk ...............................................A000476

Internal Affairs Interview of Mark K. Csapo..................................................A000504

Delaware State Police Trial Board Testimony of Elizabeth C. Dempsey,
    January 13, 2005 ....................................................................................A000527

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

ELIZABETH C. DEMPSEY,                )
                                     )
        Plaintiff,                   )        Civil Action No.: 06-456 SLR
                                     )
            v.                       )
                                     )
STATE OF DELAWARE,                   )
DEPARTMENT OF PUBLIC SAFETY,         )
                                     )
        Defendant.                   )

## CERTIFICATE OF MAILING AND/OR DELIVERY

The undersigned certifies that on January 29, 2008, she caused the attached, *Appendix to State of Delaware's Opening Brief in Support of its Motion for Summary Judgment*, to be electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Jeffrey K. Martin, Esquire
Martin & Wilson, P.A.
1508 Pennsylvania Avenue, Suite 1C
Wilmington, DE 19806

                        /s/ Stephani J. Ballard
                        Stephani J. Ballard, I.D. #3481
                        Deputy Attorney General
                        Carvel State Office Building
                        820 N. French Street, 6th Floor
                        Wilmington, DE 19801
                        (302)577-8400
                        Attorney for Defendant



**W&F**

WILCOX & FETZER LTD.

RECEIVED
JAN 15 2008
CIVIL DIVISION

In the Matter Of:

# Dempsey

v.

# State of Delaware , Department of Public Safety

C.A .# 06-456-SLR

---

Transcript of:

Captain Robert C. Hawkins

October 11, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Dempsey v. State of Delaware , Department of Public Safety

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,            )
                                 )
            Plaintiff,           )
                                 )    Civil Action
    v.                           )    No. 06-456-SLR
                                 )
STATE OF DELAWARE, DEPARTMENT)
OF PUBLIC SAFETY,                )
                                 )
            Defendants.          )

        Deposition of CAPTAIN ROBERT C. HAWKINS taken
pursuant to notice at the law offices of Martin &
Wilson, 1508 Pennsylvania Avenue, Wilmington,
Delaware, beginning at 9:08 a.m. on Thursday,
October 11, 2007, before Lucinda M. Reeder, RDR, CRR
and Notary Public.

APPEARANCES:

        JEFFREY K. MARTIN, ESQ.
        Martin & Wilson
          1508 Pennsylvania Avenue
          Wilmington, Delaware 19806
          for the Plaintiff,

        STEPHANI J. BALLARD, ESQ.
        State of Delaware, Department of Justice
          820 N. French Street
          Wilmington, Delaware 19801
          for the Defendants.

    ALSO PRESENT:

        ELIZABETH C. DEMPSEY

- - - - - - - - - - - - - - - - - - - -

            WILCOX & FETZER, LTD.
    1330 King Street - Wilmington, Delaware  19801
              (302) 655-0477
              www.wilfet.com

Dempsey v. State of Delaware , Department of Public Safety

**2**

1    CAPTAIN ROBERT C. HAWKINS,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    BY MR. MARTIN:
6    Q.  Good morning, Captain Hawkins.
7    A.  Good morning.
8    Q.  My name is Jeff Martin, as I introduced myself
9    to you previously.  I think we've had a brief
10   conversation or two over the years on some other
11   matters.  Correct?
12   A.  Yes, sir.
13   Q.  Have you had your deposition taken before
14   today?
15   A.  Yes, sir.
16   Q.  About how many times have you had your
17   deposition taken?
18   A.  About four times involving fatal accidents,
19   mostly.
20   Q.  Were you involved with the FAIR team at all?
21   A.  No, back when I began the state police, we
22   handled -- the road trooper handled fatals.  So I
23   handled some before the fatal teams were created.
24   Q.  Well, that was quite some time ago?

**3**

1    A.  Yes, sir.  Well, they began in New Castle and
2    they worked south, Kent County, and then Sussex County
3    got them last.
4    Q.  When is the last time you had your deposition
5    taken?
6    A.  Probably early 1980s.  I am thinking in '86 I
7    had an accident involving a Perdue product, a fatal
8    accident on Route 9, and I did a deposition in Dover.
9    I think it was about 1986, I believe.
10   Q.  Well, I'm pleased to say that the deposition
11   procedure probably has not changed in that interim,
12   but given the number of years, let me just refresh
13   your recollection in terms of the rules and
14   guidelines.  Okay?
15        I'd ask you to listen very carefully to
16   each question that I ask you and provide an audible
17   response that the court reporter can take down.
18   Please try to avoid "uh-huh" or "uh-uh," which is
19   something we all lapse into from time to time.  If
20   that happens, I'll prompt you or I'm sure your
21   attorney will prompt you.
22        But as to the questions, please, listen
23   carefully to the questions and if you do not
24   understand a question, please let me know.

**4**

1    A.  Yes, sir.
2    Q.  It's not my intent to ask any trick questions,
3    and I want to make sure that my questions are clear.
4    A.  Yes, sir.
5    Q.  Okay.  So if you need to take a break at any
6    time for any reason, please do so.  You do need not
7    tell me why you need to take a break.  I realize you
8    are a commanding officer of the Delaware State Police,
9    and you may have something that may demand your urgent
10   attention, and I'll -- we'll certainly work with you
11   in that regard.
12        Other than that, again, if you have any
13   question as to procedure, now is a good time to ask me
14   or ask your attorney.
15   A.  I have testified numerous times, not in
16   depositions, but Superior Court.  I was in homicide
17   for five years, so.
18   Q.  Sir, how long have you been with the Delaware
19   State Police?
20   A.  I'm in my 26th year.
21   Q.  What was your date of entry?
22   A.  March 1st, 1982.
23   Q.  Currently, you hold the rank of captain; is
24   that correct?

**5**

1    A.  Yes, sir.
2    Q.  What is your current command?
3    A.  I'm the troop commander at Troop 3, which is
4    located just south of Camden, covers all of Kent
5    County.
6    Q.  How long have you held that command?
7    A.  I have been at that position for five and a
8    half years.
9    Q.  Before that, what were your responsibilities?
10   A.  Prior to that, I was the commander of the
11   homicide unit for five years.
12   Q.  Were you a captain at that point?
13   A.  I was a lieutenant and then I made captain
14   while I was in homicide.
15   Q.  When did you become a captain?
16   A.  In August of 2000.
17   Q.  Prior to your time in homicide --
18   A.  I was the criminal lieutenant at Troop 3.  And
19   before that, I was the detective sergeant at Troop 3.
20   Q.  Do you know the lady seated next to me?
21   A.  Yes.
22   Q.  What is her name and rank, please?
23   A.  Corporal Dempsey.  I believe she's at Troop 5
24   now.  No.  Okay.  I just got a nod, so.

2 (Pages 2 to 5)

**A000003**

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

**6**

1  Q. Okay. That's all right. I wasn't going to ask
2  you where she was. I just wanted to make sure you
3  knew who she was.
4  All right. And how long have you known
5  Corporal Dempsey?
6  A. I have known of her since she's been on the
7  job, but I have never worked with her. I have only
8  met her a couple times.
9  Q. Now, in addition to your command
10  responsibilities at Troop 3, do you have any other
11  areas of involvement with the Delaware State Police?
12  A. Formerly, I was in charge of the SCUBA Team. I
13  was a member of the SCUBA Team and in charge of that
14  for 21, 22 years. And I was the commander of the
15  tactical control unit, which is like a riot squad, for
16  three years.
17  Q. And you were commander of that?
18  A. Ended up commander. I was a squad leader and
19  then I became a commander.
20  Q. What were the years where you served in the
21  tactical control unit?
22  A. That would be from -- we went into that in '91
23  to '94.
24  Q. Did you have any involvement with the cert

**7**

1  team? Or maybe it's called sort.
2  A. Sort. No. I was asked to join that years ago,
3  but, no, I have not been on the sort team.
4  Q. Do you have any current involvements other than
5  the command of Troop 3 with the Delaware State Police?
6  A. I scuba-dive on a needs basis. I'm kind of
7  semiretired from scuba and only go out and do that
8  when needed. Last year, I recovered a body and two
9  cars for them because no other divers were available.
10  I kept all of my gear. And I was able to go out and
11  take care of three dives for them.
12  Q. Other than the command of Troop 3, do you have
13  any administrative responsibilities in addition to
14  that?
15  A. I don't think so. I don't know quite what you
16  are asking. Special units you mean?
17  Q. Special units or anything you are involved with
18  through the headquarters.
19  A. I am on the diversity council. I don't know if
20  that would qualify.
21  Q. Let me ask you about your relationship with
22  Officer Brian Maher, formerly of the Delaware State
23  Police. How long have you known officer Maher?
24  A. Brian, I met him when he joined the SCUBA Team,

**8**

1  and I believe that was around 1990. I think he and
2  Jeff Giles went to scuba school together. I think
3  that's the time. It's around there. I know I was at
4  the academy at the time. I was in charge of the unit
5  and I sent Brian and Jeff Giles to dive school in
6  Florida, Navy dive school in Florida. I believe it
7  was around 1990. So I have known him since that time.
8  Q. How large of a unit was the scuba unit in the
9  '90s?
10  A. Ten. Usually it was right around ten people.
11  Q. Did that change at all after the '90s?
12  A. It's up to 12 now, but that's really the last
13  couple years. It got bumped up to 12.
14  Q. What was the average length of time, if there
15  was any, for participation on the SCUBA Team, let's
16  say, in the last five years?
17  A. People that like it stay in for probably 15 to
18  20 years. People that don't like it, do their minimum
19  five years and get out. The Delaware water is very
20  claustrophobic. It's very dark water. So if you are
21  claustrophobic, you don't like it, and those guys get
22  out quickly. The rest of us stay in. Most of the
23  guys stay in a long time.
24  Q. How long did Brian Maher stay in it, to the

**9**

1  best of your knowledge?
2  A. He was in it from 1990 until he retired.
3  Q. Do you recall when that was?
4  A. That was this year, this past year, I believe.
5  Q. Now, let me go back and ask you in terms of:
6  What is the time commitment per week or per month for
7  the SCUBA Team?
8  A. You have two training dives per month on a busy
9  year. On a busy year, you'll have 40 dives per year.
10  Not every diver makes every dive. So you are expected
11  to be at at least half of the training dives. That
12  would be 12. A good diver makes 20 to 30 dives a
13  year. If you make less than 12, then we talk to you
14  about whether you -- what kind of commitment your
15  level and whether we're going to rotate you out of the
16  unit.
17  Q. What was your understanding as to Brian Maher's
18  involvement for those number of years he was involved?
19  A. He was -- other than the year he went to
20  paramedic school -- that year he was kind of tabled
21  and wasn't member of the unit for that year -- other
22  than that, he was a pretty active diver.
23  Q. How would you describe the amount of
24  camaraderie if any among the SCUBA Team members?

3 (Pages 6 to 9)

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

**10**

1  A.  It's a close-knit unit because of the
2  conditions.  The Navy dive school is a tough place to
3  get through, and after you graduate from that, it's a
4  pretty close bond.
5  Q.  You mentioned before the five-year commitment.
6  What did you mean by that?
7  A.  When a trooper becomes a diver, we ask for a
8  five-year commitment from them.  And, basically, to
9  reimburse the State for the amount of money that we
10  spend to get them trained, to buy the equipment,
11  things like that, trying to get your money back, so to
12  speak, and -- but what we found is the ones that are
13  claustrophobic didn't like it and they weren't very
14  good divers.  We called them surface divers because
15  they didn't like to go down into the bottom, so we
16  really let them go.  I let one go before five years
17  because he just wasn't a good diver.
18  Q.  What kind of financial compensation is
19  available for the scuba --
20  A.  A scuba diver gets an additional $900 a year
21  pay.
22  Q.  One thing I failed to mention to you, and I
23  think it may be helpful for our purposes going forward
24  in this deposition.  Please make sure that I complete

**11**

1  my question.
2  A.  Yes, sir.
3  Q.  And maybe take a moment before you respond.
4  And I'll try to do the same.  It's not just a matter
5  of courtesy between the two of us, but, rather, our
6  court reporter will start to let us know that she may
7  not be able to follow our conversation.  Okay.  So,
8  I'm sorry.  You said something about 900?
9  A.  I think it's $37.50 a pay, which equals 900 a
10  year.
11  Q.  So I take it people are not really doing it for
12  the financial gain?
13  A.  No, sir.
14  Q.  Captain, how would you describe your
15  relationship with Brian Maher?
16  A.  As a fellow diver, I like Brian, yeah.  I'm --
17  Q.  Did you --
18  A.  I'm not a -- Brian is more of a party person
19  than I am.  I don't drink.  I don't smoke.  I have got
20  three kids.  And I am a homebody.  So I don't do a lot
21  of extracurricular with he or any other trooper.  But
22  as a member of the dive team, I liked him.
23  Q.  Do you consider Brian Maher a personal friend?
24  A.  Yes.

**12**

1  Q.  Captain, I am going to turn now to the events
2  surrounding an incident that occurred on either
3  October 25th or October 26th, 2003.  Did you become
4  aware of any incident that was reported to you?
5  A.  Yes, sir.
6  Q.  How did you become aware?
7  A.  I was working the Del State University
8  homecoming weekend, which the State Police and the
9  Dover Police assisted Delaware State University Police
10  on.  The night in question, I believe we had a rap
11  concert, and we had had a large fight.  And I was on
12  the inside lobby and I got a cell phone call.  I
13  couldn't hear on the inside.  So I had -- whoever -- I
14  couldn't tell who it was.  I didn't recognize the
15  number.  And I said, "Hold on a minute; I am going to
16  go outside and talk to you."  So I walked out into the
17  common area at the college, and I said, "Who is this?"
18  And he says, "This is Brian."  He says, "I want to let
19  you know that I fucked up in your county."  And I
20  said, "What are you talking about?"  And --
21  Q.  Excuse me.  Let me stop you for a moment.  When
22  he identified himself, he identified himself only as
23  "Brian"?
24  A.  As "Brian."

**13**

1  Q.  Okay.  And you knew that that was Brian Maher?
2  A.  I had to -- actually, I had to think for a
3  minute, and I thought what are your talk -- I said,
4  "What are you talking about?"  And he explained to me
5  he was -- had been seeing Corporal Dempsey, which I
6  didn't know that.  And then I asked, well -- and he
7  said he had broke a window at her house.  I said,
8  "Well, where does she live?"  And he said,
9  "Frederica."  And I said -- I said, "Are you on this
10  number?"  Because it wasn't a great connection.  And I
11  had the cell phone, so I had the number there.  He
12  said, "Yeah."  I said, "All right.  I'll call you if I
13  need you.  Let me find out what's going on."  And I
14  hung up with him.
15  Q.  Did you have any understanding at that point as
16  to why he contacted you?
17  A.  No.  I mean, normally, I'd be home in bed at
18  2:00 in the morning, but I was working.  He called me,
19  I don't know, just to let me know that he'd screwed
20  up.
21  Q.  Did you have an understanding that he contacted
22  you because you were the troop commander of the area
23  where this matter occurred?
24  A.  Yeah, I mean, that's, yeah -- yes, sir.

4 (Pages 10 to 13)

**A000005**

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

14

1  Q. So that was the extent of the first telephone
2  conversation?
3  A. It was not a great connection, and I was just
4  trying to figure out what was going on. And I just
5  asked him those few questions. Basically, I had to
6  figure out what's going on. And then I got off the
7  phone with him and I called the troop.
8  Q. All right. And you called troop -- which
9  troop?
10  A. Troop 3.
11  Q. With whom did you speak?
12  A. I talked to Sergeant Mike Houdek, who was the
13  on -- the shift commander for that shift.
14  Q. By the way, what shift are you referring to?
15  A. Mike is on -- that was on the night shift. I
16  am trying to think. You need his -- he's on C shift.
17  Q. Right.
18  A. I believe it's C shift.
19  Q. What I did not ask you was: At the time you
20  received the call while you were at DSU, what was the
21  approximate time, if you recall?
22  A. About 2:00 in the morning.
23  Q. So immediately after you received a call from
24  Brian Maher, you called Sergeant Houdek; is that

15

1  correct?
2  A. Yes, sir.
3  Q. You found him at the troop?
4  A. Correct.
5  Q. What did you relate to Sergeant Houdek?
6  A. I said, "Mike, what's going on?" I said, "What
7  do we got?" Do we have something at Dempsey's house?"
8  He said, "Yeah." And I said, "What is it?" He said,
9  "Supposedly some guy was trying to break in. Looks
10  like a burglary. Got called in. I got three guys
11  down there." And one of them had called him back,
12  said something doesn't seem right, kind of screwed up.
13       And I called, and I said, "All right, let
14  me know when you hear something back." I think I
15  spoke to Mike again later, a little bit later, and we
16  talked about it. And he was saying that there was a
17  guy there, who was a cop in Texas, I believe, and
18  relayed just that there was possibly -- they named a
19  trooper by the name of Bobby. This guy said a guy
20  named Bobby may have been -- was the guy that broke
21  this window. I said, "Mike, have Csapo do the report;
22  put it on my desk."
23       Detective Mark Csapo. Well, he was
24  corporal then. He's a detective now.

16

1  Q. Let me go back and try to understand your
2  conversation with Sergeant Houdek. You initially, as
3  I understand it, asked him what was going on.
4  Correct?
5  A. Correct.
6  Q. All the while knowing that, you know, Maher had
7  just called you and reported to you what had happened;
8  correct?
9  A. Correct.
10  Q. All right. Houdek told you it was at Dempsey's
11  house?
12  A. Yeah. He said, "Christie Dempsey's house."
13  Q. You learned that there were three officers
14  there investigating a possible burglary; correct?
15  A. Correct.
16  Q. Did you know at that point that it was not a
17  burglary?
18  A. No, I didn't -- I didn't really know what it
19  was. I was just trying to -- Mike was -- he wasn't
20  there. Mike was telling me what his guys were telling
21  him because --
22  Q. Excuse me. "Mike" being Houdek?
23  A. Mike Houdek. I'm sorry.
24  Q. Go ahead.

17

1  A. Mike wasn't there. He had Walter Gygrynuk,
2  Mark Csapo and Alex Argo, were all there. Because
3  when a police officer calls in a problem, we're going
4  to get some folks there ASAP, and they did. And Mike
5  was just saying that he had a -- there was -- he was
6  kind of filling me in from what he was getting from
7  his guys at the scene. So then I said, "Find out what
8  you got." Ad I think he either called me back or I
9  call him back about a half hour later. Because we
10  still were working DSU.
11  Q. So you spoke with Houdek again in about a half
12  hour after that?
13  A. I believe it was about a half hour later we
14  spoke. I am not sure if I called him or if he called
15  me.
16  Q. Didn't Houdek tell you that there was a report
17  of a broken window?
18  A. Yeah, he told me there was a window broke, yes.
19  Q. Is it fair to say that matched the description
20  that Maher had described to you?
21  A. Yes, sir.
22       In the second conversation that's -- I'm
23  sorry.
24  Q. Let me --

5  (Pages 14 to 17)

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

**18**

1   A.  Go ahead.
2   Q.  – pause here for a moment with the first, if I
3   may.
4   A.  Okay.
5   Q.  Did you report to Houdek that Maher had called
6   you.
7   A.  Yes.
8   Q.  What did you tell Houdek that Maher had
9   reported to you?
10   A.  I told him, I said, "Mike, Brian Maher just
11   called me and said he screwed up.  He said he's dating
12   Christie Dempsey, and so he's going to be involved in
13   this thing somehow."
14        And then when Mike calls me, the second
15   conversation, the officer from Texas gives a name of
16   Bobby, I think it was Bobby Truitt was the name that
17   was given.  I said, "Mike, don't put that in the
18   report because it's not going to be Bobby Truitt, it's
19   going to be Brian Maher.  He doesn't have his name
20   right."
21   Q.  This was the officer from Texas who gave the
22   incorrect name?
23   A.  He just gave the name of -- I know the name
24   Bobby, the name Bobby Truitt got given to me at some

**19**

1   point. I think it was when I was talking to Houdek.
2   I am not a hundred percent on that, but I know I got
3   that name at some point because I remember saying it's
4   not going to be Bobby Truitt, it's going to be Brian
5   Maher because he called up and already confessed to
6   it.
7   Q.  But your instructions to Houdek during that
8   second call were to not use this name Bobby; correct?
9        MS. BALLARD: Object to the form.
10   A.  No, the Bobby -- no, that went into the report,
11   the way -- what he said.  What I said to Mike is,
12   "It's not going to be him."  I didn't tell him not to
13   put it in because I know it's in the first report.  I
14   said to just have Csapo do a report, put it on my
15   desk, and we'll assign to somebody on Monday or I'll
16   take a look at it on tomorrow.  Because I went in on
17   the next day to look at it.
18   Q.  I'm a little confused here, Captain.  It's my
19   own fault here.. Go ahead.
20   A.  At some point, the name Bobby Truitt comes up.
21   I said to, "Mike, it isn't going to be Bobby Truitt."
22   Bobby Truitt is the name of another officer that works
23   down there.  I said, "That name is not going to be
24   right."  In other words, this guy says he gave him

**20**

1   that name.  I said, "It's going to be Brian Maher."
2   And Mike said, "Yeah, I know."
3        I said, But have Csapo do the report the
4   way that -- you know, whatever statement has been
5   given to him, and then we'll put -- you know, let me
6   look at the report and we'll -- and I'll take a look
7   at it tomorrow and I'll assign it to somebody.
8   Q.  Let's take a moment to look at the reports that
9   were filed in this matter.  They were previously
10   marked, the first one, the first report I believe is
11   Maher 1.  So if you would kindly -- I have one for you
12   Stephani --
13        MS. BALLARD:  Thanks.
14   Q.  -- could take a look at that.  Can you first,
15   Captain, tell us whether this is the first report that
16   was done on this matter?
17   A.  Correct. I have a copy of it, too.  I looked
18   at it.
19   Q.  Let me ask you off the topic here for a moment.
20   What did you review by way of writings before coming
21   to the deposition this morning?
22   A.  I looked over all my -- all the reports that I
23   have.
24   Q.  Are you referring to reports regarding this

**21**

1   incident?
2   A.  Correct.
3   Q.  Do you know how many reports you had to review?
4   A.  There is this one and then there is the report
5   that Robert Hudson did, Detective or Sergeant Robert
6   Hudson did.
7   Q.  So you just reviewed two reports?
8   A.  Right.
9   Q.  Back to this report for a moment, please.  This
10   report was done by Csapo; correct?
11   A.  Correct.
12   Q.  Was this the report that contained the name
13   "Bobby"?
14   A.  Yes, sir.
15   Q.  Where is that?
16   A.  Page 4.  Second line, first word.
17   Q.  And that's referring to witness 1 who was
18   identified as Kevin A. Keller; correct?
19   A.  Yes, sir.
20   Q.  On the bottom of page 3, Keller is reported to
21   having identified this perpetrator as a white male of
22   medium height with dark colored hair.  Do you see
23   where I am?
24   A.  Yes, sir.

6 (Pages 18 to 21)

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

22

1  Q. And that on the next line he said that he was
2  an acquaintance of V-1, meaning Ms. Dempsey; correct?
3  A. Yes, sir.
4  Q. And that subject was employed by Delaware State
5  Police. Do you see that?
6  A. Yes, sir.
7  Q. And then on that last line, Keller believed
8  that the subject worked at one of the southern troops
9  holding the rank of a high corporal? Do you see that?
10  A. Yes, sir.
11  Q. By the way, was that description that I have
12  just referred to, was that consistent with Brian
13  Maher's description?
14  A. Yes, but also Bobby Truitt. That's the only
15  problem. That's why it was my concern.
16  Q. Right. And your concern was that Bobby Truitt
17  not be identified as the subject of the investigation;
18  correct?
19  A. Correct.
20     MS. BALLARD: Objection to the form. You
21  can answer. I just need to place an objection for the
22  record.
23  A. Yes.
24  Q. Okay. Because at that point you knew -- well,

23

1  you knew right away that it wasn't Bobby, but it was
2  Brian Maher; correct?
3  A. Correct.
4  Q. All right. So getting back to the
5  conversations you had with Sergeant Mike Houdek after
6  you received the call from Maher. I understand that
7  you told Houdek during that first conversation that
8  Maher was involved. Is that fair to say?
9  A. Yes. I told him I got a call. I explained to
10  him the same thing I've explained this morning, the
11  phone call and what I got. And I shared that with
12  Sergeant Houdek, and he was -- you know.
13  Q. Is there any reason that Maher's report to you
14  was not included in this initial investigation?
15  A. I told the Sergeant Houdek just have Csapo do
16  the report of what he's got at the scene, make the
17  report, and I would take a look at it the next day.
18  Q. All right. And your intention was at that
19  point to make sure that it was clear that Brian Maher
20  was the subject, as he had confessed?
21  A. Yes, sir.
22  Q. Now, the second conversation, telephone
23  conversation you had with Houdek that -- early that
24  morning, what was the purpose of that?

24

1  A. Mike was giving me a little bit more
2  information from what happened. I mean, I am at DSU.
3  I don't know what's going on. And he wasn't there.
4  He was, you know, getting the information from his
5  troopers at the scene. So we both had a little more
6  information about what exactly happened. And then I
7  said -- when I heard all that transpired, that's when
8  I said, "Just have Csapo do the report, put on my
9  desk, and I'll deal with that tomorrow."
10  Q. All right. During your second conversation
11  that you had with Houdek did you discuss Brian Maher
12  any more than that?
13  A. No. Pretty much what we talked about, just
14  that I would have CI, the detectives, follow up on the
15  case after we took a look at the detectives.
16  Q. So you told Houdek during that second
17  conversation that you would have CI follow up?
18  A. That was the original plan, yes.
19  Q. Did CI ever follow up on this?
20  A. The case ended up getting turned over to
21  Sergeant Mullet, but that was after I had talked to
22  Corporal Dempsey and some other things had transpired.
23  Q. All right. Who was Mullet?
24  A. He was the detective sergeant at Troop 3.

25

1  Q. Indeed, he was part of CI?
2  A. Yes, at that time, he was in charge of persons
3  crimes.
4  Q. Now, you said that you -- was it your decision
5  to turn it over to Mullet?
6  A. That's on Monday. Now we're -- that's two --
7  Q. I understand. We're jumping ahead. There is a
8  lot to cover. While we're on that, I want to make
9  sure I --
10  A. Later, on I gave -- yeah. Actually, there was
11  a meeting, myself, Mullett, and Lieutenant Donaway.
12  And Mullett went in and -- what we call -- the reports
13  are all electronic. So he went in and grabbed the
14  report and ended up changing it electronically or
15  changing the report status.
16  Q. Mullett did?
17  A. Yes, sir.
18  Q. And that was Monday?
19  A. That was on Monday.
20  Q. We'll circle back.
21  A. All right.
22  Q. While you mentioned it, I wanted to follow up
23  at least to a degree.
24     So during the second conversation with

7 (Pages 22 to 25)

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

---

**26**

1  Houdek early Sunday morning, you told him at that
2  point your plan was to have CI follow up?
3  A. Correct.
4  Q. Correct?
5  A. Yes, sir.
6  Q. Now, by the time you had that second
7  conversation with Houdek, and I think you gave an
8  approximation of about 30 minutes from the first time,
9  had you had any further contact with Brian Maher?
10  A. No, sir.
11  Q. Okay. When is the next time, if at all, that
12  you had contact with Brian Maher?
13  A. He called me on Sunday morning, probably
14  10:00'ish, around -- I went home and got some sleep
15  after DSU -- when I was up.
16  Q. Is it your recollection that you had only one
17  conversation with Maher after the incident rather than
18  two?
19  MS. BALLARD: Objection to the form.
20  A. At this point, I just remember talking to him
21  once.
22  Q. Okay.
23  A. I mean, if I ....
24  Q. In that one conversation you had with Maher,

---

**27**

1  you told him that you would look into the situation;
2  correct?
3  A. Yes, sir.
4  Q. Did you, essentially, tell him, go home and
5  we'll get back to you on this?
6  A. I asked him if he was going to be at this cell
7  phone number.
8  Q. Did he ask you at all as to what he needed to
9  do?
10  A. No, he didn't.
11  Q. So was it assumed that he would just go about
12  his business and that you would contact him when
13  appropriate?
14  A. I knew I needed to look into what we had. I
15  didn't know what I had when I was talking to him at
16  Del State.
17  Q. Why is it that you didn't know what you had?
18  A. Well, I had him calling me out of the blue
19  telling me he had done something. And I didn't even
20  know what had transpired at that point. So I wanted
21  to see, look at some reports and see what we had. And
22  that's why I called Sergeant Houdek and went into work
23  the next day to read the reports and everything.
24  Q. But according to Maher's conversation with you,

---

**28**

1  he told you he was at Christie Dempsey's and he broke
2  a window; correct?
3  A. Correct.
4  Q. Did you ever learn anything different from what
5  he initially reported to you?
6  A. From him?
7  Q. From him or from anyone else.
8  A. Just reading the reports that, you know, it may
9  have been more than just breaking a window. There
10  were some threats, there were some shouts being made,
11  things like that. That wasn't relayed to me. Reading
12  all the reports.
13  Q. Did you ever have an impression that the
14  so-called threats or shouts were actionable?
15  MS. BALLARD: Objection to the form.
16  A. Sir?
17  Q. Were actionable. Were a potential cause of
18  action for the Delaware State Police.
19  A. It was all a part of the -- it was all part of
20  the crime, potentially.
21  Q. When was it that you learned that this was a
22  domestic incident?
23  A. When I read the reports the next day.
24  Q. Did you --

---

**29**

1  A. I mean, I assumed that night that it was a
2  domestic. I mean, breaking out a window, something is
3  going on, you know.
4  Q. So you went in that next morning and read what
5  was marked as Maher Exhibit 1; correct?
6  A. Correct.
7  Q. Did you discuss that with anybody after you
8  read the report?
9  A. I read the report. I had talked to him in the
10  morning. When I talked to Maher, he calls me on the
11  cell and explained to me that this was a big
12  misunderstanding, that he and Corporal Dempsey were
13  seeing each other, and it was a big misunderstanding,
14  and he was present at the location, was presently
15  going to fix the window. I think he was going to Home
16  Depot to get the materials to repair the window at
17  that point.
18  I think I gave him a good chewing out on
19  the phone that morning at that time. And I
20  think, I believe I asked for Corporal Dempsey's phone,
21  phone numbers.
22  At that point, I went into the troop, read
23  this report, and I gave -- I believe I gave her a
24  phone call at some point, probably midday on Sunday.

---

8 (Pages 26 to 29)

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

30

1  It might have been the afternoon.
2    Q.  Given your understanding that this was a
3  domestic incident, what were your responsibilities, if
4  any, to report this or make sure it was investigated?
5    A.  Well, any domestic -- I mean, since this
6  incident, we have very specific guidelines on what we
7  have to do if a trooper is involved in a domestic. It
8  was sent down after this.
9        At this point, I was treating
10  Corporal Dempsey and Corporal Maher as I could,
11  regular citizens and I called her to get, to find out
12  what she wanted done with this case. We had a
13  conversation about that.
14    Q.  When you called her, what is it that she told
15  you?
16    A.  She said that -- kind of echoed Corporal Maher,
17  that she didn't want anything done, it was a
18  misunderstanding.
19        I explained to her that I can do everything
20  from arrest him to call him up and tell him to never
21  see you again, never bother you again, and -- you
22  know, it's a range. I said, I'll give you from the
23  range of having him arrested to I can call him, you
24  know, and have him -- that he never talks to you

31

1  again. She said that was the case, it was
2  misunderstanding, they had a relationship and they
3  wanted to continue that relationship. I said, "That's
4  fine."
5        I know that I had read him the riot act,
6  probably at least once at that point. I think I did
7  it again that day. I am not sure. But I said, and if
8  it -- I remember. If that relationship at some
9  point -- I shared with her that -- in other words, if
10  it goes sour next week, you call, me and I'll still do
11  that. I know Brian. And he has screwed up here,
12  and -- you know. If that's what you want. Basically,
13  I -- I think I remember at some time I said, "The ball
14  is in your court. Tell me what you want to do and
15  we're going to do it." And she said that she -- they
16  wanted to continue the relationship, that it was a
17  misunderstanding, about everything last night had been
18  a misunderstanding, and that the window was getting
19  fixed.
20    Q.  Now, this was -- you were talking to her on her
21  cell phone on -- sometime on Sunday?
22    A.  Her cell or home phone. I am not -- I just
23  know it was over the phone.
24    Q.  How long was your telephone conversation with

32

1  Ms. Dempsey?
2    A.  I really -- maybe ten minutes.
3    Q.  Do you believe that she was being completely
4  honest with you at the time she spoke with you?
5    A.  I felt so.
6    Q.  Do you believe that she gave a full report of
7  what happened that night before?
8        MS. BALLARD:  Objection to the form.
9    A.  To the troopers at the scene or to me?
10    Q.  To you.
11    A.  Well, we didn't talk about the -- what
12  transpired. I wanted to know what she wanted to do.
13  That was the -- the basis of my conversation with her
14  was: Where do you want go with this? Because like I
15  said, it can be everything from having him locked up
16  to, you know, just talk to him. And that's -- this
17  was up to her. And this was -- the way I was looking
18  at it, she was the victim here, I needed to talk to
19  her to find out what she wanted to do, and that would
20  prompt me on what I was going to do after talking to
21  her.
22    Q.  Okay. Is there any reason why Brian Maher was
23  not identified on Maher 1?
24        MS. BALLARD:  Objection to the form.

33

1    A.  Csapo didn't even know his name. Like I said,
2  he didn't have that information. I had it because he
3  had picked up the phone and called me.
4    Q.  You had the information. You had his name.
5  You knew he was involved?
6    A.  Yes, sir.
7    Q.  And you called Sergeant Mike Houdek to report
8  that, correct?
9    A.  Yes.
10    Q.  All right. I asked you a couple moments ago
11  about the divisional policy as to how to handle
12  domestics between and among the troopers. And I
13  believe you said that the policy had been changed
14  after this incident.
15    A.  Well, it's been stressed. I don't know if it
16  changed as much as we all had memos on exactly how to
17  handle domestics within divisional members after this
18  point.
19        I'll expand on that if I can.
20    Q.  Certainly.
21    A.  When I was a criminal lieutenant and detective
22  sergeant at Troop 3 from '92 to '97, I was the de
23  facto person that went out on all the trooper-related
24  domestics. And back in those days, how you went out

9  (Pages 30 to 33)

Dempsey v. State of Delaware ., Department of Public Safety
Captain Robert C. Hawkins

**34**

1  you decide – you went out and did just what I did on
2  this case, any domestic involving a trooper. Things
3  changed a little bit. Five years I go to homicide,
4  come back. I handled it the same way we did from '92
5  to '97 on this case. And that was not the proper
6  procedure with the changes in domestic policy.
7     Q. That was not the proper procedure?
8     A. After this case, I was advised that was not the
9  way that we did it now.
10    Q. By whom were you advised that that was not the
11  proper procedure?
12    A. Staff.
13    Q. By staff, you are talking about the colonel
14  staff?
15    A. The executive staff. Yes.
16    Q. All right.
17    A. In other words, it came down from inspections
18  that this is this policy, this is the policy. Where
19  before, you went out and treated them like any citizen
20  and now there is a mandatory involvement of internal
21  affairs in any domestic involving a trooper, where
22  before it was the criminal unit of that county. So
23  that's the changes. Internal affairs is involved in
24  all domestics where it use to be just the criminal

**35**

1  unit.
2     Q. Okay. Was there any requirement, if you know,
3  for you as troop commander to make sure that the field
4  operations officer was advised?
5     A. I called Major Hughes that Sunday afternoon at
6  home.
7     Q. Do you recall whether Hughes had actually been
8  promoted to major at that point, or?
9     A. Yeah, he was major.
10    Q. So you called him at his home Sunday p.m.?
11    A. Sunday afternoon, late afternoon.
12       MS. BALLARD: For the record, he was
13  acting, I believe he was acting major at that time.
14       THE WITNESS: Was he? Okay.
15  BY MR. MARTIN:
16    Q. All right. What type of conversation did you
17  have?
18    A. I called him up and said, "Listen, we had a
19  little problem with a – at Christie Dempsey's, and it
20  was reported that a window got broken out. And the
21  original report is that it was Bobby Truitt did it;
22  however, Bobby Truitt not involved in this thing at
23  all; it's going to be Brian Maher. I spoke to
24  Dempsey. She doesn't want anything done. And we're

**36**

1  going to handle it in-house."
2     Q. What was Major Hughes' response, if any?
3     A. He didn't really – he says, "You got it
4  covered and -- or you guys are going to handle it?"
5  And that was about it.
6     Q. That was a question to you as to whether
7  Troop 3 was going to handle it; is that correct?
8     A. Basically, do you – do you have everything
9  handled? And I said, "Yes."
10    Q. At that point, what was your understanding as
11  to how you had this matter handled?
12    A. Well, I had -- I was going to give it to CI the
13  next day to reclassify the case.
14    Q. The next day, you gave it to Sergeant Mullett?
15    A. Right.
16    Q. And that was going to be reclassified from what
17  to what?
18    A. To what we call "exceptionally cleared."
19  Exceptionally cleared means the victim desires no
20  prosecution. But what happened was he ended up
21  unfounding the complaint instead.
22    Q. Your direction to Sergeant Mullett was to mark
23  this matter as "exceptionally cleared"?
24    A. No, what I told him, I said, "We need to clear

**37**

1  the case." And to me, clearing -- to me, to
2  Lieutenant Donaway and I -- we were all three in a
3  meeting or all three in his office. And I said, "We
4  need to clear this." And "exceptionally clear" is –
5  when I say "clear," that means "exceptionally clear."
6  And, basically, you go in and you add to the report
7  that additional information, and then the victim
8  desires no prosecution.
9     Q. Was there an addition to the report with an
10  indication the victim desires no prosecution?
11    A. Sergeant Mullett went in and unfounded the
12  case.
13    Q. Please explain, if you will, what that means,
14  to –
15    A. "Unfounded" means it never -- it didn't occur,
16  which I didn't learn about until like a year later
17  when I saw the supplement that he did.
18    Q. At that point, Sunday and Monday, what
19  involvement, if any, did Sergeant Houdek have with
20  this matter?
21    A. None. Sergeant Houdek is not -- other than the
22  night of the event, he didn't have anything to do with
23  any of this.
24    Q. Well, as I understand what occurred, three

10 (Pages 34 to 37)

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

38

1   officers went out and Csapo wrote the first report,
2   under the direction of Sergeant Houdek; correct?
3       A.  No.  All Houdek told him was write it the way
4   it's been relayed to you, as it's been reported.
5       Q.  Now, were they your instructions to Houdek?
6       A.  I had told Houdek: "Just have them write it
7   up, get it on my desk."
8       Q.  Did that mean write it as it was reported to
9   the officers on the scene?
10      A.  Correct.
11          MS. BALLARD:  Just for the record, because
12  we're speaking about so many people, when you say "he"
13  or you told "him," could you specify who you are
14  talking about?
15          MR. MARTIN:  I'll try to be a little
16  clearer in my questions.
17          THE WITNESS:  I relayed that to Sergeant
18  Houdek: "Just have the guys at the scene write it the
19  way it's been reported to them, and I'll take a look
20  at it the next day."
21  BY MR. MARTIN:
22      Q.  And you are satisfied, then, that Maher 1 is
23  what you had directed it to be; correct?
24      A.  Yes, sir.

39

1           MS. BALLARD:  Objection to the form.
2       Q.  I just want to make sure I recall your
3   testimony.  When Brian Maher first called you while
4   you were at DSU, he reported to you, did he not, that
5   he and Christie were dating?
6       A.  Yes, sir.  Because I didn't, I didn't know that
7   before that night.
8       Q.  I thought I recalled that.  When you spoke with
9   Christie Dempsey that next day, did you talk to her
10  about the broken window?
11      A.  I think I asked about it, and she explained to
12  me that he was going to fix the window.
13      Q.  As I understand your involvement in this case,
14  Sunday morning, you began by speaking with Brian Maher
15  for what you think was the second time; correct?
16      A.  Yes, sir.
17      Q.  And, then, you went in and you read Exhibit,
18  Maher Exhibit 1; correct?
19      A.  Yes, sir.
20      Q.  And, then, at some point, you said midday at
21  some point, you spoke with Christie Dempsey by
22  telephone; correct?
23      A.  Yes, sir.
24      Q.  And, then, sometime later that afternoon, you

40

1   called Major or Acting Major Hughes to report what had
2   happened in his capacity as the field operations
3   officer?
4       A.  Yes, sir.
5       Q.  Do you have any doubt in your mind that you
6   advised Major Hughes that Brian Maher was the subject
7   in this case?
8       A.  Yeah, I told him that.
9       Q.  So you don't have any doubt that --
10      A.  No, I don't have any doubt, no.
11      Q.  Okay.  All right.  Let me put before you what
12  was marked as Maher 2, which was a supplemental report
13  by Officer and Corporal Gygrynuk.
14          Have you seen this report before --
15      A.  Yes, sir.
16      Q.  -- captain?
17      A.  Yes, sir.
18      Q.  When did you first see that report?
19      A.  I saw it -- I am not sure if -- I think it was
20  with Csapo's report the day afterwards.
21      Q.  What was your understanding, if any, as to when
22  the report was written?
23      A.  This one?
24      Q.  Maher 2.

41

1       A.  Gygrynuk should have done a supplement, so I'm
2   not -- I am assuming he did it that night.  I don't
3   know.  I am looking at the date of the 26th.
4       Q.  Well, you see also that it's marked as
5   "Supplemental Report No. 1"; correct?
6       A.  Yes, sir.
7       Q.  So would that indicate that the Csapo report
8   had been completed before he did this supplement?
9       A.  Yeah, they're going to be separate reports.
10  Csapo's, normally, would be done first, and I'm
11  looking at this is getting completed on -- I see the
12  date that Sergeant Houdek at the bottom signed off on
13  would be the 27th at 00:19.  So it may have been the
14  next night.  Supervisor approved down there.
15          MS. BALLARD:  Is that --
16      A.  Yeah, that's the report date, the date of the
17  report is going to be the date of the incident, but --
18  well, he probably did it then.
19      Q.  The report date is the date of the incident?
20      A.  That's the report of this incident, yes.
21          MS. BALLARD:  For the record, we're
22  referring to the top line on the supplemental report.
23          MR. MARTIN:  Right.  I, perhaps, have a
24  misunderstanding that was when the date -- when the

11  (Pages 38 to 41)

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

**42**

1  report was completed rather than the actual incident.
2       THE WITNESS: Okay.
3       MS. BALLARD: I don't know, Jeff.
4       THE WITNESS: I am just looking at that.
5       MR. MARTIN: All right.
6       MS. BALLARD: Does that report date at the
7  top mean date the officer does the report or date of
8  the incident or both?
9       THE WITNESS: The date of the occurrence is
10  always going to be the date when the incident occurred
11  and that should be when he typed the report up.
12  That's what it should be. I am just looking.
13       What happens is it just didn't get looked
14  at by the sergeant until the next -- didn't get
15  approved until the next day, just after midnight.
16  BY MR. MARTIN:
17       Q. But the next day -- this incident occurred on,
18  essentially, a Saturday night-Sunday morning?
19       A. Correct.
20       Q. So Sunday was October 26th. This report was
21  approved by Sergeant Houdek on Monday, Monday morning,
22  very early Monday morning at 20 after 12:00.
23       A. Yes, sir.
24       Q. Do you agree?

**43**

1       A. Yes, sir. So then I didn't see it that day?
2       Q. Hmm?
3       A. Then I probably didn't see it that day; I just
4  looked at this report.
5       Q. Okay. Well --
6       A. If that's what you're saying.
7       MS. BALLARD: You said I just look at this
8  report. You were reporting to Maher 1?
9       THE WITNESS: Yes. From what you just
10  said, this would be the only report I would have had
11  Sunday when I went in. I didn't see this until
12  probably the following day.
13  BY MR. MARTIN:
14       Q. Well, if you look back at Maher 1, it appears
15  that Maher 1 was, Csapo's report, was actually after
16  the --
17       A. Oh.
18       Q. -- Gygrynuk report. So would you have
19  reviewed --
20       A. You can print it out without a supervisor
21  approval. I have mine here. I can look and see if
22  mine doesn't have supervisor approval on it.
23       Q. You have the actual report you reviewed?
24       A. Well, I have a copy. I don't know if it's the

**44**

1  same one or not.
2       Q. Well, please take a look at it, if you will.
3  Take a moment.
4       (Brief recess taken.)
5       THE WITNESS: No, mine is the same.
6  BY MR. MARTIN:
7       Q. Captain, are you aware of another version of
8  this report that you had seen at any point?
9       A. No. I remember I saw this, and then Robert
10  Hudson or Sergeant Hudson's later. I saw that final
11  version. I have seen this at some point.
12       Q. Please refer to it for the record.
13       A. This is, I'm sorry, Maher 2.
14       Q. May I see it for a moment, take a look at the
15  report that you referred to?
16       A. Mine is the exact same thing as Maher 1.
17       Q. Where did you get this particular report?
18       A. I printed it out.
19       Q. You printed it out?
20       A. At the troop.
21       Q. Recently?
22       A. No. I think I've had it. Let me -- the only
23  thing I noticed -- I don't know if it's different or
24  not. The only thing different on these two reports is

**45**

1  my narrative is printed out different than the one,
2  the Maher 1.
3       MS. BALLARD: You mean it's laid out
4  differently, the page break is different?
5       THE WITNESS: I have got ... this is all
6  different. I guess it just printed differently. It
7  printed differently. I have --
8  BY MR. MARTIN:
9       Q. I'll tell you what I would like to do is make a
10  copy of that as -- we can later mark that as Hawkins
11  1. If you would leave that out, we'll mark that in a
12  little while as H-1, just to ... but if you could give
13  us your best recollection as to when you printed that
14  out, it would be appreciated.
15       A. That's been in my file -- probably when the
16  I -- I printed it out probably about the time the IA,
17  internal affairs investigation, which was, like,
18  somewhere about a year afterwards. Probably '04. And
19  I just have a file.
20       Q. Now, the file that you are referring to, did
21  you review those documents in preparation for today's
22  deposition?
23       A. Yes. It's a copy of the two reports and it's
24  my IA.

12 (Pages 42 to 45)

**A000013**

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

46

1   Q. I'm sorry.
2   A. And that's information from my internal
3 affairs.
4   Q. May I see that for a moment please?
5       MS. BALLARD: May I look at this first to
6 make sure there isn't anything privileged?
7       THE WITNESS: Sure. It's the subpoena from
8 you guys. It is the report Robert did. And then my
9 own.
10      MS. BALLARD: Okay.
11      MR. MARTIN: We're off the record, Cindy.
12   (Discussion off the record.)
13      MR. MARTIN: Cindy, could you give me a
14 little assist here?
15   (The reporter read the record as
16 requested.)
17 BY MR. MARTIN:
18   Q. Captain, as I understand it, you believe that
19 you reviewed the reports that are before us as Maher 1
20 and 2 before they were approved by the supervisor?
21   A. I definitely remember seeing Maher 1. Maher 2,
22 I am not a hundred percent on.
23   Q. Okay. All right. Now, seeing that
24 Sergeant Houdek approved these reports on Monday

47

1 morning, albeit early Monday morning, does that change
2 your recollection at all as to whether Sergeant Houdek
3 was participating in this investigation?
4   A. No, sir, just a matter of every report has to
5 be approved by a supervisor. It was a matter of going
6 through making sure all the blocks are checked and
7 that there is a narrative and might do a spell check
8 on it and then approves the report.
9   Q. Do you have any understanding as to whether
10 Sergeant Houdek went out to the scene, meaning
11 Christie's home?
12   A. I don't believe he did.
13   Q. Was that in violation of divisional policy?
14   A. I mean, I don't see it as a violation. I
15 don't -- it may be now, but I think Mike -- there was
16 something else going on that night and he was working
17 on that at the troop, if I remember.
18   Q. All right. Let me mark this, I guess since we
19 already said in the record Hawkins 1 will be the
20 Captain's copy of the report, that this should be
21 Hawkins 2.
22   (Hawkins Exhibit No. 2 was marked for
23 identification.)
24

48

1 BY MR. MARTIN:
2   Q. Let me represent to you, Captain, that this was
3 produced in this litigation by the State and that this
4 is part of the divisional manual as it was represented
5 to me.
6      MS. BALLARD: Let me state for the record
7 this may not be the whole section pertaining to this
8 subject, this page. There could be something on the
9 page prior.
10     MR. MARTIN: Yeah. And that's -- I have
11 that page right here if you would like to take a look
12 at that.
13     MS. BALLARD: I am not asking you to put it
14 in I just wanted to note that for the record. This is
15 D 00041.
16     MR. MARTIN: That's the Bates number.
17     MS. BALLARD: Right. But I think it's
18 continued from 40.
19 BY MR. MARTIN:
20   Q. The policy is VII-4-4. I just ask that you
21 review that and maybe refresh your recollection as to
22 the policy.
23   A. Yes, this is the document that got sent back
24 and reiterated and all of us -- for everybody, all

49

1 commanders and criminal lieutenants. This is the
2 policy, let's make sure we adhere to it after this
3 incident.
4   Q. So you believe this policy was in effect at the
5 time of this incident?
6   A. I believe so. I am not a hundred percent on
7 that. I don't know if it got tweaked, but I believe
8 so.
9   Q. One of the statements is that: "The field
10 operations officer will make the determination to
11 initiate action by the internal affairs unit." Do you
12 see that, sir, in the middle of the first paragraph?
13   A. Yes, sir.
14   Q. Do you know whether that occurred in this
15 instance?
16   A. It did not until what, about a year later.
17   Q. Do you find that unusual?
18   A. Well, as I stated earlier, I handled this case
19 like I'd had handled about five others, and I was
20 disciplined for that. But that's -- I handled it the
21 way we, basically, use to handle them. And this all
22 came about -- if it came about, it was while I was in
23 homicide. And now this is the way it was done, and I
24 was disciplined for handling it the way we use to,

13 (Pages 46 to 49)

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

<table>
<tr><td colspan="2">

**50**

1  quite frankly.
2  Q. All right. Captain, you said this came about.
3  Are you talking about the —
4  A. If these changes, I don't think these were in
5  place, this domestic policy took place when domestics
6  changed, and that changed probably early 2000. I
7  think that's when DV started kicking in. I would like
8  to know when this came about because I don't know.
9  But I know the policy before was the criminal
10 lieutenant goes out and you handled a domestic like,
11 you know, find out what needs to be handled. And like
12 I said, I have done it about five times with troopers.
13 Q. What I asked you was: Did you find it unusual
14 that there was some time lag that you identified as
15 approximately a year between the time of this incident
16 and the time of report to internal affairs?
17 A. There was a complaint about this case, and
18 that's why it ended up going to internal affairs.
19 Q. Do you know who, where the complaint came from?
20 A. Captain Dixon.
21 Q. Captain Dixon was the troop commander for which
22 troop?
23 A. Troop 5 at the time.
24 Q. That was Corporal Dempsey's troop?

</td><td colspan="2">

**52**

1  A. Yes, by looking at this, yes.
2  Q. Do you have any reason to believe that
3  Captain Dixon was not notified about this incident?
4  A. He was not troop commander at that time. I
5  thought they were both at Troop 7 at that time.
6     MS. BALLARD: "Both" meaning who?
7     THE WITNESS: Both Corporal Maher and
8  Corporal Dempsey. I thought they were both at Troop
9  7. Maybe I'm wrong on that.
10 BY MR. MARTIN:
11 Q. Yeah, the record will show that Corporal Maher
12 was at 7 at the time of this incident and
13 Corporal Dempsey was at 5 at the time of this
14 incident.
15 A. I apologize.
16 Q. But my question, then, is: Well, it should
17 relate back to the time of the incident, I would
18 think, rather than the time that the IA occurs.
19 Correct?
20 A. Correct.
21 Q. So the troop commander for Troop 5 should have
22 been notified by way of this policy?
23 A. They did not get notified.
24 Q. Do you know who the troop commander for Troop 5

</td></tr>
<tr><td colspan="2">

**51**

1  A. I believe she was there at that time.
2  Q. Are you aware of whether there were any
3  standards in terms of how long one IA can wait before
4  they initiate an investigation?
5     MS. BALLARD: Objection to the form.
6  A. I do not, sir. I don't know.
7  Q. All right. Staying with this policy for a
8  moment. Do you see where it requires the on-duty
9  supervisor to respond to the scene?
10 A. Yes, sir.
11 Q. And that did not occur; is that correct?
12 A. Correct.
13 Q. And we talked about the field operations
14 officer, and that would have been Major Hughes, was,
15 according to this policy, supposed to make the
16 determination to initiate the action by internal
17 affairs; correct?
18 A. Yes, sir.
19 Q. To the best of your knowledge, that did not
20 occur?
21 A. No, sir.
22 Q. All right. Okay. And do you know whether —
23 also, as part of this policy, was the troop commander
24 for the officer involved supposed to be notified?

</td><td colspan="2">

**53**

1  was at the time?
2  A. Well —
3  Q. I'm sorry?
4  A. At — in '03?
5  Q. Yes.
6  A. I think it's Dixon. I am not sure at that
7  time. Because, yes, it had to be because Major Hughes
8  had been the troop commander at 5. If he changed,
9  then Dixon took his place. So he's there. I believe
10 he was at FBI academy at the time. Captain Nolt is at
11 Troop 7.
12 Q. Isn't it fair to say that these people were not
13 notified because this was, essentially, a
14 misunderstanding, this matter between Dempsey and
15 Maher.
16 A. That's how we tried to handle it.
17 Q. Did you believe that it was a misunderstanding?
18 A. I saw it as two troopers had screwed up, and I
19 didn't want to see anybody get in trouble.
20 Q. All right. How is it that you believed that
21 Corporal Dempsey screwed up at the time?
22 A. Well, that she didn't give the proper statement
23 to the guys at the scene. There was a little portion
24 about this gentleman from Texas being there and not

</td></tr>
</table>

14 (Pages 50 to 53)

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

54

1 being there in the report when the original call came
2 in.
3    Q.   Well --
4    A.   And I -- go ahead.
5    Q.   -- I'm trying to understand the significance of
6 that.
7    A.   Well, I just -- when I read the report, I
8 thought, that's great. So we've got, what it looked
9 like, somebody trying to save their relationship. I
10 don't know if that was something that she didn't want
11 Maher to know or what, but. It wasn't in the report.
12 And then when they interviewed the guy, the troopers
13 at the scene were leaning toward a domestic between
14 them two. When they got to the bottom of it, he had
15 been there when the whole thing took place, and
16 originally it wasn't that way in the report.
17         MS. BALLARD:  Can you say who you are
18 referring to as "he"?
19         THE WITNESS:  The guy from Texas. I don't
20 know.
21         MS. BALLARD:  Keller?
22         THE WITNESS:  I don't know him. Keller.
23 BY MR. MARTIN:
24    Q.   But when you referred to the report given by

55

1 Christie Dempsey that there -- was this the report
2 given to the dispatcher that you are referring to?
3         For the record, you are not sure what I
4 asked. Is that fair to say?
5    A.   Yeah.
6    Q.   Can I restate the question, if I can?
7    A.   Sure. Please.
8    Q.   When I ask you what or how Christie Dempsey
9 screwed up, I think your response was because there
10 was a failure to report that there was this fellow
11 from Texas there. Is that fair to say?
12    A.   Yes, sir.
13    Q.   Now, what report are we talking about? Are we
14 talking about the initial report of the attempted
15 break-in?
16    A.   Yes.
17    Q.   Yes?
18    A.   Yeah. I am just --
19         MS. BALLARD:  For the record, he's pointing
20 to Maher 1.
21    Q.   Okay.
22    A.   Originally, he states he's at his sister's
23 house, and then later -- this is Killen or Keller.
24         MS. BALLARD:  Keller.

56

1    A.   And then, originally, he says he's at his
2 sister's house. She calls. He comes over. Then
3 later in the report says that, no, he was there the
4 whole time. I just -- I don't think that's a big
5 deal. I am not saying that. I am just saying that
6 that -- it's in the report, so it's just creates more
7 problems for, now, Corporal Dempsey. Corporal Maher
8 has, obviously, got problems. Corporal Dempsey has
9 got a problem for what it's in the report.
10         And quite frankly, I was -- I was just kind
11 of trying to clean it up for both of them and be done
12 with it, but that didn't work out.
13    Q.   All right. Your reference was to Maher 1 in
14 that second page. The statement of the witness, was
15 the statement of the witness Kevin Keller?
16    A.   Yeah. Look at the -- the first paragraph says
17 he was at his sister's. Then the second one says, no,
18 they were dining out at Friday's and then he was
19 there.
20    Q.   But whose statement was that, was that Keller's
21 or Dempsey's?
22    A.   That's Keller's.
23    Q.   All right. I am missing something. I am
24 trying to understand how there was what I think you

57

1 are suggesting was an incorrect report by Ms. Dempsey?
2    A.   In the report, she states here she arrived home
3 along, was alone at the time of the incident. V-1, at
4 the bottom at page 3: "Victim 1," being Corporal
5 Dempsey, "states prior to arriving home, she was out
6 on a hay ride located off Westville Road, that she
7 arrived home alone and was alone at the time of the
8 incident." But then you immediately see there,
9 shortly thereafter, that this fellow was there at the
10 house when this thing is going on from his statement
11 to Corporal Csapo later.
12         MS. DEMPSEY:  I'm not following where he's
13 talking about.
14         MS. BALLARD:  It's this, the bottom of
15 Dempsey's statement, before the line that starts
16 "Keller's."
17         MS. DEMPSEY:  Oh.
18         MR. MARTIN:  Mm-hmm.
19 BY MR. MARTIN:
20    Q.   I think you stated on the record it was not a
21 big deal that there was a report that she arrived home
22 alone. Do you agree with that?
23    A.   She -- right. She switched stories, basically.
24 Originally, she's home alone and this guy is back in

15  (Pages 54 to 57)

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

58

1 the bedroom or -- we don't know he's there, but. And
2 this is all going on. And then later on, it's this
3 guy has been here the whole time and it's just -- it's
4 a little problematic in the report. And again, I
5 looked at it as just a problem for her. Maher had
6 major problems. Now she's got a problem. I'll be
7 honest with you, like I said, I tried to take care of
8 the thing.
9     Q.   Did you get involved at all when Captain Dixon
10 allegedly discovered this matter many months later and
11 pressed for an IA?
12     A.   No.
13     Q.   No?
14     A.   He called me one day about it, and I said that
15 I had passed it on to Major Hughes.
16     Q.   And you were referring to what you did
17 initially on, on or about October 26th?
18     A.   Correct.
19     Q.   So you realized at that point apparently
20 Captain Dixon had not known before the time he made
21 this call to you?
22     A.   Correct,
23     Q.   And you told him that you got this report from
24 Brian Maher and you passed it along to Major Hughes?

60

1     Q.   Well, yeah, and that's a poor choice of words.
2 But would you agree that you were the primary
3 investigator of this situation?
4     A.   I would say, I was the person that decided not
5 to pursue the matter because I had two parties both
6 wishing not to pursue it.
7     Q.   Okay.  So when Captain Dixon called you, what
8 did he state were his intentions as to why he was
9 calling you?
10     A.   You know, I don't know what his -- I think I
11 know his intentions, but it's speculation.
12     Q.   But you understood at that time he was at that
13 time Christie Dempsey's troop commander?
14     A.   Yes, sir.
15     Q.   And that he was -- he believed that he was kept
16 out of the loop of an incident involving one of his
17 troopers?
18     A.   Yes.
19     Q.   And he called you because he knew that the
20 report had been made to you?
21        MS. BALLARD:  Objection to the form.
22     A.   It was a Troop 3 case.
23     Q.   It was a Troop 3 case?
24     A.   And that's why he called.

59

1     A.   Correct.
2     Q.   Did you say anything more about the matter?
3     A.   We had about a five-minute phone conversation.
4        MS. BALLARD:  Meaning you and Dixon?
5        THE WITNESS:  Captain Dixon and I.
6 BY MR. MARTIN:
7     Q.   Do you have any recollection as to when this
8 conversation or when you received this telephone call
9 from Captain Dixon?
10     A.   Shortly before this whole internal affairs
11 began.
12     Q.   So you can't say --
13     A.   No, sir.
14     Q.   -- as to --
15     A.   I don't know when exactly.
16     Q.   Okay.
17     A.   I know I was at my office.  I know he called me
18 on my office phone, and we talked about five minutes.
19     Q.   Is it fair to say that you were the chief
20 investigator of this domestic incident between
21 Christie and Brian in October of 2006?
22     A.   The chief investigator?
23     Q.   2003.
24     A.   I don't know I was the chief investigator.

61

1     Q.   Did you -- you had the impression that
2 Captain Dixon wanted to press some type of charges
3 against the troopers involved?
4     A.   He wanted -- he called up to, basically, to
5 kind of get the gist of it, and then, I mean, that's
6 a -- I assume that's what he was -- it wasn't the
7 trooper -- it seemed like he wanted it to go further
8 than it had.  Let's just say that.
9     Q.   Well, when you just testified he wanted to get
10 the gist of it, I understood your prior testimony to
11 say in response to his question simply that, you know,
12 you took the report and/or you were involved and sent
13 it along to Major Hughes?
14        MS. BALLARD:  Objection to the form.
15     A.   I don't quite follow you.
16     Q.   All right.  How much detail, if any, did you
17 give to Captain Dixon about what you recalled as to
18 the incident when he called you?
19     A.   I remember he called up and wanted to know,
20 basically, what had happened involving this case, and
21 I shared with him much like I have with everybody
22 today.
23        MS. BALLARD:  Off the record.
24        (Discussion off the record.)

16 (Pages 58 to 61)

**A000017**

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

62

BY MR. MARTIN:
1   BY MR. MARTIN:
2   Q.  All right.  How long of a conversation did you
3   have with Captain Dixon?
4   A.  About five minutes.
5   Q.  You gave him your -- strike that.  What did you
6   say, if anything, about this matter?
7   A.  Basically, I gave him the Reader's Digest
8   version of what happened.
9   Q.  Did you report to him that you thought it was a
10  matter of misunderstanding between two troopers?
11  A.  Yes.
12  Q.  Did you report to him that you felt that this
13  should not be prosecuted either through the criminal
14  means or through IA?
15  A.  I don't know if I said that exactly.  I told
16  him it was in LEISS.  It's been reported.  That's a
17  report system.  He was kind of accusatory that we
18  completely did not do a report.  I said, "No, it's in
19  LEISS."  That was a question he posed at me.  I said,
20  "It's in LEISS."  That means a report has been made.
21  I said, "No, that's not the case."  I said, "I ran it
22  up the chain."  He was kind of asking me what we did,
23  and I explained to him.  And we got off the phone.
24  Q.  And what was your next understanding, if any,

63

1   as to with a occurred?
2   A.  Well --
3       MS. BALLARD:  Objection to the form.
4   A.  Shortly thereafter, then the IA began.
5   Q.  The IA began.  When you say "the IA began,"
6   began for Corporal Dempsey and Corporal Maher?
7   A.  No, I think it was more -- well, I don't know
8   if Corporal Dempsey was.  I know Corporal Maher.  And
9   then the reinvestigation of the case took place.  And
10  I think that all coincided about the same time.
11  Probably had the reinvestigation of the case first.
12  But I just know at that point the whole thing got
13  brought back up.  Short -- I say -- well, not right
14  then.  Shortly thereafter.
15  Q.  When you say -- I'm sorry.  When you refer to
16  the IA, are you referring to the, in part, to the IA
17  against you?
18  A.  Well, I got IA'd along with a lot of other
19  people, yeah.
20  Q.  You got IA'd along with whom else, whoever
21  else?
22  A.  Well, originally, it was --
23      MS. BALLARD:  I am just going to state for
24  the record that the IA file is confidential.  Just to

64

1   the best of his knowledge.
2       THE WITNESS:  So should I not --
3       MS. BALLARD:  No, you can answer.  I just
4   don't want you to --
5       THE WITNESS:  Should I speak to the
6   people --
7       MS. BALLARD:  I want to be clear you are
8   not in IA, so just answer to the extent you know.
9       THE WITNESS:  Originally, it was very
10  broad-range and some people got eliminated right away
11  after I talked the to Captain Paige.  They really
12  wanted to IA the troopers at the scene, Sergeant
13  Houdek, Sergeant Mullett, Lieutenant Donaway, myself,
14  Major Hughes.
15      And I explained to them that Donaway,
16  Mullet, Houdek, troopers at the scene, if you want to
17  IA, you can IA me; you don't need to IA all these
18  people underneath me for the decisions I made 2:00 in
19  the morning, so.  So it ended up getting lessened down
20  to just a few people, then.
21  BY MR. MARTIN:
22  Q.  Who were those people?
23  A.  Myself, Major Hughes and Corporal Maher and
24  then Corporal Dempsey, I believe.  I don't know if she

65

1   got IA'd with that group or not.
2   Q.  Let me put before you what was marked as
3   Maher 3 and was a Supplemental Report No. 2 issued by
4   Sergeant Mullett on 11/06 -- I'm sorry.  Again, here,
5   we're looking at the report date here, and it's
6   10/29/03, which would have been three or four days
7   following this incidence.  Is that consistent with
8   when you had gotten Sergeant Mullett involved?
9   A.  We would -- I would have talked to him on,
10  like, the 27th.  He would have been in the office, the
11  meeting we had.  What happens is that's when he typed
12  up the report.
13  Q.  Okay.  All right.  And this is where he decided
14  that this matter is unfounded.  Correct?
15  A.  Correct.
16  Q.  Do you know whether Sergeant Mullett conferred
17  with anybody or did any type of an investigation
18  before doing this?
19  A.  No, it was just after talking to myself and
20  Lieutenant Donaway.
21  Q.  Now, with the recognition that you had advised
22  Sergeant Houdek shortly after this incident that Brian
23  Maher was involved in this, do you believe that the
24  reports issued as Maher 1 and 2 were complete or

17  (Pages 62 to 65)

A000018

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

66

1 whether they were incomplete because there nowhere
2 appeared the name Brian Maher?
3 A. Well, that should have come on a supplement.
4 The original officers didn't have that information.
5 This is the one we should have had the information on
6 Supplement 3.
7 MS. BALLARD: According to Maher 3.
8 THE WITNESS: Maher 3.
9 BY MR. MARTIN:
10 Q. All right. So Maher 3, you believe, should
11 have included the name Brian Maher?
12 A. Correct, and the case actually should have been
13 exceptionally cleared versus unfounded.
14 Q. Do you have any understanding as to why Brian
15 Maher's name was not listed on Maher 3?
16 A. No, I don't. No, I don't. I didn't see this
17 report until when the internal affairs -- that's when
18 I brought this up. Then I was like, oh, crap, they
19 didn't even do that right, so. I thought that it was
20 EC'd with him listed as a suspect. You have to list a
21 suspect to EC a case. That wasn't done here.
22 Q. As I understand it, Mullett was assigned this
23 matter by you?
24 A. Correct.

67

1 Q. Is that fair to say?
2 A. Yes, sir.
3 Q. Is there any reason why you did not receive
4 this Supplemental Report No. 2 or any type of
5 statement back from Sergeant Mullett?
6 A. I didn't. It's electronic. It's all
7 electronic. I didn't -- I mean, I don't -- I should
8 have, but I didn't.
9 Q. Now, I have Maher 4, which is the supplemental
10 report No. 3, dated April 20, 2004.
11 A. Who wrote this?
12 Q. It's cut off on the bottom, but it's
13 Corporal Argo or Trooper Argo.
14 MS. BALLARD: I think it is. I think it's
15 also two pages. And this is the first page of the two
16 pages because it cuts off at the bottom. I do think
17 it's Argo.
18 MR. MARTIN: Well, we actually -- we can go
19 back and look at Brian Maher's deposition. We agreed
20 that it was Argo's report.
21 MS. BALLARD: Yes, I am remembering.
22 BY MR. MARTIN:
23 Q. But Captain Hawkins, you are saying you have
24 never seen this report?

68

1 A. I don't think I have ever seen this report, but
2 I may have later.
3 Q. At least with respect to this page that's
4 before you, do you see any recognition that Brian
5 Maher was the suspect in this matter?
6 A. No, he's not listed. I don't see it.
7 Q. And this is occurring some six months following
8 this incident, would you agree, this report?
9 A. From that date, of the reported date on the top
10 of the report.
11 MS. BALLARD: Again, this report is
12 incomplete.
13 BY MR. MARTIN:
14 Q. Is there any reason that you know of that, as
15 troop commander of Troop 3, that Brian Maher's name
16 was not put on this report?
17 A. No, I don't. I don't know if I have ever seen
18 this report, this supplement.
19 Q. All right. And then we have -- there is yet a
20 further supplement that we've made copies of this
21 morning. Off the record here a moment.
22 (Discussion off the record.)
23 BY MR. MARTIN:
24 Q. There is a Supplemental Report No. 4, and this

69

1 is issued by Sergeant Hudson; correct?
2 A. Yes, I have seen this.
3 MS. BALLARD: I am not sure that's a
4 supplemental report.
5 MR. MARTIN: It says, "Supplemental Report
6 No. 4" on it. That's why I --
7 MS. BALLARD: Okay. It's a different type
8 of report.
9 MR. MARTIN: All right. We're going to
10 mark that as Hawkins 3.
11 (Hawkins Exhibit No. 3 was marked for
12 identification.)
13 MS. BALLARD: Do you have a copy, Jeff?
14 MR. MARTIN: Yes.
15 MS. BALLARD: Are these the documents from
16 his file?
17 MR. MARTIN: Yes.
18 MS. BALLARD: What are we marking this as?
19 MR. MARTIN: Hawkins 3.
20 MS. BALLARD: Is this the first one of
21 those you are putting in? I want to be clear.
22 MR. MARTIN: Well, Hawkins 1 is -- we
23 haven't marked it. We have it right here. That's his
24 version of the Csapo report.

18 (Pages 66 to 69)

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

**A000019**

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

70

1    MS. BALLARD: Okay. At some point, I want
2  all the documents he brought marked so that I have
3  that for the record.
4    MR. MARTIN: As do I. We will do that.
5    MS. BALLARD: Okay. I don't have a copy of
6  Hawkins 1 or 2.
7    MR. MARTIN: Nor do I.
8    MS. BALLARD: Can we do that? It's just
9  going to get too crazy if we don't do it.
10    MR. MARTIN: Let's take a moment to mark
11  these. Captain, you don't have to use your -- you can
12  keep your file intact, if you will.
13    THE WITNESS: All right.
14    MR. MARTIN: This is H-1 right here,
15  Hawkins 1.
16    (Hawkins Exhibit No. 1 was marked for
17  identification.)
18    MR. MARTIN: Let's mark them. Then we'll
19  go back, and I'll doll them out to everybody.
20    (Hawkins Exhibit No. 4 was marked for
21  identification.)
22    MR. MARTIN: This will be H-5.
23    (Hawkins Exhibit No. 5 was marked for
24  identification.)

71

1  BY MR. MARTIN:
2    Q.  Captain, you said you were familiar with
3  Sergeant Hudson's report?
4    A.  Yes.
5    Q.  Because you had reviewed that before coming
6  today?
7    A.  Yes, sir.
8    Q.  That's been marked as Hawkins 3. And then I
9  believe that Hawkins 4 is the continuation of that?
10    A.  Yes, that's the narrative.
11    Q.  Okay. All right. This was done under the
12  auspices of Troop 4; is that correct?
13    A.  Correct.
14    Q.  Why is it that Troop 3 was not involved in
15  this?
16    A.  They brought in an investigator from another
17  county.
18    Q.  Was that -- why did that happen?
19    A.  We do the same -- we do the same thing for them
20  when an officer is involved in a case. A lot of times
21  we'll go down to Sussex or to New Castle to handle a
22  case for them. Because of the issues involving this
23  case, they brought in a detective from another troop.
24    Q.  Were you consulted about that?

72

1    A.  I was told.
2    Q.  I'm sorry?
3    MS. BALLARD: He said he was told.
4    A.  I was told.
5    Q.  You were told. Okay. So did you have any
6  involvement at all in this investigation?
7    A.  No; I got interviewed.
8    Q.  Is it fair to say that Hawkins 3 represents the
9  first time that Brian Maher was listed as a suspect in
10  this matter, at least in writing?
11    A.  Yes, sir.
12    Q.  Okay. Now, you were the subject of an IA
13  investigation as a result of this matter?
14    A.  Yes, sir.
15    Q.  Had you been the subject of any IA
16  investigations prior to this?
17    A.  I have been dung. That was for -- dung means
18  you lose days vacation time. I have been disciplined
19  before. I was subject to one, yes, use of force many
20  years ago. I was subject to a use of force case and
21  was exonerated in about 1983.
22    Q.  Why was it that you were dung'd?
23    A.  I lost a prisoner once. I had a car accident.
24  And I lost four hours on the car accident. I lost

73

1  three days for the prisoner, losing a prisoner. And I
2  lost two days for my car being overdue for service the
3  day that it was assigned to me. That was the olds
4  days, they use to dung us for just about anything.
5    Q.  Wait a minute. Is it ding or is it dung?
6    A.  Dung. So I think those are my big three.
7    Q.  So is it fair to say this is the first time
8  that your professional judgment was called into
9  question by an IA investigation?
10    A.  Yes.
11    MS. BALLARD: Objection to the form.
12    Q.  Now, you were the subject of an internal
13  affairs investigation, but did they actually complete
14  an investigation of you in this matter?
15    A.  Yes.
16    Q.  I see that the form that you --
17    MS. BALLARD: We're referring to Hawkins 5.
18    MR. MARTIN: Yes.
19    THE WITNESS: Okay.
20  BY MR. MARTIN:
21    Q.  A summary disciplinary action, does that not
22  mean at least sometimes summary discipline can be
23  given without the benefit or detriment of a full IA
24  investigation?

19  (Pages 70 to 73)

**A000020**

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

|  | 74 |
|---|---|
| 1 | A. Yes, it can. I do those at the troop level for |
| 2 | car accidents and for minor events, yes. You can do |
| 3 | that. |
| 4 | Q. Anyway. I forgot to ask you about the report |
| 5 | form that was used in -- that we looked at in Maher 1, |
| 6 | 2, 3. Should that not have been a domestic violence |
| 7 | form rather than the form that was chosen? |
| 8 | A. We should have flipped it from -- not -- the |
| 9 | original troopers on the scene, they didn't have that |
| 10 | information. From Sergeant Mullett's on should have |
| 11 | been. The supplement Sergeant Mullett did should have |
| 12 | been on a DV form. The road trooper is going back in |
| 13 | and just doing a supplement from the original. So |
| 14 | he's just going to go in and grab the original. It's |
| 15 | all electronic. The one we should have switched out |
| 16 | would have been Sergeant Mullett's. |
| 17 | MS. BALLARD: Which is Maher 3? |
| 18 | THE WITNESS: Which is Maher 3, correct. |
| 19 | Because that was the first person that had privy to |
| 20 | everything. |
| 21 | BY MR. MARTIN: |
| 22 | Q. Let me go back to Hawkins 5. I'm sorry to keep |
| 23 | switching back and forth. I want try to cover |
| 24 | everything. |

|  | 75 |
|---|---|
| 1 | According to the Resume of Violation, it |
| 2 | cites poor judgment with regard to the direction that |
| 3 | you gave to "administratively unfound" the complaint, |
| 4 | the particular complaint that we were referring to. |
| 5 | Do you agree that that's the direction that you gave? |
| 6 | A. There's times when you just take the discipline |
| 7 | that's handed out, and that's what I did here. I am |
| 8 | not going to drag a sergeant into something that was |
| 9 | my responsibility to go back and I should have checked |
| 10 | that report, which I didn't do, so that's my |
| 11 | responsibility. |
| 12 | Q. Do you believe you would have been subject to |
| 13 | discipline had Sergeant Mullett complied with your |
| 14 | direction? |
| 15 | A. If he had put it in Brian Maher's name, |
| 16 | probably not. But it wasn't done correctly, so here |
| 17 | we sit. |
| 18 | Q. Next there is the statement that you exercised |
| 19 | poor judgment in failing to address the issue with |
| 20 | Corporal Dempsey making false statements to |
| 21 | investigating troopers in connection with the |
| 22 | complaint. What is your understanding if any, |
| 23 | Captain, as to what they mean by the false statements? |
| 24 | A. On the -- like I stated earlier, the -- on the |

|  | 76 |
|---|---|
| 1 | burglary report when she gave the version that the |
| 2 | gentleman from Texas wasn't in the residence, then all |
| 3 | of a sudden he was, that can be construed as a false |
| 4 | statement. And they're saying on that that I didn't |
| 5 | pursue that. Basically, she didn't want anything |
| 6 | done, he didn't want anything done, and I tried to |
| 7 | make it go away. |
| 8 | Q. Were you aware of any other allegations of |
| 9 | false statements other than what you have just |
| 10 | testified to? |
| 11 | A. Just involving the, just involving the burglary |
| 12 | complaint in the report here I talked about. |
| 13 | Q. As a result of this summary discipline, you |
| 14 | forfeited your vacation; is that fair to say? |
| 15 | A. Yes, sir. |
| 16 | MR. MARTIN: Let's go off. |
| 17 | MS. BALLARD: Okay. |
| 18 | (Recess taken.) |
| 19 | BY MR. MARTIN: |
| 20 | Q. Okay. Just what I hope are a few questions. |
| 21 | Then Ms. Ballard has some questions for you. I |
| 22 | appreciate your cooperation here this morning, going |
| 23 | through all these documents, et cetera. |
| 24 | Captain, when you were contacted by |

|  | 77 |
|---|---|
| 1 | Captain Dixon, the date of which you are not clear, |
| 2 | did you have any reason to believe that there was any |
| 3 | new evidence that may have sparked this investigation? |
| 4 | A. No. It was a call out of the blue, I mean. |
| 5 | I -- |
| 6 | Q. What do you mean, "call out of the blue"? |
| 7 | A. I just picked up the phone, and -- he's not a |
| 8 | person I talk to much, and he says, I have -- he had |
| 9 | some questions. And I answered his questions. |
| 10 | Q. Do you know how Captain Dixon learned of this |
| 11 | situation? |
| 12 | A. I heard he just got wind of it through the |
| 13 | grapevine. I don't know that. |
| 14 | Q. Do you believe that the punishment given |
| 15 | Ms. Dempsey as a result of this was fair? |
| 16 | A. I didn't know -- |
| 17 | MS. BALLARD: Objection to form. |
| 18 | A. I don't even know what she got, to be honest |
| 19 | with you. |
| 20 | Q. Well, initially, it was termination. Do you |
| 21 | believe that was a fair punishment for what happened |
| 22 | here? |
| 23 | MS. BALLARD: Objection to the form. |
| 24 | A. I don't know. I'd like -- I'd have to review |

20 (Pages 74 to 77)

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

78

1  the whole case because I didn't know that. I didn't
2  know she got terminated.
3  Q. It's surprising, though. Fair to say you are
4  surprised?
5  A. Yeah. Again, I don't know what all was going
6  on. I didn't know that.
7  Q. Captain, we've talked a couple times about this
8  statement on Maher 1 with regard to this uncertainty
9  as to or this statement as to where Mr. Keller was,
10  whether he was at the home or -- her home, Christie's
11  home, or at his sister's home. Do you believe that
12  Corporal Csapo may have made a mistake with regard to
13  his recollection of what Ms. Dempsey told her?
14      MS. BALLARD: Objection to the form.
15  A. I don't think so. I am just reading the report
16  as it was recorded. I know that the statement -- the
17  folk -- the gentleman from Texas, is that Keller?
18  Q. Keller.
19  A. Keller. I know that our guys were looking at
20  him as this was a domestic incident between the two of
21  them and they were trying to get to the bottom of it.
22  And, basically, he comes clean when they take him to
23  his sister's and says, look, I'm going to tell you the
24  truth, this is what happened, bah, bah, bah. And

79

1  that's what comes out in this.
2      That's the gist I get from the whole report
3  is that when they pressed a little bit, he came clean
4  and told exactly where he was, you know, when this
5  whole thing was taking place.
6  Q. Does it make a difference for the investigating
7  officer as to one's state of inebriation at the time
8  one is talking to a police officer?
9  A. Yeah, I mean, you -- depending on the case, and
10  who it is and everything. I wasn't there. I don't
11  know how bad people were, but.
12  Q. You were aware of some discrepancies, I think
13  you pointed to before on the police report, initial
14  report, Maher 1. And I understand that you had
15  reviewed this report before speaking with Ms. Dempsey
16  sometime Sunday. Is that fair to say?
17      MS. BALLARD: Objection to the form.
18  A. Yes, I took a look at it, yes.
19  Q. Were you aware that there were those
20  discrepancies at the time you spoke with her?
21  A. About the different statement?
22  Q. Yes.
23  A. I believe so. I mean, it's a couple years ago,
24  I can't remember exactly, but. I'll be honest with

80

1  you, my focus was what she wanted to do. I wasn't
2  worried -- personally, I wasn't real worried about --
3  and she and I talked. I was upset that I had troopers
4  going probably a hundred miles an hour to her house.
5  And, you know, I would have wanted them -- I would
6  have wanted them called off, called back. And we
7  talked about that a little bit. And, you know, she
8  apologized about not giving the straight information
9  to the guys when they got there. But my focus --
10  Q. You believe that what she was telling you was
11  the truth, the whole truth when you spoke to her on
12  Sunday?
13      MS. BALLARD: Objection.
14  A. About Corporal Maher and the fact that she
15  didn't want prosecution, yes.
16  Q. And about the incident in particular?
17  A. She was sorry about the whole incident. She
18  wished it hadn't occurred. And I agreed with her on
19  that, I wished it hadn't occurred either.
20      MR. MARTIN: Thank you, Captain. I don't
21  have anything further.
22      MS. BALLARD: I do have some questions for
23  you.
24  BY MS. BALLARD:

81

1  Q. Let's go back to one of the last things you
2  were asked about, about Ms. Dempsey being terminated.
3  Are you aware that Corporal Dempsey elected to have a
4  trial board hearing on the charges?
5  A. No, I didn't.
6  Q. Are you aware that at a trial board hearing is
7  three troopers who had no involvement in the
8  underlying matter sitting in judgment of the
9  situation?
10  A. Correct.
11  Q. And are you aware that -- well, you're aware
12  Corporal Dempsey is still employed by the State
13  Police?
14  A. Correct.
15  Q. So if I told you she was reinstated after an
16  appeal, do you have any knowledge of that?
17  A. What you are -- what -- now that you say that,
18  I remember there was a trial board, and I remember --
19  I didn't remember that she got terminated, but that is
20  a process that occurs, you can appeal a judgment of a
21  trial board. Obviously, that's what happened.
22  Q. Any what -- sorry?
23  A. You can appeal a judgment and, obviously, that
24  must have happened here.

21  (Pages 78 to 81)

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

82

1  Q. Okay. Turning to your IA, which is Hawkins 5?
2  A. Yes.
3  Q. The third page of that, it's all one in this
4  exhibit, but this was a separate document. Is that a
5  notification of internal inquiry that you got?
6  A. Correct.
7  Q. Is this what starts a formal IA investigation?
8  A. Right, they bring it down, and they give it to
9  you before you get interviewed. Then they asked if
10 you are going to be interviewed, if you will allow
11 yourself to be interviewed. And I was given this and
12 then I was interviewed by Captain Paige.
13 Q. Is it your understanding from having received
14 this document that they were doing a formal IA of you?
15 A. Yes.
16 Q. The summary discipline that's the first two
17 pages of Hawkins 5, is that what you got at the end of
18 the formal IA investigation?
19 A. Correct, that's the result.
20 Q. You were asked about the words they chose here,
21 and you alluded to it, but administratively unfound,
22 do you agree those were your exact words to
23 Sergeant Mullett?
24 A. No. But like I said, you -- I told him to

83

1  clear the case. And this is what he did, but I am
2  responsible for that. I didn't go in and look at it.
3  Q. Do you know who the signature of highest
4  reviewing officer is?
5  A. Yes, that's Captain James Paige from internal
6  affairs.
7  Q. Is he the one who handled the whole internal
8  affairs investigation?
9  A. I know he did my interview. He interviewed me.
10 Q. What year was Brian Maher in paramedic school,
11 if you can recall?
12 A. I do not. I am thinking around '95, but I am
13 not a hundred percent on that. I know I had to do a
14 check-out dive with him when he got done, that he was
15 off for a year and then I had to do the check-out dive
16 before he could be back on the SCUBA Team. But I
17 think it was around '95.
18 Q. You testified that you considered Brian Maher
19 to be a friend. Did your actions in handling the
20 Dempsey-Maher matter, were those actions based in any
21 way on your friendship with Brian Maher?
22 A. No, I am going to actually -- as stated, I have
23 handled about five of these type complaints before,
24 and they were involving other troopers. And I just

84

1  tried to handle it to make sure everybody's handled it
2  correctly. On this case, I felt like that's what she
3  wanted. I wanted -- that's what I wanted to, you
4  know, see happen.
5  Q. Were you trying to handle things fairly with
6  respect to Corporal Dempsey?
7  A. Yes.
8  Q. When you called the troop -- the call you
9  placed from DSU Sunday night, right after you got the
10 call from Maher, were you trying to reach
11 Sergeant Houdek or were you just calling the troop in
12 general?
13 A. I called the troop just to find out what was
14 going on.
15 Q. Did you speak to Sergeant Houdek because he was
16 on duty?
17 A. Yes, I spoke to Sergeant Houdek.
18 Q. We discussed the initial report by Csapo, which
19 is Maher I. And I believe you said, you told,
20 instructed Sergeant Houdek to have his officers write
21 it up the way it was, the way the information was
22 given to them?
23 A. Correct.
24 Q. Is that standard operating procedure?

85

1  A. Yes.
2  Q. Would it really have been appropriate for
3  Corporal Csapo to write up something, information you
4  had received in a phone call in an incident report?
5  A. No. Realistically, that should go in a
6  supplement either by myself or somebody else.
7  Q. Were you ever asked to do a supplement?
8  A. No.
9  Q. I just want to clarify for the record. What
10 time -- when was the first time you spoke with
11 Corporal Dempsey after this incident?
12 A. I believe it was the afternoon of Sunday. This
13 would be the 26th the whole thing was happening. I
14 get the call 2:00 in the morning. This would have
15 been the -- I went home and got some sleep, and like
16 the following afternoon, I believe it was.
17 Q. Did you call her or did she call you?
18 A. I called her.
19 Q. Did you speak with her again that Sunday after
20 that one conversation?
21 A. I am not sure. I am not sure if I --
22 Q. Do you know if you spoke to her on a Monday?
23 A. I may have. I am not sure a hundred percent on
24 that.

22 (Pages 82 to 85)

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

**86**

1  Q. It's correct that you testified you gave her
2  the option of having Maher arrested?
3  A. Yes. I laid it all out. I said, "The ball is
4  in your court. You tell me what you want to do, and
5  I'll do it."
6  Q. Did she address that one way or the other?
7  A. She said the whole thing was a big
8  misunderstanding, that he was going to fix the window
9  and she didn't want any prosecution.
10  Q. Do you affirmatively remember she said I don't
11  want him arrested?
12  A. She told me she didn't want him arrested; it
13  was a big misunderstanding. She didn't want anything
14  done.
15  Q. The policy you testified about that exists at
16  least now that IA is always to get involved when there
17  is a trooper domestic. Do you know when that policy
18  went into effect?
19  A. I do not. That was not, like I said, I was
20  probably ten years behind the times. When I had
21  handled them as a lieutenant, it was the criminal unit
22  came out and handled them, and we handled them the
23  same way we did for any citizen. But that had
24  changed, obviously.

**87**

1  Q. Your instruction to Sergeant Mullett to
2  reclassify the case, would it be accurate to say that
3  was based on Corporal Dempsey's direction to you as to
4  what she wanted done with the case?
5  A. Correct, that she didn't want to prosecute.
6  That's what -- when I meant clear, that's what I mean.
7  Q. When you said --
8  A. When I said clear, clear the case out,
9  exceptionally clear is what it should have been.
10  Q. Do you know why Mullett chose to unfounded
11  instead of exceptionally clear?
12  A. I do not know.
13  Q. Was Sergeant Mullett on the SCUBA Team?
14  A. No.
15  Q. Take a look at Maher 1 on page 3, Statement of
16  Victim Dempsey. The second line from the bottom, is
17  it correct that that says, "Dempsey stated she can
18  offer no suspect information nor any investigative
19  leads"?
20  A. Correct.
21  Q. And that would be something she told Csapo that
22  night?
23  A. Correct.
24  Q. And based on your knowledge, that was untrue;

**88**

1  correct?
2  A. Correct.
3  Q. We discussed the last line. "Dempsey stated
4  she arrived home alone and was alone at the time of
5  the above incident."
6  A. Yes.
7  Q. And that was untrue also; correct?
8  A. Correct.
9  Q. And would you look at Maher 2?
10  A. Mm-hmm.
11  Q. The last line of the first paragraph. This
12  appears to be a quote that Corporal Gygrynuk is
13  relating from Corporal Dempsey. "I asked her if she
14  has a boyfriend. She stated, 'No.' I asked her if
15  she has a male friend who thinks he is her boyfriend.
16  She stated, 'No.'
17  Based on your understanding of the
18  incident, is that incorrect?
19  A. That's not correct.
20  Q. Let me ask you to look at Maher 3, which is
21  Sergeant Mullett's report. First of all at the
22  bottom, he's the reporting officer and the supervisor?
23  A. Correct.
24  Q. Is that normal?

**89**

1  A. Yeah. Sergeant and above can -- they can
2  approve their own reports.
3  Q. Was there any need -- is there any need,
4  typically, for you as a captain to approve a
5  sergeant's reports?
6  A. No.
7  Q. Let's look at what he wrote in the
8  investigative narrative, the second line. "The victim
9  in this case has stated that the suspect is in fact a
10  friend and she desires no further action in this
11  case." Is that true?
12  A. True.
13  Q. "Apparently the window has been repaired and
14  dispute settled." Is that true from your
15  understanding?
16  A. Yes.
17  Q. "Victim feels no crime was committed." Is that
18  your understanding from having spoken to Christie?
19  A. Not wanting to pursue it.
20  Q. It was true she did not want to pursue it?
21  A. Correct.
22  Q. Then he wrote: "This case is closed as
23  unfounded"?
24  A. Correct.

23 (Pages 86 to 89)

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

**90**

1  Q. That was not the correct coding to use?
2  A. That's not the coding, but it was closed, yes.
3  Q. Would it have said exception -- what's the
4  word?
5  A. If it had been exceptionally cleared, what you
6  do is you have to put a suspect name in there.
7  Q. Did you instruct Sergeant Mullett not to put
8  Brian Maher's name on this form?
9  A. No, I didn't. I didn't tell him not to. I
10  assumed he was.
11  Q. You assumed he was going to?
12  A. Just put it -- to EC, you have to put a
13  suspect's name.
14  Q. Did you tell anyone at any time not to put
15  Brian Maher's name on any of these reports?
16  A. No.
17  Q. Did anyone tell you Brian Maher's name
18  shouldn't appear on these reports?
19  A. No, nobody said that to me.
20      I can't speak for Sergeant Mullett, but I
21  can tell you he probably didn't want to go the DV
22  route, and that's why he did what he did, looking at
23  this.
24  Q. Do you know why he wouldn't have wanted to go

**91**

1  the DV route?
2  A. Because that would raise more flags, and that's
3  probably why -- I am looking at this, thinking that's
4  probably why he did that.
5  Q. Do you know if that was based on
6  Corporal Dempsey's desire not to prosecute?
7  A. Oh, yeah, that's why it would be.
8  Q. Were any actions you took in regard to your
9  handling of this matter based on the gender of either
10  Brian Maher or Christie Dempsey?
11  A. No.
12  Q. To your knowledge, did anyone take gender-based
13  action in this matter?
14  A. No.
15  Q. I believe you said you thought the
16  investigation reopened up about a year later.
17  However, Sergeant Hudson's report appears to be
18  started in April of '04. Would it be correct to say
19  that it was probably started up six months later?
20  A. Okay. Then that would be right. It's
21  whenever, whenever Sergeant Hudson's, that's when it
22  gets reopened.
23  Q. Okay.
24  A. I thought it was a year.

**92**

1  Q. Do you remember in your list of options you
2  gave Christie as to how this could be handled, do you
3  recall asking or giving her the option of having IA
4  get involved?
5  A. I don't know if I offered IA or not. But I did
6  tell her I could either arrest him, and I gave her the
7  different options I discussed.
8  Q. You testified earlier that Christie didn't tell
9  responding officers Kevin Keller was in the house,
10  that you didn't think that was a big deal. Wouldn't
11  you agree it was a big deal for a responding trooper
12  responding to a burglary not to know somebody is
13  hidden in the back of the house?
14  A. Yes. You should know who all is in the house.
15  Because I -- I guess I was privy to all this other
16  information, reading the reports. To me it wasn't
17  because it -- I guess I'm reading between lines, but I
18  figured -- I was assuming she just didn't want this to
19  get to Maher, and that's what I was looking at there.
20  Q. Would it be correct to say in hindsight --
21  A. But in hind -- but the trooper wants to know
22  who all is around, definitely; for an officer
23  safety-wise, definitely, yes.
24  Q. You were asked why you think Captain Dixon got

**93**

1  involved or what his intentions were in getting
2  involved in early 2004, and you sort of alluded to
3  that and then you stopped. What do you think his
4  intentions were?
5  A. You know, I don't know everything on that,
6  but -- I better stay away from that. I think that's
7  going to be a lot of hearsay on my part or speculation
8  on my part. Well, okay.
9  Q. I don't want you to speculate.
10  A. Well, I am just ...
11  Q. Did it have to do with internal politics?
12  A. Yes. I'll leave it at that.
13  Q. Do you know if Captain Dixon and then
14  Captain Hughes were competing for a major spot at some
15  point?
16  A. No, not Dixon. No, they weren't competing for
17  a major spot, no.
18  Q. You were discussing the IA investigation. You
19  said it was a broad-range IA investigation, and then
20  it came down to a few people being IA'd. When you
21  said IA'd there, did you mean actually disciplined?
22  A. Internal affairs investigation allows for
23  anybody that's, you know, principal that can be
24  disciplined, yes. So it was very broad. And my only

24  (Pages 90 to 93)

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

**A000025**

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

**94**

1  thing when I spoke to them, the people that are below
2  me, I didn't want to see them get in ....
3     Q.  Was it your understanding that IA looked into
4  their conduct, but didn't actually discipline them?
5     A.  They looked into it, and I think after I got
6  done being interviewed by Captain Paige, he realized
7  that they were going under my direction.
8     Q.  Would it be correct that troopers are supposed
9  to write up their reports based on the information
10  they have at the scene through what they observe and
11  witness information?
12     A.  Yes.
13     Q.  Let's take a look at Hawkins 3 for a minute.
14  This is Hudson's report?
15     A.  Yes.
16     Q.  On the front page, "Modified Victim
17  Information." Is it correct that Elizabeth Dempsey's
18  address is 12 Sea Chase Lane, Rehoboth Beach,
19  Delaware?
20     A.  Yes.
21     Q.  And if you'd turn the page. "Modified Suspect/
22  Defendant Information." Brian Maher, is it correct
23  his address at that time was 12 Sea Chase Lane,
24  Rehoboth Beach, Delaware?

**96**

1     Q.  You gave an interview to Sergeant Hudson, and
2  that is Hawkins 4?
3     A.  Yes.
4     Q.  He's reporting your interview in that document
5  at page 7 and 8.
6     A.  Yes.
7     Q.  On page 8, Sergeant Hudson writes that you told
8  him -- this is about midway on the page -- "Victim
9  Dempsey advised that there had been no threats, no
10  assault and no other damage other than a window." Is
11  that correct?
12     A.  Correct.
13     Q.  Is that what you told him?
14     A.  Yes.
15     Q.  "Captain Hawkins advised that Victim Dempsey
16  advised she did not want any further police
17  involvement, stated she was sorry she didn't tell
18  troopers that responded that morning the truth." Is
19  that correct?
20     A.  Yes.
21     Q.  That's what you told him?
22     A.  Yes.
23         MS. BALLARD:  I think that's all I have.
24  That's all I have. Thank you.

**95**

1     A.  Yes.
2     Q.  Was there ever a time after the initial
3  incidence of October 26th that you talked to Christie
4  Dempsey about this matter?
5     A.  Yes.
6     Q.  When as that?
7     A.  We were at -- I was at a wedding reception for
8  Steve Griffin, which is a fellow scuba diver.
9  Christie was there with Brian Maher. I was there with
10  my wife. When we were leaving, she came up and
11  thanked me for taking care of the situation that they
12  had.
13     Q.  When was that wedding?
14     A.  The reception -- the wedding was in October.
15  The reception would have been November of 2003.
16     Q.  So about a month after the incident?
17     A.  Yes.
18     Q.  Did you have any other conversation with her
19  after that?
20     A.  No.
21     Q.  Whose wedding was it, did you say?
22     A.  Steve Griffin.
23     Q.  Is he a trooper?
24     A.  Yes, and Jennifer Griffin was his wife also.

**97**

1  BY MR. MARTIN:
2     Q.  I am going to back to ask you just one, I think
3  follow-up, and that's with regard to the Captain Dixon
4  matter and your response as to internal politics. And
5  let me preface my question, Captain, by telling you,
6  that is, while this is a court of law in terms of
7  giving sworn testimony, the standards for deposition
8  testimony are a little bit different from what we
9  would do in a court of law. So, therefore, I
10  appreciate the fact that, you know, what you may know
11  may be considered hearsay, but that is still something
12  that we have a right to discover on. So I would ask
13  you to elaborate on your response to Ms. Ballard.
14     A.  It's probably speculation on my part before I
15  say anything. I ... you know, I just think Dixon,
16  Captain Dixon is a close friend of another trooper
17  that was, I think in trouble at the time or looking to
18  get in trouble and sometimes misery wants company, and
19  I think that may have been driving some of that.
20     Q.  That was Captain Conley?
21     A.  Correct. It's just -- that and sometimes it is
22  competition for the next rank, and it's like if you
23  can throw some mud on somebody and ... Again, this is
24  speculation. This is strictly speculation on my part.

25  (Pages 94 to 97)

Dempsey v. State of Delaware , Department of Public Safety
Captain Robert C. Hawkins

|   | 98 |
|---|---|
| 1 | But he seemed awful interested in something that was |
| 2 | something that was six months past and I felt was all |
| 3 | taken care of and done. But -- |
| 4 | Q. And not only was it very old, but it was also |
| 5 | very minor, would you agree? |
| 6 | A. I had looked at it that way, sir. But I was, |
| 7 | obviously, wrong. |
| 8 | MR. MARTIN: Thank you. That's all I have, |
| 9 | Captain. |
| 10 | MS. BALLARD: One question. Actually, no, |
| 11 | I don't have that question. We're done. Thanks. |
| 12 | (Deposition concluded at 11:34 a.m.) |
| 13 | — — — |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|   | 100 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | REPLACE THIS PAGE |
| 5 | |
| 6 | WITH THE ERRATA SHEET |
| 7 | |
| 8 | AFTER IT HAS BEEN |
| 9 | |
| 10 | COMPLETED AND SIGNED |
| 11 | |
| 12 | BY THE DEPONENT. |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|   | 99 |
|---|---|
| 1 | INDEX |
| 2 | WITNESS: CAPTAIN ROBERT C. HAWKINS    PAGE |
| 3 | EXAMINATION BY MR. MARTIN            2 |
| | EXAMINATION BY MS. BALLARD          81 |
| 4 | EXAMINATION BY MR. MARTIN           97 |
| 5 | HAWKINS DEPOSITION EXHIBITS |
| 6 | NO.                    MARKED |
| 7 | 1  Captain Hawkins' copy of Csapo report    70 |
| 8 | 2  One-page document from divisional        47 |
| | manual, stamped D 00041 |
| 9 | |
| | 3  Supplemental Report No. 4              48 |
| 10 | |
| | 4  Pages 3 through 13 of               70 |
| 11 | Supplemental Report No. 4 |
| 12 | 5  Document titled "Summary Disciplinary    71 |
| | Action |
| 13 | — — — — |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|   | 101 |
|---|---|
| 1 | State of Delaware ) |
| 2 | New Castle County ) |
| 3 | |
| 4 | CERTIFICATE OF REPORTER |
| 5 | I, Lucinda M. Reeder, Registered Diplomate |
| 6 | Reporter, Certified Real-time Reporter and Notary |
| | Public, do hereby certify that there came before |
| 7 | me on October 11, 2007, the witness herein, |
| | CAPTAIN ROBERT C. HAWKINS, who was first duly sworn by |
| 8 | me and thereafter examined by counsel for the |
| | respective parties; that the questions asked of said |
| 9 | witness and the answers given were taken down by me in |
| | Stenotype notes and thereafter transcribed by use of |
| 10 | computer-aided transcription and computer printer |
| | under my direction. |
| 11 | |
| | I further certify that the foregoing is a true |
| 12 | and correct transcript of the testimony given at said |
| | examination of said witness. |
| 13 | |
| | I further certify that I am not counsel, |
| 14 | attorney, or relative of either party, or otherwise |
| | interested in the event of this suit. |
| 15 | |
| 16 | |
| 17 | Lucinda M. Reeder |
| 18 | Lucinda M. Reeder, RDR, CRR |
| | Certification No. 132-RPR |
| | (Expires January 31, 2008) |
| 19 | |
| 20 | |
| 21 | |
| 22 | DATED:   10-26-07 |
| 23 | |
| 24 | |

26 (Pages 98 to 101)

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477



**WILCOX & FETZER LTD.**

# CONFIDENTIAL
# PORTIONS

## In The Matter Of:

# Dempsey v. State of Delaware
# Department of Public Safety

## C.A. # 06-456-SLR

## Major Randall Hughes

### October 11, 2007

Dempsey v. State of Delaware Department of Public Safety

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

*PAGE 34 CONTAINS CONFIDENTIAL TESTIMONY AND HAS BEEN
PLACED IN A SEALED ENVELOPE AT THE BACK OF TRANSCRIPT*

ELIZABETH C. DEMPSEY,      )
                           )
            Plaintiff,     )
                           )    Civil Action
v.                         )    No. 06-456-SLR
                           )
STATE OF DELAWARE, DEPARTMENT)
OF PUBLIC SAFETY,          )
                           )
            Defendants.    )

        Deposition of MAJOR RANDALL HUGHES taken pursuant
to notice at the law offices of Martin & Wilson, 1508
Pennsylvania Avenue, Wilmington, Delaware, beginning
at 11:46 p.m. on Thursday, October 11, 2007, before
Lucinda M. Reeder, RDR, CRR and Notary Public.

APPEARANCES:

        JEFFREY K. MARTIN, ESQ.
        Martin & Wilson
           1508 Pennsylvania Avenue
           Wilmington, Delaware 19806
           for the Plaintiff,

        STEPHANI J. BALLARD, ESQ.
        State of Delaware, Department of Justice
           820 N. French Street
           Wilmington, Delaware 19801
           for the Defendants.

ALSO PRESENT:

        ELIZABETH C. DEMPSEY
- - - - - - - - - - - - - - - - - - - - - - - - - - - --
        WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware  19801
            (302) 655-0477

            www.wilfet.com

Dempsey v. State of Delaware Department of Public Safety

2

MAJOR RANDALL HUGHES,

1
2     the witness herein, having first been
3     duly sworn on oath, was examined and
4     testified as follows:
5     BY MR. MARTIN:
6     Q.  Good morning, Major Hughes.
7     A.  Good morning.
8     Q.  My name is Jeff Martin, and I'm going to take
9     your deposition today with regard to a matter
10    involving Ms., Corporal Christie Dempsey.  Do you know
11    Corporal Christie Dempsey?
12    A.  Yes.
13    Q.  Ms. Dempsey?
14    A.  Yes.
15    Q.  How do you know Ms. Dempsey?
16    A.  She's a fellow trooper.
17    Q.  How long have you known Corporal Dempsey?
18    A.  Christie came to Troop 5 1999, I think.  I
19    believe.  I was troop commander there.  And she came
20    to Troop 5.  I believe that was in 1999 or 2000.
21    Q.  How long did you continue at Troop 5 as troop
22    commander?
23    A.  I was there for three years.
24    Q.  What observations, if any, did you make with

Wilcox & Fetzer, Ltd. Registered Professional Reporters          302-655-0477

---

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

3

1     regard to Corporal Dempsey's ability to be a State
2     Trooper?
3     A.  Sir, at this time, I don't recall anything that
4     was negative in the three-year time period that I can
5     recall today without looking at any performance
6     appraisals or anything.
7     Q.  Do you recall whether you were involved in any
8     of the performance, of her performance appraisals?
9     A.  I would have only been involved, I believe, as
10    the trooper commander just as they would -- once
11    they're finished coming through for review.
12    Q.  Okay.  And so you don't have any specific
13    recollection of any negatives?
14    A.  No, sir.
15    Q.  Do you have any recollection of any positive
16    achievements that she may have accomplished during
17    your tenure as troop commander?
18    A.  Well, I would like to think that all of our
19    troopers we had at Troop 5, because we had a fantastic
20    team, were all doing great things every day.  I could
21    not sit here today and tell you the great things of
22    any of those troopers, to be honest with you,
23    Mr. Martin.
24    Q.  Okay.

Wilcox & Fetzer, Ltd. Registered Professional Reporters          302-655-0477

---

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

4

1     A.  We had a great team.
2     Q.  Major, have you had your deposition taken
3     previously?
4     A.  Yes, sir.
5     Q.  Has it been taken subsequent to late 2005 in
6     the Connolly matter?
7     A.  No, sir.
8     Q.  Please listen carefully to my questions.  If
9     you do not understand a question, please tell me.
10    I'll be glad to restate it.  Okay?
11    A.  Very well.
12    Q.  I'm not here to trick you by any stretch of the
13    imagination.  I would much prefer to repeat a question
14    as many times as needed so that I can get my question
15    across to you.
16          Please be sure, if you will, to let me
17    complete my question before you begin your answer.
18    And I will give you that same courtesy.  I say that
19    for the sake of our court reporter, who cannot take
20    down two different people at one time, although she is
21    probably capable of doing that, but let's not put her
22    to that task today.
23          All right.  If at any time you need a
24    break, please, feel free to take a break, and no need

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          302-655-0477

---

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

5

1     to give us a rhyme or reason for that.  You can just
2     say you need a break, and I'll certainly respect that.
3          How long have you been with the Delaware
4     State Police?
5     A.  I am currently in my 23rd year.
6     Q.  What was your beginning point?
7     A.  March of 1985.
8     Q.  All right.  And you've fairly recently been
9     promoted to the rank of major; correct?
10    A.  Yes.
11    Q.  When was that?
12    A.  I believe that was in 2003.
13    Q.  Do I understand that the only commanders above
14    you would be the lieutenant colonel and colonel in
15    terms of the chain of command?
16    A.  Yes, sir.
17    Q.  As you sit here today as major, what are your
18    responsibilities, your commands?
19    A.  Today, my area of responsibilities are:  I am
20    the administrative officer/budget.  In my table of
21    organization, we have, of course, the fiscal section,
22    the transportation sections, the supply section, the
23    State Bureau of Identification.  I am probably leaving
24    somebody off of the list.  It's money, budget.

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          302-655-0477

2 (Pages 2 to 5)

Dempsey v. State of Delaware Department of Public Safety
## Major Randall Hughes

6

1   Q.  How long have you been in that, in this
2   position as major?
3   A.  I believe one year anniversary is either today
4   or tomorrow.
5   Q.  Okay.  When you were initially promoted to
6   major, you believe sometime in 2003, what
7   responsibilities did you have at that point?
8   A.  I was assigned as the field operations officer
9   for Kent and Sussex County.
10  Q.  Can you tell us what your responsibilities were
11  in that capacity?
12  A.  My table of organization at that time were
13  troops -- 3 in Kent County and the three troops in
14  Sussex County, Troop 7 in Lewes, Troop 4 in
15  Georgetown, and Troop 5 in Bridgeville.
16  Q.  What does that term, "field operations
17  officer," mean?
18  A.  Those troops that I just mentioned are patrol
19  and criminal troops.  They deal with the operations,
20  if you will, of the police services side of our
21  organization or the day-to-day operations, responding
22  to calls and conducting criminal investigations.
23  Q.  So by way of the chain of command, you would be
24  one step above the -- each of the troop commanders?

Wilcox & Fetzer, Ltd. Registered Professional Reporters    302-655-0477

Dempsey v. State of Delaware Department of Public Safety
## Major Randall Hughes

7

1   A.  Yes.
2   Q.  And then who did you report to in your capacity
3   as field operations officer?
4   A.  It would be the lieutenant colonel.
5   Q.  And who was that in 2003?
6   A.  That would have been
7   Lieutenant Colonel Macleish, Tom Macleish.
8        MR. MARTIN:  Off the record.
9        (Discussion off the record.)
10  BY MR. MARTIN:
11  Q.  So Lieutenant Colonel Macleish was the
12  lieutenant colonel until what time, if you recall?
13  A.  Well, he replaced Colonel Chaffinch as the
14  superintendent, and I do not recall that exact time.
15  And I should know that, but I don't recall when that
16  took place.
17  Q.  What is your current age, Major?
18  A.  45.
19  Q.  What is your educational background?
20  A.  I have a master's degree.
21  Q.  Master's in what?
22  A.  Public administration.
23  Q.  Where did you obtain that?
24  A.  Wilmington College.

Wilcox & Fetzer, Ltd. Registered Professional Reporters    302-655-0477

Dempsey v. State of Delaware Department of Public Safety
## Major Randall Hughes

8

1   Q.  And what year did you obtain that?
2   A.  2007.  I was the commencement speaker.
3   Q.  You were the commencement speaker for your own
4   graduation?
5   A.  At Georgetown, yes, sir.
6   Q.  Okay.  That's a nice accomplishment.
7   Congratulations?
8   A.  Thank you.  It was quite a shock.
9   Q.  Where did you receive your bachelor's?
10  A.  University of Delaware.
11  Q.  What year was that?
12  A.  I attended -- started in 1980, graduated 1984.
13  1980 to 1984.
14  Q.  Then you joined the police department in
15  March of '85; correct?
16  A.  Yes, sir.
17  Q.  Was that a lifelong aspiration to be a police
18  officer?
19  A.  Yes, sir, it was.
20  Q.  Were you born and raised in the State of
21  Delaware?
22  A.  Yes, sir.
23  Q.  Now, can you give us a, perhaps, a month and
24  perhaps a date for when you assumed the position, or

Wilcox & Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

Dempsey v. State of Delaware Department of Public Safety
## Major Randall Hughes

9

1   I'm sorry, when you were promoted to the rank of
2   major?
3   A.  I was actually officially promoted in November
4   of 2003.  However, I assumed the responsibilities in
5   July of 2003.  I can confirm that if I looked at the
6   scrapbook actually, I suppose, but I believe it was
7   July or at the very end of July when I went up to
8   headquarters.
9   Q.  And whose responsibilities did you assume; in
10  other words, who is your predecessor?
11  A.  Lieutenant Colonel Macleish.
12  Q.  All right.  Was that when Macleish became
13  superintendent at that point?
14  A.  He became deputy superintendent at that point.
15  Q.  Okay.
16  A.  He was the major, operations officer, in Kent
17  and Sussex.  He was promoted, and then I was promoted
18  to that major spot.
19  Q.  Immediately before that, were you still at
20  Troop 5?
21  A.  Yes, sir.
22  Q.  What is the process by which one is eligible
23  and becomes promoted to the rank of major in the
24  Delaware State Police?

Wilcox & Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

3 (Pages 6 to 9)

A000031

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

10

1    A. I think the process is being a captain. Once
2  you obtain the rank of captain, and then as — as I
3  understood it to be, it was at the discretion of the
4  superintendent.
5    Q. Who was the superintendent at the time you were
6  promoted to major?
7    A. Colonel Chaffinch.
8    Q. Was there any type of a testing process to
9  become eligible for promotion to major?
10    MS. BALLARD: I am going to object to the
11  relevance, but you can answer.
12    A. No.
13    Q. No. Okay. It's simply a matter of the
14  superintendent's discretion to choose whomever from
15  the ranks of captain?
16    A. Based on my experience from when I was
17  promoted, I was a captain, and would hope that past
18  performance would have been a part of that, but it was
19  at the discretion of the superintendent.
20    Q. Okay. So when you — you testified that you
21  assumed the responsibilities in July of 2003 from then
22  Major Macleish; correct?
23    A. Yes, yes, sir.
24    Q. Did you assume all of his responsibilities that

Wilcox & Fetzer, Ltd.Registered Professional Reporters    302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

11

1  he had as major and the field operations officer for
2  Kent and Sussex?
3    A. If all his responsibilities were for field
4  operations in Kent and Sussex, yes.
5    Q. That's helpful. I'm sorry. That question was
6  a little vague, but you clarified it.
7    Is there a field operations officer for, a
8  separate one for New Castle County?
9    A. Yes, sir.
10    Q. And who is that currently?
11    A. Today, it is Major Albert Homiak.
12    Q. How did you become aware of an incident
13  occurring at Christie Dempsey's home in Frederica,
14  Delaware?
15    A. My recollection of how I became aware was a
16  phone call on a Sunday morning. The phone call would
17  have taken place before 09:30 on that Sunday morning.
18    Q. How do you know that?
19    A. We were on our way to church; church starts at
20  09:30.
21    Q. Okay.
22    A. And I was made aware that there was an incident
23  at Christie's residence and that it was being looked
24  into. She was okay. The question — if I may?

Wilcox & Fetzer, Ltd. Registered Professional Reporters    302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

12

1    Q. Sure.
2    A. The question was: "She was okay?" And that
3  they were sorting things out, and that Captain Hawkins
4  was going to be talking to her later that day.
5    Q. And may I assume that Captain Hawkins is the
6  one who notified you?
7    A. Yes, sir.
8    Q. And that was your first knowledge of the
9  situation; correct?
10    A. Yes, sir.
11    Q. Okay. What specifically or as best you can
12  recall was relayed to you by Captain Hawkins by
13  telephone as before 09:30 that morning?
14    A. What I recall from that phone call, as you
15  mentioned earlier in your question, was that there was
16  an incident at Christie's residence and that we had
17  responded, our troopers had responded to the incident,
18  and that he was going to be looking into it further to
19  find out what was going on, and that she was okay.
20    Q. Did Captain Hawkins tell you how he was — how
21  he became aware of this incident?
22    A. No. No, sir.
23    Q. Can you provide your best estimate as to the
24  length of time you spoke with Captain Hawkins by

Wilcox & Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

13

1  telephone that morning?
2    A. In minutes. Five minutes would be long, I
3  would think.
4    Q. All right. What — did you have any subsequent
5  contact with Captain Hawkins regarding this incident?
6    A. As I recall, the follow-up information came, I
7  believe, on Monday, the next day.
8    Q. Well, let me just finish with Sunday then. Was
9  there any further involvement by you in any fashion
10  with regard to this incident on Sunday?
11    A. I don't recall another phone call on Sunday.
12  It does strike me as a bit odd that there wouldn't
13  have been one, but as I sit here today, sir, I don't
14  recall one on Sunday. My next I do recall was on
15  Monday, I think it was.
16    Q. Was that next call from Captain Hawkins or was
17  that — or did you place that to Captain Hawkins?
18    A. Now, that, sir, I don't recall. I remember
19  talking to him. I don't know if I called him or if he
20  called me. I don't recall.
21    Q. But to the best of your recollection, it was
22  Monday?
23    A. Yes, sir.
24    Q. Do you recall whether it was Monday morning or

Wilcox & Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

4 (Pages 10 to 13)

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

14

1   Monday afternoon?
2     A.  I believe it would have been Monday morning.
3     Q.  Okay.  What's the best you can recall as to
4   that conversation?
5     A.  As to that conversation, what I got from that
6   conversation was that there was an incident at
7   Christie's residence, that Christie was aware of who
8   the perpetrator was, but did not wish to have
9   prosecution.
10          Based on that information, I told
11   Captain Hawkins, well, if she doesn't want
12   prosecution — and I was also informed: "Well, we
13   have done this in the past, if they don't want
14   prosecution, we won't prosecute."  I said, "Well, make
15   sure the victim services is offered" — victim
16   services being any counseling that needs to be done —
17   "for Christie."  Again, I recall asking: "Is she
18   okay?"  Again, the answer was: "Yes."
19     Q.  What's your — strike that.  As to that call,
20   what's your best estimate as to the length of that
21   call?
22     A.  Again, it would be minutes, five, ten minutes
23   or so.
24     Q.  Did you do anything as a result of that call

Wilcox & Fetzer, Ltd. Registered Professional Reporters      302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

15

1   from Captain Hawkins?
2     A.  I did at staff meeting — actually, the call
3   took place after our Monday morning staff meeting,
4   executive staff meeting, because I did brief at the
5   staff meeting.  I did do a quick, just a quick brief,
6   there was an incident at Christie's residence and that
7   Hawk would be contacting — I would be talking to Hawk
8   later and that we would be having more information.
9     Q.  Who attended your executive staff meeting?
10     A.  All staff are supposed to be there, but on that
11   day, I can't tell you if they were all there at that
12   time.
13     Q.  Would that include Captain Hawkins?
14     A.  No, no, sir.  This would be majors and above.
15     Q.  Okay.  Where was this?  Did you physically
16   attend this executive staff meeting?
17     A.  Yes, sir.  At that time, my office was next to
18   the conference room.
19     Q.  Okay.  So you recall that you attended this
20   executive staff meeting and alerted whomever that
21   there had been this incident and that was based solely
22   upon that one call you got before church on Sunday?
23     A.  Yes, sir.
24     Q.  So then sometime after that you had this call

Wilcox & Fetzer, Ltd. Registered Professional Reporters      302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

16

1   with Captain Hawkins?
2     A.  Yes, sir.
3     Q.  Okay.  And as a result of that call, do you
4   recall whether you did anything?
5     A.  Again, sir, it would strike me as odd that I
6   would not have gone and had a conversation with the
7   lieutenant colonel regarding that; however, I cannot,
8   honestly tell you today that I had that conversation.
9   It would strike me as odd that I wouldn't have that
10   conversation being a new person in that position, but
11   I don't recall having that.
12     Q.  And the lieutenant colonel was your immediate
13   predecessor?
14     A.  That is correct, yes, sir.
15     Q.  It was something that — that type of situation
16   was something that then Lieutenant Colonel Macleish
17   probably had some familiarity with — not this
18   particular situation, but situations involving
19   troopers?
20     A.  He certainly would have had more experience
21   than I.
22     Q.  All right.  What is your next recollection of
23   anything that related to this incident?
24     A.  My next recollection of this incident is a huge

Wilcox & Fetzer, Ltd. Registered Professional Reporters      302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

17

1   gap in between, is that at a DUI awards ceremony in
2   Rehoboth at — not the Rusty Rudder.  Whatever is next
3   door to the Rusty Rudder is where they have banquets.
4     Q.  It's called the Rudder Complex.
5     A.  The Rudder Complex.  Captain Dixon, who was the
6   troop commander at Troop 5, approached me, asked me
7   about Brian — or Christie and Brian Maher.  I was
8   shocked.  I was surprised.  I asked him what he was
9   talking about.  He proceeded to tell me that Brian
10   Maher was the person who attempted to get into
11   Christie's residence.
12     Q.  Did you remember right away what that incident
13   was about?
14     A.  No, sir.  Actually, when Captain Dixon
15   mentioned to me that, I asked him what he was talking
16   about when he said something — first it came up as
17   Brian and Christie.  And I had — I asked him what he
18   was talking about.  Then he told me.  And then it
19   clicked, I went back to that incident.
20     Q.  Let's set the time and place here.  You said
21   these were DUI awards that were held in Dewey Beach?
22     A.  Yes, sir.
23     Q.  Do you recall the particular month that was
24   involved?

Wilcox & Fetzer, Ltd. Registered Professional Reporters      302-655-0477

5  (Pages 14 to 17)

A000033

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

18

1   A. After he — talking with Ms. Ballard, yes. But
2   until we talked, just prior to, no.
3   Q. What is your best recollection now that your
4   recollection may be refreshed?
5   A. April.
6   Q. Okay. Do you recall when in April?
7   A. No, sir.
8   Q. Why were you attending this awards ceremony?
9   A. As a field operations officer, we had many of
10  our troopers receiving recognition for their
11  outstanding work with their efforts with DUI
12  enforcement, so I wanted to be there.
13  Q. Was this an annual event?
14  A. Yes.
15  Q. Had you attended this event previously?
16  A. Yes, I had.
17  Q. What type of the day did this event occur?
18  A. Evening.
19  Q. Do you recall anyone who was honored on that
20  particular evening?
21  A. No, sir. We have multiple troopers who do
22  fantastic work. We had many troopers there, I mean.
23  Q. Was this a type of function where you were all
24  seated and presentations were made?

Wilcox & Fetzer, Ltd. Registered Professional Reporters     302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

20

1   A. Actually, Captain Dixon was at the function as
2   well for his troopers from his troop.
3   Q. What troop was that?
4   A. He was at Troop 5.
5   Q. In Bridgeville?
6   A. Yes, sir.
7   Q. Okay.
8   A. Just I went up to him and was making
9   conversation, talking to him, and a couple of other
10  folks that were standing there, and we were talking.
11  And then he — we stepped off to the side and he asked
12  me about — it came up about the — Brian and
13  Christie.
14  Q. What is it that you recall he said?
15  A. Well, he said that Brian was the person who
16  tried to get into Christie's residence and he actually
17  went on to say that I knew about it.
18  Q. And what did you say in response to that?
19  A. I said, "This is news to me. I did not know
20  that Brian was the person who tried to get into
21  Christie's residence."
22  Q. Are you sure as you sit here today that no one
23  ever told you that at or around the time of the
24  incident that Brian was the suspect in this matter?

Wilcox & Fetzer, Ltd.     Registered Professional Reporters     302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

19

1   A. Yes.
2   Q. Where were you seated in relation to the
3   podium, if you recall?
4   A. Sir, I don't know.
5   Q. Were you, given your position, were you up
6   there giving out the awards?
7   A. No, sir. I was not at the front table.
8   Actually, I don't even recall if there was a front
9   table at the podium other than just being a podium.
10  Q. Do you recall who sponsored this event?
11  A. Normally, it's the Office of Highway Safety in
12  conjunction with Mothers Against Drunk Drivers. But I
13  don't want to state for sure that it was that event,
14  that they both did that event.
15  Q. I'm sorry. Were there two different events?
16  A. No, no. I have been to multiple events, and
17  several at that location. I don't — I believe it
18  would have been OHS, Office of Highway Safety, and
19  MADD.
20  Q. You were accustomed to them doing those awards
21  jointly, OHS and MADD?
22  A. Yes.
23  Q. How was it that you had contact with Captain
24  Dixon?

Wilcox & Fetzer, Ltd. Registered Professional Reporters     302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

21

1   A. I am absolutely positive that I did not know
2   Brian Maher was the suspect in this.
3   Q. You never heard Captain Hawkins tell you that
4   Brian Maher had confessed to this situation?
5   A. No, sir.
6   Q. No, sir meaning that you definitely did not
7   hear Captain Hawkins say that to you?
8   A. That is correct.
9   Q. Fine. I just wanted to make sure we're clear.
10  Okay.
11       Now, with regard to your conversation with
12  Captain Dixon, how did it begin, as best you recall?
13  It seems to me at least if his opening line was Brian
14  Maher was the person who tried to get in, you know,
15  you would have been a little confused or whatever.
16  Did he come up and tell you, Hey, Major, we've got a
17  problem here or we've got to do something about this
18  type of thing?
19  A. That may very well have been how he opened up
20  the conversation. I don't know. What I recall and
21  what I remember, because it was such a shock to me,
22  was that Brian Maher was the person who tried to break
23  into Christie's residence.
24  Q. Why was it such a shock to you?

Wilcox & Fetzer, Ltd.     Registered Professional Reporters     302-655-0477

6 (Pages 18 to 21)

A000034

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

22

1    A.  I did not know that he was the person.
2    Q.  What had you known about the alleged crime that
3    occurred?
4    A.  Someone tried to break into Christie's
5    residence, that she knew who it was, but did not
6    desire prosecution.
7    Q.  Were you aware of any further details in terms
8    of what happened physically at her property in terms
9    of the break-in attempt?
10   A.  Not that the -- not initially, sir, no.
11   Q.  When you say not initially --
12   A.  No, not until -- oh, I'm sorry.
13   Q.  No, go ahead.
14   A.  Not until after Captain Dixon's conversation.
15   And then I notified the lieutenant colonel.  And then
16   we initiated an internal affairs investigation.  Then
17   those details started to come.
18   Q.  Are you positive, sir, that the internal
19   affairs investigation was not initiated before this
20   time?
21   A.  I initiated the internal affairs investigation.
22   Q.  Okay.  And was that part of your
23   responsibilities ass field operations officer, to
24   initiate internal affairs investigations?

Wilcox & Fetzer, Ltd. Registered Professional Reporters          302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

23

1    A.  Yes, sir.
2    Q.  I am trying to complete your conversation with
3    Captain Dixon.  How do you recall his demeanor when he
4    was talking to you about the situation?
5    A.  He was upset.
6    Q.  Did you have any understanding at that point as
7    to why he was upset?
8    A.  It started to become clear to me as I heard
9    him, what he was saying, why he would be upset.
10   Q.  And what was that?
11   A.  In that there had been, in his words, "a
12   cover-up."
13   Q.  So he used that term, "cover-up"?
14   A.  I remember "cover-up."
15   Q.  When he first described this to you, what did
16   he say in terms of how this was covered up?
17   A.  In that Brian Maher was the person who
18   attempted to break into the residence or was the
19   suspect, if you will, and that I knew about it and
20   that no action was taken.
21   Q.  And you immediately told him that you had
22   nothing --
23   A.  I immediately told him -- I'm sorry.  I didn't
24   mean to --

Wilcox & Fetzer, Ltd. Registered Professional Reporters          302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

24

1    Q.  That's okay.
2    A.  I immediately told him I did not know that that
3    was -- that Brian Maher had been involved.
4    Q.  Did you talk about any other commanders at that
5    point?
6    A.  No.  I don't recall talking about it.  I was --
7    had some other things on my mind at that time as to
8    what my -- what I was going to do next.
9    Q.  Obviously, you were upset yourself having been
10   accused by this troop commander that you knew
11   something that you did not know?
12   A.  Yes, sir.
13   Q.  What did Captain Dixon say to you in terms of
14   how he became aware of this information?
15   A.  There was some conversation about that,
16   Mr. Martin, but to tell you the truth, I don't recall
17   how he said he became aware of it.  He was aware of
18   it.  I was aware of it.  So I knew there were steps
19   that I needed to take.
20   Q.  What did that trigger in your mind in terms of
21   your position as field operations officer when you got
22   this information?
23   A.  First, the first thing that I did is I went
24   and, using my cell phone, tried to contact Captain

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

25

1    Hawkins.  After several attempts, I did get ahold of
2    Captain Hawkins and I asked him if Brian Maher was in
3    fact a suspect or the suspect in this?  And he said,
4    "Yes."  He also went on to say that he had told me
5    that Brian Maher was the suspect.  So it was a bit of
6    a disagreement over that on the phone.
7    Q.  So at this point here, within five minutes, you
8    have two troop commanders telling you that you knew
9    what had happened?
10   A.  Yes, sir.
11   Q.  Did you start to question your own memory?
12   A.  No.
13   Q.  All right.  Go ahead.  Please continue with
14   your conversation with Captain Hawkins.
15   A.  That was pretty much the extent of that
16   conversation, was -- once I learned that in fact Brian
17   Maher was the suspect, I knew I had to make another
18   phone call, which would have been to the lieutenant
19   colonel.
20   Q.  So through this conversation, you had a cell
21   phone call to Captain Hawkins, you were able to
22   confirm that Brian Maher was the suspect?
23   A.  That is correct.
24   Q.  That triggered your call to Lieutenant Colonel

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          302-655-0477

7 (Pages 22 to 25)

A000035

Dempsey v. State of Delaware Department of Public Safety
**Major Randall Hughes**

26

1  Macleish?
2  A.  Macleish.
3  Q.  What happened at that point?
4  A.  We had a discussion about the new facts I had
5  had, and we decided on Monday morning we would be
6  meeting first thing to decide our path forward.
7  Q.  Try to complete your conversation with
8  Captain Dixon.  As you sit here today, you recall that
9  he had discussed with you how he became aware of it,
10  he meaning Captain Dixon, and aware of the incident.
11  But you don't have any recollection as to what he
12  said?
13  A.  No, Mr. Martin.
14  Q.  All right.  Did you have the understanding from
15  Captain Dixon that until this point he had no idea
16  that this incident had happened?
17  A.  I am not sure if I understand your question.
18  Q.  Okay.  Was it your impression while talking to
19  Captain Dixon that this was his first notice, that he
20  had just gotten first notice of this incident?
21  A.  I don't think I can answer that.  I think
22  because I became so focused on -- I don't know when he
23  knew -- when he knew what he knew.  Once I knew this
24  information, I knew there was a path forward that I

Wilcox & Fetzer, Ltd. Registered Professional Reporters    302-655-0477

---

Dempsey v. State of Delaware Department of Public Safety
**Major Randall Hughes**

27

1  needed to follow.
2  Q.  Did he -- he meaning Captain Dixon -- give you
3  any further elaboration as to what he called "a
4  cover-up"?
5  A.  Sir, I remember hearing the words "cover-up,"
6  which are very -- not words you want to hear.  As far
7  as elaboration, is that I knew about -- what I was
8  hearing, what I was getting from is that I knew about
9  a cover-up from this incident.
10  Q.  Well, did he name any other individuals who
11  were part of this cover-up?
12  MS. BALLARD:  Objection to the form.
13  THE WITNESS:  Am I answering?
14  MR. MARTIN:  Yes.
15  MS. BALLARD:  I'm sorry.  You can answer.
16  You can pretty much answer everything.
17  THE WITNESS:  Did he tell me of anyone
18  else.  I believe he did mention Captain Hawkins.
19  BY MR. MARTIN:
20  Q.  Saying that Captain Hawkins knew about this
21  situation?
22  A.  Yes.
23  Q.  Were you aware at that point of any tension
24  between Captain Hawkins and Captain Dixon?

Wilcox & Fetzer, Ltd. Registered Professional Reporters    302-655-0477

---

Dempsey v. State of Delaware Department of Public Safety
**Major Randall Hughes**

28

1  A.  No, I don't believe so.
2  Q.  Have you become aware subsequently as to any
3  tension between those two commanders?
4  A.  Between --
5  Q.  Dixon and Hawkins?
6  A.  -- Glen Dixon and Hawkins?  I'm not aware of --
7  no fights that I know of.
8  Q.  Well, I am not asking just about fights.
9  A.  No, I -- I'm sorry.  I didn't mean to be
10  flippant with that.  No, I am not aware of those
11  tensions, no.
12  Q.  I understand that after this Saturday night
13  event, wherein you were unfairly accused of cover-up,
14  you followed up to include a call to
15  Lieutenant Colonel Macleish; correct?
16  A.  That is correct, sir.
17  Q.  Did you call him Saturday evening?
18  A.  I recall calling -- yes, I do believe it was on
19  Saturday that I think I called him.
20  Q.  Did you call anyone else Saturday night other
21  than Captain Hawkins with regard to this incident?
22  A.  I clearly remember talking to Captain Hawkins.
23  I don't recall talking to anyone else other than
24  calling the lieutenant colonel. -

Wilcox & Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

---

Dempsey v. State of Delaware Department of Public Safety
**Major Randall Hughes**

29

1  Q.  Was there anything that occurred regarding that
2  on Sunday, the next day?
3  A.  I don't recall.  I don't recall anything.
4  Q.  Then you talked about a meeting on that
5  following day, Monday; correct?
6  A.  Yes.
7  Q.  What type of meeting was held?
8  A.  That was me -- walking into the lieutenant
9  colonel's office and telling him what I heard and that
10  we needed to have an investigation into this matter.
11  He agreed.  He instructed me to contact the internal
12  affairs unit and make them aware.  And I did.
13  Q.  When you walked into his office, did you feel
14  somehow responsible for this state of affairs with
15  regard to this incident?
16  A.  Probably in the manner of I should be more in
17  tuned to what's going on within my realm of
18  responsibility.
19  Q.  All right.  So it was your decision with
20  Lieutenant Colonel Macleish's concurrence that the IA
21  investigation would begin?
22  A.  Yes, sir.
23  Q.  Who was responsible for the IA investigation?
24  A.  Captain Paige.

Wilcox & Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

8 (Pages 26 to 29)

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

30

1    Q.   Was there another investigation being conducted
2  concurrently?
3        MS. BALLARD:  Objection to the form.
4    A.   Typically, if there is going to be another
5  investigation, if you are referring to a criminal
6  investigation, they will be independent of each other.
7  Once this investigation was launched, I was removed
8  from the process, if you will.  I was not a party to
9  the criminal investigation nor was I a party to the
10 internal affairs investigation.
11   Q.   All right.  Why is it that you were removed
12 from both these investigations?
13   A.   Quite honestly, sir, I was a suspect in a
14 cover-up.
15   Q.   Were you ever charged divisionally with being a
16 suspect in a cover-up?
17   A.   Well, not being charged with a cover up.  There
18 was discipline initiated against me for poor judgment,
19 which resulted in two days suspension with the option
20 to forfeit vacation.  Once it was presented to me, I
21 signed it, and -- which, in essence, is pleading
22 guilty to that.
23   Q.   What was the factual basis stated on your
24 disciplinary form?

Wilcox & Fetzer, Ltd.Registered Professional Reporters        302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

31

1    A.   I believe the policy is -- well, I know what
2  the policy is.  If a trooper is involved in an
3  incident of a domestic nature, which I should have
4  known that was domestic only because when it was
5  revealed that Christie knows who it is but doesn't
6  want to say, it should have clicked, it should have
7  clicked in my brain to take more steps, and I did not.
8  That was poor judgment on my part.
9    Q.   Why don't you finish that thought, if you will.
10 If a trooper is involved in a domestic incident, what
11 was your responsibility?
12   A.   I'm sorry, Mr. Martin.  The policy states that
13 internal affairs will be notified.
14   Q.   Do you believe, in retrospect, that this should
15 have been done back in October of '03?
16   A.   Yes, sir, as soon as I knew that a trooper was
17 involved in this incident, I should have contacted
18 internal affairs.
19   Q.   Your understanding is if a trooper is involved,
20 and we're not talking about two troopers, but just one
21 trooper is enough to mandate -- is it a mandating an
22 internal affairs investigation?
23   A.   My understanding of the policy that I know
24 today, yes, it would be mandating.  If I were ever in

Wilcox & Fetzer, Ltd.Registered Professional Reporters        302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

32

1  that situation again, it would be mandated.
2    Q.   All right.  You say the policy that you know
3  today.  Has the policy changed in any regard?
4    A.   I cannot -- I don't know if it has changed.  I
5  was not familiar with it verbatim when this initially
6  happened.
7    Q.   Let me refer you to what was marked at the last
8  deposition as Hawkins 2 and represent to you this came
9  out of the divisional manual.  It's Bates stamped
10 D000041?
11       MS. BALLARD:  For the record, as stated in
12 the other deposition, this appears to be just part of
13 the entire policy.
14 BY MR. MARTIN:
15   Q.   Is that, Major, what you were referring to as
16 to the policy?
17   A.   Yes, sir.
18   Q.   Do you believe that that policy was in effect
19 in 2003 when this incident occurred?
20   A.   Yes, sir, I do believe that it was.  In
21 hindsight, I do believe that it was.  I can't tell you
22 that in 2003 I knew that this policy was as written
23 was there.
24   Q.   Is there any reason you didn't know it was

Wilcox & Fetzer, Ltd.    Registered Professional Reporters        302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

33

1  there as written?  Just had no experience to --
2    A.   I'd like to a -- I'm sorry, Mr. Martin.
3    Q.   That's okay.  I was trailing off.
4    A.   I would like to say, I did not have any
5  experience with a trooper being involved in a domestic
6  situation, but that would be not true.  As a troop
7  commander at Troop 5, we did have a trooper that was
8  involved in a domestic situation, and we contacted
9  internal affairs right away.  However, in that
10 particular incident the trooper was the aggressor
11 suspect, if you will, who --
12   Q.   Who was that trooper?
13       MS. BALLARD:  I am not.  I can't tell him
14 not to answer, but maybe this part of the record
15 should be sealed because I don't know what happened to
16 that case.  He could have been charged and exonerated.
17 And probably not something that should be public
18 information.
19       MR. MARTIN:  Okay.  If it's sealed, that's
20 something that I don't have an objection to as to this
21 question and answer.
22       MS. BALLARD:  It's just an invasion,
23 potential invasion of somebody's privacy.  It could be
24 there could be a public record out there, but I have

Wilcox & Fetzer, Ltd.    Registered Professional Reporters        302-655-0477

9  (Pages 30 to 33)



Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes - Confidential

34

1   no way of knowing.
2       MR. MARTIN:  Okay.
3       MS. BALLARD:  So we can seal this part of
4   the question.
5   ████████████████████████████
6   ████████████████████████████
7   ████████████████████████████
8   ████████████████████████████
9   ████████████████████████████
10  ████████████████████████████
11  ████████████████████████████
12  ████████████████████████████
13  ████████████████████████████
14  ████████████████████████████
15  ████████████████████████████
16  ████████████████████████████
17  ████████████████████████████
18  ████████████████████████████
19      MS. BALLARD:  We'll take it out of sealing.
20  BY MR. MARTIN:
21      Q.  Referring again to what was marked as Hawkins
22  No. 2, do you see in there that there is an
23  obligation for the on-duty supervisor to respond to
24  the scene?

Wilcox & Fetzer, Ltd. Registered Professional Reporters    302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

36

1   internal affairs unit.  Do you see where —
2       A.  Yes, sir, I do.
3       Q.  Now, field operations officer was you; correct?
4   You were at least in an acting capacity at that point?
5       A.  Yes, sir.
6       Q.  And it seems to give you the discretion, as I
7   read it, to determine whether to initiate action by
8   IA.
9       A.  As I read it now and understand it, there would
10  be no discretion, sir.
11      Q.  So at this point you believe that it was
12  mandatory?
13      A.  Yes, sir.
14      MS. BALLARD:  Are you talking this point
15  today?
16      MR. MARTIN:  Yes.
17      THE WITNESS:  Yes, sir.
18  BY MR. MARTIN:
19      Q.  Referring again to that same policy that was in
20  effect —
21      A.  Yes, sir.
22      Q.  — your understanding of the policy or at least
23  the way it's been interpreted is that it's also —
24  that it's mandatory.  Let me ask you about the

Wilcox & Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

35

1       A.  Yes, sir.
2       Q.  Do you have any understanding as to whether
3   that occurred in this situation?
4       A.  Yes, it did occur.
5       Q.  Okay.  Who — how did it occur?
6       A.  When I am answering these questions, am I
7   answering them from the date of the incident or from
8   what I know now?
9       Q.  Either one.  I assume you know more now than
10  you did then.
11      A.  Yeah.  From what I know now, which actually,
12  Mr. Martin — from what I know now — here's what I
13  know now.  There was a place called to 911 or to the
14  Kent Com Center.  Troopers did respond to the
15  residence.  And that a sergeant did also go.  I
16  believe it was Sergeant Houdek responded to the
17  residence.
18      Q.  If you were to learn that Sergeant Houdek did
19  not respond to the residence, would you agree that's
20  in violation of the divisional policy?
21      A.  Yes.
22      Q.  It also mandates that under this policy that
23  you have before you, that the field operations officer
24  will make the determination to initiate action by the

Wilcox & Fetzer, Ltd. Registered Professional Reporters    302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

37

1   notification of the officer's troop commander.  This
2   policy also mandates that.  Does it not?
3       A.  Yes, sir, it does.
4       Q.  Do you know who the officer's troop commander
5   was or at least this officer, Officer Dempsey's troop
6   commander was at the time?
7       A.  I believe that would have been Captain Dixon.
8       Q.  All right.  So to the best of your
9   understanding, Captain Dixon did or did not receive
10  notice at or around the time that Corporal Dempsey was
11  involved in a domestic incident?
12      A.  I don't believe he did receive notice.
13      Q.  What is the — as a major now, you've probably
14  had experience with this.  When a sworn officer
15  violates established divisional policy per the manual,
16  does that call for discipline?
17      MS. BALLARD:  Objection to the form.
18      A.  If a trooper violates policy?
19      Q.  Yes.
20      A.  I'm sorry.  I would assume or I would think
21  that that would depend on what the policy was,
22  intentions, was it a mistake, did they mean to do it,
23  would certainly have to come into play, severity of
24  the actions would come into play.  In regards to if —

Wilcox & Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

10  (Pages 34 to 37)

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

38

1  and if there is going to be discipline, and if there
2  is going to be discipline, to what degree.
3     Q.  By the way, you mentioned this term "severity."
4  Do you have any -- strike that.  Let me go back to
5  your initial understanding of this incident through
6  Captain Hawkins.  Did you have an understanding as to
7  the severity of that incident?
8     A.  My understanding from the initial was that
9  someone tried to break into Christie's residence and
10  we were investigating.  The subsequent phone call was
11  someone tried to break into Christie's residence and
12  Christie knew who that was, but did not want
13  prosecution.
14    Q.  As so severity, did that mean anything to you
15  as to severity?
16    A.  Sir, at those times, I see Christie as the
17  victim; hence, my request to make sure the victim
18  services is notified, is she okay?
19    Q.  What is your understanding, if any, Major, as
20  to how she may have been classified as victim but also
21  suspect?  Do you understand the reasons why?
22       MS. BALLARD:  Objection to form.
23    A.  When was she classified -- when -- I don't
24  understand the question.

Wilcox & Fetzer, Ltd. Registered Professional Reporters    302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

40

1     Q.  So let me add that to my prior question.  As to
2  your experience with discipline of these credibility
3  issues for officers who are off-duty, can you think of
4  any, any officers who may have been disciplined in
5  that regard?
6       MS. BALLARD:  Objection to form.
7     A.  Sir, as I sit here today, no, I cannot.
8     Q.  Returning to Hawkins 2 again.  If we assume
9  that Sergeant Houdek did not report to the scene per
10  this policy, is there any reason why discipline should
11  not be imposed on Sergeant Houdek?
12       MS. BALLARD:  Objection to the form.
13    A.  The question is:  Is there any reason why it
14  should not?
15    Q.  Yes.
16    A.  There very well may be a reason.  I don't know
17  what that would be.
18    Q.  All right.  But while you have testified that
19  you were not familiar with the divisional policy that
20  we have before us as H-2, would you agree that it's
21  fundamental that the on-duty supervisor would report
22  directly to the scene of a domestic involving a
23  trooper?
24    A.  Yes.

Wilcox & Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

39

1     Q.  Are you aware that she had an IA investigation
2  that led to a trial board that caused her termination?
3     A.  Yes, I am.
4     Q.  So my question to you is:  What is your
5  understanding, if any, as to what infractions may have
6  been violated by Corporal Dempsey?
7     A.  I do not have information on what those charges
8  were that were presented to me in any official
9  capacity.  What I have heard, it was for a credibility
10 issue.
11    Q.  How often in your 23-year career have you -- do
12  you understand that a fellow trooper has been
13  terminated because of a credibility issue?
14    A.  Rare.  And I am trying to -- there was a
15  memorandum that was issued by, I believe Attorney
16  General Brady at the time that discussed an officer's
17  integrity and credibility and what that could lead to
18  in proceedings, court proceedings.  But I don't know
19  if that was brought on by someone's -- testing
20  someone's veracity.
21    Q.  Did you have any understanding as to this
22  incident involving Christie Dempsey as to whether she
23  was on-duty or off-duty at the time?
24    A.  I assumed off-duty.

Wilcox & Fetzer, Ltd. Registered Professional Reporters    302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

41

1     Q.  Okay.  And what reasons, if any, may exist why
2  a sergeant in this capacity failing to report to the
3  scene of the domestic would not be subject to
4  discipline?
5       MS. BALLARD:  Objection to the form.
6     A.  Again, sir, I don't know.
7     Q.  We discussed at least briefly your discussion
8  with Lieutenant Colonel Macleish on that Monday
9  following your discussion with Captain Dixon.  I
10  understand that investigations ensued.  We've already
11  discussed the internal affairs investigation had
12  ensued.  Correct?
13    A.  Yes, sir.
14    Q.  Did you have any further involvement beyond
15  that point, the point of you going in and talking to
16  Lieutenant Colonel Macleish regarding the situation
17  other than your own disciplinary situation?
18    A.  Being interviewed by internal affairs and then
19  my discipline was my only involvement.
20    Q.  Were you aware that a criminal investigation
21  ensued as well?
22    A.  Yes, sir.
23    Q.  Were you aware of who did the -- who was
24  charged with the criminal investigation?

Wilcox & Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

11 (Pages 38 to 41)

Dempsey v. State of Delaware Department of Public Safety
## Major Randall Hughes

42

1  A. Yes.
2  Q. Who was that?
3  A. Brian Maher. Oh, I'm sorry. Charged with
4  doing the investigation?
5  Q. Yes.
6  A. I'm sorry, Mr. Martin.
7  Q. I understand. The record will reflect your
8  confusion there.
9  A. Thank you.
10  Q. Not a problem.
11  A. Pointing out my confusion.
12  Q. All right.
13     MS. BALLARD: Did you answer the question?
14  A. No, I haven't. I'm still thinking. I'm sorry.
15  I am not exactly sure who was in charge of the
16  criminal investigation. Perhaps Lieutenant Donaway.
17  I think he was the lieutenant in charge of the
18  criminal investigation unit at that time at Troop 3
19  or often -- sometimes we have taken, removed it from
20  the county and brought in other investigators.
21  Perhaps Sergeant Hudson who had done some of these
22  investigations for us in the past. In fact, I believe
23  it was Robert Hudson. I believe it was Robert Hudson
24  who conducted that investigation.

Wilcox & Fetzer, Ltd. Registered Professional Reporters     302-655-0477

Dempsey v. State of Delaware Department of Public Safety
## Major Randall Hughes

44

1  Q. If I were to point out on Maher 1, show you how
2  one of the witnesses identified this person as a
3  Delaware State Police trooper, are you saying you had
4  no knowledge about that?
5  A. Mr. Martin, I had no knowledge that a trooper
6  was involved other than the victim, Christie.
7  Q. Let me ask you about your contact with other
8  troopers regarding this domestic incident in October
9  of 2003. In particular, I would like to understand
10  whether you've ever spoken to Brian Maher about this
11  incident.
12  A. My contact with Brian Maher has been very
13  limited. In regards to this incident?
14  Q. Yes.
15  A. Sir, I don't believe I have had conversations
16  with him about this incident.
17  Q. So the answer is, no? I'm just checking.
18  A. Yeah.
19  Q. Have you spoken to Christie Dempsey about this
20  incident?
21  A. I don't believe we've had a conversation about
22  this.
23  Q. Sergeant Houdek?
24  A. No, I have not had a conversation with Sergeant

Wilcox & Fetzer, Ltd.     Registered Professional Reporters     302-655-0477

Dempsey v. State of Delaware Department of Public Safety
## Major Randall Hughes

43

1  Q. I may have asked you this. Let me show you
2  what was marked as Maher 1, Maher 2, Maher 3 at the
3  last deposition, at Mr. Maher's deposition. Also I'll
4  show you Maher 4. What I would like to understand is
5  whether you have ever reviewed those documents. If
6  they don't appear to be familiar, please indicate. If
7  you need to take time, that's fine as well.
8  A. No. Maher 1, no. Maher 2, no. Maher 3, no.
9  Maher 4, no. I was not part of the review process on
10  any of those reports. These reports I have -- I was
11  not a part of the review process. They were
12  presented, I believe at my interview with internal
13  affairs, at which time I said I was not part of the
14  review.
15  Q. Okay. When is it that you first learned that
16  the perpetrator in this incident involving Ms. Dempsey
17  was a trooper? And I am not talking about the
18  identity of the trooper, but just the fact that the
19  person was a trooper.
20  A. In the conversation with Captain Dixon.
21  Q. You didn't -- you didn't have any information
22  to -- before that to show or at least suggest that the
23  perpetrator was a trooper?
24  A. No, sir.

Wilcox & Fetzer, Ltd. Registered Professional Reporters     302-655-0477

Dempsey v. State of Delaware Department of Public Safety
## Major Randall Hughes

45

1  Houdek.
2  Q. And you knew, however, that Sergeant Houdek was
3  the sergeant at the time this was, this incident was
4  reported; correct?
5  A. Yes.
6  Q. So at least after your understanding that a
7  trooper, and a trooper by the name of Maher, was
8  involved, you never went back and spoke with Houdek
9  about the situation?
10  A. No, sir. I do not recall going back because
11  once we started the criminal or the internal affairs
12  investigation, they were handling the investigation.
13  Q. As you sit here today, do you believe that the
14  supervisors below you, talking about sergeant,
15  lieutenant, captain, could have better handled this
16  incident?
17  A. As I sit here today --
18  Q. Yes.
19  A. -- I could have better handled this incident.
20  Q. We'll talk about that in a moment. With what
21  you understand right now, do you believe that any of
22  these other officers -- and I'll point out
23  Sergeant Houdek, and you have, Captain Hawkins, I am not
24  quite sure which lieutenant may have been involved,

Wilcox & Fetzer, Ltd.     Registered Professional Reporters     302-655-0477

12 (Pages 42 to 45)

**A000040**

1 but do you believe that they could have done something
2 that would have alleviated or prevented this
3 situation, including your own IA investigation?
4   A. Yes.
5   Q. Okay. And who was that?
6   A. We all could have followed the policy exactly.
7   Q. Do you believe that the -- this policy in
8 particular should be carried out and adhered to word
9 for word or do you believe that there is some
10 discretion involved with the officers?
11   A. My view is a bit tainted since this incident
12 and my discipline. I would remove the discretion from
13 that.
14   Q. In response to my other question to you as to
15 who could have handled it better and how, can you,
16 please, elaborate on that? And I'm talking about
17 Sergeant Hondek or Captain Hawkins.
18       MS. BALLARD: Please be specific who you
19 are talking about in your answer.
20   A. My answer is that, for this particular
21 incident, it makes no difference to what -- for this
22 particular incident and my involvement -- what actions
23 were below me. The information that I was given, that
24 a trooper was involved, and being Christie, as a

1 victim in this incident, and once I heard that she
2 knew who it was, but did not wish prosecution, I
3 should have known that it was a domestic incident and
4 that I should have followed this. My failure to do
5 that --
6   Q. "This," you are referring to?
7   A. This policy. I'm sorry.
8   Q. Yeah.
9   A. My failure to do that prolonged this, and it
10 should have been taken care of immediately.
11   Q. Let me ask you also as to who you may have
12 contacted or discussed this matter with. Did you ever
13 speak to any of the investigating troopers,
14 Corporal Gygrynuk, Corporal Csapo and Trooper Argo?
15   A. I may have talked to them, but not about this
16 incident that I recall no, sir.
17   Q. I am just confining this to this incident. How
18 about Major Papili?
19   A. I don't recall I had discussion with regards to
20 this incident. Once the internal affairs
21 investigation started, I was instructed not to talk to
22 other folks about this incident.
23   Q. What further discussion, if any, did you have
24 with then Lieutenant Colonel Macleish or then

1 Colonel Chaffinch about this situation?
2   A. Once the internal affairs investigation had
3 launched? There really was no discussion about this
4 until Lieutenant Colonel Macleish presented me with
5 the Summary Disciplinary form.
6   Q. What is your understanding, if any, as to the
7 role of Sergeant Chuck Mullett in this situation?
8   A. Well, Sergeant Mullett would have been major
9 crimes or the -- a sergeant in the criminal
10 investigations unit. He might have been involved in
11 the investigation. I don't know his role. I don't
12 know his specific role.
13       MR. MARTIN: All right. Why don't we take
14 just a minute? I believe I'm just about finished. I
15 want to just check my notes.
16       THE WITNESS: Okay.
17       (Recess taken.)
18       MR. MARTIN: Major, I think that's all the
19 questions I have right now. I appreciate your
20 attention.
21       THE WITNESS: Thank you.
22       MS. BALLARD: I have a few.
23 BY MS. BALLARD:
24   Q. Let's go back to October. The end of October

1 2003, you got this call from Captain Hawkins. You
2 gave some testimony. I wasn't clear on what you were
3 saying. After that call or the next day, were you
4 saying that you couldn't recall if you had a
5 conversation with the lieutenant colonel or you don't
6 think you had a conversation with the lieutenant
7 colonel?
8   A. After the initial phone call on the Sunday
9 before 9:30?
10   Q. Right.
11   A. I did have a conversation Monday. I thought I
12 was explaining about the staff meeting. That's when I
13 would have made them aware.
14   Q. Okay. You said something at the staff meeting?
15   A. Yes, ma'am.
16   Q. Did you have another conversation, a separate
17 conversation with the lieutenant colonel outside of
18 the staff meeting?
19   A. Again, it would strike me as odd if I did not,
20 but I don't -- I can't sit here and recall that I did
21 today.
22   Q. So you are saying you don't recall?
23   A. No.
24   Q. That's what I wanted to clarify. You were

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

50

1    aware at the end of October 2003 that Christie Dempsey
2    did not want the matter pursued; correct?
3        A.   That was -- yes, that's how that was given to
4    me, yes, ma'am.
5        Q.   Even though you weren't aware of the specifics
6    of the matter as to who the intruder was?
7        A.   Yes.
8        Q.   Cover-up were Glen Dixon's words; correct?
9        A.   Yes.
10       Q.   Did you agree with that characterization?
11       A.   No.
12       Q.   I don't want to put words in your mouth.  But
13   would you characterize this as more as policy not
14   being followed correctly or how else would you have
15   characterized it?
16           MR. MARTIN:  Objection, because I think you
17   have just done so.  Leading.
18       Q.   You can answer.
19       A.   Yes to your question.
20       Q.   Well was the policy followed correctly?
21       A.   No.
22       Q.   It wasn't followed correctly by you?
23       A.   Yes.
24       Q.   And the troopers below you?

Wilcox & Fetzer, Ltd. Registered Professional Reporters          302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

51

1        A.   I know it was not followed properly by me.
2        Q.   Now, there was a formal IA investigation of you
3    in connection with this matter; correct?
4        A.   Yes.
5        Q.   And certain charges were substantiated at the
6    end of that investigation?
7        A.   Yes.
8        Q.   And I believe you said that?
9        A.   Poor judgment.
10       Q.   One count of poor judgment?
11       A.   Yes.
12       Q.   Were any charges that would equate to a
13   cover-up substantiated?
14       A.   No.
15       Q.   Were any charges equating to a cover-up
16   substantiated with regard to anyone in this matter, to
17   your knowledge?
18       A.   Not to my knowledge.
19       Q.   If you need to discuss details we can go under
20   seal again, but I am just going to call this trooper
21   "Trooper M" that you referred to.
22       A.   Mm-hmm.
23       Q.   You said you referred that incident with
24   Trooper M to IA because of the nature of the charges;

Wilcox & Fetzer, Ltd. Registered Professional Reporters          302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

52

1    correct?
2        A.   Yes.
3        Q.   When you did that, is it because you had the
4    policy marked Hawkins 2 in mind or just because of the
5    nature of what had happened?
6        A.   Because of the nature of what had happened.  He
7    assaulted another person.
8        Q.   And is it correct that you don't know exactly
9    when the document marked Hawkins 2 went into effect in
10   the form it's in?
11       A.   Referring to the policy.  No, I don't know the
12   exact date that it went into effect.
13       Q.   Is it possible there were revisions at some
14   point?
15       A.   Yes.
16       Q.   But you don't know?
17       A.   No, I don't know.  It should be noted,
18   somewhere in that manual, there should be a revision
19   date if in fact there was a revision.  If it's
20   possible that it was a revision.
21       Q.   You were asked about the IA investigation as it
22   pertained to Christie Dempsey.  Would it refresh your
23   recollection to know that her infractions, alleged
24   infractions were making false reports to the

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

53

1    responding troopers?
2        A.   I don't know exactly what those charges were.
3    But I think -- a credibility issue is how I recall it.
4        Q.   To your knowledge, did Christie Dempsey take
5    advantage of a trial board in having her charges
6    heard?
7        A.   I believe there was a trial board.
8        Q.   Does a trial board consist of three troopers?
9        A.   Yes.
10       Q.   And --
11       A.   Well --
12       Q.   Sorry.  Go ahead.
13       A.   Yes.  But sometimes it may not be troopers if
14   the officer is a rank of -- sometimes we have -- for
15   captain, we've had outside agencies conduct the -- be
16   members of the panel.
17       Q.   Would it be correct to say the three members
18   that sit had no involvement in the underlying
19   incident?
20       A.   Yes.
21       Q.   They're independent?
22       A.   Yes.
23       Q.   Do you have a comprehensive knowledge of all
24   discipline that has been imposed by Delaware State

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          302-655-0477

14 (Pages 50 to 53)

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

54

1  Police during your tenure?
2    A. No.
3    Q. So it's possible that certain discipline could
4  have been dished out to a trooper that you don't know
5  about?
6    A. Yes.
7    Q. I think you already testified, though, once you
8  turned this matter over to IA, it would not be
9  appropriate for you to discuss it with potential
10  witnesses. Correct?
11    A. Correct.
12    Q. Based on the information you got in the call
13  from Captain Hawkins on or about October 26th, the
14  first call, do you take responsibility for not
15  handling this situation properly?
16    A. Yes.
17    Q. Would you say you were negligent in not
18  following the policy?
19    A. Yes.
20    Q. Would it also be correct to say that as soon as
21  you knew from Glen Dixon the full scope of the issue
22  that you took action?
23    A. Yes.
24    Q. And you referred it to your superior lieutenant

Wilcox & Fetzer, Ltd. Registered Professional Reporters     302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

55

1  colonel; correct?
2    A. Yes.
3    Q. To your knowledge, was that the first time the
4  lieutenant colonel knew Brian Maher was involved?
5    A. To my knowledge, yes.
6    Q. When you told him what you knew from Captain
7  Dixon, did the lieutenant colonel tell you to refer it
8  to IA or did you tell him --
9    A. We need to refer this to internal affairs.
10    Q. What did he respond?
11    A. We were saying it at the same time as an
12  affirmative.
13    Q. Let me just take you back to Hawkins 2 for a
14  second. If you could look at that second paragraph.
15  You were asked a couple questions about that. The
16  second line of that second paragraph, doesn't this
17  refer to incidents that take place outside the
18  jurisdiction of the Delaware State Police?
19    A. It does say outside the jurisdiction of
20  Delaware State Police yes.
21    Q. The incident that occurred in Frederica, would
22  that have been one of those incidents?
23    A. I am not sure. I don't know if that was within
24  the town limits of Frederica or not. I don't know

Wilcox & Fetzer, Ltd. Registered Professional Reporters     302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

56

1  that answer.
2    Q. Given that the state troopers responded, was it
3  within the State Police jurisdiction?
4    A. Well, it could have -- yes and no. Frederica
5  did not always have and I don't know when the last
6  time they had 24-hour coverage. It may have been a
7  time when we were providing contract services for
8  their municipality. So I don't know where exactly
9  this took place, if it was in the limits of Frederica.
10    Q. So would it be correct to say you don't know if
11  this paragraph would apply or not or do you know if it
12  applies?
13    A. I guess I'm applying it because we went and
14  therefore it applies.
15    Q. So you -- I'm sorry. Are you saying it was
16  within State Police jurisdiction or it was not within
17  State Police jurisdiction?
18    A. I believe that it was within State Police
19  jurisdiction.
20    Q. Do you have any knowledge that during the
21  initial handling of this incident in October of 2003
22  any preferential treatment was given to Brian Maher
23  versus treatment given to Christie Dempsey?
24    A. No, I do not.

Wilcox & Fetzer, Ltd.     Registered Professional Reporters     302-655-0477

Dempsey v. State of Delaware Department of Public Safety
Major Randall Hughes

57

1    Q. Are you aware of any handling of this matter
2  that was based upon the gender of either party?
3    A. No.
4    Q. In your opinion, the matter not being pursued
5  in October of 2003, did that have the same effect on
6  Dempsey and Maher?
7    A. In my opinion, the matter not being pursued in
8  October?
9    Q. I am not sure if my question is clear.
10    A. Yeah.
11    Q. I don't want to use the term "cover-up"
12  because, obviously, you disagree with that
13  characterization. But to the extent that the matter
14  was not pursued and you got two troopers involved,
15  would that be of the same benefit or detriment to both
16  of them equally?
17    A. It should have been pursued. I don't know --
18  bad news does not get better with time. It should
19  have been pursued.
20    Q. Because that was policy?
21    A. Yes, ma'am.
22        MS. BALLARD: That's all I have.
23        MR. MARTIN: No further questions.
24        (Deposition concluded at 1:11 p.m.)

Wilcox & Fetzer, Ltd.     Registered Professional Reporters     302-655-0477

15 (Pages 54 to 57)



Dempsey v. State of Delaware Department of Public Safety

58

```
1           INDEX
2   WITNESS: MAJOR RANDALL HUGHES          PAGE
3       EXAMINATION BY MR. MARTIN            2
        EXAMINATION BY MS. BALLARD          48
4
    (There were no exhibits marked for identification)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Wilcox & Fetzer, Ltd.Registered Professional Reporters        302-655-0477

Dempsey v. State of Delaware Department of Public Safety

60

```
1   State of Delaware  )
                       )
2   New Castle County  )
3
4       CERTIFICATE OF REPORTER
5
6       I, Lucinda M. Reeder, Registered Diplomate
    Reporter, Certified Real-time Reporter and Notary
7   Public, do hereby certify that there came before
    me on October 11, 2007, the witness herein,
8   MAJOR RANDALL HUGHES, who was first duly sworn by me
    and thereafter examined by counsel for the respective
9   parties; that the questions asked of said witness and
    the answers given were taken down by me in Stenotype
10  notes and thereafter transcribed by use of
    computer-aided transcription and computer printer
    under my direction.
11
12      I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
    examination of said witness.
13
14      I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
    interested in the event of this suit.
15
16
17
18          Lucinda M. Reeder, RDR, CRR
            Certification No. 132-RPR
19          (Expires January 31, 2008)
20
21
22  DATED:   10-26-07
23
24
```

Wilcox & Fetzer, Ltd.        Registered Professional Reporters        302-655-0477

Dempsey v. State of Delaware Department of Public Safety

59

```
1
2
3       REPLACE THIS PAGE
3
        WITH THE ERRATA SHEET
4
        AFTER IT HAS BEEN
5
        COMPLETED AND SIGNED
6
        BY THE DEPONENT.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Wilcox & Fetzer, Ltd.Registered Professional Reporters        302-655-0477



**WILCOX & FETZER LTD.**

In the Matter Of:

# Dempsey

## v.

# State of Delaware Department of Public Safety

C.A. # 06-456-SLR

Transcript of:

Sergeant Michael C. Houdek

January 14, 2008

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A000045

A000046

A000047

Dempsey v. State of Delaware Department of Public Safety

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,              )
                                   )
              Plaintiff,           )
                                   )    Civil Action
         v.                        )    No. 06-456-SLR
                                   )
STATE OF DELAWARE, DEPARTMENT)
OF PUBLIC SAFETY,                  )
                                   )
              Defendants.          )

         Deposition of SERGEANT MICHAEL C. HOUDEK taken
pursuant to notice at the law offices of Martin &
Wilson, 1508 Pennsylvania Avenue, Wilmington,
Delaware, beginning at 3:00 p.m. on Monday,
January 14, 2008, before Lucinda M. Reeder, RDR, CRR
and Notary Public.

APPEARANCES:

         JEFFREY K. MARTIN, ESQ.
         Martin & Wilson
           1508 Pennsylvania Avenue
           Wilmington, Delaware 19806
           for the Plaintiff,

         STEPHANI J. BALLARD, ESQ.
         State of Delaware, Department of Justice
           820 N. French Street
           Wilmington, Delaware 19801
           for the Defendants.

ALSO PRESENT:

         ELIZABETH C. DEMPSEY

- - - - - - - - - - - - - - - - - - - - - - - - --

         WILCOX & FETZER, LTD.
   1330 King Street - Wilmington, Delaware  19801
              (302) 655-0477
              www.wilfet.com

A000049

Dempsey v. State of Delaware Department of Public Safety

**2**

1       MICHAEL CARLOUIS HOUDEK,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    BY MR. MARTIN:
6       Q.  Good afternoon, Sergeant.
7       A.  How are you?
8       Q.  Good, thanks.  My name is Jeff Martin, as I
9    introduced myself previously.  I represent Christie
10   Dempsey in a matter that's been filed against the
11   State -- in particular, the State Police.
12          First of all, let me ask:  Have you had
13   your deposition taken previously, not just on this
14   matter, but any other matter?
15      A.  Yes.
16      Q.  How many times have you had your deposition
17   taken?
18      A.  I believe I've given two depositions.
19      Q.  What type of matters?
20      A.  One was a motorcycle accident, and the other
21   one was an automobile accident.
22      Q.  Okay.  How long ago were these depositions?
23      A.  Probably 15 years ago.
24      Q.  Okay.  Well, I'm pleased to say that the

**3**

1    deposition process has not changed much in 15 years.
2    But just as a brief refresher, I just ask you to
3    listen very closely to each of the questions that I
4    have for you.  I'll make an effort to ask one question
5    at a time.  If you do not understand my question,
6    please, let me know.  I'll be happy to restate it.
7    Okay?
8       A.  Yes.
9       Q.  I ask you to make sure that all of your answers
10   are verbalized so that the court reporter can take
11   them down, if your voice level is high enough for her
12   to hear you.
13          Also, please, avoid the uh-huh, uh-uh type
14   syndrome that I must tell you that we all lapse into.
15   I don't think I have been to a deposition where the
16   deponent, including myself, I have been deposed in
17   some matters, I have lapsed into that.  If that's the
18   case, we may just ask, you know, is that a yes or a
19   no.
20      A.  I understand.
21      Q.  Okay?
22      A.  Yes.
23      Q.  If you need a break at any time for any reason,
24   please, feel free to do so.  Please don't think that

**4**

1    you need to tell us why you need to take break.  Just
2    go and take a break.
3           I think with that being said, do you have
4    any questions about the process?
5       A.  No, sir.
6       Q.  Sergeant, how about if you give us your full --
7    and I know you stated that for the court reporter, but
8    if you would do that for me as well.  Your current
9    title is Sergeant; is that correct?
10      A.  That's correct, Sergeant Michael Houdek.
11      Q.  H-O-U-D-E-K?
12      A.  Yes, sir.
13      Q.  What troop are you assigned to?
14      A.  I'm currently assigned to Troop 3, Uniform
15   Patrol Division.
16      Q.  How long have you been in that capacity?
17      A.  Twelve years as sergeant.
18      Q.  Twelve years as sergeant.  How long with
19   uniform patrol in Troop 3?
20      A.  Probably a total of almost 20 years.
21      Q.  Do you have any type of designation as
22   sergeant, like a master sergeant or anything like
23   that?
24      A.  No, sir, it's just sergeant.

**5**

1       Q.  Can you tell me, briefly, what your duties are
2    as a sergeant at Troop 3?
3       A.  As a patrol sergeant at Troop 3, I'm
4    responsible for the personnel working on the shift.  I
5    am responsible for scheduling, correcting paperwork,
6    delegation of duties, patrol, sector assignments,
7    training.
8       Q.  Now, were you a patrol sergeant in October of
9    2003?
10      A.  Yes, sir.
11      Q.  Have your duties changed at all from October of
12   2003 until now?
13      A.  No, sir.
14      Q.  Can you tell me, briefly, the outlines of
15   Troop 3 in terms of the geography?
16      A.  Troop 3 is located on Upper King Road, 3036
17   Upper King Road, which lies between Camden-Woodside,
18   Kent County, State of Delaware.
19      Q.  Is there a designated territory for Troop 3?
20      A.  Yes, sir.  We cover the entire Kent County
21   other than the incorporated city structures.
22      Q.  One incorporated city would be Dover.  Is there
23   another one?  Or I should say, are there any others?
24      A.  Not that I can think of, sir.

2 (Pages 2 to 5)

**A000050**

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

**6**

1  Q. So Troop 3 carries the entire Kent County
2  except for Dover; correct?
3  A. That's correct.
4  Q. Dover is handled by its own police department?
5  A. That's right. There are also smaller municipal
6  departments. When they're on duty, we don't get
7  involved. When they're off-duty, we cover their
8  territories.
9  Q. What other municipal departments are there?
10  A. Smyrna Police Department; Cheswold Police
11  Department; Camden; Felton; Harrington. Sometimes,
12  Frederica.
13  Q. Let me ask you about Frederica. What is your
14  understanding, if any, as to whether they had a
15  municipal department in October of 2003?
16  A. I don't recall if they did or not because
17  they're hit and miss.
18  Q. What do you mean by that?
19  A. Sometimes they have a police department, then
20  they lose their officer, then they don't have a police
21  department. Then they hire somebody else, they have a
22  police department for a short -- it's --
23  Q. From what I gather, that police department
24  consists generally of one officer?

**7**

1  A. That's correct.
2  Q. As you sit here today, you don't recall whether
3  they had an officer in Frederica in October of 2003?
4  A. No, sir, I don't know.
5  Q. Sergeant, what, if anything, did you do to
6  prepare for your deposition today?
7  A. Just reviewed the original report that
8  Trooper Csapo wrote so I could get the dates and
9  times.
10  Q. Did you review reports other than Csapo's?
11  A. No, sir.
12  Q. Is it fair to say that that was the first
13  report generated about the incident that's the subject
14  of this litigation?
15  A. That's correct.
16  Q. Did you review any transcripts of testimony?
17  A. No, sir.
18  Q. Let me put before you what was — I'm sorry.
19  Go ahead.
20  A. Can I get my glasses?
21  Q. Certainly. We'll go off the record.
22    (Discussion off the record.)
23  BY MR. MARTIN:
24  Q. For the record, I've just handed you a police

**8**

1  report that was marked previously as Maher 1, and it
2  is three pages in length. Please take whatever time
3  you need to review that, and I'll ask you some
4  questions about it.
5    Sergeant, is that the police report that
6  you referred to in your testimony?
7  A. Yes.
8  Q. Before we go into that, let me ask you: I
9  understand that you sustained a physical injury that
10  kept you out of work for some period of time.
11  A. Yes.
12  Q. Is that fair to say?
13  A. Yes.
14  Q. I recall, Sergeant, that your deposition was
15  originally scheduled in, I think September or October
16  in this matter. Correct?
17  A. Correct.
18  Q. You sustained an injury to your lower
19  extremity, one of them?
20  A. Yes. My left calcaneous. I had four fractures
21  there.
22  Q. When did you return to active duty?
23  A. I came back to the troop December 4th on light
24  duty capacity.

**9**

1  Q. Are you still light duty?
2  A. Yes, sir.
3  Q. All right, Sergeant. When is it that you
4  previously reviewed this police report?
5  A. Approximately a week ago and then again today
6  before I came up.
7  Q. Before you reviewed it last week, did you have
8  any independent recollection of the events described
9  in this police report?
10  A. Yes, sir.
11  Q. Before last week when you saw this police
12  report, which is Maher 1, when is the last time you
13  either saw this report or discussed this incident?
14  A. Other than discussing that I had to give a
15  deposition, probably not since the incident.
16  Q. Do you recall ever speaking with internal
17  affairs about this incident?
18  A. Yes.
19  Q. Do you recall whether you gave a statement to
20  internal affairs?
21  A. Yes, I did.
22    MR. MARTIN: Go off the record here for a
23  moment.
24    (Brief recess taken.)

3  (Pages 6 to 9)

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

---

**10**

1     MR. MARTIN: Back on the record.
2     BY MR. MARTIN:
3     Q.   Sergeant, based upon your last statement to me
4     that you did a statement for internal affairs, I am
5     advised by counsel that that has been produced with
6     the production, so I am in the process of —
7         MS. BALLARD: Let me clarify. If it was
8     transcribed, it was produced. If anything was not
9     transcribed, I gave you a list of tapes that you could
10    request, if you wanted. If it was transcribed, it was
11    produced.
12        MR. MARTIN: Okay.
13        MS. BALLARD: They were transcribed for
14    purposes of either Brian or Christie's IA, and they
15    didn't necessarily transcribe everything they had.
16    They transcribed whatever was to be used in those
17    proceedings.
18        MR. MARTIN: I understand. Okay.
19        MS. DEMPSEY: Can we take a minute?
20        MR. MARTIN: Yes.
21        MS. DEMPSEY: Sorry.
22        (Recess taken.)
23        MR. MARTIN: We're in the process of going
24    through the disk, my paralegal is, in order to see if

---

**11**

1     Sergeant Houdek's IA interview is there. As I
2     understand it, if it's not there, it may have been on
3     a list presented to us, a list of testimony for which,
4     what, a tape could be requested rather than a
5     transcript; is that fair to say?
6         MS. BALLARD: Correct; tape. I gave you a
7     list of all the tapes, some of which have been
8     transcribed and some of which probably haven't. And
9     you are free to request copies.
10        MR. MARTIN: As I understand it, there is
11    one person per tape?
12        MS. BALLARD: Yes.
13    BY MR. MARTIN:
14    Q.   All right, Sergeant. I'm sorry to kind of get
15    off track here. And I want to make sure we cover
16    everything. And quite frankly, that would help me
17    speed up the process a little bit if we have that. So
18    we'll go forward with the deposition, and if we
19    recover that on the disk, I'll bring that in and we
20    may make that a deposition exhibit.
21        Do you recall by whom you were interviewed
22    from IA?
23    A.   No, I don't.
24    Q.   Do you recall whether there are any charges

---

**12**

1     that were alleged against you, divisional charges
2     through IA?
3     A.   I know they had concerns. They had questions
4     why the report was written in the fashion it was
5     written. I don't recall if there was a specific
6     charge levied against me.
7     Q.   Did Maher 1 that you have in front of you help
8     you recall any details that you may have forgotten
9     about over the last several years?
10    A.   Not really.
11    Q.   So you've maintained a pretty constant memory
12    as to the events of that evening; correct?
13    A.   Yes, sir.
14    Q.   Why don't we go through it as best you can and
15    recount what occurred. First of all, do you recall
16    what shift you were working that day, that evening?
17    A.   I was working the night shift.
18    Q.   And what was the time on the night shift?
19    A.   7:00 p.m. to 7:00 a.m.
20    Q.   Was that a regular shift of yours?
21    A.   Yes, sir.
22    Q.   And how long before this did you have that
23    particular shift, 7:00 P to 7:00 A?
24    A.   It rotates. We do seven days of seven nights

---

**13**

1     and then seven days. It switches every two weeks.
2     Q.   So you do seven shifts followed by a break of a
3     couple of days?
4     A.   Yes, sir.
5     Q.   And then —
6     A.   They're not consistent shifts. You do two day
7     work shifts, 7:00 a.m. 7:00 p.m. You have off two
8     days. Then you work three. Off two days. Work two.
9     Then you're off three days again. Then it switches
10    back to day work — or night work, just the opposite.
11    Q.   Do you recall how many officers you had working
12    for you at Troop 3 on that particular occasion?
13    A.   The minimum staffing at Troop 3 is seven. So
14    there would have been at least seven officers that
15    evening.
16    Q.   How is it that seven is designated as minimum
17    staffing?
18    A.   It's a number that headquarters came up with to
19    adequately cover the territory that we have to patrol.
20    Q.   Is it your testimony that you have never been
21    below the minimum of seven?
22    A.   We have, but we — I'm sorry.
23        MS. BALLARD: Object to the form. You can
24    answer.

---

4   (Pages 10 to 13)

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

**14**

1  A. If for some reason we drop below seven, we're
2  authorized to call in people for overtime. So we
3  always maintain seven.
4  Q. And do you have any recollection as to how many
5  you had on this particular shift?
6  A. It would have been at least seven. I don't
7  know counting for vacations or days off, I'd have no
8  idea. It would have been at least seven people that
9  night.
10  Q. Now, were the other officers on this shift,
11  were they all working the same shift, meaning
12  7:00 p.m. to 7:00 a.m.?
13  A. There might be some fluctuations as far as what
14  we consider our early cars, where they might come out
15  an hour ahead. So they may work 6:00 p.m. to
16  6:00 a.m. or 5:00 p.m. to 5:00 a.m. We fluctuate the
17  shifts just a little bit to allow coverage.
18  Q. Now, the seven officers, are you talking about
19  seven officers who are below the rank of sergeant?
20  A. That's correct.
21  Q. Of the seven officers, do they range in terms
22  of their age and experience?
23  A. Yes.
24  Q. And what does that range go from?

**15**

1  A. It can run from a trooper fresh out of the
2  academy to a master corporal, which is a rank obtained
3  after 16 years.
4  Q. All right. At Troop 3 on that particular
5  evening, who was in command?
6  A. I was.
7  Q. Were there any officers at Troop 3 who were
8  senior to you?
9  A. Not working.
10  Q. Okay. Of those not working, what ranks were
11  they and who were those individuals?
12  A. You would have a criminal lieutenant.
13  Q. I'm sorry, criminal lieutenant?
14  A. That's correct.
15  Q. Do you remember who that was at the time?
16  A. I believe it was Lieutenant Donaway at the
17  time.
18  Q. Donaway?
19  A. That's correct.
20  Q. Okay.
21  A. The traffic lieutenant. I can't recall if that
22  was Lieutenant Huttie or not. I don't recall the
23  exact name.
24  Q. Okay.

**16**

1  A. It would have been Captain Robert Hawkins, the
2  troop commander.
3  Q. And that was the entire lineup of officers at
4  the troop; correct?
5  A. That's correct, sir.
6  Q. How long had Captain Hawkins been troop
7  commander?
8  A. I am guessing. Maybe approximately five years.
9  Q. How long did he continue to be troop commander
10  or when was it that he left?
11  A. He is still currently troop commander.
12  Q. How about Lieutenant Donaway?
13  A. He transferred down to Sussex County.
14  Q. Do you recall when Lieutenant Donaway
15  transferred?
16  A. No, sir.
17  Q. Were you present at the troop when the initial
18  call came in regarding this incident?
19  A. Yes, I was.
20  Q. And where were you?
21  A. I was at the front desk.
22  Q. Now, let me get a clarification, if I can, in
23  terms of your job responsibilities as a patrol
24  sergeant. First of all, did Troop 3 have a desk

**17**

1  sergeant? Is there such a thing?
2  A. Well, the patrol sergeant is the desk sergeant,
3  per se. There are times that you go out on the road,
4  but it's, technically, a desk job.
5  Q. When is it that you go out on the road?
6  A. I try to get out as much as possible. Up until
7  my injury, I was out every day.
8  Q. Well, on a typical 12-hour shift, how much time
9  do you spend out on the road?
10  A. Probably ten hours.
11  Q. All right. When you are out, who is it that
12  takes the calls at the front desk?
13  A. It's whoever I designate to sit at the desk.
14  It can be somebody on light duty or somebody that is
15  behind in paperwork. There is no specific person.
16  Q. Is that person designated as -- in some type of
17  authority role, the person who sits at the front desk?
18  A. Normally, it's the assistant shift commander.
19  Q. Who is deemed to be the shift commander?
20  A. On that particular day?
21  Q. If you recall, yes.
22  A. I don't recall.
23  Q. All right. Please explain to me, if you will,
24  the role of shift commander versus assistant shift

5 (Pages 14 to 17)

**A000053**

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

**18**

1  commander.
2      A.  The assistant shift commander's
3  responsibilities are to supplement the sergeant. If
4  he's out on the road, then normally the assistant
5  shift commander will sit at the desk, correct
6  paperwork, answer any questions, maintain the security
7  of the troop. If he's out on the road, then he acts
8  as the on-road supervisor, going to a lot of the
9  complaints, backing up the troopers.
10     Q.  You are talking about the assistant shift
11  commander?
12     A.  Right.
13     Q.  How does that compare to the shift commander?
14     A.  He answers to the shift commander.
15     Q.  I am trying to distinguish between the two. I
16  apologize. Of all the people in this room, save the
17  court reporter I have the least knowledge of the way
18  your troop and division is set up.
19     A.  The sergeant's responsibility is for the whole
20  shift. In absence of the sergeant, the assistant
21  shift commander would fill in for the sergeant. If
22  both of us are working, then his duties would be to be
23  at the desk, unless I designate him to go out on the
24  road, or if his duties would be out on the road, which

**19**

1  would be to monitor what happens out on the road and
2  assist the other troopers if necessary.
3      Q.  I think, from what I understand, what you are
4  implying is that as the sergeant, you were also the
5  shift commander?
6      A.  That's correct.
7      Q.  Okay. I don't think that that was said.
8          MS. BALLARD:  The missing link.
9      Q.  That was the missing link. Thank you.
10     A.  Sorry.
11         MS. BALLARD:  That's okay.
12  BY MR. MARTIN:
13     Q.  Now, do I understand it's up to you as sergeant
14  and shift commander to designate the person who is the
15  assistant shift commander?
16     A.  I have the option of picking that, that's
17  correct.
18     Q.  Is that usually a selection that lasts for some
19  period of time or does that change day to day?
20     A.  It's usually the most senior corporal. It
21  usually lasts for a long time.
22     Q.  Do you recall who was your assistant shift
23  commander on the evening of October 26th, the morning
24  of the 26th?

**20**

1      A.  If memory serves me correct, it would have been
2  Corporal Duke.
3      Q.  Was Corporal Duke involved in any way with
4  this, with the incident that is involved here?
5      A.  No, sir. I believe it was his night off.
6  That's why I was sitting at the desk.
7      Q.  On the days or evenings that you were out,
8  where you out sometimes ten out of the 12 hours of
9  your shit, what is it that -- what are your
10  responsibilities?
11     A.  Well, what I try to do is, I listen to all the
12  complaints that are being dispatched. I respond to
13  the more serious ones with the officers. I am backup
14  for my shift. I am out there to guide and assist them
15  in processing scenes and handle -- assisting them at
16  accident scenes, criminal scenes.
17     Q.  So are you, in effect, in some cases
18  supervising some of the younger officers out there?
19     A.  I am supervising all of the other officers.
20     Q.  As I understand your recollection, you believe
21  that Corporal Duke was off on that particular night;
22  correct?
23     A.  That's correct. That would have been probably
24  why I was sitting at the desk.

**21**

1      Q.  Let's talk about other nights where
2  Corporal Duke was off. Would it be typical for you to
3  work the desk?
4      A.  Yes.
5      Q.  Now, when Corporal Duke was off -- and let me
6  go back and try to establish a period of time when he
7  was your assistant shift commander. If you can give
8  me the years involved, that would be helpful.
9      A.  I believe he came to me either 2002 or 2003.
10  He was my assistant until the end of 2006.
11     Q.  During that time when Duke was off, did you
12  appoint anyone else as assistant shift commander in
13  his absence?
14     A.  No.
15     Q.  Is that something you were able to do, but
16  chose not to do?
17     A.  No, it just wasn't common practice. Just like
18  if I was off, they wouldn't appoint another sergeant.
19  There is a hierarchy, and just if you are not there,
20  you are not there.
21     Q.  On the evenings that Corporal Duke was not
22  there, evenings and days -- I should just say,
23  shifts -- what were your duties?
24     A.  Most of the time, I would sit at the desk

6 (Pages 18 to 21)

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

22

1  because that's where the majority of the paperwork
2  gets corrected; and try to monitor the security of the
3  troop; handle any walk-in complaints; assist the
4  junior shift members.
5      Q. During those times, would you go out, would you
6  leave the troop in your vehicle?
7      A. On occasions, yes.
8      Q. Approximately how much time would you spend out
9  and away from the troop when Corporal Duke was not
10  there?
11      A. To be honest with you, it fluctuates. If I had
12  somebody on light duty, then Corporal Duke and I both
13  would be out on the road. It varied from time to time
14  depending on the circumstances.
15      Q. Well, what I am trying to understand is those
16  occasions when Corporal Duke was out. And you would
17  be at the troop and you would sit at the desk;
18  correct?
19      A. Yes.
20      Q. As I understand it, when Corporal Duke was
21  there, you said you spent, perhaps, ten hours out of
22  the 12 hours away from the troop in your vehicle.
23  Correct?
24      A. That's correct.

23

1      Q. Now, in those times when Corporal Duke was not
2  there, could you give me your best estimate as to how
3  much time you spent away from the troop?
4      A. If he wasn't there?
5      Q. Yes.
6      A. And no extenuating circumstances, like light
7  duty or anything. I would spend the entire shift at
8  the troop.
9      Q. Do you know if there was any divisional policy
10  in that regard?
11      A. No, sir. I believe it's up to the sergeant how
12  he wants to perform his duties.
13      Q. Do you recall the evening of this occurrence,
14  did you have any senior corporals who were capable of
15  sitting on the desk?
16      MS. BALLARD: Objection to the form.
17      Q. You may answer. She's making a record.
18      MS. BALLARD: Yeah. You can answer all the
19  time, unless I tell you not to answer.
20      A. I train all my people to do all the jobs. I
21  mean, any one of my people could have sat at the desk.
22      Q. Let's go back to this incident. You said you
23  were there when the first report came in?
24      A. Yes, sir.

24

1      Q. How did that come in?
2      A. I was actually notified by the dispatcher that
3  Corporal Dempsey had called in a burglary in progress.
4      Q. When you talk about the dispatcher, was that a
5  911 dispatcher or was it another dispatcher?
6      A. It was a 911 dispatcher.
7      Q. Do you have any understanding as to whether
8  Corporal Dempsey called in on a 911 line or whether
9  she may have used another line?
10      A. I am not aware, sir.
11      Q. But you are sure that the call that you
12  received was from a 911 dispatcher.
13      A. Yes, sir.
14      Q. Is that correct?
15          What, to the best of your recollection,
16  what was that report that you received?
17      A. That there was a subject attempting to break
18  into her house, that she had gotten her gun.
19      Q. And did you have a location on
20  Corporal Dempsey?
21      A. My understanding, it was her residence.
22      Q. Did you know where that was?
23      A. Yes.
24      Q. Where was that?

25

1      A. It's on -- I can't think of the name of the
2  road. I know the house. It's outside of Frederica.
3  It's just a little bit north of Frederica on -- I
4  don't know the name of the road.
5      Q. Approximately how far from the troop was
6  Corporal Dempsey's residence?
7      A. Perhaps 15 miles.
8      Q. What was the approximate driving time at that
9  time of the evening from the troop to
10  Corporal Dempsey's residence?
11      A. Twenty minutes to a half hour.
12      Q. How about if an officer were responding
13  quickly, how long would it take?
14      A. A guesstimate. It could take as little as
15  probably ten minutes.
16      MR. MARTIN: Off the record for a second.
17      (Discussion off the record.)
18  BY MR. MARTIN:
19      Q. All right. What did you do upon receiving that
20  call from the dispatcher?
21      A. I told him to send as many available units as
22  they had.
23      Q. I'm sorry. You told him?
24      A. The dispatcher, make sure they send as many

7 (Pages 22 to 25)

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

**26**

1 available units as we had to get there.
2    Q. All right. You're the commander of Troop 3.
3 At that point, you were receiving the 911 call
4 involving a suspected burglary at a trooper's home;
5 correct?
6    A. Correct.
7    Q. And I guess, again, I don't understand the
8 procedure very well. You're there at Troop 3, but you
9 are asking someone else to dispatch the vehicles?
10    A. The 911 Center is in a remote location. It's
11 not incorporated in Troop 3. They still call me, and
12 they're still accountable to me for certain decisions.
13 And they will call me and make me aware of certain
14 incidents, you know, based upon the severity of it.
15 And I will tell them what I need done with my police
16 officers.
17    Q. All right. So you as the sergeant, you don't
18 dispatch, you don't get on the radio and say, you
19 know, Csapo, respond to Frederica?
20    A. No, sir.
21    Q. That is done directly through the --
22    A. 911 Center.
23    Q. Who is it that actually coordinates that, if
24 anyone?

**27**

1    A. The 911 Center?
2    Q. Yes.
3    A. They have a supervisor at the center also that
4 directs their dispatchers.
5    Q. So the 911 Center at that point tried to find
6 as many units as possible to send them to the scene;
7 is that correct?
8    A. That's correct.
9    Q. What was your understanding as to what was
10 going on?
11    A. Just that there was a subject attempting to
12 break into Corporal Dempsey's residence and that she
13 had armed herself.
14    Q. All right. With that initial report, did you
15 consider that a serious matter?
16    A. Absolutely.
17    Q. Did you have anyone at -- any other officers
18 with you at Troop 3 when you received that call?
19    A. No, sir.
20    Q. All the other units were out doing what they
21 needed to do?
22    A. That's correct.
23    Q. Do you know whether there were any units close
24 to the troop, the troop headquarters?

**28**

1    A. I don't know.
2    Q. Okay. Did you have any thought about going to
3 the scene?
4    A. I would have liked to have responded, yes.
5    Q. Well, what was your thought process when you --
6 you got the call. You told the dispatchers to
7 dispatch as many units as they could to the scene.
8    A. Right.
9    Q. What were you -- what were you thinking about
10 what your involvement would be?
11    A. Well, I was, obviously, concerned for the
12 safety of the Corporal Dempsey and the officers that
13 were responding. I am just a very active sergeant.
14 When I am out on the road, that type of call would be
15 the type of call that I would respond to. Unable to
16 go, so it would have been tough sitting there.
17    Q. And you said you were unable to go because you
18 were the only one at the troop?
19    A. That's correct.
20    Q. Was there ever any time when you left the troop
21 and there were no other officers there?
22    A. No, sir. We can't leave the troop unmanned.
23    Q. That's divisional policy?
24    A. That's correct.

**29**

1    Q. Did you make any effort to see if there were
2 any local units who could come and fill in for you so
3 that you could respond to the scene?
4    A. No, sir, I did not.
5    Q. Is there any reason for that?
6    A. I knew my officers were responding as quickly
7 and as many there could, so that would mean there were
8 no available units to come back to the troop.
9    Q. What -- I am unfamiliar with this practice and
10 procedure. Pardon me. I served as a short-term
11 officer in New Jersey, and our dispatching system was
12 very different, but.
13       What I am trying to ascertain is: As the
14 sergeant and, effectively, the commander of Troop 3,
15 as you sat there, did you know where the units were
16 out in the county?
17    A. No. We have no way of knowing. There is no
18 way of tracking where the units are other than just
19 monitoring the radio.
20    Q. Is that true today as well?
21    A. That's correct.
22    Q. All right. What is your next recollection as
23 to what happened that evening after you got that call?
24    A. I heard my officers arrive at the scene, and I

8  (Pages 26 to 29)

**A000056**

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

---

**30**

1  instructed them to give me a call as soon as possible
2  and let me know what was going on.
3     Q.  And what officers arrived at the scene?
4     A.  I believe it was Corporal Gygrynuk,
5  Corporal Csapo and corporal — he was a trooper then.
6  Trooper Argon.
7     Q.  Do you recall in what order these troopers
8  arrived?
9     A.  I believe it was Gygrynuk first, Csapo second
10  and Argo third, I think. I can't be sure of that.
11    Q.  Do you have any recollection as to
12  approximately how much time elapsed between the time
13  of the call from the dispatcher and the time of
14  arrival at the scene?
15    A.  I can't tell you in minutes, but it felt like
16  forever.
17    Q.  So you received a call when they arrived at the
18  scene?
19    A.  I instructed the dispatch center to have one of
20  them call me and inform me what was going on when they
21  had an opportunity to.
22    Q.  And who was that?
23    A.  I believe it was Corporal Csapo that called me.
24    Q.  And at the time Csapo called you, had he done

---

**31**

1  some investigation as to what was going on?
2     A.  That's correct. I believe he had contacted
3  Corporal Dempsey at that point and established that
4  she was okay.
5     Q.  And what did you do at that point after getting
6  that report from Csapo?
7     A.  I instructed him to go ahead and process the
8  scene appropriately, try to ascertain who the suspect
9  is.
10    Q.  And what did you mean by processing the scene?
11    A.  He advised me that a window had been broken.
12  And I told him to go ahead and process, reference
13  latent fingerprints.
14    Q.  Do you know whether any fingerprints were
15  removed from the scene?
16    A.  I believe he processed the window area and did
17  recover a print, which was forwarded to our State
18  Bureau of Identification.
19    Q.  You believe that this was Csapo who removed the
20  fingerprints?
21    A.  I'm fairly certain.
22    Q.  Do you have any knowledge as to what happened
23  to those fingerprints?
24    A.  No, sir, I don't.

---

**32**

1     Q.  But to the best of your knowledge, they were
2  sent to the State Bureau?
3     A.  That's correct.
4     Q.  Did you ever have any knowledge later on as to
5  what may have happened to those fingerprints?
6     A.  No, sir.
7     Q.  Do you have an understanding as to how many
8  fingerprints were lifted?
9     A.  No, sir.
10    Q.  You also asked Csapo, as I understand it, to
11  ascertain who was the suspect; is that correct?
12    A.  No, I didn't recall say — we go there to try
13  to attempt to locate a suspect.
14    Q.  I believe, at least my notes reflect — and I
15  may be mistaken — that your instructions to Csapo
16  were to process the scene and to ascertain the
17  suspect.
18    A.  For suspects. You process the scene and
19  attempt to gain suspects.
20    Q.  What was your understanding, if any, as to
21  their attempt to ascertain suspects at the scene?
22    A.  I know that he would have conducted an
23  interview of Corporal Dempsey in attempt to gain a
24  physical description, direction of travel, anything of

---

**33**

1  that nature.
2     Q.  What was your understanding, if any, as to the
3  interview with Corporal Dempsey?
4     A.  I believe she informed them that she was — it
5  was an unknown suspect who had fled southbound. And I
6  don't believe there was a vehicle description.
7     Q.  Do you recall there was any indication as to
8  whether Corporal Dempsey had actually seen this
9  suspect?
10    A.  I was given the impression she had.
11    Q.  And what gave you that impression?
12    A.  Just the fact that it was, supposedly, a white
13  male, medium build; basically, a typical type suspect
14  or suspect description.
15    Q.  All right. What type of communication, if any,
16  did you have with the other two officers, Gygrynuk and
17  Argo, at the scene?
18    A.  I don't recall any specific conversation with
19  them at that point.
20    Q.  Was Csapo the senior person at the scene?
21    A.  No, Corporal Gygrynuk would have been.
22    Q.  Why is it that you had conversation with Csapo
23  in regard to the scene?
24    A.  Because he would have been the investigating

---

9 (Pages 30 to 33)

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

**34**

1    officer on that incident.
2        Q. How was it that he was designated as
3    investigating officer?
4        A. I believe that was his assigned sector for that
5    evening. Either that or him being junior to
6    Corporal Gygrynuk, he could have been assigned by
7    Corporal Gygrynuk. I believe that was his assigned
8    sector.
9        Q. So do you have any recollection as to whether
10   you assigned Csapo to be the investigating officer?
11       A. No, I did not.
12       Q. Was it your experience or practice that the
13   senior trooper made that designation at the scene?
14       A. It's not uncommon for that to happen.
15       Q. Do you have any reason to believe that that did
16   or did not happen on this particular occasion?
17       A. I have no idea if that's what happened or not.
18       Q. But you just know that Csapo was designated as
19   the investigating officer; correct?
20       A. That's correct.
21       Q. How was it that you came to that understanding?
22       A. I guess when he called in as I requested, and I
23   asked him who was going to handle it, I think he told
24   me he was handling it, which made him the lead

**35**

1    investigator.
2        Q. Do I understand correctly that while Argo and
3    Gygrynuk were at the scene, you had no, no
4    communication with them?
5        A. Not that I recall.
6        Q. Okay. Do you have any further recollection of
7    any discussion as to the identity of the subject while
8    Csapo was at the scene or was leaving the scene?
9        A. Could you ask that again?
10       Q. Yes. I understand -- I had asked you about the
11   identity of the subject, and you advised me that Csapo
12   had interviewed Corporal Dempsey. Correct?
13       A. Right.
14       Q. You believe based upon the description that
15   Corporal Dempsey had actually seen this person;
16   correct?
17       A. Correct.
18       Q. Did you have any further discussion with Csapo
19   following that discussion while Csapo was at the scene
20   as to the identity of the subject?
21       A. No.
22       Q. Okay. How many conversations did you have with
23   Csapo while he was at the scene? I believe it was just that one. Then I spoke
24   I believe it was just that one. Then I spoke

**36**

1    to him again when he came back to the troop, which was
2    several hours later.
3        Q. Do you recall when it was that Csapo came back
4    to the troop?
5        A. It was several hours after the incident.
6        Q. Was it dawn?
7        A. No, it was still dark. It would have been the
8    early morning hours.
9        Q. Do you know why he came back to the troop when
10   he did?
11       A. Just to complete his paperwork.
12       Q. Was it customary for the troopers to return to
13   the troop before the end of the shift to complete
14   their paperwork?
15       A. Yes.
16       Q. Were there any type of rules or regulations as
17   to when the troopers could return to the troop?
18       A. There is nothing set in stone. If there is a
19   break in the action and they've got a lot of
20   paperwork, I encourage them to come back, sit down,
21   get the paperwork done and then go back out on the
22   road. So there is no real set time.
23       Q. Okay. But it's then -- it may not just be at
24   the end of the shift, but it may be during the shift.

**37**

1        A. Correct.
2        Q. Is that fair to say?
3        A. Correct.
4        Q. So you don't have seven or eight troopers
5    coming in at 5:00 a.m. and no one is out on the road?
6        A. Correct. Hopefully.
7        Q. Okay.
8        A. Hopefully.
9        Q. As the sergeant, you want to make sure that
10   people are, your troopers are still out there;
11   correct?
12       A. That's correct.
13       Q. When is the first time you spoke with Gygrynuk
14   about this incident with Corporal Dempsey?
15       A. Probably when he came back to the troop.
16       Q. Did he return to the troop before or after
17   Csapo?
18       A. I don't recall if it was before or after.
19       Q. What was the nature of your conversation with
20   him when he returned?
21       A. He was a little bit upset, feeling that
22   Corporal Dempsey had not been honest with him.
23       Q. What did he mean by that?
24       A. He just felt that there were discrepancies in

10 (Pages 34 to 37)

A000058

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

38

1  her story.
2    Q.  Did he tell you what discrepancies?
3    A.  I didn't really encourage him at that point to
4  go into a whole lot of detail. I told him just to not
5  worry about it.
6    Q.  Did you ask him to do a report?
7    A.  No, sir, I didn't. Not that I recall.
8    Q.  How about Argo, when did you -- did you speak
9  with Argo about this incident afterwards?
10   A.  Probably at the end of the shift.
11   Q.  What do you recall your discussion to be or was
12 with Argo?
13   A.  With Trooper Argo, I believe it was just a
14 concern for safety, everything is okay,
15 Corporal Dempsey was fine. There was nothing very
16 specific about the conversation.
17   Q.  Did you ask Argo to do a report?
18   A.  No, sir.
19   Q.  So is it fair to say that the only report
20 requested or that you made sure was done was this
21 Maher 1 that you have in front of you by Csapo?
22     MS. BALLARD: Objection to the form.
23   A.  That's correct.
24   Q.  Is that fair to say?

39

1    A.  Yes.
2    Q.  Let me take you back to that evening or that
3  morning. Between the time of the incident and the
4  response by your three officers, did you speak with
5  anyone else about the incident before you spoke with
6  any of your three troopers?
7    A.  No.
8    Q.  Do you recall having spoken with
9  Captain Hawkins about this incident?
10   A.  Yes.
11   Q.  When did you speak with Captain Hawkins?
12   A.  The officers had already been at the scene.
13 They had processed the scene. And they had cleared
14 the scene. And I spoke to Captain Hawkins.
15   Q.  So you probably want to amend your last answer.
16 I asked you whether you spoke with somebody really
17 between the time they cleared the scene and the time
18 your officers returned.
19   A.  No, my --
20     MS. BALLARD: Objection to form.
21   A.  My understanding of what you said, from the
22 time they were dispatched to the time they got there
23 did I speak to him. That was my understanding of your
24 question.

40

1    Q.  Thank you. I think that question was unclear.
2  What I should have asked was: Did you have any
3  discussions with anyone from the time your officers
4  cleared the scene until your officers arrive back at
5  the troop?
6    A.  Yes.
7    Q.  It was Captain Hawkins; correct?
8    A.  That's correct.
9    Q.  Did you speak with anybody else?
10   A.  Yes, sir. I spoke with Corporal Maher.
11   Q.  Let's the -- did you speak with Captain Hawkins
12 first?
13   A.  Corporal Maher first.
14   Q.  How did that conversation occur?
15   A.  Corporal Maher called in to the front desk at
16 Troop 3 and wanted to know if Captain Hawkins was
17 working. I informed him that he was, he was working
18 the Del State homecoming. He asked me if I could give
19 him his cell phone, which I did. And that was
20 basically the extent of our conversation.
21   Q.  And was there any indication that
22 Corporal Maher had been involved in this incident
23 with Ms. Dempsey?
24   A.  None that he did say.

41

1    Q.  How long was your telephone conversation with
2  Corporal Maher?
3    A.  Probably less than a minute.
4    Q.  Did you have any hesitation giving out
5  Captain Hawkins's cell phone number?
6    A.  No.
7    Q.  Why not?
8    A.  Captain Hawkins has an open door policy; he'll
9  speak to anybody at any time. Also, I'm aware that
10 Corporal Maher and Captain Hawkins were on the
11 SCUBA Team together.
12   Q.  What was the tone of voice of Corporal Maher?
13   A.  Average, I mean.
14   Q.  He didn't seem to be troubled in his voice at
15 all?
16   A.  Not that I could tell, sir.
17   Q.  Did you ask him why he was trying to reach
18 Captain Hawkins?
19   A.  No, sir.
20   Q.  Is there any reason why you did not do that?
21   A.  It was none of my business, to be honest with
22 you.
23   Q.  Approximately when did you receive this call
24 from Maher? I think you, in your testimony, you said

11 (Pages 38 to 41)

**A000059**

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

42

1 it was sometime after your troopers had cleared the
2 scene?.
3    A. I believe so, that's correct.
4    Q. Can you give me an idea as to when they may
5 have cleared the scene and when Corporal Maher called?
6    A. I can't be sure.
7    Q. If you look at Maher 11, there are some times
8 on there, up on the first or second line. May I
9 assume that was the time of dispatch?
10       MS. BALLARD: Which time?
11    Q. Let's go to the -- on the right-hand side,
12 "10/26, 1:35 a.m. to 1:42 a.m."
13    A. That's correct. That would have been the time
14 of the incident.
15    Q. And what was the time of dispatch?
16    A. The dispatch would have been 01:42 hours.
17    Q. Can you give me an approximation as to how long
18 it took the -- your troopers to clear the scene?
19    A. I don't know.
20    Q. Do you know whether it was more than an hour
21 following the time of the incident?
22    A. I really don't know.
23    Q. Okay. What's your best recollection, if at
24 all, as to when Corporal Maher called Troop 3?

43

1    A. I don't have a specific time. I know it was
2 after the officers had cleared the scene. I am
3 guessing. At best, maybe a half hour after they
4 cleared the scene.
5    Q. By the way, did you know Corporal Maher?
6    A. Do I know him?
7    Q. Did you know him at the time?
8    A. Yes.
9    Q. Were you on a first-name basis?
10    A. Yes.
11    Q. Had you ever worked together?
12    A. No.
13    Q. All right. An then approximately how much
14 longer was it that you received a call from
15 Captain Hawkins?
16    A. It was probably about a half hour after I spoke
17 to Corporal Maher.
18    Q. What was it that you and Captain Hawkins
19 discussed?
20    A. Captain Hawkins informed me that Corporal Maher
21 was involved in the incident with Corporal Dempsey,
22 and that he would have the criminal unit follow up on
23 the complaint in the morning.
24    Q. What did he mean by the criminal unit?

44

1    A. Our criminal investigative unit is housed in
2 Troop 3 also. Probably just a regular detective
3 follow up on it.
4       MS. BALLARD: Off the record.
5       (Discussion off the record.)
6 BY MR. MARTIN:
7    Q. All right, Sergeant. How long did the
8 conversation go with Captain Hawkins?
9    A. Probably less than a minute, also.
10    Q. Did you ask any questions?
11    A. No, sir.
12    Q. And what is the best -- you have already told
13 me --
14       MR. MARTIN: Off the record a second.
15       (Brief recess taken.)
16 BY MR. MARTIN:
17    Q. So a very short conversation with
18 Captain Hawkins. Correct?
19    A. That's correct.
20    Q. And he told you that Corporal Maher was
21 involved and the criminal unit would follow up.
22    A. That's correct.
23    Q. Correct? Did he say anything else?
24    A. No, sir.

45

1    Q. Did he tell you or discuss with you how to
2 write this up in terms of the reports that were to be
3 done?
4    A. No, sir.
5    Q. All right. Did you have any further contact or
6 communications with Captain Hawkins about this
7 particular incident?
8    A. No, sir.
9    Q. None at all later that morning, the following
10 day and the days following that?
11    A. No.
12    Q. So it was a one-shot discussion that you had
13 with Captain Hawkins about this particular incident;
14 correct?
15    A. That's correct.
16    Q. Okay. So was this the first knowledge that you
17 had that Brian Maher was the suspect in this matter?
18    A. Yes, sir.
19    Q. Did you share that knowledge with any of your
20 troopers?
21    A. No, I did not.
22    Q. Why not?
23    A. My instructions to Csapo were to document the
24 incident exactly as Corporal Dempsey had reported it.

12 (Pages 42 to 45)

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

46

1　Q.　Why were those your instructions?
2　A.　Because at that point, I realized that
3　Corporal Maher was involved in this, and I assumed at
4　that point that Corporal Dempsey also knew it was
5　Corporal Maher. And I was upset about the fashion in
6　which it was reported.
7　Q.　You were upset with whom?
8　A.　Corporal Dempsey.
9　Q.　Were you upset with Corporal Maher?
10　A.　No.
11　Q.　Why not?
12　A.　He was not the reporting person.
13　Q.　No, but he was the one who committed what
14　might, some might consider a felony; is that correct?
15　　　MS. BALLARD:　Objection to the form.
16　Q.　Is that correct?
17　A.　Could you re -- was I upset because of him?
18　Could you reword that, please?
19　Q.　I understand you were not upset with
20　Corporal Maher; is that correct?
21　A.　Not directly, no.
22　Q.　It didn't bother you that he had committed what
23　could have been construed as a felony?
24　A.　Oh, absolutely, it bothered me.

47

1　Q.　Why then were you not upset with
2　Corporal Maher?
3　A.　He was not the one that had made the phone call
4　and placed my officers in harm's way.
5　Q.　So your instructions to Csapo were to write it
6　up just as they found it?
7　A.　To document it exactly as Corporal Dempsey had
8　reported it to him, that's correct.
9　Q.　As a result, we have an unknown suspect that's
10　mentioned on Maher 1; correct?
11　A.　That's correct.
12　Q.　And what is -- the document, the initial crime
13　report, Maher 1, is that something that you approved?
14　A.　That's correct.
15　Q.　And when did you approve it?
16　A.　It would have been in the early mornings before
17　leaving or the completion of the shift that day.
18　Q.　Why did you approve it?
19　A.　Why did I approve it? Because it was
20　completed.
21　Q.　The report, Maher 1, is not an accurate report;
22　is that correct?
23　　　MS. BALLARD:　Objection to the form.
24　A.　It was accurate as to what was reported to

48

1　Corporal Csapo.
2　Q.　Yes, but you were the supervisor.
3　A.　Correct.
4　Q.　And you knew who the suspect was. Correct?
5　A.　Correct.
6　　　MS. BALLARD:　Objection to the form.
7　Q.　And you did not indicate anywhere in this
8　report, but approved it as an unknown suspect;
9　correct?
10　A.　Correct.
11　Q.　So it's your testimony that you did not talk
12　with any of your, the three troopers who went out to
13　investigate about the identity of the suspect, being
14　Brian Maher?
15　A.　Not that I recall, no.
16　Q.　Do you recall having a discussion with the
17　other two troopers, Argo and Gygrymuk, about this
18　matter after they returned?
19　A.　Not specifically, no.
20　Q.　By the way, if you will turn to Maher 1.
21　Although it's cut off in the first page, you will see
22　the last two pages. I believe the supervisor
23　approval, it was done electronically; correct?
24　A.　That's correct.

49

1　Q.　But it's your testimony that you did approve
2　this report; correct?
3　A.　That's correct.
4　Q.　It gives a different date than you had
5　recalled, this date being 10/27, at 02:41. That would
6　have been the next morning. Do you see that, sir?
7　A.　Yes.
8　Q.　Does that refresh your recollection as to when
9　you signed this?
10　A.　I don't understand why that date shows up
11　because I had corrected that before I left that
12　morning.
13　Q.　What had you corrected?
14　A.　The initial submitted report, Maher 1, or
15　whatever it is.
16　Q.　Tell me, please, how is it that you corrected
17　the report.
18　A.　What you do is you go into the system. It
19　comes up. You review it. It will say, "Edit, approve
20　or return." At that point, I hit the "approved"
21　button and approved it. I can't explain the date on
22　it. I have no idea why that date is on there.
23　Q.　Okay. I perhaps misunderstood what you said.
24　I thought you said that you had corrected the initial

13 (Pages 46 to 49)

**A000061**

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

50

1  report, meaning making some kind of change to it.
2      A.  No, I made no change to it. I reviewed the
3  report. Let me -- I'll state it correctly. I
4  reviewed the report, approved it.
5      Q.  Following your approval of this report, which
6  is Maher 1, do you recall whether you had any further
7  involvement in this matter?
8      A.  No, I had none.
9      Q.  Is it, then, fair to say that some time several
10  months later, you were questioned by internal affairs
11  about this matter?
12      A.  I don't know what the time frame was. After
13  the initial events of this evening, it was some time
14  after that that I, yes, had the investigation. I
15  don't know what the time frame was.
16      Q.  I'm sorry. What was your understanding as to
17  the time lapse between the initial incident and the
18  time you spoke with the internal affairs?
19      A.  What was my understanding? Nothing, really
20  specific. Sometimes it takes awhile for them to
21  question you. There is really no understanding there.
22      Q.  No. Perhaps I have misstated my question.
23  What is your recollection as to how long a period of
24  time elapsed, if it did, between the time of this

51

1  incident and the time you spoke with internal affairs?
2      A.  Just a standard amount of time. I've been
3  through previous investigations. Nothing unusual
4  about the time period.
5      Q.  What is the standard amount of time?
6      A.  Depending upon how quick the incident comes to
7  light that they conduct their investigation. It can
8  be anywhere from a month to three months, or longer.
9      Q.  You don't have any specific recollection as to
10  this incident?
11      A.  No, sir, I don't.
12      Q.  Do you have any understanding as to why this
13  incident came to light whenever it did to cause IA to
14  get involved?
15      A.  My understanding was it was because it was
16  deemed to be a domestic situation between
17  Corporal Maher and Corporal Dempsey.
18      Q.  What does that mean?
19      A.  A incident between two people of a domestic
20  nature, and the fact that there was a crime committed.
21      Q.  When was it deemed to be a domestic situation?
22      A.  I believe that would have probably have been
23  the next day by the criminal unit. I didn't have any
24  involvement in that.

52

1      Q.  And being a domestic situation, did you have
2  any duties as a commander with regard to your
3  investigation of this situation?
4          MS. BALLARD:  Objection to the form.
5      A.  The standard protocol on a reported domestic is
6  that we have to notify our on-call administrative CI,
7  sergeant, lieutenant, whatever, and they'll make a
8  determination whether or not a detective responds to
9  scene. Also, I have an obligation to respond as the
10  shift supervisor to the scene. The difference in this
11  particular case was that it wasn't reported as a
12  domestic; it was reported as a burglary in progress
13  with an unknown suspect. And after the Captain told
14  me, filled me in on what was going on, it was,
15  basically, my responsibility absolved of the
16  situation.
17      Q.  I'm sorry. Your responsibility was absolved?
18      A.  Yeah, I didn't have any responsibility towards
19  the situation. I was relieved of responsibility at
20  that point.
21      Q.  Why was that?
22      A.  Because my senior commanding officer told me
23  that he was taking care of the situation.
24      Q.  But when you spoke with Captain Hawkins, you

53

1  were aware that it was a domestic matter between two
2  troopers; is that correct?
3          MS. BALLARD:  Objection to the form.
4      A.  I was not aware of it until he told me it was.
5      Q.  Right. But your testimony is as soon as he
6  told you, you were absolved of any responsibility?
7      A.  That's correct.
8      Q.  Let me show you what's been marked at Maher's
9  deposition as Maher 2. I ask you to take a look at
10  that.
11          Off the record.
12          (Discussion off the record.)
13  BY MR. MARTIN:
14      Q.  Sergeant, have you had an opportunity to review
15  that supplemental report?
16      A.  Yes.
17      Q.  Had you seen that before today?
18      A.  I don't recall seeing it, no.
19      Q.  And this was authored by Corporal Gygrynuk;
20  correct?
21      A.  Right.
22      Q.  While you say you didn't recall seeing it, you
23  signed off on this as the supervisor approving it.
24  Did you not?

14 (Pages 50 to 53)

**A000062**

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

54

1  A. Obviously, I have seen it. I just don't recall
2  the document, to be honest with you.
3  Q. In this report, Maher 2, is there an
4  identification of Brian Maher as being the suspect?
5  A. No.
6  Q. Do you have any understanding as to why that
7  was not done?
8  A. Obviously, his name wasn't mentioned to
9  Corporal Gygrynuk either.
10  Q. It was not mentioned to Gygrynuk?
11  A. Right.
12  Q. But if in fact it was mentioned to Gygrynuk,
13  Gygrynuk should have put his -- put Maher's name in
14  there, do you agree?
15  A. That's correct.
16  Q. Let me show you what's been marked as Maher 3,
17  which is identified as Supplemental Report No. 2. By
18  the way, I should say for the record, Maher 2 is
19  identified as Supplemental Report No. 1. Do you see
20  that?
21  A. Yes.
22  Q. Are you familiar with this, Maher 3?
23  A. I haven't seen it before, no.
24  Q. You were not involved in this action where this

55

1  case was closed as unfounded?
2  A. No, sir.
3  Q. You don't have any understanding about
4  Captain Hawkins requesting that this matter be
5  exceptionally cleared?
6  A. No, sir, I have no knowledge of that.
7       MR. MARTIN: Okay. Off the record.
8       (Discussion off the record.)
9  BY MR. MARTIN:
10  Q. Sergeant, just a couple of more questions, I
11  think. Is Gygrynuk still working in Troop 3?
12  A. No, sir.
13  Q. When did he, I guess transfer out?
14  A. I believe it was maybe a year and a half, two
15  years ago.
16  Q. How would you describe your relationship with
17  him?
18  A. Corporal Gygrynuk?
19  Q. Yes.
20  A. We had a good working relationship.
21  Q. And how about Csapo?
22  A. Good relationship, also.
23  Q. And is he still working at Troop 3?
24  A. Yes, sir, he is.

56

1  Q. So he is still working under your command?
2  A. No, sir, he's been transferred to the criminal
3  unit.
4  Q. And finally, Argo, how would you describe your
5  working relationship with him?
6  A. Very good.
7  Q. Is he still at Troop 3?
8  A. He is still at Troop 3, assigned to another
9  shift.
10  Q. So you are not his direct commander any longer?
11  A. No, sir.
12       MR. MARTIN: Okay, sir. I think that's all
13  the questions I have. Ms. Ballard may have some
14  questions for you.
15       MS. BALLARD: I have a few. Let's see.
16  BY MS. BALLARD:
17  Q. Would it refresh your recollection if I
18  suggested that the person who interviewed you for IA
19  was Captain Paige or do you just not recall?
20  A. I just don't recall.
21  Q. Is it correct that no disciplinary action was
22  taken against you after the IA investigation?
23  A. That's correct.
24  Q. Did you actually hear -- when you are sitting

57

1  as the desk sergeant, do you actually hear the 911
2  phone calls come through --
3  A. No.
4  Q. -- the actual phone calls from the people?
5  A. No.
6  Q. You just hear from the dispatcher if it's
7  something important?
8  A. If it's serious enough, they call me and inform
9  me what's going on.
10  Q. Do you recall, again, exactly what you remember
11  the emergency dispatcher saying to you that night
12  about this call?
13  A. That there was an unknown subject breaking into
14  Corporal Dempsey's house and that she had armed
15  herself.
16  Q. And your response was to get as many available
17  troopers out there as possible?
18  A. That's correct.
19  Q. Anything else you said to the dispatcher?
20  A. No.
21  Q. I believe you said DSU homecoming was that
22  night also?
23  A. That's correct.
24  Q. Were other troopers in your area working the

15 (Pages 54 to 57)

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

**58**

1  homecoming?
2  A. Yes.
3  Q. So that would have taken some of the seven or
4  so troopers kind of out of commission because they
5  were working that event?
6  A. Most of the time, they have enough people
7  working that if something big happens, which often
8  does, that we have to send reinforcements in, yes.
9  Q. In terms of investigating the scene, are you
10  aware that at least one of the responding troopers
11  searched the perimeter of Ms. Dempsey's house?
12  A. Yes.
13  Q. The document Maher 2, which is
14  Corporal Gygrynuk's report, I believe you said you did
15  not specifically ask him to do a report.
16  A. No, I didn't.
17  Q. Would this have been at the request of
18  Corporal Csapo?
19  A. Sometimes. I mean, it -- It depends. It could
20  have been -- Corporal Csapo could have asked him. It
21  could have been anybody asked him to do a supplemental
22  report.
23  Q. Is it common for a responding trooper who is
24  not the chief investigator to do a report like this?

**59**

1  A. No, it's not.
2  Q. So does that suggest that somebody asked him to
3  do it?
4  A. Somebody must have, yeah. Somebody requested
5  that he do it.
6  Q. It could have been the investigating officer,
7  which was Corporal Csapo?
8  A. Right.
9  Q. Now, Csapo's report, he was the chief
10  investigator on this call; correct?
11  A. Correct.
12  Q. So he would have to do a report of some kind;
13  isn't that right?
14  A. Correct.
15  Q. So you didn't request him to do a report, but
16  you knew a report would be done because he
17  investigated the scene; correct?
18  A. That's correct.
19  Q. You mentioned that you knew that Corporal Maher
20  and Captain Hawkins were on the SCUBA Team together.
21  When Maher called in for Hawkins's cell phone number,
22  could it have been -- did you know if it was related
23  to a scuba call or related to something else?
24  A. I had no idea what it was related to.

**60**

1  Q. Were you friends with Brian Maher?
2  A. No.
3  Q. Were you friends with Corporal Dempsey?
4  A. No. Acquaintances with both of them.
5  Q. Neither of them worked for your troop; correct?
6  A. No.
7  Q. Are you aware what time the troopers cleared
8  the scene at Ms. Dempsey's house?
9  A. I don't recall.
10  Q. When you say clear the scene, that means
11  everybody goes?
12  A. That's correct.
13  Q. Now, how many years have you been a state
14  trooper?
15  A. 27.
16  Q. In your experience as a police officer, do you
17  believe it would have been proper to tell any of the
18  responding troopers to put Brian Maher's name in these
19  reports based on what Captain Hawkins had told you?
20  A. No. I stand by my decision to have it
21  documented as it was reported
22  Q. What Captain Hawkins told you was technically
23  hearsay at the time; correct?
24  A. That's correct.

**61**

1  Q. Do you know where Captain Hawkins got his
2  information that it was Brian Maher?
3  A. I'm assuming directly from Brian Maher.
4  Q. But do you know?
5  A. No, I don't know.
6  Q. I believe Captain Hawkins said that CI would
7  follow up?
8  A. That's correct.
9  Q. Do you believe it would have been appropriate
10  to tell the responding troopers that Captain Hawkins
11  had said that CI was going to follow up?
12  A. Would it be appropriate? Yes.
13  Q. Did you do that?
14  A. I don't recall if I made that statement or not.
15  Q. You had no reason to challenge
16  Captain Hawkins's decision for CI to follow up on
17  this, did you?
18  A. Absolutely not.
19  Q. Did it seem appropriate?
20  A. Yes.
21  Q. When you spoke to Captain Hawkins, did he tell
22  you there had been a domestic between Maher and
23  Dempsey?
24  A. The specific term "domestic," I don't believe

16 (Pages 58 to 61)

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

**62**

1 was used. Just the incident -- Brian Maher was
2 involved with the incident with Corporal Dempsey down
3 in Frederica.
4    Q.  The terminology Hawkins used was that Brian
5 Maher was involved with the incident?
6    A.  In the incident, correct.
7    Q.  You mentioned that you were upset with
8 Corporal Dempsey that night because of how things had
9 been handled.  Can you be more specific about why you
10 were upset?
11    A.  After receiving the phone call from
12 Corporal Maher and Captain Hawkins, I realized that,
13 obviously, Corporal Maher was involved in the
14 situation.  And at that point, I was very upset
15 because I felt that Corporal Dempsey had called this
16 in as an unknown suspect, which was false, and then,
17 again, after he left, when she failed to call it in,
18 and thereby putting my troopers in harm's way.
19 Because when we get a call to assist a trooper, we go
20 all out, and that could have been alleviated.
21    Q.  How would the troopers have been placed in
22 harm's way?
23    A.  It's just when you hear a fellow trooper in
24 trouble, your adrenaline level automatically rises,

**63**

1 your anxiety level rises, you are going just as hard
2 as you can to assist them.  So I am sure they drove
3 faster than they would have to a normal type of
4 complaint.  And the hour of the day.  I believe if I
5 remember correctly, it was somewhat foggy.  They
6 just -- it just put them in a situation that they
7 didn't necessarily have to be in.
8    Q.  Would it have been normal on a burglary in
9 progress call not involving a trooper for three cars
10 to have gone out?
11    A.  Yes.
12    Q.  Based on your knowledge and having reviewed the
13 reports, at any time, did Trooper Dempsey or -- I'm
14 sorry, Corporal Dempsey tell any of the officers that
15 she knew who the suspect was?
16    A.  My understanding was no.
17    Q.  In reviewing the reports as supervisor, you --
18 or tell me.  Do you typically revise the content of
19 reports?
20    A.  No, I don't.
21    Q.  You just make sure they're completed?
22    A.  That's correct.
23    Q.  Just to be clear.  This was not reported as a
24 domestic when the calls came in on October 26th, 2003;

**64**

1 correct?
2    A.  No, it was reported as a burglary in progress.
3    Q.  You were asked a question.  I believe the
4 question was:  If it was mentioned that Brian Maher
5 was a suspect, should Corporal Gygrynuk have put his
6 name in this report, and you said, yes.  Who would
7 have mentioned that such that it would have been
8 appropriate to put Corporal Maher's name in here?
9    A.  Corporal Dempsey.
10    Q.  Just to clarify again.  You don't have any
11 personal knowledge of how this matter was handled
12 after the night in question; correct?
13    A.  No, I don't.
14    Q.  And you had no personal involvement in that?
15    A.  No, I don't.
16       MS. BALLARD:  That's it.
17       MR. MARTIN:  Just one follow-up or maybe
18 two.
19 BY MR. MARTIN:
20    Q.  Sergeant, were you aware that Corporal Dempsey
21 had called back dispatch telling them not to send
22 anyone to the scene?
23    A.  No.
24    Q.  How was it that you remembered that it was a

**65**

1 foggy evening?
2    A.  Just because I can look right out the front
3 door of the troop.  And I remember it just being, it
4 was either misty, or foggy, or something.
5       MR. MARTIN:  That's all I have.
6       MS. BALLARD:  I have one more.
7 BY MS. BALLARD:
8    Q.  If a trooper were to make an emergency call and
9 then call back and say, don't worry about it, would
10 you still send someone out?
11    A.  We would still respond, but you wouldn't
12 respond at the same pace that you would otherwise.  I
13 believe we're -- I think we're mandated, it's just in
14 any situation like that if anyone called, just to
15 ensure they're safe; we don't know if they're being
16 held hostage or something like that.
17       MS. BALLARD:  Thanks.
18       MR. MARTIN:  Do you want to read and sign?
19       MS. BALLARD:  In the interest of time,
20 probably not.
21       MR. MARTIN:  It's your call.
22       MS. BALLARD:  You have the option to read
23 this and make sure it's all accurate.  But, typically,
24 the court reporter is very good at taking down your

17  (Pages 62 to 65)

**A000065**

Dempsey v. State of Delaware Department of Public Safety
Sergeant Michael C. Houdek

66

1   answers, so it's up to you.  You can review it or not.
2   I'll send you a copy in any event.
3         THE WITNESS:  That's fine.
4         MS. BALLARD:  We'll waive.
5         (Deposition concluded at 4:41 p.m.)
6                - - - -
                 INDEX
7
    WITNESS: SERGEANT MICHAEL C. HOUDEK        PAGE
8
    EXAMINATION BY MR. MARTIN            2
9   EXAMINATION BY MS. BALLARD           56
    EXAMINATION BY MR. MARTIN            64
10  EXAMINATION BY MS. BALLARD           65
11  (There were no exhibits marked for identification.)
12
13
14
15
16
17
18
19
20
21
22
23
24

67

1   State of Delaware  )
                       )
2   New Castle County  )
3
             CERTIFICATE OF REPORTER
4
5        I, Lucinda M. Reeder, Registered Diplomate
    Reporter, Certified Real-time Reporter and Notary
6   Public, do hereby certify that there came before
    me on January 14, 2008, the witness herein,
7   SERGEANT MICHAEL C. HOUDEK, who was first duly sworn
    and thereafter examined by counsel for the respective
8   parties; that the questions asked of said witness and
    the answers given were taken down by me in Stenotype
9   notes and thereafter transcribed by use of
    computer-aided transcription and computer printer
10  under my direction.
11       I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.
13       I further certify that reading and signing of
    the deposition were waived by the witness.
14
         I further certify that I am not counsel,
15  attorney, or relative of either party, or otherwise
    interested in the event of this suit.
16
17
18              Lucinda M. Reeder
19          Lucinda M. Reeder, RDR, CRR
            Certification No. 132-RPR
20          (Expires January 31, 2008)
21  DATED:  1-17-08
22
23
24

18 (Pages 66 to 67)

Wilcox and Fetzer, Ltd.    Registered Professional Reporters        302-655-0477

**A000066**



**WILCOX & FETZER LTD.**

In the Matter Of:

# Dempsey

v.

# State of Delaware Department of Public Safety

C.A. # 06-456-SLR

---

Transcript of:

Brian Maher

August 6, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A000067

Dempsey v. State of Delaware Department of Public Safety

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,       )
                            )
            Plaintiff,      )
                            )    Civil Action
    v.                      )    No. 06-456-SLR
                            )
STATE OF DELAWARE, DEPARTMENT)
OF PUBLIC SAFETY,           )
                            )
            Defendants.     )


        Deposition of BRIAN MAHER taken pursuant to
notice at the law offices of Martin & Wilson,
1508 Pennsylvania Avenue, Wilmington, Delaware,
beginning at 9:00 a.m. on Monday, August 6, 2007,
before Lucinda M. Reeder, RDR, CRR and Notary Public.

APPEARANCES:

        JEFFREY K. MARTIN, ESQ.
        Martin & Wilson
          1508 Pennsylvania Avenue
          Wilmington, Delaware 19806
          for the Plaintiff,

        STEPHANI J. BALLARD, ESQ.
        State of Delaware, Department of Justice
          820 N. French Street
          Wilmington, Delaware 19801
          for the Defendants.

    ALSO PRESENT:

        ELIZABETH C. DEMPSEY


- - - - - - - - - - - - - - - - - - - -
        WILCOX & FETZER, LTD.
    1330 King Street - Wilmington, Delaware  19801
                (302) 655-0477
                www.wilfet.com

**A000068**

Dempsey v. State of Delaware Department of Public Safety

2

1         BRIAN MAHER,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    BY MR. MARTIN:
6        Q.  Good morning, Brian.  My name is Jeff Martin.
7    I'm the attorney for Christy Dempsey in this matter.
8    We met very briefly outside before the deposition.
9    Have you ever had your deposition taken before today?
10       A.  In this matter or other matters?
11       Q.  Other matters.
12       A.  Yes.
13       Q.  In what other matter have you been deposed?
14       A.  A case concerning Chris Foraker.
15       Q.  By whom were you deposed?
16       A.  Rosemary Killian.  She was the attorney for the
17   state at the time.
18           MR. MARTIN:  Off the record.
19           (Discussion off the record.)
20           THE WITNESS:  The second matter was a civil
21   suit that I was involved in back in '89, '90, maybe
22   '91.
23   BY MR. MARTIN:
24       Q.  You say you were involved in.  As a plaintiff

3

1    or a defendant?
2        A.  Both.  No, I was the defendant.  I should have
3    been the plaintiff.  One of them.  One of the
4    co-defendants.
5        Q.  What was involved in --
6        A.  Something happened at Kelly's Logan House.  I
7    was not directly involved at the time, but I ended up
8    being directly involved because I was the only person
9    gainfully employed.
10           MR. MARTIN:  Off the record.
11           (Discussion off the record.)
12   BY MR. MARTIN:
13       Q.  So that was a civil matter wherein you were a
14   defendant.  Who took your deposition, if you recall?
15       A.  I am sure that one of them was the owner, the
16   attorney.  Is that Mike?
17       Q.  Mike Kelly?
18       A.  Yes, Mike must have taken it.  I am certain he
19   was there, so it must have been him.  I am not sure.
20       Q.  Any depositions in any other matters?
21       A.  Not that I recall, no.
22       Q.  Now, you referred a moment ago when I asked you
23   about depositions, I think you were thinking about
24   statements with regard to the matter that we're

4

1    involved in today.  Have you given any statements with
2    regard to a matter involving your involvement as well
3    as Christy Dempsey's?
4        A.  In the past.
5        Q.  Yes.
6        A.  Since the occurrence?
7        Q.  Yes.
8        A.  Yeah, I mean.
9        Q.  How many statements have you given?
10       A.  I would have no idea, sir.  Numerous.
11       Q.  I'm aware of a statement that you gave to
12   Internal Affairs on June 18, 2004.  It was taken by
13   Captain Paige.  Do you recall that?
14       A.  Yes.
15       Q.  Do you recall any other statements that you
16   gave?
17       A.  I thought I was interviewed by Rob Hudson, I
18   believe, in a criminal matter, I believe.
19       Q.  Do you have any recollection as to when that
20   may have occurred?
21       A.  No, sir.  Probably at least six, seven months
22   after the incident, but I don't know that my attorney
23   allowed me to speak to him or not.  I thought I had,
24   but.

5

1        Q.  But that was sometime after you were formally
2    charged with a crime?
3            MS. BALLARD:  Objection to the form.
4        Q.  You may answer.
5        A.  Yeah, it was, like I said, six months after the
6    incident.  This has been a long time ago.  Now that I
7    think about it, I don't think I was allowed to be
8    interviewed by him.  I think we declined the
9    interview, actually.
10       Q.  Do you recall having given any statements
11   immediately after this incident that occurred in
12   October of '03?
13       A.  No.
14       Q.  Do you have a clear recollection of the
15   incident that occurred on October 25-October 26th,
16   2003?
17       A.  My definition of clear, obviously, won't be the
18   same as yours, so, no, not a clear recollection of the
19   incident.
20       Q.  At the time of the incident, is it fair to say
21   you were dating Christy Dempsey?
22       A.  Yes.
23       Q.  For what period of time were you dating
24   Christy?

2 (Pages 2 to 5)

**A000069**

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

6

1   A. I don't recall.
2   Q. Was it more than a month?
3   A. I believe so.
4   Q. I referred a moment ago to the Internal Affairs
5   statement, dated June 18, 2004. Did you review that
6   prior to today's deposition?
7   A. No, I did not.
8   Q. Did you review any materials before today's
9   deposition?
10  A. No, I did not. None other than the expungement
11  record, I believe.
12  Q. I'll refer to that in a moment. The
13  expungement record appears to be dated March of '05;
14  is that correct -- or at least was filed with the
15  court in March of '05?
16      MS. BALLARD: Well, the judge has written
17  in February 28th.
18  A. Yeah, February 28th on the first page.
19  Q. Okay. That's fair. It looks like the
20  following day it was filed with the Kent County
21  Prothonotary. As I understand it, this is an
22  expungement of any convictions, any and all
23  convictions that arose out of the incident on
24  October 25-October 26th, 2003?

7

1   A. It was in reference to a probation for a
2   judgment plea, yes.
3   Q. All right. Are there any surviving convictions
4   from that date?
5   A. No.
6   Q. So they have all been expunged or, perhaps,
7   dismissed by way of Attorney General's probation?
8   A. Yeah, the only charge that was that was pled to
9   was the probation for a judgment on criminal trespass,
10  and that's been expunged. The other charges were
11  dropped.
12  Q. Do you acknowledge that you broke a window at
13  Christy's residence on that particular occasion?
14  A. Yes.
15  Q. And following the window being broken, you
16  entered the premises; is that correct?
17  A. Yes.
18  Q. Do I understand that you did not make any
19  contact with anyone after you entered the premises?
20  A. When you say "contact," can you be a little
21  more specific?
22  Q. Sure. Did you see anyone when you went into
23  her premises?
24  A. No, I did not.

8

1   Q. Did you hear anyone?
2   A. Yes, I did.
3   Q. Who did you hear?
4   A. I heard Christy and a male voice that I wasn't
5   familiar with.
6   Q. Did it appear to you as though Christy was
7   contacting the police?
8   A. At some point, yes.
9   Q. What did you do at that point?
10  A. Left.
11  Q. Now, when you entered the premises, you were on
12  the second floor; is that correct?
13  A. Yes.
14  Q. Do I understand that you left through the
15  downstairs front door?
16  A. No. I left through -- there was only one door
17  to the residence. It's a second floor apartment. I
18  left by the front door of her apartment, which is on
19  the second floor as well.
20  Q. But you did not leave through the window that
21  had been shattered?
22  A. No.
23  Q. How long do you believe you were at
24  Ms. Dempsey's premises that night before you left?

9

1   A. In the residence or at the residence?
2   Q. At the residence.
3   A. Best guess, maybe ten minutes.
4   Q. How did you arrive at the residence?
5   A. Personal vehicle.
6   Q. How did you leave?
7   A. The same.
8   Q. What is it that prompted you to leave when you
9   did?
10  A. The fact that she was on the phone with the
11  police or the 911 Center. I'm sorry.
12  Q. You say she was on with the 911 Center. How do
13  you know that?
14  A. I don't.
15  Q. What, if anything, do you recall hearing her
16  say?
17  A. I just remember her saying who it was and for
18  some reason it sounded like she was speaking to
19  someone official. I assumed it was the 911 Center.
20  In fact, I think I was even told by the male subject
21  on the other side of the door that she was calling
22  911.
23  Q. When you said she said who it was, were you
24  referring to Christy Dempsey --

3 (Pages 6 to 9)

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

|  | 10 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. – or you – |
| 3 | A. Yes. She was on the phone and she stated |
| 4 | that – I don't recall what she said, but I thought it |
| 5 | was something to the fact that this is Christy Dempsey |
| 6 | or Trooper Dempsey, I live at – something to that |
| 7 | effect. |
| 8 | Q. Did you hear your name being mentioned? |
| 9 | A. No. |
| 10 | Q. Do you have reason to believe that she used |
| 11 | your name when she called the police? |
| 12 | A. I would have no way – I did not hear her use |
| 13 | my name, but I would have no idea what the |
| 14 | conversation was with the 911 Center. |
| 15 | Q. Were you by yourself when you arrived and when |
| 16 | you left her premises? |
| 17 | A. Yes. |
| 18 | Q. Where were you coming from at the time you |
| 19 | arrived at her property? |
| 20 | A. Lewes, Delaware. |
| 21 | Q. Where did you go or where did you head as you |
| 22 | were leaving? In what direction were you going? |
| 23 | A. North Route 1. |
| 24 | Q. What was your intended destination? |

|  | 11 |
|---|---|
| 1 | A. Frederica. |
| 2 | MS. BALLARD: I'm sorry. When you said |
| 3 | when you were leaving, did you mean – |
| 4 | MR. MARTIN: I understand. I know there is |
| 5 | a mixup here. I was going to go back and cover that. |
| 6 | BY MR. MARTIN: |
| 7 | Q. You left from Lewes and you went to Christy's |
| 8 | premises in Frederica? |
| 9 | A. Yes. |
| 10 | Q. By way of north Route 1; correct? |
| 11 | A. Yes. |
| 12 | Q. Were you living in Lewes at the time? |
| 13 | A. Rehoboth, yeah. |
| 14 | Q. When you left Christy's premises after you |
| 15 | heard her contacting the police, where did you – in |
| 16 | what direction did you go? |
| 17 | A. Southbound Route 1. |
| 18 | Q. What did you do at the time you left? Did you |
| 19 | make contact with anyone? |
| 20 | A. Yes. |
| 21 | Q. With whom did you make contact? |
| 22 | A. Captain Robert Hawkins. |
| 23 | Q. Why did you contact Robert Hawkins? |
| 24 | A. Because he was the troop commander for the area. |

|  | 12 |
|---|---|
| 1 | in which the incidence occurred. |
| 2 | Q. How specifically did you contact Captain |
| 3 | Hawkins? |
| 4 | A. I contacted him by cell phone, my cell phone to |
| 5 | his cell. |
| 6 | Q. What time of the morning was it at that point? |
| 7 | A. I don't recall. |
| 8 | Q. How long after you left Christy's premises did |
| 9 | you attempt contact with Captain Hawkins? |
| 10 | A. It was almost immediately. Probably within |
| 11 | five minutes. |
| 12 | Q. How is it that you had Captain Hawkins' cell |
| 13 | phone number? |
| 14 | A. He was my unit commander for the scuba team. I |
| 15 | have a laminated card with all phone numbers. I |
| 16 | believe that's where I got it from. That card was in |
| 17 | my truck or on my calendar. One or the other. But I |
| 18 | have a laminated card with everybody's number on it. |
| 19 | Q. Why is it that you attempted to contact Captain |
| 20 | Hawkins? |
| 21 | A. Well, again, he's the troop commander for that |
| 22 | area in which the incidence occurred. At the time I |
| 23 | assumed – well, at the time I assumed it would be |
| 24 | Frederica responding. He's a personal friend of mine. |

|  | 13 |
|---|---|
| 1 | I figured he would give me good advice, and if I |
| 2 | needed to contact somebody, he was going to be the |
| 3 | person to contact. |
| 4 | Q. At the time you contacted him, did you feel as |
| 5 | though you had done something wrong? |
| 6 | A. Oh, absolutely. |
| 7 | Q. What was that? |
| 8 | A. Well, for the reasons we stated earlier, I had |
| 9 | just broken into someone's house and had a verbal |
| 10 | exchange with a gentleman. And I knew that she was |
| 11 | calling the police, so I could see where that was |
| 12 | going. |
| 13 | Q. Was it a matter of division policy to make a |
| 14 | report of such an event? |
| 15 | A. Yeah. I didn't know the policy at the time |
| 16 | verbatim what the actual contact policy was, but I |
| 17 | figured that I would have to contact someone. I mean, |
| 18 | I knew that it needed to be reported. |
| 19 | Q. Did you consider the incident to have been a |
| 20 | domestic incident? |
| 21 | A. By my standards or by divisional standards? |
| 22 | Q. Let's start with your standards. |
| 23 | A. I considered it by my standards to be an |
| 24 | unfortunate incident, but it is classified as domestic |

4 (Pages 10 to 13)

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

14

1  as far as the police department would be concerned. I
2  am sure at the time Christy and I thought it would be
3  a private incident, but it didn't turn out to be that
4  way, so.
5     Q. Why do you understand that as to division
6  standards it would be considered domestic?
7     A. Do I understand why? Yes.
8     Q. Yes.
9     A. Yes.
10    Q. Why is that?
11    A. Because we were involved in a relationship at
12 the time.
13    Q. So was it your understanding that following the
14 incident that you had to report it to a superior
15 officer?
16    A. I am not sure that's what I was thinking at
17 that exact moment, but I knew I had screwed up and
18 that it would need to be reported. And Captain
19 Hawkins was a good choice, A, because I had his number
20 and, B, because it was his troop area.
21    Q. What was the troop area Captain Hawkins covered
22 at the time?
23    A. Troop 3.
24    Q. And at the time of this incident, you were

16

1  some formal. He couldn't hear me. I am not sure he
2  knew who it was at first. Then he said, "I'll call
3  you right back." Or he had me on hold for a few
4  minutes and then I spoke to him.
5     Q. Would you agree this was the early morning
6  hours of the 26th?
7     A. I don't recall the time. It was after
8  midnight. It might have been even after 1:00, but it
9  was shortly after the incident. Within five minutes
10 of the 911 call being placed, probably.
11    Q. All right. What is it that you relayed to
12 Captain Hawkins when you spoke with him?
13    A. I briefly told him that I had been at Christy's
14 house. There was an incident where I broke the window
15 at the house. I told him — I don't remember the
16 exact wording, but I advised him there was no contact
17 or altercation other than verbal and that I left the
18 incident and was headed home. I asked him what he
19 wanted me to do, if he wanted me to start heading for
20 Troop 3. He told me: "Just hold on." He said, "Let
21 me find out who is down there or who is head of
22 there," and he would get back with me.
23    Q. So you had the impression or understanding that
24 Captain Hawkins was going to immediately contact Troop

15

1  working at Troop 7; is that correct?
2     A. Yes.
3     Q. Did you have any thought about contacting
4  somebody from Troop 7?
5     A. Not at the time. I figured contacting the
6  sergeant of the troop area was appropriate according
7  to divisional policy. I know now I was supposed to
8  contact the sergeant on duty at the troop I was
9  assigned.
10    Q. How did you learn you were to contact a
11 sergeant at your troop?
12    A. Captain Page made me aware of that during the
13 IA.
14    Q. That occurred some time, six, seven months
15 after the incident?
16    A. Yes, at least.
17    Q. Did you have an opportunity to check your
18 policy manual sometime shortly after this incident?
19    A. Not that I recall.
20    Q. So when you contacted Captain Hawkins, did you
21 get him on the first attempt?
22    A. Yeah, I believe, I made contact with him, but
23 we couldn't hear each other. He was working a
24 function at Del State. I believe it was their prom or

17

1  3?
2        MS. BALLARD: Objection to the form.
3     A. I am not sure who he was going to contact. I
4  didn't know if he was going to contact Troop 3 or the
5  911 Center, a supervisor, or --
6     Q. All right. Let me make sure I understand,
7  then, your understanding of what Captain Hawkins told
8  you. After you made a report about breaking the
9  window and entering the premises and having a verbal
10 altercation, is it fair to say that Captain Hawkins
11 told you to head home?
12    A. No. I asked him if he wanted me to start
13 heading back towards Troop 3. He said, no, hold on
14 I'll call you back, something to that effect, let me
15 see what's going on. He didn't specify who he was
16 calling, or.
17    Q. All right. But at the time you told him you
18 were headed to your home in Rehoboth; is that correct?
19    A. I don't recall specifically what that
20 conversation was.
21    Q. In the Internal Affairs investigation report --
22 and I'll be happy to show you what I am referring to,
23 on page 17, and this was the date of June 18, 2004 --
24 and this was taken by Captain James Page, in addition,

5 (Pages 14 to 17)

A000072

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

---

**18**

1 Lieutenant Robert Coupe was there as well. So your
2 counsel has shown that to you. If you look there, it
3 says you said, "I said I am on my way home."
4   A. Where is that at, sir? Okay. Got ya. I'm
5 with you. Yes.
6   Q. Does that refresh your recollection as to the
7 conversation that you had with Captain Hawkins?
8   A. Yes. I am sure that's a more accurate account
9 since it probably occurred a lot closer in date than
10 today.
11   Q. He didn't tell you to go any place other than
12 that; is that fair to say?
13   A. Yes.
14   Q. All right. And then I believe your testimony a
15 few moments ago -- not on the Internal Affairs
16 investigation -- was that Captain Hawkins said he
17 would -- he would do some sort of checking.
18   A. I am just assuming. I know that at the time he
19 said, don't -- I asked him if he wanted me to come
20 back up there. He said, "No." I don't know that
21 there was any specifics. It was a very short
22 conversation. I didn't know the specifics about where
23 he wanted me to go. He said, I'll get back with you
24 in some way, shape or form by this number, my number

---

**19**

1 or cell number.
2   Q. All right. And is it fair to say that
3 following that conversation, you continued toward home
4 and you went home?
5   A. Yes.
6   Q. Now, how long did it take you to get home from
7 Christy's home?
8   A. I am going to guess it's probably a 40-minute
9 drive, maybe.
10   Q. Did you have any other conversations with
11 anyone, obviously, by telephone during that trip home?
12   A. Not that I recall. I believe he called me
13 back. I spoke with him again. But I don't know that
14 I -- I know I tried to make contact with Christy. I
15 may have gotten through to her at some point.
16   Q. All right. But you believe that Captain
17 Hawkins contacted you before you arrived at your home?
18   A. I don't recall. I spoke to him again that
19 night, I am sure of it, but I don't know where I was
20 when I spoke to him the second time.
21   Q. It was still during the morning hours, early
22 morning hours, before dawn?
23   A. I am sure it was within 10, 15 minutes of my
24 initial call to him, but I don't recall exactly the

---

**20**

1 time.
2   Q. What was the nature of that conversation? As I
3 understand it, he initiated that; he returned your
4 call.
5   A. Yes, he called me back on the cell phone. The
6 best I can recall, he said, "Just go home." I think
7 he told me our guys or troopers from Troop 3 were
8 there taking report and that -- there may have been
9 some conversation about he would review the report or
10 talk to the sergeant and get back with me the next day
11 or something to that effect. Without reviewing the
12 transcripts, I really at this point don't recall the
13 exact conversation.
14   Q. I'm sorry. You said without reviewing the
15 transcripts?
16   A. The IA of the actual incident.
17   Q. Were you aware at the time of the responding
18 troopers who were investigating this matter?
19   A. I don't believe so, no.
20   Q. When is the first time you became aware of any
21 of the troopers?
22   A. Are you talking about their names specifically,
23 sir?
24   Q. Yes.

---

**21**

1   A. Probably the next day when I spoke to Christy.
2   Q. Did you know any of those guys?
3   A. I believe I knew than all, at least by name.
4   Q. Did you attempt to contact them in any fashion?
5   A. I don't think I have ever spoken to any of
6 them, even since that date, to be honest with you.
7   Q. Do you know whether Christy ever attempted to
8 contact any of them?
9   A. No.
10   Q. Do you have any knowledge as to whether they
11 knew that you were at Christy's premises before they
12 arrived on the scene?
13   A. No, I do not. I'm sorry, sir, are you talking
14 about my knowledge now or my knowledge at the time?
15   Q. I understood your answer to be at the time.
16   A. Yes.
17   Q. Now, let's talk about your knowledge now as to
18 whether they knew that you were at Christy's premises
19 before their arrival. What is your knowledge of that?
20      MS. BALLARD: I'm sorry. I just want the
21 question to be clear. Are you asking if they knew
22 before they arrived that he was there?
23   Q. No, I am asking Mr. Maher what he knows now as
24 to whether any of these troopers knew what your

---

6 (Pages 18 to 21)

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

22

1  identity is.
2      MS. BALLARD: When?
3      Q. At some point in, let's say, within 24, 48
4  hours of this incident.
5      A. Yeah, I wouldn't know. I know that from one of
6  the reports, one of the supplements that were written
7  at the time of the incident or within close proximity
8  of the incident that one of the troopers was told by
9  the gentleman that was there that -- he said the
10  subject or guy that came to the house was a trooper
11  that was dating Christy. I don't know that he knew my
12  name. I don't know that they knew we were seeing each
13  other at the time.
14      MR. MARTIN: Let's take a moment, and I'm
15  going to have these four reports, a report plus three
16  supplements marked as Maher 1, 2, 3 and 4.
17      (Maher Deposition Exhibit Nos. 1 through 4
18  were marked for identification.)
19      MR. MARTIN: We have marked four exhibits
20  to Mr. Maher's deposition, the first being the initial
21  crime report, dated 10/26/2003, written by corporal
22  Csapo. The second exhibit is entitled "Supplemental
23  Report No. 1" by Corporal Jack Gygrymuk, dated
24  10/26/03. The third exhibit is "Supplemental Report

23

1  No. 2" written by Sergeant Mullett on 10/29/03. And
2  the last exhibit, No. 4, is "Supplemental Report No.
3  3" written by Trooper Argo, although his name is not
4  found on the bottom. It was cut off of this, but I
5  think there is agreement among counsel that it was
6  Argo's report.
7      MS. BALLARD: Yes.
8      MR. MARTIN: And the date on that is
9  April 20, 2004.
10  BY MR. MARTIN:
11      Q. Now, have you had an opportunity to look at the
12  crime reporter?
13      A. Yes.
14      Q. Your testimony was, before we marked these
15  exhibits, was something to the effect of the identity
16  of the alleged suspect that was put on these crime
17  reports.
18      MS. BALLARD: Objection to the form.
19      A. Yes.
20      Q. Okay. What is it that you are referring to?
21      A. In the witness statement on the Exhibit 1.
22  Page 3, maybe. Yes, Page 3 at the bottom of Csapo's
23  report under the "Statement of Witness - Kevin
24  Keller," the bottom paragraph, where he gives a

24

1  description and states "who is employed by DSP." He
2  writes, "Subject works at one of the southern troops
3  and holds a rank of a high corporal." Page 4. He's
4  been on division for approximately 12 to 17 years."
5      Q. Is that an accurate description of you at that
6  point?
7      A. Fairly.
8      Q. At the time of this incident, you knew Christy
9  Dempsey knew it was you out there?
10      A. Yes.
11      Q. You promptly reported to Captain Hawkins that
12  you were there at Christy Dempsey's property and broke
13  a window and entered the premises; correct?
14      A. Yes.
15      Q. Who else knew at or around the time of this
16  incident -- when I'm talking about at or around, I am
17  going to say within 48 hours of this incident -- that
18  you were there at the property at the time of the
19  incident?
20      A. Are you asking me what I knew 48 hours out or
21  now?
22      Q. Now.
23      A. I believe that Sergeant Houdek may have known
24  by then, and I believe that Major --

25

1      Q. Hughes?
2      A. -- Hughes was aware as well.
3      Q. Let's start with Sergeant Houdek. Why is it
4  that you have reason to believe that Sergeant Houdek
5  would have known of your involvement at the time of
6  this incident?
7      MS. BALLARD: Within 48 hours of the
8  incident.
9      MR. MARTIN: Yes, within 48 hours. Thank
10  you.
11      A. I really don't know how to answer. I just get
12  the impression that -- I assume -- I got the
13  impression at some point after the incident, I don't
14  know if it was 48 hours, that Captain Hawkins had
15  spoken to him about the incident and maybe that it was
16  revealed at the time. Captain Hawkins probably would
17  have to answer that. I don't recall being told that.
18  I just remember later thinking that I knew that he was
19  aware of it sometime after the incident, but in close
20  proximity.
21      Q. Why do you believe that Captain Hawkins may
22  have had contact with Sergeant Houdek about this
23  incident?
24      A. I don't recall. At some point -- only because

7 (Pages 22 to 25)

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

26

1  there was a supplement written by Detective Mullett.
2  So he obviously knew at some point as well that I was
3  involved. I am assuming that the incident was
4  discussed with the two of them.
5      Q. The incident was discussed with the two of
6  them. You are referring to Mullett and Houdek?
7      A. Yes, sir.
8      Q. And you're also referring to Captain Hawkins
9  being a party to that conversation?
10     A. Again, I don't think that's what he said to me.
11  I am just -- that's what I pieced together. I guess I
12  am gathering from -- there was a supplement written.
13  I am certain that the sergeant would have had to have
14  been contacted about the case being handled and then
15  it was turned over to Detective Mullett. So I knew he
16  had to have been advised, you know, in order to write
17  a supplement.
18     Q. Do you have any understanding as you sit here
19  now as to why your name was not specifically put on
20  Maher 1 through 4?
21     A. I would say that initially that the responding
22  officers, to include Csapo, Gygrynuk and ....
23     MS. BALLARD: That's Argo.
24     A. -- and Argo didn't know about it when they did

27

1  the initial reports.
2      Q. If I were to represent to you that Jack
3  Gygrynuk testified by way of his Internal Affairs
4  interview that he did know about it --
5      MS. BALLARD: Object to the form.
6      Q. Let's assume that for the moment. Why is it
7  that your name was not put on this report?
8      A. I have no idea.
9      MS. BALLARD: I am going to object to the
10  representation. The document reflects what it
11  reflects.
12     Q. That's fine. Let's go back to Major Hughes. I
13  think your testimony a few moments ago was to the
14  effect that you believe that Major Hughes knew about
15  your involvement in this matter within 48 hours of its
16  occurrence. Is that correct?
17     A. Yes. 48 hours, I don't know.
18     Q. 72 hours?
19     A. I, I don't recall whether it was a week, 48
20  hours, three days, 12 hours. I know at some point
21  that Captain Hawkins had told me that he spoke to
22  Major Hughes. And I do think that that was within
23  probably 48 hours, if I remember correctly.
24     Q. Why was Major Hughes involved, if at all, in

28

1  this? What was his role?
2      A. He would have been the field force commander
3  for Sussex County.
4      Q. I'm sorry, field force?
5      A. Yes, I believe, for Kent and Sussex at the
6  time, which means he was the man in charge of both
7  counties, the executive in charge of both counties.
8      Q. Other than Sergeant Houdek and Major Hughes, do
9  you have any knowledge to suggest that any other
10  individuals knew of your involvement within 48 hours?
11  Let's expand that up to a week from the time of the
12  incident.
13     A. No, sir.
14     Q. How many times did you speak with Captain
15  Hawkins about this matter?
16     A. Sir, are you talking about from now to when the
17  incident occurred or within the first couple days?
18     Q. I'm sorry. I should have clarified that. Yes.
19  The latter. In the first couple of days to a week
20  following the incident, how many times did you speak
21  with Captain Hawkins?
22     A. Immediately following the incident and in the
23  first, probably, 12 hours afterwards, I believe I
24  spoke to him three times. The initial reporting.

29

1  When he called me back the same evening.
2      Q. Right.
3      A. And then the next morning.
4      Q. Let's go back to that --
5      A. Then again -- I'm sorry.
6      Q. Go ahead. Complete --
7      A. The next morning, would have been Sunday
8  morning. It's the same morning actually because we're
9  past midnight, actually. The next morning being
10  Sunday morning. Then Monday he called me back.
11     Q. Let's talk about each of those conversations if
12  we can. He called you back. You believe you were
13  still in your car headed home --
14     A. Yes.
15     Q. -- after the incident; correct?
16     A. Yes.
17     Q. At that point, what did he tell you?
18     A. He said that our troopers were on-scene
19  handling the incident, and that I was just to stay
20  home and that he would be back in touch with me in
21  reference to what was going to take place or if he
22  needed me to go somewhere or not.
23     Q. All right. And then the next conversation was
24  again initiated by Captain Hawkins, is that fair to

8 (Pages 26 to 29)

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

30

1 say, Sunday morning? I recognize the first two were
2 Sunday morning as well.
3 A. Yes. I understand. I believe I may have
4 called him. I was with Christy at the time. She may
5 be able to shed some light on that. I believe I was
6 at her residence fixing the window, cleaning up the
7 mess when I spoke to him. And I am not certain if he
8 had called me or if I had called him.
9 Q. What was the purpose of that call as best as
10 you can recall?
11 A. I wanted to let him know I had taken care of
12 the repair of the window, I was at her residence and
13 we had spoken. I don't recall what was going on. I
14 don't know if he called to advise me of something or
15 if I called him.
16 Q. Were you off at the time of this incident?
17 A. Yes.
18 Q. For how long were you off, a couple of days,
19 or?
20 A. I was at motor school in La Plata, Maryland.
21 So I was probably off on Friday. So I was off from
22 Friday evening to Monday morning.
23 Q. The next contact you had with Captain Hawkins
24 was sometime on Monday; is that fair to say?

31

1 A. Yes. I believe the particular conversation on
2 Sunday morning, I asked him if he wanted to speak with
3 Christy. He said, no, that he would speak to her
4 officially when he went back to work on Monday to see
5 what she desired to have done and to talk to her about
6 the incident. I believe he -- I believe -- I am not
7 even certain about this; this may have come from
8 Christy -- I believe that on Monday I spoke to him
9 again, and he might have informed me that Christy had
10 said she didn't want anything done and that it was
11 going to be taken care of at the troop level.
12 Q. What was your understanding, if any, as to what
13 that meant, that it was going to be taken care of at
14 the troop level?
15 A. That they weren't going to send it to IA or
16 have any investigation, that they were just, because
17 neither of us -- she was not wishing to have anything
18 done nor was Kevin Keller, that it was -- the issue
19 was dead, that it was just going to be taken care of.
20 Q. Now, this is a conclusion you drew after
21 speaking with Captain Hawkins; is that fair to say?
22 A. Yes.
23 Q. What specifically, if anything, did Captain
24 Hawkins say to you to give you that understanding that

32

1 it's been taken care of, that it's a dead issue?
2 A. I don't remember his exact words. I know that
3 that was the conclusion I drew at the time.
4 Q. Now, when you returned to work Monday morning,
5 did you go to the troop headquarters in Lewes?
6 A. That would be Troop 7. No. I believe I was
7 still in motor school, so I went back to La Plata,
8 Maryland for motor training.
9 Q. All right. How long is that training?
10 A. Two weeks.
11 Q. Who was -- who were your superior officers at
12 the time at Troop 7?
13 A. Captain Nolt. Maybe Rick Chamberlain was a
14 lieutenant. I am not sure who the other lieutenant
15 was at the time. I believe -- I am not sure who I was
16 working for, there were so many sergeants there.
17 Q. Did you consider a sergeant to be a superior
18 officer?
19 A. Yes.
20 Q. Do you recall which sergeant you may have
21 reported to?
22 A. Anybody, help me here? I literally had nine
23 sergeants while I was down there; so, no. This far
24 out -- I'm going to guess.

33

1 Q. Don't guess. If you don't know, you don't
2 know. That's fine.
3 A. I don't recall who I was working for at the
4 very beginning. I had some sergeant that came and
5 went very quickly. I am not sure who I was working
6 for right then and there at that time.
7 Q. During this period of time -- and I am going to
8 call this period of time now the end of October
9 through the month of November of 2003 -- did you have
10 any conversation with any of your superior officers at
11 Troop 7 with regard to this incident with Christy on
12 October 25-26, '03?
13 A. Incidentally, I believe Ron Haigen may have
14 been the other lieutenant at the time at the troop,
15 Lieutenant Haigen.
16 Yes, I believe I spoke to Captain Nolt at
17 some point in reference to the incident, but this is
18 months later when it surfaced -- I mean, months and
19 months later when everything came back around and I
20 was recontacted saying they were going to open up a
21 investigation.
22 Q. Between the time of the incident late October
23 of '03 and when this matter was reopened sometime in
24 the spring of '04, you did not have any contact with

9 (Pages 30 to 33)

A000076

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

34

1  anyone at Troop 7 with regard to this matter?
2      A.  No.
3      Q.  Why was that?  Did you believe it was a matter
4  that was totally dead --
5      A.  Yes.
6      Q.  -- as you had said?  okay.
7      A.  It wasn't in my best interests to be out
8  running my mouth about the incident, obviously,
9  because it was embarrassing, so there was no need for
10  me to talk to anybody about it.  I was told it was
11  taken care of, it was a dead issue.
12      Q.  Well, during that time period, again, from late
13  October until the time this matter resurfaced, were
14  you aware of any discussion of the incident?
15      MS. BALLARD:  Objection.
16      A.  You have to be more specific, sir.  I don't
17  know what you are talking about.  Discussion between
18  whom?
19      Q.  Well, anywhere within the division.
20      A.  Not that I know, no.
21      Q.  Okay.  Now, you talked about your four contacts
22  with Captain Hawkins about this incident that occurred
23  within the first couple of days,  Did you have any
24  further contact with Captain Hawkins from the time you

35

1  last spoke with him until the time the charges were
2  levied against you?
3      A.  Not that I -- no independent recollection, but
4  I saw him so often, it would be hard to say.  It may
5  have come up between he and I again, but it would have
6  been no more than what had already been discussed.  I
7  don't recall any specific dates.  I am sure that we
8  probably, because of the contact we had, I am sure we
9  had discussed it again.  I just couldn't give you any
10  idea of when that was or what was stated.
11      Q.  Do you recall attending a wedding sometime in
12  the month of December of '03 regarding some division
13  employee?
14      A.  Not unless you can be more specific.
15      Q.  Unfortunately, I can't be any more specific
16  because I don't know.  I am just asking the question
17  whether --
18      A.  December of '03.  It's hard to say.  I was
19  doing the wedding circuit back then.  It could -- if
20  you could be a little more specific or something to
21  clarify --
22      Q.  I think you may have covered it in the sense
23  that I understand your testimony was you were not
24  aware of any discussion of this matter from the time

36

1  of the incident up until the time you were charged in
2  the spring of '04.
3      A.  I am sure this matter was discussed before I
4  was charged in close proximity because it had to come
5  back up and resurface.  I am just saying that it
6  wasn't like all of a sudden they called me, you need
7  to respond to Troop 4, you are under arrest, or we're
8  investigating this.  I am sure at some point there
9  would have been some conversation.  I wouldn't have
10  known about them after the fact until they had
11  contacted me and said, hey, this incident is being
12  reinvestigated.  That's the only time I knew there was
13  anything going on about this whole thing.
14      Q.  When is the last time you had any contact with
15  Christy Dempsey?
16      A.  What type of contact?
17      Q.  Conversation, seeing one another.
18      A.  I saw her at a civil, I guess, lawsuit or civil
19  suit maybe two years ago.
20      Q.  You have not had any telephone conversations or
21  any other personal conversations since that time?
22      A.  Oh, it's been longer than that.
23      Q.  Longer than that?
24      A.  Mm-hmm.

37

1      Q.  Now, what is your understanding, if any, as to
2  how it was that charges were pressed against you for
3  this October '03 incident?
4      A.  Are you speaking of the internal investigation,
5  sir, or the actual criminal matter?
6      Q.  Both.
7      A.  You'll have to give me one or the other so I
8  can answer one and then --
9      Q.  That's fine.  Which one preceded the other?
10      A.  The internal investigation was first and then
11  after some time, I guess -- I am not even sure of the
12  dates -- but the criminal investigation was reopened.
13      Q.  What is your understanding, if any, as to how
14  the internal investigation was prompted?
15      A.  The best I can piece together, and I've never
16  verified this, but I believe that somebody, a sergeant
17  from Troop 4, I believe, it might have been
18  Sergeant Riley asked a question to one of the
19  lieutenants, Mark Russ, about whatever happened about
20  the incident between Christy and Brian.  They happened
21  to be in the same place at the same time and the
22  question came up.  It's my understanding that Mark
23  Russ not knowing anything -- Christy was working for
24  the troop at the time.

10 (Pages 34 to 37)

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

38

1    Q. Which troop was that?
2    A. 4, I believe. It might have been Troop 5.
3    It's been so long now. These guys move around so
4    much, it's hard to say, but, regardless. From there,
5    the best I can piece together is that Mark Russ not
6    knowing anything about it figured he was kept out of
7    the loop for a reason, went to Lieutenant Brown during
8    this function, retirement function, and asked him if
9    he knew anything. He didn't know anything as well.
10   Q. Who is Lieutenant Brown?
11   A. He was the other lieutenant at the troop
12   Christy was working at the time.
13   Q. How did you get this information?
14   A. You know what, I have no idea. I know that
15   from there, the only thing I do know is that the next
16   person's hands it fell into would have been captain at
17   the time Glenn Dixon. The two lieutenants contacted
18   him to see if they were being left out of the loop or
19   if he was familiar and that's how this whole thing got
20   started.
21   Q. How were you notified of the IA investigation?
22   A. I don't recall.
23   Q. What was told to you, if anything, about the
24   nature of the IA investigation?

39

1    A. Can you rephrase the question? I don't
2    understand what you are asking me, sir.
3    Q. Sure. Were there divisional charges placed
4    against you?
5    A. Not initially. They were -- I was told that
6    they were reopening an investigation. That may have
7    been Captain Nolt said they were reopening or opening
8    an investigation about the original incident.
9    Q. Did you have any contact with Captain Hawkins
10   at that point?
11   A. Not that I recall, no.
12   Q. Well, Captain Hawkins was the one who told you
13   that this matter was dead?
14   A. Yes.
15   Q. Was there any reason why you wouldn't go back,
16   you didn't go back to Captain Hawkins after you were
17   contacted and said you were going to get an IA?
18   A. Is there any reason I didn't?
19   Q. Yes.
20   A. I'm not saying I didn't. I don't know when I
21   spoke to him about the incident. I am sure I had at
22   some point because I had so much contact with him, but
23   I don't recall who I may have contacted or even if I
24   did contact anyone at that point when I was notified.

40

1    Q. Were you aware that there was a Troop 5 party
2    in February of '04 and that this incident may have
3    been discussed at that point?
4    A. When you say "Troop 5 party," is that the
5    retirement party I may have been speaking about?
6    Q. That's what I was going to ask.
7    A. That may be the retirement party I'm speaking
8    about. Like I said, I don't even know how I put that
9    together. But I believe that that's where this thing
10   surfaced again, if that's the same party that I am
11   speaking of, between Lieutenant Brown and
12   Lieutenant Russ.
13   Q. When you were contacted regarding this Internal
14   Affairs investigation, do you remember who it was that
15   contacted you?
16   A. No, I do not. For some reason, I think
17   Captain Nolt, but I am not certain.
18   Q. At the time you were initially contacted, you
19   were not advised that it was going to be both an
20   Internal Affairs investigation as well as a criminal
21   investigation?
22   A. No. I remember having the impression that this
23   was going to be just an Internal Affairs investigation
24   at the time.

41

1    Q. Okay. Do you recall when it was, what month in
2    which you were advised, perhaps, by Captain Nolt of
3    this investigation?
4    A. I'd be guessing.
5    Q. All right. Well, let me try to refresh your
6    recollection. It may have been March 28th -- is that
7    a date -- 2004. Is that a date that sounds consistent
8    with your recollection?
9    A. That would probably be pretty close. It was
10   five months after the incident. Yeah, that was
11   probably -- I would have guessed six months. But,
12   yeah, that's probably right around the time.
13   Q. Do you recall when it was that you were
14   arrested?
15   A. No, I do not. Oh, yes, I do. It was Memorial
16   Day. Or the Saturday before Memorial Day, maybe, or
17   the weekend of Memorial Day.
18   Q. What were you charged with?
19   A. At the time, it was criminal trespass,
20   terroristic threatening.
21   MS. BALLARD: You are asking about the
22   original charges?
23   MR. MARTIN: Yes.
24   MS. BALLARD: Just for the record --

11 (Pages 38 to 41)

A000078

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

42

1    A.   Criminal mischief.
2         MS. BALLARD: — the witness is referring
3    to the record.
4    BY MR. MARTIN:
5    Q.   Were you ever charged with burglary?
6    A.   No, I was not.
7    Q.   You were never charged with burglary?
8    A.   No.
9    Q.   If you go back to the police report, Maher 1,
10   the charge they have put on there — and I recognize
11   that that was done in October and they didn't identify
12   a suspect — they have -- the report says "burglary,"
13   does it not?
14   A.   Yes.
15   Q.   What is your understanding, if any, as to
16   whether your actions did constitute burglary in the
17   first degree?
18        MS. BALLARD: Objection to the form.
19   Q.   Let me look -- let me suggest to you, looking
20   at the Maher 1, somebody inadvertently got some bad
21   information as to you being armed with explosives or
22   deadly weapons. And I understand that that never
23   happened. Is that fair to say?
24   A.   Yes.

43

1    Q.   But if we just look at burglary first degree
2    and dwelling night, was there any -- strike that. I
3    am going to go back to the prior question I asked, and
4    that was: Did your actions constitute burglary first
5    degree?
6    A.   Yes.
7         MS. BALLARD: The same objection I had
8    before.
9    Q.   Do you have any idea why you were never charged
10   with burglary first degree?
11   A.   No.
12   Q.   Do you know who made the decision as to whether
13   you would be charged with burglary first degree?
14   A.   No, I do not.
15   Q.   What was your response, if any, to the Internal
16   Affairs investigation?
17   A.   I don't understand your question.
18   Q.   Were you charged divisionally as a result of
19   the IA investigation?
20   A.   Yes.
21   Q.   What were those charges?
22   A.   I don't recall. Probably conduct unbecoming,
23   if I remember correctly. And I believe not reporting
24   the incident properly or to the proper person. I am

44

1    not sure what that charge was worded at.
2    Q.   What was the disposition of the IA charges?
3    A.   I am not sure. I know I went to the colonel on
4    the conduct unbecoming. I assume that the other
5    charge was part of that as well. I don't know. I
6    pleaded no contest to the charge, at least the one
7    charge. I am pretty sure the other charge was still
8    withstanding. I believe it was both charges.
9    Q.   I am confused. You pled no contest to which
10   one?
11   A.   It was probably both. I just don't know. I
12   don't recall whether both those charges were still —
13   I went before the colonel on both charges. I can't
14   remember — there were something that occurred
15   beforehand with my attorney and the division. I am
16   not sure if I went in before the colonel on both
17   charges or just one. So I don't know how they
18   dismissed the reporting charge. I believe the conduct
19   unbecoming or whatever the other charge was I pled no
20   contest to.
21   Q.   What discipline was issued to you?
22   A.   I don't recall. I know there was a reduction
23   in rank and I lost some time but I don't recall the
24   specifics.

45

1    Q.   What was the nature of the reduction in rank?
2    A.   I believe I went from a corporal 3 to a
3    corporal. There are grades of corporal. Reduction in
4    rank.
5    Q.   Corporal 3 down to just corporal?
6    A.   Yes.
7    Q.   You believe that you lost time. Do you recall
8    how much time?
9    A.   No, sir.
10   Q.   So was there a period of time where you were
11   not working with the Delaware State Police following
12   the IA charges?
13   A.   Yes.
14        MS. BALLARD: Are you asking about
15   separation from Delaware State Police or suspension?
16        MR. MARTIN: I'm trying to understand
17   because, quite frankly, I don't recall the record.
18   A.   I believe you have the option — they give you
19   the option to forfeit time for some of the time and
20   then I was suspended without pay for some of the time,
21   if I remember correctly, without the option is how
22   they term it.
23   Q.   You don't how much time was involved with the
24   forfeiting or the suspension?

12 (Pages 42 to 45)

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

46

1    A.  No, sir.
2    Q.  What, if anything, did you do during the time
3    you were suspended?
4    A.  I don't understand the question.
5    Q.  Were you — you were not working while you were
6    suspended, were you?
7    A.  No.
8    Q.  So there wasn't a long period of time where you
9    were suspended, to the best of your knowledge?  For
10   example, was the suspension more than a month?
11   A.  I don't believe so.  I think you're asking
12   about a different period of time, sir.
13   Q.  Well, I am going to get to the colonel charges
14   as well.
15   A.  Okay.
16   Q.  But I just — I wanted to follow up with the
17   Internal Affairs investigation initially.  How long
18   did you remain at Troop 7?
19   A.  Until my retirement in February.
20   Q.  Your retirement was February when?  This year?
21   A.  Yes.  Yeah, February 23rd, 25th.
22   Q.  Of '07?
23   A.  Yes.
24   Q.  Did you have 20 years of service in at that

47

1    time?
2    A.  Yes.
3    Q.  Well, you hesitated on that.
4    A.  Well, with terminal, leave I was able to get my
5    retirement, but.  You don't have to stay to your
6    anniversary date of 20 years.  But, yes, I have a
7    20-year pension.  Because of vacation time and sick
8    time and accumulate timed, I was able to leave several
9    months early.
10   Q.  Did your responsibilities or activities at
11   Troop 7 change at all during the time of your Internal
12   Affairs investigation and discipline and also during
13   your criminal investigation and whatever charges you
14   pled to?  I am trying to understand what happened at
15   Troop 7, if anything.  Were you able to continue any
16   special activities operations that you did at Troop 7?
17   A.  If I understand what you are asking me, yes.
18   Are you talking about the motor unit or the special
19   units I was in?
20   Q.  Yes.  And please tell me what special units you
21   were in.
22   A.  At the time, it would have been the motorcycle
23   unit.
24   Q.  Motorcycle unit?

48

1    A.  Yes.
2    Q.  Okay.
3    A.  And the scuba unit.
4    Q.  Any other special units the last couple of
5    years of your work there at Troop 7?
6    A.  Not that I can think of, no.
7    Q.  Did any of the discipline that you may have
8    received as a result of the matters that we're
9    speaking about today have any impact at all on your
10   work with any of the special units?
11   A.  No.
12   Q.  Do you recall whether your schedule was changed
13   at all, your work schedule during the time you were
14   being investigated and thereafter?
15   A.  It may have because of the motor unit, but it
16   would have been a voluntary something we went through.
17   I don't recall — I worked the same schedule as
18   everybody else, the same rotation.  We worked a
19   semi-modified schedule in the summertime on the motor
20   unit.  That may have taken place then.  I am not sure
21   what years we did that, though.
22   MR. MARTIN:  Why don't we take a break for
23   about five minutes.
24   (Recess taken.)

49

1    BY MR. MARTIN:
2    Q.  Okay.  Let me go back and ask you a little bit
3    more about your activities at the troop level.  In
4    addition to the special unit, you also acted as the
5    assistant on a shift.  Is that correct?
6    A.  Yes.
7    Q.  Is that something that's usually bestowed upon
8    somebody with seniority?
9    A.  Not necessarily.  Depends what troop you are at
10   actually.
11   Q.  Tell me:  What does it mean to be an assistant
12   on a shift?
13   A.  Generally, the job description is you are the
14   assistant to the sergeant.  You act as the sergeant in
15   his absence and at Troop 7 because the sergeant is at
16   the desk you are the assistant on the road.  That
17   means you are in charge of what's going on on the
18   road, your subordinates or anyone junior to you.
19   Q.  Now, did you continue serving as assistant
20   after you were taken from Corporal 3 down to corporal?
21   A.  Yes.
22   Q.  Do you recall that Christy Dempsey was working
23   at Troop 7 while you were working there in 2004?
24   A.  At some point, yes.

13. (Pages 46 to 49)

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

50

1   Q.  Do you recall that after you were arrested on
2  the criminal charges, that her shift was changed?
3   A.  No.
4   Q.  You don't recall that?
5   A.  No, I do not.
6   Q.  Do you recall any time period at Troop 7 when
7  her shift was changed?
8   A.  Yes, at some point. I don't recall when that
9  was, though.
10   Q.  Do you recall the reason for the shift change?
11   A.  No, I do not.
12   Q.  I understand that you had a close relationship
13  with Pat Ogden because you both had been on SORT
14  together. Is that fair to say?
15   A.  No, I have a close relationship with Pat Ogden
16  because we were academy classmates. We've been
17  friends for over 20 years.
18   Q.  What was Pat Ogden's rank in 2004?
19   A.  I don't recall.
20   Q.  Do you recall where he was, which troop he was
21  with?
22   A.  If I had to guess in 2004, I'd say Troop 2.
23   Q.  Do you know whether you ever discussed the
24  matter of October 25-26 with Pat Ogden during the year

51

1  of 2003?
2   A.  I am sure I had at some point.
3   Q.  You are sure you had. Okay. Who else did you
4  have conversations with about this incident other than
5  Pat Ogden and Captain Hawkins in 2003?
6   A.  Are you speaking -- 2003? I probably spoke to
7  no one until the case was reopened. I never spoke to
8  anybody about it. That might have put us in 2004.
9  I'm sorry.
10   Q.  Just so the record is clear, you are amending
11  your answer --
12   A.  Yeah.
13   Q.  -- to say that you did not speak to Ogden, to
14  the best of your knowledge, in 2003?
15   A.  No, I don't think I ever mentioned the incident
16  until after it was brought back up. I don't think I
17  spoke to anyone.
18   Q.  Okay.
19   A.  Other than Captain Hawkins.
20   Q.  Referring again to the exhibits you have before
21  you, Maher 1 through 4, do you believe that they are
22  accurate reports?
23   A.  I am certain that the troopers at the time were
24  making the reports according to what they were being

52

1  told, yes.
2   Q.  That's not quite the same question I asked,
3  with all due respect, Mr. Maher.
4      MS. BALLARD: Are you asking him for an
5  opinion?
6   Q.  No. I am asking him as to -- because you know
7  the facts. You know -- you have written many of these
8  reports. Have you not?
9   A.  Thousands.
10   Q.  Do these reports -- are they accurate reports?
11   A.  Again, according to the information they had at
12  the time, I'd say, yes, they were accurate reports.
13   Q.  You said a moment ago according to what they
14  were told. Is that through their sergeant?
15   A.  I would say that it was through the person, the
16  persons they were interviewing at the time. Now, that
17  would be with the exception probably of, I'm sorry,
18  Exhibit 3, because at that time there was probably
19  more information. I would imagine that Sergeant
20  Mullett's report -- I would have no way of telling. I
21  think there was probably more information out at that
22  time. But the other three reports, I am sure
23  accurately reflect the statements of the individuals
24  they were interviewing.

53

1   Q.  The first three reports are within two or three
2  days of one another, the last being October 29, 2003.
3   A.  Mm-hmm.
4   Q.  What's your understanding, if any, as to why
5  Supplemental Report No. 3 is dated 4/20/04?
6   A.  Supplemental Report No. 3, sir?
7   Q.  Yes. That's Exhibit No. 4.
8   A.  Oh, okay. It's dated what?
9      MS. BALLARD: I am going to object to the
10  extent it calls for speculation. This is somebody
11  else's report. But you can answer, as best you can.
12   A.  I would have no idea, sir.
13   Q.  Are you aware of any divisional policy that
14  sets some time limitations between the time of an
15  incident and the time of reporting to IA or having an
16  IA investigation?
17   A.  Can you say that one more time, sir? I lost
18  some of that.
19   Q.  Are you aware of whether there is a policy
20  within the division to begin an Internal Affairs
21  investigation after a certain period of time or before
22  a certain period of time, almost like a Statute of
23  Limitations?
24   A.  Am I aware?

14 (Pages 50 to 53)

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

54

1    Q. Yes.
2    A. I am familiar with the fact that they must
3  notify you of an incident in a certain amount of time,
4  but I don't know that if it's not brought to the
5  attention of IA if there is a statute of limitation
6  before they can open up an investigation. So, no, I
7  do -- I am not aware is probably the answer to that
8  question.
9        MS. BALLARD: I actually know the answer,
10  if you want to know, but there is not.
11    Q. Were you concerned about the timeliness, lack
12  of timeliness when you were contacted the end of
13  March about an incident that occurred in late October?
14    A. I was concerned at many levels. Timeliness
15  probably came up. I was probably notified that since
16  it didn't come to light or hadn't been brought to them
17  that there was no infraction there. I am sure this
18  was covered with my attorney. I mean, I know that
19  would have been a question that I had. But I don't
20  remember specifically what the -- I believe it was
21  because they hadn't been notified or contacted.
22    Q. Do you recall an incident that you had with
23  Christy in November 2004 resulting in Christy having a
24  separated shoulder?

55

1    A. No.
2    Q. You don't have any recollection of that?
3    A. I recall an incident. I don't recall anything
4  about an injury or her having a separated shoulder.
5    Q. Do you recall whether an investigation began as
6  a result of that incident?
7    A. Yes.
8    Q. Do you recall whether you were listed as the
9  suspect or the victim in that investigation?
10    A. I don't recall.
11    Q. As you sit here now, what is your understanding
12  as to who would properly be considered the suspect and
13  who would properly be considered a victim as a result
14  of that incident?
15    A. I am not sure how I was listed on the report.
16  To be honest with you, I just don't recall.
17    Q. That's not my question. I understand you
18  answered that, but now I'm asking you: Upon
19  reflection, looking at that incident in November of
20  '04, were you properly considered to be the victim of
21  this incident or should you have been listed as the
22  suspect?
23        MS. BALLARD: Object to the form and lack
24  of foundation.

56

1    Q. You may answer.
2    A. Again, I am not sure what you're asking me. I
3  know that she made the report, so she was listed as
4  the victim. I am not sure if I was listed in the
5  report, if I was listed as a person of contact or a
6  suspect. If you have a report, it will obviously
7  reflect that. I just don't recall how they listed me.
8    Q. Do you think it would be accurate to reflect
9  that Christy Dempsey was the suspect in that
10  investigation?
11    A. No, I said that she reported it. She would
12  have been classified as the victim because she was
13  reporting it. I just don't know how they classified
14  me in the report. Simply looking at the report would
15  indicate how I was listed, and I would agree with you.
16  I just don't recall.
17    Q. But not having the report here right now, you
18  would agree that she was -- she should not have been
19  listed as the suspect?
20        MS. BALLARD: Object to the form.
21    A. I am assuming she was listed as the victim. I
22  am certain of it.
23    Q. All right. Just listen to my question. Okay.
24  This is not a tricky question.

57

1    A. Sir, there is nothing for me to hide. I don't
2  recall. She reported it. She is probably listed as
3  the victim. Without the report being in front of me,
4  I don't know. I was either listed as suspect or
5  person contacted. She may have been listed as the
6  reporting person on the report. I don't recall.
7        MS. BALLARD: I want to state on the record
8  we've had no description of what this incident is and
9  you are asking if she should have been listed as a
10  suspect or victim.
11        THE WITNESS: I don't know what you are
12  talking about. What I am telling you, I don't recall
13  how it was listed on the report.
14        MR. MARTIN: Off the record.
15        (Discussion off the record.)
16  BY MR. MARTIN:
17    Q. If Christy Dempsey was listed as the suspect on
18  the report, was that accurate?
19    A. No, I don't believe she was a suspect, no.
20    Q. Okay.
21        MS. BALLARD: Was my objection listed on
22  the record?
23        MR. MARTIN: Yes.
24        MS. BALLARD: I didn't know if we were on

15 (Pages 54 to 57)

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

58

1  or off.
2      MR. MARTIN: Your full objection was on.
3  That's why I went off the record. I am purposely
4  avoiding the -- okay.
5      MS. BALLARD: Okay. That's fine.
6  BY MR. MARTIN:
7      Q. I understand that you retired or your last day
8  as a trooper was listed as February of '07; correct?
9      A. That would be my terminal date, sir. My last
10  date of employment will be October 3rd.
11      Q. Of '06?
12      A. No, sir. This coming.
13      Q. I see.
14      A. Because of the terminal leave time.
15      Q. By whom are you currently employed?
16      A. Blackwater U.S.A.
17      Q. What is Blackwater U.S.A.?
18      A. It's a consulting firm, military and civilian
19  consulting firm.
20      Q. And is that a defense department contract?
21      A. Yeah. I am sure they have several departments.
22  Yes, the defense department is a contractor.
23      Q. What is your job?
24      A. I am an instructor.

59

1      Q. What do you teach?
2      A. Close quarter defense.
3      Q. Do you teach our military troops?
4      A. No. Well, yes, sir. Some. Mostly retired
5  military personnel and law enforcement.
6      Q. So you don't -- it's not necessary for you to
7  go into a battle theater to instruct any of these
8  individuals?
9      A. I will, yes.
10      Q. When do you expect to do that?
11      A. That's not quite clear because of our schedule,
12  but probably it would be a short-term deployment in
13  the fall.
14      Q. What is your current home address?
15      A. 116 Herronwood Drive.
16      Q. Where is that?
17      A. Milton, Delaware 19968.
18      Q. For how long have you resided at that address?
19      A. March was three years.
20      Q. Do you reside with anyone at that address?
21      A. My mother.
22      Q. May I have your cell phone number, please?
23      A. 302-593-4566.
24      MR. MARTIN: Off the record.

60

1      (Discussion off the record.)
2
3  BY MR. MARTIN:
4      Q. Do you believe that Christy Dempsey was treated
5  fairly as a result of her IA investigation and
6  subsequent discipline?
7      MS. BALLARD: Objection to the form.
8      A. Can we break that down into parts, sir?
9      Q. Sure.
10      A. The first one being treated fairly in her IA
11  investigation.
12      Q. Okay.
13      A. Was that the first part of the investigation,
14  sir?
15      Q. Yes.
16      A. I thought the entire investigation, not only my
17  part but her part was probably not handled textbook
18  correctly. Although I understand why both IA
19  investigations took place. Whether it was fair or
20  not, at this point I really don't know how to answer
21  that.
22      Q. Why do you say it was not handled textbook
23  correctly?
24      A. Well, for one, because the investigation wasn't

61

1  even opened until five or six months after the
2  incident by no fault of our own. I reported the
3  incident immediately. At that point, everything else
4  was done at pay grades way higher than mine. The way
5  this thing came back around and was reopened and then
6  the subsequent sequence of events that happened
7  afterwards not only between her and I, but between
8  individuals that were employed by the division and
9  other investigations and through Jane Brady's office,
10  I didn't think everything was handled quite properly
11  or fairly. A lot of that is just my opinion. And of
12  course --
13      Q. I'm sorry. You are referring to your criminal
14  prosecution?
15      A. No; no, I am referring to both, IA and the
16  criminal prosecution. I am talking about the whole
17  incident.
18      Q. But you said the Attorney General's Office.
19  Did the Attorney General's Office have anything to do
20  with the Internal Affairs investigation?
21      A. It was my understanding that they were
22  overseeing it or they had some party in it, some part
23  in it.
24      Q. Are you talking specifically Tupman and

16 (Pages 58 to 61)

**A000083**

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

62

1  Durstein?
2  A. No. My understanding is that Jane Brady's
3  office was interested in the case and had, possibly
4  had something to do with another incident which was
5  occurring within the division.
6  Q. Okay. What is it, to the best of your
7  understanding, that Attorney General Brady was
8  interested in?
9  A. There was another incident -- my understanding
10  was they were getting pressure through not only the
11  governor's office, but maybe Jane Brady was feeling
12  pressure about the incident because of UTA, the black
13  troopers coalition, was interested in what was going
14  to happen concerning another trooper, Gaddy, that had
15  been investigated.
16  Q. That's Leshaun Gaddy?
17  A. Yes, sir.
18  Q. And the Gaddy matter involved a situation at
19  the Christiana Mall. Is that what you are referring
20  to?
21  A. Yes.
22  Q. I am trying to understand the link between that
23  and -- are we going back to the October 25-26
24  incident?

63

1  A. Yes.
2  Q. Please try to make that link because I can't
3  seem to understand how one could be involved with
4  another.
5  A. It was my understanding that they were
6  interested in how the division was going to proceed
7  with the Internal Affairs investigation and they were
8  keeping an eye on it.
9  MS. BALLARD: Which Internal Affairs
10  investigation?
11  A. The initial -- the original October incident
12  that was not handled till five, six months later. It
13  was my understanding that they were interested in it,
14  A, because it was domestic.
15  Q. Just stop there for a moment.
16  A. Yes, sir.
17  Q. They being the Attorney General's Office?
18  A. Yes, that is my understanding.
19  Q. We're not talking about AG reps at DSP?
20  A. No.
21  Q. You are talking about somebody in Wilmington?
22  A. That was my understanding.
23  Q. How was it that you got that understanding?
24  Who told you that?

64

1  A. At this point, sir, I couldn't tell you. I
2  know at some point -- no, I am not even sure. I
3  couldn't tell you where I got that information from.
4  At some point, I saw Major Hughes at a function where
5  we could have face time or that we had had an
6  opportunity to speak and he made mention of the IA
7  investigation to me.
8  Q. Let me stop you there for a moment. This is
9  after the AI investigation began?
10  A. Yes.
11  Q. So that began in March or April of '04?
12  A. Yes, sir. I don't remember the date, but,
13  yeah, that would be close.
14  Q. What is it that you spoke to Major Hughes
15  about?
16  A. Like I said, I didn't really get to speak to
17  him because I was working an event. I saw him. He
18  just said to me, hey, look, something to the fact, I
19  don't -- of course, this is not verbatim because we're
20  dealing with years here. He said something to the
21  fact about, look, this is being reopened to be
22  relooked at to make sure that, I believe he said, all
23  the I's are dotted and T's are crossed. Just want to
24  make sure there is no problems in the future with

65

1  this. Something to that effect.
2  Q. Now, did you have an impression that this had
3  anything to do with you in particular or Christy
4  Dempsey in particular?
5  A. No. Can you --
6  Q. I am still trying to understand the, how the
7  Attorney General's Office may have been concerned --
8  A. Well --
9  Q. -- and then how the Leshaun Gaddy episode --
10  A. The Leshaun Gaddy episode entered in later
11  because of the fact that Christy was not willing --
12  Christy did not want to testify against me or have
13  charges at the time for the incident, so I guess the
14  AG's office, their position was they did not need a
15  victim. Because this was the same stance they had
16  taken in the Gaddy case where they didn't need a
17  victim to prosecute him, they had the testimony of the
18  policemen that were involved. And they were saying
19  the same thing here, that they didn't need Christy to
20  be a victim, that they could proceed in this case
21  without her by using the testimony of the trooper who
22  responded and by using corporal -- Captain Hawkins'
23  testimony that I called him. But that was probably a
24  little bit later.

17 (Pages 62 to 65)

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

66

1  Before that, involving that case, I guess
2  UTA had become involved in it or they were interested
3  because they had some meeting with Ruth Ann Minner
4  about why this wasn't -- they were saying why wasn't
5  this handled appropriately and what's being done about
6  it.
7  Q.  UTA. Can you be more specific?
8  A.  Yeah, it's a coalition, minority coalition
9  group that we have in the DSP. They're troopers, but
10  they have their own union.
11  (Discussion off the record.)
12  BY MR. MARTIN:
13  Q.  While with we were off, we identified UTA as
14  the United Troopers Association, which we understand
15  is a primarily black Delaware state troopers
16  association here in Delaware.
17  A.  It is my understanding that, from the
18  information I gathered, they were reopening this just
19  to make sure things were handled appropriately and
20  that there was no need for anyone else to be involved
21  or any further investigation because of the way this
22  thing had resurfaced.
23  Later, I guess, or somewhere in there I was
24  told that UTA was also interested in how all this was

67

1  being handled because they were saying it was not
2  handled correctly initially and they had some concerns
3  that had it been a black trooper it would have been
4  handled differently, and yada, yada, yada.
5  Q.  Okay. Let me go back to the question that
6  precipitated this, and I think my question to you was
7  whether you believed that Christy Dempsey was treated
8  fairly throughout this process, through the
9  investigation and the discipline process?
10  A.  I'll be honest, I don't remember the AI
11  investigation at the time against Christy, so I can't
12  really comment on that. I know I have some feelings
13  about how it all ended up because I was directly
14  involved in it.
15  Q.  What are they?
16  A.  Well, being that, for the reasons that she did
17  not tell them who was there, being me, obviously, I
18  had feelings what she was doing was in the best
19  interest of her privacy and not getting me in trouble.
20  So I felt, obviously, at the time that that was the
21  right thing to do.
22  Q.  You said a moment ago how this ended up and
23  then --
24  A.  Right. I obviously didn't think that when the

68

1  board found she should be terminated, I didn't think
2  that was a fair penalty for what had happened because,
3  obviously, she was trying to protect me and her own
4  privacy. I felt that, although she wasn't forthright
5  with information possibly at the time, I still thought
6  that she had done it under -- for certain reasons at
7  the time that I thought were warranted.
8  Q.  Do you have an understanding that there is a
9  good ole boys network active in the division?
10  MS. BALLARD:  Objection.
11  A.  Do I have an understanding that there is a
12  goods ole boy network?
13  Q.  Yes.
14  A.  I would say that there certainly is.
15  Q.  How is that -- how did you see that or how does
16  that manifest itself?
17  A.  Well, I think that at times, if you have a good
18  working relationship with people that know you and
19  your quality work and you as an individual and there
20  are available positions at the time or opportunity for
21  you, that someone can say, hey, he's a good guy or
22  help you along, that certainly it happens. I don't
23  know that happens any more in the private sector as it
24  does with us, but.

69

1  Q.  Is it fair to say that given your involvements
2  in different areas, being a medic, a jujitsu
3  instructor, a diver that you felt that you got better
4  treatment than some people, including females?
5  MS. BALLARD:  Objection to the form. I am
6  not sure he's a medic.
7  A.  Absolutely not.
8  Q.  No? Do you know what charge Christy Dempsey
9  was found guilty of as to the division?
10  A.  I don't recall the charge she was found guilty
11  of. I believe I know the charges she was charged
12  with, but I don't recall what she was found guilty of.
13  Q.  What is your recollection as to what she was
14  charged with?
15  A.  I think one of them was a reporting of an
16  incident, falsely reporting an incident and the other,
17  the other I believe had something to do with maybe not
18  being forthcoming with information to a supervisor or
19  something of that nature during the reporting of an
20  incident. I don't recall the specific charges.
21  Q.  What is your understanding, if any, as to other
22  troopers who may have falsely reported an incident?
23  Do they get similar treatment as Christy Dempsey?
24  MS. BALLARD:  Objection to the form.

18 (Pages 66 to 69)

**A000085**

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

**70**

1    A. I don't recall anyone specific that was charged
2    with those charges to be honest with you at this
3    point.
4    Q. How about Kevin Syzmanski, do you remember
5    that?
6    A. Yeah.
7    Q. Go ahead. What was it that you are remembering
8    about that?
9    A. To the best of my recollection, back in mid to
10   late '80s, Kevin was working — I think he was working
11   as an interdiction patrol, possibly with Bob Duman,
12   and I believe that he had falsified a speedometer log
13   and that he made the attorney, the AG aware of it
14   prior to trial. And the case, I believe, was
15   dismissed because of that and then there was,
16   obviously, an investigation afterward.
17   Q. Do you recall whether there were any divisional
18   charges against Kevin Syzmanski?
19   A. I seem to think there were, but I don't
20   remember specifically whether there was. As a matter
21   of fact, yeah, I'm quite sure that there were.
22   Q. Do you remember what kind of charge or
23   discipline he received?
24   A. No, sir.

**71**

1    Q. How about Greg Walsh?
2    A. I know Greg has been in trouble a few times,
3    but I can't remember anything for reporting, for
4    falsifying anything.
5    Q. Do you recall that there may have been a false
6    report during an IA interview?
7    A. That's still not creating a recollection.
8    Q. Okay.
9    A. Do you have anything more specific? I don't
10   recall that.
11   Q. Do you recall Ray Simpson?
12   A. Is that something recent?
13   Q. I believe so.
14   A. Yeah, I know Ray was transferred and something
15   about his time sheets, but I don't recall all the
16   specifics of the incident. I just know that he was
17   transferred in reference to something to do with his
18   time card or time sheets.
19   Q. Do you recall he received no loss of rank and
20   was not fired?
21         MS. BALLARD: We haven't established there
22   were even Internal Affairs charges or the witness has
23   not said that.
24   Q. Do you recall whether there were IA charges?

**72**

1    A. I believe there were, but, again, I don't think
2    he lost any rank and I think he was transferred.
3    Q. How about Tom Carver?
4    A. Can you be more specific? I don't know Tom
5    that well. I am not sure.
6    Q. Regarding his report of an accident when
7    Trooper Kresge struck a pedestrian.
8    A. Okay. I do remember the incident now. I have
9    no idea what happened to Tom or if there were even
10   charges.
11   Q. Do you understand what the allegation was?
12   A. For Tom Carver?
13   Q. Yes.
14   A. I believe, if I recall correctly, that
15   Lieutenant Kresge asked him maybe not to make a report
16   or not to report something in the report. Something
17   to do with a pedestrian being struck and him leaving
18   the scene, but I don't know the particulars.
19   Q. And so do you recall whether there was an IA
20   investigation against Carver?
21   A. I am sure there was, sir, but I don't know any
22   of the details.
23   Q. Do you recall whether Carver is still with the
24   division?

**73**

1    A. I have no idea.
2    Q. How about John Forester?
3    A. Is this young John Forester or Lieutenant
4    Forester?
5    Q. Let's try the young John Forester.
6    A. I seem to remember something, him getting in
7    trouble a few years ago, two, three years ago, but I
8    have no idea — maybe even a year, year and a half
9    ago, but I have no idea what it was for.
10   Q. Do you recall misuse of fingerprints on an
11   arrest report?
12   A. No, I do not.
13   Q. Does this list trigger any further
14   recollections of troopers who have had reports of
15   falsifications?
16         MS. BALLARD: Objection to the form.
17   A. Sharon Willey is the only other one that I can
18   remember anything similar.
19   Q. What's her last name?
20   A. Willey.
21   Q. What do you recall about that?
22   A. Apparently she was on — they don't call it
23   discipline, but probationary period for her weight,
24   for divisional weight policy and standards. My

19 (Pages 70 to 73)

**A000086**

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

74

1  understanding is I guess he had to be weighed in by a
2  supervisor, and that she was filling out the memos
3  herself and sending them to whoever they need to be
4  sent to. I don't even know who they went to, whether
5  it was HR or her immediate.
6    Q.  Do you know whether there was an IA
7  investigation?
8    A.  I believe there was. I don't know the outcome.
9  You know what, sir, I am going to have to take that
10  back. I don't know if there was an IA investigation.
11  I really don't know.
12    Q.  Any others you can think of?
13    A.  Not right offhand.
14    Q.  Are you aware of Colonel Chaffinich's testimony
15  during the Foraker civil trial?
16    A.  Only what I read in the paper.
17      MS. BALLARD: Objection to relevance.
18      MR. MARTIN: Let's take five minutes. I
19  think I'm done.
20      (Recess taken.)
21      MR. MARTIN: I have no further questions.
22  BY MS. BALLARD:
23    Q.  I have questions mostly in follow-up to areas
24  that were already went into. Let's go back to the

75

1  conversation you had with Captain Hawkins immediately
2  after the incident on, I believe it was a phone call
3  about five minutes after the incident and then he
4  called you back. At any point during either of those
5  phone calls, did Captain Hawkins say he wanted to
6  speak to Christy Dempsey?
7    A.  At, I believe the second phone call – no, not
8  during those two calls. I don't recall. I think it
9  was the next morning he and I had that discussion.
10    Q.  What did he say?
11    A.  He said he would have to speak to Christy and
12  find out what she wanted done or – you know, about
13  the matter, what her thoughts were, what she was
14  desiring. I offered at that time for him to speak to
15  her and he said, no, he would speak to her Monday at
16  work because she was with me initially during that
17  time of the conversation.
18    Q.  Initially, you offered for him to speak to her?
19    A.  Yes.
20    Q.  He said he would speak with – presumably, he
21  and her – the following day?
22    A.  I think he was making sure it was at work and
23  it was an official call after he had the facts. I do
24  remember him saying he didn't want to speak to her

76

1  right then and there, which was Sunday morning.
2    Q.  I want to refresh your memory a little bit from
3  your AI statement on Page 17, this page you looked at
4  before. I believe you were recounting the first
5  conversation with Captain Hawkins. Is it correct that
6  you told IA in speaking about Captain Hawkins it
7  seemed he was more interested in what Christy had to
8  say about the incident and whether she thought a crime
9  was committed and, you know, something should happen.
10  Does that refresh your memory?
11    A.  Yeah, that was, basically, he kept – he said
12  he needed to speak to her and see what she wanted to
13  have done.
14    Q.  It looks like from this transcript that
15  conversation took place the early morning of the
16  incident?
17    A.  Yes.
18    Q.  On Page 18, you discussed further contact with
19  Captain Hawkins after the initial night and that he
20  explained he had discussed the incident with
21  Christy – in the middle of the page – that he
22  discussed the incident with Christy and that she did
23  not feel there was any crime committed and that she
24  was happy with the outcome of it, that there was a

77

1  misunderstanding.
2    A.  Yes.
3    Q.  That's what Captain Hawkins told you?
4    A.  Yes.
5    Q.  On page 20, at the top of the page, I believe
6  you're discussing a conversation with Captain Hawkins
7  immediately after the incident or the next morning.
8  And is it correct that you said it was your impression
9  that it was more important for Hawkins to talk with
10  Christy than it was to talk to you?
11    A.  Yes.
12    Q.  Okay. Thanks. The statement you discussed
13  earlier, which is in Maher Exhibit 1, by Kevin Keller
14  about the fact that he knew that the intruder was a
15  trooper, are you aware that he gave that statement
16  subsequent to his initial statement at Christy's
17  premises?
18    A.  Yes.
19    Q.  In fact, he gave that statement to
20  Corporal Csapo when he was being driven home to his
21  sister's house after leaving Kristin Dempsey's
22  premises?
23    A.  Yes.
24    Q.  You were asked about the 24-48 hours

20 (Pages 74 to 77)

**A000087**

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

78

1  immediately following the incident. Do you know,
2  other than yourself, who actually spoke to who or who
3  said what about what had gone on that night in terms
4  of troopers?
5      A.  No.
6      Q.  Do you have any reason to believe that when
7  Csapo filled out this report, when he filled out this
8  report, he knew you were the suspect?
9      A.  No, I don't think he did.
10      Q.  Do you have any reason to believe that
11  Corporal Gygrynuk or Trooper Argo knew on
12  October 26th, 2003 that you were the subject and did
13  not put it in the reports?
14      A.  No.
15      Q.  Just for the record, Maher Exhibit 4 appears to
16  be just the first page of Supplemental Report No. 3
17  because it looks like it cuts off at the bottom. I
18  think there is a second page. It's all right. I
19  don't want to use it. I just want to note that.
20          Do you have any reason to believe that
21  Captain Hawkins or anyone else at the state police
22  instructed the responding trooper to falsify the
23  report?
24      A.  No.

79

1      Q.  Is it correct that Captain Hawkins actually
2  told you that Ms. Dempsey did not want the incident
3  pursued?
4      A.  Yes.
5      Q.  You continued to date Christy for some time
6  after the incident; correct?
7      A.  Yes.
8      Q.  About how long?
9      A.  I don't recall.
10      Q.  Was it a period of months?
11      A.  Yeah, it was probably six months, maybe a year.
12      Q.  Let me put it this way. When it was reopened
13  in March or April of 2004, were you still dating?
14      A.  Yes.
15      Q.  At any point during those six months or so, did
16  Christy ever express concern that not enough had been
17  done with regard to the incident?
18      A.  No.
19      Q.  Or that she wanted the state police to do
20  something they hadn't done with regard to the
21  incident?
22      A.  No.
23      Q.  Was it your impression that she was satisfied
24  with how it had played out?

80

1      A.  At that point?
2      Q.  At that point.
3      A.  Yes.
4      Q.  You were talking about subsequent contacts you
5  had with Captain Hawkins. You said with the type of
6  contact I had with him, we probably would have talked
7  about this. What type of contact did you have with
8  him?
9      A.  I would see him at least twice a month on
10  different days. Probably seen him at numerous
11  functions. Differ callouts.
12      Q.  So it was work related?
13      A.  Yes.
14      Q.  When the matter got reopened in March or
15  April of 2004, I think you spoke about possibly Mark
16  Russ speaking to Lieutenant Brown and some other
17  people. Do you have actual knowledge of who or how
18  the matter got reopened, actual knowledge?
19      A.  No.  Yes.  The only thing I was told at some
20  point was -- it may have been from IA -- was that
21  Glenn Dixon had brought the matter forward.  I know at
22  some point Captain Hawkins had told me that he was
23  contacted by Glenn Dixon in reference to why he was
24  not notified as Christy's troop commander. I believe

81

1  the answer was because he was away at the FBI Academy,
2  he was not in-state and that the major was notified.
3      Q.  Would it be consistent with your recollection
4  that Captain Dixon reported the matter to Major Hughes
5  and that Major Hughes reported it to IA in the spring
6  of '04?
7      A.  Yes.
8      Q.  Going back to Maher Exhibit 1. You were asked
9  about this burglary first degree notation. Now what
10  it says is "Crime Description"; correct?
11      A.  Yes.
12      Q.  There is not a formal charge section; correct?
13      A.  Yes.
14      Q.  This is -- you tell me. You've filled out
15  these reports. How does the officer choose what to
16  put in that block?
17      A.  According to the elements of the crime, what he
18  finds on-scene. Of course, trespassing is a crime
19  that's included in burglary, so it would just depend
20  on the totality of the circumstances on what you would
21  charge. I guess with the information they had that
22  night, he felt it was best classified as burglary
23  first.
24      Q.  Is it based upon what witnesses at the scene

21  (Pages 78 to 81)

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

82

1   tell you?
2     A. And evidence yeah, witness testimony, evidence.
3   Sometimes there is no witnesses, so flying by the seat
4   of our pants on that, just take the elements of the
5   crime and classify it.
6     Q. If a witness gave you false or incomplete
7   information, that could affect the accuracy of the
8   crime description?
9     A. Yes.
10     Q. Ultimately, the prosecution is determined by
11   the Attorney General's Office; correct?
12     A. Yes.
13     Q. In your case, the decision to offer you a
14   probation before judgment, was that entered into with
15   the Attorney General's Office?
16     A. Yes.
17     Q. You were represented by counsel also?
18     A. Yes.
19     Q. And a judge approved that?
20     A. Yes.
21     Q. You mentioned at one point in 2004 you thought
22   Christy Dempsey's shift or rotation changed?
23     A. I believe at some point she was moved to
24   another shift.

83

1     Q. Would you have played any part in the decision
2   to change her shift?
3     A. No.
4     Q. I am going to go through these reports a little
5   more with you. Maher Exhibit 1, page 3. This is a
6   statement of the victim, Elizabeth Dempsey, given to
7   Corporal Csapo. In that first paragraph, Corporal
8   Csapo writes: "V-1 stated, within seconds, she heard
9   a vehicle peel wheels from front area of residence,
10   possibly traveling eastbound towards U.S. 113." Was
11   that the direction you would have traveled in to leave
12   her home?
13     MR. MARTIN: Excuse me for a second,
14   please. I am not sure we're on the same page. I want
15   to make sure of that. You said it's the second page
16   of this?
17     MS. BALLARD: No, it's the third page of
18   that.
19     MR. MARTIN: Okay. All right. Thank you
20   sorry.
21   BY MS. BALLARD:
22     Q. It looks like Corporal Dempsey told Csapo that
23   whoever had been to her home was peeling off eastbound
24   towards 113. Is that the direction you went in?

84

1     A. I thought I had gone southbound towards --
2   well, it's probably still eastbound on that roadway,
3   but, yes, going toward Troop 1. I thought I went from
4   her house past the firehouse, the back way out. I
5   don't recall.
6     Q. If I am not mistaken, isn't Route 1 to the west
7   of Route 113?
8     A. It -- Route 1 is east.
9     Q. I'm sorry. You are right, it's east.
10     A. Of 113. On the little road we were on, it kind
11   of runs parallel to Route 1. I don't remember which
12   direction I exactly went. I don't remember if I went
13   through town, or.
14     Q. My question is: Is this consistent with how
15   you remember leaving her home? And it sounds like you
16   are not sure.
17     A. I went from her residence towards Route 1. I
18   am not exactly sure.
19     Q. The very last line of the Elizabeth Dempsey
20   statement says she was alone at the time of the
21   incident. Now, when you went into her home, was she
22   alone?
23     A. No.
24     Q. You knew that because you could hear her.

85

1     A. I saw the individual at the residence prior to
2   entering the residence.
3     Q. So that statement is incorrect?
4     A. Yes.
5     Q. On Maher Exhibit 2, this is Corporal Gygrynuk's
6   Supplemental Report No. 1. He notes that he asked her
7   if she has a boyfriend. She said, no. He also asked
8   her if she had a male friend who thinks he is her
9   boyfriend, and she said, no. Is that a correct
10   statement of your status with Ms. Dempsey at the time?
11     A. I didn't think so, but you'd have to ask her.
12     Q. And Maher Exhibit 3, Sergeant Mullett's report,
13   that noted that the victim desired no further action
14   in this case. Victim feels no crime was committed.
15   Is that consistent with your understanding from
16   speaking with Christy of how she felt about the case?
17     A. Yes.
18     Q. And, finally, Maher Exhibit 3, this is Trooper
19   Argo's supplemental report. He notes --
20     MR. MARTIN: That's Maher Exhibit 4, is it
21   not?
22     MS. BALLARD: I'm sorry. Maher Exhibit 4.
23   I originally put 3. It's 4.
24   BY MS. BALLARD:

22 (Pages 82 to 85)

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

86

1   Q.  He notes that Dempsey appeared to be very
2  reluctant to give information regarding the incident
3  and he writes, I advised reporting person Dempsey this
4  needed to be investigated due to the fact that the
5  suspect had attempted to break into her residence with
6  a marked DSP patrol vehicle parked not 50 yards away.
7  Is it your understanding from this that Trooper Argo
8  did not know the identity of you as the suspect at
9  this time?
10  A.  Yes. I assume so.
11  Q.  Corporal Csapo would have been a senior person
12  to Trooper Argo; correct?
13  A.  I don't know. I believe --
14  Q.  Corporal --
15  A.  Corporal Csapo. Yes, he would have, yes.
16  Q.  Now, in a situation where two or three troopers
17  responded to the same scene, is it normal for just one
18  of them to do the initial report or are there usually
19  multiple reports?
20  A.  There would be one initial report and then
21  other troopers may write a supplement depending what
22  they had done at the scene, if it was notable or had
23  any investigative merit, weight.
24  Q.  Does one trooper typically take over as the

87

1  primary investigator?
2  A.  Yes.
3  Q.  Do you believe that Trooper Argo, Corporal
4  Gygrynuk and Corporal Csapo's reports were accurate
5  based on what Christy Dempsey told them at the time?
6  A.  Yes.
7  Q.  You were asked about another incident with
8  Christy, which allegedly took place in November of
9  2004. Can you briefly describe that incident?
10  A.  I am not sure -- is this the incident you and I
11  were discussing earlier?
12  Q.  Yes.
13  A.  Christy and I were out. At some point, she had
14  contacted Kevin Keller to talk to him about her role
15  in this or what he was going to say or if he was in
16  fact going to come back to the state or something to
17  testify or something to that effect. I don't
18  remember --
19  Q.  Let me stop you there. You mean to testify at
20  Internal Affairs?
21  A.  Yes.
22  Q.  Then what happened?
23  A.  We were drinking. We had an argument, verbal
24  argument. She agreed that I would drop her off and be

88

1  able to take her car so I'd have a car so I could go
2  back to my residence. We got to her house. She -- I
3  had the car keys. She refused to allow me to take the
4  car. I live a good distance away.
5  Q.  Is this her car or your car?
6  A.  Her car. Her dog was at my house, I believe.
7  She refused to allow me to take the car. I then
8  decided I was going to walk. I didn't want her to
9  drive the car because I felt at the time she was
10  intoxicated. Both her and I were drinking. I threw
11  the keys in the yard so she wouldn't be able to use
12  them. I left, walked in the rain up to a shopping
13  center. Got money out of the MAC machine. Called a
14  cab, got picked up by a cab, got taken back to my
15  residence in Milton.
16        Arrived at my residence in Milton to find
17  she was already at my residence in my house. Went
18  into the house. Didn't talk to her. Went and got in
19  the shower. She refused to shut the shower door.
20  Wouldn't leave me alone. I continued to refuse to
21  talk to her. I asked her to leave numerous times.
22  She refused to leave.
23        I got out of the shower. I then asked her
24  to leave. She wouldn't leave. I then bearhugged her,

89

1  picked her up, carried her out of the residence, put
2  her on the front steps. Shut the door. Locked it.
3  Went back in. Went to bed.
4  Q.  Did you strike her or engage in any physical
5  abuse against her?
6  A.  No.
7  Q.  You just placed her outside?
8  A.  Just picked her up and then carried her
9  outside.
10  Q.  Did she call you or bang on your door or
11  anything afterward?
12  A.  I don't recall. I think she sat on the step
13  for awhile. I went to bed. Went in the bedroom.
14  Locked the door. Went to bed.
15  Q.  Had she driven her car to your home?
16  A.  Yes.
17  Q.  Did you see her shortly after that incident?
18  A.  I don't know. I don't recall. Probably. I
19  mean, I am sure I saw her within a few days or talked
20  to her within a few days, but I don't recall.
21  Q.  Did she have an injured shoulder after that
22  incident?
23  A.  I don't recall.
24  Q.  Was there another incident where Christy

23 (Pages 86 to 89)

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

**90**

1  Dempsey used a key to enter your home uninvited?
2  A.  Yes.
3  Q.  Do you remember approximately when that
4  occurred?
5  A.  No, I do not.
6  Q.  Do you know if it was before or after the
7  incident you just discussed?
8  A.  It would have been after.
9  Q.  Can you just briefly describe what happened
10  there?
11  A.  I was at my residence. Christy was working.
12  She came to my house. She used the code for my garage
13  door to open my garage door. I had a key hidden or
14  placed in the garage near the door hidden. She used
15  that key to enter the garage door and come into my
16  residence. She came into my residence, came in
17  through my bedroom. I was there with another female.
18  There was a verbal exchange between the two of them.
19  I was holding her at bay at the door. She refused to
20  leave the residence. I just held her there until she
21  calmed down. She agreed to leave. She left the
22  residence.
23  Q.  Did Christy make a police report following that
24  incident?

**91**

1  A.  She didn't -- a police report?
2  Q.  Did she call the police?
3  A.  She called her supervisor, Sergeant Meyers at
4  the time.
5  Q.  Did she try to press any charges against you?
6  A.  No.
7  Q.  Did she try to press any charges against you
8  with regard to the incident where you put her out of
9  the house, the other one?
10  A.  No.
11  Q.  During this second incident where she came into
12  your bedroom and you were with another woman, were you
13  still dating her at the time? Christy, I mean.
14  A.  That's a complex question. Probably a very
15  complex answer. The short form of that is, probably
16  yes.
17  Q.  Did you continue to date Christy after these
18  two incidents?
19  A.  I don't recall. I don't think so.
20  Q.  Was there an Internal Affairs investigation as
21  to either of those two incidents as to either of you?
22  A.  I believe both.
23  Q.  Both incidents or --
24  A.  Both incidents.

**92**

1  Q.  What was the disposition?
2  A.  I think the first incident was unsubstantiated.
3  Q.  As to both you and Christy?
4  A.  I don't think there was any -- I don't think
5  Christy was investigated, IA'd in the first incident.
6  I think I was investigated during that incident.
7  Q.  It was unsubstantiated as to you?
8  A.  Yeah, I believe so.
9  Q.  What about the second incident?
10  A.  I believe I was listed as the victim on that
11  report. I refused to cooperate. I am not sure what
12  happened with Christy.
13  Q.  When you say "victim," are you talking about
14  criminal report or Internal Affairs report?
15  A.  I believe I was -- I don't recall how I was
16  interviewed, as a person of interest there or as a
17  victim or a person of contact or how it went actually
18  or if in fact there was an IA after that.
19  Q.  Do you remember if there was an IA?
20  A.  I don't remember at this point.
21  Q.  Do you recall whether there was an IA with
22  regard to Christy with regards to that incident? I
23  don't want you to guess.
24  A.  I know I was interviewed by Mark Daniels. I

**93**

1  don't know if that was in reference to Christy being
2  IA'd or myself, to be honest with you.
3  Q.  The testimony you gave about the UTA and the
4  relationship between your October 2003 incident and
5  what Leshaun Gaddy, is that just sort of information
6  you got through the rumor mill?
7  A.  Yes.
8  Q.  Now, when you heard this investigation, your
9  investigation was going to be reopened in March or
10  April of 2004, did you discuss this with Christy?
11  A.  Yes.
12  Q.  Did she appear to want the investigation to be
13  reopened at that point?
14  A.  No.
15  Q.  Was she upset?
16  A.  Yes.
17  Q.  Can you describe the conversation you had with
18  her about it?
19  A.  To the best of my recollection, her and I both
20  wanted this to be over with and done with. We
21  continued to see each other. I know she didn't want
22  people to pry into her personal life and this to be a
23  public issue, meaning divisionally. So I know that
24  we -- her wishes and my wishes at the time were that

24 (Pages 90 to 93)

Dempsey v. State of Delaware Department of Public Safety
Brian Maher

94

1  it just be over with and that we could carry on with
2  our lives.
3      Q.  Now, with regard to this incident, the one
4  that's the subject of this lawsuit, are you aware that
5  Christy Dempsey went through a trial board process
6  with regard to her charges?
7      A.  Yes.
8      Q.  And that is where three members of Delaware
9  State Police are selected to sit, basically, as a jury
10  and hear your case?
11      A.  Yes.
12      Q.  And you have the opportunity to strike certain
13  members off the list; correct?
14      A.  Yes.
15      Q.  In fact, you had the opportunity to have that
16  kind of trial board, but you elected not to?
17      A.  Yes.
18      Q.  You just went to the colonel?
19      A.  Yes.
20      Q.  Do you have any reason to believe that three
21  members of the trial board discriminated against
22  Christy in any way because of her gender?
23      A.  No.
24      Q.  When you described a good ole boy network at

95

1  Delaware State Police, are you referring to
2  friendships among certain troopers?
3      A.  Yes.
4      Q.  Is it based along gender lines?
5      A.  No.
6      Q.  The penalty of termination, is it your
7  understanding that the trial board has the right to
8  recommend that penalty in a situation where the
9  trooper can contest the charges if they feel it's
10  appropriate?
11      A.  Yes.
12      Q.  You were asked about five or six other troopers
13  that may or may not have had Internal Affairs charges
14  brought against them.  Do you have actual knowledge of
15  the records of any of those troopers?
16      A.  No.
17      Q.  Have you ever worked in Internal Affairs?
18      A.  No.
19      Q.  At the time of this incident, let's say, end of
20  2003, the beginning of 2004 when you were dating
21  Christy, did she keep a diary?
22      A.  I'd have to say, yes.  She wrote a lot of
23  things down.  I couldn't swear to that.  I don't know.
24  But she generally did write in a diary or keep notes.

96

1      Q.  Do you know what sort of things she would make
2  notes about?
3      A.  Not specifically, no.
4      Q.  Did she keep a calendar that she kept notes on?
5      A.  I know she wrote in a calendar a lot of events
6  that took place.
7          MS. BALLARD:  I just want to state on the
8  record we have requested copies of any diaries,
9  calendars, other notes that Ms. Dempsey might have.
10  Nothing has been produced yet.  I think that's about
11  it.  Let me just take a look at this.
12          I think that's all I have.
13          MR. MARTIN:  Okay.  Do you want to advise
14  him on the ability to read this transcript?
15          MS. BALLARD:  You have the right to read
16  this transcript to make sure your answers are
17  accurate, the same as you have given them today or you
18  can waive that right.  It's entirely up to you.
19          THE WITNESS:  I'll waive that right.
20          (Deposition concluded at 11:36 a.m.)
21          -- -- -- --
22
23
24

97

1              INDEX
2  WITNESS: BRIAN MAHER              PAGE
3  EXAMINATION BY MR. MARTIN            2
   EXAMINATION BY MS. BALLARD          74
4
5          MAHER DEPOSITION EXHIBITS
   NO.              MARKED
6
   1  10/26/03 Initial Crime Report        23
7
   2  10/26/03 Supplemental Report No. 1   23
8
   3  10/29/03 Supplemental Report No. 2   23
9
   4  4/20/04 Supplemental Report No. 3    23
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

25 (Pages 94 to 97)

Dempsey v. State of Delaware Department of Public Safety

98

1    State of Delaware  )
               )
2    New Castle County  )
3

        CERTIFICATE OF REPORTER
4
5      I, Lucinda M. Reeder, Registered Diplomate
    Reporter, Certified Real-time Reporter and Notary
6    Public, do hereby certify that there came before me on
    August 6, 2007, the witness herein, BRIAN MAHER, who
7    was first duly sworn and thereafter examined by
    counsel for the respective parties; that the questions
8    asked of said witness and the answers given were taken
    down by me in Stenotype notes and thereafter
9    transcribed by use of computer-aided transcription and
    computer printer under my direction.
10
11      I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
    examination of said witness.
12
      I further certify that reading and signing of
13    the deposition were waived by the witness.
14      I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
15    interested in the event of this suit.
16
17                      Lucinda M. Reeder
18
        Lucinda M. Reeder, RDR, CRR
19        Certification No. 132-RPR
        (Expires January 31, 2008)
20
    DATED:   8-27-07
21
22
23
24

26 (Page 98)

A000093

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,                    :
                                         :
          Plaintiff,                     :          Civil Action No.:
                                         :
     v.                                  :
                                         :          JURY TRIAL DEMANDED
STATE OF DELAWARE,                       :
DEPARTMENT OF PUBLIC SAFETY,             :
                                         :
          Defendant.                     :

## COMPLAINT

## PARTIES

1.     Plaintiff, Elizabeth C. Dempsey (hereinafter "Plaintiff"), has at all times relevant

to this Complaint been a resident of Kent County and later Sussex County in the State of

Delaware.

2.     Defendant, State of Delaware, Department of Public Safety also known as The

Department of Safety and Homeland Security (hereinafter "Defendant"), is a state

agency, and at all times relevant to this Complaint, the employer of Plaintiff Christine

Dempsey.   The Department of Safety and Homeland Security is subject to service

through the Secretary of Public Safety David B. Mitchell, whose address is Public Safety

Building, P.O. Box 818, 303 Transportation Circle, Dover, Delaware 19903-0818.

## JURISDICTION

3.     Jurisdiction is founded on the existence of a question arising under federal

statutes.  This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 704(a) of Title

VII of the Civil Rights Act. The jurisdiction of this Court is invoked to secure protection and redress deprivation of rights secured by federal and state law which prohibits discrimination against employees because of their gender.

## FACTUAL BACKGROUND

4.      Plaintiff graduated from the Delaware State Police Academy on December 16, 1999 and was certified by the Council on Police Training. Thereafter, Plaintiff participated in Field Training at Troops 5 &7 through March of 2000. In March of 2000, Plaintiff was assigned to Troop 3 in Kent County.

5.      On or about October 25, 2003, Plaintiff was at her home with Kevin Keller (hereinafter "Keller") and off-duty, Master Corporal Brian Maher (hereinafter "Cpl. Maher") of Troop 7 came to Plaintiff's residence and broke into Plaintiff's apartment while threatening to harm Keller.

6.      Plaintiff contacted the non-emergency line to Kent County Dispatch Center and explained to dispatch that someone was breaking into her residence. She was advised that officers were in route. When Plaintiff became aware that the assailant had fled, she again called the Dispatch Center and advised that no officers were needed.

7.      Trooper Argo, Cpl. Capo and Cpl. Gygrynuk arrived at Plaintiff's residence moments later.

8.      Shortly thereafter, Cpl. Maher advised Captain Hawkins (hereinafter "Capt. Hawkins") of his actions at Plaintiff's residence. Capt. Hawkins then contacted Major R.L. Hughes (hereinafter "Major Hughes") and advised him of the same. Cpl. Maher was told by Capt. Hawkins to go home and that he would call Cpl. Maher if necessary.

9.      Also on or about October 26, 2003, Cpl. Gygrynuk, Cpl. Csapo and Tpr. Argo returned to Troop 3 and met with Sergeant Houdek (hereinafter "Sgt. Houdek"). Sgt.

Houdek informed Cpl. Gygrunyk, Cpl. Csapo and Tpr. Argo not to put Cpl. Maher's name in the incident report.

10.    On or about October 27, 2003, Capt. Hawkins contacted Plaintiff via the telephone to discuss the October 26th incident. Capt. Hawkins advised the Plaintiff that Major Hughes was made aware of the circumstances surrounding the incident and that everything was "taken care of". Capt. Hawkins further advised Plaintiff that she did not need to discuss the incident with anyone else.

11.    In or around March 28 2004, Cpl. Maher was contacted by Captain Nolt (hereinafter "Capt. Nolt") who advised Cpl. Maher that there was going to be a criminal and Internal Affairs Investigation of the October 26 incident.

12.    On or about April 6, 2004, Plaintiff was called into Captain Dixon's (hereinafter "Capt. Dixon") office with Sergeant Chuck Caldwell (hereinafter "Sgt. Caldwell"). Plaintiff was informed that there would be an internal investigation and a criminal investigation into the incident that occurred at Plaintiff's residence on October 26, 2003. Plaintiff was also informed that she was considered the "victim" in the incident.

13.    On or about April 23, 2004, Plaintiff interviewed at the Attorney General's office in Georgetown by Sgt. Robert Hudson who advised Plaintiff that she was the "victim".

14.    On or about May 28, 2004, Cpl. Maher was arrested and suspended for the October incident. Although his conduct on the date of the incident amounted to burglary which is a felony, Cpl. Maher was charged with first degree trespassing, terroristic threatening and criminal mischief; which constitute misdemeanors under the Delaware criminal code.

15.    Prior to this incident in May 2004, Capt. Nolt welcomed Plaintiff to Troop 7 and advised her that she would work on the "C Shift". However, after Cpl. Maher's arrest, Lt.

Hagan contacted Plaintiff and advised her that she was being moved to work on the "A Shift".

16.     Cpl. Maher was on suspension during the change in Plaintiff's schedule from "C Shift" to "A Shift". Lt. Hagan advised Plaintiff that this shift change was made in anticipation of Cpl. Maher's return so that Plaintiff and Cpl. Maher would not work the same schedule.

17.     The notification of Plaintiff's schedule change did not occur two weeks before the schedule change was to take place.

18.     Although his conduct on the date of the October 2003 incident amounted to *criminal* conduct unbecoming a Trooper, in August 2004, Cpl. Maher was charged divisionally with conduct unbecoming a Trooper and failing to report a domestic incident to a superior. Cpl. Maher pled guilty to both charges and went before Col. Chaffinch. The punishment set forth by the Col. Chaffinch was that Cpl. Maher's rank was reduced to Corporal while on probation for one year. However, Cpl. Maher was still allowed to return to Troop 7 and was permitted to participate in special units despite being on probation.

19.     Plaintiff was charged divisionally with violating Rule #15 which is falsifying a report to a superior officer and failing to report a domestic incident to a superior.

20.     On or about December 1, 2004, the Trial Board convened concerning Plaintiff's appeal of the charges of violating Rule #15 which is falsifying a report to a superior officer and failing to report a domestic incident to a superior stemming from the October 2003 incident.  The Board consisted of three white males; despite the fact that there were two minorities that could have been chosen for Plaintiff's panel. The panel members were Major Joe Papili, Capt. Albert "Skip" Homiak and Cpl. Larry Welch.

21.    The Trial Board refused to allow Plaintiff to have access to the Internal Affairs interviews of all those interviewed in connection with the October 2003 incident. Additionally, Major Houghes, Sgt. Houdek and Capt. Hawkins were not called to testify during the Internal Affairs investigation.

22.    The Trial Board concluded on January 13, 2005 with a finding that Plaintiff was guilty of falsifying a report and recommended that she be terminated. On January 31, 2005, Plaintiff was terminated.

23.    During the Internal Affairs investigation, Cpl. Gygrynuk testified that Sgt. Houdek instructed Cpl. Gygrynuk, Cpl. Csapo and Tpr. Argo to write the incident report as having an "unknown" suspect.

24.    Based on information and belief, Cpl. Gygrynuk, Tpr. Argo and Cpl. Csapo each falsified information in their investigative reports when they indicated that the suspect was "unknown" because they were aware that the suspect was Cpl. Maher. However, Cpl. Gygrynuk, Tpr. Argo and Cpl. Csapo were not disciplined for the false reports.

25.    Additionally, Sgt. Houdek was the approving officer of Cpl. Gygrynuk, Tpr. Argo and Cpl. Csapo's reports. Therefore, Sgt. Houdek also falsified the same said reports.

26.    Based on information and belief, Sgt. Houdek was not subjected to any disciplinary action.

27.    Sgt. Mullet is the head of Troop 3 Criminal Division and he was instructed by Capt. Hawkins to conduct a final report on the October 26 incident. Although Sgt. Mullet was aware that Cpl. Maher was the suspect in the incident, he failed to identify him on his report.

28.    Based upon information and belief, Sgt. Mullet was not disciplined for this false report.

29.    Capt. Hawkins and Major Hughes both were aware that Cpl. Maher was the main suspect in the incident report and also advised the responding troopers through the "chain of command" not to identify Cpl. Maher on any of the reporting documentation.

30.    Based on information and belief, both Capt. Hawkins and Major Hughes pled guilty to dereliction of duty, but only received three-day suspensions.

31.    Sgt. Mullet, Tpr. Argo, Cpl. Csapo and Cpl. Gygrynuk falsified incident reports concerning the October 26 incident. However, not one of these officers was disciplined for falsifying their reports.

32.    Thereafter, Plaintiff appealed the Trial Board's decision to Secretary David Mitchell. In a May 2005 conference call with Secretary Mitchell, Secretary Mitchell admitted to Plaintiff and her counsel that the punishment was too harsh and that he was ordering Plaintiff back to work. He also stated that he looked forward to Plaintiff having a long career with the Delaware State Police and that this incident would not hamper Plaintiff's career anymore.

33.    A "Decision on Review of Disciplinary Action" was drafted by Secretary Mitchell's office which stated that in part, "I am remanding this matter to the superintendent to impose the penalty of loss of rank for a one-year period which shall begin on January 31, 2005. After a one year time period, Dempsey shall be returned to her previous rank."

34.    Finally, on August 15, 2005, Plaintiff met with Capt. Yeomans, Capt. Winstead and Lt. Hudson about her return to the Division. Plaintiff questioned why she was being reassigned to Troop 4 rather than being allowed to return to Troop 7. Their response was that they would pass the questions onto Col. Macleish and he would get back to her. Plaintiff also asked why her loss of rank date was changed to commence on July 20,

2005; rather than commencing on January 31 2005, the original date ordered by Secretary Mitchell and the date upon which Plaintiff was suspended without pay.

35.    On or about August 25, 2005, Plaintiff received a letter from Col. Macleish which stated that he was exercising his authority to change Plaintiff's loss of rank date. He also indicated in the letter that Plaintiff's transfer to Troop 4 was a "command decision".

36.    On August 29, 2005, Plaintiff returned to work at Troop 4.

37.    Plaintiff filed a charge of discrimination with both the DDOL and the EEOC on April 6, 2005. A copy of Plaintiff's Charge of Discrimination is attached as Exhibit "A".

38.    The EEOC issued a Right to Sue Letter to Plaintiff on May 4, 2006. A copy of this Right to Sue Letter, received first by the undersigned attorney on May 4, 2006, is attached hereto as Exhibit "B".

### FIRST CAUSE OF ACTION
#### (Gender Discrimination)

39.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-38.

40.    This cause of action arises under Title VII, 42 U.S.C. § 2000e(2)(a), as amended by the Civil Rights Act of 1991.

41.    Defendant intentionally and maliciously discriminated against Plaintiff on the basis of her gender (female) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e(2)(a) when it:

    (a)    treated Plaintiff differently from similarly-situated males by disciplining
           Plaintiff more harshly than similarly situated male comparators;

    (b)    treated Plaintiff differently from similarly-situated males by terminating Plaintiff's employment;

    (c)    treated Plaintiff differently from similarly-situated males by changing her loss of rank date and transferring her to a different Troop after Plaintiff was reinstated;

    (d)    subjecting Plaintiff to public humiliation by treating Plaintiff more harshly than her similarly-situated male comparators and terminating Plaintiff's employment;

42.    As a result of Defendant's unlawful gender discrimination, Plaintiff lost considerable pay; past, present and future and has also suffered humiliation, mental anguish and emotional pain.

43.    Defendant's discrimination was willful, wanton and malicious.  As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

44.    The above-stated damages were not the result of any act or omission on the part of the Plaintiff.

## SECOND CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)

45.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-44.

46.    The actions of Defendant constitute a violation of the Covenant of Good Faith and Fair Dealing implicit in every employment agreement.

**A000101**

47.    Defendant breached the Covenant of Good Faith and Fair Dealing to Plaintiff by discriminating against her based upon her race.

48.    Defendant's discrimination was willful, wanton, and malicious. As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

49.    The above-stated damages were not the result of any act or omission on the part of the Plaintiff.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment against the Defendant, State of Delaware, Department of Public Safety, and in her favor for damages suffered by Plaintiff as a result of Defendant's actions, including, but not limited to, back pay, front pay, benefits (both retroactively and prospectively), compensatory damages, punitive damages, attorney's fees, the cost of this litigation, pre- and post-judgment interest and such other further relief as this Honorable Court deems just and proper.

MARGOLIS EDELSTEIN

Jeffrey K. Martin, Esquire (#2407)
Lori A. Brewington, Esquire (#4522)
1509 Gilpin Avenue
Wilmington, Delaware 19806
(302) 777-4680
(302) 777-4682 facsimile
Attorney for Plaintiff Christine Dempsey

Dated: July 27, 2006

# EXHIBIT A

## CHARGE OF DISCRIMINATION
*CP Copy*
This form is affected by the Privacy Act of 1974

**Delaware Department of Labor**

| ENTER CHARGE NUMBER |
| --- |
| ☐ FEPA |
| ☐ EEOC |

and EEOC (if applicable)

**NAME** (Indicate Mr., Mrs., Ms)
Ms. Elizabeth C. Dempsey

**HOME TELEPHONE NO.** (Include Area Code)
(302) 632-8559

**STREET ADDRESS**
12 Seachase Drive

**CITY, STATE AND ZIP CODE**
Rehoboth Beach, DE 19971

**COUNTY**
Sussex

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME** (if more than one, list below.)

**NAME**
State of DE./Dept. of Homeland
Security/DE. State Police

**NO. OF EMPLOYEES OR MEMBERS** 500+

**TELEPHONE NUMBER** (Incl. Area Code)
(302) 739-5900

**STREET ADDRESS**
P.O. Box 430 Dover, DE 19903

**CITY, STATE AND ZIP CODE**

**NAME**

**TELEPHONE NUMBER** (Include Area Code)

**STREET ADDRESS**

**CITY, STATE AND ZIP CODE**

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE

☐ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

**DATE DISCRIMINATION TOOK PLACE**
EARLIEST 4/2004
LATEST 04/6/2005
☒ CONTINUING ACTION

**THE PARTICULARS ARE** (If additional space is needed, attached extra sheet(s):

Jurisdiction: Charging Party was employed by Respondent as a State Trooper in its Lewes, Delaware location-Troop 7

Charging Party's protected class: Female

Adverse employment action: Suspension

Brief statement of allegations: Charging Party was friends with another State Trooper, Brian Maher (male). During the relationship an altercation between the two occurred on October 26, 2003 and other State Troopers were called to Charging Party's residence. Charging Party was told by a superior officer, Capt. Robert Hawkins (male), not to disclose any information involving the incident. An internal and criminal investigation of the incident was conducted in April 2004. Charging Party was charged with filing a false complaint. The three male officers who responded to the scene and filed false complaints were not investigated or charged. The officers involved were Alex Argo, Mark Csepo and Walter Gyrgrunek. As a result of a Trial Board Hearing held on December 1, 2004 and January 13, 2005, Charging Party was suspended without pay pending termination on January 31, 2005.

Respondent's explanation: Charging Party filed a false complaint.

Applicable law(s): Title VII of the Civil Rights Act of 1964, as amended, and state of Delaware's Discrimination in Employment Act, as amended.

Comparator(s) or other specific reason(s) for alleging discrimination: Brian Maher received a loss of rank and suspended but allowed to use vacation. He was never threatened to be terminated even though criminal charges were accessed against him for the October 2003 incident. Respondent violated several policies while conducting it's investigation and handling the matter. Charging Party was questioned about her sexual relationship with Mr. Maher which was not relevant to the matter at-hand.

Additional information and verification of these facts are provided by the attached Affidavit.

| ☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT _____ 4/6/05 |
| --- | --- |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

DDOL FORM B-05
REV 11/04

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

# EXHIBIT B

May-04-06   10:30am   From-EEOC STATE & LOCAL PROGRAMS                                      T-431   P:002/002   F-258

EEOC Form 161 (3/98)                      U. EQUAL EMPLOYMENT OPPORTUNITY CO..ISSION

## DISMISSAL AND NOTICE OF RIGHTS

To:  Elizabeth C. Dempsey                          From:   Philadelphia District Office - 530
     12 Seachase Drive                                     21 South 5th Street
     Rehoboth Beach, DE 19971                               Suite 400
                                                           Philadelphia, PA 19106

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17C-2005-00303 | Charles Brown, III, State & Local Coordinator | (215) 440-2842 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans with Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge. |
| [ ] | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
| [ ] | While reasonable efforts were made to locate you, we were not able to do so. |
| [ ] | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| [ ] | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [X] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_Marie M. Tomasso_                                          May 4, 2006

Enclosure(s)                    Marie M. Tomasso,                          (Date Mailed)
                                District Director

cc:  STATE OF DE/DEPT. OF HOMELAND SECUR
     ity/De State Police
     P.O. Box 430
     Dover, DE 19903

**A000106**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,⟩
⟩
Plaintiff,⟩
⟩
v.⟩
⟩    C. A. No. 06-456 SLR
STATE OF DELAWARE,⟩
DEPARTMENT OF PUBLIC SAFETY, ⟩
⟩
Defendant.⟩

## ANSWER OF DEFENDANT, STATE OF DELAWARE DEPARTMENT OF PUBLIC SAFETY

COMES NOW, Defendant, State of Delaware, Department of Public Safety, and answers plaintiff's complaint as follows: Unless expressly admitted or qualified, all of the allegations in the Complaint are generally denied.

1.    Upon information and belief, admitted.

2.    Denied as alleged. Plaintiff, Elizabeth "Christine" Dempsey, is employed by the Division of State Police, which is a State agency within the Department of Safety and Homeland Security (DSHS). DSHS is a department within the executive branch of the State of Delaware government, headed by Secretary David B. Mitchell. The balance of the averment states a legal conclusion to which no response is deemed necessary. Should an answer be deemed necessary, the balance of the averment is denied.

3.    This averment states legal conclusions to which no response is deemed necessary. State Defendant reserves all defenses, including jurisdictional defenses, which may be available.

4.      Admitted that Plaintiff, Elizabeth C. Dempsey, graduated from the Delaware State Police Academy in or around December 1999 and was assigned to Troop 5 (12/27/99 – 2/6/00), Troop 7 (2/7/00 – 3/5/00) and Troop 5 (3/6/00 – 3/19/00) for Field Training. Plaintiff was then promoted to Trooper on March 20, 2000 and assigned to Troop 3.

5.      Admitted, upon information and belief, that on or about the night of October 25, 2003 (and/or the early morning hours of October 26th), Plaintiff was at her home during off duty hours with Kevin Keller, a social companion.  Upon information and belief, while Keller was at the residence, Plaintiff placed a cell phone call to Brian Maher, with whom she was involved in a romantic relationship, which call precipitated Maher driving to Plaintiff's residence. The balance of this averment is denied as alleged.

6.      Denied as alleged.  Admitted that Plaintiff placed a "911" call to the Kent County Communications Center ("Kentcom") stating that an unidentified person was breaking into her residence; Plaintiff failed to disclose the identity of the "suspect," which she knew, at the time she placed the call, to be Brian Maher.  Plaintiff identified herself as a Delaware State Trooper to the 911 operator.  Upon information and belief, Plaintiff was advised that officers were en route.  Shortly thereafter, plaintiff made a second call to 911/Kentcom stating that officers did not need to report and again explicitly stating that she did not know who the alleged intruder was.

7.      Admitted that three Delaware State Troopers (Trooper Alexander Argo, Cpl. Mark Csapo and Cpl./1 Walter Gygrynuk) traveling separately, responded within minutes on an emergency basis to Plaintiff's residence and attempted to take a report from Plaintiff. Plaintiff was uncooperative, and maintained that she did not know who had tried to break in to her home and that she did not want to pursue the matter.

8.     Admitted that while driving home from plaintiff's residence, Cpl./3 Brian Maher called Captain Robert Hawkins, the troop commander for the area in which the incident had occurred, to report what had happened. Captain Hawkins took the information Cpl./3 Maher relayed and advised he would get back to him. The balance of the averment is denied as alleged.

9.     Upon information and belief, admitted that the three responding troopers met with their Sergeant, Michael Houdek, at Troop 3 after they concluded their investigation at plaintiff's residence. The balance of the averment is denied as alleged.

10.    Upon information and belief, Captain Hawkins contacted plaintiff by telephone on Sunday, October 26, 2006. The balance of the averment is denied. Captain Hawkins asked plaintiff what she wanted done, including whether she wanted Brian Maher arrested. Plaintiff said that she did not want anything done.

11.    Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of this averment. Admitted that both criminal and internal affairs investigations were undertaken sometime in the spring of 2004.

12.    Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of this averment. Upon information and belief, admitted that plaintiff was informed that both criminal and internal affairs investigations had been undertaken sometime in the spring of 2004.

13.    Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of this averment. Upon information and belief, admitted that plaintiff was informed that both criminal and internal affairs investigations had been undertaken

sometime in the spring of 2004, and that plaintiff was interviewed in connection with the same.

14.    Admitted that Cpl./3 Maher was arrested and charged with three misdemeanor counts on May 28, 2004. He was released on unsecured bond and was suspended from employment with the Delaware State Police. The balance of the averment is denied.

15.    Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of this averment.

16.    Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of this averment.

17.    Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of this averment.

18.    Denied as alleged.    Admitted that Cpl./3 Brian Maher was charged Divisionally with one count each of violation of DSP Rule and Regulation (R&R) #4, "conduct unbecoming," and R&R #14, notification of domestic incident. Both allegations were substantiated following a Superintendent's hearing and disciplinary action was imposed as follows: Cpl./3 Maher was reduced to the rank of Corporal (a three-rank demotion)[1] and placed on probation for one year; he was also suspended for 15 days (including 5 days without the option to forfeit vacation). By way of further response, there is no distinction within DSP R&R #4 for "criminal" conduct unbecoming an officer and other conduct unbecoming an officer. In addition, there are no prohibitions from participation in special units by troopers while on disciplinary probation.

---

[1]    There are 4 ranks of "Corporal" in the Delaware State Police.  From lowest to highest rank: Corporal; Corporal Grade 1 (Cpl/1); Senior Corporal (Cpl/2) and Master Corporal (Cpl/3).

19.    Denied as alleged. Admitted that Plaintiff, Cpl. Elizabeth Dempsey, was charged Divisionally with violations of DSP Rule and Regulation (R&R) #15, (false statement/withholding material information), and R&R #14, notification of domestic incident, in connection with her actions in October 2003. The text of the Rules speaks for itself.

20.    Admitted that plaintiff exercised her right to have a hearing in front of a Divisional Trial Board, and per DSP procedure, was given a list of prospective board members of various ranks, which list included women and minority troopers, and was given the opportunity to strike several persons from that list. The final trial board consisted of Major Papili; Captain Homiak and Cpl. Larry Welch. The two-day hearing, at which plaintiff was represented by counsel, was held on December 1, 2004 and January 13, 2005. The balance of the averment is denied as alleged.

21.    Denied. Plaintiff was provided with all requested investigative information to which she was entitled under the Law Enforcement Officer's Bill of Rights, 11 Del. C. Ch. 92. The trial board made a finding to this effect in its final decision following plaintiff's hearing. Relevant witnesses to plaintiff's alleged misconduct were selected for presentation to the trial board by the prosecuting Deputy Attorney General, not by Defendant. By way of further response, Plaintiff also had the right to request that any DSP troopers appear as witnesses at the hearing.

22.    Denied as alleged. The trial board, advised by counsel, issued a formal written decision, with findings of fact and conclusions of law, on or about January 25, 2005, in which it concluded that plaintiff violated R&R 15. The recommended penalty, for reasons outlined in the decision, was that plaintiff "be suspended with pay with intent to terminate

pending review by the Acting Superintendent." On January 31, 2005, Acting Superintendent Thomas F. MacLeish concurred with the findings and recommended penalty of the trial board. Plaintiff, Cpl. Dempsey, was ordered suspended without pay pending review by the Secretary of the Department of Safety and Homeland Security. Plaintiff was never actually terminated from employment with DSP.

    23.    Denied as alleged.

    24.    Denied. By way of further answer, investigations into the conduct of Trooper Argo, Cpl. Csapo and Cpl./1 Walter Gygrynuk were conducted by DSP Internal Affairs and no violations were found. Accordingly, there was no discipline imposed. Specifically denied that there was any "falsification" of report(s).

    25.    Admitted that Sgt. Houdek was the superior officer to, and reviewed reports (including reports pertaining to the Dempsey/Maher incident) prepared by subordinate officers Trooper Alexander Argo, Cpl. Mark Csapo and Cpl./1 Walter Gygrynuk. The balance of the averment is denied. Specifically denied that there was any "falsification" of report(s). By way of further answer, an investigation into the conduct of Sgt. Houdek was conducted by DSP Internal Affairs and no violations were found.

    26.    Admitted. See response to averment #25 above.

    27.    Denied as alleged. Sgt. Charles Mullett was the head of criminal investigations at Troop 3 and prepared a supplemental report shortly after the October 26, 2003 incident. This report stated, *inter alia*, that plaintiff desired no further action in the case, and the incident was classified as "unfounded."

28.    Denied that there was any "falsification" of report(s).  By way of further answer, an investigation into the conduct of Sgt. Mullet was conducted by DSP Internal Affairs and no violations were found.  Accordingly, there was no discipline imposed.

29.    Denied.  By way of further answer, plaintiff herself requested of Captain Hawkins that no action be taken with regard to the incident reports she caused to be created as a result of the events of October 25-26, 2003, even though Captain Hawkins asked her if she wanted Cpl. Maher arrested.  See also response to averment #8.

30.    Denied.  Captain Hawkins and Major Hughes each entered into a summary discipline agreement to a violation of Job Performance Standard #12, "poor judgment" (one count each), in connection with the incident.  Major Hughes' disciplinary penalty was a two day suspension, and Captain Hawkins' disciplinary penalty was a three day suspension.

31.    Denied that any "falsification" of reports occurred.  By way of further answer, the conduct of Trooper Argo, Cpl. Csapo, Cpl./1 Walter Gygrynuk and Sgt. Mullet was investigated by Internal Affairs and no violations were found.  Accordingly, no discipline was imposed on these troopers.

32.    Admitted that plaintiff appealed the trial board's decision to the Secretary and that Secretary David Mitchell held a hearing on Plaintiff's appeal, and issued a written decision on or about July 1, 2005, in which he remanded the case to the Superintendent to issue a modified penalty for plaintiff's violation.  Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of the balance of the averment.

33.    Admitted.

34.    Defendant is without knowledge or information sufficient to form a belief as to the truth or falsity of this averment.

35.    Denied as alleged.    Admitted that Colonel MacLeish sent plaintiff a letter regarding her disciplinary penalties on or about August 19, 2005.  The letter speaks for itself.

36.    Admitted that plaintiff returned to work at Troop 4 following her suspension. Upon information and belief, her scheduled return to work date was July 20, 2005; her actual return to work date was August 15, 2005.

37.    Admitted that plaintiff filed a charge of discrimination with the Delaware Department of Labor and the EEOC, in which a "no cause" finding was issued and the charge was dismissed.

38.    Upon information and belief, admitted.

39.    Defendant restates and incorporates herein by reference the responses set forth in paragraphs 1 through 38 above.

40.    This averment states legal conclusions to which no response is deemed necessary.  State Defendant reserves all defenses, including jurisdictional defenses, which may be available.

41.    Denied as to all parts and sub-parts.

42.    Denied.

43.    Denied.  By way of further response, punitive damages are not available as a remedy against a government agency under a Title VII claim.  See affirmative defenses.

44.    Denied.  Damages, if any, were the direct and proximate result of plaintiff's own conduct.

45.    Defendant restates and incorporates herein by reference the responses set forth in paragraphs 1 through 44 above.

46.    Denied.

47.    Denied.[2]

48.    Denied.

49.    Denied.  Damages, if any, were the direct and proximate result of plaintiff's own conduct.

### DEFENSES/AFFIRMATIVE DEFENSES

50.    The State and its agencies are immune from liability to plaintiff under the doctrine of sovereign immunity.

51.    The State and its agencies are immune from liability to plaintiff under the Eleventh Amendment of the United States Constitution.

52.    Plaintiff's claims, in whole or in part, are barred by the appropriate statute of limitation, repose, or other statutorily required administrative time requirement.

53.    The complaint should be dismissed, in whole or in part, for failure to exhaust administrative remedies.

54.    Plaintiff unreasonably failed to take advantage of any preventive, corrective or remedial opportunities provided by the employer, and unreasonably failed to avoid harm otherwise.

55.    This Court is without original subject matter jurisdiction over Count 2 of plaintiff's complaint, pursuant to Article III, Section 2 of the United States Constitution, and 28 U.S.C. §§1331, 1332.

56.    Count 2 of plaintiff's complaint, even if properly before the Court, would be barred by the exclusivity provision of Delaware's Workers' Compensation Law, 19 Del. C. §2304.

---

[2] Defendant assumes that the reference to "race" discrimination in this averment is an error.  Specifically denied that plaintiff has ever complained of "race" discrimination in this matter, or that she could maintain such a claim.

57.    The State and its agencies are immune from liability to the plaintiff for claims, if any, sounding in State law, pursuant to the Delaware State Tort Claims Act.  10 <u>Del.C.</u> §4001 *et. seq.*

58.    All decisions made and actions taken by Defendant with regard to the alleged events were not based upon or motivated by gender.

59.    To the extent Plaintiff's claims sound in negligence, Plaintiffs cannot state a cause of action under Title VII.

60.    Plaintiff cannot impute liability (if any) for actions of other State agencies or their officials to Defendant.

61.    To the extent Defendant exercises prosecutorial, or quasi-prosecutorial functions, Defendant is immune from liability.

62.    Plaintiff fails to state a claim for punitive damages, as such damages are not available as a remedy against a government agency under a Title VII claim.  42 U.S.C. § 1981a(b)(1).

63.    It is specifically denied that plaintiff is entitled to any damages, including compensatory damages, punitive damages and/or attorneys' fees.

64.    It is specifically denied that plaintiff is entitled to any relief.

65.    Plaintiff's injuries and damages, if any, were the direct and proximate result of plaintiff's own conduct.

66.    Plaintiff failed to mitigate any alleged damages.

67.    Plaintiff otherwise fails to state a claim upon which relief may be granted.

**WHEREFORE**, Defendant demands that judgment be entered in its favor as to all claims, and that costs and attorney fees be awarded to the Defendant.

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

  /s/ Stephani J. Ballard
STEPHANI J. BALLARD (ID # 3481)
Deputy Attorney General
State of Delaware
Department of Justice
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
Attorney for Defendant

DATED: September 15, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,                    )
                                         )
         Plaintiff,                      )
                                         )
v.                                       )
                                         )        C. A. No. 06-456 SLR
STATE OF DELAWARE,                       )
DEPARTMENT OF PUBLIC SAFETY,             )
                                         )
         Defendant.                      )

CERTIFICATE OF MAILING AND/OR DELIVERY

The undersigned certifies that on September 15, 2006, she caused the attached, *Answer of*

*Defendant, State of Delaware Department of Public Safety,* to be electronically filed with the

Clerk of Court using CM/ECF which will send notification of such filing to the following:

Jeffrey K. Martin, Esquire
Margolis Edelstein
1509 Gilpin Avenue
Wilmington, DE 19806

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

/s/ Stephani J. Ballard
Stephani J. Ballard, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302)577-8400
Attorney for Defendant

**A000118**

**Mitchell Jennifer (DOJ)**

| | |
|---|---|
| **From:** | ded_nefreply@ded.uscourts.gov |
| **Sent:** | Friday, September 15, 2006 11:39 AM |
| **To:** | ded_ecf@ded.uscourts.gov |
| **Subject:** | Activity in Case 1:06-cv-00456-SLR Dempsey v. State of Delaware Department of Public Safety "Answer to Complaint" |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Ballard, Stephani J. entered on 9/15/2006 at 11:39 AM EDT and filed on 9/15/2006

| | |
|---|---|
| **Case Name:** | Dempsey v. State of Delaware Department of Public Safety |
| **Case Number:** | 1:06-cv-456 |
| **Filer:** | State of Delaware Department of Public Safety |
| **Document Number:** | 5 |

**Docket Text:**
ANSWER to Complaint by State of Delaware Department of Public Safety.(Ballard, Stephani)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=9/15/2006] [FileNumber=273442-0]
[79ed2bcb06b721be4716e7609fd7002fa87093485d33dd73abcddda74efdaee5f460
8a40a028867634ae53a049d0404549014ec7f38c7488365aa4633ddb1f51]]

**1:06-cv-456 Notice will be electronically mailed to:**

Stephani J. Ballard    stephani.ballard@state.de.us, Jennifer.Mitchell@state.de.us

Lori Ann Brewington    lbrewington@margolisedelstein.com, mmurphy@margolisedelstein.com;
kdecrease@margolisedelstein.com

**1:06-cv-456 Notice will be delivered by other means to:**

09/19/2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CHRISTINE DEMPSEY,                    :
                                      :
          Plaintiff,                  :          C.A. NO. 06-456-SLR
                                      :
     v.                               :
                                      :          JURY TRIAL DEMANDED
STATE OF DELAWARE,                    :
DEPARTMENT OF PUBLIC SAFETY           :
          Defendant.                  :

## PROPOSED SCHEDULING ORDER

This ᵈᵗʰ day of *October*, 2006, the parties having satisfied their

obligations under Fed. R. Civ. P. 26(f), and the court having conducted a pretrial

scheduling conference pursuant to Fed. R. Civ. P. 16 and D. Del. LR 16.2(a) and (b).

     IT IS ORDERED that:

     1.     **Pre-Discovery Disclosures.** The parties have/will exchange by **October**

**20, 2006,** the information required by Fed. R. Civ. P. 26(a)(1) and D. Del. LR 16.2.

     2.     **Discovery.**

          (a)     Discovery will be needed on the following subjects: Discovery is

needed concerning the events of October 25-26, 2003 and their aftermath, including

investigations into the conduct of troopers, and internal affairs and disciplinary

proceedings re: same; plaintiff's claims of discrimination and use of administrative

remedies; existence and scope of damages.

          (b)     All discovery shall be commenced in time to be completed by

**October 1, 2007.**

          (c)     Maximum of **50** interrogatories by each party to any other party.

**A000120**

(d)      Maximum of 50 requests for admission by each party to any other party.

(e)      Maximum of 15 depositions by plaintiff and 15 by defendant.

(f)      Each deposition limited to a maximum of 7 **hours** unless extended by agreement of parties.

(g)      Reports from retained experts under Rule 26(a)(2) on issues for which any party has the burden of proof due by May 31, 2007. Rebuttal expert reports due by July 31, 2007.

(h)      **Discovery Disputes.** Any discovery dispute shall be submitted to the court pursuant to Fed. R. Civ. P. 37. During the course of discovery, each party is limited to two (2) Rule 37 motions. The court shall make itself available, however, to resolve through a telephone conference, disputes that arise during the course of a deposition and disputes related to entry of a protective order.

3.      **Joinder of other Parties, Amendment of Pleadings, and Class Certification.** All motion to join other parties, amend the pleadings, and certify a class action shall be filed on or before November 20, 2006. ᵍᵘ

4.      **Settlement Conference.** Pursuant to 28 U.S.C. § 636, this matter is referred to Magistrate Judge Thynge for the purposes of exploring the possibility of a settlement.

5.      **Summary Judgment Motions.** All summary judgment motions shall be served and filed with an opening brief on or before January 8, 2008. Briefing shall be pursuant to D. Del. LR 7.1.2. No summary judgment motion may be filed more than ten (10) days from the above date without leave of the court.

6. **Applications by Motion.** Any application to the court shall be by written motion filed with the clerk. Unless otherwise requested by the court, counsel shall not deliver copies of papers or correspondence to changers. **Any non-dispositive motion shall contain the statement required by D. Del. LR 7.1.1.**

7. **Motions in Limine.** All motions in limine shall be filed on or before [two-weeks before pretrial conference]. All responses to said motions shall be filed on or before [one week before pretrial conference].

March 26, 2008

April 2, 2008

8. **Pretrial Conference.** A pretrial conference will be held on [within 9, 2008] at 4:30 p.m. in Courtroom No. 6B, Sixth Floor Federal Building, 844 King Street, Wilmington, Delaware. The Federal Rules of Civil Procedure and D. Del. LR 16.4 shall govern the pretrial conference.

April

9. **Trial.** This matter is scheduled for a **six-day jury trial** commencing on April 21, 2008 in Courtroom 6B, Sixth Floor Federal Building, 844 King Street, Wilmington, Delaware. For purposes of completing pretrial preparations, the parties should plan on being allocated a total number of hours in which to present their respective cases.

Sue L. Robinson

Judge Sue L. Robinson

**Mitchell Jennifer (DOJ)**

| | |
|---|---|
| **From:** | ded_nefreply@ded.uscourts.gov |
| **Sent:** | Wednesday, November 01, 2006 4:45 PM |
| **To:** | ded_ecf@ded.uscourts.gov |
| **Subject:** | Activity in Case 1:06-cv-00456-SLR Dempsey v. State of Delaware Department of Public Safety "Scheduling Order" |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

## U.S. District Court

## District of Delaware

Notice of Electronic Filing

The following transaction was received from rld, entered on 11/1/2006 at 4:45 PM EST and filed on 11/1/2006

**C   e Name:**    Dempsey v. State of Delaware Department of Public Safety
**Case Number:**    1:06-cv-456
**Filer:**
**Document Number:** 11

**Docket Text:**
SCHEDULING ORDER: Case referred to the Magistrate Judge for the purpose of exploring ADR. Joinder of Parties due by 11/20/2006. Amended Pleadings due by 11/20/2006. Discovery due by 10/1/2007. Dispositive Motions due by 1/8/2008. Motions in Limine due by 3/26/2008. Responses to Motions in Limine due by 4/2/2008. Pretrial Conference set for 4/9/2008 04:30 PM in Courtroom 6B before Honorable Sue L. Robinson. Jury Trial set for 4/21/2008 09:30 AM in Courtroom 6B before Honorable Sue L. Robinson. Signed by Judge Sue L. Robinson on 10/24/06. (rld, )

The following document(s) are associated with this transaction:

**D   ument description:** Main Document
**C   .ginal filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=11/1/2006] [FileNumber=296627-0]
[1cef35f7a280d1f55af7154c4dec84071615113eea3c9b678306a4d36c3540b4e8bd
1d7fc3081bb7c0b29f8e46b1f732f1e6e41b38e4e02dca69891012cba62e]]

**1:06-cv-456 Notice will be electronically mailed to:**

Stephani J. Ballard    stephani.ballard@state.de.us, Jennifer.Mitchell@state.de.us

Lori Ann Brewington    lbrewington@margolisedelstein.com, mmurphy@margolisedelstein.com;
kdecrease@margolisedelstein.com

**1:06-cv-456 Notice will be delivered by other means to:**

11/02/2006

**A000123**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,                    )
                                         )
          Plaintiff,                     )
                                         )
v.                                       )
                                         )     C. A. No. 06-456 SLR
STATE OF DELAWARE,                       )
DEPARTMENT OF PUBLIC SAFETY,             )
                                         )
          Defendant.                     )

## STIPULATION AND ORDER OF CONFIDENTIALITY

This Stipulation and Order of Confidentiality is designed to balance the rights of the

plaintiff Elizabeth C. Dempsey (the APlaintiff@) to have access to potentially relevant evidence in

the custody, possession or control of the Delaware State Police/Department of Public Safety (the

ADefendant@), against the privacy rights of non-party employees, past or present, of the

Defendant whose disciplinary or personnel records the Plaintiff may seek to discover.  It is,

therefore, agreed:

      1.      Before seeking to discover the disciplinary or personnel records of any non-party

individual, Plaintiff's counsel shall attempt to identify specific individuals or class of individuals

defined by certain parameters to be agreed to by the parties.  If Defendants' counsel agrees that

the disciplinary or personnel records of any such individual or individuals may be potentially

relevant to the claims of discrimination in Plaintiff's complaint, then Defendant=s counsel shall

produce such documents subject to the confidentiality provisions below.

      2.      Any disciplinary or personnel files that may be produced pursuant to this

Stipulation and Confidentiality Order, and any other documents and information of a personal

1

nature concerning non-party employees or former employees of the Defendant (hereinafter referred to collectively as AConfidential Material@) may be supplied by Defendant to Plaintiff pursuant to discovery subject to the further stipulations in paragraphs 4-13 below.

3.    To protect the privacy of non-party individuals, the parties agree to assign each individual non-party whose personnel or disciplinary records may be disclosed in discovery with code numbers to protect their identity (e.g., Trooper 1, Trooper 2, etc.). For purposes of motions, briefs, letters, or any other papers or pleadings filed with the Court which are not filed under seal, the parties agree to use those code numbers in lieu of the Trooper=s real name.

4.    The designation of Material as AConfidential@ for purposes of this Stipulation shall be made in the following manner:

(a)    In the case of documents, exhibits, briefs, memoranda, interrogatories or other materials (apart from depositions or other pretrial testimony): by affixing the legend AConfidential@ to each page containing any Confidential Material, except that in the case of multi-page documents bound together by staple or other binding, the word AConfidential@ need only be stamped on the first page of the document in order for the entire document to be treated as Confidential Material; provided that the failure to designate a document as AConfidential@ does not constitute a waiver of such claim, and Defendant may so designate a document after such document has been produced, with the effect that such document is subject to the protections of this Stipulation and Order;

(b)    In the case of depositions or other pretrial discovery: (i) by a statement on the record at the time of such disclosure that such testimony shall be treated as Confidential Material; (ii) by written notice, sent by counsel to all parties within ten business days after

2

receiving a copy of the transcript.  In both of the foregoing instances, counsel shall direct the court reporter that the confidentiality legend be affixed to the first page and all portions of the original and all copies of the transcript containing any Confidential Material.  Only those portions of the transcripts designated as AConfidential@ shall be deemed Confidential Material.  The parties may modify this procedure for any particular deposition, through agreement on the record at such deposition, or otherwise by written stipulation, without further order of the Court.

    5.     Each person to whom Confidential Material is disclosed or made available, including experts or consultants retained by Plaintiff, shall be advised of the existence and the contents of this Stipulation and Order and shall be bound by its terms and conditions.  No such person shall divulge any Confidential Material, or any data or information obtained, derived or generated from Confidential Material, to any other person, except as provided herein.  Each such person, excluding the Plaintiff, counsel for the Plaintiff, and counsel's staff shall sign a statement which shall include his or her name, job title and employer, and a statement that he or she has read this Stipulation and Order of Confidentiality and agrees to be bound by all of its terms and conditions.  Such statements shall be maintained by counsel for Plaintiff throughout this litigation and the statements of any persons shown Confidential Material shall be made available to counsel for Defendant upon termination of this litigation or upon good cause shown.

    6.     Confidential Material, or data and information obtained, derived or generated from Confidential Material, shall be disclosed only to:

      (a)     The Court and Court personnel;

      (b)     Plaintiff's attorney of record in this action and persons employed in the attorney's office on a need-to-know basis;

3

     (c)     Plaintiff;

     (d)     Independent experts such as economists;

     (e)     Witnesses or potential witnesses with whom Plaintiff's's attorney deems it necessary to discuss such material in the course of Plaintiff's discovery and/or preparation for trial.

7.     Confidential Material, or data and information obtained, derived or generated from Confidential Material, shall not be used for any purpose other than pretrial proceedings, preparation for trial, at trial, and post-trial litigation in connection with the above-captioned action.

8.     Any documents filed of record which contain Confidential Material shall be placed in a sealed envelope or other sealed container at the time of filing, which envelope or container shall be conspicuously endorsed with the title of this action, the words AConfidential Material - Subject to Protective Order,@ and a statement substantially in the following form:

> This envelope is sealed pursuant to order of the Court and contains confidential information filed in this case by [name or party] and is not to be opened or the contents thereof to be displayed or revealed except by order of the Court.

9.     Any person may be examined as a witness at trial or during a deposition concerning any Confidential Material as to which that person has prior knowledge.  During examination, any such witness may be shown Confidential Material which appears on its face or from other documents or testimony to have been received by that witness from, or communicated to that witness by, the Defendants.

10.     Nothing contained in this Stipulation and Order of Confidentiality shall be construed as a waiver by Defendant of its right to object to the subject matter of any discovery

4

request made in this action, or the admissibility into evidence of any document or testimony subject to this Stipulation and Order.  The execution of the Stipulation and Order of Confidentiality shall not be construed as an agreement by Defendant to produce any document or supply any information, and shall not constitute an admission that any designated material is relevant in any way to the issues raise in the pending action or as a waiver of any privilege with respect thereto.

11.    Any dispute arising under this Stipulation and Order of Confidentiality shall be submitted to the Court for resolution. If Plaintiff disagrees with the designation of any material as Confidential Material, the material so designated shall nonetheless be deemed to be Confidential Material, and Plaintiff shall be required to file an appropriate motion with the Court.  A motion may be made at any time, and failure to make a prompt motion shall not be deemed a waiver of the intent to make such motion.

12.    Within thirty (30) days after the final termination of this action, whether by settlement, judgment, or decision on appeal, all originals and copies of documents designated as confidential shall be returned to Defendant, together with all documents containing data or information derived from or set forth in such Confidential Material, but this paragraph does not cover or include any pleadings filed by the plaintiff with the Court.

5

13.    If any Confidential Material, information or data obtained, derived or generated

therefore, is sought through discovery from Plaintiff by any party in any other judicial or

administration proceeding, Plaintiff will immediately notify Defendant=s counsel so as to permit

Defendant to seek a protective order from the appropriate court.

Dated: _____, 2007

_____
Lori A. Brewington, Esquire (#4522)
Jeffrey K. Martin, Esquire (#2407)
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
Attorneys for Plaintiff

Dated: March 01, 2007

/s/ Stephani J. Ballard
Stephani J. Ballard, Esquire (#3481)
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302) 577-8400
Attorney for Defendant

**APPROVED AND SO ORDERED** this _____ of _____, 2007.

_____
Sue L. Robinson
United States District Judge

6

**A000129**

CM/ECF LIVE - U.S. District Court:ded                                    Page 1 of 1

## Other Documents
1:06-cv-00456-SLR Dempsey v. State of Delaware Department of Public Safety
MEDIATION

### U.S. District Court

### District of Delaware

## Notice of Electronic Filing

The following transaction was entered by Ballard, Stephani on 3/21/2007 at 9:02 AM EDT and filed on 3/21/2007

**Case Name:**        Dempsey v. State of Delaware Department of Public Safety
**Case Number:**      1:06-cv-456
**Filer:**            State of Delaware Department of Public Safety
                      Elizabeth C. Dempsey
**Document Number:** 18

**Docket Text:**
STIPULATION Confidentiality re: Non-party Employment/Disciplinary Records by Elizabeth C. Dempsey, State of Delaware Department of Public Safety. (Ballard, Stephani)

**1:06-cv-456 Notice has been electronically mailed to:**

Stephani J. Ballard    stephani.ballard@state.de.us, Jennifer.Mitchell@state.de.us

Lori Ann Brewington    lbrewington@margolisedelstein.com, dlohinetz@margolisedelstein.com, rtaylor@margolisedelstein.com

**1:06-cv-456 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=3/21/2007] [FileNumber=360335-0]
[8acc5a76b2f2b5405825488712e23e9065953f25773283d7987e616deb87f7315c1a
fe9d033c85e64ef31b6ba5afdb3d0821727dc60b1b00295fe43c459ca08e]]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,                    :
                                         :
        Plaintiff,                       :          Civil Action No. 06-456 (SLR)
                                         :
             v.                          :
                                         :          JURY TRIAL DEMANDED
STATE OF DELAWARE,                       :
DEPARTMENT OF PUBLIC SAFETY,             :
                                         :
        Defendant.                       :

**DEFENDANT'S RESPONSES TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES**

1.    Identify each person from whom You have obtained or will obtain a written or oral report, statement, memorandum, affidavit, declaration or testimony regarding the allegations of Plaintiff's Complaint, contrary or otherwise, state the date that such written or oral report, statement, memoranda, affidavit, declaration or testimony was taken, and the nature and content of such written oral report, statement, memoranda, affidavit, declaration or testimony.

**ANSWER:**

Objection. This interrogatory is vague, overbroad and unduly burdensome, and calls for the production of attorney-client and work-product materials. Notwithstanding said objection, see documents, including Internal Affairs documents, produced with Defendant's Responses to Plaintiff's Requests for Production.

2.    Identify each expert You have consulted, and state if You have reason to believe You will call them to testify at trial, and for each expert provide the information required by Rule 26(a)(3).

1

**ANSWER:**

No experts have been retained at this time. Defendant reserves the right to identify experts at a later date.

3.      Identify any person, including Yourself, who you know or believe has any knowledge of the allegation in or defenses against Plaintiff's Complaint. With respect to each person identified, describe in detail the factual knowledge You believe each person has and state how You became aware that each identified person had such knowledge.

**ANSWER:**

Objection. This interrogatory is vague, overbroad and unduly burdensome. Notwithstanding said objection, see responses to Initial Disclosures as well as documents, including Internal Affairs documents, produced with Defendant's Responses to Plaintiff's Requests for Production.

4.      Identify each person with whom You have discussed the facts and circumstances surrounding the Complaint filed in the above-captioned matter, and as to each person so identified, provide the date(s) the discussion(s) occurred, who initiated the discussion(s), and a brief summary of the discussion(s).

**ANSWER:**

Objection. This interrogatory is vague, overbroad, and calls for information protected by the attorney-client privilege. It is also not susceptible of a meaningful response as the Defendant to whom the question is directed is a governmental entity.

2

5.     Was Plaintiff's job performance ever evaluated by Defendant?   If answered in the affirmative, please state the name(s) and title(s)/rank(s) of the person(s) evaluating Plaintiff's performance, the date, time, place and method of each evaluation, the content or substance of the each evaluation, whether Plaintiff was ever informed of the contents of the each evaluation and the standards by which Plaintiff would be evaluated.   If the evaluations were contested by Plaintiff, provide copies of any written evaluation(s) in Your possession.

**ANSWER:**

Yes.  Please see copies of written performance evaluations in Plaintiff's personnel file, produced with Defendant's Responses to Plaintiff's Requests for Production.

6.     Were any other disciplinary actions ever taken against Plaintiff prior to the details of this Complaint during her employment with Defendant?   If answered in the affirmative, please state the date(s) of the occurrence(s) which gave rise to the action(s), the event(s) which gave rise to the action(s), when notice of procedure policy, rule or regulation was provided to Plaintiff the specific nature of the action(s) taken against Plaintiff, the date(s) of the disciplinary action(s), the name(s), address(es) and title(s)/rank(s) of each person involved in the issuance of the disciplinary action(s), whether the disciplinary action(s) were contested by Plaintiff, and provide copies of all disciplinary notices given to Plaintiff.

**ANSWER:**

Please see Plaintiff's personnel and troop files, produced with Defendant's Responses to Plaintiff's Requests for Production.  In addition to the Internal Affairs

3

**A000133**

charges arising out of the instant matter, a charge of Discourteous Conduct (JPS #9) was substantiated against Plaintiff in 2003. See also summaries of IA matters. (Bates D001075 – D001086).

7.    Please discuss all complaints of harassment and/or discrimination from Plaintiff, up to the present time, including the nature of the complaint(s), the date each complaint was made, to whom each complaint was made, the action(s) taken regarding each complaint made, and the final outcome of each complaint made.

**ANSWER:**

Objection. The wording of this question is vague, confusing and not susceptible of meaningful response. Notwithstanding said objection, the only known formal complaint(s) of "harassment or discrimination" by Plaintiff against DSP are the EEOC charge and the lawsuit in the instant case.

8.    Please identify the periods of Plaintiff's employment and position (s) or assignments held. Also, set forth each and every reason that Plaintiff's position(s) or assignment(s) was changed. Identify all those involved in the decision to change Plaintiff's position(s) or assignment during her tenure.

**ANSWER:**

Please see personnel records, Bates D-000099 – D000264. Troop assignments are changed by the Superintendent based on operational needs. At one point, Plaintiff voluntarily resigned from DSP for personal reasons, unrelated to this lawsuit. She later requested reinstatement, and was re-hired by the Division.

4

**A000134**

9.    Please state whether within the past ten (10) years anyone has made a claim against You alleging sexual discrimination in any employment decision you made. If You answered in the affirmative, please identify each claim that resulted in legal proceedings and each claim that did not result in legal proceeding as well as a description of each claim and the parties involved in such claim.

**ANSWER:**

Objection, this Request is vague, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding said objection, the only lawsuits against DSP alleging sex discrimination were brought by Cpl. Rebecca McKnatt and Captain Barbara Conley. As to Captain Barbara Conley, her District Court lawsuit is a matter of public record, District of Delaware, C.A. No. 04-1394 GMS. That case was tried to a jury in June 2006, resulting in a verdict in favor of all Delaware State Police defendants, and rejecting Captain Conley's claims of sex discrimination in promotion. Cpl. McKnatt's (who was represented by Plaintiff's counsel in this case) trial resulted in a mixed verdict, in favor of McKnatt on some counts and in favor of DSP on others, with a jury award of $80,000. The only known EEOC/DDOL charges against DSP alleging sex discrimination were brought by Plaintiff in this case and by Cpl. Rebecca McNatt. Plaintiff's counsel in this case represented both plaintiff and Cpl. McNatt in these cases.

10.    Did Cpl. Brian Maher's conduct at the residence of Plaintiff on October 25-26, 2003 amount to a burglary under Delaware State Criminal Code?

5

**A000135**

**ANSWER:**

Objection. This request is outside the scope of F.R.C.P. 33 and F.R.C.P. 26(b)(1), as it calls for a legal determination. Notwithstanding said objection, Brian Maher entered into a probation before judgment plea on a charge of criminal trespass, first degree, a misdemeanor, in connection with the October 25-26, 2003 incident. The probation was complied with and Maher's record has since been expunged.

11.    When did an investigation of the October 25-26, 2003 incident begin? Please explain (a) by whom and (b) whose decision was it to investigate.

**ANSWER:**

The investigation into the incident, reported by Plaintiff as a burglary with an unknown suspect, began immediately on October 26, 2003, when three responding Delaware State Troopers reported to Plaintiff's residence per emergency 911 dispatch. Two of the three responding troopers prepared contemporaneous crime/incident reports.

12.    Please state the reason(s) for investigating the incident of October 25-26, 2003 more than seven (7) months after the October 25-26, 2003 incident.

**ANSWER:**

Objection, this question is vague, argumentative and presumes facts not in evidence in this case. Notwithstanding said objection, see response to Interrogatory No. 11, above. The investigation into the incident began that night and was closed per Plaintiff's request that nothing further be done. The matter was re-opened in April, 2004,

6

**A000136**

and further investigation was done by DSP Internal Affairs into the incident itself and the reporting of it.

13.    At what point in time did each of these officers learn that Master Corporal Brian Maher was the suspect[1] in the October 25-26, 2003 incident at Plaintiff's residence: Corporal Gygrynuk, Corporal Csapo, Trooper Argo, Captain Hawkins, Sgt. Houdek, Sgt. Mullett and Major R.L. Hughes.  For each explain the circumstances surrounding how they became aware that Brian Maher was the suspect.

**ANSWER**

Objection to the extent this question presumes facts not in evidence in this case. Notwithstanding said objection:

Gygrynuk: Cpl. Gygrynuk believes that he learned by hearsay that the alleged "suspect" was a Trooper, believed to be Brian Maher, the night of the incident or the next day.

Csapo:  Cpl. Csapo first heard that the alleged "suspect" was Brian Maher "through the rumor mill" about a week after the incident.  He was never formally informed of this fact until around the time of Plaintiff's trial board hearing.

Argo:  Trooper Argo learned of Brian Maher's involvement several months after the October 26, 2003 incident, when he was contacted by Detective Hudson and asked to write a supplement to the incident report.

Hawkins:  Captain Robert Hawkins became aware, via a cell phone call from Brian Maher on October 26, 2003, soon after the incident, that Brian Maher had

---

[1] Defendant objects to the use of the word "suspect" throughout these Interrogatories, to the extent it implies a legal and/or criminal conclusion.

been to Christine Dempsey's home, which was in Hawkins' Troop area, and had

broken a window there.

Houdek: Captain Hawkins contacted Sgt. Houdek by phone shortly after the

October 26, 2003 phone call from Maher to Hawkins. .Hawkins advised Houdek

of what Maher had told him.

Mullett: Sgt. Mullett learned of Maher's involvement in the incident on or about

October 27, 2003, when the initial incident reports were forwarded to his unit,

Criminal Investigations Unit (CIU).

Hughes: Major Hughes' recollection is that he learned of a break-in at

Dempsey's house on Sunday, October 26, 2003, from Captain Hawkins, but did

not learn that a fellow trooper was involved or that Brian Maher was involved

until he was approached by Captain Glenn Dixon in the spring of 2004, who

relayed this information.


14.    What was the nature and purpose of Captain Hawkins's telephone

conversation with Plaintiff on October 27, 2003?

**ANSWER:**

Captain Hawkins had a phone conversation with Plaintiff on either October 26 or

October 27, 2003 (he does not recall which day with certainty). Hawkins advised

Plaintiff of her options, including having Maher arrested, and said he would handle the

matter as Plaintiff saw fit. Dempsey advised that she did not wish the matter to be

pursued, that everything was fine and the window was fixed and that she did not want

anything further to be done.

8

**A000138**

15.    What did Defendant charge Corporal Maher with in relation to the incident of October 25-26, 2003? Please include (a) how charges were determined; (b) who determined charges; and (c) why he was not he charged with felony burglary?

**ANSWER:**

Objection. This question is vague, including but not limited to the use of the word "charge", and presumes facts not in evidence in this case. Notwithstanding said objection, criminal charges as to Brian Maher, as in any criminal case, are determined by the Attorney General's office and not by the criminal defendant's employer (the Defendant in this civil case). Determination of criminal charges is a matter fully within the discretion of the prosecutor.

16.    Explain the circumstances surrounding the decision to charge Corporal Brian Maher with conduct unbecoming a Trooper and failing to report a domestic incident to a supervisor rather than charging him criminally. Please explain (a) who was involved in the decision and (b) their reason for the decision.

**ANSWER:**

Objection. This question is vague, including but not limited to the use of the word "charge", and presumes facts not in evidence in this case. Notwithstanding said objection, this question appears to inquire about Internal Affairs disciplinary "charges." Internal Affairs charges and criminal charges are separate and independent matters (see response to Interrogatory No. 15, above). Internal Affairs "charges" were brought against Maher by DSP in connection with the October 25-26, 2003 incident. The charges

9

**A000139**

were (1) conduct unbecoming an officer (R&R 4) and failing to report a domestic

incident (Job performance standard #14). In all cases, charging decisions are made,

following review of the investigation by Internal Affairs, by the Lt. Colonel, in

consultation with the Internal Affairs investigator(s) and DSP legal counsel. Procedures

followed in the investigative and charging process are set forth in "Complaint and

Disciplinary Procedures", DSP Manual, VII-V-1 *ff*, copies of which are being produced

as part of Defendant's responses to Requests for Production.


17.    What were the circumstances surrounding the Plaintiff's schedule change

from "C" shift to "A" shift at Troop 7 in May 2004? Please include (a) whether

Plaintiff's schedule change complied with Defendant's notification policy; (b) when was

Plaintiff notified of her schedule change; and (c) who notified the Plaintiff of the

schedule change.

**ANSWER:**

Plaintiff transferred, per her request, to Troop 7 from Troop 5, on or about May

31, 2004. The Troop Commander of Troop 7 was Captain Gregory Nolt, who was in

charge of rotation assignments. A/B and C/D are "rotations" (not shifts) to which

Troopers are assigned. The rotations have different days off and both involve both night

and day work. When Plaintiff came to Troop 7, there was an operational need to place

her on A/B rotation. Brian Maher, senior to Plaintiff in terms of years and time at Troop

7, was already on C/D rotation, and needed to remain on that rotation because he was a

shift supervisor, and also part of the motorcycle unit and provided motorcycle coverage

for C/D. Captain Nolt personally informed Plaintiff of her assignment to A/B. To

10

Captain Nolt's recollection, there was no rotation "change"; Plaintiff was initially assigned to A/B when she first arrived at Troop 7 in May 2004. A trooper does not have the right to be assigned to any particular rotation upon transferring to a new troop; the determination is based upon operational needs.

18.     Please explain the reason(s) for Corporal Maher's probation in or around the incident of October 2003. Please include (a) date(s) of probation; (b) terms of probation; and (c) whether Corporal Maher participated in special units during probation.

**ANSWER:**

See Results of Superintendent's Hearing, part of IA file No. 12-04. Then-Colonel L. Aaron Chaffinch, among other discipline, imposed a one-year period of probation, effective October 27, 2004. Upon information and belief, Corporal Maher's job duties, including special units, did not change during his probationary period. There is no prohibiton or limitation on troopers' participation in special units while on probation.

19.     Why was Corporal Maher still permitted to participate in special units despite being placed on probation for his involvement in the incident of October 25-26, 2003?

**ANSWER:**

See response to Interrogatory #18, above.

20.     Please explain the process of selection for members' participation on a Trial Board.

11

**ANSWER:**

See Internal Investigation and Disciplinary Procedures, including Bates # D0053-0054.

21.    What is Defendant's policy/procedure with respect to an employee's request for access to Internal Affairs interviews for his or her Trial Board Hearings?

**ANSWER:**

Internal Affairs matters are conducted in compliance with the Law Enforcement Officers' Bill of Rights, 11 Del.C. Ch. 92, and Internal Affairs procedures set forth in DSP Administrative Manual.

22.    Why was the Plaintiff denied access to the Internal Affairs interviews at her Trial Board hearing?

**ANSWER:**

Plaintiff was not denied access to any materials to which she was entitled pursuant to the Law Enforcement Officers' Bill of Rights, 11 Del.C. Ch. 92, and Internal Affairs procedures set forth in DSP Administrative Manual.

23.    Explain circumstances surrounding Trial Board's finding that Plaintiff was guilty of falsifying a report and its recommendation of termination.

**ANSWER:**

The Trial Board's written decision was supplied to Plaintiff and her counsel, and is produced again along with Defendant's responses to Requests for Production.  The

12

**A000142**

document speaks for itself. See also, the court reporter's transcript of the trial board proceedings, which should already be in the possession of Plaintiff and/or her attorney.

24. Were Major Hughes, Sergeant Houdek and Captain Hawkins called to testify during the Internal Affairs investigation stemming from the incident of October 25-26, 2003? If yes, please state reason(s) why they did not testify?

**ANSWER:**

No. Neither Plaintiff nor the Division called these persons to testify. Decisions as to witnesses to be presented on behalf of the Division are made by the Deputy Attorney General prosecuting the disciplinary matter. Plaintiff and her counsel were free to request any witnesses to appear before the Board.

25. Explain the circumstances surrounding the decision to charge Plaintiff with falsifying a report to a supervisor officer and failing to report a domestic incident to a supervisor. Please explain (a) who was involved in the decision to charge Plaintiff and (b) their reason(s) for the decision.

**ANSWER:**

Internal Affairs "charges" were brought against Plaintiff, Christine Dempsey, by DSP in connection with the October 25-26, 2003 incident. The charges were (1) making false statements (R&R 15) and failing to report a domestic incident (Job performance standard #14). In all cases, charging decisions are made, following review of the investigation by Internal Affairs, by the Lt. Colonel, in consultation with the Internal Affairs investigator(s) and DSP legal counsel. Procedures followed in the investigative

13

**A000143**

and charging process are set forth in "Complaint and Disciplinary Procedures", DSP

Manual, VII-5-1 *ff*, copies of which are being produced as part of Defendant's responses

to Requests for Production.


26.    Were Corporal Gygrynuk, Corporal Csapo, Trooper Argo, Sergeant

Mullet and Sergeant Houdek disciplined for falsifying a police report in relation to the

October 25-26, 2003 incident?  If yes, please state (a) when they were disciplined; (b)

terms of their discipline; and (c) who disciplined them.  If no, please explain why their

actions did not constitute a falsification of a report.

**ANSWER:**

Objection, this question is vague, argumentative and presumes facts not in

evidence in this case.  Notwithstanding said objection, no.  The conduct of each named

Trooper was reviewed by DSP internal affairs as part of IA# 12-04, and no conduct was

found and/or substantiated which would warrant disciplinary proceedings.


27.    Did Sgt. Houdek instruct Cpl. Gygrynuk, Cpl. Csapo or Trp. Argo to write

the incident report as having an "unknown" suspect?  If yes, please explain the reason(s)

surrounding his instruction.

**ANSWER:**

No.  Sgt. Houdek instructed Cpl. Csapo, who was preparing the initial report, and

Cpl. Gygrynuk, who prepared a supplemental report, to document the incident based

upon how it was reported and information obtained from the investigation and the

14

**A000144**

witnesses that night.   Sgt. Houdek was not involved in, and did not approve, the

supplemental report subsequently prepared by Trooper Argo.


      28.    Explain the reason(s) that Sgt. Mullett did not identify Brian Maher on the

final report of the incident of October 26, 2003.

**ANSWER:**

    Sgt. Mullett met with Captain Hawkins and Lt. Donaway to discuss the incident

on or about October 27, 2003.   The report was closed as unfounded, as Dempsey had

advised that she did not wish the matter to be pursued and did not want anything further

to be done.


      29.    Explain what, if any, discipline Sgt. Mullett, Capt. Hawkins and Major

Hughes were given as a result of their reporting of the October 26, 2003 incident.   Please

explain (a) timing of the discipline, (b) identify reason for discipline, (c) who was

involved in the decision to discipline, (d) what was the discipline and (e) identify the

actual charges of discipline.

**ANSWER:**

    Sgt. Mullett was notified of charges of violation of Job Performance Standard #12

(poor judgment).   After investigation, the allegation was deemed to be unfounded.   No

discipline was imposed.   Captain Hawkins was notified of charges of violation of Rule

and Regulation #5 (neglect of duty) and Job Performance Standard #12 (poor judgment).

After investigation, the R&R #5 allegation was deemed to be unfounded and the JPS #12

allegation was substantiated.   Capt. Hawkins agreed to Summary Discipline of 24 hours

suspension with the option to forfeit vacation. Major Hughes was notified of charges of violation of Rule and Regulation #5 (neglect of duty) and Job Performance Standard #12 (poor judgment). After investigation, the R&R #5 allegation was deemed to be unfounded and the JPS #12 allegation was substantiated. Major Hughes agreed to Summary Discipline of 16 hours suspension with the option to forfeit vacation. See IA documents produced with Defendant's RFP responses.

30.    Why was there a time lapse of over seven months before Plaintiff was allowed to meet with superiors to discuss her reinstatement to the Delaware Police Department?

**ANSWER:**

Objection. This question is vague, argumentative and not susceptible of a meaningful response. DSP personnel communicated with Plaintiff as to her reinstatement beginning immediately after Secretary Mitchell's decision. Plaintiff herself delayed her actual return to work date from July to August by opting to take some vacation days in July followed by some of her suspension days (agreed to with DSP) in August. See time records produced with Defendant's RFP responses. (Bates # D000073 – D000098.

31.    Explain reasons surrounding decision to reassign Plaintiff to Troop 4 rather than allowing her to return to Troop 7. Please include (a) names of those involved in decision; (b) reason for the decision; and (c) when the decision was made.

**ANSWER:**

16

**A000146**

Colonel MacLeish, after consultation with Lt. Colonel Seifert, Capt. Yeomans and DSP legal counsel, made the decision to assign Plaintiff to Troop 4, following her reinstatement following the appeal to the Secretary, based upon staffing needs at Troop 4. In addition, given the history of incidents between Plaintiff and Cpl. Maher, including one incident in 2004 where Plaintiff intruded unannounced into Maher's home resulting in an altercation[2], it was felt that Dempsey and Maher should not work at the same troop, if possible.

32.     Based on Secretary Mitchell's "Decision on Review of Disciplinary Action" concerning Plaintiff, what date was Plaintiff supposed to return to her previous rank?

**ANSWER:**

Secretary Mitchell's written decision on appeal has been produced to the Plaintiff and speaks for itself.

33.     Why was Plaintiff's loss of rank date changed to commence on July 20, 2006 when Secretary Mitchell ordered the date to be January 31, 2005?

**ANSWER:**

Upon receipt of Secretary Mitchell's decision, Colonel MacLeish consulted with Deputy Attorney General Michael Tupman, DSP legal counsel. Mr. Tupman advised that, based on precedent and his legal opinion, a demotion period must be co-extensive with the probationary period, while the Trooper was on duty with the Division. The

---

[2] The conduct of both Dempsey and Maher was reviewed by IA as to this 2004 incident, but no charges were substantiated as to either Trooper.

17

Secretary had ordered a one year probationary period along with the one year loss of

rank. Cpl. Dempsey had been suspended without pay pending termination for the time

period between January 31, 2005 and July 20, 2005. Accordingly, Tupman advised

Colonel MacLeish that both the loss of rank period and probationary period should begin

upon Dempsey's return to duty with DSP as of July 20, 2005.


    34.    How many times has Chief Macleish made command decisions that refute

the orders of Secretary Mitchell? If answered in the affirmative, explain circumstances

surrounding each occurrence.

**ANSWER:**

    Objection, this question is vague and argumentative, not susceptible of a

meaningful response and not reasonably calculated to lead to the discovery of relevant

information.


    35.    Identify when Plaintiff was allowed to return to her previous rank. If the

date that Plaintiff was restored to her previous rank took place after January 31, 2006,

please explain circumstances surrounding decision not to return her to her previous rank

on January 31, 2006. Please include the (a) names of those involved in this decision; (b)

reason for the decision; and (c) when the decision was made.

**ANSWER:**

    Please see response to Interrogatory # 33, above. Upon further legal review in

August 2006, and discussions by undersigned counsel with Plaintiff's IA attorney, Robert

McDonald, Esquire, Plaintiff and DSP agreed that her demotion date was to be changed

in her records to January 31, 2005, with a return to rank date of January 31, 2006.

Plaintiff was due a slight salary differential which was tendered and accepted, resolving

the matter of the demotion dates. This agreement was conveyed to Plaintiff's counsel.

See letter agreement at Bates D000089 – D000090.

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

 /s/ Stephani J. Ballard
Stephani J. Ballard, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
Attorney for Defendant

Dated: April 9, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,         :

                                   :

      Plaintiff,             :      Civil Action No.: 06-456

                                   :

         v.               :

                                   :      JURY TRIAL DEMANDED

STATE OF DELAWARE,         :

DEPARTMENT OF PUBLIC SAFETY,   :

                                   :

      Defendant.             :

## DEFENDANT'S RESPONSES TO PLAINTIFF'S
## FIRST REQUEST FOR ADMISSIONS

Pursuant to Federal Rule of Civil Procedure Rule 36, Defendant, by and through its undersigned counsel, hereby responds to Plaintiff's First Requests for Admissions as follows:

1.      An investigation of the October 25-26, 2003 incident involving Plaintiff and Brian Maher more than five months after the incident.

**ANSWER:**

Objection. The wording of this question is vague and not susceptible of an admission or denial. Notwithstanding said objection, to the extent the question suggests that no investigation of the October 25-26, 2003 incident took place until more than five months after the incident, that statement is Denied.

1

2.    Corporal Walter Gygrynuk was aware that the main suspect[1] in the incident on October 26, 2003 was Brian Maher when he completed his report of the incident.

**ANSWER:**

Denied as stated. Admitted that Corporal Walter Gygrynuk became aware, through hearsay information, on or about October 26, 2003, that Brian Maher had been to Christine Dempsey's home that night.

3.    Corporal Mark Csapo was aware that the main suspect in the incident on October 26, 2003 was Brian Maher when Csapso completed his report of the incident.

**ANSWER:**

Denied.

4.    Trooper Alex Argo was aware that the main suspect in the incident on October 26, 2003 was Brian Maher when Argo completed his report of the incident.

**ANSWER:**

Denied as stated. Admitted that Trooper Alex Argo had become aware, through hearsay information, that Brian Maher had been to Christine Dempsey's home that night, by the time he completed his supplemental report on April 20, 2004.

5.    On or about October 26, 2003, Sergeant Houdek became aware that the main suspect in the incident of October 26, 2003 was Brian Maher.

---

[1] Defendant objects to the use of the word "suspect" throughout these Requests for Admission, to the extent it implies a legal and/or criminal conclusion. Defendants admissions and denials are as to factual issues concerning the events in question only.

2

**A000151**

**ANSWER**

Admitted that, on October 26, 2003, by phone, Captain Robert Hawkins advised Sgt. Houdek of the phone call from Brian Maher in which Maher advised he had been at Christine Dempsey's home that night.

6.    On or about October 26, 2003, Captain Robert Hawkins became aware that the main suspect in the incident of October 26, 2003 was Brian Maher.

**ANSWER:**

Denied as stated. Admitted that Captain Robert Hawkins became aware, via a cell phone call from Brian Maher on October 26, 2003, that Brian Maher had been to Christine Dempsey's home and had broken a window there.

7.    Sergeant Chuck Mullet was aware that Brian Maher was the main suspect in the incident on October 26, 2003 when he completed his report of the incident.

**ANSWER:**

Denied as stated. Admitted that Captain Robert Hawkins advised Sgt. Mullett, on or about Monday October 27, 2003, of his awareness of the incident, including the October 26, 2003 call from Brian Maher, in which Maher stated he had been to Christine Dempsey's home and had broken a window there. Hawkins also advised Mullett of his conversation with Christine Dempsey and her request that nothing further be done regarding the incident.

3

**A000152**

8.      Captain Hawkins had a telephone conversation with Plaintiff on October 27, 2003 and informed Plaintiff that Major Hughes was aware of the circumstances surrounding the incident and that she did not need to discuss the incident with anyone else.

**ANSWER:**

Denied.  By way of further response, admitted that Captain Hawkins had a phone conversation with Plaintiff on either October 26 or October 27, 2003.  See also response to Interrogatory # 14.

9.      Corporal Maher's conduct on October 26, 2003 constituted felony burglary.

**ANSWER:**

Objection.  This request is outside the scope of F.R.C.P. 36 and F.R.C.P. 26(b)(1), as it calls for a legal determination.  Notwithstanding said objection, admitted that Brian Maher entered into a probation before judgment plea agreement on a charge of criminal trespass, first degree, a misdemeanor, in connection with the October 25-26, 2003 incident.  The probation was complied with and Maher's record has since been expunged.

10.     Corporal Maher was permitted to participate in special units despite being placed on probation for his involvement in the incident of October 26, 2003.

**ANSWER:**

Admitted.  There is no prohibition on an officer participating in special units while on a probationary status.

4

**A000153**

11.     Plaintiff was not allowed access to the Internal Affairs interviews of every person who testified at her Trial Board hearing.

**ANSWER:**

Denied. *See* letter of December 10, 2004 from Ralph Durstien, III, Deputy Attorney General to Robert McDonald, Esquire, Plaintiff's lawyer, designating transcripts and tapes provided. (Bates D000683 – D000685).

12.     Major Randall Hughes was not called to testify during the Internal Affairs investigation stemming from the incident of October 26 despite the fact that Hughes had knowledge of incident.

**ANSWER:**

Admitted that neither DSP nor Plaintiff called Major Hughes as a witness at Plaintiff's Internal Affairs hearing.

13.     Sergeant Houdek was not called to testify during the Internal Affairs investigation stemming from the incident of October 26, 2003 despite the fact that Houdek had knowledge of incident.

**ANSWER:**

Admitted that neither DSP nor Plaintiff called Sgt. Houdek as a witness at Plaintiff's Internal Affairs hearing.

5

14.    Captain Hawkins was not called to testify during the Internal Affairs investigation stemming from the incident of October 26, 2003.

**ANSWER:**

Admitted that neither DSP nor Plaintiff called Captain Hawkins as a witness at Plaintiff's Internal Affairs hearing.

15.    Corporal Walter Gygrynuk was not disciplined for the way in which he reported the October 26, 2003 incident.

**ANSWER:**

Admitted. By way of further response, the conduct of Corporal Walter Gygrynuk was reviewed by Internal Affairs, and no basis for disciplinary action was found.

16.    Corporal Mark Csapo was not disciplined for the way in which he reported the October 26, 2003 incident.

**ANSWER:**

Admitted. By way of further response, the conduct of Corporal Mark Csapo was reviewed by Internal Affairs, and no basis for disciplinary action was found.

17.    Trooper Alex Argo was not disciplined for his reporting of the incident.

**ANSWER:**

6

**A000155**

Admitted.  By way of further response, the conduct of Trooper Alex Argo was reviewed by Internal Affairs, and no basis for disciplinary action was found.


18.    Sergeant Chuck Mullet was not disciplined for the way in which he reported the October 26, 2003 incident.

**ANSWER:**

Admitted.  By way of further response, the conduct of Sergeant Chuck Mullet was investigated by Internal Affairs, and no basis for disciplinary action was found.


19.    Sergeant Houdek approved the reports of Csapo, Argo and Gygrynuk even though he was aware at that time that Brian Maher was the suspect in the October 25-26, 2003 incident.

**ANSWER:**

Objection.  This compound request fails to comply with F.R.C.P. 36. Notwithstanding said objection, denied as stated.  As to Cpl. Csapo and Cpl. Gygrynuk, it is admitted that their Initial Crime Report and "Supplemental Report #1" (respectively) were approved by their supervisor, Sgt. Houdek.  The reports were documented to reflect information as it was provided at the scene from the witnesses.  Denied as to Trooper Argo.  Trooper Argo did not create a report contemporaneously with the October 25-26, 2003 incident.  Trooper Argo later created a supplemental report, but this was not reviewed or "approved" by Sergeant Houdek.


7

**A000156**

20.    Captain Hawkins pled guilty to dereliction of duty for his involvement in the October 25-26, 2003 incident.

**ANSWER:**

Denied.

21.    Major Hughes pled guilty to dereliction of duty for his involvement in the October 25-26, 2003 incident.

**ANSWER:**

Denied.

22.    There was a time lapse of over seven months between the time Plaintiff was supposed to be reinstated per Secretary Mitchell's order and the time Plaintiff met with her superiors to discuss reinstatement to the Delaware Police Department.

**ANSWER:**

Objection.  The wording of this question is vague, ambiguous and not susceptible of an admission or denial.  Notwithstanding said objection, Denied.

23.    Plaintiff's loss of rank date was changed to commence on July 20, 2006 in direct conflict with Secretary Mitchell's order that Plaintiff's penalty of loss of rank for a one year period was to begin on January 31, 2005.

**ANSWER:**

Denied.

8

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

/s/ Stephani J. Ballard
Stephani J. Ballard, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
Attorney for Defendant

Dated: April 9, 2007

9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELIZABETH C. DEMPSEY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.: 06-456 |
| | : | |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| STATE OF DELAWARE, | : | |
| DEPARTMENT OF PUBLIC SAFETY, | : | |
| | : | |
| Defendant. | : | |

### DEFENDANT'S RESPONSES TO PLAINTIFF ELIZABETH C. DEMPSEY'S
### FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to F.R.C.P. 34, State Defendants respond to Plaintiff's First Request for Production of Documents as follows. Documents with Bates numbers D00001 – D001105 are produced as part of these Responses.

### GENERAL OBJECTIONS

The following general objections apply to and are hereby incorporated by reference into each individual response herein, whether or not expressly incorporated by reference in such individual response:

1.      State Defendants object to the Discovery Requests to the extent that they seek to obtain information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable protections or privileges.

2.      State Defendants object to the Discovery Requests to the extent that they seek information not in State Defendants' possession, custody or control on the

ground that any such request exceeds the obligations imposed by the Federal Rules of Civil Procedure.

3.      State Defendants object to the Discovery Requests to the extent that they seek information that is already in the possession, custody or control of Plaintiff or information that is equally available to Plaintiff.

4.      State Defendants object to the Discovery Requests to the extent they purport to require State Defendants to produce documents at the offices of Plaintiff's attorneys.

5.      State Defendants object to the Discovery Requests to the extent that they seek to impose requirements not otherwise required by the Federal Rules of Civil Procedure or the Local Rules for the United States District Court for the District of Delaware.

6.      State Defendants object to the Discovery Requests to the extent that they are vague, ambiguous, or otherwise incomprehensible.

7.      State Defendants object to the Discovery Requests to the extent that they are overly broad, unduly burdensome, or seek information that is neither relevant to the issues raised in the Complaint (the "Complaint"), nor reasonably calculated to lead to the discovery of admissible evidence.

8.      In providing responses to these Discovery Requests, State Defendants do not waive, and expressly reserve, all objections as to competency, relevancy, materiality and admissibility thereof, as well as all objections to any other discovery request.

9.      State Defendants' assertion that they will produce documents in response to a particular request is not to be construed as an admission that any document exists within any requested category or categories, but solely as an assertion that State Defendants will make available for inspection and copying responsive, nonprivileged documents within their possession, custody or control should any such documents be located after a reasonably diligent search.

10.     Pursuant to the applicable provisions of the Federal Rules of Civil Procedure, State Defendants reserve the right to supplement or amend these responses and assert additional objections as they completes their review and analysis in response to the Discovery Requests.

## DOCUMENTS TO BE PRODUCED

1.      Any and all documents referred to or identified in Defendant's Rule 26(a) Initial Disclosures.

**RESPONSE:**

See Bates # D000001 – D001105.   Defendants reserve their right to supplement discovery if additional responsive documents become available.

2.      Any and all documents referred to or identified in your Answers to Interrogatories.

**RESPONSE:**

Objection, this Request is vague, overbroad, unduly burdensome and calls for the production of attorney-client privileged and work product materials.  Notwithstanding

said objection, see documents produced with these responses.  Bates # D00001 –
D001105.

    3.    Any and all correspondence, memoranda and/or notes to or from You
concerning claims in this case.

    **RESPONSE:**

Objection, this Request is vague, overbroad, unduly burdensome and calls for the
production of attorney-client privileged and work product materials.  Notwithstanding
said objection, see documents produced with these responses.  Bates # D000001 –
D001105.  Additionally, responsive documents exchanged between Defendant's and
Plaintiff's counsel are already within the possession of Plaintiff's counsel.

    4.    Any and all documents concerning communication between You and any
current or former employees or agents of Defendants regarding the allegations set forth in
the Complaint.

    **RESPONSE:**

Objection, this Request is vague, overbroad, unduly burdensome and calls for the
production of attorney-client privileged and work product materials.  Notwithstanding
said objection, see Internal Affairs documents, produced with these responses, Bates #
D000533 – D001074.

5.      Copies of any reports or other documents by any person you will identify as an expert. Please include opinions and/or facts upon which these opinions are based concerning any matter at issue in this case.

**RESPONSE:**

To be supplied at a later date. No experts have been retained at this time.

6.      Copies of all written statements, e-mails, audiotapes, tape recordings, notes, diaries, logs, reports of investigation, and other documents taken, made, or prepared by You or on Your behalf concerning any fact at issue in this case including, without limitation, summaries, statements, or recorded interview of any person concerning any matter at issue in the pleadings

**RESPONSE:**

Objection, this Request is vague, overbroad and calls for the production of attorney-client privileged and work product materials. Notwithstanding said objection, Notwithstanding said objection, non-privileged documents which are responsive to discovery requests and/or subject to production under Rule 26(a) have been produced and/or identified and made available for review or copying. As to interviews taken by Internal Affairs, see response to Request for Production #34. Defendants reserve their right to supplement discovery if additional responsive documents become available.

7.      Copies of all e-mails, notes, documents, paper filings, submissions, records, letters concerning Plaintiff and/or Brian Maher and/or the events surrounding the incident that occurred on October 25-26, 2003, involving Plaintiff and Brian Maher.

**RESPONSE:**

Objection, this Request is vague, overbroad, unduly burdensome and calls for the production of attorney-client privileged and work product materials.  Notwithstanding said objection, see Internal Affairs documents, produced with these responses, Bates # D000533 – D001074.


8.    Any and all documents submitted by You, or received by You, from any agency, person or entity concerning complaints about State of Delaware Department of Public Safety's policies or practices, including, but not limited to, any statement by You or other employees or former employees of Delaware State Police contained in those documents.

**RESPONSE:**

Objection, this Request is vague, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.   Notwithstanding said objection, see responses to Requests # 9 and 10, below.


9.    Any and all documents concerning any lawsuit, complaint, charge or other judicial or administrative proceeding that has been brought against You including, but not limited to, employment discrimination, failure to promote or any other adverse treatment in the last ten (10) years.

**RESPONSE:**

Objection, this Request is vague, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding said objection, the only lawsuits against DSP alleging sex discrimination were brought by Cpl. Rebecca McKnatt and Captain Barbara Conley. Plaintiff's counsel in this case represented Cpl. McKnatt in her case and has access to responsive documents pertaining to that case. As to Captain Barbara Conley, her District Court lawsuit is a matter of public record, District of Delaware, C.A. No. 04-1394 GMS. That case was tried to a jury in June 2006, resulting in a verdict in favor of all Delaware State Police defendants, and rejecting Captain Conley's claims of discrimination. The only known EEOC/DDOL charges against DSP alleging sex discrimination were brought by Plaintiff in this case and by Cpl. Rebecca McKnatt. Plaintiff's counsel in this case represented both plaintiff and Cpl. McKnatt in their EEOC/DDOL cases and has access to responsive documents pertaining to those cases. See also response to Request #10, below.

10.     Any and all documents submitted by You, or received by You, from the Equal Employment Opportunity Commission or the Delaware Department of Labor that relate or refer in any way to Plaintiff's charge or complaint of employment discrimination or other adverse treatment filed by Plaintiff or on Plaintiff's behalf against You, including, but not limited to, any statement by You or other employees or former employees of the State of Delaware Department of Public Safety and the Delaware State Police contained in those documents.

**RESPONSE:**

Objection, Plaintiff's counsel in this case represented plaintiff in her EEOC/DDOL case and should be in possession of all responsive documents pertaining to that cases. Plaintiff can also request copies of her own EEOC file, in the same manner as Defendant. Notwithstanding said objection, see attached documents kept by DSP's Human Resources office with regard to Plaintiff's EEOC complaint, Bates # D000399 – D000454.

11.    Any and all documents, including e-mails, pertaining to any complaints or concerns regarding Plaintiff's performance of her job duties while on the Delaware Police Force.

   **RESPONSE:**

Objection, this Request is vague, overbroad, and unduly burdensome. Notwithstanding said objection, see Plaintiff's Personnel and Troop files, produced with these responses.

12.    A copy of Plaintiff's complete employee/personnel file(s), including, but not limited to "language, discriminatory action, promotions, salary increases, and transfers.

   **RESPONSE:**

Objection—this request, specifically the references to "language, discriminatory action" is vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, Plaintiff's personnel file is freely available for her

own review at any time.  Notwithstanding said objection, a copy of Plaintiff's personnel and "troop" file is produced herewith, at Bates # D000099 – D000398.

13.    A copy of the complete employee/personnel file(s) of Master Corporal Brian Maher, including , but not limited to "language, discriminatory action, promotions, salary increases, and transfers.

**RESPONSE:**

Objection.  This request is vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence.  Master Cpl. Brian Maher is not a party to this case, and his personal privacy interests in the confidentiality of the contents of his personnel file substantially outweigh any possible relevance of the requested documents. Notwithstanding said objection, all documents pertaining to internal affairs investigation of and discipline imposed against Brian Maher (issues relevant to the subject of this lawsuit) have been produced as part of these responses.

14.    A copy of the complete employee/personnel file(s) of Trooper Argo including , but not limited to "language, discriminatory action, promotions, salary increases, and transfers.

**RESPONSE:**

Objection.  This request is vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence.  Trooper Argo is not a party to this case, and his personal privacy interests in the confidentiality of the contents of his personnel

file substantially outweigh any possible relevance of the requested documents. Notwithstanding said objection, all documents pertaining to internal affairs investigation of Trooper Argo (issues relevant to the subject of this lawsuit) have been produced as part of these responses.

15.    A copy of the complete employee/personnel file(s) of Corporal Csapo, including , but not limited to "language, discriminatory action, promotions, salary increases, and transfers.

**RESPONSE:**

Objection. This request is vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence. Corporal Csapo is not a party to this case, and his personal privacy interests in the confidentiality of the contents of his personnel file substantially outweigh any possible relevance of the requested documents. Notwithstanding said objection, all documents pertaining to internal affairs investigation of Corporal Csapo (issues relevant to the subject of this lawsuit) have been produced as part of these responses.

16.    A copy of the complete employee/personnel file(s) of Corporal Gygrynuk, including , but not limited to "language, discriminatory action, promotions, salary increases, and transfers.

**RESPONSE:**

Objection. This request is vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence. Corporal Gygrynuk is not a party to this case, and his personal privacy interests in the confidentiality of the contents of his personnel file substantially outweigh any possible relevance of the requested documents. Notwithstanding said objection, all documents pertaining to internal affairs investigation of Corporal Gygrynuk (issues relevant to the subject of this lawsuit) have been produced as part of these responses.

17.     A copy of the complete employee/personnel file(s) of Sergeant Houdek, including , but not limited to "language, discriminatory action, promotions, salary increases, and transfers.

**RESPONSE:**

Objection. This request is vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence. Sergeant Houdek is not a party to this case, and his personal privacy interests in the confidentiality of the contents of his personnel file substantially outweigh any possible relevance of the requested documents. Notwithstanding said objection, all documents pertaining to internal affairs investigation of Sergeant Houdek (issues relevant to the subject of this lawsuit) have been produced as part of these responses.

18.    A copy of the complete employee/personnel file(s) of Major Hughes, including , but not limited to "language, discriminatory action, promotions, salary increases, and transfers.

**RESPONSE:**

Objection. This request is vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence. Major Hughes is not a party to this case, and his personal privacy interests in the confidentiality of the contents of his personnel file substantially outweigh any possible relevance of the requested documents. Notwithstanding said objection, all documents pertaining to internal affairs investigation of Major Hughes (issues relevant to the subject of this lawsuit) have been produced as part of these responses.

19.    A copy of the complete employee/personnel file(s) of Sergeant Mullet, including , but not limited to "language, discriminatory action, promotions, salary increases, and transfers.

**RESPONSE:**

Objection. This request is vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence. Sergeant Mullet is not a party to this case, and his personal privacy interests in the confidentiality of the contents of his personnel file substantially outweigh any possible relevance of the requested documents. Notwithstanding said objection, all documents pertaining to internal affairs investigation

of Sergeant Mullet (issues relevant to the subject of this lawsuit) have been produced as part of these responses.

20.    The original police reports completed by all parties involved in this Complaint.

**RESPONSE:**

Copies of all crime reports and supplemental reports pertaining to the October 25-26, 2003 incident are produced at Bates # D000533 – D000557.

21.    The complete criminal record of Master Corporal Brian Maher.

**RESPONSE:**

Objection. This request is vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence. Moreover, Delaware State Police, as Maher's employer, is not the custodian of his "criminal record." Notwithstanding said objection, documents which are part of the internal affairs investigative file pertaining to Brian Maher's criminal charge and probation before judgment arising out of the October 25-26, 2003 incident have been produced as part of these responses. (See Bates # D000533 – D001074).

22.    The documents involved with Master Corporal Brian Maher's divisional misconduct charge and probationary reduction in rank.

**RESPONSE:**

See Bates # D000533 – D001074.

23.    Any and all e-mails, notes, documents, paper filings, submission, records or letters concerning the decision to charge Plaintiff with violating Rule #15 and failing to report a domestic incident to a superior.

**RESPONSE:**

Objection to the extent this request presumes facts not in evidence in this case. The documents pertaining to the IA investigation and disciplinary charges against Plaintiff are produced at Bates # D000533 – D001074 and speak for themselves.

24.    Any and all e-mails, notes, documents, paper filings, submissions, records or letters concerning the decision to charge Brian Maher with Conduct Unbecoming an Officer and failing to report a domestic incident to a superior.

**RESPONSE:**

Objection to the extent this request presumes facts not in evidence in this case. The documents pertaining to the IA investigation and disciplinary charges against Cpl. Maher are produced at Bates # D000533 – D001074 and speak for themselves.

25.    A complete transcript of the Trial Board Hearing where Plaintiff was dismissed from the Delaware State Police Department.

**RESPONSE:**

A copy of this transcript should already be in the possession of Plaintiff and/or her attorney. A copy will be made available for review and copying at Delaware State Police Headquarters, Dover DE, upon request.

26.    All documents, files, records and memos concerning the Trial Board Hearing involving Plaintiff.

**RESPONSE:**

Objection. This request is vague, overbroad, and unduly burdensome. Notwithstanding said objection, see documents pertaining to Plaintiff's trial board hearing produced as part of this Production of Documents, see Bates # D000533 – 001075 specifically see D000560 – D000561, D000584 – D000594 and D000646 – 000665 decision.

27.    Any and all salary information for all positions held by Plaintiff.

**RESPONSE:**

See documents produced at Bates # D000069 – D000072.

28.    Any and all documents concerning the Internal Affairs investigation surrounding Plaintiff.

**RESPONSE:**

Objection. This request is vague, overbroad, and unduly burdensome. Notwithstanding said objection, see documents pertaining to Plaintiff's internal affairs

investigation and disciplinary hearing produced as part of this Production of Documents, Bates # D000533 – D001074.

29.     Any and all documents, e-mails or records concerning any charges brought against Major Hughes and/or Captain Hawkins for their respective role(s) in the incident and aftermath of October 25-26, 2003 involving Plaintiff and Brian Maher.

**RESPONSE:**

See documents pertaining to internal affairs investigation of Major Hughes and Captain Hawkins, as part of IA Case number 12-04 produced as part of this Production of Documents, see Bates # D000533 – D001074.

30.     All documents, files, records and memos concerning Secretary David Mitchell's decision on Review of Disciplinary Action concerning Plaintiff.

**RESPONSE:**

See documents produced at Bates # D000565 - 000568.

31.     The original letter from Colonel Macleish on August 25, 2005 stating he was exercising his authority to change Plaintiff's loss of rank date, and Plaintiff's transfer to Troop 4.

**RESPONSE:**

Objection to the extent this request presumes facts not in evidence in this case.

Notwithstanding said objection, Colonel MacLeish's August 19, 2005 letter to Plaintiff is

produced at Bates # D000166 – D000169.


32.    Complete copies of Policies and Procedure Handbook for Delaware State

Troopers, including, but not limited to Policeman's Bill of Rights, procedures for Internal

Affairs investigations and procedures for transfer of employees.

**RESPONSE:**

Objection.  This request is vague, overbroad, and unduly burdensome.

Notwithstanding said objection, the Law Enforcement Officers' Bill of Rights is codified

at 11 <u>Del.C.</u> Chapter 92.  There is no DSP "Policies and Procedure Handbook".  DSP

maintains Divisional and Administrative Manuals which cover a wide variety of policies

and procedures.  These manuals are voluminous and complete copies are available for

review at DSP Headquarters in Dover DE.  A copy of the index to these manuals is being

supplied.  (Bates # D000001 – D000012).  If Plaintiff wishes to make a specific request

for particular sections(s) of the Manuals, those sections can be copied and supplied.

Defendant reserves the right to object to or limit disclosure of certain portions of the

manual which may compromise State security interests.  Copies of portions of the

manuals pertaining to Internal Affairs Rules and Procedures (VII-5-1) and "Transfer

Policy" (III-6-76) are being produced with this production (Bates # D000013 – D000015,

D000042 – D000068).

33.    Any and all documents subpoenaed in reference to this case

**RESPONSE:**

Objection. This request is vague, overbroad, and unduly burdensome.

Notwithstanding said objection, no documents have been subpoenaed in this litigation to

date.


34.    Any and all Internal Affairs interviews completed for the Trial Board

hearing concerning Plaintiff.

**RESPONSE:**

Objection. This request is vague, overbroad, and unduly burdensome. Further,

interviews are completed as part of any IA investigation and not "for" a trial board, which

may or may not result. Notwithstanding said objection, see transcriptions of certain

interviews in IA matter #12-04 (a multi person investigation, which included Plaintiff),

produced within Bates # D000773 – D001074. These are the only transcriptions

currently in possession of Defendant.

All interviews taken in internal affairs investigation No. 12-04 were tape

recorded. The following Tape Recordings may be reviewed upon request, by

appointment, at Delaware State Police Internal Affairs office in Dover: (1) Chris

Dempsey—Notification of Charges; (2) Brian Maher—Notification of Charges; (3) 911

calls from October 25-26, 2003; (4) Chris Dempsey—Results of Divisional Hearing

Board; (5) Brian Maher—Superintendent's Hearing; Interviews of: (6) Major Eckrich; (7)

Lt. Col. MacLeish; (8) [former] Col. Chaffinch; (9) Julie Brooks; (10) Richard W. Jester;

(11) Kevin Keller; (12) Crystal Anderson; (13) Major Hughes; (14) Major Papili; (15)

Sgt. Mullett; (16) Capt. Hawkins; (17) Lt. Donaway; (18) Major Seifert; (19) Major

Baylor; (20) Sgt. Houdek; (21) Capt. Dixon; (22) Christine Dempsey; (23) Cpl.

Grygrynuk; (24) Cpl. Csapo; (25) Trooper Argo; (26) Brian Maher.

In addition defendant is in possession of audiotape of Plaintiff's appeal hearing

before Secretary Mitchell.

Defendant hereby supplements its Initial Disclosures, §B, to include all tape

recordings identified above, as well as verbatim transcripts of these tape recordings

which may exist now or be created in the future.


35.    A copy of the original investigative report and later versions of all officers

involved in reporting incident of October 25-26, 2003.

**RESPONSE:**

Objection. This request is vague, overbroad, and unclear as to what is being

requested.  To the extent Plaintiff is requesting copies of initial and supplemental

criminal reports pertaining to the investigation of the incident at Plaintiff's home on

October 25-26, 2003, those documents are produced at Bates # D000533 - 000557.


36.    Any and all tapes, transcripts, recording or documents of Plaintiff's

contact with the non-emergency line to Kent County Dispatch Center.

**RESPONSE:**

Objection to the extent this request presumes facts not in evidence in this case.

Upon information and belief, Plaintiff did not make calls to a "non-emergency line" but

to a "911" line.  Copies of transcripts of Plaintiff's "911" calls on October 25-26, 2003

are supplied at Bates # D000773 – D000776.  Tapes of the actual 911 phone calls are

made available for review at DSP Internal Affairs office upon request; See also response

to Request # 34.

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

 /s/ Stephani J. Ballard
Stephani J. Ballard, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
Attorney for Defendant

Dated: April 9, 2007

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,   )
         )
  Plaintiff,     )
         )
  v.       )  C.A. No. 06-456 SLR
         )
STATE OF DELAWARE,   )
DEPARTMENT OF PUBLIC SAFETY, )
         )
  Defendant.    )

### PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSIONS

   Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Defendant hereby requests that the Plaintiff(s) admit the following. If your response is anything other than an unqualified admission, please state, with specificity, the part(s) of the Request you are denying and all factual bases for your denial.

   Pursuant to Rule 36, if objection is made to any request or part of any request, the reasons therefore shall be stated. An answer other than an unqualified admission shall specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder.

   An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless the party states that the party has made reasonable inquiry and that the information known or readily obtainable by the party is insufficient to

enable the party to admit or deny. A party who considers that a matter of which an admission has been requested presents a genuine issue for trial may not, on that ground alone, object to the request; the party may, subject to the provisions of Rule 37(c), deny the matter or set forth reasons why the party cannot admit or deny it.

### REQUESTS FOR ADMISSION

1.    On or about October 26, 2003[1], Plaintiff called "911" to report that someone had broken into her home.

**ANSWER:    Denied.**

2.    During the call, Plaintiff advised the 911 operator that she did not know the identity of the person who had broken into her home.

**ANSWER:    Denied.**

3.    At the time Plaintiff made the representation referenced in Request for Admission number 2, to the 911 operator, Plaintiff was actually aware that Cpl. Brian Maher was the person who had broken into her home.

**ANSWER:    Denied as stated. By way of further answer, Plaintiff admits that she was aware only through listening that Cpl. Brian Maher was the person who had broken into her house.**

4.    When Troopers Csapo, Gygrynuk and Argo responded to her residence on October 26, 2003, in response to the Emergency dispatch, Plaintiff at no time informed any of them that she knew that Brian Maher was the person who had broken into her home.

**ANSWER:    Admitted.**

---

[1] The events in question occurred beginning in the late night of October 25, 2003 extending into the early morning hours of October 26, 2003. For ease of reference the date "October 26, 2003" will refer to the date and all events of the entire "incident", unless otherwise indicated.

5.    Plaintiff initially advised responding Trooper Cpl. Csapo, who was investigating the break-in, that she was home alone at the time of the incident.

**ANSWER:    Denied.**

6.    Plaintiff later advised Cpl. Csapo that Kevin Keller had come to her home at her request after the break-in.

**ANSWER:    Denied.**

7.    Kevin Keller was with Plaintiff in her home while the break-in was in progress on October 26, 2003.

**ANSWER:    Admitted.**

8.    When Troopers Csapo, Gygrynuk and Argo responded to her home, Plaintiff told Kevin Keller to stay in the bedroom with the door closed.

**ANSWER:    Denied.**

9.    When Troopers Csapo, Gygrynuk and Argo responded to her home, Plaintiff told Kevin Keller that she did not want him to speak to the responding officers.

**ANSWER:    Denied.**

10.    Plaintiff advised responding Trooper Gygrynuk that she did not know who had broken her window.

**ANSWER:    Denied.**

11.    On October 26, 2003, shortly after the break-in, Cpl. Brian Maher reported to Captain Robert Hawkins, a superior officer, that he had been involved in an incident at Plaintiff's home.

**ANSWER:    Admitted only on information and belief.**

12.    Captain Hawkins spoke to Plaintiff by phone shortly after the incident (the same day or next day) and asked her how she wanted the situation handled.

**ANSWER:    Admitted.**

13.    During that conversation, Captain Hawkins advised Plaintiff that if she wanted Maher to be arrested for the break-in, he would be.

**ANSWER:    Denied.**

14.    During that conversation, Plaintiff advised Captain Hawkins that she did not want any further action taken by Delaware State Police with regard to the October 26, 2003 incident.

**ANSWER:    Admitted.**

15.    Plaintiff allowed Brian Maher to return to her home later on October 26, 2003 and repair the broken window.

**ANSWER:    Admitted.**

16.    Plaintiff and Brian Maher continued to date each other following the October 26, 2003 incident.

**ANSWER:    Denied.**

17.    In December of 2003, at the wedding of a fellow trooper, Plaintiff approached Captain Hawkins and thanked him for how he handled the October 23, 2003 incident.

**ANSWER:    Denied.**

18.    Plaintiff maintained, in 2003, a personal diary, datebook, notebook and/or journal (whether in hard copy or electronic form) in which she recorded thoughts, incidents and events.

**ANSWER:    Denied.**

19.    Plaintiff's personal diary, datebook, notebook and/or journal contains material pertaining to the October 26, 2003 incident and the allegations in this lawsuit.

**ANSWER:    Denied.**

20.    When Plaintiff reported to Troop 7 in May 2004, she had never previously been assigned to that Troop (disregarding Field Training experience) as a DSP Trooper.

**ANSWER:    Admitted.**

21.    DSP troopers are not guaranteed to be assigned to a specifically requested Troop or a specifically requested rotation/shift.

**ANSWER:    Admitted upon information and belief.**

22.    When Plaintiff was given her notice of Internal Affairs charges, containing the list of potential trial board members, Plaintiff (and/or her attorney) struck a female DSP Captain, Elizabeth Shamany, from the list of potential trial board members.

**ANSWER:    Admitted.**

23.    Neither Plaintiff nor her then-attorney requested that Major Hughes be subpoenaed to testify at her trial board hearing.

**ANSWER:    Admitted.**

24.    Neither Plaintiff nor her then-attorney requested that Sgt. Houdek be subpoenaed to testify at her trial board hearing.

**ANSWER:    Admitted.**

25.    Neither Plaintiff nor her then-attorney requested that Capt. Hawkins be subpoenaed to testify at her trial board hearing.

**ANSWER:    Admitted.**

26.     Neither Plaintiff nor her then-attorney requested that Sgt. Mullett be subpoenaed to testify at her trial board hearing.

**ANSWER:     Admitted.**

27.     The punishment/discipline which was ordered imposed by Secretary Mitchell, following Plaintiff's appeal hearing before him, was fair and appropriate for Plaintiff's substantiated violations of DSP Rules and Regulations.

**ANSWER:     Denied.**

**MARTIN & WILSON, P.A.**

JEFFREY K. MARTIN, ESQUIRE
DE Bar I.D. No.  2407
1508 Pennsylvania Avenue
Wilmington, DE  19806
(302)  777-4681
E-Mail – jmartin@martinandwilson.com

DATED:  August 13, 2007

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,              )
                                   )
          Plaintiff,               )
                                   )
     v.                            )          C. A. No. 06-456 SLR
                                   )
STATE OF DELAWARE,                 )
DEPARTMENT OF PUBLIC SAFETY,       )
                                   )
          Defendant.               )

## PLAINTIFF'S RESPONSES TO DEFENDANT'S 1ˢᵗ SET OF INTERROGATORIES DIRECTED TO PLAINTIFF

Defendant hereby requests that plaintiff fully answer, in writing and under oath, each of the following interrogatories within 30 days of receipt, pursuant to Fed.R.Civ.P. 33. These interrogatories are continuing and the information requested must be kept current by supplementation.

## GENERAL DEFINITIONS

A.     The term "document[s]" or any similar term shall be construed in its broadest possible terms and shall include, but not limited to: any written, recorded, filmed, or graphic matter, whether produced, reproduced, or on paper, cards, tapes, film, electronic facsimile, computer storage devices or any other media, including, but not limited to, memoranda, notes, minutes, records, employment files, job assignments, job postings, applications or requests for promotions or job assignments, case files, pleadings, photographs, films, videotapes, reels, slides, correspondence, telegrams, diaries, bookkeeping entries, financial statements, tax returns, checks, check stubs, reports, studies, charts, graphs, statements, notebooks, handwritten notes, applications,

1

agreements, books, pamphlets, periodicals, E-mails, appointment calendars, notes, records and recordings of oral conversations, work papers, and also including, but not limited to, originals, drafts, and all copies which are different in any way from the original whether by interlineation, receipt stamp, notation, indication of copies sent or received, or otherwise.

B.     The term "communication" or "communicate" shall be construed in their broadest possible terms and shall include any oral, written expressions without regard to the means of this communication, including, but not limited to email, telephone, facsimile, interoffice or other forms of memoranda, or mail.

C.     The terms "describe" or "explain" or any similar term shall be construed in their broadest possible terms and shall mean to describe fully by reference to underlying facts rather than by ultimate facts or conclusions of facts or law, and to particularize as to time, place and manner.

D.     The term "identify" or any similar term shall be construed in its broadest possible terms.

(1)     When used with reference to an individual person "identify" shall mean to state his or her full name (or if not known, provide sufficient description so that he or she will be identifiable to the recipients of your answer), job title, employer or business affiliation, and last known business or home address.

(2)     When used in reference to a document or written communication "identify" shall mean to state the type of document or communication (e.g., memorandum, employment application, letter, handwritten notes, etc.), to state its date, to briefly describe its contents, to identify the author (and if different, the originator and

2

signer), and to identify the person (or, if widely distributed, the organization or classes of persons) to whom the document or communication was sent. You may produce the document or written communication in lieu of identifying it.

(3)    When used with reference to an oral communication, discussion, conversation, meeting, conference, or any other oral statements, "identify" shall mean to describe in detail the substance of, to state the date and location of, and to identify the participants in each such communication, discussion, conversation, meeting, conference or statement.

E.    The terms "You," "Your," and "Yourself" and "Plaintiff" refer to Plaintiff and any agent(s) or representative(s) acting on Plaintiff's behalf.

F.    The term "Defendant" refers to the State Defendant, Department of Public Safety[1], and the Delaware State Police, a Division within DSHS, unless otherwise specified.

G.    The term "substance" shall be construed in its broadest possible terms and refers to the content of subject matter contained in the communication.

H.    The term "date" shall include the month, day and year if available, and if not available, the best possible approximation thereto.

I.    The term "relevant" shall be construed in its broadest possible terms and refers to all information within the scope of discovery under the Federal Rules of Evidence.

J.    The term "relate" or any similar term shall be construed in its broadest possible terms and shall mean anything having any connection to the Interrogatory in

---

[1] The Defendant Agency's correct legal name is Department of Safety and Homeland Security (DSHS).

3

**A000187**

question including referencing, concerning, pertaining to, explaining, summarizing, digesting or describing.

## INSTRUCTIONS

A.    In answering these Interrogatories, furnish all information that is available to you, including information in the possession of your attorneys or investigators, and not merely such information known of your own personal knowledge. If you cannot answer these Interrogatories in full after exercising due diligence to secure the information to do so, so state and answer to the extent possible.

B.    If any information requested in these Interrogatories is withheld pursuant to a claim of any privilege or that the information constitutes attorney work product or trial preparation material, state the privilege or protection claimed for each item of information expressly, and describe the nature of such information withheld in a manner that, without revealing the privileged or protected information, will enable other parties to assess the applicability of the privilege or protection.

C.    Any and all objections to any Interrogatory shall be articulated fully and supported with legal citation for the basis of the objection. If an objection is proffered for only a portion of any Interrogatory, the portion of the Interrogatory not objected to shall be answered in full.

D.    Any term stated in the singular shall also be construed in the plural and vice versa.

E.    Any sentence stated in the disjunctive shall also be construed in the conjunctive and vice versa.

4

F.    Any verb stated in the present shall also be construed in the past, future or other tense and vice versa.

G.    Any pronoun in the masculine shall also be construed in the feminine and vice versa.

H.    Your answers must be made in writing and under oath pursuant to Rule 33(b)(1).

I.    These Interrogatories are continuing in nature and require prompt supplemental answers should you obtain supplemental information that is responsive to the Interrogatory.    Such supplemental information shall be produced as soon as reasonably practicable and in any event within a reasonable time prior to trial.

## INTERROGATORIES

1.    Identify by name, address, phone number, location, date and persons present, all individuals who have been interviewed by you in connection with this matter and whether any documents or memoranda were prepared relating to that interview.

**Answer:**    **Plaintiff or her counsel has interviewed no one.**

2.    Identify each and every document, photographs, videotapes, audio tapes or any other form of recording media, or other item of evidence that you intend to use in this lawsuit, for any purpose, including, but not limited to, cross-examination, during any pretrial or trial proceedings, either as exhibits, for purposes of impeachment, or as demonstrative evidence.

**Answer:**    **All crime reports – Csapo, Gygrunyk, Argo and Mullet, Internal Affairs transcripts of interviews of all parties, Trial Board transcripts, Transcript of R.L. Hughes' deposition taken for <u>Conley v. Chaffinch, et al.</u>, C.A. No.: 04-1394 GMS.**

5

3.    Please identify all DSP troopers whom you consider "similarly situated" male comparators" for purposes of your allegations of disparate discipline. (*See* Compl. ¶41). As to each named trooper, please explain the entire factual basis for your contention that these troopers are "similarly situated" to Plaintiff.

<u>Answer</u>:
- <b>Similarly situated Males:</b>
  - <b>Kevin Szymanski (1991-1993): falsified speedometer log and was caught in lie while on the stand in Federal Court, the incident brought about letter from Attorney General's Office.</b>
  - <b>Aaron Chaffinch (2003-2004): Colonel testified during Chris Foraker civil suit and found to have lied; unknown punishment, but not fired.</b>
  - <b>Greg Walsh (? Dates): lied during an Internal Affairs interview, which was discovered during a polygraph; unknown punishment, but not fired.</b>
  - <b>Ray Simpson (February 2006): falsified time sheets; received no loss of rank and not fired.</b>
  - <b>Tom Carver (May 2006 ?): falsified an accident report when Trooper Kresge (off-duty) struck a pedestrian. Unknown punishment, but not fired.</b>
  - <b>Jon Forester (after 2000 ?): used his own prints on an arrest report or criminal summons. Unknown punishment, but not fired.</b>
  - <b>Jon Forester: didn't get out and actually check on an alarm, was witnessed by civilian. Unknown punishment, but was not fired.</b>
- <b>Others:</b>
  - <b>Sharon Dunn (2005-2007): had not maintained her weight and was in the "weight program" in which she had to send monthly reports to Headquarters. She would fill out paperwork/report with false weight and sign Lt. Warrington's name to it. Severe loss of work (Col/3 to TFC), but not fired.</b>
  - <b>Mary Maguire (2004-2005 ?): Domestic w/ girlfriend, 10-10 w/ electric box, but lied. Unknown punishment, but not fired.</b>
  - <b>Jim Morton (2000-2003): DE River & Bay Police Department; pursued a vehicle that crashed but said he came upon the accident. Not fired (?), no Attorney General Letter.</b>

4.    State and describe all administrative and/or legal steps Plaintiff took to address the claims and concerns set forth in her Complaint prior to filing suit, including but not limited to, internal DSP remedies, union grievance procedures, mediation, arbitration, and/or reference to State or Federal agencies. Please include the specific time

6

and date of the steps taken, and identify any persons contacted, and identify any documents filed in connection therewith.

**Answer:**    Plaintiff filed a Charge of Discrimination with the Delaware Department of Labor on April 6, 2005, Case No. 05040142M; EEOC Case No.: 17CA500303 – Defendant is in receipt of same.

5.    State and identify by names of parties, court or administrative body and case number all civil lawsuits, administrative proceedings, and/or other civil or criminal legal proceedings, at law or equity, of any nature in which Plaintiff, Elizabeth C. Dempsey, is or was a party, and the current status or disposition of each such matter.

**Answer:**    AAA Storage v. Elizabeth Dempsey, C.A. NO.: J0507014217, on November 2, 2005 the Court found in favor of the defendant and the case was dismissed. In favor of Ms. Dempsey.

6.    Did Plaintiff at any time, between October 26, 2003 and March 28, 2004 lodge a complaint with DSP Internal Affairs (IA) as to Brian Maher's conduct in connection with the October 26, 2003 incident, or make a request to anyone that Brian Maher be investigated by IA for his conduct on October 26, 2003 or thereafter? If your answer is in the affirmative, please identify the specific nature of the request, the person(s) to whom the request was made, and identify any supporting documentation.

**Answer:**    No.

7.    Did Plaintiff at any time, between October 26, 2003 and March 28, 2004 lodge a complaint with DSP Internal Affairs (IA) as to the conduct of Troopers Argo, Csapo and Grygrynuk (any or all of them), in connection with the October 26, 2003 incident, or make a request to anyone that Troopers Argo, Csapo and Grygrynuk (or any or all of them) be investigated by IA in connection with the October 26, 2003 incident?

7

If your answer is in the affirmative, please identify the specific nature of the request, the person(s) to whom the request was made, and identify any supporting documentation.

    <u>Answer:</u>    **No.**

    8.    Did Plaintiff at any time, between October 26, 2003 and March 28, 2004 lodge a complaint with DSP Internal Affairs (IA) as to the conduct of Troopers Houdek, Mullett, Hawkins and Hughes (or any or all of them), in connection with the October 26, 2003 incident, or make a request to anyone that Troopers Houdek, Mullett, Hawkins and Hughes (or any or all of them) be investigated by IA for their conduct in connection with the October 26, 2003 incident? If your answer is in the affirmative, please identify the specific nature of the request, the person(s) to whom the request was made, and identify any supporting documentation.

    <u>Answer:</u>    **No.**

    9.    Please state the entire factual basis for your claim in ¶23 of your Complaint, that Sgt. Houdek "instructed Cpl. Gygrynuk, Cpl. Csapo and Tpr. Argo to write the incident report as having an 'unknown' suspect."

    <u>Answer:</u>    **Brian Maher's name is not listed in the reports filed by these officers; this is consistent with the testimony of Cpl. Gygrynuk during Plaintiff's trial board as well as his statement to Internal Affairs.**

    10.    Please state the entire factual basis for your allegation that Troopers Gygrynuk, Csapo and Argo (or any or all of them) knowingly falsified their reports concerning the 10/26/03 incident at Plaintiff's home, as alleged in your Complaint at ¶24.

    <u>Answer:</u>    **See answer to No. 9 above.**

    11.    Please state the entire factual basis for your allegation that Captain Hawkins "advised the responding troopers through the 'chain of command' not to

8

**A000192**

identify Cpl. Maher on any of the reporting documentation," as alleged in your Complaint at ¶29.

**Answer:**    **This is consistent with Cpl. Gygryunuk's testimony.    In addition, Plaintiff believes that these allegations will be bourn out in the Internal Affairs interviews for Officers Houdek, Hughes, and Hawkins.    Plaintiff will make a request for same under separate cover.**

12.    Please state the entire factual basis for your allegation that Major Hughes "advised the responding troopers through the 'chain of command' not to identify Cpl. Maher on any of the reporting documentation," as alleged in your Complaint at ¶29.

**Answer:**

13.    Please state the basis for inclusion of the following individuals in your Initial Disclosures, Q. I (D.I. 10), including disclosure of their specific factual knowledge which you contend is pertinent to any or all of your claims and/or damages.

    a) Captain Merganthaler

    b) Sgt. Robert Hudson

    c) Sgt. Joe Myers

    d) Sgt. Bernard Miller

    e) Cpl. Troy Pezzutto

    f) Su Lee Chafin, LPCMH – as to this person, please also provide current contact information (address and phone number).

**Answer:**    **Captain Merganthaler, Sgt. Robert Hudson, Sgt. Joe Myers, and Cpl. Troy Pezzutto will testify with regard to the continuing discrimination against Plaintiff as a result of the November 13, 2004 incident with Maher.  Su Lee**

9

Chafin will testify in her role as Plaintiff's counselor when Ms. Chafin worked at Phoenix Mental Health. At this point, it is not believed that testimony will be elicited from Sgt. Bernard Miller.

14.    In your Initial Disclosures, Q. II (D.I. 10), which refers to copies of relevant documents in your possession, your response is that responsive documents "Include[e] but are not limited to" the enumerated items. Please disclose any and all other documents in your possession which are or may be relevant to your claims, in addition to the enumerated items in D.I. 10.

**Answer:**    **Plaintiff believes that all items have been produced.** **If, however, further documents are found, they will be disclosed to Defendant immediately.**

15.    In your Initial Disclosures, Q. II (D.I. 10), you refer to an "Unemployment Hearing of 4/6/05." Please describe, in detail, the nature of this hearing, including the docket number, parties, claims, defenses and outcome.

**Answer:**    **At issue at the unemployment hearing held on April 6, 2005 was whether Plaintiff had missed the deadline to appeal my denial of benefits. Plaintiff's appeal was granted and a subsequent hearing was held on April 25, 2005 regarding the denial of Plaintiff's unemployment compensation benefits. Plaintiff won that hearing and was granted unemployment compensation benefits on April 27, 2005. The unemployment case no. was 731867**

16.    State and identify all injuries and compensatory and punitive damages, including both general and special damages, that Plaintiff claims to have suffered as a result of the Defendant's alleged conduct and include the basis for your calculations of those amounts, if any.

10

<u>Answer:</u>    Plaintiff suffered various damages including, but not limited to, pain and suffering as a result of her discriminatory treatment by defendant resulting in her loss of rank and suspension from her employment.

17.    State and itemize by date, task, and hours all attorney fees and other costs that have accrued by plaintiff in this matter up to and including the date on which these Interrogatories are answered.

<u>Answer:</u>    As of August 24, 2007, Plaintiff's attorneys and staff have spent the following of number of hours on this matter: Jeffrey K. Martin, _____ hours at $ 300.00 per hour, Lori Brewington, _____ hours at $ 200.00 per hour, Carrie Morris, _____ hours at $ 200.00.  Plaintiff will not provide any further breakdown or nature of tasks completed until this litigation has been resolved.  Such disclosure would be direct violation of attorney client privilege.  In addition to the hours spent by Plaintiff's counsel the following costs have been paid by Plaintiff or her counsel:

18.    Describe in detail the "mental anguish" that Plaintiff contends she has suffered as a result of Defendant's alleged conduct, and identify any and all documents that support your allegation that Plaintiff has suffered mental anguish.

<u>Answer:</u>    In response to this inquiry cannot be properly stated in this pleading.  Defense counsel will have an opportunity to depose Plaintiff and will be able to question her extensively with regard to her claim for mental anguish.

A000195

MARTIN & WILSON, P.A.

JEFFREY K. MARTIN, ESQUIRE
DE State Bar I.D. No.: 2407
1508 Pennsylvania Avenue
Wilmington, DE 19806
(302) 777-4681
E-Mail – jmartin@martinandwilson.com
Attorney for Plaintiff

DATED: September 24, 2007

12

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY, )
)
    Plaintiff, )
)
v. )    C. A. No. 06-456 SLR
)
STATE OF DELAWARE, )
DEPARTMENT OF PUBLIC SAFETY, )
)
    Defendant. )

## PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST REQUEST FOR PRODUCTION DIRECTED TO PLAINTIFF

Defendant, State of Delaware Department of Public Safety, hereby requests that Plaintiff produce at Defendant's attorney's office for the purpose of inspection and copying, all of the following documents or evidence within 30 days pursuant to Fed.R.Civ.P. 34.

## GENERAL DEFINITIONS

A.    The term "document[s]" or any similar term shall be construed in its broadest possible terms and shall include, but not limited to: any written, recorded, filmed, or graphic matter, whether produced, reproduced, or on paper, cards, tapes, film, electronic facsimile, computer storage devices or any other media, including, but not limited to, memoranda, notes, minutes, records, employment files, job assignments, job postings, applications or requests for promotions or job assignments, case files, pleadings, photographs, films, videotapes, reels, slides, correspondence, telegrams, diaries, bookkeeping entries, financial statements, tax returns, checks, check stubs, reports, studies, charts, graphs, statements, notebooks, handwritten notes, applications, agreements, books, pamphlets, periodicals, E-mails, appointment calendars, notes, records and recordings of oral conversations,

work papers, and also including, but not limited to, originals, drafts, and all copies which are different in any way from the original whether by interlineation, receipt stamp, notation, indication of copies sent or received, or otherwise.

B.     The term "communication" or "communicate" shall be construed in their broadest possible terms and shall include any oral, written expressions without regard to the means of this communication, including, but not limited to email, telephone, facsimile, interoffice or other forms of memoranda, or mail.

C.     The terms "describe" or "explain" or any similar term shall be construed in their broadest possible terms and shall mean to describe fully by reference to underlying facts rather than by ultimate facts or conclusions of facts or law, and to particularize as to time, place and manner.

D.     The term "identify" or any similar term shall be construed in its broadest possible terms.

(1)     When used with reference to an individual person "identify" shall mean to state his or her full name (or if not known, provide sufficient description so that he or she will be identifiable to the recipients of your answer), job title, employer or business affiliation, and last known business or home address.

(2)     When used in reference to a document or written communication "identify" shall mean to state the type of document or communication (e.g., memorandum, employment application, letter, handwritten notes, etc.), to state its date, to briefly describe its contents, to identify the author (and if different, the originator and signer), and to identify the person (or, if widely distributed, the organization or classes of persons) to whom the document or communication was sent. You may produce the document or written communication in lieu

of identifying it.

(3)    When used with reference to an oral communication, discussion, conversation, meeting, conference, or any other oral statements, "identify" shall mean to describe in detail the substance of, to state the date and location of, and to identify the participants in each such communication, discussion, conversation, meeting, conference or statement.

E.    The terms "You," "Your," and "Yourself" and "Plaintiff" refer to Plaintiff and any agent(s) or representative(s) acting on Plaintiff's behalf.

F.    The term "Defendant" refers to the State Defendant, Department of Public Safety[1], and the Delaware State Police, a Division within DSHS, unless otherwise specified.

G.    The term "substance" shall be construed in its broadest possible terms and refers to the content of subject matter contained in the communication.

H.    The term "date" shall include the month, day and year if available, and if not available, the best possible approximation thereto.

I.    The term "relevant" shall be construed in its broadest possible terms and refers to all information within the scope of discovery under the Federal Rules of Evidence.

J.    The term "relate" or any similar term shall be construed in its broadest possible terms and shall mean anything having any connection to the Interrogatory in question including referencing, concerning, pertaining to, explaining, summarizing, digesting or describing.

---

1 The Defendant Agency's correct legal name is Department of Safety and Homeland Security (DSHS).

## DOCUMENTS TO BE PRODUCED

1. Copies of any and all notes, diaries, journals, datebooks, cards, emails in electronic or print format, teletypes, maintained in paper form and/or electronically, recordings, photographs or other video media, which pertain to this litigation or Plaintiff's claims in any way.

**RESPONSE: See attached.**

2. All records and documents, whether maintained as originals or copies, pertaining to Delaware State Police issues and/or personnel (including Plaintiff herself), including but not limited to copies of e-mails, personnel records, disciplinary or counseling records, reprimands, teletypes, "speed letters", notes, correspondence and/or video and audio recordings, maintained, or previously maintained by Plaintiff at her residence, on her personal or laptop computer(s) or otherwise in her personal possession outside of her workplace, in paper or electronic form. This request specifically includes, but is not limited to, all documentation pertaining to the events of October 26, 2003, and its subsequent investigation(s), and documents to or from the Plaintiff, Elizabeth Dempsey, and the following individuals or referencing the following individuals:

   a) Brian Maher;

   b) Trooper Alex Argo;

   c) Cpl. Walter Gygrynuk;

   d) Cpl. Mark Csapo;

   e) Major Randall L. Hughes, II;

   f) Captain Robert Hawkins;

   g) Sgt. Michael Houdek;

   h) Captain Glenn Dixon;

i)  Captain Gregory Nolt;

j)  Sgt. Charles Mullett;

k)  Greg Donaway;

l)  Colonel Thomas MacLeish;

m)  DSHS Secretary David Mitchell;

n)  Captain Merganthaler

o)  Sgt. Robert Hudson

p)  Sgt. Joe Myers

q)  Sgt. Bernard Miller

r)  Cpl. Troy Pezzutto.

**RESPONSE: 2a) See Response to Request for Production No. 3 below.**

**2b-r)  No documents.**

3.  Copies of any and all letters, emails, notes, answering machine or voicemail recordings, and/or any other recorded communications between Plaintiff and Brian Maher from October 26, 2003 to the present.

**RESPONSE:  No documents.**

4.  Copies of any and all letters, emails, notes, answering machine or voicemail recordings, and/or any other recorded communications between Plaintiff and Kevin Keller from October 26, 2003 to the present.

**RESPONSE:  No documents.**

5.  Copy of the "Agreement between State of Delaware Department of Public Safety and Delaware State Trooper's Association July 1, 2001 to June 30, 2003" referenced in your Initial

Disclosures, Q. II, (D.I. 10).

**RESPONSE: Plaintiff is not currently in possession of same.**

     6. Copy of all documents pertaining to "Unemployment Hearing of 4/6/05" referenced in

your Initial Disclosures, Q. II, (D.I. 10).

**RESPONSE: Plaintiff is not currently in possession of same.**

 

                     **MARTIN & WILSON, P.A.**

 

                     **JEFFREY K. MARTIN, ESQUIRE**
                     DE State Bar I.D. No.: 2407
                     1508 Pennsylvania Avenue
                     Wilmington, DE 19806
                     (302) 777-4681
                     E-Mail – jmartin@martinandwilson.com
                     Attorney for Plaintiff

DATED: September 24, 2007

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ELIZABETH C. DEMPSEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 06-456-SLR |
| | ) |
| STATE OF DELAWARE, | ) |
| DEPARTMENT OF PUBLIC SAFETY, | ) |
| | ) |
| Defendant. | ) |

**O R D E R**

At Wilmington this 9th day of November, 2007, having reviewed the

parties' stipulation to extend the briefing schedule for their summary judgment motions

and having informed the parties that such an extension will cause the current trial date

in this action to be removed from the court's calendar[1];

IT IS ORDERED that said stipulation (D.I. 33) is granted as follows:

1.  Summary judgment motions and accompanying opening briefs shall be

filed on or before **January 29, 2008.**

2.  Answering briefs shall be filed on or before **February 15, 2008.**

3.  Reply briefs shall be filed on or before **February 28, 2008.**

_____
United States District Judge

_____

[1]The trial date will not be rescheduled until the pending dispositive motions are
resolved by the court.

**A000203**

**Mitchell Jennifer (DOJ)**

| | |
|---|---|
| **From:** | ded_nefreply@ded.uscourts.gov |
| **Sent:** | Friday, November 09, 2007 5:07 PM |
| **To:** | ded_ecf@ded.uscourts.gov |
| **Subject:** | Activity in Case 1:06-cv-00456-SLR Dempsey v. State of Delaware Department of Public Safety Order Setting Briefing Schedule |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

**U.S. District Court**

**District of Delaware**

**Notice of Electronic Filing**

The following transaction was entered on 11/9/2007 at 5:07 PM EST and filed on 11/9/2007
**Case Name:**       Dempsey v. State of Delaware Department of Public Safety
**Case Number:**     1:06-cv-456
**Filer:**
**Document Number:** 34

**Docket Text:**
ORDER resetting briefing schedule, Motions terminated: D.I. 33 is granted andthe current trial date is removed from the court's calendar at this time; no new trial date will be scheduled until dispositive motion(s) is/are decided: Summary Judgment Motion and Opening Brief due 1/29/2008.,Answering Brief due 2/15/2008.,Reply Brief due 2/28/2008. Signed by Judge Sue L. Robinson on 11/9/07. (rlp)


**:06-cv-456 Notice has been electronically mailed to:**
Jeffrey K. Martin jmartin@martinandwilson.com, bdolphin@martinandwilson.com,
njoyce@martinandwilson.com
Stephani J. Ballard stephani.ballard@state.de.us, Jennifer.Mitchell@state.de.us

**1:06-cv-456 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=11/9/2007] [FileNumber=473866-0]
[15492cd9e459e8b2e05c2b3bcdfccfdc0fb19eaeea36fae44f6b15ecdd6f83e637c3
a3c6ab605efc66ed7c619b596b7e3a1e701de49e478d13ffd0fff4d07e3b]]

11/13/2007

## RULES & REGULATIONS INTRODUCTION

By virtue of the authority vested in the Secretary of the Department of Public Safety, pursuant to 29 Del. C. s. 8203, and the authority vested in the Superintendent of the Division of State Police, the following Code of Ethics and Rules and Regulations are hereby enacted and shall govern the administration of the Division and the conduct of employees.   (1.1.2)

These Rules and Regulations are intended for the guidance of members of the Division so they may be informed on the operations of their Division, their responsibilities, and Code of Ethics they are expected to observe.  No member of the Division shall be disciplined except for just cause, and all discipline shall be uniformly applied.

In establishing such Rules and Regulations, it must be recognized that it is not possible to anticipate every potential situation that may arise.  However, the lack of a rule or regulation covering a specific situation should not be interpreted as lessening the requirement that personal conduct must at all times be well within the bounds of propriety and that discretion and good judgment must be exercised in the performance of duty.

Under our form of government, where public confidence in the institutions of government is essential, it is vital that the system upon which public safety depends is maintained at a high level of efficiency and that the system is administered in a manner to assure the continued approval and respect of the public.

A member must be aware at all times of the authority and discretion that has been given him by virtue of his role as a State Police officer.  Because the community grants him far more discretion and authority than the ordinary citizen does, he is expected to conform to a higher standard of conduct than the ordinary citizen does.  The price of the authority granted a State Police officer is not only the expectation that he will discharge

**OPR: Superintendents Office**

VII-1-1

D000016

**A000205**

his legal duties but that he will attempt to avoid even the appearance of impropriety. Accordingly, a member must strive at all times to fulfill the trust and responsibility that has been placed in him to serve the people well and faithfully. It is both a privilege and an obligation to carry on the fine traditions that have won esteem and prestige for the Delaware State Police and have made the Division a symbol of dedication and service.

Promulgated and signed this 25th day of April 2002

_____

Colonel L. Aaron Chaffinch
Superintendent, Division of State Police

## GENDER STATEMENT

As used herein, words denoting the masculine gender may and, where necessary, shall be construed as denoting the feminine gender unless the context requires otherwise.

VII-1-2

D000017

### DELAWARE STATE POLICE RULES AND REGULATIONS (26.1.1)

1. Members shall observe and obey State and Federal Laws, municipal ordinances, Rules, Regulations, Job Performance Standards, Orders, the requirements of the Complaint and Disciplinary Procedures of the Division, rules of the Training Academy while in attendance there, and the Standard Operating Procedures of the Division.

2. All members shall maintain a loyalty to the Division of State Police and its associates as is consistent with State and Federal Law, Rules, Regulations, and Orders of the Division.

3. A Member of the Division having knowledge of a fellow police officer violating State or Federal Laws, municipal ordinances or Rules, Regulations, or Orders of the Division, or disobeying orders, Job Performance Standards, the Complaint and Disciplinary Procedures of the Division, rules of the Training Academy while in attendance there, and the Standard Operating procedures of the Division, shall report such violations to the Internal Affairs Officer.

4. Members shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Division. Conduct unbecoming an officer shall include that which tends to bring the Division into disrepute or reflect discredit upon the officer as a member of the Division, or that, which tends to impair the operation and efficiency of the Division or the officer.

5. No member of the Division of State Police shall engage in any conduct, which constitutes neglect of duty.

6. All members of the Division of State Police shall render assistance and take appropriate enforcement action toward aiding a fellow police officer whose personal safety is actually or potentially threatened.

7. All sworn members of the Delaware State Police are required to establish and maintain their actual bona fide residence and domicile within the boundaries of the State of Delaware. Recruit troopers are required to meet this residency requirement prior to beginning the Field Training Officer (FTO) program. Decisions on residency require judgment based upon the totality of circumstances present in each case. The factors cited below are among the indicia, which will be considered in applying that judgment on a case-by-case basis.

**OPR: Superintendent's Office, OIC Internal Affairs**

VII-3-1

Residence means more than mere physical presence and includes the legal concept of domicile. Residence shall mean actual living quarters, which must be maintained within the State by an officer and his or her immediate family (spouse and/or children). Neither voting in the state or the payment of taxes of any kind by itself shall be deemed adequate to satisfy the requirements of this section. Ownership of real property within the State, when not coupled with maintaining of actual living quarters in the State as herein required shall be deemed insufficient to meet the requirements of this section. No consideration shall be give to the fact that an officer intends to maintain a residence in the State if he or she does not maintain a residence as specified above.

The determination of bona fide residency shall include, but not be limited to, an overall consideration of the following factors, with the weight of any factor to be determined by the hearing officers based upon the evidence received:

A. At what location do the officer's immediate family members reside and attend school?

B. At what location does the officer keep his or her tangible personal property and effects?

C. At what location does the officer receive his or her general correspondence?

D. At what location does the officer spend his or her off duty time?

E. What location does the officer list as his or her residence for official documents?

F. What location is more suitable in terms of aesthetics, habitability, comparative comfort, convenience and regular access?

G. At what location is habitation fixed without any present intent to move?

H. At what location is there an apparent intent to make a permanent domicile?

I. In the event that one location is owned and the other is rented or shared with persons not of the immediate family, some presumption of residency shall be applied to the non-shared property.

VII-3-2

D000025

8.  It shall be the duty of every member of the Division to maintain the high public regard in which the Division is held by giving assistance when it is requested or otherwise necessary and by impartial administration of the law.

9.  No member shall interfere with the operation or discipline of the Division provided, however, the foregoing shall not preclude proper utilization of the grievance procedures.

10. Members shall treat as confidential the official communications and business of the Division.

11. No member shall make any effort to go outside the structure of the Division of State Police in an effort to bring influence to bear upon the Superintendent for the purpose of securing promotion or transfer or to avoid the penalties for reprehensible action or conduct.

12. No member shall make any public statement, written, or oral, criticizing the Division, or any member thereof, where such expression is:

    A.  Defamatory

    B.  Unlawful

    C.  Of such a nature that it is likely to impair the operation of the Division; or

    D.  Made with reckless disregard for its truth or falsity

13. No member shall threaten, strike or otherwise assault any other member of the Division.

14. No Division record shall be removed from any Troop without prior authorization of the Troop Commander. Headquarters records shall not be removed without the authorization of the Section Chief concerned, or the Superintendent. No record shall be removed in any case without proper notation being made as to the name of the person receiving it and the date it was removed.

15. No member shall knowingly make a false statement, falsify any written or verbal report made to a superior officer, or willingly and intentionally withhold material matter from such report or statement.

16. No member shall knowingly make a false official report or knowingly enter or cause to be entered in any Divisional book or record any inaccurate, false or improper entries or misrepresentation of facts.

VII-3-3

D000026

A000209

## JOB PERFORMANCE STANDARDS (26.1.1)

1.  Personal Appearance

    Personnel shall maintain their uniforms in a neat and
    serviceable condition and shall, set an example of neatness
    and strict conformity with standards of personal appearance
    established by the Division.

2.  Professional Courtesy

    A.  Definitions:

        **Covered** and **uncovered** means wearing and not wearing
        headgear.

        **Under Arms:** A Trooper is under arms when he/she is
        wearing the sidearm.

    B.  Uniformed Members, **under arms**, when encountering
        commissioned officers of the Division, the Governor,
        Lieutenant Governor, Secretary of Public Safety or
        commissioned officers of other police departments, shall
        render the proper salute in the prescribed manner.

        1.  A uniformed member **does not** salute when **uncovered.**

        2.  Outdoors:

            A.  Members in uniform salute when covered and
                under arms at the proper distance.

            B.  Members in **civilian clothes** salute officers
                as usual.  Commissioned officers wearing
                plain clothes salute and are saluted, if
                recognized, as if they were in uniform.

        3.  Indoors:

            A.  Uniformed troopers **covered and under arms**
                salute as usual.

            B.  Uniformed troopers not under arms **do not
                salute indoors.**

            C.  Members in civilian clothes **do not
                salute indoors.**

**OPR: Superintendent's Office, Inspections Office**

VII-4-1

D000038

**A000210**

C.   Members of the Division shall be courteous and civil at
     all times.  All ranks shall be treated with respect and
     all officers will be referred to by rank.

D.   In the performance of their duties, every member of the
     Division shall furnish his/her name; rank, IBM number
     and assignment to any person properly entitled to this
     information, except when such information would tend to
     **jeopardize his personal safety or his assignment.**

3.   Physical and Psychological Condition

A.   Each member of the Division shall keep himself in such
     physical and psychological condition as will enable him
     to readily perform his duties.

B.   When a member's condition is such that he cannot
     efficiently perform his duties, it shall be the duty of
     his commanding officer to notify the member and the
     Superintendent accordingly.

4.   No member of the Division shall recommend or suggest to
     anyone the employment or name of any person, firm or
     corporation, as attorney, counsel, or bondsman, except with
     the approval of the Superintendent.  Nothing herein shall be
     construed as restricting the rights of members of the
     Division in connection with the administration of their
     private affairs.

5.   Any Division member who is involved in a crash while
     operating a Division vehicle, aircraft, or watercraft shall
     report the crash to his immediate supervisor.  Likewise,
     damage to any Division property shall be immediately
     reported to his immediate supervisor.

6.   Where two or more officers, commissioned or non-commissioned,
     of the same rank are assigned a detail, unless specific
     instructions have been issued to the contrary, the senior
     officer in grade shall be in command.

7.   No member of the Division shall leave the state on police
     business, except by authority of an immediate supervisor,
     Troop Commander, or other officer acting in this capacity, a
     Section Chief, or the Superintendent.  This is not to be
     construed so as to interfere with a fresh pursuit.

8.   Members shall observe Federal and State regulations and
     Divisional policies, which govern the use of radio
     communications.

D000039

9.  When engaged in a verbal or physical confrontation with the public, members shall treat the public in a courteous, civil manner. (The above does not preclude the use of reasonable force or restraint against an individual legally arrested or detained.)

10. Searches (1.2.4)

   A.  Members are expected to keep abreast of Federal and State laws in addition to Divisional policies relating to lawful search and seizure and shall not knowingly or intentionally conduct an illegal or improper search or seizure.

   B.  When conducting a lawful search or seizure members, upon completion of the search, shall return the premises, conveyance, or area of search as near possible to it's condition of normalcy.

11. Members shall at all times maintain a quality and quantity of work consistent with the standards and policies of the Division.

12. Members shall at all times use sound judgment in the performance of their duties.

13. Any member who becomes a defendant or suspect in any traffic, or criminal matter shall promptly report such fact in writing to the member's immediate supervisor. In addition, any member who is questioned by any official concerning an alleged involvement of the member in any criminal and/or traffic offense shall report such questioning to the member's immediate supervisor. Also any member who is served with notice of a PFA Hearing shall promptly report this to their immediate supervisor.

14. **Domestic Incidents involving sworn Division members**

   **Whenever a sworn Division member is issued a Protection From Abuse order, or any protection order, as a respondent, it is his/her responsibility to make immediate notification to the on duty supervisor at his/her assigned Troop/Section.**

   **When a sworn Division member is involved, as the suspect or the victim, in a domestic incident, it is his/her responsibility to make immediate notification to the on duty supervisor at his/her assigned Troop/Section. The supervisor, or his/her designee, will notify the on-call CIU administrator who will notify the officer's Troop Commander and the appropriate Field Operations Officer.**

VII-4-3

D000040

A000212

When a sworn Division member is involved, as the suspect or the victim, in a domestic incident, within the jurisdiction of the Delaware State Police, the on duty supervisor, working that patrol area, shall respond to the scene; ascertain the facts of the complaint; preserve the scene; and notify the on-call CIU administrator. The on-call CIU administrator or his/her designee will notify the officer's Troop Commander and the appropriate Field Operations Officer. The Field Operations Officer will make the determination to initiate action by the Internal Affairs unit. A criminal Sergeant or Lieutenant will be assigned to direct or conduct the criminal investigation. A detective from the Domestic Violence unit may assist the criminal Sergeant or Lieutenant. The Internal Affairs unit Commander will direct the administrative investigation.

When a sworn Division member is involved, as a suspect or the victim, in a domestic incident, outside the jurisdiction of the Delaware State Police, but within the State of Delaware, the on duty supervisor shall notify the on-call CIU administrator for the county in which the officer is assigned. The on-call administrator will notify the officer's Troop Commander and the appropriate Field Operations Officer to establish contact with the investigating agency and determine the need for the Internal Affairs unit response.

VII-4-4

D000041

## COMPLAINT AND DISCIPLINARY PROCEDURES

I. **INDIVIDUAL RIGHTS AND RESPONSIBILITIES OF A DELAWARE STATE POLICE MEMBER WHEN THEIR CONDUCT IS QUESTIONED.**

A. Scope

Members of the Delaware State Police must recognize that they are held in high esteem and hold unique status. The nature of their position and the performance of their duties involve the exercise of substantial authority throughout the State. To a great extent, the security of the State and its citizens depends upon the manner in which the Delaware State Police members discharge their duties. In the performance of their duties, members necessarily become involved in all manner of contacts and relationships with the public.

Out of their contacts and relationships with the public, as well as their conduct within the Division, questions may arise, particularly with reference to the Rules, Regulations, and Standards of Conduct set forth herein. Whenever a question concerning the propriety of the conduct of a member of the Division arises it is in the best interests of both the member and the Division that an immediate inquiry be conducted.

The public and the Delaware State Police both have an important interest in expecting the members to give sincere and honest replies to questions specifically, directly, and narrowly relating to the performance of their official duties and/or their fitness to hold office.

To insure that Division investigations are conducted in a fair manner conducive to good order and discipline, while at the same time protecting the individual rights of each member of the force, the following rules of procedure shall be adhered to:

B. Investigation of Alleged Violations of Division Rules and Regulations - General Operating Procedure.

Whenever a member of the Division is under investigation or is subjected to questioning for any reason, which could lead to disciplinary action, demotion, or dismissal, the investigation or questioning shall be conducted under the following conditions:

OPR: **Internal Affairs OIC**

VII-5-1

D000042

**A000214**

1.  The questioning shall be conducted at a reasonable
    hour, preferably at a time when the officer is on
    duty unless the gravity of the investigation, in
    the opinion of the investigator, is of such degree
    that immediate questioning is required.

2.  The questioning shall take place at Headquarters
    or at the office of the local troop or unit in
    which the incident allegedly occurred as
    designated by the investigating officer or unless
    otherwise waived in writing by the officer being
    investigated.

3.  The member of the Division under investigation shall
    be informed of the name, rank, and command of the
    officer in charge of the investigation.  All
    questions directed to the officer shall be asked by
    and through no more than two investigators.  No
    formal complaint against an officer seeking dismissal
    or suspension or other formal disciplinary action
    shall be prosecuted under Divisional rule or
    regulation unless the complaint is supported by
    substantial evidence derived from an investigation by
    an authorized member of the Division.

4.  The officer under investigation shall be informed
    in writing of the nature of the investigation
    prior to being questioned.

5.  Interview sessions shall be for reasonable periods
    of time. Time shall be provided for the officer to
    attend to such personal necessities and rest
    periods as are reasonably necessary.

6.  Except upon refusal to answer questions pursued in
    a valid investigation, no officer shall be
    threatened with transfer, dismissal, or other
    disciplinary action.

7.  A complete record, either written, taped, or (if
    taped) transcribed, shall be kept of all interviews
    held in connection with the administrative
    investigation.  Upon notification that substantial
    evidence exists for seeking an administrative
    sanction against the officer, a copy of the record
    shall be provided to the officer or their counsel
    at their expense upon request.

VII-5-2

D000043

**A000215**

8.  If the officer under interrogation is under arrest
    or may reasonably be placed under arrest as a
    result of the investigation, they shall be informed
    of their Miranda rights, including the reasonable
    possibility of their arrest prior to the
    commencement of the interrogation.

9.  Any officer under questioning shall have the right
    to be represented by counsel or other representative
    of their choice.  The counsel or representative
    shall be present at all times during the questioning
    unless waived in writing by the officer being
    questioned. If the officer requests representation,
    the questioning shall be suspended for a reasonable
    amount of time until representation can be obtained.

10. An officer who is charged with violating any
    Divisional rules or regulations, or their
    representative, will be provided access to
    transcripts, records, written statements, written
    reports, analyses, and video tapes pertinent to the
    case if they are exculpatory, intended to support
    any disciplinary action or are to be introduced in
    the Divisional hearing on the charges involved.
    Upon demand of the officer or counsel, they shall
    be produced within 48 hours of the written
    notification of the charges.

11. At the conclusion of the administrative
    investigation, the investigator shall inform the
    officer in writing of the investigative findings
    and any recommendation for further action.

C.  Duty To Cooperate In Internal Investigations

1.  A member, who is directed to appear and answer
    questions narrowly relating to the performance of
    their official duties and who is advised that their
    testimony will not be used as evidence against him
    in a criminal proceeding, and who thereafter
    refuses to cooperate in the investigation, shall be
    subject to disciplinary action.

2.  A member of this Division, who is directed to
    appear and submit to a chemical test, polygraph,
    blood test, or any medical examination relating to
    the performance of their official duties and who is
    advised that the evidence obtained will not be

VII-5-3

D000044

**A000216**

used as evidence against him in a criminal
proceeding and, who thereafter refuses to
cooperate, shall be subject to disciplinary action.

D. Advisement of Rights

1. If a member of this Division is directed to appear
and answer questions before the Internal Affairs
Section, Divisional Hearing Board, or other
Divisional Hearing, and there is a likelihood that
criminal charges may result from the investigation,
the following warnings shall be given the member
concerned prior to the commencement of the
interviews:

Officer _____, you are being questioned as
part of an official investigation of the Delaware
State Police. You will be asked questions
specifically, directly, and narrowly    relating to
the performance of your official duties. You are
entitled to all the rights and privileges guaranteed
by the Constitution of the United States, the
Constitution of the State of Delaware, and the laws
of the State of Delaware, including the right not to
be compelled to incriminate yourself, and the right
to have legal counsel present at each and every
stage of the investigation.

If you refuse to testify or answer questions
relating to the performance of your official
duties, you will be subject to Division charges,
which could result in your dismissal from the
Delaware State Police. If you answer, your
statements cannot be used against you in a
subsequent criminal proceeding. However, these
statements may be used against you in relation to
subsequent Divisional charges.

E. Two Year Probation Period

1. All members of the Division shall serve a two-year
probation period from the date of their appointment.

2. A probationary member of the Division shall be
accorded all the rights and privileges contained
herein. This pertains to sworn members only and
does not include any member prior to being sworn.

VII-5-4

D000045

3. Probationary members falling under this section will not be permitted to work extra duty assignments (pay jobs). The Superintendent has the authority to waive this restriction.

4. Probationary members falling under this section <u>will not</u> be permitted to hold secondary employment.

F. Members of the Division placed on probation for violation of Divisional Rules or Job Performance Standards.

1. A member of the Division placed on probation, as a result of disciplinary action, shall not be eligible for promotion during that period of probation.

2. The Summary Disciplinary process will not be used when a member of the Division who is on such disciplinary probation is accused of the breach of any Divisional Rule or Job Performance Standard while on that probation.

3. A member of the Division who is on such a disciplinary probation and is found to have violated any Divisional Rule or Job Performance Standard during that probation may be recommended for dismissal at the discretion of the Superintendent.

4. Working extra duty assignments (pay jobs) will be at the discretion of the Superintendent. Members who fall under this section must have approval from the Superintendent to work pay jobs, unless otherwise specified in the disciplinary action against the member.

5. Secondary employment held by members on disciplinary probation will be at the discretion of the Superintendent. Members who fall under this section must have approval from the Superintendent to hold secondary employment, unless otherwise specified in the disciplinary action against the member.

VII-5-5

D000046

## II.  INTERNAL INVESTIGATION AND DISCIPLINARY PROCEDURES

A.   Scope

The purpose of this section is to insure the integrity of the Delaware State Police by establishing procedures for handling complaints and disciplinary actions against members of the Division of State Police.  These procedures will assure the prompt and thorough investigation of incidents to establish appropriate responsibility and facilitate suitable disciplinary action where necessary.  It must be continually recognized that discipline is the function of command and a well-disciplined police force is a force, which voluntarily and ungrudgingly conforms to all rules and orders.  The incidents which are to be handled in accordance with these procedures are alleged or suspected violations of Rules and Regulations, Orders, Job Performance Standards, or established policy directives by members of the Division of State Police. These alleged violations may come to the attention of any member of the Division from any source.

B.   Investigative Responsibility

1.   Each member of the Division will perform the duties and assume the obligations of his rank in the investigation of complaints or allegations of misconduct against members of the Division and will cooperate fully with personnel of the Internal Affairs Section or any other member of the Division conducting such investigation.  When the subject complained of or observed is within the scope of their authority, supervisory, and command personnel, themselves, will initiate the appropriate investigation procedures; they will not look to higher authority for the initiation of an investigation.

a.   **Investigations by Line Supervisors:** First Line supervisors will investigate minor violations of the Rules and Regulations or Job Performance Standards that are not of such a serious nature as to require an internal affairs investigation or Divisional Hearing Board.

VII-5-6

D000047

**A000219**

b.   A citizen inquiring about procedures for filing a complaint against a member of this Division shall be directed to the unit commander of the unit involved. The unit commander will make a preliminary evaluation of the complaint and then contact the Internal Affairs officer who will determine how the complaint will be handled.

The Internal Affairs Office will then provide the complainant with written verification that the complaint has been received, as well as a description of the investigative process.

2.   **Complaints that Require Investigation by the Internal Affairs Office:** Alleged or suspected violations will be reported to the Internal Affairs Section by the supervisor or commanding officer who first receives information of the alleged violations, even when it is believed to be unfounded. All complaints of alleged misconduct from sources outside of the Division, regardless of the seriousness of the allegation, shall be forwarded in writing to the Internal Affairs Section. The information will be reported by telephone as soon as possible and, in any event, within twenty-four (24) hours of receipt of knowledge of the incident, except where:

a.   Summary disciplinary action for less serious transgressions is appropriate under summary punishment procedures set forth under Section IV herein, or

b.   The complaint relates to a difference of opinion between a police officer and a citizen over the issuance of a traffic summons; provided, however, that if there is an allegation of a violation of law or of Division Rules or Regulations or Orders on the part of the officer, such allegations shall be referred to the Internal Affairs Section for further investigation unless the allegation is one which, if proven, would result in summary punishment.

VII-5-7

D000048

3.   All verbal reports to the Internal Affairs Section shall be followed by a written report of the alleged incident to the Internal Affairs Section as soon as possible.

4.   It will be the responsibility of the Internal Affairs officer to notify the Superintendent or Deputy Superintendent or in their absence, one of the Staff Officers, of any serious complaints brought to the attention of the Internal Affairs Section. Notification will be made via verbal and/or written communication depending on the circumstances.

C.   Internal Affairs Section

1.   The Internal Affairs Section has staff supervision over the investigation of complaints or allegations of serious misconduct against members of the Division, and reports directly to the Deputy Superintendent or designee.

2.   Procedure

a.   Depending upon the seriousness of an allegation, the Internal Affairs Section may, upon receipt of a complaint:

(1)   Refer it to an appropriate command; or

(2)   Make a preliminary investigation and then assign it to an appropriate command; or

(3)   Make an independent investigation of the complaint.

b.   Every complaint received by the Internal Affairs Section shall be recorded in a bound ledger to be known as the Internal Investigation Control Log.  Spaces will be provided in the ledger for the control number, name, rank, identification number, and assignment of the alleged violator; date and hour of receipt of the Reportable Incident Form; nature of the alleged violations; name of reporting person, and (if sworn) rank and identification number of the reporting member; action taken by the Internal Affairs Section, date and nature of the final action by the Superintendent.

VII-5-8

D000049

c.    No persons shall be permitted access to the Internal Investigation Control Log except the Superintendent of State Police, Deputy Superintendent or designee, division attorney and the personnel of the Internal Affairs Section, except upon written authority from the Superintendent directed to the Internal Affairs Officer.

d.    The Internal Affairs Section shall be responsible for the expeditious completion of all investigations assigned to the appropriate command. Investigations shall be completed within a sixty-day period unless extenuating circumstances exist or the complexity of a case dictates otherwise.

e.    The Internal Affairs Section shall be responsible for conducting an investigation at the request of any member of the Division who justifiably feels threatened by a false accusation or a contrived situation involving false evidence. Such persons are authorized to report their situations directly to the commanding officer of the Internal Affairs Section without reporting to their supervisors. After a preliminary investigation, the commanding officer of the Internal Affairs section may follow the procedure as established under this section, (C.2.a.).

f.    The O.I.C. of Internal Affairs shall designate the "**investigator**" and that person shall report directly to the O.I.C. of Internal Affairs.

g.    Section Chiefs and Troop Commanders will fully cooperate with the investigator in the conduct of all complaint investigations.

h.    The investigator will be responsible for informing the O.I.C. of Internal Affairs of the continuing developments in the investigation in order that it may be determined whether to:

VII-5-9

D000050

**A000222**

     (1)   Retain the officer under investigation in their present assignment; or

     (2)   Assign the officer under investigation to some other duty unrelated to the conduct under investigation; or

     (3)   Excuse the officer under investigation from duty or seek their immediate suspension.

i.   When an investigation is being conducted the investigator will notify the on-duty commander of the unit to which the officer who is under investigation is assigned.

j.   When the act complained of tends to present an immediate threat to the effective operation of the Division, the officer under investigation may be relieved from duty by the investigator. Under no circumstances will the officer under investigation be relieved from duty for a period longer than forty-eight (48) hours without the permission of the Superintendent of State Police or Deputy Superintendent. Whenever an officer under investigation is relieved from duty, the investigator will immediately notify:

     (1)   The O.I.C. of Internal Affairs

     (2)   The appropriate Operations Officer;

     (3)   The Director of the Human Resources Section (for payroll purposes); and

     (4)   The commanding officer of the section to which the member is assigned.

k.   When the alleged act, if proven, would be a crime and the evidence is such that had the act been committed by a private person it would have resulted in arrest, the investigator will explain the circumstances to the O.I.C of Internal Affairs. A decision as to whether the officer should be arrested forthwith, or a warrant for arrest should first be obtained, or criminal action should be delayed pending further investigation will be made by the O.I.C. of Internal Affairs. When desired, the investigator may contact the Office of the Attorney General for legal advice pertaining to investigations.

VII-5-10

D000051

l.    When the investigation is completed the
      Investigator will classify the complaint as
      follows:

    (1)   Unfounded-Allegation is false or not
        factual.

    (2)   Exonerated-Incident complained of
        occurred but was lawful and proper.

    (3)   Not Substantiated-Insufficient evidence
        either to prove or disprove the
        allegation.

    (4)   Substantiated-The allegation is
        supported by substantial evidence.

m.    When the investigation is completed,
      classified, and reviewed by Internal Affairs
      and the Deputy Superintendent or designee,
      the Investigator will notify the officer
      under investigation and inform the employee
      in writing of the outcome.  An Internal
      Affairs officer will ensure that the
      complaining party is notified by telephone or
      by letter explaining the final
      outcome/status.

    (1)   When the investigation results in a
        determination of unfounded, exonerated,
        or not substantiated, the officer under
        investigation will remain on duty.  If
        previously relieved from duty without
        pay during the investigation, a trooper
        will be paid for that period of time
        suspended.

    (2)   When the investigation is classified as
        substantiated by the Investigator, the
        O.I.C. of Internal Affairs shall
        immediately notify the Superintendent
        that a Divisional Hearing Board should
        be convened or may recommend that the
        matter be handled by the use of the
        Summary Discipline Procedure, set forth
        in Section IV. The penalties for certain
        Summary Offenses are mandated by a
        matrix (see VII-5-20 through 21).

VII-5-11

(3) If it is determined that a Hearing Board should be convened, the Internal Affairs Officer will immediately notify the member under investigation, in writing, of the nature of the charges and the fact that a Hearing Board will convene; or, if a member elects not to contest the charges and allegations, that member may elect to have a hearing before the Superintendent.

(4) In a Superintendent's hearing, the member shall have the right to counsel as outlined in Section II-D-8; and the Superintendent shall have the authority to either dismiss the allegation or to impose disciplinary measures as detailed in Section II-D-9. And in the latter event, the accused can exercise their privilege of appeal to the Secretary of Public Safety as outlined in Section II-D-12. All such hearings before the Superintendent will be recorded.

n.   All investigative determinations of unfounded, exonerated, or not substantiated shall be subject to review by the O.I.C. of Internal Affairs and by the Deputy Superintendent or designee. The officer under investigation will be notified as to the nature and final classification of the investigation.

D.   Divisional Hearing

1.   When notified by the O.I.C. of Internal Affairs that a hearing is necessary, the Superintendent shall order a Trial Board. A new Trial Board shall be appointed for each case, except that one Trial Board may hear multiple charges against one or more officers if the charges arise out of the same transaction or occurrence. The Board shall consist of three members. The presiding member of the Board shall be selected from a list of three staff officers submitted by the Superintendent, of which the charged officer shall strike one name. The second member of the Board shall be selected from a list of five commissioned officers of which

VII-5-12

D000053

A000225

the charged officer shall strike two names. The final member of the Board shall be selected from a list of five troopers of a rank similar to the trooper charged of which the charged officer shall strike two names. Troopers serving as a Board member must have at least ten years seniority with the Division.

2. Whenever any member of the Division has been charged with an alleged transgression of the Division's Rules and Regulations and a Divisional Hearing Board is to be convened, the Internal Affairs Officer will transmit an e-mail to all troops and sections which will:

   a. Identify the defendant officer

   b. Identify the Rule or Job Performance Standard allegedly violated.

   c. Identify the date, time, and place of the hearing

   d. Identify the officers selected to hear the matter

3. Upon posting the e-mail, any employee of the Division who believes that any officer selected to the Board would be biased, prejudiced, or otherwise predisposed in the matter, shall immediately contact the O.I.C. of Internal Affairs.

4 Additionally, any employee of the Division who may possess information that would affect the proceeding shall contact the O.I.C. of Internal Affairs.

5. The Internal Affairs Office will have responsibility for preparation of cases for presentation to the Divisional Hearing Board and may use the services of a Divisional attorney.

6. The Internal Affairs Office will schedule the hearing and will arrange for all testimony to be recorded.

7. The Trial Board Presiding Officer shall decide any question of procedure or admissibility of relevant evidence. Hearsay evidence may be accepted as admissible at the discretion of that officer. A Divisional attorney or a lawyer from the Attorney General's Office may be used as counsel for the Trial Board.

VII-5-13

D000054

8. The accused shall have the right to counsel at all stages of the Divisional Hearing Board proceeding and shall have the right to be heard before the Trial Board.

9. The Divisional Hearing Board shall determine, by majority vote, whether substantial evidence has been presented to support the charge. If the Trial Board finds that the charge against the accused is supported by substantial evidence, or finds the accused guilty of a lesser-included violation, it shall recommend any of the following to the Superintendent, after a review of the individual's disciplinary record.

    a. Suspension not to exceed ninety (90) days, and/or

    b. Demotion in rank, and/or

    c. Probation, with or without conditions, not to exceed one (1) year, and/or

    d. Transfer in assignment or duty station

    e. Restitution for lost or damaged property, where such property has been lost or damaged as a consequence of malicious, reckless or grossly negligent conduct by the member.

    g. Dismissal.

In those instances where suspension is recommended, that member, at the discretion of the Trial Board, may be afforded the opportunity to forfeit vacation for a period of time equivalent to that which he would have been otherwise suspended. No action shall be taken under this provision without the written consent of the member. Under no circumstances shall the suspended member be permitted to work uncompensated.

In finding the charges to be supported, the Divisional Hearing Board shall set forth, in writing, the basis of its findings and furnish copies of its report to the Superintendent, the accused, and the Internal Affairs O.I.C. The dissenting member of the Trial Board may prepare a minority report and copies shall be provided to the Superintendent, the accused, and the Internal Affairs O.I.C.

VII-5-14

10. If the Divisional Hearing Board finds, by majority vote, that the evidence presented does not support any of the charges, the Trial Board shall so notify the Superintendent, by written report, with copies to the accused and the Internal Affairs O.I.C. A member will be reimbursed or otherwise compensated for any suspension without pay if the Board exonerates that member.

11. The Superintendent shall review recommendations for disciplinary actions made by the Trial Board, and shall take such action as considered appropriate. The Superintendent shall have the power to sustain, increase or reduce the recommended action or dismiss the charge. The Superintendent shall not order dismissal of a member if the Trial Board does not so recommend. In deciding the penalty, the Superintendent may consider the nature and severity of the offense, the officer's personnel record, disciplinary record, recommendation of the Trial Board, and penalty imposed in prior cases of a similar nature.

12. In an instance where dismissal is recommended, the accused shall be informed of the decision by the Superintendent and immediately placed on suspension without pay and benefits until such action is met with concurrence by the Secretary of Public Safety pursuant to 29 Del. C. section 8203.

13. When the decision is suspension of more than five days, demotion, probation, transfer, or dismissal from the Division, the accused shall have five (5) days, excluding weekends, from receipt of notice to submit a written request to the Superintendent for a hearing before the Secretary of Public Safety. The Superintendent shall forward the written notice received from the member to the Secretary of Public Safety. (26.1.6)

14. The Secretary of Public Safety is vested with the authority to hear appeals and his/her action constitutes the final action within the department. The appeals shall be consistent with the following guidelines:

VII-5-15

D000056

a.   The appeal shall be based on the record of the
     Trial Board hearing, the written findings of fact
     and the officer's personnel/disciplinary file.

b.   The Secretary's review, in the absence of
     actual fraud, shall be limited to the
     determination of whether the decision below
     was supported by substantial evidence of
     record; whether there was a clear abuse of
     discretion; or whether appellant was denied
     minimal due process.

c.   The appellant shall submit a letter or
     memorandum to the Secretary of Public Safety,
     setting forth the basis and grounds for the
     appeal.

d.   The Division shall submit a reply letter or
     memorandum.

e.   Each side will be allowed 30 minutes to present
     oral argument.  The Secretary may grant
     additional time upon a request by either party.

f.   The appellant shall be entitled to open and
     conclude the argument of the case.

g.   Oral arguments may be waived by consent of
     all parties and the case submitted on the
     memoranda, unless the Secretary requests oral
     argument.

## III. LETTER OF SUSPENSION WITH THE INTENT TO DISMISS

A.   The Superintendent shall have the authority to suspend,
     with intent to dismiss, any employee or member of the
     Division after appropriate investigation.

B.   The Superintendent may suspend the ordinary
     investigative procedures when there is substantial
     evidence of a violation of the rules or standards which
     requires immediate action and the member has received a
     due process hearing in a court of law for that
     violation.  Under such circumstances the member may be
     immediately suspended with the intent to dismiss.

VII-5-16

D000057

**A000229**

C.    The employee or member so suspended shall be notified, in writing, by the Superintendent or designee of such intent to dismiss, accompanied by a brief summary of the reason for such action and reciting the procedure for a request for a hearing before a Divisional Trial Board or Superintendents Hearing.

D.    Upon receipt of such written notification of suspension with intent to dismiss, as describe in III.B, the employee or member will be suspended without pay. Upon receipt of the notice of suspension, if the member desires a hearing, the member shall submit a written request for a hearing before a Divisional Trial Board or the Superintendent within five days of receipt of the notice of suspension. The hearing shall be conducted within thirty days of the request. If no such request for a hearing has been forwarded, with the concurrence of the Secretary of Public Safety the employee or member will be terminated from the Division, pursuant to 29 **Del. C.** section 8203.

E.    An employee or member dismissed from the Division under this Section shall have the opportunity to appeal such action to the Secretary of Public Safety under the conditions outlined in Section II-D-12 and 13 of these Procedures.

IV.    **SUMMARY DISCIPLINE FOR LESS SERIOUS TRANSGRESSIONS**

A.    **Introduction**-This procedure provides for disciplinary action against those members who commit minor violations of the Rules and Regulations or Job Performance Standards that are not of such a serious nature so as to require a Divisional Hearing Board. These transgressions do not require a control number and subsequent detailed investigation. The penalties for certain Summary Offenses are mandated by a matrix (see VII-5-20 through 21). Summary Discipline may be imposed by the highest ranking officer of the unit involved or the member acting in that capacity, subject to review by the Deputy Superintendent or designee.

VII-5-17

D000058

**A000230**

B.  Any Special Unit member who performs a specialized job task is prohibited from receiving any outside employment of compensation related to that specialized job task.  This does not prohibit a member from receiving payment for providing training in that specialized field with required approval and compliance with this section. **(Revision: 01/2007 paragraph added)**

C.  The part-time position shall in no way interfere with the officer's full-time responsibility to the State Police.

D.  If the part-time employment falls on a regular work day, the officer shall be restricted to working no more than four hours a day and this will be completed four hours prior to their regular tour of duty with the State Police.

E.  On their day off, they may work a regularly, scheduled shift.

5.  The Superintendent will make the final determination on applications and approvals will be granted consistent with the individual's ability to maintain compliance with the foregoing regulations.  After the Superintendent has reached a decision, a response to the requesting individual and his/her Troop Commander/Section Chief will follow.  All requests will be maintained in personnel files in the Human Resources Office.

6.  If an officer is unable to perform at full duty and continuing for the duration of a disability, any prior approval for outside employment will be rescinded immediately.  The officer has the option to resubmit a request for outside employment to the Superintendent through the appropriate Operations Officer, advising how working part-time will not aggravate the medical condition or injury.

7.  Commissioned officers shall not be excluded from application.

## TRANSFER POLICY

All members of the Division are subject to reassignment at any time, either on a temporary or permanent basis, to any location in the State of Delaware. While every attempt will be made to afford the employee an opportunity for individual growth as well as improving job satisfaction and performance, the operational needs of the Division will be met.  Permanent reassignment shall be the sole responsibility of the Superintendent.

Any uniformed member desiring a reassignment shall submit a written Request for Transfer (Form #426) including the Transfer Request Resume (Form #365) through the chain of command in the troop/section of the requesting officer.  Whenever possible, requested assignments will be made on a basis of seniority, length of service, and other vital considerations involving the member and the Division.

III-6-76

D000013

Reassignments will be considered and made for legitimate purposes when in the best interests of the Division, or member, or at the request of the member, and will be primarily based on, but not limited to, the following reasons:

1. The member's rank, ability, experience, or effectiveness can be better utilized in another location.

2. If, during the lawful discharge of his duties, an incident or incidents have taken place that creates an atmosphere that makes it difficult or impossible for the member to function efficiently in that community due to public sentiment.

3. Intradepartmental relationships which are such that the individual cannot function in good rapport with other uniformed members, be it superiors, subordinates, or other members of similar rank.

4. Relationships with other agencies are such that lack of communication, cooperation, credibility or rapport has adversely affected the individual's ability to perform necessary duties and functions.

5. Relationship with the general public is such that the uniformed member cannot fulfill the duties, responsibilities, and obligations of the organization.

6. Conduct, either personal or professional, that adversely affects the individual's or Division's ability to render law enforcement services in that locality.

7. As a result of a disciplinary action supported by just cause, it serves the greater interest of the Division to reassign the individual within another location within the organization.

### REQUESTS FOR TRANSFERS AND CHANGES IN JOB ASSIGNMENTS

1. Personnel, who desire to transfer or to change duty assignment, may forward a request by following the format described below.

2. All requests must be reviewed through the chain of command in the troop/section of the requesting officer. The reviewing officers may make comments supporting approval or disapproval of the request. Officers making comments must put their initials and the date reviewed beneath their comments.

3. Endorsing officers, who do not wish to make any comments, should put their initials and date next to their name and title acknowledging they have reviewed the request.

4. In addition to The Request for Transfer (form 426), the requesting officer is to complete a Transfer Request Resume (form 365).

III-6-77

D000014

A000232

Job Summary

New Window | Help | Customize Page |

## Job Summary

| Dempsey,Elizabeth C | | Employee | | EmplID: 075463 | Empl Rcd#: |

### Job Information

Customize | Find | View 7 |    First 1-

| General | Job Information | Work Location | Compensation |

| Eff Date | Sequence | Action | Action Reason |
|----------|----------|--------|---------------|
| 09/16/2006 | 0 | Pay Rate Change | Step Increase |
| 07/20/2006 | 1 | Promotion | Career Ladder |
| 07/20/2006 | 0 | Position Change | Career Ladder Change |
| 07/01/2006 | 0 | Pay Rate Change | General Salary Increase |
| 06/11/2006 | 0 | Data Change | Funding Change |
| 10/08/2005 | 0 | Pay Rate Change | Levelling Up |
| 10/07/2005 | 0 | Pay Rate Change | Levelling Up |
| 09/18/2005 | 0 | Pay Rate Change | Adjustment |
| 09/16/2005 | 0 | Data Change | Funding Change |
| 07/20/2005 | 1 | Demotion | Involuntary Demotion |
| 07/20/2005 | 0 | Position Change | Career Ladder Change |
| 07/01/2005 | 1 | Pay Rate Change | Contract Increase |
| 07/01/2005 | 0 | Recall from Suspension/Layoff | Recall from Suspension |
| 06/12/2005 | 0 | Data Change | Funding Change |
| 03/20/2005 | 0 | Position Change | Position Data Update |
| 02/01/2005 | 0 | Suspension | Suspension w/oPay w/Benefi |
| 09/16/2004 | 1 | Pay Rate Change | Step Increase |
| 09/16/2004 | 0 | Position Change | Location Change |
| 07/01/2004 | 0 | Pay Rate Change | General Salary Increase |
| 06/13/2004 | 0 | Data Change | Funding Change |
| 04/04/2004 | 0 | Data Change | 8.8 HR, BA & PR Upgrade |
| 09/16/2003 | 1 | Promotion | Career Ladder |
| 09/16/2003 | 0 | Position Change | Career Ladder Change |
| 06/15/2003 | 1 | Position Change | Position Data Update |
| 06/15/2003 | 0 | Data Change | Funding Change |
| 09/16/2002 | 0 | Pay Rate Change | Step Increase |
| 07/01/2002 | 0 | Pay Rate Change | General Salary Increase |
| 06/16/2002 | 0 | Data Change | Funding Change |
| 11/01/2001 | 0 | Rehire | Benefits Waiting Period |
| 08/31/2001 | 0 | Termination | Voluntary Resignation(Gener |
| 07/16/2001 | 1 | Promotion | Career Ladder |
| 07/16/2001 | 0 | Position Change | Career Ladder Change |
| 07/01/2001 | 2 | Pay Rate Change | Contract Increase |
| 07/01/2001 | 1 | Data Change | 7.51HR Upgrade/BA&PR Imp |
| 07/01/2001 | 0 | Data Change | 7.51HR Upgrade/BA&PR Imp |
| 04/17/2001 | 0 | Data Change | FICA Status Change |
| 07/16/2000 | 0 | Pay Rate Change | Step Increase |
| 07/01/2000 | 0 | Pay Rate Change | Contract Increase |
| 06/01/2000 | 0 | Position Change | Position Data Update |
| 03/27/2000 | 0 | Promotion | Career Ladder |
| 07/16/1999 | 0 | Hire | New Hire |

A000233

'08/01/2006 TUE 15:31  FAX 302 739 5966 DE STATE POLICE                              ☒005/009



STATE OF DELAWARE
DEPARTMENT OF SAFETY AND HOMELAND SECURITY
DIVISION OF STATE POLICE
P.O. BOX 430
DOVER, DELAWARE 19903

July 15, 2005

Ms. Elizabeth C. Dempsey
P.O. Box 118
Frederica, Delaware  19946

RE:    Reinstatement

Dear Ms. Dempsey:

In a decision dated July 1, 2005, the Secretary overruled the Division's recommendation that you be terminated for violations of State Police Rule and Regulation #15.

You are to report for duty at 0900 hours to Captain Timothy Winstead on Wednesday, July 20, 2005 for assignment, at which time, you will receive two weeks notice of your work schedule.  Effective that same date, you will be demoted to Trooper First Class and placed on probation for one year.  If you successfully complete your probation, you will be promoted back to the rank of Corporal.

You are entitled to back pay from the date you were suspended without pay pending review by the Secretary, to the effective date of your reinstatement (July 20, 2005) at your previous rank and salary.

Sincerely,

Colonel Thomas F. Mac Leish
Superintendent

cc:    ✓Captain John A. Yeomans
        Director of Human Resources

        Captain Timothy Winstead
        Commander, Troop 4

RECEIVED

JUL 1 9 2005

Human Resources Office
Delaware State Police

D000073

**A000234**



STATE OF DELAWARE
DEPARTMENT OF SAFETY AND HOMELAND SECURITY
DIVISION OF STATE POLICE
P.O. BOX 430
DOVER, DELAWARE 19903

August 19, 2005

**VIA CERTIFIED MAIL**

Trooper First Class Elizabeth C. Dempsey
#12 Seachase Drive
Seachase
Rehoboth, Delaware 19971

RE: Reinstatement

Dear TFC Dempsey:

This is a follow up addressing the concerns raised during your meeting with Captains Yeomans and Winstead on Monday, August 15, 2005.

Secretary David B. Mitchell imposed the penalty of loss of rank for a one-year period beginning January 31, 2005, a suspension of 15 days, 10 of which given the option to forfeit vacation, and a one-year probation period to begin upon your return to work. He remanded this matter to me for a more appropriate penalty, and I exercised my authority to do so. Therefore, your loss in rank was effective on July 20, 2005, and your back payment at the rank of Corporal was calculated correctly. Subsequently, your one-year probation period commenced on this date and your eligibility to return to the rank of Corporal will be on July 20, 2006. Your transfer to Troop 4 was a command decision in which I made due to operational and manpower necessities.

You will still be charged the 13 days/104 hours vacation leave for the period of July 20 – August 5, 2005. The five days suspension without pay will be reflected on August 8 – 12, 2005, and will be deducted in your payroll check dated September 2, 2005. As you stated, your decision to satisfy the remaining ten-day suspension is to take them as suspension without pay, and as I understand you and Captain Winstead have already made the necessary arrangements. At the bottom of the attachment to this letter a revision has been made to your vacation balance.

D000074

**A000235**

08/01/2006 TUE 15:31  FAX 302 739 5966 DE STATE POLICE                    @003/009

Trooper First Class Elizabeth C. Dempsey
August 19, 2005
Page 2

State Prosecutors are obligated to disclose information regarding the truthfulness of a police witness in a criminal case; therefore, the findings of the Trial Board qualify as such exculpatory information. You will have to request a copy of Attorney General M. Jane Brady's letter either personally or through your attorney.

Since your Deferred Compensation deduction of $10 was not retroactively increased in your back payment on July 22, 2005, you are to contact Ms. Leighann Hinkle in the State Treasures Office at 744-1083, to arrange a payroll deduction in the amount of $100. At that time Ms. Hinkle will make the appropriate adjustment for the state match to occur.

If you need additional information, please contact Captain John A. Yeomans of the Human Resources Office at 739-5981.

Sincerely,

Colonel Thomas F. Mac Leish

Colonel Thomas F. Mac Leish
Superintendent

TFM:lem
Attachment

cc:  Robert McDonald, Esquire

    Captain Timothy E. Winstead
    Troop Commander Troop 4

    Captain John A. Yeomans
    Director of Human Resources

D000075

**A000236**

## Winstead Timothy E (DSP)

| | |
|---|---|
| **From:** | Pleasanton Theresa (DSP) |
| **Sent:** | Thursday, August 03, 2006 4:08 PM |
| **To:** | Winstead Timothy E (DSP) |
| **Subject:** | FW: Dempsey |

Forgive me, the retro figure of $3,587.79 should be $3,592.86.

| | |
|---|---|
| **From:** | Pleasanton Theresa (DSP) |
| **Sent:** | Thursday, August 03, 2006 3:20 PM |
| **To:** | Winstead Timothy E (DSP) |
| **Subject:** | Dempsey |

Captain Winstead,

In response to your request for payroll information on TFC Dempsey, I submit the following:

1. TFC Dempsey **was paid as Corporal** for the period of 2-1-05 through 7-19-05.  Her total salary paid was $24,251.92.

> $22,726.81 paid 7-22-05 (reinstated @ Cpl retro to 2-1-05)
> $ 1,395.51 paid 8-05-05 ( 7 days regular pay @ Cpl)
> $   129.60 paid retro $ based on new payscale of 7-1-05

If she was paid as TFC for the period 2-1-05 through 7-19-05, her salary would have been $22,684.44.  The gross salary difference between Corporal and TFC for 2-1-05 through 7-19-05 was $1,567.48.

2. She was demoted to TFC effective 7-20-05.  If she is reinstated to Cpl retro to 7-20-05 through 8-05-06, we will owe her $3,587.79 and her current salary as Corporal will be $58,281.

If you need additional information, please let me know.

Thank you,
Theresa Pleasanton

1

D000076

**A000237**



STATE OF DELAWARE
DEPARTMENT OF SAFETY AND HOMELAND SECURITY
**DIVISION OF STATE POLICE**
P.O. BOX 430
DOVER, DELAWARE 19903

August 4, 2006

Robert C. McDonald, Esquire
Silverman, McDonald & Friedman
1010 North Bancroft Parkway, Suite 22
Wilmington, Delaware 19805

Dear Mr. McDonald:

Re: Elizabeth C. Dempsey

Colonel Mac Leish referred your letter of July 21, 2006, to me for response. It has always been the policy and practice of the Division that a Trooper cannot serve any discipline while separated from the Division. That includes both disciplinary probation and loss in rank which are always coextensive.

By letter dated July 15, 2005 (copy attached), the Division notified Dempsey to report for work on July 20, 2005. "Effective that same date, you will be demoted to Trooper First Class and placed on probation for one year. If you successfully complete your probation, you will be promoted back to the rank of Corporal. You are entitled to back pay from the date you were suspended without pay pending review by the Secretary (January 31, 2005), to the effective date of your reinstatement (July 20, 2005) at your previous rank and salary."

In her July 22, 2005 paycheck, Dempsey received $22,726.81 for the period February 1 – July 9, 2005, at the Corporal rate. In her August 5, 2005 paycheck, Dempsey received $1,395.51 for the period July 10 – 19, 2005, at the Corporal rate.

After Dempsey questioned her paychecks, by letter dated August 19, 2005 (copy attached), Colonel Mac Leish explained that "your loss in rank was effective on July 20, 2005, and your back pay at the rank of Corporal was calculated correctly."

Dempsey's disciplinary probation ended on July 20, 2006. She will be restored to the rank of Corporal effective that date with any back pay which might be owed to that date.

D000087

Robert C. McDonald, Esquire
August 4, 2006
Page 2

     Dempsey's request for back pay to January 31, 2005, at the Corporal rate would amount to double payment.  If, as she maintains, her one-year demotion in rank should have started on January 31, 2005, then she should not have accepted and would have to re-pay the difference between a Corporal's and a TFC's salary for the period of January 31 – July 19, 2006.

Very truly yours,

*Timothy E. Winstead*

Captain Timothy E. Winstead
Director of Human Resources

TEW:vll

Attachments (2)

cc: Colonel Thomas F. Mac Leish
     Superintendent

bcc:  W. Michael Tupman
      Deputy Attorney General

      Stephani J. Ballard, Esquire
      Deputy Attorney General

D000088



**STATE OF DELAWARE**
DEPARTMENT OF JUSTICE

**CARL C. DANBERG**
Attorney General



| NEW CASTLE COUNTY | KENT COUNTY | SUSSEX COUNTY |
|---|---|---|
| Carvel State Building | 102 West Water Street | 114 E. Market Street |
| 820 N. French Street | Dover, DE 19904 | Georgetown, DE 19947 |
| Wilmington, DE 19801 | Criminal Division (302) 739-4211 | (302) 856-5352 |
| Criminal Division (302) 577-8500 | Fax: (302) 739-6727 | Fax: (302) 856-5369 |
| Fax: (302) 577-2496 | Civil Division (302) 739-7641 | TTY: (302) 856-2500 |
| Civil Division (302) 577-8400 | Fax: (302) 739-7652 | |
| Fax: (302) 577-6630 | TTY: (302) 739-1545 | |
| TTY: (302) 577-5783 | | |

PLEASE REPLY TO: New Castle County - Civil Division

August 14, 2006

Robert C. McDonald, Esquire
1010 North Bancroft Parkway
Suite 22
Wilmington, DE 19805

Re:    *Cpl. Elizabeth C. Dempsey*.

Dear Bob:

This will confirm our telephone conversation of August 9th (along with Lt. Col. Seifert), regarding the appropriate date for Cpl. Dempsey's one year demotion to TFC, pursuant to the Secretary's Order dated July 1, 2005. This will also serve as response to your letter of July 21, 2006 to Colonel MacLeish. While, as you know, Cpl. Dempsey has recently filed a federal suit through Jeff Martin, Esquire (whom I am copying with this letter), you advised that you could speak for Cpl. Dempsey on this issue. As a result of our conversation, we are in agreement as to the matters set forth below.

It appears that, based upon prior legal review of the Secretary's order, it was determined that a disciplinary demotion could not run co-terminally with the suspension without pay. Thus Cpl. Dempsey was not demoted until July 20, 2005, her actual return to work date. It is undisputed that she was returned to the rank of Corporal as of July 20, 2006. Upon review of your letter and the Secretary's order, my client and I agree that the intended suspension dates [*demotion date*] which should have been applied were February 1, 2005 (the day Cpl. Dempsey was actually suspended without pay pending appeal) until January 31, 2006. Dempsey's records will be changed accordingly.

The change of dates also involves a pay differential, with a small balance owed to your client, which I outlined for you. Here are the numbers per the DSP Human Resources department:

RECEIVED

AUG 1 7 2006

Human Resources Office
Delaware State Police
D000089

**A000240**

**WHAT CPL. DEMPSEY ACTUALLY EARNED:**

| Date | Rank status | Salary |
|------|-------------|--------|
| 2/1/05 – 7/19/05 | Suspended, rank of Cpl. | $24,251.92 |
| 7/20/05 – 7/19/06 | Active duty; rank of TFC | $49,857.07* |

    * This amount reflects a deduction for 13 days suspension without pay, valued
    at $2545.35, which Cpl. Dempsey served in Aug. 2005)

| TOTAL | | $74,108.99 |

**WHAT CPL. DEMPSEY SHOULD HAVE EARNED:**

| Date | Rank status | Salary |
|------|-------------|--------|
| 2/1/05 – 7/19/05 | Suspended, rank of TFC | $22,684.44 |
| 7/20/05 – 1/31/06 | Active duty, TFC | $27,979.85 |
| (13 days suspension w/out pay/TFC rate) | | ($2545.35) |
| 2/1/06 – 7/19/06 | Active duty, Cpl. | $26,191.83 |

| TOTAL | | $74,310.77 |

Thus, the balance owed to Cpl. Dempsey is $ 201.78. By copy of this letter to Captain Winstead, he will see that this amount is credited to an upcoming paycheck.

Thank you for your cooperation in resolving this matter. If you and your client are in agreement with the information set forth above, kindly sign and return a copy of this letter. A copy will be placed in Cpl. Dempsey's file and her records will be updated accordingly.

Please free to contact me if you should have any questions.

Very truly yours,

Stephani J. Ballard
Deputy Attorney General

cc: Colonel Thomas MacLeish
    Lt. Col. Mark Seifert
    Captain Timothy Winstead
    Jeffrey Martin, Esquire

_____                    _____
Robert C. McDonald, Esquire                  Cpl. Elizabeth C. Dempsey

D000090

New Window | Help | Customize Page |

## Paycheck Summary

Dempsey,Elizabeth C                                    ID: 075463

| | | | |
|---|---|---|---|
| Company: | DEL | Earnings: | 2,510.67 | Empl Rcd#: | 0 |
| Pay Group: | DE1 | Taxes: | 561.44 | Form ID: | ADVICE |
| Pay Period End: | 08/19/2006 | Deductions: | 239.86 | Check #: | 4652991 |
| Sep Chk #: | | Net Pay: | 1,709.37 | Off Cycle ? | |

Begin Date:  08/06/2006        End Date:  08/19/2006

| | Rate Code | Hours | Rate | Earnings | Hourly Rate: | 28.019712 |
|---|---|---|---|---|---|---|
| Regular: | | 80.00 | 28.019712 | 2,241.58 | FLSA Rate: | |
| Overtime: | | | | | Shift/Rate: | N / |
| Reg Earns: | | | | | State: | DE |
| Rate Used: | Hrly Rt. | | | | Locality: | |

| Code | Description | Rate Code | Hours | Rate Used | Amount |
|---|---|---|---|---|---|
| ARP | Retroactive Pay | | | | 201.78 |
| ONT | Offset Non-PET Accumulators | | | | -2443.36 |
| OTA | Offset PET Accumulator | | | | |

← Return to Search   ↑ Previous in List   ↓ Next in List   Notify

*check date   9/1/06*

Theresa
Rhonda
Kristy
Lisa
Vanessa
Gene
file



STATE OF DELAWARE
DEPARTMENT OF SAFETY AND HOMELAND SECURITY
**DIVISION OF STATE POLICE**
P.O. BOX 430
DOVER, DELAWARE 19903

July 15, 2005

Ms. Elizabeth C. Dempsey
P.O. Box 118
Frederica, Delaware 19946

> RE:    Reinstatement

Dear Ms. Dempsey:

In a decision dated July 1, 2005, the Secretary overruled the Division's recommendation that you be terminated for violations of State Police Rule and Regulation #15.

You are to report for duty at 0900 hours to Captain Timothy Winstead on Wednesday, July 20, 2005 for assignment, at which time, you will receive two weeks notice of your work schedule. Effective that same date, you will be demoted to Trooper First Class and placed on probation for one year. If you successfully complete your probation, you will be promoted back to the rank of Corporal.

You are entitled to back pay from the date you were suspended without pay pending review by the Secretary, to the effective date of your reinstatement (July 20, 2005) at your previous rank and salary.

Sincerely,

Colonel Thomas F. Mac Leish

Colonel Thomas F. Mac Leish
Superintendent

cc:    ✓Captain John A. Yeomans
        Director of Human Resources

        Captain Timothy Winstead
        Commander, Troop 4

RECEIVED

JUL 1 9 2005

Human Resources Office
Delaware State Police
D000193

**A000243**

# JOB ASSIGNMENTS / PROMOTIONS

NAME:    **DEMPSEY, ELIZABETH CHRISTINE**          SS NO.:  **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**  IBM
ID # **U296**

| <u>DATE</u> | <u>REMARKS</u> |
|---|---|
| 7/16/1999 | Hired as a Recruit in the 70th D.S.P. Class and assigned to the D.S.P. Academy |
| **9/16/1999** | **Adjusted Date of Hire** |
| 12/27/1999 | Assigned to Troop 5 for the Field Training Officer program |
| 2/7/2000 | Assigned to Troop 7 for the Field Training Officer program |
| 3/6/2000 | Assigned to Troop 5 for the Field Training Officer program |
| 3/20/2000 | Promoted to Trooper |
| 3/27/2000 | Assigned to Troop 3 Traffic |
| 7/16/2001 | Promoted to Trooper First Class |
| 8/30/2001 | Resigned |
| 11/1/2001 | Reinstated as a Trooper Frist Class and assigned to Troop 5 |
| 9/16/2003 | Promoted to Corporal |
| 5/31/2004 | Assigned to Troop 7 |
| 1/31/2005 | Suspended without pay (see Censures) |
| 2/1/2005 | **Demoted to Trooper First Class - see Censures and 08/14/06 letter (change from previous date of 07/20/05)** |
| 7/20/2005 | Return from suspension without pay and assigned to Troop 4 Traffic |
| 2/1/2006 | Promoted to Corporal |

D000185

# CENSURES

**OFFICER:** DEMPSEY, Elizabeth C.

**DATE**     **REMARKS**

01-19-03     CHARGE:     Discourteous conduct
             PENALTY:    Official Reprimand

02/14, 08/16 &  CHARGE:     Failure to maintain quality and quantity of work
09/13/03     PENALTY:    Official Reprimand

05-28-03     CHARGE:     Departmental accident
             PENALTY:    Official Reprimand

11-13-04     Notification of Suspension
             Suspended with pay and benefits pending criminal and administrative investigations

12-22-04     Suspension Rescinded – restored to full duty

01-13-05     **DIVISIONAL HEARING BOARD:**
             Found not guilty of violating RR #14 and found guilty of violating RR #15
             RECOMMENDATION: Dismissal

             Notification of Suspension with Pay
             Suspended with pay and benefits pending Superintendent's review of Board's recommendation
             for termination

01-31-05     Notification of Suspension without Pay
             Suspended without pay and benefits with the intent to dismiss. (Effective 1646 hours)

07-01-05     Reinstatement
             Recommendation to terminate overruled on appeal by Secretary David Mitchell. Effective July
             20, 2005: Demotion to TFC, one-year probation, transfer to Troop 4. 40 hours suspension
             without pay and 80 hours suspended with the option to forfeit vacation; opted to be suspended
             without pay.

D000186

**Tuxward Kristy L (DSP)**

| | |
|---|---|
| **From:** | Paige James (DSP) |
| **Sent:** | Wednesday, December 22, 2004 15:46 |
| **To:** | DSP_Users |
| **Subject:** | Suspensions rescinded (Dempsey & Maher) |

**Message sent authority of Major Paul Eckrich**

Effective immediately the suspensions of Cpl. Brian D. Maher #666 and Cpl. Elizabeth C. Dempsey #296 have been rescinded .
They are restored to full duty.

Captain James Paige
Delaware State Police
Internal Affairs
302-739-5990

1

D000198

**Tuxward Kristy L (DSP)**

| | |
|---|---|
| **From:** | Paige James (DSP) |
| **Sent:** | Saturday, November 13, 2004 18:58 |
| **To:** | DSP_Users |
| **Subject:** | Suspensions |

This message is authorized by Lt. Colonel Thomas MacLeish

Effective Saturday, November 13, 2004, Cpl. Elizabeth C. Dempsey, IBM# 296 and Cpl. Brian D. Maher, IBM #666 were both suspended with pay and benefits regarding pending criminal and administrative investigations.

05/10/2005

D000199

Page: 1 | Report Date: 10/26/2003 | Agency: Troop 3 State Police | Complaint#: 03-03-038183

Reported Date and Time: SUN 10/26/2003 0142

**Initial Crime Report**

Occurred: SUN 10/26/2003 0135 thru SUN 10/26/2003 0142

Location: 1715 B FREDERICA RD    Frederica, DE 19946

**M.O. and Incident Overview:** UNKNOWN SUSPECT(S) DAMAGED V-1'S PROPERTY AND ATTEMPTED TO GAIN ACCESS TO SAME.

| Grid: 125-182 | Sector 34 | County Kent | Domestic Related ☐Yes ☒No | 4-F-14 Sent? ☐Yes ☒No | Gen Broadcast Sent? ☐Yes ☒No |
|---|---|---|---|---|---|

## Victim Information

| Victim Number 001 | Name: DEMPSEY, ELIZABETH |
|---|---|

| Type Individual | Sex Female | Race White | Ethnic Origin Non-Hispanic | Age 28 | D.O.B. 04/02/1975 |
|---|---|---|---|---|---|

| Address 1715 B FREDERICA RD Frederica, DE 19946 | Resident Status Full Time | Home Telephone (302) 632-8559 | Employer/School | Work Telephone |
|---|---|---|---|---|

| Reporting Person? ☒Yes ☐No | Victim Injured? ☐Yes ☒No | Victim Deceased? ☐Yes ☒No | Officer Comments |
|---|---|---|---|

| Injuries | Description of Injuries |
|---|---|

## Suspect/Defendant Information

| Sequence 001 | Type Unknown | SBI Number | Name | | Nick Name |
|---|---|---|---|---|---|

| Sex Male | Race White | | Ethnic Origin Non-Hispanic | Age | D.O.B. | Height | Weight | Skin Tone | | Eye Color |
|---|---|---|---|---|---|---|---|---|---|---|

| Hair Color | Hair Length | Hair Style | Facial Hair | Voice Speech | Teeth | Build | Glasses |
|---|---|---|---|---|---|---|---|

| Disguise | Disguise Color(s) | Resident Status Unknown | Unusual Characteristics | Armed With Unarmed |
|---|---|---|---|---|

| Address | Home Telephone | Employer/School | Work Telephone |
|---|---|---|---|

| Arrest Number | Suspect's Clothing Description |
|---|---|

## Crimes and Associated Information

| Number 001 | Crime Seq 001 | Statute DE:11:0826:0001:F:C | Crime Description Burglary First Degree Dwelling Night Armed With Explosives or Deadly Weapon |
|---|---|---|---|

| Location Type Residence/Home | Status Pending-Active | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense ATPT - Attempt to Commit |
|---|---|---|---|

| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 22025A - Burglary/Forced Entry/Residence |
|---|---|

| Number of Premises 0 | Burglary Force Involved ☒Yes ☐No |
|---|---|

| M.O Information | MO Class Point of Entry | MO Description Roof/Skylight |
|---|---|---|
| | MO Class Method of Entry | MO Description Break Glass |

| Victim Number 001 | Crime Seq 002 | Statute DE:11:0811:00A1:M: | Crime Description Criminal Mischief Under $1000 Damage Property |
|---|---|---|---|

| Location Type Residence/Home | Status Pending-Active | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
|---|---|---|---|

| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 2902 - Damage/Private Property |
|---|---|

| Burglary Force Involved ☐Yes ☐No |
|---|

| Damaged Property | Property Category Structures/Single Occupancy | Value 100.00 |
|---|---|---|

| Extended Description LIVING ROOM DOUBLE GLASS WINDOW; |
|---|

| M.O Information | MO Class Point of Entry | MO Description Window |
|---|---|---|

## Associated Property Summary

| Total Stolen Property $0.00 | Total Recovered Property $0.00 | Total Seized Property $0.00 | Total Damaged Property $100.00 |
|---|---|---|---|

## Victim - Suspect/Defendant Relationships

| 001 DEMPSEY, ELIZABETH | Suspect/Defendant - 001 Unknown | Victim Offender Relationship Relationship Undetermined |
|---|---|---|

| Reporting Officer CPL CSAPO - 3295 2 | Supervisor Approval MICHAEL HOUDEK PSPT543 Date 10/27/2003 0241 |
|---|---|

D000533

**A000248**

| Page: 2 | Report Date: 10/26/2003 | Agency: Troop 3 State Police | Complaint: 03-03-038183 |
|---|---|---|---|

## Witness Information

| Sequence 001 | Type Witness | Name KELLER, KEVIN A | Sex Male | Race White | Age 30 | D.O.B. 08/07/1973 |
|---|---|---|---|---|---|---|
| Address 1825 H N MAIN ST PPERS COVE, TX 76522 | | Home Telephone (254) 681-1595 | Employer/School | | | Work Telephone |

| Sequence 002 | Type Person Contacted | Name GYGRUNICK, CPL P | Sex Male | Race White | Age | D.O.B. |
|---|---|---|---|---|---|---|
| Address 3036 Upper King RD DSP Troop 3 Dover, DE 19901 | | Home Telephone (302) 697-4454 | Employer/School | | | Work Telephone |

| Sequence 003 | Type Person Contacted | Name ARGO, TPR | Sex Male | Race White | Age | D.O.B. |
|---|---|---|---|---|---|---|
| Address 3036 Upper King RD DSP Troop 3 Dover, DE 19901 | | Home Telephone (302) 697-4454 | Employer/School | | | Work Telephone |

## Investigative Narrative

ON SU 102603 APPROX 0115 HOURS, I RESPONDED TO 1715 B FREDERICA, RD., FREDERICA, DE., REFERENCE A BURGLARY COMPLAINT. PRIOR TO MY ARRIVAL, K-COMM ADVISED ON A SECURE CHANNEL THAT V-1/DEMPSEY, ELIZABETH WAS A DELAWARE STATE TROOPER AND THAT INCIDENT JUST OCCURRED. K-COMM ALSO ADVISED V-1 WAS ARMED WITH A HANDGUN. UPON MY ARRIVAL, PC-1/ARGO, TPR WAS ON SCENE. I ARRIVED APPROX TWO MINUTES AFTER PC-2. I CONTACTED V-1, WHO WAS OUT SIDE OF RESIDENCE WITH PC-2, (SEE V-1 STATEMENT). SHORTLY AFTER MY ARRIVAL, PC-1/GYGRUNICK, CPL. ARRIVED AT SCENE.

WHILE AT SCENE, I OBSERVED DAMAGE TO FRONT WINDOW, LOCATED ON SECOND FLOOR OF RESIDENCE. WINDOW WAS LOCATED ON THE SOUTH SIDE OF RESIDENCE AND ACCESSED LIVING ROOM AREA. GLASS FROM SAME WAS LOCATED ON INTERIOR AND EXTERIOR OF RESIDENCE. LOCATION OF INCIDENT WAS AN ⌐MENT, LOCATED ON THE SECOND FLOOR OF RESIDENCE. SAME IS ACCESSED VIA WOODEN STEPS, ⌐TED ON WEST SIDE OF RESIDENCE. AT TOP OF SAID STEPS WAS FRONT ACCESS DOOR. ROOF TO FRONT OF RESIDENCE IS ACCESSED FROM THE LANDING AREA OF SAID STEPS. SAID ROOF IS DIRECT ACCESS TO FRONT WINDOW, WHICH WAS DAMAGED.

UPON OBSERVING DAMAGED WINDOW, WHICH WAS A DOUBLE GLASS WINDOW, SAME WAS UNLOCKED AND PUSHED UP, AS IF UNK SUSPECT(S) WERE ATTEMPTING TO ACCESS INTERIOR. V-1 ADVISED SAID WINDOW WAS CLOSED AND SECURE. A SCREEN WAS PRESENT ON SAID WINDOW, WHICH CAN BE EITHER OPENED OR CLOSED, AND UN-ABLE TO BE SECURED. AFTER FULLY OBSERVING DAMAGED WINDOW AND SURROUNDING AREA OF SAME, I DETERMINED WINDOW AREA WAS NOT ABLE TO BE PROCESSED.

AFTER SAME, MYSELF, PC-1, AND PC-2 OBSERVED FRONT ACCESS DOOR, WHICH POSSESSED A GLASS STORM DOOR. FRESH PRINTS WERE OBSERVED ON EXTERIOR OF GLASS STORM DOOR. AFTER DETERMINING ONE POSSIBLE LIFTABLE PRINT ON SAID GLASS, I WAS ADVISED BY PC-1 TO MAKE ATTEMPTS TO LIFT SAID PRINT. I RESPONDED TO MY VEHICLE AND OBTAINED MY FINGERPRINT KIT. UPON RESPONDING BACK TO FRONT ACCESS DOOR, I OBSERVED W-1/KELLER, KEVIN ON THE INTERIOR OF RESIDENCE. PC-1 ADVISED T⌐T AFTER INQUIRING WITH V-1 IF ANYONE ELSE WAS PRESENT, PC-1 FOUND W-1 INSIDE BEDROOM ⌐ING A BOOK. AFTER SUCCESSFULLY LIFTING SINGLE PRINT OUT OF FOUR SMEARED PRINTS, I C⌐ ACTED W-1, (SEE W-1 STATEMENT). SAID PRINT WILL BE FORWARDED TO SBI FOR FURTHER PROCESSING.

| Reporting Officer: CPL CSAFO    -3295 2 | Supervisor Approval MICHAEL HOUDEK PSPTS43 Date 10/27/2003 0241 |
|---|---|

D000534

| Page: 3 | Report Date: 10/26/2003 | Agency: Troop 3 State Police | Complaint # 03-03-038183 |

### Investigative Narrative - Continued

WHILE AT SCENE, IT WAS DETERMINED W-1 NEEDED A RIDE BACK TO SISTERS RESIDENCE.  I OFFERED W-1 A RIDE, AND UPON ARRIVING AT SISTERS RESIDENCE, LOCATED AT #423 JOHNNY CAKE LANDING RD., FREDERICA, DE., W-1 ADVISED HE HAD MORE INFORMATION REGARDING INCIDENT.  BOTH MYSELF AND W-1 EXITED MY PATROL VEHICLE, AND WHILE STANDING OUTSIDE OF SAME, W-1 OFFERED ADDITIONAL INFORMATION, (SEE W-1 STATEMENT).  AFTER DEPARTING SCENE, I RESPONDED TO DSP/T#3 AND CONTACTED HOUDEK, SGT.  SAME ADVISED TO COMPLETE INITIAL REPORT AND TOT SAME TO DSP/T#3 CI DIVISION FOR FOLLOW UP.

### Statement of Victim 001 - ELIZABETH DEMPSEY

RP-1/V-1 STATED SHE CONTACTED 911 VIA PUBLIC SERVICE BECAUSE SHE HEARD GLASS BREAKAGE FROM FRONT WINDOW OF RESIDENCE WHILE INSIDE HER BEDROOM.  V-1 STATED PRIOR TO SAID, SHE HEARD BANGING ON FRONT DOOR TO RESIDENCE WHILE WASHING HER FACE INSIDE BATHROOM.  V-1 STATED SHE DISREGARDED NOISE, BECAUSE SHE WAS NOT EXPECTING ANYONE.  V-1 STATED AFTER EXITING BATHROOM, SHE ENTERED HER BEDROOM.  V-1 STATED SHE BELIEVES AT ONE POINT AFTER THE LOUD BANGING ON FRONT DOOR, SHE HEARD FOOT STEPS, POSSIBLE COMING FROM ROOF AREA.  V-1 STATED WHILE IN BEDROOM, SHE HEARD GLASS BREAKAGE, WHICH OCCURRED TO LIVING ROOM WINDOW.  V-1 STATED SHE ARMED HERSELF WITH A HANDGUN, AND CONTACTED 911 VIA PUBLIC SERVICE.  V-1 STATED WITHIN SECONDS, SHE HEARD A VEHICLE PEEL WHEELS FROM FRONT AREA OF RESIDENCE, POSSIBLE TRAVELING E/B TOWARDS US#113.  V-1 STATED AFTER CHECKING INTERIOR AND DETERMINING SAME WAS CLEAR, SHE RE-CONTACTED K-COMM AD VISED DISPATCH OF SAME.  V-1 STATED SHE THEN CONTACTED W-1 AT HIS SISTERS RESIDENCE AND INFORMED HIM OF SITUATION.  V-1 STATED W-1 RESPONDED TO SCENE PRIOR TO POLICE ARRIVAL.  V-1 STATED SHE CAN OFFER NO SUSPECT INFORMATION, NOR ANY INVESTIGATIVE LEADS.  V-1 STATED NO ITEMS WERE REMOVED FROM INTERIOR OF HER RESIDENCE.

V-1 STATED PRIOR TO ARRIVING HOME, SHE WAS OUT AT A HAY RIDE LOCATED OFF OF WESTVILLE RD., WYOMING, DE.  V-1 STATED SHE ARRIVED HOME ALONE, AND WAS ALONE AT TIME OF ABOVE INCIDENT.

### Statement of Witness 001 - KEVIN A KELLER

W-1 STATED INITIALLY HE WAS AT HIS SISTER'S RESIDENCE, LOCATED AT #423 JOHNNY CAKE LANDING RD., FREDERICA, DE., (302-335-0861).  W-1 STATED HE RECEIVED A CALL FROM V-1, WHO ADVISED HIM UNKNOWN SUBJECT(S) DAMAGED FRONT WINDOW TO RESIDENCE AND POSSIBLY ATTEMPTED TO GAIN ACCESS.  W-1 STATED HE RESPONDED TO RESIDENCE AS SUPPORT TO V-1.  W-1 STATED HE AND V-1 ARE LONGTIME FRIENDS.  W-1 STATED HE WAS IN DE TO SEEK FUTURE EMPLOYMENT.

(ABOVE STATEMENT OBTAINED AT LOCATION OF INCIDENT)

(BELOW STATEMENT OBTAINED OUTSIDE OF SISTER'S RESIDENCE ON SR#12, W/O FREDERICA, DE.)

W-1 STATED HE AND V-1 WERE DINING OUT AT TGI FRIDAYS ON SAID DATE.  W-1 STATED BOTH HIMSELF V-1 RESPONDED TO V-1'S RESIDENCE TOGETHER PRIOR TO ABOVE INCIDENT.  W-1 STATED WHILE AT 3 RESIDENCE, UNKNOWN SUBJECT WAS BANGING ON FRONT ACCESS DOOR.  W-1 STATED HE WAS ABLE TO O..RVE SAID SUBJECT THROUGH WINDOW SURROUNDING DOOR.  W-1 STATED SAID SUBJECT WAS A WHITE MALE OF MEDIUM HEIGHT, W/ DARK COLORED HAIR.  W-1 STATED SAID SUBJECT WAS ADVISING V-1 TO OPEN

| Reporting Officer CPL CSAPO   -3295 2 | Supervisor Approval MICHAEL HOUDEK PSPT543 Date 10/27/2003 0241 |

D000535

| Page: 4 | Report Date: 10/26/2003 | Agency: Troop 3 State Police | | Complaint: 03-03-038183 |
|---------|------------------------|------------------------------|-|------------------------|

## Statement of Witness 001 - KEVIN A KELLER - Continued

DOOR. W-1 STATED SAID SUBJECT WAS AN AQUIANTENCE OF V-1, WHO IS EMPLOYED BY DSP. W-1 ADVISED SAID SUBJECT WORKS AT ONE OF THE SOUTHERN TROOPS, HOLDS THE RANK OF A HIGH CPL., AND HAS BEEN ON THE DIVISION FOR APPROX 12-17 YEARS. W-1 STATED HE BELIEVES FIRST NAME OF SAID SUBJECT IS 'BOBBY'. W-1 STATED AFTER UNK SUBJECT WAS DENIED ACCESS, SAME ACCESSED FRONT ROOF AREA OF RESIDENCE, SMASHED FRONT LIVING ROOM WINDOW WITH UNKNOWN OBJECT, AND ACCESSED INTERIOR THROUGH SAME. W-1 STATED ONCE INSIDE, V-1 AND UNK SUSPECT EXCHANGED WORDS. W-1 STATED V-1 PICKED UP TELEPHONE AND DIALED 911. W-1 STATED AT SAID POINT, UNK SUSPECT ADVISED HIM THAT V-1 JUST 'SAVED ASS' AND EXITED RESIDENCE. W-1 STATED HE OBSERVED UNK SUSPECT ACCESS A LIGHT COLORED GMC EXT CAB P/U AND EXIT AREA. W-1 STATED HE IS CONCERNED FOR V-1'S SAFETY, AND BECAUSE OF SAME, ADVISED THE INVESTIGATING OFFICER OF THE TRUTH CONCERNING ABOVE INCIDENT.

## Statement of Witness 002 - CPL GYGRUNICK P

SEE ATTACHED SUPPLEMENT

## Statement of Witness 003 - TPR ARGO

SEE SUPPLEMENT.

| Reporting Officer CPL CSAPO -3295 2 | Supervisor Approval MICHAEL HOUDEK PSPT543 Date 10/27/2003 0241 |
|---|---|
| Detective Notified | Referred To Troop 3 State Police - Major Crimes |

| Solvability Factors | ☐ Witness ☐ Suspect Located | ☐ M.O. ☐ Suspect Described | ☐ Trace Stolen Property ☐ Suspect Identified | ☐ Suspect Named ☐ Suspect Vehicle Identified | Status Has Follow Up |
|---|---|---|---|---|---|

D000536

| Page: 1 | Report Date: 10/26/2003 | Agency: Troop 3 State Police | | Complaint: 03-03-038183 |

## Supplemental Report

| Original Occurrence Dates and Times: SUN 10/26/2003 0135 thru SUN 10/26/2003 0142 | Grid: 128-182 | Sector: 34 |

Incident Location:
.5 B FREDERICA RD    Frederica, DE 19946

### Investigative Narrative

I was advised by Kent Com of a burglary that just occurred at 1715-B Frederica Rd. I arrived at approximately 0153hrs, 10-26-03(before the time change) seconds after Tpr Argo and Cpl Csapo. I entered V/Rp-Dempsey's apartment and observed broken glass on the floor of her living room as well as a broken window. The living room has two windows on the east side of the apartment. Both windows were open with the southern window having the shattered glass. I asked V/Rp-Dempsey if she was home when the incident occurred. V/Rp-Dempsey stated, "No, I came home and found the glass on the floor and noticed the broken window." I asked her if there was anything missing from her apartment and she stated, "No." I asked her if she has a boyfriend, she stated, "No." I asked her if she has a male friend who thinks he is her boyfriend, she stated, "No."

I observed nothing inside or outside the apartment that would indicate the object used to shatter the window. There was no foreign objects inside the apartment. During the course of the investigation, in the front yard of the house, I heard V/Rp-Dempsey state to either Tpr Argo or Cpl Csapo that she heard a knock on the front door, then the shattering of the window. I replied immediately, "You said you weren't home during the incident." V/Rp-Dempsey replied "Yes, I was home. I heard a banging on the front door, but I wasn't expecting anyone so I didn't go to the door. I was washing my face. I then heard foot steps on the roof while I was in my bedroom and then I heard the window shatter." As the investigation continued V/Rp-Dempsey mentioned that there is someone else in the apartment. I asked V/Rp-Dempsey to clarify what she had just said, "There is someone else here?" V/Rp-Dempsey stated Kevin is in the bedroom. The bedroom door is connected to the living room and the door was shut. V/Rp-Dempsey called out to Kevin. I heard a male voice and I immediately opened the bedroom door and found W-1 Keller, Kevin sitting on the bed. W-Keller, Kevin stated he is a friend of V/Rp-Dempsey and that he is a police officer from Texas. W-1 Keller, Kevin stated he arrived in Delaware last Wednesday to visit family. W-1 Keller, Kevin stated V/Rp-Dempsey called him at his sisters house and told him about what had occurred and asked him to come over. W-1 Keller, Kevin stated repeatedly that he had been drinking.

I observed a partial print on the front glass storm door. Cpl Csapo was left alone to process the crime scene. Tpr Argo and I had to leave due to a domestic in progress on S. State St.

| Reporting Officer: CPL/T GYGRYNUK  - 885 001 | Supervisor Approval: MICHAEL HOUDEK PSPT543 Date 10/27/2003 0019 |

| Solvability Factors: | ☐Witness ☐Suspect Located | ☐M. O. ☐Suspect Described | ☐Trace Stolen Property ☐Suspect Identified | ☐Suspect Named ☐Suspect Vehicle Described | Status Has Follow Up |

D000537

| Page: 1 | Report Date: 10/29/2003 | Agency: Troop 3 State Police | | Complaint: 03-03-038183 |
|---|---|---|---|---|

## Supplemental Report

| Original Occurrence Dates and Times: SUN 10/26/2003 0135 thru SUN 10/26/2003 0142 | Grid: 128-182 | Sector: 34 |
|---|---|---|

Location: B FREDERICA RD　　Frederica, DE 19946

## Crimes and Associated Information

| Victim Number: 001 | Crime Seq: 001 | Statute: DE:11:0826:0001:F:C | Crime Description: Burglary First Degree Dwelling Night Armed With Explosives or Deadly Weapon | | |
|---|---|---|---|---|---|
| Location Type: Residence/Home | | Status: Unfounded 10/29/2003 | Involvement: ☐Alcohol ☐Drugs ☐Computer | General Offense: ATPT - Attempt to Commit |
| Suspected Hate/Bias ☐Yes ☒No - N/A | | Crime Code: 2202SA - Burglary/Forced Entry/Residence | | |
| Number of Premises 0 | Burglary Force Involved ☒Yes ☐No | | | |

| Victim Number: 001 | Crime Seq: 002 | Statute: DE:11:0811:00A1:M: | Crime Description: Criminal Mischief Under $1000 Damage Property | | |
|---|---|---|---|---|---|
| Location Type: Residence/Home | | Status: Unfounded 10/29/2003 | Involvement: ☐Alcohol ☐Drugs ☐Computer | General Offense: |
| Suspected Hate/Bias ☐Yes ☒No - N/A | | Crime Code: 2902 - Damage/Private Property | | |
| Burglary Force Involved ☐Yes ☐No | | | | |

## Investigative Narrative

As the result of an administrative review, this case is being reclassified as Criminal Mischief. The Victim in this case has stated that the Suspect is in-fact a friend and she desires no further action in this case. Apparently the window has been repaired and the "dispute" settled. Victim feels that no crime was committed. This case is closed as UNFOUNDED.

| Reporting Officer: SGT MULLETT - 669 002 | Supervisor Approval: CHARLES MULLETT PSPT669 Date 11/06/2003 1521 | |
|---|---|---|
| Solvability Factors | ☐Witness ☐Suspect Located | ☐M. O. ☐Suspect Described | ☐Trace Stolen Property ☐Suspect Identified | ☐Suspect Named ☐Suspect Vehicle Described | Status: Closed |

D000538

| Page: 1 | Report Date: 04/20/2004 | Agency: Troop 3 State Police | | Complaint: 03-03-038183 |
|---|---|---|---|---|

## Supplemental Report

| Original Occurrence Dates and Times: SUN 10/26/2003 0135 thru SUN 10/26/2003 0142 | Grid 128-182 | Sector 34 |
|---|---|---|

Incident Location: 5 B FREDERICA RD      Frederica, DE 19946

### Investigative Narrative

On 10-26-03 at 0115 hrs I responded to 1715 B Frederica Rd. Frederica for a burglary in progress. Prior to my arrival KentCom advised the RP, Elizabeth Dempsey, was a Delaware State Trooper and stated she was armed with her handgun. Upon arrival I contacted RP Dempsey on the exterior stairway. RP-Dempsey lives in a second floor apartment of a residence and is accessed by the stairway. Upon contacting RP-Dempsey she advised everything was OK and she did not want to make a big deal out of it. I asked RP-Dempsey to show me which window was broken. RP-Dempsey was very hesitant to let me go to the top of the stairway. RP-Dempsey showed me that you could access the front second story window by stepping over the stairway railing and walking on the porch roof. I walked on the roof to the front of the residence and observed the window was broken. I observed glass on the porch roof and inside the residence on the floor. I also observed the window was open. While I was on the roof CPL Gygrynuk arrived on scene and CPL Csapo shortly behind him. RP-Dempsey appeared to be very reluctant in giving information regarding the incident. I advised RP-Dempsey that this needed to be investigated do to the fact that a suspect had attempted to break into her residence with a marked DSP patrol vehicle parked not 50 yards away. Upon exiting the roof the investigation was turned over to the senior Trooper CPL Gygrynuk. I check the exterior of residence and surrounding area on foot for suspects and evidence with negative results. I then entered the residence were CPL Gygrynuk and CPL Csapo were conducting the interview with RP-Dempsey. During the interview RP-Dempsey advised there was someone else in the residence. CPL Gygrynuk located W-1, Kevin Keller, in RP-Dempsey's bedroom. During the interview RP-Dempsey's statements changed. RP-Dempsey originally advised no one else was in the residence.

to a domestic in progress CPL GyGrynuk and myself had to leave the scene and respond to .e. I had no further involvement with the investigation.

| Inv. Officer: Trk. ARGO - 3391 003 | Supervisor Approval: MARK A GAGLIONE PSPT918 Date 04/20/2004 1133 | |
|---|---|---|
| Solvability Factors | ☐ Witness  ☐ Suspect Located | ☐ M. O.  ☐ Suspect Described | ☐ Trace Stolen Property  ☐ Suspect Identified | ☐ Suspect Named  ☐ Suspect Vehicle Described | Status: Has Follow Up |

D000539

| Page: | Report Date: 04/28/2004 | Agency: Troop 4 State Police | | Complaint #: 03-03-038183 |
|---|---|---|---|---|

## Supplemental Report - #4

| Original Occurrence Dates and Times: SUN 10/26/2003 0135 thru SUN 10/26/2003 0142 | Grid 128-182 | Sector 34 |
|---|---|---|

Actual Location!
B  FREDERICA RD    Frederica, DE 19946

| Risk Assessment Done? [X]Yes [ ]No [ ]N/A | Any Children Present? [ ]Yes [X]No | Juvenile Residents [ ]Yes [X]No | Intimate Relationship [X]Yes [ ]No | Extended Reason for call |
|---|---|---|---|---|

| Active with Family Services? [ ]Yes [X]No | Caseworker Name | | Complainant in Other case? [ ]Yes [X]No | Agency |
|---|---|---|---|---|

| Victim Reported Prior Incident? [ ]Yes [X]No | | Violent Activity? [X]Yes [ ]No | Was DFS Notified? [ ]Yes [X]No | DFS Caseworker Notified | Was a Dual Arrest Made? [ ]Yes [X]No |
|---|---|---|---|---|---|

| Court Orders Active? [ ]Yes [X]No | Active Orders | Order Description |
|---|---|---|

| [ ] Arrest Made | [X] No Arrest Made | [ ] Suspect GOA | [ ] No Crime | [ ] Warrant Pending | [ ] Other |
|---|---|---|---|---|---|

### Original Victim Information

| Victim Number 001 | Name DEMPSEY, ELIZABETH | | | | | |
|---|---|---|---|---|---|---|
| Type Individual | Sex Female | Race White | | Ethnic Origin Non-Hispanic | Age 28 | D.O.B. 04/02/1975 |

| Address 1715 E FREDERICA RD Frederica, DE 19946 | Resident Status Full Time | Home Telephone (302) 632-8559 | Employer/School | | Work Telephone |
|---|---|---|---|---|---|

| Reporting Person? [X]Yes [ ]No | Victim Injured? [ ]Yes [X]No | Victim Deceased? [ ]Yes [X]No | Officer Comments |
|---|---|---|---|

### Modified Victim Information

| Victim Number 001 | Name DEMPSEY, ELIZABETH | | | | | |
|---|---|---|---|---|---|---|
| Type Individual | Sex Female | Race White | | Ethnic Origin Non-Hispanic | Age 28 | D.O.B. 04/02/1975 |

| Address 12 Sea Chase LA Rehoboth Beach, DE 19971 | Resident Status Full Time | Home Telephone (302) 632-8559 | Employer/School DELAWARE STATE POLICE TROOP 5 Bridgeville, DE 19933 | | Work Telephone (302) 337-1090 |
|---|---|---|---|---|---|

| Reporting Person? [ ]Yes [ ]No | Victim Injured? [ ]Yes [X]No | Victim Deceased? [ ]Yes [X]No | Officer Comments | Description of Injuries |
|---|---|---|---|---|

### Risk Assessment

[X] 1. Gun present in the home or accessible to the suspect
[ ] 2. Suspect has used or threatened to use a weapon
[ ] 3. Parties had a recent separation or threatened separation
[ ] 4. Suspect abuses alcohol
[ ] 5. Suspect uses illegal drugs or abuses legal drugs
[ ] 6. Increase in frequency or severity of violence
[ ] 7. Suspect is violent outside the relationship
[ ] 8. Suspect has destroyed cherished personal items
[ ] 9. Suspect is jealous or attempts to control partner
[ ] 10. Suspect has accused the victim of cheating
[ ] 11. Suspect has said, "If I can't have you, no one can."
[ ] 12. Suspect threatens to kill
[ ] 13. Suspect contemplated, threatened, or attempted suicide
[ ] 14. Suspect violent toward children
[ ] 15. Suspect has injured or killed pets
[ ] 16. Suspect has forced victim to have sex when victim did not agree
[ ] 17. Suspect has directed violence toward pregnant partner
[ ] 18. Victim is currently pregnant
[ ] 19. Victim contemplated, threatened, or attempted suicide
[ ] 20. Suspect has mental health history
[ ] 21. Has either party recently filed for a PFA/divorce/other legal filings

### Original Suspect/Defendant Information

| Sequence 001 | Type Unknown | SBI Number | Name | | | Nick Name |
|---|---|---|---|---|---|---|
| Sex Male | Race White | | Ethnic Origin Non-Hispanic | Age | D.O.B. | Height | Weight | Skin Tone | Eye Color |

| | Hair Length | Hair Style | Facial Hair | Voice Speech | Teeth | Build | Glasses |
|---|---|---|---|---|---|---|---|

| Reporting Officer SGT HUDSON  - 812 | Supervisor Approval ROBERT HUDSON PSPT812 Date 05/04/2004 1021 |
|---|---|

D000540

| Page: 2 | Report Date: 04/28/2004 | Agency: Troop 4 State Police | | Complaint: 03-03-038183 |
|---|---|---|---|---|

| Sequence 001 Continued | | | | |
|---|---|---|---|---|

## Suspect/Defendant Information

| Address | | Home Telephone | Employer/School | Work Telephone |
|---|---|---|---|---|

| Arrest Number | Suspect's Clothing Description | | | |
|---|---|---|---|---|

## Modified Suspect/Defendant Information

| Sequence 001 | Type Suspect | SBI Number | Name MAHER, BRIAN DAVID | | Nick Name |
|---|---|---|---|---|---|

| Sex Male | Race White | Ethnic Origin Non-Hispanic | Age 37 | D.O.B. 09/06/1966 | Height 5' 10" | Weight 165 | Skin Tone | Eye Color Blue |
|---|---|---|---|---|---|---|---|---|

| Hair Color Brown | Hair Length Short | Hair Style Military | Facial Hair Clean Shaven | Voice Speech | Teeth | Build Average | Glasses |
|---|---|---|---|---|---|---|---|

| Disguise | Disguise Color(s) | Resident Status Full Time | Unusual Characteristics | Armed With Unarmed |
|---|---|---|---|---|

| Address 12 Sea Chase LA Rehoboth Beach, DE 19971 | Home Telephone (302) 644-2317 | Employer/School DELAWARE STATE POLICE TROOP 7 Lewes, DE 19958 | Work Telephone (302) 645-6653 |
|---|---|---|---|

| Arrest Number | Suspect's Clothing Description | | |
|---|---|---|---|

## Original Crime and Associated Information

| Victim Number 001 | Crime Seq 002 | Statute DE:11:0811:00A1:M: | Crime Description Criminal Mischief Under $1000 Damage Property | |
|---|---|---|---|---|

| Location Type Residence/Home | Status Pending-Active | Involvement ☐ Alcohol ☐ Drugs ☐ Computer | General Offense |
|---|---|---|---|

| Suspected Hate/Bias ☐ Yes ☒ No - N/A | Crime Code 2902 - Damage/Private Property | |
|---|---|---|

| Burglary Force Involved ☐ Yes ☐ No | | |
|---|---|---|

## Modified Crime and Associated Information

| Victim Number 001 | Crime Seq 002 | Statute DE:11:0811:00A1:M: | Crime Description Criminal Mischief Under $1000 Damage Property | |
|---|---|---|---|---|

| Location Type Residence/Home | Status Pending-Active | Involvement ☐ Alcohol ☐ Drugs ☐ Computer | General Offense |
|---|---|---|---|

| Suspected Hate/Bias Yes ☒ No - N/A | Crime Code 2902 - Damage/Private Property | |
|---|---|---|

| Burglary Force Involved ☐ Yes ☐ No | | |
|---|---|---|

| M.O. Information | MO Class Point of Entry | MO Description Window |
|---|---|---|
| | MO Class Criminal Mischief Actions | MO Description Break House Windows |

## Crimes and Associated Information

| Victim Number 001 | Crime Seq 003 | Statute DE:11:0825:0001:F:D | Crime Description Burglary Second Degree Dwelling | |
|---|---|---|---|---|

| Location Type Residence/Home | Status Pending-Active | Involvement ☐ Alcohol ☐ Drugs ☐ Computer | General Offense |
|---|---|---|---|

| Suspected Hate/Bias ☐ Yes ☒ No - N/A | Crime Code 22025A - Burglary/Forced Entry/Residence | |
|---|---|---|

| Number of Premises 0 | Burglary Force Involved ☒ Yes ☐ No | |
|---|---|---|

| Stolen Property | Property Category None | Quantity | Unit Price | Stolen Value .00 | Recovered Value .00 | Recovery Date |
|---|---|---|---|---|---|---|

| M.O. Information | MO Class Criminal Mischief Actions | MO Description Break House Windows |
|---|---|---|
| | MO Class Entry Location | MO Description Front Side |

## Crimes and Associated Information

| Victim Number 001 | Crime Seq 004 | Statute DE:11:0621:00a1:M:A | Crime Description Terroristic Threatening | |
|---|---|---|---|---|

| Location Type Residence/Home | Status Pending-Active | Involvement ☐ Alcohol ☐ Drugs ☐ Computer | General Offense |
|---|---|---|---|

| Suspected Hate/Bias ☐ Yes ☒ No - N/A | Crime Code 13164E - Intimidation/Reckless Endanger/Terroristic Threat/Harassment/Other Assaults/Non-Aggravated | |
|---|---|---|

| Burglary Force Involved ☐ Yes ☐ No | Weapon/Force Used Personal WeaponsHands/Feet | |
|---|---|---|

| Reporting Officer SGT HUDSON  - 812 | Supervisor Approval ROBERT HUDSON  PSPT812  Date 05/04/2004 1021 |
|---|---|

D000541

**A000256**

| Page 3 | Report Date: 04/28/2004 | Agency: Troop 4 State Police | | Complaint: 03-03-038183 |
|---|---|---|---|---|

## Victim - Suspect/Defendant Relationships

| Victim - 001 DEMPSEY, ELIZABETH | Suspect/Defendant - 001 MAHER, BRIAN DAVID | Victim Offender Relationship Boyfriend/Girlfriend |
|---|---|---|

### Investigative Narrative

Narrative Attached.

| Reporting Officer SGT HUDSON  - 812 | | Supervisor Approval ROBERT HUDSON  PSPT812  Date 05/04/2004 1021 | | | |
|---|---|---|---|---|---|
| Solvability Factors | ☐ Witness ☐ Suspect Located | ☐ M. O. ☐ Suspect Described | ☐ Trace Stolen Property ☐ Suspect Identified | ☒ Suspect Named ☐ Suspect Vehicle Described | Status Has Follow Up |

D000542

Complaint #03-03-038183
Sgt. Hudson (Troop 4)
Page 3 of 13

<u>Interview Victim</u>

Victim, **Elizabeth (Christie) Dempsey**, was contacted and interviewed on April 23rd, 2004 at app 1558hrs at the Sussex County Attorney General's Office in Georgetown. Present was Attorney Bob McDonald. The interview was audio taped and a summary follows (for exact dialogues see tape).

Christie advised that on the date of the incident, she was at home with Kevin Keller. She advised that she was in the bathroom washing her face when Kevin told her someone was banging on the door. She advised that she heard a voice that she recognized as that of Brian Maher. She advised that both she and Kevin were intoxicated. She advised that she received a call, either on her home phone or cell phone, from Brian. She advised that he might have asked her to come outside, she could not recall. Christie advised that she ended the call and then heard steps on the porch roof. She advised that Kevin asked the identity of the guy. She advised that she then heard Brian banging on the dormer windows. She advised that she told Kevin it was a Trooper and called 911. Christie advised that was when she heard glass break. She advised that she and Kevin were in the bedroom with the door closed and that the window that was broken was the furthest to the left, facing the front of the residence, which is to the living room not the bedroom.

Christie advised that she never saw Brian neither inside nor outside of the residence. When asked if Brian came into the residence, she replied that she did know. She did not hear him banging on the bedroom door. She advised that she thinks he left while she was on the phone with 911.

Christie advised that she spoke with Brian via public service about an hour after the incident. She advised that Brian stated he was sorry and that he had spoken to the Captain (unknown who to her at that time) what he had done. She advised that Kevin also came back to the residence to argue about how the incident was handled.

Christie admitted that she did not tell the Troopers on scene the truth (who broke the window). She advised that she was embarrassed and did not know what to do.

She advised that she spoke with Brian later in the day on Sunday (26th) around noon. She advised he came over later and began fixing the window. Christie also advised that she spoke with Capt. Hawkins, that day, and he went over if she was okay and if she wanted an arrest.

I next went over the facts again with Christie.

1. The person that broke her window on the 26th was Brian Maher
2. She does not know if he came inside the residence.
3. Brian apologized for breaking the window.

D000543

**Complaint #03-03-038183**
**Sgt. Hudson (Troop 4)**
**Page 4 of 13**

4.    She did not tell the Troopers on scene that night, because she was embarrassed and did not know what to do.
5.    Brian Maher fixed the window.
6.    She does not want prosecution, now or then.
7.    They are now friends and there is no conflict.
8.    Everything she told me is the truth.

In conclusion of the interview, I had Christie and her attorney complete a Risk Assessment.

### Interview Suspect

Suspect, **Brian Maher**, was contacted on April 14th, 2004 at app 1040hrs via public service. He advised that at the advice of Mr. McDonald (attorney) that he would not make a statement.

### Interview Witnesses

Person Contacted, **Mark M. Dyer**, was contacted and interviewed via public service on April 8th, 2004 at app 1050hrs. Mr. Dyer's name came from Captain Dixon.

Mr. Dyer advised that sometime back in October-November 2003, he was talking with Rick Powell (a friend) the day after this incident. He advised that Rick stated that Kevin Keller (Rick's brother-in-law) had been at the house of a trooper and that a domestic dispute ensued. He advised that the dispute involve another trooper coming to the house and kicking in a window. Mr. Dyer advised that he heard the incident involved Troopers Dempsey and Maher.

Mr. Dyer advised that he is a friend of Captain Dixon and brought it to his attention what Rick had said. He advised that he has no direct knowledge of the incident, only what Rick told him.

Witness, **Kevin Keller**, was contacted and interviewed via public service on April 12th, 2004 at app 1458hrs. Kevin resides and is a police officer in Texas. The interview was audio taped and a summary follows (for exact dialogues see tape).

Kevin advised that he is friends with Christie and that he was staying with her during the week. He advised that, on the night of the incident, he and Christie

**Complaint #03-03-038183**
**Sgt. Hudson (Troop 4)**
**Page 5 of 13**

went out with friends and had some drinks. He advised that they were back at the residence, getting ready for bed. Kevin advised that Christie was in the bathroom when he heard someone banging on the door. He advised that he went to the door to see what was going on. He advised there was a guy beating and banging on the door making threats. Kevin could not recall the exact context of the threats but stated they were, "I'm going to kick your ass", and "I'm going to come in there and kill you". He advised that he asked Christie who the guy was and that she replied to just go into the bedroom and that he would leave. He advised that they went into the bedroom and closed the door. Kevin advised that it was evident to him that Christie knew who the guy was.

Kevin advised that he then heard the guy climbing around on the porch roof, beating and banging on the bedroom windows. He advised that he told Christie either she was going to do something or he would. He advised that it was now obvious that the guy was someone that Christie was seeing. Kevin advised that Christie refused to do anything. He advised that at that point, they heard the glass break.

Kevin advised that the guy was now (inside the house) beating and banging on the bedroom door and making the same aforementioned threats. Kevin, at this point, added that he was wasted (intoxicated). He advised that Christie then called 911 and that the guy outside the door knew she was calling 911. He advised that the guy was now saying, "This is fucked-up" and "I thought I knew you better than this".

Kevin advised that the guy then went out the front door. He advised that the guy resembled "Charlie Sheen" and left in a GMC or Chevy extended cab P/U (silver or white)

Kevin advised that he now knows that the guys name is Brian and that he is a Corporal or Sergeant with DSP.

Kevin advised that Christie had called him about a week prior to my call and told him that the case was being reinvestigated and that I would be calling him. He advised that he has never had contact with Brian. He advised that everything he told me was the truth and that Christie had not told him what to say.

He advised that there was no physical assault but that the same threats that were made outside the residence were made inside. He advised that something should be done even if it was minor administrative. Kevin advised that where he comes from, this is a felony. He advised that he did not desire any prosecution but was pissed off about what happened.

Witness, **Cpl. Csapo**, was contacted and interviewed via public service on April 20th, 2004 at app 0840hrs. Cpl. Csapo is a member of the Delaware State

D000545

**Complaint #03-03-038183**
**Sgt. Hudson (Troop 4)**
**Page 6 of 13**

Police Troop 3 and responded on October 26th, 2003 to this complaint. He completed the Initial Crime Report.

Cpl. Csapo advised that there were no changes to his report. He advised that he has done no further investigative work in the case since the initial response. He advised that he has subsequently heard through the "rumor mill" that the incident was in fact a domestic dispute between Victim Dempsey and Suspect Maher. He advised that he has had no contact with either the Victim or the Suspect since the initial incident.

Cpl. Csapo was asked about the latent lift he obtained at the scene and that according to SBI no print had been submitted. Cpl. Csapo advised that he definitely lifted a latent print and forwarded it to SBI.

When asked his "gut feeling" about the case on the night he responded, he replied it appeared not to make sense. He could add nothing further (see Initial Crime Report for further details of action taken by Cpl. Csapo).

Witness, **Tpr. Alex Argo,** was contacted and interviewed via public service on April 20th, 2004 at app 0850hrs. Tpr. Argo is a member of the Delaware State Police Troop 3 and responded on October 26th, 2003 to this complaint. He completed Supplement #3 at my request.

Tpr. Argo advised that he responded to the incident and arrived with Cpl. Gygrynuk. He advised that he spoke with Victim Dempsey and that she said someone had broken a window at the house. He advised that Cpl. Csapo was also on scene and that it appeared that Victim Dempsey didn't want anything done. He advised that he felt like he was not getting all the facts from Victim Dempsey.

Tpr. Argo advised that he has done no further investigative work on the case since his response on the initial complaint. He advised that he has subsequently heard through the rumor mill that the Suspect was Cpl. Maher.

He could add nothing further (see Supplement #3 for further details of action taken by Tpr. Argo).

Witness, **Cpl. Gygrynuk,** was contacted and interviewed via public service on April 21st, 2004 at app 1430hrs. Cpl. Gygrynuk is a member of the Delaware State Police Troop 3 and responded on October 26th, 2003 to this complaint. He completed Supplement #1.

Cpl. Gygrynuk advised that there were no changes from his supplement. He advised that upon initial contact with Victim Dempsey, the case was "hinky". He advised that he took initial statements from Victim Dempsey that changed as

D000546

**Complaint #03-03-038183**
**Sgt. Hudson (Troop 4)**
**Page 7 of 13**

the investigation continued at the scene and that she did not appear to be a victim. He advised that Victim Dempsey did not appear intoxicated but witness Keller was "wasted". He advised that witness Keller appeared scared. Cpl. Gygrynuk advised that the case appeared to be a domestic and that he called and advised Sergeant Houdek.

Cpl. Gygrynuk advised that has done no further investigative work on the case since his response on the initial complaint. He advised that he has subsequently heard that the Suspect was Cpl. Maher. He could add nothing further (see Supplement #1 for further details of action taken by Cpl. Gygrynuk).

Witness, **Richard Jester**, was contacted and interviewed at his residence (1715A Frederica Road) on April 21st, 2004 at app 1100hrs. Mr. Jester resided in the same residence, downstairs apartment, below where Victim Dempsey resided (1715B) on October 26th, 2003.

Mr. Jester advised that he has limited hearing in his right ear and is deaf in his left ear due to a battle with cancer. He advised that he recalled the incident at Victim Dempsey's apartment but that he did not hear any of it. He advised that his son, Timmy Jester, resides with him and that he did hear the incident.

Mr. Jester advised that he saw the broken window the next morning and asked Victim Dempsey what happened. He advised that she stated that she had a fight with her boyfriend and that she pushed him through the window. He advised that he asked her if she was okay and she responded, "you didn't hear any gun fire". He took that to mean that if she weren't all right he would have heard some shooting.

Mr. Jester advised that there have been several different men at Victim Dempsey's apartment over the months she lived there. He advised that she had a domestic dispute with a guy she lived with when she first moved in.

Mr. Jester could add nothing further and stated he would have his son call me.

Witness, **Captain Robert Hawkins**, was contacted and interviewed on April 21st, 2004 at app 0947hrs at Troop 3.  Capt. Hawkins in the Troop 3 Commander. He received a public service call from the Suspect Maher on the morning of the incident.

Capt. Hawkins advised that on October 26th, 2003 he was working at the Delaware State College homecoming. He advised he and other officers were extremely busy and that at app 0200hrs, he received a call from the Suspect Maher on his cell phone. Capt. Hawkins advised that Suspect Maher stated that

**Complaint #03-03-038183**
**Sgt. Hudson (Troop 4)**
**Page 8 of 13**

he had "fucked up" in his County. He advised that Suspect Maher commented that he had broken a window and provided his cell phone number to Capt. Hawkins if he needed to reach him. Capt. Hawkins advised that was the end of the conversation and that he could not tell if Suspect Maher was intoxicated.

Capt. Hawkins advised that he called Troop 3 and spoke to Sgt. Houdek. He advised that Sgt. Houdek advised there had been an incident at Victim Dempsey's residence and that the case sounded screwed-up. He advised that he decided to turn the case over to DV or a detective for follow-up.

Capt. Hawkins advised that he responded to Troop 3 later in the day on October 26th, 2003 and observed the report written by Cpl. Csapo. He advised that he then spoke with both Victim Dempsey and Suspect Maher.

Capt. Hawkins advised that Victim Dempsey apologized for the incident and stated that it was a big misunderstanding. He advised that she stated that the window was being fixed. He advised that he went over any threats or physical attacks during the incident and Victim Dempsey advised that there had been no threats, no assaults and no other damage other than the window. Capt. Hawkins advised that Victim Dempsey advised that she did not want any further police involvement and stated that she was sorry she didn't tell the troopers that responded that morning the truth.

Capt. Hawkins advised that Suspect Maher advised that he was fixing the window. Suspect Maher also advised Capt. Hawkins that he and Victim Dempsey had been seeing each other in a BF/GF capacity. Capt. Hawkins advised that Suspect Maher advised that the incident was a big misunderstanding, said he was sorry, and that he had screwed-up.

Capt. Hawkins advised that he relayed the information on to Major Hughes and that he assigned the case to Sgt. Mullett on Monday (10/27/03) for follow-up.

Witness, **Detective/Sergeant Chuck Mullett**, was contacted and interviewed via public service on April 26th, 2004 at app 1528hrs. Sgt. Mullett is a member of the Delaware State Police Troop 3 and was given this case for review. He completed Supplement #2.

Sgt. Mullett advised he was given the case and after an administrative review it was cleared as unfounded. He advised that he conducted no interviews of either the Suspect Maher or Victim Dempsey.

He advised that the extent of his investigation is reflected in Supplement #2.

D000548

Complaint #03-03-038183
Sgt. Hudson (Troop 4)
Page 9 of 13

## Investigative Action

### April 2nd, 2004

0700hrs -   I contacted Major Hughes at Troop 4. He assigned me case #03-03-038183 for re-investigation. He presented me with the reports prepared to that date and requested that I investigate the case and obtain a disposition.

0800hrs -   I did a computer check of Leiss to verify that I had all reports and supplements prepared to that date and that they were complete and approved.
What I had been presented with, by major Hughes, were all the reports and supplements.

### April 6th, 2004

0830hrs -   Contacted Ed Marecki (Kent COM 739-5868) and requested a copy of the 911 call from 1715B on 10/26/03.

0900hrs -   Contacted Captain Dixon (Troop 5 Commander) at Troop 5. The Victim Dempsey is station at troop 5 under Capt. Dixon's command. He advised that he is aware of the incident but has no direct knowledge of the case facts. He advised that he had not interviewed Victim Dempsey.

### April 8th, 2004

1000hrs -   I reviewed the 911 taped sent to me by Mr. Marecki via E-mail. I also made an audiocassette recording of the 911 call from the E-mail.

1050hrs -   I interviewed Mark Dyer via public service.

### April 9th, 2004

0900hrs -   Responded to Troop 3 and checked the Criminal Files for any additional supplements or attachments to the original report(s). None were located.

D000549

**Complaint #03-03-038183**
**Sgt. Hudson (Troop 4)**
**Page 10 of 13**

Contacted Captain Robert Hawkins (Troop 3 Commander) and advised him of my check of the file and that I would be re-investigating the case. I advised that this would involve interviews with Troopers Gygrynuk, Argo, Csapo, Mullett and himself if so needed.

### April 12th, 2004

1030hrs -     Contacted Suspect Brian Maher via public service. He asked if I had just attempted Victim Dempsey's cell phone. I replied yes and he advised that she was at his home in the shower. I made him aware that I was re-investigating the case and needed to talk to him. He advised that he was aware that the case was being re-investigated and would need to first contact his lawyer Mr. McDonald prior to making any statements. I advised him that I would expect him to call me back with an answer. I also left a message through him that I also needed to talk to Victim Dempsey.

1050hrs -     I left a message for witness Kevin Keller to contact me.

1458hrs -     I conducted an audio taped interview with Kevin Keller via public service. He was in Texas.

### April 14th, 2004

1040hrs -     I called Suspect Maher via public service. He advised that on the advice of Mr. McDonald he was going to refuse to submit to an interview.

1215hrs -     I called Victim Dempsey via public service. I asked when she could meet with me reference an interview as to the facts of the case.

              She advised that she wished to speak with her attorney (also Mr. McDonald) prior to giving a statement. I requested that she call me with the next two days with a response. She agreed.

### April 19th, 2004

1027hrs -     I left a message for Victim Dempsey to call me since the two days had passed.

D000550

**Complaint #03-03-038183**
**Sgt. Hudson (Troop 4)**
**Page 11 of 13**

**April 20th, 2004**

0840hrs –     I conducted an interview with Cpl. Csapo via public service.

0850hrs –     I conducted an interview with Tpr. Argo via public service.

0859hrs –     I contacted Rod Hegman (SBI Fingerprint Analyst) via public service. I had previously contacted Mr. Hegman with regards to a print that had been lifted at the scene and sent to SBI for analysis. On that prior occasion Mr. Hegman advised that there was no latent in his office concerning this case. On this occasion, I advised Mr. Hegman that according to Cpl. Csapo, he had definitely sent the print to SBI. Mr. Hegman advised that he would check for the print again. He sent me an E-mail at 0954hrs advising that he had not located a print.

1035hrs –     I received a public service call from Mr. McDonald. He advised that Suspect Maher would not be making a statement. He advised that Victim Dempsey would make a statement. We agreed to meet at the Sussex County AG's Office on 04/23/04 at 1500hrs.

               Mr. McDonald advised that both Victim Dempsey and Suspect Maher had signed waivers concerning any conflict in his representation of both victim and the suspect.

**April 21st, 2004**

0947hrs –     I conducted an interview with Captain Hawkins in his office at Troop 3.

1050hrs –     I responded to 1715 A & B Frederica Road. The residence is a two-story home with an apartment on the lower level and one on the upper level. 1715A is the lower and 1715B is the upper.

               I obtained (4) Polaroid photographs of the exterior of the home.

1100hrs –     While at the residence, I was contacted by witness Richard Jester, the residence of 1715A. He advised that he was home on the occasion o0f the broken window and that his son was also at the residence Timmy Jester.

D000551

Complaint #03-03-038183
Sgt. Hudson (Troop 4)
Page 12 of 13

I conducted an interview with Richard Jester and left my card for his son Timmy to contact me.

1430hrs - I conducted an interview with Cpl. Gygrynuk via public service.

April 23rd, 2004

1558hrs - I conducted an audio taped interview with Victim Dempsey at the Sussex County Attorney General's Office (in the upstairs conference room). Present during the interview was attorney Bob McDonald.

April 26th, 2004

1528hrs - I conducted an interview with Sgt. Mullett via public service.

## Examination of Crime Scene

Crime scene is a two-story residence located at 1715 Frederica Road. The residence is divided into two apartments. 1715 A is the downstairs apartment, occupied by Richard Jester, and 1715 B is the upstairs apartment, that was occupied by on October 26th, 2003 by Victim Jester.

On April 21st, 2004 at app 1050hrs, I responded to the scene. I obtained (4) Polaroid photographs of the exterior of the residence. The residence is located at the split of Frederica Road and Market Street. Frederica Road runs in front of the residence, while Market Street runs behind the residence. The upstairs residence door is accessed via a set of wooden stairs. There is no access to the upstairs windows except by climbing onto the front porch roof or by ladder. To access the window that was damaged (front window farthest to left when facing the residence) on must climb on to the porch roof.

I did not access the interior of apartment B. Nor could I observe the damaged window from anywhere other than from the ground. I could not tell the window had ever been damaged.

## Evidence

No evidence work completed by me. I did contact SBI reference a latent print lifted by Cpl. Csapo. SBI, Rod Hegman, advised that the print was not located.

D000552

**Complaint #03-03-038183**
**Sgt. Hudson (Troop 4)**
**Page 13 of 13**

On 04/21/04, I obtained (4) Polaroid photographs of the exterior residence.

**Damaged Property**

See Initial Crime Report.

**Prosecutive Action**

The facts in this case support the elements contained in: Burglary 2nd 11-825, Terroristic Threatening 11-621 and Criminal Mischief 11-811. The case will be turned over to the Attorney General's Office (Kent County) for review.

The victim in the case does not desire prosecution.

D000553

| Page: 1 | Report Date: 05/28/2004 | Agency: Troop 4 State Police | | Complaint: 03-03-038183 |
|---|---|---|---|---|

## Supplemental Report

| Original Occurrence Dates and Times: SUN 10/26/2003 0135 thru SUN 10/26/2003 0142 | Grid: 128-182 | Sector: 34 |
|---|---|---|

Location: 35 B FREDERICA RD   Frederica, DE 19946

## Victim Information

| Victim Number: 001 | Name: DEMPSEY, ELIZABETH |
|---|---|

| Type: Individual | Sex: Female | Race: White | Ethnic Origin: Non-Hispanic | Age: 28 | D.O.B.: 04/02/1975 |
|---|---|---|---|---|---|

| Address: 12 Sea Chase LA, Rehoboth Beach, DE 19971 | Resident Status: Full Time | Home Telephone: (302) 632-8559 | Employer/School: DELAWARE STATE POLICE TROOP 5 | Work Telephone: (302) 337-1090 |
|---|---|---|---|---|

| Reporting Person? X Yes ☐ No | Victim Injured? ☐ Yes X No | Victim Deceased? ☐ Yes X No | Officer Comments |
|---|---|---|---|

| Injuries | Description of Injuries |
|---|---|

### Risk Assessment

- X 1. Gun present in the home or accessible to the suspect
- ☐ 2. Suspect has used or threatened to use a weapon
- ☐ 3. Parties had a recent separation or threatened separation
- ☐ 4. Suspect abuses alcohol
- ☐ 5. Suspect uses illegal drugs or abuses legal drugs
- ☐ 6. Increase in frequency or severity of violence
- ☐ 7. Suspect is violent outside the relationship
- ☐ 8. Suspect has destroyed cherished personal items
- ☐ 9. Suspect is jealous or attempts to control partner
- ☐ 10. Suspect has accused the victim of cheating
- ☐ 11. Suspect has said, "If I can't have you, no one can."
- ☐ 12. Suspect threatens to kill
- ☐ 13. Suspect contemplated, threatened, or attempted suicide
- ☐ 14. Suspect violent toward children
- ☐ 15. Suspect has injured or killed pets
- ☐ 16. Suspect has forced victim to have sex when victim did not agree
- ☐ 17. Suspect has directed violence toward pregnant partner
- ☐ 18. Victim is currently pregnant
- ☐ 19. Victim contemplated, threatened, or attempted suicide
- ☐ 20. Suspect has mental health history
- ☐ 21. Has either party recently filed for a PFA/divorce/other legal filings

| Victim Number: 002 | Name: KELLER, KEVIN A |
|---|---|

| Type: Individual | Sex: Male | Race: White | Ethnic Origin: Non-Hispanic | Age: 30 | D.O.B.: 08/07/1973 |
|---|---|---|---|---|---|

| Address: 1625 H N Main ST, COPPERS COVE, TX 76522 | Resident Status: Full Time | Home Telephone: (302) 681-1595 | Employer/School | Work Telephone |
|---|---|---|---|---|

| Reporting Person? ☐ Yes X No | Victim Injured? ☐ Yes X No | Victim Deceased? ☐ Yes X No | Officer Comments |
|---|---|---|---|

| Injuries | Description of Injuries |
|---|---|

## Suspect/Defendant Information

| Sequence: 001 | Type: Defendant | SBI Number: 00082582 | Name: MAHER, BRIAN DAVID | Nick Name |
|---|---|---|---|---|

| Sex: Male | Race: White | Ethnic Origin: Non-Hispanic | Age: 37 | D.O.B.: 09/06/1966 | Height: 5' 10" | Weight: 165 | Skin Tone | Eye Color: Blue |
|---|---|---|---|---|---|---|---|---|

| Hair Color: Brown | Hair Length: Short | Hair Style: Military | Facial Hair: Clean Shaven | Voice Speech | Teeth | Build: Average | Glasses |
|---|---|---|---|---|---|---|---|

| Disguise | Disguise Color(s) | Resident Status: Full Time | Unusual Characteristics | Armed With: Unarmed |
|---|---|---|---|---|

| Address: 116 Heronwood DR, Rehoboth Beach, DE 19971 | Home Telephone: (302) 644-2317 | Employer/School: DELAWARE STATE POLICE TROOP 7 Lewes, DE 19958 | Work Telephone: (302) 645-6653 |
|---|---|---|---|

| Arrest Number: 379518 | Arrest Type: Warrant | Suspect's Clothing Description |
|---|---|---|

## Crimes and Associated Information

| Victim Number: 001 | Crime Seq: 001 | Statute: DE:11:0826:0001:F:C | Crime Description: Burglary First Degree Dwelling Night Armed With Explosives or Deadly Weapon |
|---|---|---|---|

| Reporting Officer: SGT HUDSON - 812 005 | Supervisor Approval: ROBERT HUDSON PSPT812 Date 06/01/2004 1045 |
|---|---|

D000554

| Page: 2 | Report Date: 05/28/2004 | Agency: Troop 4 State Police | | Complaint: 03-03-038183 |
|---|---|---|---|---|

## Crimes and Associated Information

| Location Type Residence/Home | Status Unfounded 10/29/2003 | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense ATPT – Attempt to Commit |
|---|---|---|---|
| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 22025A – Burglary/Forced Entry/Residence | | |
| Number of Premises ☐ | Burglary Force Involved ☒Yes ☐No | | |

| Victim Number 001 | Crime Seq 002 | Statute DE:11:0811:00Af:M: | Crime Description Criminal Mischief Under $1000 Damage Property |
|---|---|---|---|

| Location Type Residence/Home | Status Adult Arrest 05/28/2004 | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
|---|---|---|---|
| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 2902 – Damage/Private Property | | |
| Burglary Force Involved ☐Yes ☐No | | | |

| Victim Number 001 | Crime Seq 003 | Statute DE:11:0825:0001:F:D | Crime Description Burglary Second Degree Dwelling |
|---|---|---|---|

| Location Type Residence/Home | Status Prosecution Declined 05/28/2004 | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
|---|---|---|---|
| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 22025A – Burglary/Forced Entry/Residence | | |
| Number of Premises 0 | Burglary Force Involved ☒Yes ☐No | | |

| Victim Number 001 | Crime Seq 004 | Statute DE:11:0621:00a1:M:A | Crime Description Terroristic Threatening |
|---|---|---|---|

| Location Type Residence/Home | Status Adult Arrest 05/28/2004 | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense THRT – Threat to Commit |
|---|---|---|---|
| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 13164E – Intimidation/Reckless Endanger/Terroristic Threat/Harassment/Other Assaults/Non-Aggravated | | |
| Burglary Force Involved ☐Yes ☐No | Weapon/Force Used Personal Weapons/Hands/Feet | | |

| Victim Number 001 | Crime Seq 005 | Statute DE:11:0823:0000:M:A | Crime Description Criminal Trespass First Degree |
|---|---|---|---|

| Location Type Residence/Home | Status Adult Arrest 05/28/2004 | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
|---|---|---|---|
| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code 5707 – Trespassing/Free Text | | |
| Burglary Force Involved ☐Yes ☐No | | | |

## Victim - Suspect/Defendant Relationships

| Victim - 001 DEMPSEY, ELIZABETH | Suspect/Defendant - 001 MAHER, BRIAN DAVID | Victim Offender Relationship Boyfriend/Girlfriend |
|---|---|---|
| Victim - 002 KELLER, KEVIN A | Suspect/Defendant - 001 MAHER, BRIAN DAVID | Victim Offender Relationship Otherwise Known |

## Investigative Narrative

On 05/28/04, I received notice from DAG Welch to proceed with charges against the defendant Maher. The charges were Terroristic Threatening, Criminal Mischief and Criminal Trespass 1st. I next responded to troop 4 and prepared a warrant for the aforementioned charges and contacted Defendant Maher.


At app 1930hrs, Defendant Maher met me at Troop 4. He was processed and then arraigned at JP3.


Defendant Maher was released on $650.00 unsecured bond with a No Contact Order (with Victim Dempsey or Victim Keller).

| Reporting Officer SGT HUDSON - 812 005 | | Supervisor Approval ROBERT HUDSON PSPT812 Date 06/01/2004 1045 | | |
|---|---|---|---|---|
| Solvability Factors | ☐Witness ☐Suspect Located | ☐M.O. ☐Suspect Described | ☐Trace Stolen Property ☐Suspect Identified | ☐Suspect Named ☐Suspect Vehicle Described | Status Closed |

A000270

D000555

D000556

**A000271**



D000557

A000272

**Citizen complaint     IA number: 12-04     Received: 03/30/2004 14:30**

Case number: 12-04

Officers involved:

**Cpl/3 Brian D. Maher [U666/U666]**

Officer current info:

IA Type:
Troop:  Aviation
Unit:

Snapshot - officer information at time of incident:

Badge/ID no:
IA Type:
Troop:
Unit:
Rank/title:
Age:     Years of employment:     Years with unit:
In uniform:   Off duty:   Off duty employed:

Allegations:

R&R #4 - Conduct Unbecoming - Substantiated - Aug 06, 2004
JPS #14 - Fail to Notify On-Duty Supervisor of Domestic - Substantiated - Aug 06, 2004

Actions taken:

Oct 27, 2004 - Immediate reduction to Corporal  Days/hrs suspended/assessed:
Oct 27, 2004 - 1 year probation  Days/hrs suspended/assessed:
Oct 27, 2004 - 80 Hours with Option to Forfeit Vacation  Days/hrs suspended/assessed:
Oct 27, 2004 - 40 Hours without Pay  Days/hrs suspended/assessed:

**Corporal Elizabeth  C. Dempsey [296/296]**

Officer current info:

IA Type:
Troop:  Troop 5
Unit:  Patrol

Snapshot - officer information at time of incident:

Badge/ID no:
IA Type:
Troop:
Unit:
Rank/title:
Age:     Years of employment:     Years with unit:
In uniform:   Off duty:   Off duty employed:

Allegations:

R&R #15 - False Statement - Substantiated - Aug 06, 2004
JPS #14 - Fail to Notify On-Duty Supervisor of Domestic - Substantiated - Aug 06, 2004

D000574

**A000273**

Actions taken:

Jan 13, 2005 – Terminated  Days/hrs suspended/assessed:
Jan 31, 2005 – Immediate reduction to TFC.  Days/hrs suspended/assessed:
Jan 31, 2005 – 1 year probation  Days/hrs suspended/assessed:
Jul 01, 2005 – 40 Hours without Pay  Days/hrs suspended/assessed:
Jul 01, 2005 – 80 Hours with Option to Forfeit Vacation  Days/hrs suspended/assessed:
Jul 01, 2005 – Appeal hearing-Reversed Termination  Days/hrs suspended/assessed:

**Major Randall L. Hughes II [U596/U596]**

**Officer current info:**

IA Type:
Troop:  Headquarters-academy
Unit:

**Snapshot – officer information at time of incident:**

Badge/ID no:
IA Type:
Troop:
Unit:
Rank/title:
Age:    Years of employment:    Years with unit:
In uniform:    Off duty:    Off duty employed:

Allegations:

R&R #5 – Neglect of Duty – Unfounded – Aug 18, 2004
JPS #12 – Poor Judgment – Substantiated – Aug 18, 2004

Actions taken:

Aug 18, 2004 – 16 Hours with Option to Forfeit Vacation  Days/hrs suspended/assessed:

**Captain Robert C. Hawkins [U072/U072]**

**Officer current info:**

IA Type:
Troop:  Headquarters-homicide Un
Unit:

**Snapshot – officer information at time of incident:**

Badge/ID no:
IA Type:
Troop:
Unit:
Rank/title:
Age:    Years of employment:    Years with unit:
In uniform:    Off duty:    Off duty employed:

Allegations:

R&R #5 – Neglect of Duty – Unfounded – Aug 18, 2004

12-04  Page: 3

JPS #12 - Poor Judgment - Substantiated - Aug 18, 2004

Actions taken:

Aug 18, 2004 - 24 Hours with Option to Forfeit Vacation  Days/hrs suspended/assessed:

**Lieutenant Gregory W. Donaway [U022/U022]**

**Officer current info:**

IA Type:
Troop:  Special Invest - South
Unit:

**Snapshot - officer information at time of incident:**

Badge/ID no:
IA Type:
Troop:
Unit:
Rank/title:
Age:    Years of employment:    Years with unit:
In uniform:   Off duty:   Off duty employed:

Allegations:

JPS #12 - Poor Judgment - Unfounded - Aug 06, 2004

**Sergeant Michael C. Houdek [U543/U543]**

**Officer current info:**

IA Type:
Troop:  Troop 5
Unit:

**Snapshot - officer information at time of incident:**

Badge/ID no:
IA Type:
Troop:
Unit:
Rank/title:
Age:   Years of employment:   Years with unit:
In uniform:   Off duty:   Off duty employed:

Allegations:

R&R #5 - Neglect of Duty - Unfounded - Aug 06, 2004
JPS #12 - Poor Judgment - Unfounded - Aug 06, 2004

**Sergeant Charles R. Mullett [U669/U669]**

**Officer current info:**

IA Type:

D000576

**A000275**

Troop: Troop 3 - Criminal
Unit:

**Snapshot - officer information at time of incident:**

Badge/ID no:
IA Type:
Troop:
Unit:
Rank/title:
Age:    Years of employment:    Years with unit:
In uniform:    Off duty:    Off duty employed:

Allegations:

   JPS #12 - Poor Judgment - Unfounded - Aug 06, 2004

**Officer complainants:**

   **Lt. Colonel Thomas F. Macleish [484/484]**

      **Officer current info:**

      IA Type:
      Troop: HQ
      Unit:  Executive Staff

**Summary:**

   Cpl/3 Brian Maher broke Cpl. Elizabeth's window to her second floor
   apartment and gained entry during the course of a domestic incident on
   October 26, 2003.  During the subsequent crimini investigtion, Cpl.
   Dempsey made false statements to 911 dispatchers, as well as, Delaware
   State Police Troopers.

   **When/where:**

   Date/time occurred: Oct 26 2003  01:42

   Address: 1715B Frederica Road Frederica  DE

         County:  Kent

   **Status/assignment information:**

   Status: Completed Priority: Medium

   Opened: 03/30/2004      Assigned: 03/30/2004      Due:
                 Completed: 08/19/2004

   Disposition: Substantiated

   Unit assigned: Internal Affairs Unit    Handled at field/unit level: No
   Investigator assign: Captain James Paige
   Supervisor assign: Captain James Paige
   Source of information: Administrative Officer

D000577

12-04  Page: 5

**Organizational component(s):**

Troop: Troop 7
Unit: Patrol
County: Sussex

Entered by:  Captain James Paige on Aug 19, 2004 at 14:51

D000578

**Cpl/3 Brian D. Maher #666**

Delaware State Police Rule and Regulation #4 – Conduct Unbecoming

Delaware State Police Job Performance Standard #14 – Domestic Incidents involving sworn Division members.

A review of the actions taken by Cpl/3 Maher on October 26, 2004, shows that there is evidence to substantiate the allegations. A criminal investigation conducted by Sgt. Robert Hudson and Internal Affairs investigation revealed that Cpl/3 Maher broke a window to Cpl. Dempsey's residence and gained entry. During the incident Cpl/3 Maher threatened to cause physical harm to Kevin Keller. Cpl/3 Maher was arrested for Terroristic Threatening, Criminal Mischief and Criminal Trespass 1st. As part of a plea agreement reached, Cpl/3 Maher elected Probation Before Judgment on the Criminal Trespass 1st charge and the two remaining charges were nolle prossed. Cpl/3 Maher did conduct himself in a manner to bring discredit upon himself and the Division in violation of Delaware State Police Rule and Regulation #4.

Cpl/3 Maher did not notify the on-duty supervisor at Troop 7 regarding the incident on October 26, 2004 in violation of Delaware State Police Job Performance Standard #14.

**Cpl. Elizabeth C. Dempsey #296**

Delaware State Police Rule and Regulation #15 – False Statements

Delaware State Police Job Performance Standard #14 – Domestic Incidents involving sworn Division members.

A review of the statements given by Cpl. Dempsey shows that there is evidence to substantiate that she gave false statements to Delaware State Police dispatchers and troopers. Cpl. Dempsey failed to notify the on-duty supervisor at Troop 5 regarding the incident.

**Sgt. Michael Houdek #543**

Delaware State Police Rule and Regulation #5 – Neglect of Duty

Delaware State Police Job Performance Standard #12 – Poor Judgment

A review of Sgt. Houdek's actions in this incident does not substantiate the allegations. Sgt. Houdek did not respond to the scene for several reasons. First, his Troop Commander directed him to have his troopers clear the scene and the matter would be followed up the following day. Second, by the time a decision could be reached to

respond, the troopers were actually clearing the scene. Sgt. Houdek instructed Cpl. Csapo to document the incident as reported by Cpl. Dempsey. Sgt. Houdek's reasoning for such instruction was that he felt that the incident should document Cpl. Dempsey's report of the incident and subsequent statements and actions as they unfolded to document that the incident was falsely reported.

### Captain Robert C. Hawkins #072

Delaware State Police Rule and Regulation #5 – Neglect of Duty

Delaware State Police Job Performance Standard #12 – Poor Judgment

A review of Captain Hawkins's actions in this incident revealed that he exercised poor judgment rather than neglecting his duties with regards to the direction he gave to "administratively unfound" complaint 03-03-38183. Captain Hawkins also exercised poor judgment in failing to address the issue with Corporal Dempsey making false statements to investigating troopers in connection with complaint 03-03-38183. Captain Hawkins failed to follow up and advise all pertinent facts of complaint 03-03-38183 to Major Hughes.

### Lieutenant Gregory W. Donaway #022

Delaware State Police Job Performance Standard #12 – Poor Judgment

A review of Lt. Donaway's actions in this incident revealed that he was acting on the direction of his Troop Commander. The allegation is unfounded.

### Sgt. Charles R. Mullett #669

Delaware State Police Job Performance Standard #12 – Poor Judgment

A review of Sgt. Mullett's actions in this incident revealed that he was acting on the direction of his Troop Commander. The allegation is unfounded.

### Major Randall L. Hughes #596

Delaware State Police Rule and Regulation #5 – Neglect of Duty

Delaware State Police Job Performance Standard #12 – Poor Judgment

A review of Major Hughes's actions in this incident revealed that he used poor judgment rather than neglecting his duties when per telephone conversation with Captain Hawkins,

D000580

**A000279**

Major Hughes was made aware of an incident, complaint 03-03-38183, involving Delaware State Troopers and failed to notify Internal Affairs.



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## FINAL DISPOSITION

**INTERNAL AFFAIRS #:**   IA 12-04

**INVESTIGATED BY:**   Captain James Paige
Internal Affairs Division

**TROOPER:**   Captain Robert C. Hawkins #072
Troop 3 Commander

**DATE OF REVIEW:**   August 6, 2004 and August 18, 2004

**REVIEWED BEFORE:**   Lt. Colonel Thomas MacLeish/Major Paul Eckrich

**DATE OF HEARING:**   N/A

**ALLEGATION:**
It is alleged that you failed to follow policies and procedures regarding the investigation and/or prosecution of a criminal/domestic incident, specifically complaint 03-03-38183. It is also alleged that you used poor judgment regarding the manner in which the investigation was supervised and/or conducted.

**Delaware State Police Rule and Regulation #5:**
To Wit: "No member of the Division of State Police shall engage in any conduct, which constitutes neglect of duty."

**FINDING:**   The allegation was <u>Unfounded</u>.

**Delaware State Police Job Performance Standard #12:**
To Wit: "Members shall at all times use sound judgment in the performance of their duties."

**FINDING:**   The allegation was <u>Substantiated</u>.

D000570



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

<u>FINAL DISPOSITION</u>

**INTERNAL AFFAIRS #:**    IA 12-04

**INVESTIGATED BY:**    Captain James Paige
Internal Affairs Division

**TROOPER:**    Major Randall L. Hughes #596
Kent/Sussex Operations

**DATE OF REVIEW:**    August 6, 2004 and August 18, 2004

**REVIEWED BEFORE:**    Lt. Colonel Thomas MacLeish/Major Paul Eckrich

**DATE OF HEARING:**    N/A

**ALLEGATION:**
It is alleged that you failed to follow policies and procedures of the Division regarding the criminal/administrative investigation and/or prosecution of a criminal/domestic incident, specifically complaint 03-03-38183. It is also alleged that you used poor judgment regarding the manner in which the investigation was supervised and/or conducted.

<u>Delaware State Police Rule and Regulation #5:</u>
To Wit: "No member of the Division of State Police shall engage in any conduct, which constitutes neglect of duty."

**FINDING:**    The allegation was <u>Unfounded.</u>

<u>Delaware State Police Job Performance Standard #12:</u>
To Wit: "Members shall at all times use sound judgment in the performance of their duties."

**FINDING:**    The allegation was <u>Substantiated.</u>

D000569



## Delaware State Police
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

### FINAL DISPOSITION

**INTERNAL AFFAIRS #:**    IA 12-04

**INVESTIGATED BY:**    Captain James Paige
Internal Affairs Division

**TROOPER:**    Sergeant Michael Houdek #543
Troop 3 Shift Supervisor

**DATE OF REVIEW:**    August 6, 2004

**REVIEWED BEFORE:**    Lt. Colonel Thomas MacLeish/Major Paul Eckrich

**DATE OF HEARING:**    N/A

**ALLEGATION:**
It is alleged that you failed to follow policies and procedures regarding the investigation and/or prosecution of a criminal/domestic incident, specifically complaint 03-03-38183. It is also alleged that you used poor judgment regarding the manner in which the investigation was supervised and/or conducted.

**Delaware State Police Rule and Regulation #5:**
To Wit: "No member of the Division of State Police shall engage in any conduct, which constitutes neglect of duty."

**FINDING:**    The allegation was **Unfounded.**

**Delaware State Police Job Performance Standard #12:**
To Wit: "Members shall at all times use sound judgment in the performance of their duties."

**FINDING:**    The allegation was **Unfounded.**

D000571

**A000283**



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## FINAL DISPOSITION

**INTERNAL AFFAIRS #:**   IA 12-04

**INVESTIGATED BY:**   Captain James Paige
Internal Affairs Division

**TROOPER:**   Lieutenant Gregory W. Donaway #022
Troop 3 Criminal Operations

**DATE OF REVIEW:**   August 6, 2004

**REVIEWED BEFORE:**   Lt. Colonel Thomas MacLeish/Major Paul Eckrich

**DATE OF HEARING:**   N/A

**ALLEGATION:**

It is alleged that you used poor judgment by failing to follow policies and procedures regarding the investigation and/or prosecution of a criminal/domestic incident, specifically complaint 03-03-38183. It is also alleged that you used poor judgment regarding the manner in which the investigation was supervised and/or conducted.

**Delaware State Police Job Performance Standard #12:**
To Wit: "Members shall at all times use sound judgment in the performance of their duties."

**FINDING:**   The allegation was <u>Unfounded</u>.

D000572

**A000284**



## Delaware State Police
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

### FINAL DISPOSITION

**INTERNAL AFFAIRS #:**  IA 12-04

**INVESTIGATED BY:**  Captain James Paige
Internal Affairs Division

**TROOPER:**  Sergeant Charles R. Mullett #669
Troop 3 Criminal Operations

**DATE OF REVIEW:**  August 6, 2004

**REVIEWED BEFORE:**  Lt. Colonel Thomas MacLeish/Major Paul Eckrich

**DATE OF HEARING:**  N/A

**ALLEGATION:**

It is alleged that you used poor judgment by failing to follow policies and procedures regarding the investigation and/or prosecution of a criminal/domestic incident, specifically complaint 03-03-38183.

**Delaware State Police Job Performance Standard #12:**
To Wit: "Members shall at all times use sound judgment in the performance of their duties."

**FINDING:**  The allegation was **Unfounded**.

D000573



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

### NOTIFICATION OF INTERNAL INQUIRY

TO:  Sergeant Charles R. Mullett #669
Delaware State Police Troop 3

FROM:  Captain James Paige
Internal Affairs Division

DATE:  July 8, 2004

This is to inform you that the Internal Affairs Division is conducting an investigation into an allegation of violation (s) of: Delaware State Police Job Performance Standard #12 – Poor Judgment.

### ALLEGATION

It is alleged that you used poor judgment by failing to follow policies and procedures regarding the investigation and/or prosecution of a criminal/domestic incident, specifically complaint 03-03-38183.

### If substantiated the allegation would be a violation of:

Job Performance Standard #12, which states, "Members shall at all times use sound judgment in the performance of their duties.

This is an administrative investigation, not a criminal investigation. Your signature below only acknowledges receipt of this notice and is not an admission of guilt.

_____ 219  7-8-2004
(Internal Affairs Officer)              Date

_____ Charles R. Mullett 669
(Signature of Officer)              Date  7-8-04

D000620

**A000286**



## Delaware State Police
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

### NOTIFICATION OF INTERNAL INQUIRY

TO:        Sergeant Charles R. Mullett #669
                Delaware State Police Troop 3

FROM:     Captain James Paige
                Internal Affairs Division

DATE:      July 21, 2004

      This is to inform you that the Internal Affairs Division is conducting an investigation into an allegation of violation (s) of: Delaware State Police Job Performance Standard #12 -- Poor Judgment.

### ALLEGATION

      It is alleged that you used poor judgment by failing to follow policies and procedures regarding the investigation and/or prosecution of a criminal/domestic incident, specifically complaint 03-03-38183.

### If substantiated the allegation would be a violation of:

      Job Performance Standard #12, which states, "Members shall at all times use sound judgment in the performance of their duties.

This is an administrative investigation, not a criminal investigation. Your signature below only acknowledges receipt of this notice and is not an admission of guilt.

_____   7-21-04
(Internal Affairs Officer)           Date

_____   7-21-04
(Signature of Officer)             Date

D000621



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

### ATTORNEY WAIVER FORM

I've been made aware of my right to be represented by an attorney before any questioning and I hereby waive my right with the understanding that I may still request an attorney at anytime during the questioning.

Name _____

Date _____7·21·04_____

D000622



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## ATTORNEY WAIVER FORM

I've been made aware of my right to be represented by an attorney before any

questioning and I hereby waive my right with the understanding that I may still request

an attorney at anytime during the questioning.

Name _Charl R Mullet 660_

Date _7-8-04_

D000623



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

### Results of Internal Inquiry

TO:         Sergeant Charles R. Mullett #669
            Delaware State Police Troop 3

FROM:       Captain James Paige
            Internal Affairs Division

CASE No:    IA 12-04

DATE:       August 19, 2004

This is to inform you that the Internal Affairs Division has concluded its investigation into the allegation of Poor Judgment.

On Friday, August 6, 2004, the investigation was reviewed with Lt. Colonel Thomas MacLeish.  The allegation of Poor Judgment in violation of Delaware State Police Job Performance Standard #12 has been ruled as **Unfounded**.

Your signature below acknowledges receipt of this notice.  Retain one copy for your records and return the IAD copy to the Internal Affairs Division as soon as possible.

_____ 219          _8-19-2004_____
(Internal Affairs Officer)                  (Date)

_____ 669          _8-23-04_____
(Signature of Trooper)                     (Date)

D000624

**A000290**



## Delaware State Police
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

### NOTIFICATION OF INTERNAL INQUIRY

TO:       Lieutenant Gregory W. Donaway #022
            Delaware State Police Troop 3

FROM:    Captain James Paige
            Internal Affairs Division

DATE:     July 8, 2004

       This is to inform you that the Internal Affairs Division is conducting an investigation into an allegation of violation (s) of: Delaware State Police Job Performance Standard #12 – Poor Judgment.

### ALLEGATION

       It is alleged that you used poor judgment by failing to follow policies and procedures regarding the investigation and/or prosecution of a criminal/domestic incident, specifically complaint 03-03-38183. It is also alleged that you used poor judgment regarding the manner in which the investigation was supervised and/or conducted.

### If substantiated the allegation would be a violation of:

       Job Performance Standard #12, which states, "Members shall at all times use sound judgment in the performance of their duties.

This is an administrative investigation, not a criminal investigation. Your signature below only acknowledges receipt of this notice and is not an admission of guilt.

_____    2 17    7-8-2004
(Internal Affairs Officer)           Date

_____ 2022    07-08-04
(Signature of Officer)            Date

D000625

**A000291**



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## ATTORNEY WAIVER FORM

I've been made aware of my right to be represented by an attorney before any

questioning and I hereby waive my right with the understanding that I may still request

an attorney at anytime during the questioning.

Name _LT Guy Dg 2022_

Date _07-08-04_

D000626



## Delaware State Police

Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

### Results of Internal Inquiry

TO:     Lieutenant Gregory W. Donaway #022
        Delaware State Police Troop 3

FROM:   Captain James Paige
        Internal Affairs Division

CASE No:    IA 12-04

DATE:       August 19, 2004

This is to inform you that the Internal Affairs Division has concluded its investigation into the allegation of Poor Judgment.

On Friday, August 6, 2004, the investigation was reviewed with Lt. Colonel Thomas MacLeish. The allegation of Poor Judgment in violation of Delaware State Police Job Performance Standard #12 has been ruled as **Unfounded**.

Your signature below acknowledges receipt of this notice. Retain one copy for your records and return the IAD copy to the Internal Affairs Division as soon as possible.


_____    _____
(Internal Affairs Officer)              (Date)
                                        8-19-2004

_____    _____
(Signature of Trooper)                  (Date)
                                        08-23-04

D000627

**A000293**



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## NOTIFICATION OF INTERNAL INQUIRY

TO:      Sergeant Michael Houdek #543
         Delaware State Police Troop 3

FROM:    Captain James Paige
         Internal Affairs Division

DATE:    July 2, 2004

        This is to inform you that the Internal Affairs Division is conducting an investigation into an allegation of violation (s) of: Rule and Regulation #5 – Neglect of Duty and Delaware State Police Job Performance Standard #12 – Poor Judgment.

### ALLEGATION

        It is alleged that you failed to follow policies and procedures regarding the investigation and/or prosecution of a criminal/domestic incident, specifically complaint 03-03-38183.  It is also alleged that you used poor judgment regarding the manner in which the investigation was supervised and/or conducted.

### If substantiated the allegation would be a violation of:

        Rule and Regulation #5, which states, "No member of the Division of State Police shall engage in any conduct, which constitutes neglect of duty."

        Job Performance Standard #12, which states, "Members shall at all times use sound judgment in the performance of their duties.

This is an administrative investigation, not a criminal investigation.   Your signature below only acknowledges receipt of this notice and is not an admission of guilt.

_____     7/2/2004
(Internal Affairs Officer)                 Date

Sgt Michael C. Houdek ___  2543  07-02-04
(Signature of Officer)                     Date

D000628

**A000294**



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

### ATTORNEY WAIVER FORM

I've been made aware of my right to be represented by an attorney before any

questioning and I hereby waive my right with the understanding that I may still request

an attorney at anytime during the questioning.

Name _Sgt. Michael C Hail 2343_

Date _____07-02-04_____

D000629



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## Results of Internal Inquiry

TO:        Sergeant Michael Houdek #543
           Delaware State Police Troop 3

FROM:      Captain James Paige
           Internal Affairs Division

CASE No:   IA 12-04

DATE:      August 19, 2004

This is to inform you that the Internal Affairs Division has concluded its investigation into the allegation of Neglect of Duty and Poor Judgment.

On Friday, August 6, 2004, the investigation was reviewed with Lt. Colonel Thomas MacLeish. The allegation of Neglect of Duty in violation of Delaware State Police Rule and Regulation #5 has been ruled as **Unfounded**. The allegation of Poor Judgment in violation of Delaware State Police Job Performance Standard #12 has been ruled as **Unfounded**.

Your signature below acknowledges receipt of this notice. Retain one copy for your records and return the IAD copy to the Internal Affairs Division as soon as possible.

_____  209        8-19-2004
(Internal Affairs Officer)             (Date)


Sgt. M. cHoudek 2543                  08-23-04
(Signature of Trooper)                 (Date)

D000630

**A000296**



### Delaware State Police
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## NOTIFICATION OF INTERNAL INQUIRY

TO:       Major Randall L. Hughes #596
          Delaware State Police Kent/Sussex Operations

FROM:     Captain James Paige
          Internal Affairs Division

DATE:     July 14, 2004

This is to inform you that the Internal Affairs Division is conducting an investigation into an allegation of violation (s) of: Rule and Regulation #5 – Neglect of Duty and Delaware State Police Job Performance Standard #12 – Poor Judgment.

## ALLEGATION

It is alleged that you failed to follow policies and procedures of the Division regarding the criminal/administrative investigation and/or prosecution of a criminal/domestic incident, specifically complaint 03-03-38183. It is also alleged that you used poor judgment regarding the manner in which the investigation was supervised and/or conducted.

## If substantiated the allegation would be a violation of:

Rule and Regulation #5, which states, "No member of the Division of State Police shall engage in any conduct, which constitutes neglect of duty."

Job Performance Standard #12, which states, "Members shall at all times use sound judgment in the performance of their duties.

D000631

**A000297**

This is an administrative investigation, not a criminal investigation.    Your signature below only acknowledges receipt of this notice and is not an admission of guilt.

_____    7-14-2004
(Internal Affairs Officer)                          Date

_____    July 14, 2004
(Signature of Officer)                              Date

D000632

# Delaware State Police
### Internal Affairs Division
### 1441 North Dupont
### Dover, Delaware 19901

### _Waiver of Policeman's Bill of Rights Section 9200(C)(2)_

**9200. Limitations on political activity; "law-enforcement officer" defined; rights of officers under investigation.**

(c) Whenever a law-enforcement officer is under investigation or is subjected to questioning for any reason, which could lead to disciplinary action, demotion or dismissal, the investigation or questioning shall be conducted under the following conditions;

(2) The questioning shall take place at the agency headquarters or at the office of the local troop or police unit in which the incident allegedly occurred as designated by the investigating officer or unless otherwise waived in writing by the officer being investigated.

I have been made aware of my right to have this interview conducted at the agency headquarters or at the office of the local troop in which the incident allegedly occurred. I waive this right and elect to have this interview conducted at Delaware State Police Internal Affairs office at the McKee Business Park.

_____
(Signature of Officer)

_____
Date

D000633

**A000299**



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## ATTORNEY WAIVER FORM

I've been made aware of my right to be represented by an attorney before any

questioning and I hereby waive my right with the understanding that I may still request

an attorney at anytime during the questioning.

Name _____

Date _July 14, 2004_____

D000634

**A000300**



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## Results of Internal Inquiry

TO:        Major Randall L. Hughes #596
                Delaware State Police Troop 3

FROM:     Captain James Paige
                Internal Affairs Division

CASE No:   IA 12-04

DATE:      August 19, 2004

This is to inform you that the Internal Affairs Division has concluded its investigation into the allegations Neglect of Duty and Poor Judgment.

On Friday, August 6, 2004 and Wednesday, August 18, 2004, the investigation was reviewed with Lt. Colonel Thomas MacLeish. The allegation of neglect of Duty in violation of Delaware State Police Rule and Regulation #5 has been ruled as **Unfounded**. The allegation of Poor Judgment in violation of Delaware State Police Job Performance Standard #12 has been ruled as **Substantiated**.

Your signature below acknowledges receipt of this notice. Retain one copy for your records and return the IAD copy to the Internal Affairs Division as soon as possible.

_____   219       _8-19-2004_
(Internal Affairs Officer)               (Date)

_____          _10-14-04_
(Signature of Trooper)               (Date)

D000635

## SUMMARY DISCIPLINARY ACTION

NAME OF MEMBER: Randall L. Hughes

RANK: Major          IBM#: 596      TROOP/SECTION: HQ

DATES OF VIOLATION (S): October 26, 2003

VIOLATION (S): Delaware State Police Job Performance Standard #12 – Poor Judgment

OFFICIAL REPRIMAND: ☐

SUSPENSION: ☒          _____ HOURS WITHOUT PAY:

MATRIX:     ☐     16    HOURS WITH OPTION TO FORFEIT VACATION:

I, Randall L. Hughes, having been given the option to forfeit vacation leave do hereby;

☒   elect to forfeit vacation.

☐   elect to be suspended without pay on the following date (s)
    (As designated by the Troop Commander/ Section Chief)_____

RESUME OF VIOLATION (S): On or about October 26, 2003, Major Hughes used poor judgment when per telephone conversation with Captain Hawkins, Major Hughes was made aware of an incident, complaint 03-03-38183, involving Delaware State Troopers and failed to notify Internal Affairs.

| OFFICER RECOMMENDING PENALTY: | DATE: |
|---|---|
| *LTC R M H* | 8-19-2004 |
| SIGNATURE OF HIGHEST REVIEWING OFFICER: | DATE: |
| *219* | 8-19-2004 |
| APPROVED: *LTC R M H* | DATE: |
| DEPUTY SUPERINTENDENT | 10-14-04 |

PURSUANT TO THE POLICE BILL OF RIGHTS (11 DEL. CODE CHAPTER 92) I HAVE THE RIGHT TO HAVE THIS MATTER TRIED BY AN IMPARTIAL HEARING BOARD. BY ACCEPTING THE SUMMARY PUNISHMENT, I ACKNOWLEDGE MY RIGHTS AND WAIVE THEM.

D000636

**A000302**

## RIGHT TO APPEAL

I, Randall L. Hughes, having been advised of my right to appeal to the Summary Discipline Appeal Board do hereby:

☑     WAIVE MY RIGHT TO APPEAL

☐     APPEAL THE PENALTY AND REQUEST THAT A SUMMARY DISCIPLINE APPEAL BOARD BE CONVENED

☐     APPEAL THE PENALTY AND, IN LIEU OF A SUMMARY DISCIPLINE APPEAL BOARD, ENTER A PLEA OF NO CONTEST. I UNDERSTAND THAT THE DISCIPLINE INITIALLY IMPOSED WILL REMAIN IN EFFECT.

### Reason(s) For Appeal

_____

_____

_____

_____

_____

Randall Hughes   2596
SIGNATURE OF OFFICER        DATE: 10·14·04

### SUMMARY DISCIPLINE APPEAL BOARD

The Summary Discipline Appeal Board, after hearing the evidence in this appeal, hereby renders its decision that the penalty above shall be:

| | | |
|---|---|---|
| ☐ DISMISSED | ☐ | REDUCED TO REPRIMAND |
| ☐ DECREASED TO SUSPENSION OF __ HOURS WITHOUT PAY | ☐ | SUSTAINED |
| ☐ DECREASED TO SUSPENSION OF __ HOURS WITH OPTION TO FORFEIT VACATION LEAVE | ☐ | INCREASED TO SUSPENSION OF __ HOURS WITHOUT PAY |
| | ☐ | INCREASED TO SUSPENSION OF __ HOURS WITH OPTION TO FORFEIT VACATION LEAVE |

☐     OTHER:

| THE MAJORITY DECISION RENDERED ON | AS FOLLOWS: |
|---|---|
| | (Board Member) |
| | (Board Member) |
| | (Board Member) |

Form #317
Revised 11/5/03

D000637

A000303



### Delaware State Police
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## NOTIFICATION OF INTERNAL INQUIRY

TO:         Captain Robert C. Hawkins #072
            Delaware State Police Troop 3

FROM:       Captain James Paige
            Internal Affairs Division

DATE:       July 20, 2004

  This is to inform you that the Internal Affairs Division is conducting an investigation into an allegation of violation (s) of: Rule and Regulation #5 – Neglect of Duty and Delaware State Police Job Performance Standard #12 – Poor Judgment.

### ALLEGATION

  It is alleged that you failed to follow policies and procedures regarding the investigation and/or prosecution of a criminal/domestic incident, specifically complaint 03-03-38183. It is also alleged that you used poor judgment regarding the manner in which the investigation was supervised and/or conducted.

#### If substantiated the allegation would be a violation of:

  Rule and Regulation #5, which states, "No member of the Division of State Police shall engage in any conduct, which constitutes neglect of duty."

  Job Performance Standard #12, which states, "Members shall at all times use sound judgment in the performance of their duties.

This is an administrative investigation, not a criminal investigation. Your signature below only acknowledges receipt of this notice and is not an admission of guilt.

_____ 217  7-20-2004
(Internal Affairs Officer)         Date

_____  7-20-04
(Signature of Officer)           Date

D000638

**A000304**



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## ATTORNEY WAIVER FORM

I've been made aware of my right to be represented by an attorney before any

questioning and I hereby waive my right with the understanding that I may still request

an attorney at anytime during the questioning.

Name _____

Date _____

D000639



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

<u>NOTIFICATION OF INTERNAL INQUIRY</u>

TO:      Captain Robert C. Hawkins #072
         Delaware State Police Troop 3

FROM:    Captain James Paige
         Internal Affairs Division

DATE:    June 29, 2004

This is to inform you that the Internal Affairs Division is conducting an investigation into an allegation of violation (s) of: Rule and Regulation #5 – Neglect of Duty and Delaware State Police Job Performance Standard #12 – Poor Judgment.

**<u>ALLEGATION</u>**

It is alleged that you failed to follow policies and procedures regarding the investigation and/or prosecution of a criminal/domestic incident, specifically complaint 03-03-38183. It is also alleged that you used poor judgment regarding the manner in which the investigation was supervised and/or conducted.

**<u>If substantiated the allegation would be a violation of:</u>**

Rule and Regulation #5, which states, "No member of the Division of State Police shall engage in any conduct, which constitutes neglect of duty."

Job Performance Standard #12, which states, "Members shall at all times use sound judgment in the performance of their duties.

This is an administrative investigation, not a criminal investigation. Your signature below only acknowledges receipt of this notice and is not an admission of guilt.

_____  219   6-29-2004
(Internal Affairs Officer)        Date

_____      06-29-04
(Signature of Officer)            Date

D000640



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

June 29, 2004

**ATTORNEY WAIVER FORM**

I've been made aware of my right to be represented by an attorney before any questioning and I hereby waive my right with the understanding that I may still request an attorney at anytime during the questioning.

Name _____

Date _____

D000641



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## Results of Internal Inquiry

TO:         Captain Robert C. Hawkins #072
            Delaware State Police Troop 3

FROM:       Captain James Paige
            Internal Affairs Division

CASE No:    IA 12-04

DATE:       August 19, 2004

This is to inform you that the Internal Affairs Division has concluded its investigation into the allegations Neglect of Duty and Poor Judgment.

On Friday, August 6, 2004 and Wednesday, August 18, 2004, the investigation was reviewed with Lt. Colonel Thomas MacLeish. The allegation of neglect of Duty in violation of Delaware State Police Rule and Regulation #5 has been ruled as **Unfounded**. The allegation of Poor Judgment in violation of Delaware State Police Job Performance Standard #12 has been ruled as **Substantiated**.

Your signature below acknowledges receipt of this notice. Retain one copy for your records and return the IAD copy to the Internal Affairs Division as soon as possible.

_____          8-19-2004
(Internal Affairs Officer)          (Date)

_____          10-14-04
(Signature of Trooper)              (Date)

D000642



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

### Results of Internal Inquiry

TO:        Captain Robert C. Hawkins #072
           Delaware State Police Troop 3

FROM:      Captain James Paige
           Internal Affairs Division

CASE No:   IA 12-04

DATE:      August 19, 2004

This is to inform you that the Internal Affairs Division has concluded its investigation into the allegations Neglect of Duty and Poor Judgment.

On Friday, August 6, 2004 and Wednesday, August 18, 2004, the investigation was reviewed with Lt. Colonel Thomas MacLeish. The allegation of neglect of Duty in violation of Delaware State Police Rule and Regulation #5 has been ruled as **Unfounded**. The allegation of Poor Judgment in violation of Delaware State Police Job Performance Standard #12 has been ruled as **Substantiated**.

Your signature below acknowledges receipt of this notice. Retain one copy for your records and return the IAD copy to the Internal Affairs Division as soon as possible.


_____ 209        8-19-2004
(Internal Affairs Officer)         (Date)


_____             10-14-04
(Signature of Trooper)              (Date)


D000643

## SUMMARY DISCIPLINARY ACTION

| | |
|---|---|
| NAME OF MEMBER: Robert C. Hawkins | |
| RANK: Captain | IBM#: 072    TROOP/SECTION: Troop 3 |

DATES OF VIOLATION (S): October 26, 2003

VIOLATION (S): Delaware State Police Job Performance Standard #12 – Poor Judgment

OFFICIAL REPRIMAND: ☐

| | | |
|---|---|---|
| SUSPENSION: ☒ | _____ HOURS WITHOUT PAY: | |
| MATRIX: ☐ | 24 | HOURS WITH OPTION TO FORFEIT VACATION: |

I, Robert C. Hawkins, having been given the option to forfeit vacation leave do hereby;

☒ elect to forfeit vacation.

☐ elect to be suspended without pay on the following date (s)
(As designated by the Troop Commander/ Section Chief)_____

RESUME OF VIOLATION (S): On or about October 26, 2003, Captain Hawkins used poor judgment with regards to the direction he gave to "administratively unfound" complaint 03-03-38183. Captain Hawkins also exercised poor judgment in failing to address the issue with Corporal Dempsey making false statements to investigating troopers in connection with complaint 03-03-38183. Captain Hawkins failed to follow up and advise all pertinent facts of complaint 03-03-38183 to Major Hughes.

| | |
|---|---|
| OFFICER RECOMMENDING PENALTY:<br><br>*LTC R M L* | DATE:<br><br>10-14-04 |
| SIGNATURE OF HIGHEST REVIEWING OFFICER:<br><br>*217* | DATE:<br><br>9-19-2004 |
| APPROVED: *LTC R M L*<br>DEPUTY SUPERINTENDENT | DATE:<br><br>10-14-04 |

PURSUANT TO THE POLICE BILL OF RIGHTS (11 DEL. CODE CHAPTER 92) I HAVE THE RIGHT TO HAVE THIS MATTER TRIED BY AN IMPARTIAL HEARING BOARD. BY ACCEPTING THE SUMMARY PUNISHMENT, I ACKNOWLEDGE MY RIGHTS AND WAIVE THEM.

D000644

**A000310**

**RIGHT TO APPEAL**

I, Robert C. Hawkins, having been advised of my right to appeal to the Summary Discipline Appeal Board do hereby:

☒    WAIVE MY RIGHT TO APPEAL

☐    APPEAL THE PENALTY AND REQUEST THAT A SUMMARY DISCIPLINE APPEAL BOARD BE CONVENED

☐    APPEAL THE PENALTY AND, IN LIEU OF A SUMMARY DISCIPLINE APPEAL BOARD, ENTER A PLEA OF NO CONTEST. I UNDERSTAND THAT THE DISCIPLINE INITIALLY IMPOSED WILL REMAIN IN EFFECT.

**Reason(s) For Appeal**

_____

_____

_____

_____

_____

SIGNATURE OF OFFICER          DATE: _10-14-04_

**SUMMARY DISCIPLINE APPEAL BOARD**

The Summary Discipline Appeal Board, after hearing the evidence in this appeal, hereby renders its decision that the penalty above shall be:

| | |
|---|---|
| ☐  DISMISSED | ☐  REDUCED TO REPRIMAND |
| ☐  DECREASED TO SUSPENSION OF ___ HOURS WITHOUT PAY | ☐  SUSTAINED |
| ☐  DECREASED TO SUSPENSION OF ___ HOURS WITH OPTION TO FORFEIT VACATION LEAVE | ☐  INCREASED TO SUSPENSION OF ___ HOURS WITHOUT PAY |
| | ☐  INCREASED TO SUSPENSION OF ___ HOURS WITH OPTION TO FORFEIT VACATION LEAVE |

☐    OTHER:

| THE MAJORITY DECISION RENDERED ON | AS FOLLOWS: |
|---|---|
| | (Board Member) |
| | (Board Member) |
| | (Board Member) |

Form #317
Revised 11/5/03

D000645

**A000311**



### Delaware State Police
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

### NOTIFICATION OF INTERNAL INQUIRY

TO:        Cpl/3 Brian D. Maher #666
                Delaware State Police Troop 7

FROM:      Captain James Paige
                Internal Affairs Division

DATE:      June 18, 2004

     This is to inform you that the Internal Affairs Division is conducting an investigation into an allegation of violation (s) of: Delaware State Police Rule and Regulation # 4 – Conduct Unbecoming and Delaware State Police Job Performance Standard #14 – Domestic incidents involving sworn Division members.

### ALLEGATION

     It is alleged that your conduct during an incident at 1715B Frederica Road, Frederica, Delaware on or about October 26, 2003, you failed to conduct yourself in a manner as to reflect most favorably on the Division. It is also alleged that you failed to report a domestic incident that you were involved in on October 26, 2003 to the on-duty supervisor at your assigned troop.

### If substantiated the allegation would be a violation of:

     Delaware State Police Rule and Regulation #4, which states, "Members shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Division. Conduct unbecoming as officer shall include that which tends to bring the Division into disrepute or reflect discredit upon the officer as a member of the Division, or that, which tends to impair the operation and efficiency of the Division or the officer."

D000595

Job Performance Standard #14, which states, "When a sworn Division member is involved, as the suspect or the victim, in a domestic incident, it is his/her responsibility to make immediate notification to the on duty supervisor of his/her assigned Troop/Section. The supervisor, or his/her designee, will notify the on-call CIU administrator who will notify the officer's Troop Commander and the appropriate Field Operations Officer."

This is an administrative investigation, not a criminal investigation. Your signature below only acknowledges receipt of this notice and is not an admission of guilt.

_____  zm    6-18-2004
(Internal Affairs Officer)         Date

_____  666  6-18-2004
(Signature of Officer)             Date

D000596

**A000313**

# Delaware State Police
### Internal Affairs Division
### 1441 North Dupont
### Dover, Delaware 19901

### _Waiver of Policeman's Bill of Rights Section 9200(C)(2)_

**9200. Limitations on political activity; "law-enforcement officer" defined; rights of officers under investigation.**

(c) Whenever a law-enforcement officer is under investigation or is subjected to questioning for any reason, which could lead to disciplinary action, demotion or dismissal, the investigation or questioning shall be conducted under the following conditions;

(2) The questioning shall take place at the agency headquarters or at the office of the local troop or police unit in which the incident allegedly occurred as designated by the investigating officer or unless otherwise waived in writing by the officer being investigated.

I have been made aware of my right to have this interview conducted at the agency headquarters or at the office of the local troop in which the incident allegedly occurred. I waive this right and elect to have this interview conducted at Delaware State Police Internal Affairs office at the McKee Business Park.

_____          4/1 7/04
(Signature of Officer)                              Date

D000597



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## NOTIFICATION OF DEPARTMENTAL CHARGES

TO:    Cpl/3 Brian D. Maher #666
          Delaware State Police Troop 7

FROM:  Captain James Paige
          Internal Affairs Division

DATE:   August 19, 2004

RE:     IA 12-04

As a result of an investigation conducted by the Internal Affairs Division, the following violation(s) of the Delaware State Police Rules and Regulations and Job Performance Standards of the Division of State Police is alleged to have occurred:

**Delaware State Police Rule and Regulation #4,** which states, ""Members shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Division. Conduct unbecoming as officer shall include that which tends to bring the Division into disrepute or reflect discredit upon the officer as a member of the Division, or that, which tends to impair the operation and efficiency of the Division or the officer."

To wit: On or about Sunday, October 26, 2003, you failed to conduct yourself in a manner as to reflect most favorably on the Division during an incident at 1715B Frederica Road, Frederica, Delaware when you broke a window to the residence of Elizabeth C. Dempsey and entered same during a domestic incident.

Delaware State Police Job Performance Standard #14, which states, "When a sworn Division member is involved, as the suspect or the victim, in a domestic incident, it is his/her responsibility to make immediate notification to the on duty supervisor of his/her assigned Troop/Section. The supervisor, or his/her designee, will notify the on-call CIU administrator who will notify the officer's Troop Commander and the appropriate Field Operations Officer."

Page 1 of 3

To wit: You failed to report a domestic incident that you were involved in on October 26, 2003 to the on-duty supervisor at your assigned troop.

These incidents have been substantiated and as such under Section II-C-2-m (2), of the Division's Rules and Regulations, I have notified the Superintendent that a Divisional Hearing Board should be convened. This section states that you have the following options in regard to the hearing:

1.  You may request a hearing before the Superintendent if you elect not to contest the charge as herein outlined.

2.  You may request a Divisional Hearing Board to hear your case.

If you elect to have a Divisional Hearing Board, you must eliminate the name of one of the below-listed staff officers, two of the names of the listed commissioned officers and two of the names of the troopers of similar rank. Depending on the schedules of those remaining, one presiding officer and two hearing officers will be scheduled for the hearing:

### STAFF OFFICERS

Major Joseph A. Papili

Major Mark W. Seifert

### COMMISSIONED OFFICERS

Captain Richard C. Pulling Jr.

Captain Charles J. Simpson

Captain Albert J. Homiak

Captain John A. Yeomans

Captain John J. Laird

### TROOPERS OF SIMILAR RANK

Cpl/3 Michael A. Austin

Cpl/3 Daniel I. Bramble Jr.

Cpl/3 Debra D. Wooters

Cpl/3 Warren C. McGee

Cpl/3 Bruce W. Harris

Page 2 of 3

D000599

**A000316**

**You are to notify my office, in writing, no later than Thursday, August 26, 2004, at 1600 hours, of your decision in this matter. <u>(Note: Due date is five (5) working days after notice)</u>**

The Policemen's Bill of Rights also requires that you be notified that if you plead guilty or are found guilty of these violations, the range of penalty is from a verbal reprimand to dismissal.

You are also reminded that you have the right to counsel at all stages of these proceedings as stated in the Rules and Regulations of the Division of State Police, Section II-D-8.

You have been officially charged with violating Divisional Rules and Regulations as described in this formal charge sheet.

Your signature below acknowledges that you have had the charge sheet read to you and have been presented with a copy of this document.

_____    8-19-2004
Signature of Internal Affairs Officer        Date

_____    8/19/04
Signature of Trooper        Date

IAD Copy

D000600

**A000317**

To:  Captain James Paige

From:  Cpl/3 Brian Maher #666

Date:  August 26th, 2004

RE:  IA 12-04

Please accept this letter as a request to have a hearing before the Superintendent.

Brian Maher

## NOTIFICATION OF SUSPENSION

As the result of an administrative sanction, you have elected ~~suspension for~~ (been ordered suspended with) ~~without~~ pay and benefits from the Division of State Police.

You are hereby advised of the following restrictions

Beginning Date: _5/28/04_

Ending Date: _Pending_

1. You are to turn in all departmental weapons, badges and identification.

2. You are not to operate any Delaware State Police Vehicle.

3. You are not to engage in any activities related to, or representing, the Delaware State Police.

4. If you observe a crime in progress, or foresee that a situation may occur which has the potential of placing you in a position to act as a police officer, **you are to remove yourself from the situation** and act in the same capacity as a civilian by notifying a full-duty officer or the communications center of the situation.

5. If during this suspension period you are summoned to court or any hearing related to your previous duty assignment, you are to notify your troop administration immediately.

6. If you currently have any pending investigation or matters needing immediate attention, or if you become aware of any, you are to advise your troop administration immediately.

7. While under suspension, you will not access any Telex terminal for ANY REASON WHATSOEVER.

_____     5/28/04
OFFICER SUSUSPENDED                DATE

_Capt. Gregory D Wolf 2692_        5/28/04
TROOP COMMANDER/SECTION CHIEF/SUPERVISOR   DATE

Form 317A (10/31/97)

VII-7-7

## NOTIFICATION OF SUSPENSION

As the result of an administrative sanction, you have elected ~~suspension to~~ been ordered suspended with ~~without~~ pay and benefits from the Division of State Police.

You are hereby advised of the following restrictions

Beginning Date:  _5/28/04_

Ending Date:  _Pending_

1.  You are to turn in all departmental weapons, badges and identification.

2.  You are not to operate any Delaware State Police Vehicle.

3.  You are not to engage in any activities related to, or representing, the Delaware State Police.

4.  If you observe a crime in progress, or foresee that a situation may occur which has the potential of placing you in a position to act as a police officer, you are to remove yourself from the situation and act in the same capacity as a civilian by notifying a full-duty officer or the communications center of the situation.

5.  If during this suspension period you are summoned to court or any hearing related to your previous duty assignment, you are to notify your troop administration immediately.

6.  If you currently have any pending investigation or matters needing immediate attention, or if you become aware of any, you are to advise your troop administration immediately.

7.  While under suspension, you will not access any Telex Terminal for ANY REASON WHATSOEVER.

_(signature)_ 6464                    5/28/04
OFFICER SUSUSPENDED                   DATE

_Capt. Gregory D Nolt_ 2692           5/28/04
TROOP COMMANDER/SECTION CHIEF/SUPERVISOR    DATE


Form 317A (10/31/97)


VII-7-7

D000603



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## NOTIFICATION OF HEARING BEFORE SUPERINTENDENT

TO:     Cpl/3 Brian D. Maher
        Troop 7  - Patrol

FROM:   Captain James Paige
        Internal Affairs Division

DATE:   September 21, 2004

This is to inform you that the hearing you elected before the Superintendent has been scheduled for Wednesday, October 27, 2004 at 1400 hours. The hearing will take place at Delaware State Police Headquarters in the Executive Staff Conference Room located on the second floor.

Should there be a conflict with the above date you are to request a continuance in writing as soon as possible.

Your signature below only acknowledges receipt of this notice. Please retain a copy for your files and forward the Internal Affairs copy back to me as soon as possible.

_____  219          _____9-21-2004_____
(Internal Affairs Officer)                      (Date)

_____               _____
(Signature of Officer)                          (Date)

D000604

**A000321**



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

### SUPERINTENDENT'S HEARING

Read by Colonel:    1.  "Today is Wednesday, October 27, 2004; the current time is
                       *1416* hrs.

This hearing is being conducted in the Conference Room at the
Delaware State Police Headquarters Complex. I'm Colonel
L. Aaron Chaffinch, Superintendent of the Delaware State Police.
This will be a hearing for Cpl/3 Brian D. Maher.  Mr. Robert
MacDonald is representing Cpl/3 Maher.

Also present are: **Read names of _all_ of those in attendance.**

2.    Captain Paige – "Are you ready to proceed?

3.    Cpl/3 Maher – "Are you ready to proceed?

4.    Cpl/3 Maher, I am required to advise you that pursuant to
      29 Del. C. sub-section 10,004 (Delaware Sunshine Law),
      you have the right to request that this hearing be opened to
      the public. Do you want to have this hearing open to the
      public?   *No, Sir.*

5.    In addition, the Law Enforcement Officer's Bill of Rights
      (11 De. C. Chapter 92) provides among other privileges,
      the right to have this matter heard before an impartial
      board. Having these rights in mind, do you wish to waive
      your entitlements and have this heard before me?   *Yes, Sir.*

6.    Captain Paige, please read the formal charge against Cpl/3
      Maher.  IA Officer reads the charge(s).

7.    Cpl/3 Maher, do you understand the charge(s) as read?  *Yes, Sir.*

8.    How do you plead to this charge?
      (Can only be guilty or nolo contendere)

      *No Contest*

9.   Captain Paige, is there anything to be added to explain the charge or situation?

10.  Cpl/3 Maher, is there anything else you wish to say on your behalf? Is there anyone here that wishes to speak on your behalf?

11.  I am now going to **recess to consider the facts of this hearing.** The time is now _1423_.

## TO BE READ AFTER RECESS BY SUPERINTENDENT

12.  This time is now _1439_. The hearing for Cpl/3 Maher is reconvened. I have accepted your plea of (guilty or nolo contendere) and I impose the following discipline:

     **Read penalty:**

     (If there is suspension of more that 5 days, demotion, probation transfer or the recommendation of termination, also read the following):

     If you wish to appeal this discipline to the Secretary of Public Safety, you have 5 days from today, weekends excluded, to submit that appeal in writing to my office.

13.  Cpl/3 Maher, do you have any questions?

14.  If there is nothing further, this will conclude the hearing for Cpl/3 Maher. The time is now _1441 hrs_.

**     If you do not make a finding of fact at the time of the hearing, you must notify the accused officer, that a written decision will be forwarded to him/her within 10 working days.**

D000606

**A000323**

IN THE COURT OF COMMON PLEAS OF THE STATE OF DELAWARE
IN AND FOR KENT COUNTY

STATE OF DELAWARE       :      Case No. _0405023093_

                               Cr. A. No. _____

vs.                    :      Charge: _CRIMINAL TRESPASS_
                                           _FIRST DEGREE_

_BRIAN MAHER_      :     PROBATION BEFORE JUDGMENT (MAS)

THIS _30TH_ day of _AUGUST_, 20_04_, the defendant having entered a plea of guilty or nolo contendere to a violation or misdemeanor offense under Titles 4, 7, 11 or 21 of the Delaware Code;

IT having been represented to the Court that the defendant:

(a)     is not currently serving a sentence of incarceration, probation, parole or early release of any type imposed for another offense; and

(b)     has not been admitted to Probation before Judgment for any offense within five (5) years of the current offense; and

(c)     has not been convicted under the laws of another State, the United States or any territory of the United States of any offense which is the same as, or equivalent to, any offense specified herein; and

(d)     has not previously been adjudicated a delinquent; and

(e)     is currently charged with an offense set forth in §709 of Title 21 of the Delaware Code, but has not previously been convicted of any offense under Title 21 of the Code within five (5) years of the date of the alleged offense; or

(f)     is charged with an offense under Titles 4 or 7 of the Delaware Code, but has not previously been convicted of any offense under Titles 4 or 7 of the Code within five (5) years of the date of the alleged offense; or

(g)     is charged with an offense under Title 11 of the Delaware Code, but has not been previously convicted of any violent felony under 11 Del. C. §4201; or

(h)     is charged with an offense under Title 11 of the Delaware Code, but has not previously been convicted of a non-violent felony within ten (10) years of the date of the alleged offense; or

(i)     is charged with an offense under Title 11 of the Delaware Code, but has not previously been convicted of any misdemeanor offense within five (5) years of the date of the alleged offense.

IT IS SO ORDERED, in accordance with 11 Del.C. §4218, with the consent of the Defendant and the Attorney General, that the entry of judgment is stayed, further proceedings are deferred and the Defendant is placed on Level _II_ "Probation Before Judgment", commencing this date for a period of _6 months_ subject to supervision by the Department of Correction.

Special conditions of probation are as follows:

(a) Discharge probation upon payment all fines and costs

D000607

**A000324**

IT IS FURTHER ORDERED that the Department of Correction shall advise the Court of any new conviction and/or violation of the general conditions of Probation and shall submit a written report to the Court at or about the date the terms and conditions of Probation Before Judgment are fulfilled.

IT IS FURTHER ORDERED that if the defendant fails to appear at court when summoned after receiving timely notice of a violation of probation, the court may proceed in defendant's absence by entering a judgment of guilt on this charge and the defendant will be sentenced as if he had not been placed on "Probation Before Judgment".

IT IS FURTHER ORDERED that upon fulfillment of the terms and conditions outlined herein, the Defendant shall be discharged from "Probation Before Judgment" without the entry of a judgment of guilt.

IT IS FURTHER ORDERED the Defendant shall pay the ($ 64.00 ) costs, ($ 100.00 ) fines, and ($ ) restitution within _10 day_ months of the date of this Order.

_Sam Nah_
Defendant

_Joe M_
Defense Counsel

_Charles N Welch_
Deputy Attorney General

Judge/Commissioner

**FINAL DISPOSITION**

COMES NOW THIS _____ day of _____ 20____, the Court found that the defendant:

(  ) Having completed the terms and conditions of Probation Before Judgment as ordered above, the Defendant herein is discharged without judgment of guilt and the charge is hereby dismissed.

(  ) Having not completed the terms and conditions of Probation before Judgment as ordered above, judgment for the offense(s) is hereby entered and the Court will proceed with sentencing.

Special conditions of probation are as follows:

_and the defendant upon payment of fines_

_____
Judge/Commissioner

(Retyped: 1/03: 7/04)

D000608

**A000325**



## Delaware State Police
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## <u>Results of Superintendent's Hearing</u>

TO:     Corporal Brian D. Maher
        Delaware State Police Troop 7

FROM:   Captain James Paige
        Internal Affairs Division

CASE No:   # IA 12-04

DATE:   October 28, 2004

On Wednesday, October 27, 2004 in the Executive Staff Conference Room, Headquarters, you elected to have a hearing before Colonel L. Aaron Chaffinch, Superintendent of the Delaware State Police.

You were advised of your rights under the Delaware Sunshine Law and elected to have your hearing closed to the public. Under the Law Enforcement Officer's Bill of Rights you were entitled to have your charges heard before an impartial board. You elected to waive that right and have a hearing before the Superintendent.

You entered a plea of no contest to the charges of violating Delaware State Police Rule and Regulation # 4 and Delaware State Police Job Performance Standard #14.

The Superintendent imposed the following discipline.

1. Reduced in rank to Corporal effective October 27, 2004.

2. Suspension of 80 hours with the option to forfeit vacation.

3. Suspension of 40 hours without the option to forfeit vacation.

4. Placed on probation for a period of 12 months effective October 27, 2004.

If discipline consists of more than five days suspension, demotion, probation, transfer, or removal from the division, you have the right to appeal this discipline to the Secretary of Public Safety. You have five days from today, weekends excluded, to submit that appeal in writing to the Superintendent.

D000618

**A000326**

This office will make a copy of the tape recording of the Superintendent's hearing available to you if requested by you.

Your signature below acknowledges receipt of this notice.   Retain the Trooper's copy for your records and return the Internal Affairs Division copy to me as soon as possible.

_____          10/28/2004
(Internal Affairs Officer)                (Date)

_____          10/28/04
(Signature of Trooper)                    (Date)

Trooper's copy

D000619

**A000327**



## Delaware State Police
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## FINAL DISPOSITION

**INTERNAL AFFAIRS #:**   IA 12-04

**INVESTIGATED BY:**   Captain James Paige
Internal Affairs Division

**TROOPER:**   Cpl/3 Brian D. Maher #666
Troop 7 – Uniformed Patrol

**DATE OF REVIEW:**   August 6, 2004

**REVIEWED BEFORE:**   Lt. Colonel Thomas MacLeish/Major Paul Eckrich

**DATE OF HEARING:**   N/A

**ALLEGATION:**
It is alleged that during an incident at 1715B Frederica Road, Frederica, Delaware on or about October 26, 2003, Cpl/3 Maher failed to conduct himself in a manner as to reflect most favorably on the Division. It is also alleged that Cpl/ Maher failed to report a domestic incident that he was involved in on October 26, 2003 to the on-duty supervisor at his assigned troop.

**Delaware State Police Rule and Regulation #4:**
To Wit: "Members shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Division. Conduct unbecoming as officer shall include that which tends to bring the Division into disrepute or reflect discredit upon the officer as a member of the Division, or that, which tends to impair the operation and efficiency of the Division or the officer."

**FINDING:**   The allegation was **Substantiated.**

**Delaware State Police Job Performance Standard #14:**
To Wit: "When a sworn Division member is involved, as the suspect or the victim, in a domestic incident, it is his/her responsibility to make immediate notification to the on duty supervisor of his/her assigned Troop/Section. The supervisor, or his/her designee,

D000558

A000328

will notify the on-call CIU administrator who will notify the officer's Troop Commander and the appropriate Field Operations Officer."

**FINDING:**   The allegation was **Substantiated**.

As a result of a Superintendent's Hearing on Wednesday, October 27, 2004, Cpl/3 Brian D. Maher, Troop 7 Patrol, plead no contest to a violation of Delaware State Police Rule and Regulation #4 and Delaware State Police Job Performance Standard #14.

The following disciplinary action has been imposed:

1. Reduced to the rank of Corporal effective immediately.
2. One year probation effective immediately.
3. Ten days suspension with the option to forfeit vacation.
4. Five days suspension without the option to forfeit vacation.

D000559

**Paige James (DSP)**

| | |
|---|---|
| From: | Paige James (DSP) |
| Sent: | Wednesday, October 27, 2004 3:45 PM |
| To: | DSP_Users |
| Subject: | Results of Superintendent's Hearing |

As a result of a Superintendent's Hearing on Wednesday, October 27, 2004, Cpl/3 Brian D. Maher, Troop 7 Patrol, plead no contest to a violation of Delaware State Police Rule and Regulation #4 and Delaware State Police Job Performance Standard #14.

The following disciplinary action has been imposed:

1. Reduced to the rank of Corporal effective immediately.
2. One year probation effective immediately.
3. Ten days suspension with the option to forfeit vacation.
4. Five days suspension without the option to forfeit vacation.

Authority: Colonel L. Aaron Chaffinch, Superintendent

Captain James Paige
Delaware State Police
Internal Affairs
302-739-5990

1

D000696



### Delaware State Police
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

### NOTIFICATION OF INTERNAL INQUIRY

TO:        Cpl. Elizabeth C. Dempsey #296
                     Delaware State Police Troop 7

FROM:     Captain James Paige
                     Internal Affairs Division

DATE:      June 25, 2004

      This is to inform you that the Internal Affairs Division is conducting an investigation into an allegation of violation (s) of: Delaware State Police Rule and Regulation # 15 – False Statements and Delaware State Police Job Performance Standard #14 – Domestic incidents involving sworn Division members.

### ALLEGATION

      It is alleged that you made false statements to Emergency Reporting Center dispatchers and/or investigating troopers regarding an incident, which occurred at 1715B Frederica Road, Frederica, Delaware on or about October 26, 2003. It is also alleged that you failed to report a domestic incident that you were involved in on October 26, 2003 to the on-duty supervisor at your assigned troop.

### If substantiated the allegation would be a violation of:

     Delaware State Police Rule and Regulation #15, which states, "No member shall knowingly make a false statement, falsify any written or verbal report made to a superior officer, or willingly and intentionally withhold material matter from such report or statement."

D000584

**A000331**

Job Performance Standard #14, which states, "When a sworn Division member is involved, as the suspect or the victim, in a domestic incident, it is his/her responsibility to make immediate notification to the on duty supervisor of his/her assigned Troop/Section. The supervisor, or his/her designee, will notify the on-call CIU administrator who will notify the officer's Troop Commander and the appropriate Field Operations Officer."

This is an administrative investigation, not a criminal investigation.   Your signature below only acknowledges receipt of this notice and is not an admission of guilt.

_____          6-25-2004
(Internal Affairs Officer)                   Date

_____          062504
(Signature of Officer)                        Date

D000585

**A000332**

# Delaware State Police
## Internal Affairs Division
### 1441 North Dupont
### Dover, Delaware 19901

### *Waiver of Policeman's Bill of Rights Section 9200(C)(2)*

**9200. Limitations on political activity; "law-enforcement officer" defined; rights of officers under investigation.**

(c) Whenever a law-enforcement officer is under investigation or is subjected to questioning for any reason, which could lead to disciplinary action, demotion or dismissal, the investigation or questioning shall be conducted under the following conditions;

(2) The questioning shall take place at the agency headquarters or at the office of the local troop or police unit in which the incident allegedly occurred as designated by the investigating officer or unless otherwise waived in writing by the officer being investigated.

I have been made aware of my right to have this interview conducted at the agency headquarters or at the office of the local troop in which the incident allegedly occurred. I waive this right and elect to have this interview conducted at Delaware State Police Internal Affairs office at the McKee Business Park.


_____
(Signature of Officer)

_____
Date

D000586

**A000333**



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## NOTIFICATION OF DEPARTMENTAL CHARGES

TO:    Corporal Elizabeth C. Dempsey #296
       Delaware State Police Troop 7

FROM:  Captain James Paige
       Internal Affairs Division

DATE:  August 25, 2004

RE:    IA 12-04

As a result of an investigation conducted by the Internal Affairs Division, the following violation(s) of the Delaware State Police Rules and Regulations and Job Performance Standards of the Division of State Police is alleged to have occurred:

**Delaware State Police Rule and Regulation #15,** which states, "No member shall knowingly make a false statement, falsify any written or verbal report made to a superior officer, or willingly and intentionally withhold material matter from such a report or statement."

To wit: On or about Sunday, October 26, 2003, you made false statements to Delaware State Police dispatchers and/or troopers and/or willingly and intentionally withheld material matter from your statement.

**Delaware State Police Job Performance Standard #14,** which states, "When a sworn Division member is involved, as the suspect or the victim, in a domestic incident, it is his/her responsibility to make immediate notification to the on duty supervisor of his/her assigned Troop/Section. The supervisor, or his/her designee, will notify the on-call CIU administrator who will notify the officer's Troop Commander and the appropriate Field Operations Officer."

D000587

**A000334**

To wit: You failed to report a domestic incident that you were involved in on October 26, 2003 to the on-duty supervisor at your assigned troop.

These incidents have been substantiated and as such under Section II-C-2-m (2), of the Division's Rules and Regulations, I have notified the Superintendent that a Divisional Hearing Board should be convened. This section states that you have the following options in regard to the hearing:

1. You may request a hearing before the Superintendent if you elect not to contest the charge as herein outlined.

2. You may request a Divisional Hearing Board to hear your case.

If you elect to have a Divisional Hearing Board, you must eliminate the name of **one** of the below-listed staff officers, **two** of the names of the listed commissioned officers and **two** of the names of the troopers of similar rank. Depending on the schedules of those remaining, one presiding officer and two hearing officers will be scheduled for the hearing:

### STAFF OFFICERS

Major Joseph A. Papili

Major Mark W. Seifert


### COMMISSIONED OFFICERS

Captain Nathaniel McQueen

Captain Timothy E. Winstead

Captain Albert J. Homiak

Captain Elizabeth E. Shamany

Captain Paul E. Smentkowski


### TROOPERS OF SIMILAR RANK

Cpl/1 Adrienne E. Owen

Cpl/2 Timothy J. Aube

Cpl/2 Eric T. Loechster

Cpl/3 Larry W. Welch

Cpl/3 James E. Phillips


Page 2 of 3

D000588

**A000335**

**You are to notify my office, in writing, no later than Wednesday, September 1, 2004, at 1600 hours, of your decision in this matter. (Note: Due date is five (5) working days after notice)**

The Policemen's Bill of Rights also requires that you be notified that if you plead guilty or are found guilty of these violations, the range of penalty is from a verbal reprimand to dismissal.

You are also reminded that you have the right to counsel at all stages of these proceedings as stated in the Rules and Regulations of the Division of State Police, Section II-D-8.

You have been officially charged with violating Divisional Rules and Regulations as described in this formal charge sheet.

Your signature below acknowledges that you have had the charge sheet read to you and have been presented with a copy of this document.

_____          8/25/2004
Signature of Internal Affairs Officer          Date

_____          082504
Signature of Trooper          Date

IAD Copy

Page 3 of 3

D000589

**A000336**



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## <u>NOTIFICATION OF DIVISIONAL TRIAL BOARD</u>

TO:    Corporal Elizabeth C. Dempsey
        Troop 7 - Patrol

FROM:  Captain James Paige
        Internal Affairs Division

DATE:  September 21, 2004

A Divisional Trial Board has been scheduled regarding your charges.

In compliance with the Policeman's Bill of Rights the proceedings will commence on Friday, November 5, 2004, at 0900 hours at Delaware State Police Headquarters in the second floor conference room.

Should there be a conflict with the above date, you are to request a continuance in writing as soon as possible.

The Board will be comprised of <u>Major Joseph A. Papili, Captain Albert J. Homiak Jr. and Cpl/3 Larry W. Welch.</u>

Your signature below acknowledges receipt of this notice. Retain one copy for your records and return the I. A. copy to the Internal Affairs Division as soon as possible.

_____ 2-13       _9-21-2004_
(Internal Affairs Officer)           (Date)

_Cpl E. C. Dempsey 29c_    _092304_
(Signature of Officer)            (Date)

D000590

**A000337**



### Delaware State Police
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## NOTIFICATION OF DIVISIONAL TRIAL BOARD

TO:     Corporal Elizabeth C. Dempsey
             Troop 7 - Patrol

FROM:    Captain James Paige
            Internal Affairs Division

CASE No:    IA 12-04

DATE:     November 5, 2004

A Divisional Trial Board has been scheduled regarding your charges.

In compliance with the Policeman's Bill of Rights the proceedings will commence on Tuesday, November 30, 2004 at 0900 hours at Delaware State Police Headquarters in the second floor conference room.

Should there be a conflict with the above date, you are to request a continuance in writing as soon as possible.

The Board will be comprised of <u>Major Joseph Papili, Captain Albert Homiak and Cpl/3 Larry Welch.</u>

Your signature below acknowledges receipt of this notice. Retain one copy for your records and return the I. A. copy to the Internal Affairs Division as soon as possible.

_____     _____
(Internal Affairs Officer)                11/5/2004
                                                  (Date)

_____     _____
(Signature of Officer)                   11/9/04
                                                  (Date)



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## NOTIFICATION OF SUSPENSION

As the result of an administrative sanction, you have been ordered suspended with pay and benefits from the Division of State Police.

You are hereby advised of the following restrictions

Beginning: January 13, 2005                    Ending: Pending

1. You are to turn in all departmental weapons, badges and identification.

2. You are not to operate any Delaware State Police vehicle.

3. You are not to engage in any activity related to, or representing, the Delaware State Police.

4. If you observe a crime in progress, or foresee that a situation may occur which has the potential of placing you in a position to act as a police officer, you are to remove yourself from the situation and act in the same capacity as a civilian by notifying a full-duty officer or the communications center of the situation.

5. If during this suspension period you are summoned to court or any hearing related to your previous duty assignment, you are to notify your troop administration immediately.

6. If you currently have any pending investigation or matters needing immediate attention, or if you become aware of any, you are to advise your troop administration immediately.

7. While under suspension, you will not access NCIC, CJIS, LEISS, any Divisional computer program or Divisional computer for **ANY REASON WHATSOEVER.**

_____        1/13/05
(Trooper)                                (Date)

_____        1/13/2005
(Internal Affairs Officer)               (Date)

D000592

**A000339**



## Delaware State Police
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

### Results of Divisional Hearing Board

TO:        Corporal Elizabeth C. Dempsey
           Delaware State Police Troop 7

FROM:      Captain James Paige
           Internal Affairs Division

CASE No:   # IA 12-04

DATE:      Monday, January 31, 2005

On December 1, 2004 and January 13, 2005, in the Executive Staff Conference Room, Headquarters, you elected to have a hearing before a Divisional Hearing Board, as you were entitled under the Law Enforcement Officer's Bill of Rights. The Board composed of Major Joseph Papili, Captain Albert Horniak and Corporal/3 Larry Welch heard your case.

You were advised of your rights under the Delaware Sunshine Law and elected to have your hearing closed to the public.

You entered a plea of not guilty to the charge of violating Delaware State Police Rule and Regulation # 15.

You entered a plea of not guilty to the charge of violating Delaware State Police Job Performance Standard #14.

The Divisional Hearing Board heard testimony in the case and after deliberating reached a unanimous decision and **substantiated** the charge of violating Delaware State Police Rule and Regulation #15. The Divisional Hearing Board reached a unanimous decision and **did not substantiate** the charge of violating Delaware State Police Job Performance Standard #14.

The Divisional Hearing Board recommended the following disciplinary action: **Dismissal.**

Acting Superintendent, Lt. Colonel Thomas MacLeish, has reviewed the Board's findings of fact and conclusions of law and recommended penalty. Lt Colonel MacLeish concurs

D000593

with the Board's findings and conclusions and with the recommended penalty of dismissal.

Effective immediately you are hereby suspended without pay and benefits with intent to dismiss subject to review by the Secretary of Safety and Homeland Security.

If discipline consists of more than five days suspension, demotion, probation, transfer, or removal from the division, you have the right to appeal this discipline to the Secretary of Safety and Homeland Security. You have five days from today, weekends excluded, to submit that appeal in writing to the Superintendent. Therefore, if you elect to appeal this action you must submit your appeal in writing by Tuesday, February 8, 2005, before 1000 hours.

A transcription of the Divisional Hearing Board proceedings will be made available to you upon your request to the Internal Affairs Division office.

Your signature below acknowledges receipt of this notice. Retain the Trooper's copy for your records and return the Internal Affairs Division copy to me as soon as possible.

_____          _____
(Internal Affairs Officer)                         (Date/Time)

_____          _____
(Signature of Trooper)                              (Date)

D000594

**A000341**



**Delaware State Police**
Internal Affairs Division
P.O. Box 430
Dover, Delaware 19903

## FINAL DISPOSITION

| | |
|---|---|
| **INTERNAL AFFAIRS #:** | IA 12-04 |
| **INVESTIGATED BY:** | Captain James Paige<br>Internal Affairs Division |
| **TROOPER:** | Cpl. Elizabeth C. Dempsey #296<br>Troop 5 – Uniformed Patrol |
| **DATE OF REVIEW:** | August 6, 2004 |
| **REVIEWED BEFORE:** | Lt. Colonel Thomas MacLeish/Major Paul Eckrich |
| **DATE OF HEARING:** | N/A |

**ALLEGATION:**
It is alleged that you made false statements to Emergency Reporting Center dispatchers and/or investigating troopers regarding an incident, which occurred at 1715B Frederica Road, Frederica, Delaware on or about October 26, 2003. It is also alleged that you failed to report a domestic incident that you were involved in on October 26, 2003 to the on-duty supervisor at your assigned troop.

**Delaware State Police Rule and Regulation #15:**
To Wit: "No member shall knowingly make a false statement, falsify any written or verbal report made to a superior officer, or willingly and intentionally withhold material matter from such report or statement."

**FINDING:**   The allegation was **Substantiated**.

**Delaware State Police Job Performance Standard #14:**
To Wit: "When a sworn Division member is involved, as the suspect or the victim, in a domestic incident, it is his/her responsibility to make immediate notification to the on duty supervisor of his/her assigned Troop/Section. The supervisor, or his/her designee,

D000560

will notify the on-call CIU administrator who will notify the officer's Troop Commander and the appropriate Field Operations Officer."

**FINDING:**    The allegation was **Substantiated**.

As a result of a Divisional Hearing Board held on Thursday, January 13, 2005, Corporal Elizabeth C. Dempsey, Troop 7, was found not guilty of violating Job Performance Standard #14. Corporal Dempsey was found guilty of violating Rule and Regulation #15.

The Hearing Board has recommended the following disciplinary action: Dismissal.

Effective this date Corporal Dempsey has been placed on administrative suspension with pay and benefits pending the Superintendent's review of the Hearing Board's recommendation for termination.

**Appeal Hearing before Secretary David Mitchell** on May 18, 2005. Decision was reached on July 1, 2005. Decision – substantial evidence to support the finding that a violation of R&R #15 occurred. However, the penalty of termination is not proportionate to the severity of the infraction considering the circumstances of the violation. **Penalty to be imposed** – Loss of rank for one year effective 01/31/2005 (Cpl to TFC) after one year return to the rank of Cpl., probation period of one year, 10 days suspension with the option to forfeit vacation, 5 days without the option to forfeit vacation. (Total suspension of 15 days.)

D000561

# SILVERMAN, McDONALD & FRIEDMAN
*Attorneys at Law*

MICHAEL I. SILVERMAN*
ROBERT C. MCDONALD
(302) 888-2900
JEFFREY S. FRIEDMAN†
DONNA M. SCHNITZLER
BRIAN E. LUTNESS**

1010 NORTH BANCROFT PARKWAY
SUITE 22

WILMINGTON, DE 19805

TELEPHONE:

TELECOPIER:
(302) 888-2902

*Also Admitted in PA
**Also Admitted in NJ
†Also Admitted in PA and NJ

August 30, 2004

Captain James Paige
Internal Affairs Division
Delaware State Police
P.O. Box 430
Dover, Delaware 19903
**BY TELEFAX ONLY: (302)-739-5970**

**Re:  Cpl Elizabeth C. Dempsey**
**IA: 12-04**

Dear Captain Paige:

Please be advised that I have been retained by Corporal Dempsey with respect to a rules violation.  Please accept this communication as our demand for a disciplinary hearing board.

Pursuant to 11 <u>Del.C.</u> §9200(c)(10), please produce all transcripts, records, written statements, written reports, analyses and video tapes pertinent to the case if they are exculpatory or intended to support any disciplinary action or are to be introduced in the departmental hearing on the charges involved.

Finally, when the Board is appointed, I request the Chairman to contact my office for the purpose of setting a mutually agreeable time to conduct the hearing.

D000764

**SILVERMAN, McDONALD & FRIEDMAN**
Re: Cpl Elizabeth Dempsey
August 30, 2004
Page Two

Very truly yours,

Robert C. McDonald

RCM/jli

**Coupe Robert M (DSP)**

| | |
|---|---|
| **From:** | Paige James (DSP) |
| **Sent:** | Tuesday, September 21, 2004 3:54 PM |
| **To:** | DSP_Users |
| **Subject:** | Trial Board |

A Divisional Trial Board has been scheduled for Friday, November 5, 2004, at 0900 hours at Delaware State Police Headquarters to hear charges against Corporal Elizabeth C. Dempsey. She is charged with violating Delaware State Police Rule and Regulation #15 and Delaware State Police Job Performance Standard #14.

The board will be composed of Major Joseph A. Papili, Captain Albert J. Homiak Jr. and Cpl/3 Larry W. Welch.

Any member of this Division, uniformed or civilian, who believes any of the officers selected to this Board would be biased, prejudicial or otherwise predisposed in the above matter, will immediately contact the Internal Affairs Division office.

Additionally, any member, uniformed of civilian, who may possess any information that would affect the proceeding will, likewise, contact the Internal Affairs Division office.

Captain James Paige
Delaware State Police
Internal Affairs
302-739-5990

1

D000699

**Coupe Robert M (DSP)**

| From: | bob@silverman-mcdonald.psemall.com |
|---|---|
| Sent: | Monday, August 30, 2004 11:30 AM |
| To: | Coupe Robert M (DSP) |
| Subject: | Maher & Dempsey |

    

production.request.w     production.request.w     board.selection.wpd
pd                       pd

Dear Bob:

I understadn that Capt. Paige is out of the office untile 9/7/04. As such, I am transmitting my production request for both Maher and Dempsey. In addition, I have selected a trial board for Cpl. Dempsey

Any question, please call.

Bob

Robert C. McDonald, Esquire
Silverman & McDonald
1010 N. Bancroft Pkwy
Wilmington, Delaware 19805
302-888-2900

1

D000716

**A000347**

## SILVERMAN, McDONALD & FRIEDMAN
*Attorneys at Law*

MICHAEL I. SILVERMAN*
ROBERT C. McDONALD
(302) 888-2900
JEFFREY S. FRIEDMAN†
DONNA M. SCHNITZLER
BRIAN E. LUTNESS**

1010 NORTH BANCROFT PARKWAY
SUITE 22

WILMINGTON, DE  19805

TELEPHONE:

TELECOPIER:
(302) 888-2902

*Also Admitted in PA
**Also Admitted in NJ
†Also Admitted in PA and NJ

August 30, 2004

Captain James Paige
Internal Affairs Division
Delaware State Police
P.O. Box 430
Dover, Delaware 19903
**BY TELEFAX ONLY: (302)-739-5970**

**Re:   Cpl Elizabeth C. Dempsey**
**IA: 12-04**

Dear Captain Paige:

With regard to my client, captioned above, we are selecting a Divisional Hearing Board to consider the alleged rules violations.  Towards that end, we strike the following:

Major Mark Seifert
Captain Elisabeth E. Shamany
Captain Paul E. Smentkowski
Cpl/2 Eric Loechster
Cpl/3 James E. Phillips

Once again, once the Board is selected, please ask the Chairperson to contact me to arrange a mutually agreeable hearing date.

D000761

**SILVERMAN, McDONALD & FRIEDMAN**
Re: Cpl Elizabeth Dempsey
August 30, 2004
Page Two

Very truly yours,

Robert C. McDonald

RCM/jli

New Castle County                    Writer's Direct Dial: (302) 577-8510
FAX: (302) 577-5866

~~December 10, 2004~~  *1 -13-05*

Robert C. McDonald, Esquire
Silverman & McDonald
Suite 22
1010 North Bancroft parkway
Wilmington, DE 19805

Re: Cpl. Dempsey

Dear Mr. McDonald:

I am responding on behalf of the Internal Affairs Unit to your renewed request
for production of additional documents in this matter, which is presently at
recess pending the recovery by your client from her recent injury.

The following were provided to you on **August 30, 2004**:

### Tape Recordings

1. 911 tape recordings from October 26, 2003.
2. 911 tape recording from October 26, 2003.
3. Tape recorded IA interview with Cpl. Dempsey (5 tapes)
4. Tape recorded IA interview with Cpl. Maher (3 tapes)

D000465

5.  Tape recorded IA interview with Kevin Keller (2 tapes)
6.  Tape recorded interview with Cpl. Dempsey (Hudson 1 tape)
7.  Tape recorded interview with Kevin Keller (Hudson 1 tape)
8.  Tape recorded IA interview with Cpl. Gygrynuk (2 tapes)
9.  Tape recorded interview with Cpl. Csapo (2 tapes)
10. Tape recorded interview with Tpr. Argo (2 tapes)

### Documents

1.  Initial Crime Report #03-03038183
2.  Supplemental Report - Gygrynuk #03-03-38183
3.  Supplemental Report - Mullett #03-03-38183
4.  Supplemental Report - Argo #03-03-38183
5.  Supplemental Report - Hudson #03-03-38183  April 28, 2004
6.  Supplemental Report - Hudson #03-03-38183  May 28, 2004
7.  Transcribed interview - April 23, 2004 - Cpl. Elizabeth C. Dempsey
8.  Transcribed 911 call - October 26, 2004 (Initial call)
9.  Transcribed interview - April 12, 2004 - Kevin Keller
10. Copy of floor plan of 1715B Frederica Road
11. 17 photographs from 1715B Frederica Road

On **October 18, 2004** transcripts of the following interviews were provided:

1.  Interview of Cpl. Dempsey 04/23/2004.
2.  Interview of Cpl. Dempsey 06/25/2004.
3.  Interview of Cpl/3 Maher 06/18/2004.
4.  Interview of Kevin Keller 05/11/2004.
5.  Interview of Cpl. Csapo 05/03/2004.
6.  Interview of Tpr. Argo 05/04/2004.
7.  Interview of Cpl/1 Gygrynuk 05/04/2004.

As you know, the Internal Affairs investigation extended to issues and individuals other than your client.  Tapes and/or transcripts of the following interviews, not relating to the charges against Cpl. Dempsey, and not exculpatory, were not provided:

1.  Sgt. Houdek
2.  Captain Hawkins
3.  Major Hughes
4.  Tim Jester
5.  Richard Jester
6.  Julie Brooks
7.  Captain Dixon

D000466

**A000351**

8.  Lt. Donaway
9.  Sgt. Mullett
10. Colonel Chaffinch
11. Lt. Col MacLeish
12. Major Baylor
13. Major Seifert
14. Major Papili
15. Major Eckrich

Tim Jester and Richard Jester were the individuals who lived in the unit immediately below Cpl Dempsey. The other officers were either the subjects of independent investigations, or witnesses as to such investigations. Pursuant to 11 *Del.C.* §9200(c)(12) and (d), those records are confidential, and shall not be released to the public. They are not discoverable under §9200(c)(10), in that they are not pertinent to the disciplinary case against your client, and are not exculpatory or supportive of the action against Cpl Dempsey, nor does the prosecution intend to introduce them as evidence against Cpl Dempsey in the current hearing. Implicit in this finding is the fact that investigations of other officers for other alleged or possible violations cannot constitute defenses to the charges against Cpl. Dempsey.

I f you contend that any of these documents are discoverable under LEOBOR, I suggest that we submit that dispute to Mike Tupman as counsel for the trial board, prior to resumption of the hearing.

Very truly yours,


Ralph K. Durstein III, Esquire
Deputy Attorney General

D000467

**A000352**

BEFORE A DELAWARE STATE POLICE

DIVISIONAL TRIAL BOARD

IN THE MATTER OF:                              )
                                               )
CORPORAL ELIZABETH C. DEMPSEY                  )
                                               )

      Pursuant to due notice of time and place of hearing, this matter came before a Divisional

Trial Board convened by the Delaware State Police under 11 Del. C. Section 9203 at 0900 hours

on December 1, 2004 at State Police Headquarters, North DuPont Highway, Dover DE 19903.

After taking much of the evidence in the case, The Trial Board continued the remainder of the

hearing until January 13, 2005.

PRESENT:

Major Joseph A. Papili
Presiding Officer

Captain Albert J. Homiak, Jr.
Member

Corporal Larry W. Welch
Member

W. Michael Tupman, Deputy Attorney General, on behalf of the Trial Board

APPEARANCES:

Robert C. McDonald, Esquire
  on behalf of Corporal Elizabeth C. Dempsey

Ralph K. Durstein, III, Esquire
Deputy Attorney General
Captain James Paige
  on behalf of the Division

D000646

A000353

## SUMMARY OF THE EVIDENCE

The Trial Board admitted into evidence with certain objections the thirteen tabbed exhibits in the Division's trial book.[1] The Trial Board also admitted into evidence: (1) a handwritten note on an Rx pad from Corporal Dempsey's doctor dated November 30, 2004; (2) correspondence between counsel about Dempsey's request for a continuance; (3) letter dated December 29, 2004 from Dr. Brian Horn; (4) letter dated January 13, 2005 from DAG Durstein to Mr. McDonald; (5) black ring binder with photographs of Dempsey's residence; (6) blow-up photograph of Dempsey's residence; and (7) letter dated February 3, 1998 from Attorney General Brady to Colonel Ellingsworth.

The Division called four witnesses: Trooper Alexander Argo, V; Corporal Mark K. Csapo; Corporal Walter J. Gygrymuk; and Kevin Keller. Dempsey called one witness (Captain James Paige) and testified on her own behalf.

## PROCEDURAL MATTERS

### Request for Continuance

By letter dated November 29, 2004, Mr. McDonald asked for a continuance of the hearing scheduled for December 1, 2004. According to Mr. McDonald, Dempsey was taking pain medication for a recent shoulder separation and "is unable to effectively participate in her own

---

[1]    Dempsey objected to the admission of the transcripts of witnesses who either did not testify at the hearing (Maher) or who testified (Keller, Csapo, Argo, and Gygrymuk). In its findings of fact and conclusions of law the Trial Board did not rely on any of those written statements but rather based its decision solely on the live testimony and other documents admitted into evidence without objection.

-2-

D000647

defense." By letter dated November 29, 2004, counsel for the Trial Board, on behalf of the Presiding Officer, informed Mr. McDonald that "your request for a continuance is denied. You have not provided any medical evidence to support your client's claim that she 'is unable to effectively participate in her own defense' or that going forward with the hearing would deny her 'a full and adequate defense of the allegations.'"

Under cover of letter dated November 30, 2004 to the Trial Board, Mr. McDonald enclosed a hand-written note from a doctor (signature illegible) stating: "Patient currently under care and on medicine that currently impairs clear cognitive thought and ability to express oneself. Expected duration 30 days and will recheck."

At the hearing on December 1, 2004, Dempsey acknowledged that she had driven her personal vehicle from her residence in Rehoboth Beach to State Police Headquarters, and that she had not taken any pain medication that day except ibuprofen. The Trial Board was not certain Dempsey had met her burden of showing impairment, but out of an abundance of caution deferred her testimony until a future date. The Trial Board went forward to hear most of the other evidence in the case. [2]

By letter dated December 29, 2004, Dempsey's doctor wrote that she "is physically and mentally able to return to work." She did not claim any impairment when she testified at the continuation of the hearing on January 13, 2005. The Trial Board considers the issue of her competence to testify as moot.

---

[2]    Mr. McDonald still objected to the hearing going forward because he claimed his client could not assist him. The Board notes that during the hearing on December 1, 2004, Corporal Dempsey did not appear in any way impaired. She actively assisted her counsel by reviewing documents and writing notes and otherwise consulting with him in her defense.

-3-

D000648

A000355

### Jurisdiction

Dempsey argues that the Trial Board lacks jurisdiction to hear charges of misconduct against her because the hearing did not take place within the time required by the Law-Enforcement Officer's Bill of Rights, 11 *Delaware Code*, Chapter 92 (LEOBOR).

Section 9204 of LEOBOR provides: "In the event an officer is entitled to a hearing, a hearing shall be scheduled within a reasonable period of time from the alleged incident, but in no event more than 30 days following the conclusion of the internal investigation, unless waived in writing by the charged officer." Dempsey's alleged misconduct occurred on October 25-26, 2003. The matter was initially investigated at Troop 3, and closed as unfounded criminal mischief on October 29, 2003.

Based on new information, the State Police reopened the investigation by Internal Affairs on March 30, 2004. On August 25, 2004, Internal Affairs charged Dempsey with violating State Police Rules and Regulations and Job Performance Standards. Dempsey does not dispute that since the conclusion of the Internal Affairs investigation she has waived her right to a hearing within thirty days to accommodate the schedules of counsel. She contends, however, that LEOBOR required a hearing within thirty days of the conclusion of the initial investigation at Troop 3 on October 29, 2003 to substantiate any charges arising out of the incident at Dempsey's residence on October 25-26, 2003.

"As a general rule, where a statute which imposes upon a public officer the duty of performing some act relating to the interests of the public and which fixes a time for the doing of such act, the requirement of time will be construed as directory rather than mandatory and not as a limitation of the exercise of the power, unless by reason of the act to be performed, or the

-4-

D000649

**A000356**

manner of its performance, it will have an adverse effect on some public interest or private right."
Pitts v. White, 111 A.2d 217, 218-19 (Del. 1955). "Government agencies do not lose jurisdiction
for failure to comply with statutory time limits unless the statute *both* expressly requires an agency
or public official to act within a particular time period *and* specifies a consequence for failure to
comply with the provision." Brock v. Pierce County, 476 U.S. 253, 259 (1986).

LEOBOR does not expressly say that, as a consequence of the 30-day rule, a Trial Board
loses jurisdiction to hear a charge of misconduct. The Trial Board therefore is not divested of
jurisdiction by operation of law because it did not convene within thirty days after the conclusion
of the initial internal investigation on October 29, 2003.

LEOBOR, however, also requires that a hearing be held "within a reasonable period of
time from the alleged incident." The Trial Board reads that provision as an equitable principle
of fundamental fairness. Dempsey has not shown how the passage of time since her alleged
misconduct has so prejudiced her ability to defend herself as to make it unfair for the hearing to
go forward. She has not identified the loss of any relevant documents, or the unavailability of any
material witnesses, during the intervening period of time which might, arguably, violate her right
of temporal due process as guaranteed by LEOBOR.

### Production of Witness Statements

Section 9200(c)(10) of LEOBOR provides: "An officer who is charged with violating any
departmental rules or regulations, or the officer's representative, will be provided access to
transcripts, records, written statements, written reports, analyses and video tapes pertinent to the
case if they are exculpatory, intended to support any disciplinary action or are to be introduced
in the departmental hearing on the charges involved. Upon demand by the officer or counsel, they

-5-

D000650

shall be produced within 48 hours of the written notification of the charges." 11 *Delaware Code* §9200(c)(10).

Dempsey argues that her rights under LEOBOR were violated because she has did not receive copies of the statements of fifteen witnesses interviewed by Internal Affairs in connection with the incident at Dempsey's residence on October 25-26, 2003.

The Division introduced a letter from DAG Durstein outlining the tape recordings, documents, and transcripts of witness statements provided to Dempsey's counsel on August 30 and October 18, 2004. The Division objected to providing fifteen of the witness statements identified in that letter because "the Internal Affairs investigation extended to issues and individuals other than your client . . . "[T]hey are not pertinent to the disciplinary case against your client and are not exculpatory or supportive of the action against Cpl Dempsey, nor does the prosecution intend to introduce them as evidence against Cpl Dempsey in the current hearing."

Unlike the court rules of civil discovery, LEOBOR does not require the production of evidence that is "relevant" or might lead to the discovery of relevant evidence. LEOBOR requires disclosure of witness statements if they are (1) exculpatory or (2) to be introduced as evidence in support of the charges. The Division did not use the disputed witness statements to support the charges against Dempsey. Nor is there anything in the record to suggest that those witness statements might be exculpatory of Dempsey's alleged misconduct. The Trial Board should not have to make an *in camera* review of the disputed statements to see if there might be any exculpatory information unless Dempsey "at least advances some factual predicate which makes it reasonably likely that the file will bear such fruit." Snowden v. State, 672 A.2d 1017, 1024 (Del. 1996).

-6-

Dempsey has not met that burden of going forward. Absent some factual showing that it is reasonably likely that the disputed witness statements might contain exculpatory information, the Trial Board finds that the statements were not required to be produced under LEOBOR.

### Double Jeopardy

Dempsey contends that because she was investigated in October 2003 and no disciplinary action taken, the principle of double jeopardy bars any subsequent disciplinary proceeding based on the same transaction or occurrence.

"The constitutional concept of double jeopardy does not apply to employment decisions." Ziegler v. City of South Pasadena, 73 Cal.App.4th 391, 397 (1999). Accord Bart v. Illinois State Police, 367 N.E.2d 773, 776 (Ill. App. 1977) (double jeopardy did not attach when a state trooper was suspended for thirty days for misconduct and later terminated; "double jeopardy has application only in criminal prosecutions"); Cross v. City of Michigan City, 419 N.E.2d 991, 995 (Ind. App. 1981) ("double jeopardy doctrine does not apply to police disciplinary proceedings").

### Personal Privacy

Dempsey argues that her constitutional right of privacy forecloses the State Police from disciplining her for off-duty personal conduct.

Some courts have "recognized a right of privacy in private, off-duty behavior of police officers." Fugate v. Phoenix Civil Service Board, 791 F.2d 736, 741 (9th Cir. 1986). This limited privacy protection does not extend "to behavior that is not purely private, that compromises a police officer's performance, and that threatens to undermine a police department's internal morale and community reputation." Id.

-7-

D000652

A000359

In Fleisher v. City of Signal Hill, 829 F.2d 1491 (9th Cir. 1987), the federal appeals court held that the constitutional right of privacy did not prevent a police department from disciplining an officer for off-duty misconduct. "It is understandable that the Department would be concerned that individuals hired to be guardians of the law should themselves have a history of compliance with the law. Like the officers' conduct in *Fugate*, Fleisher's conduct threatened to undermine the Department's community reputation and internal morale." 829 F.2d at 1499.

In Fabio v. Civil Service Commission of the City of Philadelphia, 373 A.2d 751 (Pa. Cmwlth. 1977), the police department fired an officer for off-duty misconduct, and the officer appealed claiming the discipline violated his right of privacy. The court held that "off-duty conduct by policemen and firemen may be used as the basis for a charge of conduct unbecoming an officer." 373 A.2d at 754. "We demand from our law enforcement officers, and properly so, adherence to demanding standards which are higher than those applied to many other professions. It is a standard which demands more than a forbearance from overt and indictable illegal conduct. It demands that in both an officer's private and official lives he do nothing to bring dishonor upon his noble calling and in no way contribute to a weakening of the public confidence and trust of which he is a repository." Id. The court observed that the police officer's "'private' conduct led to rumors and, eventually the discovery of his relationship and a complaint by his father-in-law. These facts are sufficient to make Fabio's conduct a matter of legitimate concern to the City of Philadelphia. Fabio's attempts to keep his conduct private were obviously unsuccessful; his acts, in fact, became a matter of public knowledge." 373 A.2d at 755.

The incident at Dempsey's residence on October 25-26, 2003 was not a purely private affair. An out-of-state police officer was involved, and Dempsey did not have any reasonable

-8-

D000653

expectation of privacy after she called 911 to make a criminal complaint and three Troopers responded to the scene to investigate. The man who broke into her residence was prosecuted for criminal trespass, a matter of public record. The incident spawned parallel Internal Affairs investigations of other Troopers. Because the charges involve alleged false statements and dishonesty, Dempsey's alleged misconduct could compromise her performance as a police officer and undermine the Division's public reputation. These facts are sufficient to make Dempsey's off-duty misconduct a legitimate concern of the Division.

## FINDINGS OF FACT

Kevin Keller is a municipal police officer in Copperas Cove, Texas. Originally from Delaware, Keller visits family in Delaware from time-to-time. Keller has known Dempsey for a number of years, but it was not until a family visit in October 2003 that they went out on a date.

On October 25, 2003, Dempsey and Keller went on a Haunted Trail hayride and then had dinner and consumed much alcohol (4-7 drinks each) at TGI Fridays in Dover. They ended up at Dempsey's residence outside Frederica around midnight. Her apartment is on the second floor of the building; the stairway to the second floor is on the outside of the building. Keller was in the bedroom and Dempsey in the bathroom when Keller heard knocking at the front door. Keller went into the living room and peered through a window over the door and saw a white male who started banging on the door and yelling, "Christy! Christy!"

Keller was concerned because it appeared the man knew Dempsey and was very upset. At one point the man yelled, "I'm going to kick your ass." Dempsey then came into the living room and asked Keller to go back into the bedroom, saying that the man would just go away if

D000654

**A000361**

they ignored him. Dempsey and Keller went into the bedroom, and the banging and yelling at the front door stopped. The man outside, however, had climbed onto the roof and started banging on one of the windows in the bedroom. He yelled, "I'm going to count to ten, and if you don't come out, I'm coming in." Keller was very concerned for their safety at this point, and implored Dempsey to call 911, but she would not, saying "I can't believe he showed up here." She insisted that if they just kept quiet and ignored him, everything would be fine.

Keller then heard glass breaking in the living room. The man had entered the apartment and was now banging on the locked bedroom door. Keller was so fearful for their safety that he sat down on the floor and braced his back against the door to prevent the man from breaking the door in. Keller repeatedly asked Dempsey to call 911 on her cell phone but she would not. At this point, Keller felt their lives were threatened, and he told Dempsey that if she did not call 911, he would get her service revolver if the man broke into the bedroom.

Finally, Dempsey relented and called 911. The intruder apparently realized what was going on, and Keller heard him say, "That's f***** up, I can't believe you're doing this." The pounding on the door stopped. After a few minutes, Keller unlocked the bedroom door and peered into the living room. He saw broken glass on the floor. He walked across the room and looked out the window and saw a white male getting into a pick-up truck and driving off.

Dempsey was not happy that Keller had made her call 911 because now there would be an investigation. She told Keller to go into the bedroom and close the door and that "She would take care of it."

The Trial Board listened to the audiotapes of the two 911 calls made by Dempsey together with a transcript of the calls. Dempsey told the call taker that "somebody just broke into the

-10-

D000655

**A000362**

house" but that she did not have a clue who it was. She said that at the time of the break in she was alone in the residence. In the second call, Dempsey told the call taker that the Troopers dispatched to the scene "don't even need to come. I mean I don't even know who it was."

Corporal Argo was on patrol the night of October 26, 2003 in Magnolia when he heard a radio call from Kentcom on a secure channel about a burglary in progress at a Trooper's house and that a weapon was involved. Argo was the first of three Troopers to respond to the scene. Dempsey was outside of her apartment on the exterior stairwell. She told Argo that everything was OK and she did not want to make a big deal out of it. Argo climbed over the stairwell railing and walked along the porch roof where he saw the broken window. Dempsey said she did not know who broke the window and she was hesitant to let Argo enter her apartment. Argo told Dempsey he needed to investigate because he was concerned that someone tried to break into a Trooper's residence even though her marked patrol vehicle was in plain view.

Corporal Csapo was the second Trooper to arrive at the scene. He was on patrol in Harrington when he heard the report on a secure channel that someone had broken into a Trooper's home and she had armed herself. Csapo inspected the broken glass and lifted a latent print off the front door. Dempsey told Csapo that she had cleared the interior of her residence with her service weapon to make sure that no one had gained entry. Dempsey did not tell Csapo that she knew who the suspect was, or that Keller was in the residence.

Shortly after Argo, Corporal Gygrynuk arrived at the scene. He too heard the report from Kentcom on a secure channel that someone had broken into a Trooper's residence and a weapon was involved. As the senior officer at the scene, Gygrynuk questioned Dempsey the most. At first, she told him that when she came home that night she found broken glass in the living room.

-11-

D000656

She then changed her story to say she was at home at the time of the break-in. She did not disclose that Keller was there at the time or that she knew who the suspect was. After 5-10 minutes of questioning, Dempsey revealed that there was someone in the bedroom. Grygynuk entered the bedroom and found Keller. After interviewing Keller, Gygrynuk and Argo left to respond to a domestic violence complaint. Csapo gave Keller a ride home to his sister's residence.

## CONCLUSIONS OF LAW

### COUNT ONE

The Division charged Dempsey with violating State Police Job Performance Standard #14:

> When a sworn Division member is involved, as the suspect or the victim, in a domestic incident, it is his/her responsibility to make immediate notification to the on duty supervisor at his/her assigned Troop/Section.

The Administrative Manual does not define "domestic incident." The Trial Board believes that JPS #14 is designed to make the Division aware of any incidents involving a State Trooper as a suspect or a victim which might qualify as domestic violence. [3] Section 1041 of Title 10 of the Delaware Code defines "domestic violence" as "abuse perpetrated by one member against another member of the following protected classes: a. Family, as that term is defined in §901(9)

---

[3]     The Trial Board's interpretation of JSP #14 is reinforced by the consequences if a Trooper is the alleged suspect in a domestic violence incident and the victim obtains a protection-from-abuse (PFA) order. The Family Court will order the Trooper to relinquish all firearms, including his/her service weapons, rendering him or her unable to perform the essential duties of a State Trooper.

-12-

D000657

of this title, [4] regardless, however, of the state of residence of the parties; or b. Former spouses, a man and a woman co-habitating together with or without a child of either or both, or a man and a woman living separate and apart with a child in common."

In recent years, the legislatures in other states have expanded the definition of domestic violence to include "dating relationships." See, e.g., N.J.Stat.Ann. §2C:25-19(d) ("Victim of domestic violence also includes any person who has been subjected to domestic violence by a person with whom the victim had a dating relationship."). As yet, the General Assembly in Delaware has not followed suit.

The domestic violence statutes are remedial in nature, and the courts in some states have construed them broadly to cover a variety of interpersonal relationships that do not involve a family relationship, children, or co-habitation, even though the statute does not expressly mention dating relationships. "The point of domestic violence legislation is to protect victims from harm caused by persons whose intimate relationship to the victim increases the danger of harm, either because the parties live in physical proximity or because the relationship is one whose intimacy may disable the victim from seeking protection." Barnett v. Wiley, 2002 WL 125841, at p.1 (Ky. App., Feb. 1, 2002). "The domestic violence statute was enacted for the purpose of protected a person who engages in a lengthy, intimate relationship with a partner who perpetrates violence

---

[4]   Section 901(9) defines "family" to include: mother; father; mother-in-law; father-in-law; brother; sister; brother-in-law; sister-in-law; son; daughter; son-in-law; daughter-in-law; grandfather; grandmother; grandson; granddaughter; stepfather; or stepmother.

-13-

D000658

against her." Id. [5]

Even if the domestic violence laws in Delaware apply to a "dating relationship," the courts have construed that term to mean "a social relationship between two individuals who have or have had a reciprocally amorous and increasingly exclusive interest in one another, and shared expectation of the growth of that mutual interest, that has endured for such a length of time and stimulated such frequent interactions that the relationship cannot be deemed to have been casual." Oriola v. Thaler, 84 Cal.App.4th 397, 412 (2000). [6]

The evidentiary record does not support a legal conclusion by the Trial Board that Dempsey and the man who broke into her residence had a dating relationship that might have triggered the application of the Delaware domestic violence laws or the reporting requirements of

---

[5] But see the dissenting opinion in Barnett. "Although Wiley was surely entitled to protection from violence at the hands of Barnett, I conclude that her only remedy under the law was to press criminal charges against him. Unless the legislature amends the statute, I don't believe the boyfriend/girlfriend situation is covered in the absence of facts meeting the definition of a 'member of an unmarried couple.'" 2002 WL 125841, at p.2.

[6] The Superior Court in New Jersey has identified five factors in determining whether the requisite "dating relationship" exists: (1) Was there a minimal social interpersonal bonding of the parties over and above a mere fraternization? (2) How long did the alleged dating activities continue prior to the acts of domestic violence? (3) What were the nature and frequency of the parties' interactions? (4) What were the parties' ongoing expectations with respect to the relationship, either individually or jointly? and (5) Did the parties demonstrate an affirmation of their relationship before others by statement or conduct? Andrew v. Rutherford, 832 A.2d 379, 384 (N.J. Super. 2003).

-14-

D000659

JPS #14. The only evidence in the record was Dempsey's own testimony, and she denied that the man was her boyfriend or that they had any dating relationship prior to the break-in.[7] We conclude that this charge against Dempsey is not substantiated.


## COUNT TWO

The Division charged Dempsey with violating State Police Rule and Regulation # 15:

**No member shall knowingly make a false statement, falsify any written or verbal report made to a superior officer, or willingly and intentionally withhold material matter from such report or statement.**

Dempsey argued that the Trial Board must dismiss this count because any false statement or intentional withholding of material information was not "to a superior officer." R&R 15, however, consists of three distinct kinds of misconduct, all in the disjunctive. The first, "No members shall knowingly make a false statement," is not qualified by "to a superior officer."

The Trial Board concludes that Dempsey made a series of false statements when she called 911 and to the Troopers investigating her criminal complaint. In the first call to 911, she said that she did not have a clue who the person was who broke into her apartment. In the second call to 911, to explain why a quick response was no longer necessary, she said: "I don't even know who it was."

---

[7]     The Trial Board notes that Dempsey's testimony in this regard was questionable because she also testified that after the incident her romantic relationship with the man blossomed and they vacationed together in California several months later.

-15-

D000660

Dempsey told Corporal Argo that she "did not know who had broken the window." When questioned by Corporal Gygrynuk, she first told him she discovered the broken glass in the living room only after she returned home that night. She told Gygrynuk that the suspect was " not someone she knew." She withheld the material information that Keller was still in her residence until, under further questioning, it slipped out.

In her Trial Board testimony, Dempsey admitted that she knew from the start when the banging and yelling started at her front door who the man was. She visited him in the hospital earlier that day, and he invited her to dinner at the beach. She called him at the Starboard from TGI Fridays while she was out with Keller to say she would not be coming down because she was seeing someone else. Dempsey also testified that during the incident when she was in the bathroom she text-messaged the man (presumably to try to convince him to go away). The man called her the next day to apologize and came to her residence to board up the broken window.

Even if the Trial Board's reading of R&R 15 is not legally correct, there was one superior officer present: Corporal Gygrynuk, who was a Corporal One at the time (Dempsey was a Corporal). Dempsey made a false statement to Gygyrnuk that she did not know the identity of the suspect, and withheld a material matter from Gygyrnuk (that Keller – a material witness – was still in the residence). [8]

Dempsey's explanation for why she lied and withheld material information was that she

---

[8]    Should any reviewing body reverse the decision of the Trial Board regarding the R&R 15 charge, the Board concludes in the alternative that in withholding material information from the 911 call-taker and Corporals Argo and Csapo, the Trial Board concludes that Dempsey committed the lesser-included offense of violating Article 5 of the Canons of Law Enforcement Ethics because she failed to "cooperate with public officials in the discharge of their authorized duties."

-16-

D000661

felt the investigation was an invasion of her personal privacy and that, as the victim, when she said she did not want to pursue the matter the investigating officers should have respected her decision and left. [9] Any reasonable expectation of privacy was lost when Dempsey called 911 and made a criminal complaint. Three other Troopers raced at high speed to get to her residence after learning that someone was breaking into a Trooper's residence and she had armed herself for protection. Their concern for her safety was heightened when they arrived at the scene and could see that the suspect broke-in with her marked patrol vehicle in plain view, and the discovery of an unidentified man in her residence. It is not the victim's decision whether a complaint will be investigated or prosecuted. The three Troopers responding to the scene would have been derelict in their duty to the public safety if they had not pursued the matter.

The Trial Board concludes as a matter of law that the evidence in the record substantiates the charge that Dempsey violated R&R 15.

---

[9]       While not directly relevant to the charges against Dempsey, the Trial Board was troubled by her testimony how she handles domestic violence complaints. She said that if there is no evidence of physical injury, if the victim does not want to press charges Dempsey only completes an NPR (no police action report) which is filed at the Troop.

-17-

D000662

## RECOMMENDED PENALTY

It is the unanimous recommendation of the members of the Trial Board that Dempsey be suspended with pay with intent to terminate pending review by the Acting Superintendent. The Trial Board appreciates that Dempsey was the victim of an embarrassing incident at her residence on October 25-26, 2003. But as a police officer, she had a duty to provide the 911 call-taker with truthful and complete information when she made her criminal complaint. Troopers responding to the scene of a crime are always exposed to some risk of personal safety, at the very least in driving at a high speed to get to the scene of the crime. Their ability to minimize that risk depends on the quality and accuracy of the information they receive via the 911 dispatcher from the complainant.

When a police officer lies and withholds material information during a criminal investigation, it violates the public trust and has enormous consequences for the criminal justice system. In a letter dated February 3, 1998 to Colonel Alan D. Ellingsworth, Attorney General M. Jane Brady wrote that decisions by the Delaware Supreme Court require the disclosure (as Brady materials) of any information in the personnel or Internal Affairs file of a State Trooper that might be "relevant to an officer's credibility (which may be used for impeachment)." This constitutional requirement seriously compromises Dempsey from ever testifying as a witness in a criminal case. By her own course of conduct on the night of October 25-26, 2003, she has so impaired her ability to perform one of the essential functions of a State Trooper that termination is the appropriate recourse.

Dempsey argued during the penalty phase of the hearing that it is problematic whether her credibility will ever become an issue in a criminal case, and there are other options short of

-18-

D000663

**A000370**

termination (for example, assigning her to a desk position where she would be less likely to have to testify in a criminal case). This Trial Board will not be a party to creating a precedent for what would, in effect, be an award of a permanent light duty position for Troopers who lie and withhold material information during the course of a criminal investigation. The effects on the morale of the Division and the public trust are far too important to even contemplate such a result.

IT IS SO DECIDED, this 25th day of January, 2005

_Major Joseph A. Papili_
Major Joseph A. Papili, Presiding Officer

_Captain Albert J. Homiak, Jr._
Captain Albert J. Homiak, Jr., Member

_Cpl/3 Larry W. Welch_
Corporal Larry W. Welch, Member

-19-

D000664

**A000371**

## DECISION BY THE ACTING SUPERINTENDENT

After reviewing the Trial Board's findings of fact and conclusions of law and recommended penalty, I concur with those findings and conclusions and with the recommended penalty of suspension with intent to terminate.    I find that termination is  appropriate and warranted under the circumstances given the nature of Corporal Dempsey's misconduct and its effect on the operations of the Division, the criminal justice system, and the public trust. Effective immediately, Corporal Dempsey is suspended without pay pending review by the Secretary of the Department of Safety and Homeland Security.  If the Secretary agrees with my recommendation and terminates Dempsey, then the Division will refer the matter to the Council on Police Training for de-certification.

Dated:    January 31 , 2005

*LTC Thomas F. MacLeish*
Lieutenant Colonel Thomas F. MacLeish
Acting Superintendent

I:\TUPMAN\FILES\dempsey.trialboard.wpd

-20-

D000665

4-28-99



**STATE OF DELAWARE**
DEPARTMENT OF JUSTICE

M. JANE BRADY
ATTORNEY GENERAL

| NEW CASTLE COUNTY | KENT COUNTY | SUSSEX COUNTY |
|---|---|---|
| Carvel State Building | Sykes Building | 114 E. Market Street |
| 820 N. French Street | 45 The Green | Georgetown, DE 19947 |
| Wilmington, DE 19801 | Dover, DE 19901 | (302) 856-5352 |
| Criminal Division (302) 577-8500 | Criminal Division (302) 739-4211 | Fax: (302) 856-5369 |
| Fax: (302) 577-2496 | Fax: (302) 739-6727 | |
| Civil Division (302) 577-8400 | Civil Division (302) 739-7641 | |
| Fax: (302) 577-6630 | Fax: (302) 739-7652 | |

PLEASE REPLY TO:
New Castle County

February 3, 1998

Colonel Alan D. Ellingsworth
Superintendent
Delaware State Police
P.O. Box 430
Dover, DE 19903

Re:  Disclosure of Internal Affairs Investigations

Dear Colonel Ellingsworth:

Pursuant to decisions by the United States Supreme Court and the Delaware Supreme Court, the State is constitutionally required to disclose to the defense exculpatory evidence that is known by prosecutors or by police officers. The evidence that must be disclosed includes evidence that can be used for impeachment purposes at trial.

Recent decisions by the Delaware Supreme Court have caused this office to consider the question of whether we must provide information relevant to an officer's credibility (which may be used for impeachment) that may be present in any internal affairs file on a particular officer. Based on our review of the law and case decisions, we conclude that prosecutors must review personnel files or internal affairs files in response to a specific motion filed by defense counsel or in response to a subpoena. If prosecutors determine that the particular file contains information that must be disclosed as required by the federal and state Constitutions, that information will be disclosed to defense counsel.

I am sure you recognize that certain officers, based on the contents of their personnel or internal affairs files, may have substantial credibility problems if called to testify at trial. This challenge to their credibility would make them undesirable witnesses for the state. To minimize the effect such credibility problems might have in the prosecution of any case, it may be advisable to assign those officers to duties which make it unlikely that they would be required to testify.

Finally, this office would ask your assistance in those situations, when prosecutors will need to review these files.

Sincerely,

M. Jane Brady
Attorney General

MJB/jf
cc:  All Deputy Attorneys General (via e-mail)

SUPERINTENDENT'S
OFFICE

FEB - 9 1998
RECEIVED

D000532

**Paige James (DSP)**

| | |
|---|---|
| **From:** | Paige James (DSP) |
| **Sent:** | Thursday, January 13, 2005 3:29 PM |
| **To:** | DSP_Users |
| **Subject:** | Results of Divisional Hearing |

As a result of a Divisional Hearing Board held on Thursday, January 13, 2005, Corporal Elizabeth C. Dempsey, Troop 7, was found not guilty of violating Job Performance Standard #14.  Corporal Dempsey was found guilty of violating Rule and Regulation #15.

The Hearing Board has recommended the following disciplinary action: Dismissal.

Effective this date Corporal Dempsey has been placed on administrative suspension with pay and benefits pending the Superintendent's review of the Hearing Board's recommendation for termination.

Captain James Paige
Delaware State Police
Internal Affairs
302-739-5990

1

D000681

# SILVERMAN, McDONALD & FRIEDMAN
### Attorneys at Law

MICHAEL I. SILVERMAN*
ROBERT C. McDONALD
JEFFREY S. FRIEDMAN†
DONNA M. SCHNITZLER
BRIAN E. LUTNESS**

1010 NORTH BANCROFT PARKWAY
SUITE 22
WILMINGTON, DELAWARE 19805

TELEPHONE:
(302) 888-2900
TELECOPIER:
(302) 888-2923

*Also Admitted in PA
**Also Admitted in NJ
†Also Admitted in PA and NJ

February 3, 2005

Colonel A. Leonard Chaffinch
Superintendent
Delaware State Police
P.O. Box 430
Dover, Delaware 19903

Re:    **Cpl Elizabeth C. Dempsey**
       **IA: 12-04**

Dear Colonel Chaffinch:

Please accept this communication as Corporal Elizabeth C. Dempsey's appeal from the finding of the Trial Board published on or about February 1, 2005.

Should you have any question, please do not hesitate to call upon me.

Very truly yours,

Robert C. McDonald

cc:    Captain James Paige
       Corporal Elizabeth Dempsey

D000488

A000375



**STATE OF DELAWARE**
**DEPARTMENT OF SAFETY AND HOMELAND SECURITY**
P.O. BOX 818
DOVER, DELAWARE 19903-0818
302-744-2680

The Honorable Ruth Ann Minner
Governor

David B. Mitchell, J.D.
Secretary

April 18, 2005

Robert C. McDonald
1010 North Bancroft Parkway
Suite 22
Wilmington, DE 19805

RE: Corporal Elizabeth C. Dempsey

Dear Mr. McDonald:

Oral arguments for Corporal Dempsey's appeal before Secretary Mitchell have been scheduled on May 18, 2005 at 2:00 P.M. at the Department of Safety and Homeland Security building in Dover, Delaware. As per our conversation, I ask that you submit a memorandum to Secretary Mitchell by May 2, 2005 setting forth the basis and grounds for the appeal. The Deputy Attorney General representing the Division of State Police will then have until May 16, 2005 to submit a reply memorandum. If you have any questions, please contact me at (302)744-2668.

Sincerely,

William G. Bush, IV, Policy Advisor
Department of Safety and Homeland Security

D000490



STATE OF DELAWARE
DEPARTMENT OF SAFETY AND HOMELAND SECURITY
P.O. BOX 818
DOVER, DELAWARE 19903-0818
302-744-2680

The Honorable Ruth Ann Minner
Governor

David B. Mitchell, J.D.
Secretary

## BEFORE THE SECRETARY OF THE DEPARTMENT OF SAFETY AND HOMELAND SECURITY

IN THE MATTER OF:

CORPORAL ELIZABETH C. DEMPSEY

### DECISION ON REVIEW OF DISCIPLINARY ACTION

#### Procedural Background of the Case

This matter came up for oral argument before the Secretary of the Department of Safety and Homeland Security ("the Secretary") on May 18, 2005. Robert C. McDonald, Esquire appeared on behalf of Corporal Elizabeth C. Dempsey ("Dempsey"), who was also present for the argument. Deputy Attorney General W. Michael Tupman, Esquire and Captain James Paige appeared on behalf of the Division of State Police.

In January 2005, a three-member Divisional Trial Board ("Trial Board") unanimously substantiated charges against Dempsey of violating State Police Rule and Regulation #15. The Trial Board recommended that Dempsey be terminated.

On January 31, 2005, the Acting Superintendent, Thomas MacLeish ("Superintendent"), concurred with the proposed penalty and suspended Dempsey without pay with intent to terminate subject to review by the Secretary of the Department of Safety and Homeland Security.

D000528

Dempsey lodged a timely written request for review by the Secretary.  Pursuant to a stipulated schedule, Dempsey filed her opening letter of memorandum to the Secretary setting forth the basis and grounds for the appeal on May 09, 2005 and counsel for the State Police submitted a reply letter of memorandum on May 16, 2005.

## Standard of Review

The Delaware State Police *Administrative Manual* provides that an appeal before the Secretary "shall be based on the record of the Trial Board hearing, the written findings of fact and the officer's personnel/disciplinary file."  Additionally, "the Secretary's review, in the absence of actual fraud, shall be limited to the determination of whether the decision below was supported by substantial evidence of record; whether there was a clear abuse of discretion; or whether appellant was denied minimal due process."

"Substantial evidence has been defined to mean 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' Substantial evidence is 'more than a scintilla but less than a preponderance.'" Olney v. Cooch, Del. Supr., 425 A. 2d 610, 614 (1981) (citation omitted).

## Decision

State Police Rule and Regulation #15 provides "No member shall knowingly make a false statement, falsify any written or verbal report made to a superior officer, or willingly and intentionally withhold material matter from such report or statement."

Based upon the record I find that there was substantial evidence to support the finding that a violation of State Police Rule and Regulation #15 occurred.

Delaware law provides, "administrative sanctions must, in order to be fair, be proportionate to the severity of the infraction." Blinder, Robinson & Co. v. Bruton, C.A. No. 9096 (Del. Ch., Feb. 12, 1990)(Allen, C.). Id. "It is appropriate in fixing an administrative sanction to consider the characteristics of the violator, the circumstances of the violation, and the violator's history beyond the matter at hand, in order to assess the likelihood of future violations." Id.

In reviewing the circumstances surrounding the violation, I find that the penalty of termination is not proportionate to the severity of the infraction considering the circumstances of the violation. Therefore, I am remanding this matter to the Superintendent to impose the penalty of loss of rank for a one-year period which shall begin on January 31, 2005. After the one-year time period, Dempsey shall be returned to her previous rank. Furthermore, Dempsey shall be suspended without pay for 15 days. She shall have the option of forfeiting vacation for 10 days of the suspension. Additionally, a probation period of one-year shall be imposed. The one-year probation period begins upon Dempsey's return to work.

Conclusion

In conclusion, after reviewing the transcript of the Trial Board hearing, the written findings of fact, and Dempsey's personnel/disciplinary file, I find that there was substantial evidence to find that a violation of State Police Rule and Regulation #15 occurred. However, the penalty is not proportionate to the severity of the infraction

considering the circumstances of the violation.  Therefore, I am remanding this matter for

a more appropriate penalty to be imposed by the Superintendent of the Delaware State

Police as stated above.

Dated July 1, 2005

David B. Mitchell, J.D.
Secretary of the Department of Safety and
Homeland Security

D000531

**A000380**

**Smentkowski Paul E (DSP)**

| | |
|---|---|
| **From:** | Smentkowski Paul E (DSP) |
| **Sent:** | Friday, July 22, 2005 11:56 AM |
| **To:** | DSP_Users |
| **Subject:** | Divisional Member- Duty Status |

Sent Authority of Colonel Thomas F. Mac Leish

After an administrative appeal to Secretary David B. Mitchell, Department of Safety and Homeland Security, the Secretary affirmed the Trial Board's findings of a violation of Rule 15 by TFC Elizabeth C. Dempsey, but reversed the recommended penalty of termination. The disciplinary action authorized by the Secretary has been imposed. Effective July 20, 2005, TFC Dempsey was assigned to Troop 4 patrol.

Captain Paul E. Smentkowski
Office of Professional Responsibility
302-739-5990 (office)
302-739-5970 (fax)

1

D000677

**A000381**

| CHARGE OF DISCRIMINATION | ENTER CHARGE NUMBER |
|---|---|
| This form is affected by the Privacy Act of 1974 | ☐ FEPA 05040142M |
| | ☐ EEOC 17CA500303 |

Delaware Department of Labor      and EEOC (if applicable)

| NAME (Indicate Mr., Mrs., Ms) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| Ms. Elizabeth C. Dempsey | (302) 632-8559 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 12 Seachase Drive | Rehoboth Beach, DE 19971 | Sussex |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

| NAME | NO. OF EMPLOYEES OR MEMBERS 500+ | TELEPHONE NUMBER (Incl. Area Code) |
|---|---|---|
| State of DE./Dept. of Homeland Security/DE. State Police | | (302) 739-5900 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| P.O. Box 430 Dover, DE 19903 | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| | |

| ☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RETALIATION ☐ DISABILITY ☐ OTHER (Specify) | EARLIEST 4/2004    LATEST 04/6/2005 |
| | ☒ CONTINUING ACTION |

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

Jurisdiction: Charging Party was employed by Respondent as a State Trooper in its Lewes, Delaware location-Troop 7

Charging Party's protected class: Female

Adverse employment action: Suspension

Brief statement of allegations: Charging Party was friends with another State Trooper, Brian Maher (male). During the relationship an altercation between the two occurred on October 26, 2003 and other State Troopers were called to Charging Party's residence. Charging Party was told by a superior officer, Capt. Robert Hawkins (male), not to disclose any information involving the incident. An internal and criminal investigation of the incident was conducted in April 2004. Charging Party was charged with filing a false complaint. The three male officers who responded to the scene and filed false complaints were not investigated or charged. The officers involved were Alex Argo, Mark Csapo and Walter Gyrgrunek. As a result of a Trial Board Hearing held on December 1, 2004 and January 13, 2005, Charging Party was suspended without pay pending termination on January 31, 2005.

Respondent's explanation: Charging Party filed a false complaint.

Applicable law(s): Title VII of the Civil Rights Act of 1964, as amended, and state of Delaware's Discrimination in Employment Act, as amended.

Comparator(s) or other specific reason(s) for alleging discrimination: Brian Maher received a loss of rank and suspended but allowed to use vacation. He was never threatened to be terminated even though criminal charges were accessed against him for the October 2003 incident. Respondent violated several policies while conducting it's investigation and handing the matter. Charging Party was questioned about her sexual relationship with Mr. Maher which was not relevant to the matter at-hand.

Additional information and verification of these facts are provided by the attached Affidavit.

| ☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT |
|---|---|
| | [signature] 040605 |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

DDOL FORM B-05 REV 11/04      PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

RECEIVED

APR 1 5 2005

Human Resources Office
D000401

<u>**VERIFICATION**</u>
Pursuant to Title 19 <u>Del. C.</u> § 712(c)(1)

State of Delaware        )
                              )     ss:
<u>Kent</u>      County               )

I, <u>Elizabeth C. Dempsey</u>, swear or affirm that I have read the Charge of Discrimination and that it is true to the best of my knowledge, information and belief.

I further agree to advise the agencies involved if I change my address or telephone number, and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

In addition to the facts set forth in the Charge of Discrimination, I hereby aver the following: (optional; do not include witness information)

*None at this time.*

_____
Charging Party's Verification Signature

**SWORN TO AND SUBSCRIBED** before me this _____ day of _____, 2005.

_____
Notary Public/Attorney at Law

RECEIVED

APR 1 5 2005

Human Resources Office
Delaware State Police
D000402

**A000383**

STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS – DISCRIMINATION PROGRAM

RECEIVED
STATE PERSONNEL
WILMINGTON

2006 MAR -3  A 11: 40

Ms. Elizabeth C. Dempsey
12 Seachase Dr.
Rehobeth Bch., DE 19971                                    State Case # 05040142M
vs.
State of DE/Dept of Homeland Security/DE State Police
C/O Tom LoFaro, Labor Relations Executive
Carvel State Building, 10th Fl.
820 North French Street
Wilmington, DE 19801

## FINAL DETERMINATION AND RIGHT TO SUE NOTICE

Pursuant to 19 Del. C. § 710, et seq., the parties in the above-captioned matter are hereby Noticed of the Department's Final Determination and Right to Sue Notice, as follows:

### No-Cause Determination and Dismissal with Corresponding Right to Sue Notice.

In this case, the Department has completed its investigation and found that there is no reasonable cause to believe that an unlawful employment practice has occurred. The Department hereby issues a No-Cause Determination and Dismissal and provides the Charging Party with a Delaware Right to Sue Notice.

This No Cause determination is based on the following facts:

The Charging Party in this Charge of Discrimination bears the burden to prove her allegations by a preponderance of the evidence. She specifically alleges that she was disciplined more harshly than similarly situated male comparators for violations of the Respondent's policies relating to off-duty misconduct of State Police Officers. The incident that led to the present controversy occurred when the Charging Party called 911 saying there had been a break-in at her residence. On the night in question the Charging Party was out with a male companion. When they arrived back at her home, a former romantic interest of hers arrived and demanded entry to the residence. Thereafter this individual (also a DE State Trooper) broke her front window to gain access to the home. The Charging Party's companion demanded that she call the police fearing the situation would escalate. The former romantic interest then departed. When State Troopers arrived, the Charging Party told the officers responding to the scene that she was not at home when the incident occurred, that she was alone in the residence at the time, and that she did not know who was responsible for the break-in. It soon became evident to the responding Troopers the Charging Party was misrepresenting actual events. The Respondent conducted an internal investigation into the incident. The result of this inquiry resulted in the Charging Party being recommended by a trial board for termination because of her intentional misrepresentations to the investigating officers. This recommendation was overturned and her discipline was reduced to suspension, a one year probationary period followed by a reduction in grade for that term. The former romantic interest was given the very similar discipline as the Charging Party. The Charging Party complains that more senior officers in her chain of command were not disciplined as harshly as she for their misrepresentations on official documents relating to this unique incident. On information and belief, these persons were reprimanded for compounding the errors of that night. The Charging Party also complains the other Trooper, the former romantic interest, was not given the exact same discipline as she. It appears that the Charging Party was not disparately treated because of her gender. Rather, the Respondent was moved to take the action they did in response to the Charging Party's misconduct. Respondent disciplined other individuals for their misconduct to lesser degrees based on the severity of their actions. According to the evidence submitted by both parties to this matter, it is not possible to issue a Reasonable Cause Determination on behalf of the Charging Party.

See the attached Notice of Rights.

This Final Determination is hereby issued on behalf of the Department of Labor, Division of Industrial Affairs, Discrimination Program.

_2/28/06_
Date issued

_Julie Klein Cutler_
Julie Klein Cutler, Administrator

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*
DOL Form C-12NC : 01/06

D000450

**Dempsey 911 Call**

Disp: State Police can I help you?

D: Kevin stay in here.

Disp: Hello

D: He is here

Disp: hello

D: 1715B Frederica Road

Disp: 1715

D: B Frederica Road

Disp: OK what's going on?

D: Somebody just broke into my house

Disp: Are they in your, inside your residence?

D: I think they've left.

Disp: You don't have a clue who it was?

D: No

D: Kevin, get in here.  Kevin please.

Disp: OK, How did they get in maam.

D:  They broke the glass.

Disp: They broke the glass?

D: yes

Disp: The door or window?

D: Door, Kevin, Kevin.  Did he leave?

D000773

Disp: maam, hello?

D: yes

Disp: How many people in the residence?

D: There was just one.

Disp: One person?

D: Yes.

Disp: now what happened? Did you hear the window break or…

D: We heard the window break.

Dsip: Did you hear someone inside the house?

D: He came in the house.

Disp: he came in the house.

D: Yes

Disp: has anything been taken or anything?

D: No, well I don't think so.

Disp: OK. Stand by one. What's your name maam?

D: Elizabeth Dempsey. IBM 296.

Disp: What's the phone number your calling from?

D: I'm actually calling from my cell phone, its 632-8559.

Disp: OK, did you hear anybody drive away or anything?

D: yes

Disp: You heard em, ok. OK did you see anything, a description of a vehicle.

D: No.

Disp: You didn't see anybody either?

D000774

D: No

Disp: Ok where is everybody at in the house now?

D: I'm sorry.

Disp: Is everybody in one room in the house now?

D: Yea, were fine. I have my gun, I'm fine.

Disp: OK, I'm going to go ahead and send an officer over there to talk to you, ok, just make sure. We want to make sure nothing was taken or exactly what they were doing in there. Um, well if you um walk around in the residence and stuff just be careful. Don't touch anything, ok?

D: Right, right

Disp: Ok and we'll send somebody over

D: Thank you

Disp: your welcome, bye.

### Second Call to Kentcom

Disp: State Police, Melvin

D: Hey Melvin, this is Dempsey again.

Disp: Hey

D: Just wanted to make sure you could tell the trooper to slow their response, I'm fine.

Disp: Yea, OK, we told them that no one was in the house at this time, but we have two enroute to you.

D: They, they don't even need to come. I mean I don't even know who it was.

Disp: OK, well did they take anything? Or

D: Ahhh, no. No, nothing's taken, just the window's broke.

Disp: OK, is it out of your front door?

D000775

D: No, actually it's out of, I'm not sure why I thought this, but I thought they had broken the glass on the door, but it was out of a side window on the roof.

Disp: Oh, OK.

D: Then they got in the house and then went out the front door.

Disp: They went out the front door, OK.

D: Well, I think they did. I was locked in the bedroom.

Disp: Ok, you don't want anybody to come out and do a report on it?

D: Whose coming?

Disp: Um, I think, I believe its Trooper Argo and officer Gygrynuk.

D: Gygrynuk.

Disp: Em hah.

D: No, that's fine.

Disp: Your sure you don't want either of them to respond?

D: If one, If one almost here that's fine, but ah

Disp: We did have one right there at Law's Church, so they aren't far from you.

D: OK, they can just totally slow their response.

Disp: OK

D: Alright

Disp: I'll let them know, thanks.

D: Thank you.

Disp: See you.

D000776

**Dempsey Statement**

H: Today's date is April 23. It is the year 2004 and the time is approximately 3:58 pm. My name is Detective Rob Hudson. I'm with the Delaware State Police Troop 4, Major Crimes Unit and I'm conducting an interview at this time in the upstairs conference room at the Sussex County Attorney General's Office. Um, this interview is being audiotaped only and the interview is with Elizabeth Dempsey. We will be referring to her as Christy and present on her behalf is attorney Robert McDonald. Um, Christy if you could just state your name for voice recognition on the tape.

D: Christy Dempsey

H: OK and if I could get you do that also Mr. McDonald.

M: Sure. It's Bob MacDonald.

H. OK and this in reference to complaint number 03-03-38183, ah date of 10/26/2003 and the time of this complaint is 0135 to 0142 at which time that's when the 911 center is called. Um, on October the 26th of 2003 a 911 call was made from your residence. Was that you that made the 911 call?

D: Yes

H: OK and can you tell me what that 911 call was about? Take your time.

D: You want the whole story?

H: Sure why don't we start, why don't we start, yea, why don't we start right from the beginning.

D: I had. I was at my residence. Um, I was in the bathroom washing my face, ah, getting ready for bed. Ah, friend of mine, Kevin Keller, was also at the house. He was out in the living room. Um, we had been out with some other friends. We'd been to a hay ride and ah gone out and had a couple of drinks and come back to the house. He, we both, like I said had a couple of drinks, both intoxicated. Um, didn't feel he should drive back to his sister's house, so he was staying. As I said, I was in the bathroom washing my face and ah, when I came out of the bathroom Kevin told me that there's some guy outside banging on the door.

H: OK, about what time is that?

D: I was going to say.

D000777

H: The report says the 911 call came in about 0142 in the morning. Is that, that sound about right.

D: Right, so it

H: About quarter two in the morning, somewhere in there.

D: So this is, you know 0130, 0135. 0135,

H: OK.

D: Um

H: What happens after he says there's banging on the door?

D: He asked me who it was outside. I said, I don't know, um, like I said I was a little intoxicated.

H: OK.

D: At some point I did hear a voice and recognized it. Um, or thought I recognized it. Um, again I did not see the person, so I wasn't positive.

H: OK. I'm gonna stop you for just for a second and I have four Polaroid photographs that I have just so that we can refer to them if need be.

D: OK.

H: Is that a picture of your residence, right there or what it was back on October

D: Right, right

H: I mean it may not look exactly right.

D: I live upstairs, so that was my door.

H: OK, so this would be the door and that is the only door that enters the house? Is that correct?

D: Enters my apartment right em hah.

H: Enters your apartment, OK and that's the door you hear the banging on.

D: Right

H: OK, alright go ahead.

D000778

D: Right um,

H: What happens after that at, you think you might recognize the voice?

D: Ah, I did receive ah, phone call. Um, from Brian Maher. ✱

H: OK

D: Um, I forget if it was on my cell phone or on my house phone.

H: OK

D: Um, but I answered it and he was angry with me that I did not come to see him and go out with him at the beach that night.

H: OK

D: I, I explained to him earlier in the day that ah, that I'd had plans with some friends and that my friend, Kevin Keller, was in town from Texas and that I'd be hanging out with him and some other high school friends.

H: What time is this phone call?

D: Ah, sometime after 0130.

H: OK, so sometime after you hear the banging on the door.

D: Right.

H: OK.

D: And um, I forget if he asked me to come outside and I told him that you know, I was going to bed.

H: This is while your on the phone with him?

D: Right, we'd been, we'd been drinking and, and just to go home and I would talk to him in the morning.

H: OK, go ahead. I know you're waiting on me to write, right? OK.

D: At some point I heard steps on the, on the, the roof area.

H: OK and that's the porch area and that, that's ah, its actually, its not the actual roof, its actually the porch, well, it's the porch roof, not the actual residence roof correct.

D000779

D: Right, yea right, right, I mean that's where it sounded to me like it was coming from.

H: OK so you thought you heard.

D: Right, um, you know, Kevin's yelling at me, you know, who is this guy? Why is he, you know, banging on the door and climbing on the roof and I told him just ignore him, he'll go away. Um, at some point he was knocking on the windows also.

H: OK. OK. OK go ahead.

D: Um, Kevin kept asking, you know, why, why don't I just go outside and talked to him and I said, well I, I don't think that's would be a very good idea because we've all been drinking. I don't think that's the thing to do.

H: Um hah.

D: I just want to leave it alone and

H: OK

D: he'll go away.

H: OK

D: Ah, when he kept banging on the windows and

H: How would you describe that banging? Was it loud, I mean...

D: Yea, it was loud I guess.

H: I mean its not (Hudson knocks on the table) He's not knocking on it, he's banging (bangs louder on the table) on the window.

D: Yes it was a bang.

H: OK what happens after that?

D: Um, like I said, Kevin wanted to go outside and confront him. I said that just isn't gonna be a good idea. That's not gonna make this matter any better. Stay in here. He'll go away. At some point he encourages me to call 911. I said look, I said you don't understand. I said were both troopers. We could both get in trouble for this. He's arguing with me that you can't get in trouble, you're not doing anything wrong..dah dah dah...I said look, you don't understand. You're from a rinky dinky little police in Texas. Your not a Delaware State Trooper. We both are. We can get in trouble for this. So just leave it alone, he'll go away. He keeps banging. At some point, I can't really remember if Brian said something that indicated he was going to come in or if I just heard the glass

D000780

breaking, but I rememeber Kevin said you better call 911 now and at that point I didn't know what else to do. I didn't want the matter to get any worse. Not that it was going in a real good direction anyway. Um, so I had my cell phone in the bedroom and it took me a second cause I was a little upset. UM, but I called the ah, I didn't even call 911, I called the regular

H: OK

D: 739-4863

H: OK. How about as far as the glass breaking. Did, did you, at what point did the glass break? Before you called 911 or after or before you called the EOC, I'm sorry.

D: Sir, I'm not positive, it was either..

H: OK, somewhere in close proximity...

D: Right, I can't tell you if was right before or right after, during, but yes it was in

H: OK. What room are you in at that point?

D: The bedroom.

H: OK and that's, that's just right in, right inside the front door, right inside your door, right to the left

D: No, that's actually um, when you come in the front door you're at, you know, this is the living room, these two windows are the living room and these two windows are the bedroom. There's a wall that goes in between

H: OK and which window broke?

D: Um, that window, yea

H: This one right here?

D: Sorry, I know it was one of the living room windows. I was trying to remember which one.

H: Alright, for this one on the left facing the residence on Frederica Road.

D: Right.

H: OK. OK and then what happens after that while your on the phone with 911? Is there any conversation between you and Brian through the window or??

D000781

A000393

✱D: I don't remember anything specifically being said between Brian and I or Kevin and him. I remember Kevin saying call 911 and I'm calling them and (sigh). It's a long time ago. Um, I don't remember anything specific being said. Um.

H: Do you recall any threats or anything like that?

D: No. Brian never threatened either one of us.

H: Did he inflict any physical harm on you or Kevin?

D: I never saw him. Neither one of us ever saw him.

H: Never saw him.

D: The only time Kevin would have possibly seen him was standing up looking. I believe, when I came out of the bathroom, I mean Kevin could obviously tell me it was, it was, a guy outside my door and I believe he gave me some brief description of what he looks like. So I was under the assumption that he like stood on his tippy toes and looked over that, through that window.

H: OK

D: And I guess saw him on the steps.

H: Through the top window.

D: Right

H: OK I see

D: I'm not tall enough to that

H: But the door was closed, right?

D: Yes, I'm not tall enough to that but I guess...

H: OK and at the time that this window gets broken...

D: Em hah, we are, we are in the bedroom with the door closed.

H: So you guys don't even see him here.

D: Correct

H: OK, do you know if he even comes in the house or not? Do you recall?

D000782

D: I never saw him in the house.  I believe he was, but I never saw him in the house. ←

H: Did you ever hear any banging on the bedroom door?

D: (sigh) I can't say for sure.  I think I heard footsteps, but

H: OK.  So you never saw him outside or inside.

D: No

H: OK.  And you don't recall him banging on the bedroom door?

D: I do not recall him banging on the bedroom door.

H: Ok and what happens after that?  After your on the phone with 911?  Is there any discusson between you and Brian at that point in time?

D: Not that I remember.

H: OK, so your on the phone with 911 waiting and the police are coming.  What does Brian do?  Do you know?

D: Like I said, I heard footsteps and that was it, um..

H: But your not sure where those footsteps were.  They could have been on the roof.  Could have been inside.  You don't know.

D: I'm not positive, I mean I assumed they were inside but I'm not positive.          *He was banging on the Bedroom door.*

H: OK, alright so you're not positive, OK.  Um, and then what happens after that?  He leaves or what happens?

D: I assumed he left.  Right.

H: OK so you never see him gain.  Never hear anything when the troopers get there.  Where are you when the troopers get there?

D: Pacing around the house.

H: OK, OK so you ended up, you came outside?

D: Yea, I believe.

H: OR were you pacing inside.

D000783

A000395

D: Yea, I believe I met Csapo on um, somewhere on the steps, the landing or on the steps and I told him everything was fine.  Um, I tried to get them to just leave.

H: OK

D: And that everything was fine.  Everything was under control and they wouldn't and the next thing I know Argo was there and then Gygrynuk was there and and ah.  I was upset.  I was embarrassed. I didn't know exactly what to say, what to do.  I was a shitty ✳ situation to put it bluntly.

H: Well um, and then how about that night.  Do you get any more calls from Brian or do you talk to him anymore that, I'm sorry its actually morning, two o'clock in the morning

D: Technically, right yea.

H: Do you talk to him anymore?

D: I did.

H: OK and what time did you talk to him again?

D: Oh gosh, um, I'd say the next hour.

H: OK. Did he call your house or call your cell phone?

D: I think it was my cell phone, but I'm again, I'm not positive.

H: And what was the ah extent of that phone conversation?  What did he say?

D:  First he said he was sorry.

H: OK

D: Um, he told me that, he told me that he spoke with Captain.

H: OK

D: At that point I didn't, again I was still upset, um, Kevin had started, I think, yea, I think Kevin had already shown back up at the house and wanted to argue about things because he didn't think I handled things right.

H: OK

D: Um, so I was still very upset, shaking, ticked off, embarrassed.  Um, so I, at that point in time I didn't understand who he was saying Captain.  There's lots of Captains.  Um, he said he spoken to Captain and told him that if ah he needed him to I think the words he

D000784

used to answer up. Um, that he had screwed up and if he needed him to reach him on his cell phone.

H: OK

D: And, I said you did what? He was like, well. So didn't you tell him it was me? I said no I didn't. I said I didn't know what to do.

H: OK and after to you talked to him then, when is the next time you talked to Brian?

D: Emmm....I don't know a specific time, but I believe it was sometime later that morning. Maybe, maybe closer to noon.

H: OK, what was the extent of that conversation?

D: Well he had told me on the phone, the first, first call, he had told me, mentioned something that he would come up and take care of the window.

H: OK.

D: And so I believe that the second call was more about that, him coming up, I got the stuff ready.

H: OK and did he in fact come and fix the window?

D: Em hah (positive indication)

H: When was that?

D: Well um, sometime, sometime that day, um.

H: OK on Sunday.

D: Right.

H: The 26th still. Were still on the 26th, right?

D: Right, Sunday. Um, at that point I'll I could do was, um, clean up the glass and ah, put plywood over it.

H: OK

D: It took awhile just because there old windows to actually get the window fixed, but.

H: OK, and um, did you have a conversation that day with Captain Hawkins on the 26th?

D000785

D: Yes.

H: And what was the extent of that conversation with him that day?

D: Sir it was either that Sunday or that Monday. I believe it was Sunday, but it could have been possibly been Monday.

H: OK, so it was either Sunday or Monday sometime.

D: Right, right, but yes we, we did speak on the phone.

H: What was the extent of the conversation?

D: Wanted to know if I was alright.

H: OK

D: Um, um. If there was anything he could do for me. Um, if there was anything further that I wanted done as far as a report of Brian being arrested. Um and I told him, told him no, that we were working things out and that things were fine. He asked if ah the window was taken care of. I said, said yes, ah again I can't remember which day the, the conversation was, but, you know I indicated to him that the window wither was taken care of or was being taken care of and I had no, no concern that it wouldn't be fine.

H: OK, lets just wrap things up a little bit ok? I just got a couple of things I just want to make sure I'm clear on. On October 26th of 2003 the person that broke your window at approximately 0142 in the morning was Brian Maher, is that correct?

D: Correct.

H: And you are not sure of whether or not he entered your residence or not, is that correct?

D: Correct.

H: And in fact that morning you got a call from Brian Maher and he apologized for breaking the window, correct?

D: Correct.

H: And as you said earlier when troopers responded there and asked you what happened, you were embarrassed and didn't know what to do and that's the reason you didn't them who had broken it, or had broken the window, is that correct?

D: Right, I told them that I did not see who broke it.

D000786

H: OK. And that window was in, that window was in fact fixed by Brian Maher, correct?

D: Correct.

H: And on October the 26th of 2003 you did not wish any criminal prosecution at that time, correct?

D: Correct.

H: And on this date, April the 23rd, 2004, do you desire prosecution in this case?

D: No, I do not.

H: At this time are you engaged in a relationship with Brian Maher or are the two of you friends, or what, what. I guess I should say at this point in time are the two of you friends and is there any conflict between the two of you?

D: We are friends and there is no conflict.

H: No conflict. OK, thank you. And everything you've told me today is the truth, is that correct?

D: Correct.

H: Um, I'm looking over my notes a little bit. This case because of the apparent relationship between Brian and yourself is either boyfriend or girlfriend back on October the 26th, it's a domestic related case. But what I'm gonna do is hand to you and Mr. MacDonald a copy of domestic violence risk assessment which I have no choice but to go over with you and the two of you can decide which questions you wish to answer and which you don't. And I'm going to hand that to you just so you can look it over first, ok? While I look back over my notes. Any you may be familiar with it Christy, cause you probably have, you have to fill on out on occasion anyway.

D: Yea.

There is some faint talking between Dempsey and MacDonald. Inaudible.

D: Does it make any difference that we were not in a

H: I'm willing to go over it, but no, if your involved, well you know what domestic refers to. It refers to someone whose other than an aquaintance at the time and I ah just based on common sense wouldn't of believed that an acquaintance isn't going to be beaten on a, a window. And I have no choice but to go over that form with you.

More inaudible talk between Dempsey and MacDonald.

D000787

M: Yea that's the only one we have concern with was the firearm. I mean there both police officers, which she has access to a firearm in the house.

H: OK

M: I don't get a sense that he does, so

H: OK, so of the 21 questions which I have under the risk factors, ah which it says in the course of the investigation attempt to identifiy any of the follwing risk factors. Check the corresponding blocks and give a detailed explanation in the narrative. Other than question number 1, which is obvious that you as a police officer have a weapon and Brian as a police officer have a weapon. There are, all the rest of the questions are answered in the negative, correct?

D: Correct.

H: There are none that are not being answered based on the advice of counsel, correct? They are in the negative.

D: Correct.

H: You know what I'm saying?

M: In other words, I'm not telling you not to answer the questions.

D: Right, correct.

H: All these are in the negative, correct?

D: Correct.

H: OK, thank you.

M: And the one dealing with firearms, it is my understanding that while they have firearms assigned to them that wasn't a factor.

D: That's correct. That question 1 which a gun present in the home or accessible to suspect is not relevant. That's already known. Um, the tape is still rolling. I have no further questions. Do either one of you have any questions of me at this time?

M: Not me, do you?

D: Not at this time, I don't think.

H: Ok, well stop the tape, its approximately 4:25 or 1625 hours.

D000788

# INTERNAL AFFAIRS INVESTIGATION
## Transcribed Interview

**CASE NAME:**               IA 12-04

**PERSON INTERVIEWED:**   Kevin A. Keller

**DATE:**                 May 11, 2004

**INTERVIEWER:**          Captain James Paige
                         Internal Affairs

**TRANSCRIBED BY:**       Brenda Lee Unruh
                         Delaware State Police

**TOTAL PAGES:**          50

*Kevin Keller has sniffles throughout interview.*

D000903

Ok, this is Captain James Paige, Delaware State Police Internal Affairs Division. I'm going to be conducting a tape-recorded phone interview with Kevin A. Keller. Ah, today's date is May 11, 2004 and the current time is approximately 11:00 hours.

JP:     Ah, Kevin, if you would, state your full name please.

KK:     Ah, Kevin Allen Keller.

JP:     Ok and what is your date of birth?

KK:     Ah, 08 ah 07 19 (cut off)

JP:     I'm sorry you got cut off there, 19 what?

KK:     Seventy-three.

JP:     Ok and your employer?

KK:     Ah, City of Copper's Cove.

JP:     Ok. And is that in…what state is that in?

KK:     Ah, Texas.

JP:     Ok and how long have you been employed there?

KK:     Ah, three years.

JP:     Ok and your occupation?

KK:     I'm a Police Officer.

JP:     Ok. Alright ah, as you are aware, I'm conducting an Administrative Investigation to the events that occurred at ah, Christy Dempsey's home on October 26th, 2003. And I'm gonna right off the bat, I'm going to apologize if some of the questions I'm…I'm going to ask you ah, may be personal in nature. But it's very important that I learn all the events that occurred that evening. Ah, cause Christy's actions, as well as the Trooper involved have lead ah, other troopers to come under scrutiny and are being investigated

2

D000904

also for the action they took…took involved in the investigation. So, I really need…I need your utmost ah…ah…cooperation ah, regarding what you recall from that night. Ok?

KK: Ok.

JP: Ah, how…how do you know ah, Christy?

KK: Ah, actually we go back…back into high school. Ah, but I really…I guess I really met her ah, started hanging out with her in like '92-93, we actually dated back then.

JP: Ok, how long did you date?

KK: Ah, probably for just like a summer, we dated.

JP: Now, would this be in high school still, or?

KK: Ah, this was college. We were both going to ah…ah…ah, the parallel program there at University of Delaware.

JP: Ok and you were at

KK: At ah

JP: You were residing in the Dover area then at that time?

KK: Ah, I was living in ah, Magnolia.

JP: Ok and she was living in…in the area also?

KK: Yeah, I believe she was living in Camden. We were both going to college up there at Del Tech. Ah

JP: Ok.

KK: So we…we dated for a couple months there and then ah, you know, of course that ended and I…I didn't see her or talk to her for years.

JP: Uh huh.

3

D000905

KK:  Ah, I think it was for about 10 years, I hadn't seen or talk to her.

JP:  Oh, is that right? Ok.

KK:  Yeah, I hadn't...hadn't seen her from like ninety, I guess about '93 until last summer I ran into her.

JP:  Ok and how did you come in contact with her last summer then?

KK:  I was ah, vacationing and ah, I drove by where she was residing. And I didn't even know she lived there but I looked over and I saw her. And so I just stopped and talked to her.

JP:  Ok.

KK:  And ah, like I say, it'd been like 10 years so I didn't know...and we had left on a bad note, so I didn't know if she'd talk with me or not, but.

JP:  Uh huh.

KK:  Ah, so we started talking and I think that was August of ah, last summer.

JP:  Ok. So...does...do you guys ah...other than that visit in August, that one time that you saw her, did you see her anymore after that?

KK:  Yeah, we ah, well I had saw her in August, we started talking again and of course I came back down here ah, to Texas. And we talked on the phone and communi...communicated by emails and phone from August and I planned ah, a vacation in October to come up there. Ah, you know, with my sole intent was to, you know, basically coming to see her.

JP:  Ok.

KK:  Ah, as well as my family. But we...we...we had talked like everyday on the phone and I had ah, been considering possibility of maybe moving back up there. And ah, and just ah, come up in October and feel it out. See how...how it was going to be.

4

D000906

JP: Ok. So ah, so you planned this vacation in October of last year to basically spend time with Christy then?

KK: Ah, then I'd also...I was...I was doing some ah, testing ah, I was trying to find employment up there.

JP: Uh huh.

KK: Ah, I had scheduled a...a test with ah, Dover PD.

JP: Uh huh.

KK: That weekend. But ah, I mean, when I...when I was on my way up there I was planning on staying with her all week and...and staying at her place. Yeah, she was going to pick me up at the airport. Ah,

JP: Ok so you...you stayed with her then that...that week that you were in...in...in the Dover area then?

KK: Ah yes, I stayed with my sister I think one time; one or two days. But basically I'd stayed with her two or three nights.

JP: Ok. Ah, and during that time frame...and...and I...again I'm going to apologize, cause I'm just trying to establish the relationship with you and Christy.

KK: Oh, that's fine.

JP: I know that maybe uncomfortable but I...I...I need to know. I haven't had an opportunity to interview Christy at this point yet. Ah

KK: Ok.

JP: because of the criminal investigation is still not complete. So ah,

KK: I've...I've been...I've been through the Internal's before and I....and I don't mind talking about anything.

5

JP:  Ok. Ah, so you…you….you…you stay at her residence in late October ah, how would you classify your relationship at this point? Are you guys ah, intimate? Or are you still just friends? Or…or what's…what's?

KK:  Yeah…no…I mean, we were intimate. We ah, you know, from the time she picked me up from the airport. Ah, of course now…the whole time we were talking phone several months prior to that.

JP:  Ok.

KK:  Ah, yeah I was looking forward to coming and seeing her and I had…I had been considering moving back to the area and, you know, along with that I…I told her, I said, you know, I wanted to come up and see how things were with her. And ah, from the time I arrived there we were intimate. I mean, she spent time with my family ah…I stayed at her place. Ah, she drove me around. We went and did things together and ah, you know, things were going really well. (chuckle)

JP:  Ok, so you would classify yourselves as boyfriend-girlfriend, more or less then?

KK:  Ah, nah. I wouldn't say boyfriend-girlfriend cause I mean, I knew I was coming back down to Texas, but

JP:  Uh huh.

KK:  but definitely it was…it was a…a romantic relationship. Yeah.

JP:  Ok. Now during your time:…during this time frame between August and in October did she ever mention to you that she was in a relationship with anybody else?

KK:  I knew that she went out with…with different guys. Ah, I didn't…I never really asked to what extent. Ah, I just knew that she would go out on, you know, dat…to shift parties or, you know, shoot…go out and have drinks with some guys or whatever. And that's fine with me, I understood that because I knew I was down here doing the same thing.

JP:  Right. So that was sort of a…a mutual understanding then?

6

D000908

KK:    Right, but I just...I...I didn't...after everything played out I didn't realize that she may...may have actually had a boyfriend through all this. And I didn't know that.

JP:    Ok. So at that...that...at that point in October or anytime during that time frame you didn't realize or you were never told by her that she may be having relationship with another trooper?

KK:    Ah, no. No, never...never that she was having a relation...a relationship, just that, she was seeing other people.

JP:    Ok.

KK:    (cleared throat)

JP:    And while you were staying with her in October, do you recall her ever being on the phone with ah, any other boyfriends? Or...or another trooper...another male trooper?

KK:    Ah, no, I do not.

JP:    Ok. Did any of her ah, male friends or this male trooper, other than the time this ah, trooper came to house the night of the incident, was there this...another male trooper that came up to visit her while you...while you were staying there?

KK:    No, not that I know of.

JP:    Ok. Ok ah,

KK:    I...I...I do know at one point ah, I think ah, this...this same individual had gone to the hospital. That same week ah, I...I don't remember is...is a Brian, is that the guys name?

JP:    Yes.

KK:    Ok. I think he had gone to the hospital. Because there was one...one time during that week, huh, (inaudible) I was doing something and...and she had called and I...I think I'd spent time with my family and she had gone to the hospital to see a friend.

7

D000909

JP:    Uh huh.

KK:    And I think…it might, you know, I think it was that day, that same day, that
       Saturday. Ah, she had gone to the hospital to visit with…with the friend.
       And I believe it was…was Brian.

JP:    Did she ever say what he was in the hospital for?

KK:    Ah, it was an internal…is there like a…I don't know, he was having
       problems with his pancreas or liver or something, an internal problem.

JP:    Huh, ok.

KK:    Ah, but I believe it was that Saturday, the same Saturday.

JP:    Ok. Ah, so it's my understanding then on October 25th that evening ah,
       which would have been Saturday evening, you and Christy went out ah

KK:    Yep.

JP:    and I don't… I'm not quite sure ah, I guess that's where I basically want
       start with…with you. Go ahead, I'm going to let you go ahead and run
       through…run through the…the evening events, as far as where you went,
       who you were with and what you did when you got back. And into what
       occurred that evening, then I'll go back and…and I think what I'll do is just
       follow that up with some questions. Ok?

KK:    Ok. Ah, just cut me off, cause I get long winded sometimes. (chuckle)

JP:    (chuckle)

KK:    She ah, ok, we went…that Saturday night we went ah, I guess about six or
       seven o'clock we left, we went to ah, went out with her best friend ah, and
       her husband. Ah

JP:    Now do you know their names?

8

D000910

KK:     Ah, Wyatt ah, well actually, I don't know her married name. Ah, Christine Wyatt, we went to school together too, but she since married and I can't think of her husband's name, right off.

JP:     Ok.

KK:     But we had ah, went out with them. We went to ah, a ah, haunted ride, out ah, out side of Dover, somewhere; like a haunted trail.

JP:     Uh huh.

KK:     And went and (cut off) and we got done there and we went to ah, TGIFridays in Dover. And basically from there, we had some hors d'oeuvres and we sat around and (cut off) probably about two-three hours. Ah, and then once we left there ah, you know, we ah, of course we were all pretty intoxicated, and we had...we had been there sitting there drinking for about two hours. When we left there and we drove back to her place...to Christy's place (cut off) and ah, of course we...when we went upstairs, she went ah, I think she went in to get a shower. But now I realize, I think she was in the bathroom use...on her cell phone. (chuckle) Ah, no as we get there, I was just doing, you know, lighting candles and

JP:     Ah, let's...let's back up here. (chuckle)

KK:     Ok.

JP:     You mean you thought she was taking a shower but now in retrospect

KK:     Yeah.

JP:     you think she was on the cell phone? Why...why do you say that?

KK:     Ah, just because, as...as the events rolled out, she kep...I remember her telling me, I told him not to come over here. So then I realize, oh she must have been on the phone with him in there; in the bathroom.

JP:     Ok.

KK:     Ah, so I was doing, you know, doing my thing. Getting ready and, you know, for bed and I thought she was in the bathroom, you know, taking a

9

D000911

shower or something. And ah, so I'm in the bedroom and of course in just ah, my boxers shorts or something. And ah, all of sudden I hear the front door open and the outside storm door. So I go out to look and ah, I wonder what's going on and there's the top of her door has like windows on top of the storm door.

JP: Uh huh.

KK: And as I look up, to look out the storm door, there's this dude standing there looking in at me. (chuckle) Ah so, you know, he starts...at that point he just starts yelling, you know, who are you? I'm...I'm com...I'm going to come in there. I don't...I don't remember exactly what he said, but you know

JP: I want you...I want you to try to think because I think it's important to establish...and if you don't remember, you don't remember, but if you can think back the best you can to...to...

KK: Yeah.

JP: any specifics as to what...you know, you stated that he was yelling at you, but do you recall what he was yelling at?

KK: I...I do know he was saying, I'm going to kick your ass. Ah, I'm...I'm hesitant to say ah, I...I know he's was saying, I'm going to kick your ass. Yelling, who was I...you know, who are you? And what are you doing in there? Ah, I'm hesitant to say that...that he said anything more threatening. I don't think ah, I...I...I wouldn't...I wouldn't feel fair in saying that he said he was going to kill me or anything like that, as far as, like a terrorist threatening. I don't...I don't recall him saying that ah, right off hand. But ah, I just remember him threatening, I'm going to come in there and kick your ass and...and going on. Ah, at that point, I was like; whoa. I don't know who this guy is and all of a sudden I'm realizing, you know, maybe...maybe something is going on behind my back that I didn't know about. So ah, at that point, she came out of the bathroom and she said; just go in the bedroom, shut the door and he'll leave. And you know, of course, I...like I said, I was pretty intoxicated so I went in the bedroom. And I said; alright well, you know, who is this guy? I started questioning, who is he? And...and why is he beating down your front door? And she said; ah, it's...I don't...I don't ever remember her saying his name. But I remember her saying, you know, it's...it's some guy I date and just...he'll go away if...if you don't

10

open the door, he'll go away. So ah, we just...I stayed in the bedroom, we shut the door and she shut the door and ah, he's continually banging on...on the door. Ah, yelling that he's going to come in and...and cursing and

JP:     What's he cursing?

KK:     Just, I'm going to kick your ass and...and calling her a bitch. Ah, you know, you fucking bitch and...and just going on like that. Ah,

JP:     I mean, if he didn't know...when he was yelling and screaming at you, is he ah...I mean is he really loud? Or is it just sort of like; hey, hey, hey, you know, open the door let me the fuck in, or what's...what's he saying? I mean,

KK:     No.

JP:     is he banging really loud? Is he screaming at the top of his lungs? Or?

KK:     Yeah. Yeah, banging loud, screaming at the top of his lungs...at the top of...I...it...when I found out that he was a trooper afterwards. I was embarrassed. Because I thought; how could somebody that's supposed to be doing the same job that I do, you know,

JP:     Uh huh.

KK:     that...that was embarrassing to me. Because, you know, we respond to things like this and we...we handle situations like this. And I couldn't believe that a professional is conducting himself like this.

JP:     Ok.

KK:     Ah, that was my biggest problem with it. It was like; how...how can this be happening? You know, this guy's suppose to be upholding...upholding the laws of the state and now he's, you know, breaking into this residence.

JP:     Ok, alright, I'm going to put you on pause so I can do a couple follow up questions before we get to far into this.

KK:     Ok.

11

D000913

JP:   Ah, now so, you were staying…you were staying at Christy's that week and she picked you up at the airport. Ah, did you have a vehicle that you had borrowed from anybody in your family for the week? Or…or not?

KK:   Ah, she pretty much drove me around for the week. But my family, I mean, they let me borrow their vehicles when I'm visiting.

JP:   Did you keep a vehicle at her…at her place?

KK:   That night? I think, yeah, I had driven that night. I had my mom's ah, ah, GMC; what was it a Blazer, two door Blazer or something like that.

JP:   Ok. Do you recall what color it was?

KK:   Ah, it's silver or like a pewter color.

JP:   Ok. And then you went out to a…a haunted ah…haunted ah…hayride or something like that?

KK:   Yes.

JP:   And then you went out to TGIFridays, you had some drinks and

KK:   Yes.

JP:   you made the comment that you were intox…you both were intoxicated?

KK:   Yes.

JP:   How much did you have to drink?

KK:   Whooa…I was drinking Captain Morgan's that night, ah, Captain and Coke. I think I probably drank, huh, I had…probably had six or eight.

JP:   Ok. And Christy?

KK:   I think…I'm not positive, but I think she was drinking the same.

JP:   Ok.

12

KK:    Cause I knew she started off the night with a Captain and Coke, that she took with her from the house.

JP:    Ok and then you ah, you left TGIFridays and then you came…you went to Dempsey's house then…Christy's house?

KK:    Ah, well we…we had rode…rode to Dover, actually yeah, we had ridden to Dover with her friend ah, they drove us back to her place and that was in Felton. And then we drove from Felton over to Christy's.

JP:    Ok so, about what time did you get to Christy's house?

KK:    Ah, I want to say probably 11:00 or 12:00…probably about midnight..11:00 or 12:00.

JP:    Ok. Alright, during the evening ah, did…did ah, Christy get any phone calls? While you were out on her cell phone or anything?

KK:    Ah, not that I recall. No.

JP:    Ok. Alright. We've gone over pretty specific…now when he…now this…this subject, we'll just use his name; Brian, cause that's who it is, there's no sense in hiding that fact. Brian was at the front door. You never met Brian, correct?

KK:    No, I had never met him or seen him.

JP:    So, Brian's at the front door, it's ah…he's beating, banging on the door. Does it sound like he's trying to break the door down? Is it that bad or is he just pounding on the door?

KK:    I…I thought he was. I thought he was coming through the door. (chuckle)

JP:    I mean…I mean, (sigh) I mean, there's a difference between a knock or a banging, then a body trying to break a door down. I think we all can

KK:    Yeah

JP:    determine that factor. What, in your opinion, what do you think…from what you heard, what was going on?

13

D000915

KK:   I...I would say he was banging as hard as he could with his arms. I don't think he was using his body to actually to come through the door, but he was banging with his arms as loud as he could.

JP:   Alright. And the only threat that you ah, recall specifically is; I'm going to kick your ass.

KK:   Yeah.

JP:   You don't recall any statement ah, anything about; I'm going to come in there and kill you?

KK:   I...I want to say, yes. I mean, I remember him making some serious statements and threats. But I don't...honestly don't think I can say under oath and say; yeah, he...he said he was going com...he was going to kill me.

JP:   Ok.

KK:   But ah, I...I seem to remember him making all kinds of threats and I'm pretty sure that he did say I'm...I'm going to come in there an kill you. But I'm not, huh, I'd be...I'd be hesitant to say that under oath, cause I'm...I'm not a hundred per cent certain that he did say that.

JP:   Ok. (sigh) Were there any other threats that Brian made to you or Christy that night?

KK:   Ah

JP:   Did he threaten Christy at all?

KK:   (sigh) I don't...I don't really recall him threatening her. Ah, I just...I remember him just saying...saying things like, you know; why are you doing this? Ah, I can't believe you're doing this. You...you fucking bitch. Ah, you know, why are you with another guy? I don't really remember him, right off, just threatening her.

JP:   Any other comments, I mean, you're throwing out quite a few. But do you recall anything else he that he said? Now, he's yelling this, correct? Very loud?

14

D000916

**A000414**

KK:  Yeah.

JP:  Ok.

KK:  Yeah. Yeah, he's…it's at the top of his lungs. (chuckle) Ah, gosh, nah, I mean, not…not that I can remember off hand.

JP:  Ah, now while…while this beating and banging on the front doors going on, are you both out in the living room at this point or are you back in the bedroom? Where are you at in the residence?

KK:  Yeah, we're back…we're in the bedroom with the door shut now.

JP:  Ok. Did…when…when the…when the initial beat and banging started, and you saw the person looking up into the window and you went back and…and told Christy, she was…where was she at?

KK:  She was ah, coming out of the bathroom.

JP:  She was actually coming out…now did she actually hear the beating and banging and come out? Or did you have to make her aware of it?

KK:  No, she knew, because when I…after I yelled at her; who is this guy banging on your door? That's…she was coming out of the bathroom at that time. And she was like; just leave him alone and he'll go away.

JP:  Ok.

KK:  She said; don't confront him. Just stay away from the door, go in the bedroom.

JP:  Does she come out into the living room?

KK:  Ah, she…she more or less came out of the bathroom and just wrapped around right into the bedroom. Ah, and then we just…and she shut the door.

JP:  Ok so, the…the bathroom entrance is separate from the bedroom then?

15

D000917

KK:  Yes, it's like right next door, so you kind of come out and turn left and go right into the bedroom.

JP:  Ok. Ok. Ah, so at this point, it was obvious that she knew who it was?

KK:  Yeah, uh huh, yeah. I...I knew, at that point, she knew who this was and that ah, I...I guess I was respecting her, you know, it was her house. Ah, obviously this is some guy that's pissed off at her. (chuckle)

JP:  Uh huh.

KK:  And I'm going to respect...if you want me to go in and just chill in the bedroom and wait until he leaves. I'll respect that.

JP:  Alright. Now while...while this is going on, or prior...prior to this going on, or while this is going on, does Christy receive a phone call?

KK:  Ah, (sigh, sounds) I think...I want to...yeah, I want to say her phone was ringing several times. I think he was calling her.

JP:  Now what phone? Was it the home phone or a cell phone?

KK:  I think it was her cell phone.

JP:  Ok. Do you recall her talking with anyone on the cell phone?

KK:  Huh, I never even...I...I didn't even recall that until you just said it. Ah, I remember her yelling at him; just leave. Go home. Get away from here, you're drunk; stuff like that. But I don't know if that was on the phone or if that was just yelling through...through the window at him. When he came around by the bedroom. Ah, but I don't recall exactly if...if she answered the phone or what she'd said on the phone. I don't recall that.

JP:  Ok. Alright. Alright, so at this point, we've gotten up to the point where he's banging on the front door. Banging loudly, yelling these comments that you've told me about. What occurs next?

KK:  Ah, her...I'm not sure if you're familiar with the layout of her resident?

16

D000918

JP:    Somewhat. I've...I've...I've gone by the residence and I've seen...I have some photographs of the residence. So, yeah, I don't know the inside layout, per se, but I have an idea that you basically walk in the front...the front door is sort of on the side of the res...I think it's on the south side of the residence.

KK:    Correct.

JP:    And you come in and I guess you come into the living room area?

KK:    Yes, uh huh.

JP:    And then if you kept walking straight you would walk into the bedroom, I guess?

KK:    Yes, uh huh.

JP:    And then I'm not sure, if there's a kitchen or what else, but

KK:    Yeah

JP:    that's what I can kind of gather so far.

KK:    Yeah, well the...the way it's laid out with the...with the porch roof from...from downstairs, you can...I'm sure you saw, you can jump from were the front door is, you can get onto like where the roof of the porch and walk around the house.

JP:    Right.

KK:    Well, as we're in the bedroom, everything gets quite for a minute and I think, well alright, good maybe he's left, you know? And all of sudden, there he is banging on the bedroom windows. Which, you know, of course the binds are drawn so he can't see in, but he starts banging on the bedroom window.

JP:    Ok now, when you're in the bedroom ah, do you have lights on in the bedroom?

KK:    Ah, I think there was like a night-light, yes.

D000919

JP:    Now, I mean, now a night-light, huh, is that one of those little things that's in the plug?

KK:    No, like a...like a...a...nightstand light.

JP:    Ok.

KK:    Nightstand lamp.

JP:    Now was there any lamps or any lights lit in the living room at this time? Do you recall?

KK:    Ah, I think the kitchen light was on.

JP:    Ok.

KK:    I think the living room lights were off, but the kitchen light was on. It...it was a pretty bright light.

JP:    Ok so, when he came...when he came...when he started...you said, now he...he walked around to the bedroom window and started banging?

KK:    Yes. Uh huh.

JP:    Ok ah, did he bang on the other windows first? Or did he come directly to the bedroom windows?

KK:    He...ah, I don't recall that. I don't recall. He may have banged on...on the living room window first; which is just to the south of the ah, bedroom window, but I don't recall. I just remember him coming to the bedroom and banging.

JP:    Ok so, he's...now, you say he's banging on the window now? I mean, are we knocking on the window or are we ah, banging like we're banging on the door or give me a...give me a

KK:    Yeah, I...I would banging hard enough, but just, you know, not...not quite breaking the window.

D000920

JP:   Ok and what's...what's he saying at this point?

KK:   Ah, open the door. Come open the door. Ah, ah, who's that guy in there with you? Ah, what are you doing? Ah, what are you doing to us; type deal? And that's where I really started thinking, you know, and I look at her and said; you got a frigging boyfriend, don't you? (chuckle) And she's like; no, I don't. I...you know, to me, at that point, this guys obviously upset because I'm in here with his girl. And that's when I start to feel guilty. I was like; God, you know, I hope I'm not doing anything wrong. But, you know, I had no knowledge of that.

JP:   Uh huh.

KK:   So he's ah, banging on the window ah, just yelling; come open the door. Ah, and he started counting. He said ah, I'm going to give you to the count of three or ten, I don't remember, he says if...if you don't open the front door, I'm coming in. Ah, yeah and this is where I started looking at her. I was like; you know what, what are you going to do? Ah, you know, I...I don't know the statutes up there but, you know, from where I come from, you know, when someone breaks into house, with the intent to assault somebody. It's a burglary. I mean we're talking felony stuff here.

JP:   Ok now, let me ask you this question, are you...while he's yelling at the bedroom window or...did you ever say anything? Or...or are you just

KK:   No.

JP:   keeping quite?

KK:   I mean, talking to her but no I didn't...I didn't confront him. I didn't say anything to him at all.

JP:   Ok.

KK:   Ah, so I'm just telling her at that point, I was like; you need to...you need to call 9-1-1. You need to call and get somebody out here. Ah, and she kept saying; no, he'll go away, he'll go away. And I said; he's...obviously he's not going to go away because he's banging on the...on the window, here by the bedroom now. Ah, so I told her, I said; you...you call 9-1-1 or I'm calling because, you know, here I'm feeling like a little stuck pig. You

D000921

know, I said; you don't want me to go confront him. This guys getting ready to break into your house ah, you know, he's ranting and raving, he's obviously drunk and you don't want to nothing about it. So, you know, give me the phone, I'm going to call. And ah, she just kept saying; no, no, no, we're not calling. He'll go away.

JP:     Ok.

KK:     So, you know, so he's does...he's doing his counting thing, you know ah, after ten or fifteen seconds...well I mean, he's probably beating and banging on the window for awhile. But then he said; if you don't open the window, he star...I mean, counting to three or ten or whatever, he says then I'm going to ah...he says; if don't open the front door, I'm coming in. And after he made that comment, it was probably about ten...ten to twenty seconds and I heard the glass break. (chuckle) And ah,

JP:     Is that the same window he...he broke into then?

KK:     No, it was the...the bedroom window. The one to...to the south of it, which I really don't understand, looking back if...if he knew we were in the bedroom why didn't...why did he break into that window, I don't know.

JP:     Well if...when he's banging on the bedroom window and...and yelling, does Christy say anything back to him?

KK:     Yeah, she's yelling at him to go.

JP:     To go away?

KK:     Yes, she's yelling;

JP:     So then

KK:     will you just go home?

JP:     Ok, so then he...he has to know that you're the bedroom then?

KK:     Yeah, oh yeah. Yeah, I thought

20

D000922

JP:    But when he breaks the window, he doesn't break the bedroom window, he goes and breaks the living room window?

KK:    Yeah.

JP:    A different window?

KK:    And that's always...you know, looking back at the whole incident, that's one of the things that I really don't understand why. Why he didn't break into the window where he knew we were. I don't...I don't know why he did that.

JP:    Ok. Now did you

KK:    I...I would have expected him to come through the bedroom window.

JP:    Right. Now did you ask Dempsey ah, if you wanted...if she wanted you to go out and talk to this guy? Or what...was there any conversation to that effect?

KK:    Yeah, because I mean of course, from the time he's...from the time I first saw him at the front door until the window break in, it was probably I'm...I'm thinking probably five to eight minutes. Ah, and I had told her, I was like; do you want me to go talk to this guy? I mean, I...do you want me to go confront him and see who he is and what he's doing? And you know, this is initially, I was like you know, when she's saying get in the bedroom. And I said; well, who is this guy? Let me go talk to him. She...that's when she saying; no, just leave him alone and he'll go away. And you know, that's also one of the things that made...made me believe she knew who it was.

JP:    Uh huh. Now did she...did she ever tell you he was a Trooper?

KK:    Ah, I don't know if she said she had worked with him or ah,

JP:    No, I mean, not afterwards, but while this was going on? Does she...does she make reference to the fact that he's a Trooper?

KK:    I think...I think during this...because I knew he was a Trooper at that point.

JP:    How did you know that?

21

D000923

KK:    I think...I think what had happened was she ah, because she had told me she was at the hospital earlier today with...with ah, a fellow...a Trooper from work.

JP:    Uh huh.

KK:    And I think somewhere during the course of this, is when she told me that ah, this is the guy she had seen at the hospital. I think that's where I had put it together that he was a Trooper.

JP:    Ok.

KK:    But when he was...when he was outside at that point, yeah, I...I knew he...he worked with her and that he was a Trooper. And I...I think that's how I...I think I just came to that conclusion. I don't think she ever said, you know, he's a Trooper.

JP:    Ok. Now ah, so the window in the bed...the bedroom breaks after about, I think you said ah, fifteen to twenty seconds, is that correct? My memory serving me good here?

KK:    Yeah, probably ten-twenty seconds.

JP:    Ten to twenty seconds later the window breaks in the living room and ok so, what happens from that point then?

KK:    Ah, we're sitting on the...on the bed and of course, he's yelling and screaming and then all of a sudden, bomb. I hear the...the glass breakage in the ah, in the living room.

JP:    Uh huh.

KK:    At that point, I told her, I said; you...you call right now, or I call. I said; this is crazy, we're...we're sitting in the...in the bedroom here like, you know, like little victims. And I said; this isn't right. We need to...you need to call and get somebody out here. And I understand her not wanting to call because obviously she knows this guy, she doesn't want him to get into trouble and she doesn't want to get into trouble. But ah, once I heard the glass breakage and he started banging on...or knocking and banging on

22

D000924

the…on the bedroom door. I ah, she said…she said; sit in front of the door. So I sat down on the floor, in front of the door and put my back to the door.

JP:     Now, why did you do that?

KK:     To prevent him from coming in; in the bedroom.

JP:     Alright now, the…the bedroom door is that ah…what kind of door is that?

KK:     Ah, just like a fabricated wood door.

JP:     Ok and was it locked?

KK:     Yes, uh huh.

JP:     Ok and when he's beating and banging on this door, describe the fashion that he's doing that.

KK:     Ah, it was to the point where, I mean, I was sitting on the floor in front of the door and it was to the point it was jolting me forward. That he was pushing on the door.

JP:     So he…he was…he was going beyond the beating and banging and actually pushing on the door?

KK:     Yeah, uh huh.

JP:     And could you…could you…and you could tell that by what the sound? Or just by you just being knocked away from the door? Or both? Or?

KK:     The…the sound and being, you know, I could feel the…the…the foot being kicked in at the bottom of the door, in like my lower back.

JP:     Ok. And what's he saying at this point?

KK:     Ah, he's saying stuff; you better open this damn door, you fucking bitch. Ah, (sigh) you know, I'm going to kick your ass, again, stuff…stuff like that ah,

JP:     Now, that; I'm going kick your ass, is that…is that projected towards to you? Or Christy? Or you don't know? Or is he just saying it?

· 23

D000925

KK: I...I took it as it was towards me. That he was upset at me because I was in, you know, in her house with her.

JP: Ok.

KK: Ah, like I said, you know, I don't remember the exact threats. I...I do...I just remember that one playing over in my mind. Ah, if ah, you know, I...I will tell you that when I was sitting there on the floor pushing, we get...you know, I come from where, you know, ah, we stop crimes like this from occurring. (chuckle)

JP: Right.

KK: And the whole time this is going on, I'm...I'm feeling like a little pussy. Cause I'm like; here I am sitting in front of the door, excuse my language, but I'm sitting here in front of this door blocking so this guy can't come out. Where I'm use to responding to these calls and handling the deal.

JP: Uh huh.

KK: And she's...but I'm trying to respect her. You know, it's her house. Obviously she knows this guy and I was like whatever. Well when he started beating and banging and kicking on the bedroom door, that's when I told her, I said; you call now and end it...and I'll be honest with you, I was looking for...for her gun. Cause I told her, I said; if he comes in the bedroom, I don't know if he's got a gun, I don't know if he's armed. And ah, I told...I was looking for her gun and I think she had it locked up in her safe. But ah, I...at that point, I was willing, if he came in the room, you know, as far as I was concerned, I was willing to use deadly force, if I could have found her gun.

JP: Now you would have used deadly force, based on...on what reasons?

KK: Ah, if...if he had come in there, with a...if he had commit a felony with intent to...well, of course, I don't know the statues up there. If he had come into the house with the intent to assault us ah, I mean, he had already proved to me that he had broke into the residence.

JP: Uh huh.

24

D000926

A000424

KK:    Ah, he had busted a window and slid through the window and come in there. Obviously he meant business. And ah, at that point, you know, as a...as a human being inside of a residence, at that point, I think I could have justified the use of deadly force.

JP:    Even if he was unarmed?

KK:    Yeah, uh huh.

JP:    Ok.

KK:    As a police officer, no, but as a resident, you know, on vacation, yeah I think I could have articulate that.

JP:    Ok, but at this...at this point, you don't know if he's armed or not?

KK:    No, I do not.

JP:    Ok.

KK:    But I will tell you, when I was sitting on the floor ah, you know, you have those scary moments and I kept thinking, I'm about to get shot in the back. I could just feel it. And I thought, I hope he doesn't have his gun and I hope he's not going to use it, because, I could just picture getting shot through the back through a damn closed door.

JP:    Uh huh.

KK:    And ah, that was a scary moment at that point.

JP:    Ok. Now ah, is Christy saying anything to him at this point?

KK:    Ah, at that point, she's...I remember when he first came in, she's yelling at him to just leave, go home, get out of here. Ah, but once the glass broke and he started kicking on the door ah, that's when she picked up the phone and she was on with the 9-1-1, at that point.

JP:    Ok, now does she tell him to leave, at that point too or is she just busy on the phone?

25

D000927

A000425

KK:     Well, I think he heard her on the phone because I heard her…of course when she dialed 9-1-1, he's yelling and screaming still. And I don't know if those call are recorded I don't know if he could be heard in the background screaming at that point, but ah, at that point he heard her on the phone and he…I just remember him saying; that's fucked up, I can't believe you're doing that and he was gone. Just like that.

JP:     And he left?

KK:     Yeah.

JP:     Ok. Ah,

KK:     Well, it…it got silent out there and I thought; shit I hope he's not getting ready to ambush us now. (chuckle) And ah, it got silent and then I heard his (cut off)

JP:     I'm sorry, it got silent and what?

KK:     Ah, yeah she was on the phone, that's…that's why I heard his truck start.

JP:     Ok.

KK:     Outside.

JP:     Ok, so while you're in the bedroom then…so, you never, from what you're telling me then, you never have face to face with this…with this guy?

KK:     Ah, no, not face to face, I saw him, of course, through the top of the window.

JP:     Right.

KK:     Top of the door, through the window.

JP:     Uh huh.

KK:     Ah, and then once…once the truck started, you know, I…I crept out into the living room and opened the front door and ah, he was driving off. Ah, of

26

D000928

course, she's still on the phone with 9-1-1. Ah, he had pulled out in the roadway and headed out ah, toward...northbound towards ah, 13 and ah, and he stopped in the middle of the road and he just yelled some more curse words at me. Ah, which I don't remember exactly what he said at that point. Ah, but he yelled some curse words and started laughing and took off. And that's when I saw his truck and ah, you know, described his truck to the Troopers that came out that night.

JP: Uh huh.

KK: And they seemed to...when I described the truck and his stature and stuff to them they ah, ah, they seemed to know who I was talking about.

JP: Ok. At any time during this incident then is there...is there ever an argument...would you say there's an argument between Christy and Brian? Or he's...he's just yelling at her and she telling him to leave? Or do they get into some sort of confrontation? Do they ever go face to face?

KK: No, they did not. She was with me the whole time.

JP: Ok. But is there any sort of argument between the two?

KK: Ah, just through the ah, more...I'd say more through the ah, the window in the bedroom, when he was around there banging on the window.

JP: Uh huh.

KK: You know, him yelling; open the door ah, I want to come in and talk you and her yelling, you know; go home, go away, leave us alone.

JP: Ok, is she...is she telling him to go? Is she yelling at him to go? Or is she pleading, you know, just Brian just go home? Or what...what...what's the tone?

KK: Yeah, more or less a pleading. Just ah, shaken up. Just go home, I can't believe this is happening. Leave, I'll call you later. Get out of here, I don't want you here right now. Ah, I would say she was more or less pleading with him to leave.

D000929

JP:    Ok. Now ah, you mention the fact that ah, you were…you were looking for her gun. I mean, did you physically get up and start looking for it?

KK:    Ah, I knew she had ah, I knew she had slept with it under her pillow.

JP:    Uh huh.

KK:    Ah, I…I think it was one night I was over there and ah, it was either under her or…or she moved it from underneath her pillow, once I got in bed or something like that.

JP:    Uh huh.

KK:    But ah, I knew it was under her pillow and I remember I looking up underneath her pillows for it. And ah, I told her

JP:    It wasn't

KK:    and I said

JP:    It wasn't there?

KK:    No, it was not.

JP:    Ok and what did you tell her?

KK:    I told her, I said…I said; where is your gun? I said; because if he comes in this house. I said; I want to…I want to defend myself and I want to defend you. And…and she just…I remember that's when she told me; don't…no, you're…you're not having my gun. And I think…I think she had said it was locked up, it's in the safe.

JP:    Ok.

KK:    Ah, (cleared throat)

JP:    So he knows ah, according to what you told me then, is that he knows that she's contacted ah, 9-1-1. He makes comments ah, to her that he heard her on the phone and stated that; this is fucked up. Can't believe you're doing this.

28

KK:   Yes.

JP:   Thought I knew you better than that and...and then he takes out the front
      door?

KK:   Ah, yes, uh huh, he walked out the front door.

JP:   Ok ah, now did you see him go out of the residence?

KK:   No and I don't even remember hearing the front door. I...I don't know
      remember hearing the front door opening up. I just remember his truck
      starting up. I think he's got pipes on his truck. I remember hearing it start.

JP:   Alright well ah, this may sound like a silly question, but if you didn't see
      him go through the front door; how did you know he went through the front
      door?

KK:   I...I guess it's just my assumption because the window ah, ah, I just...I
      don't think he climbed back out the window. Well, you know what? I think
      when we came out...I think when we came out the front door, you know, the
      storm door I think it was standing open. Yeah, it was.

JP:   So both...were both...was the storm door and the other door open then?

KK:   The...the storm...the glass door; as it's an all glass door, I think it's an all
      glass door, that was shut. Yeah, when we came out of the bedroom finally,
      opened the door and came out ah, the storm door was standing open; I think.

JP:   Ok. What about the ah, the regular door then?

KK:   Ah, yeah I sorry I mean, that...the storm door (inaudible) shut.

JP:   The regular door was sh...open but the storm door was shut?

KK:   Yeah, I sorry, that's how it goes.

JP:   Ok, ok.

29

D000931

KK:    Yeah the glass door; the storm door was shut but the other door, I think was…was left open.

JP:    Ok. Alright ah, how long would you estimate that this incident ah, took place over? Was it one or two minutes? Five minutes? Ten minutes? Do you have a…an estimation of that?

KK:    Ah, I…I want to say initially from the first time I saw him at the front door was probably five to…about five to eight minutes, but it may…if…if anything it was longer, it wasn't shorter. I know it was at least five to eight minutes. (chuckle) Ah, of course, at times like that it felt like eternity. I was like how…how long is this going to go on? Ah, I was surprised that ah, maybe they did, I don't know? I was thinking, you know, that she had downstairs neighbors and I thought surely they hear what's going on. Their going to call or maybe they won't because they know her. Her occupation. You know, maybe they wouldn't call.

JP:    Did you ever see anybody down there that night?

KK:    No, I never saw anybody down there the whole week I was staying there. I…I mean, their vehicle was there but I think it was an older couple or older gentleman that lives there.

JP:    Ok.

KK:    But I would say at least five to eight minutes, possibly longer.

JP:    Ok. Now ah, I had a chance to talk to your sister a week or so ago. I don't know if she talked to you since and told her that I…that I talked to her. But I was curious as to ah, getting a little bit of background on how…what you…what your reactions were when you got…when you got to her residence that night.

KK:    Uh huh.

JP:    And according to her, you told her, you made a statement that; I almost died tonight. Ah, do you recall saying that to her?

KK:    Ah, no. (chuckle)

D000932

JP:   (chuckle)

KK:   By the time I got...by the time I got to her house, because after he left...after he left Christy's, in between that point when the Troopers got there, I just more or less grabbed (chuckle) grabbed a bottle and started hitting it. And ah, I mean,

JP:   I'm sorry, back up, what did you do? I'm sorry.

KK:   I grabbed a bottle of ah, of ah, ah, ah, Captain Morgan's and just started tipping it. (chuckle)

JP:   Oh, after he had left?

KK:   Yeah, after he had left. Ah, when we were waiting for the Troopers to arrive.

JP:   Uh huh.

KK:   I went to the kitchen, got the bottle of Captain Morgan and just started tipping it and...and by the time I got to my sisters, I was tore up. Ah, but I do remember when I got there I was...I was upset. I mean, I was crying. Ah, you know, and I...I remember she came out and talked to me and...and we just...I told her everything that had happened.

JP:   Uh huh.

KK:   Ah, at that point.

JP:   Ok. So, ah, the Troopers get there and they conduct their investigation. Ah, but it's my understanding from reading the reports that you were in the bedroom and didn't come out and speak to the Troopers?

KK:   Ah, not initially, no.

JP:   Ok. Is there any particular reason why you stayed in the bedroom?

KK:   Sheee...she just...when...when they arrived, she went out and she said stay in here. Don't come out. And you know, of...at this time ah...at this point I...I want to respect her.

D000933

JP:     Uh huh.

KK:     It's her house and the last thing I want to do is see is this girl get into trouble. You know, it's like somebody I care about. And it's like; God, you know, even though you done wrong and you know, you didn't report this, and you're letting this happen. I can't believe ah, you know, I...I don't want to see you get into trouble. So, she tells me to stay in the bedroom and shut...and shut the door.

JP:     Ok. Alright listen ah, I'm going to go ahead and I got a forty-five minute tape in the machine.

KK:     Ok.

JP:     And it's about ready to ah, expire here in the next minute. It's ah, 11:44 hours. I'm going to go ahead and...and stop the tape and put a new tape in. So, hang on one second, ok? We're going to go off tape here for a second.

KK:     Ok.

JP:     Ok, we're back on tape it's still 11:44 hours. And ah, so the police get there ah, you say Christy walks out of the house to meet the Troopers and tells you to stay in the home?

KK:     Yes.

JP:     Does she tell you to go specifically in the bedroom? Or does she just tell you to stay in the house?

KK:     Ah, no to stay...they came up to the living room, she told me to stay in the bedroom.

JP:     She told you to stay in the bedroom?

KK:     Yep, she was like...she shut the door and she just said; just stay in here.

JP:     Ok.

KK:     Ah, at this point, she was getting mad at me now. (chuckle) Because she ah, I guess, because I more or less forced her. I was like, you know, you call 9-

32

D000934

1-1 or I call or I'm going to go out there and confront him. And at that point, I think, I can see her turn ah, take anger towards me.

JP: Right.

KK: Because she didn't want any of this to get documented. She didn't want any of this ah, to come out. And I told her, it's gonna...it's gonna come out. It's gonna come out, I mean, it's... just doesn't happen like this. So at that point, you know, I was like; whatever, I'll respect your wishes. Whatever, go do what you want, I'll stay in the bedroom and sit here. You know, in the...in the dark. (chuckle)

JP: Ok. Ah, I want...I want to jump back ah, just a little bit before we go into what the police did when they got there. Ah, you made mention that you did see the guys face through the...through the ah... the ah...the small windows ah, in the...in the front door of the residence. And I don't...did you see him any other time?

KK: Ah, just from the ah, from the truck window, when he was out on the...on the road, yelling up at me. (chuckle)

JP: How far away would you have said that he would have been at that point?

KK: Ah, gosh, it's probably hundred feet, hundred twenty-five feet.

JP: Now where you downstairs, or just out on the landing, or what?

KK: I was just standing out on the landing.

JP: Ok. So, would you say, you got a better look at him from through the window of the door or from the landing out to the road?

KK: Through the window.

JP: Ok. Well, can you give me description?

KK: I just...I...when I look at people, I familiarize myself with somebody and I see Charlie Sheen. And I don't know if that's any kind of comparison. Maybe if the guy walked up to me I wouldn't even recognize him, but I remember him looking like Charlie Sheen.

33

JP:     Ok.

KK:     Ah, kind of a round face ah, short cropped brown hair. Ah, I knew he had to be small of stature because looking at the window that he came through ah, he had a small body to come through there.

JP:     Uh huh.

KK:     Ah, and ah, probably...probably a little stocky; muscular.

JP:     Now, how do you say that? Why do you...why do you...what makes you say that?

KK:     Ah, well, I know ah, just because he was real small and I know that Christy had said...I...of course, I...I don't...by looking at him I mean, I wouldn't...I wouldn't know he was stocky, because I only really saw his head. But I know she told me he was in the martial arts and stuff. Ah, cause I remember at one time I told her I was going to go confront him, she said...she looked at me and she said; he'll kick your ass. He's in...he's in the martial arts and stuff. Just stay away from him. I was like; ok, whatever. So, by that I figure, he must be pretty stocky.

JP:     Ok. So, the Troopers are there. They're...they're talking to ah, Christy. And they're conducting their...their investigation ah, and she basically bef...before the Troopers get there or as they get there, she tells you to go...stay in the bedroom and shut the door. Did you tell you she didn't want you to talk to the police?

KK:     Yes. Uh huh.

JP:     She told you that?

KK:     Yeah. She told me that she...she didn't want me to say anything to them and that she was going to come up with something. (chuckle)

JP:     Ok. Alright, ok, and I had...I've had an opportunity to read through ah, the criminal reports and...and ah, I noticed...I noticed originally that, at some juncture, you're...you're discovered in the bedroom. And we'll get to...

D000936

KK: Of course.

JP: into that in…in a minute. I guess, at this point, tell me how…how does that go down?

KK: Ah, I was sitting in the bedroom, of course, not…they're out…they're talking to her in the living room for quite awhile. And then all of a sudden, one of them decides, whoa, we better clear the house make sure (cut off) in here. So ah, I hear one of saying; so, is there anybody else in the house? And about that time, I hear the door opening. And of course, I'm sitting on the bed and they came in and they looked at me and I'm like; hey, how you doing? (chuckle) You know, and ah, then they wanted to know who I was and what I was doing in the house?

JP: Uh huh.

KK: Ah, at that point ah, I don't remember which one came in. I know, Alex Argo eventually sho…arrived and you know, me and Alex went to school together. And…and he had come in and he's really the only one I remember talking to ah, that I knew. Ah, of course, that's when they started asking me, you know, what happened here?

JP: Uh huh.

KK: Ah, and that's where, you know, after…I was listening to her tell her…her side of what had happened; through the door. And that's when I figured, you know what, I'll just help to cover her butt.

JP: Ok, so prior to police coming, did you guys ah, get together and come up with some sort of story? Or?

KK: No, I don't think we necessarily did that. It was just…she just…she made the comment something like, you know; I'll take care of it. Or I'll come up with something. Or something of that effect, to where she let me know that she wasn't going to be honest.

JP: Ok. Now ah, and you could hear what…what she told the police from…from the bedroom?

35

D000937

A000435

KK:   Ah, I could, but I don't remember exactly what...what was said. I think ah, I remember, you know, when they were asking; who did this? You know, who came into the house? And I remember her saying ah; she didn't know. She didn't know who it was. Ah, I don't know...I don't know...I want to say she'd...she'd initially said it was a black...a black male.

JP:   Uh huh.

KK:   That she didn't recognize, but I'm not certain on that.

JP:   Ok.

KK:   Ah, but she was more or less playing the game, somebody...in fact, I think she had even told them that the window was broke and it was more or less just a criminal mischief and that no...nobody came inside the house. I think that was the initial story she gave them. That somebody had just more or less came up there and broke the window and left. That they'd never came inside.

JP:   Uh huh.

KK:   Ah, of course at that point, you know, once...once I'm discovered in the bedroom hiding, you know, then they ah, the Troopers started asking me about what happened and I just played along with her story. Yeah, whatever she said ah, type deal. Yeah, there was some guy banging on the window. We don't know who it was. Ah, you know, I...I guess I was more or less sarcastic than anything cause at that point I'm just like, yeah...yeah, I don't...I don't care. I have no idea what...what happened here. Because I just...I was...I was pissed off because she was doing that.

JP:   Ok. Now according...according to the original police report that was ah, completed that night ah, you made...your statement was that ah, let me get to it here. That you were at your sister's residence and you received a phone call from her. And she told you that somebody had damaged her...one of her windows to the residence. And...and asked you to respond over. Is that correct?

KK:   Ah, I think I had changed...I think I had changed the story. Ah, god maybe that...you have to forgive me, I'm trying to remember all the stuff. (chuckle) I was just so friggin drunk that night. Ah, I think I had told one of the

36

D000938

Troopers that; yeah, it was whatever she said, it was some guy that broke the window. And then, I think, he walked out. I think there was a Corporal...but when one of them walked out, the other one walked in. I think that's when I changed my story. I was like; no, you know ah, you know I was at my sister's house and she called and said some guy broke in. Because I think she initially told them that I...I think Christy initially said that I wasn't even there.

JP:   Uh huh.

KK:   And I think, once I picked up that she had said that, I was like; oh shit. Because she's sitting there saying I wasn't there and I'm telling them, yeah I was there. And I think once I picked up that I'd messed her story up, that's when I tried to cover for her.

JP:   Ok. So ah,

KK:   It's bullshit; I shouldn't have had to do that.

JP:   Ah, so basically your reasoning...your motive for not being forthright was, that you were going to try and cover for her?

KK:   Right. And...and, not that I agree with what she was doing, but I...I just more or less at that point, I just wanted to get the hell out of there and come back home and go back to my job and my lifestyle. And forget everything that happened. And I didn't want to see her ah, in her profession get...get hurt.

JP:   Ok. Ah, but up to...up to that point, to when the police...before the police got there, had she done anything wrong?

KK:   Ah, no. Nah huh.

JP:   So

KK:   Not...once she started lying, that's where I...that's where I got made at her and losing respect. I was like I can't believe...I can't believe you're sitting there lying to your own...to your own brothers, about what happened here.

JP:   Uh huh.

37

D000939

KK: That to me...that was bullshit. If she was honest and upfront it would have been ok. But I think, she was still afraid of the domestic dispute thing, you know, being on her record. But that's what I told her; you did nothing wrong. I mean, this guy was wrong. You didn't do anything wrong until you sit...sat there and started making these false reports.

JP: Right.

KK: That's when you messed up.

JP: Now, you make specific mention to the fact that you can't believe that she's lying to her brother troopers. What lies did she tell the troopers?

KK: Ah, that she didn't know who it was.

JP: Ok.

KK: That ah, nobody...I...I want to say that she said nobody came in the house.

JP: Uh huh.

KK: That they broke the window. Ah, but the main one, was she sat there and was telling them...of course, after you know, they found me in the bedroom, then you know, we were all standing there talking together and her sitting there saying; I have no idea who this was.

JP: Uh huh. Ok.

KK: To me that was a bold faced lie because she knew who it was.

JP: Ok. So I guess at some juncture you get a ride ah, with a Corporal Csapo, takes you home?

KK: Yes.

JP: Ok and at some juncture you decide to tell him a different account of what you told the Troopers originally?

KK: Yes.

D000940

JP:     And what...what made you ah, come...come with this different account?

KK:     Well, a couple of things. Number one is, I don't...I'm not a liar, I don't believe in lying. I believe that the truth sets you free and I'm a very honest person. And I couldn't believe at that point that I had sat there myself and lied to...to Troopers; Alex Argo who is a friend. You know,

JP:     Uh huh.

KK:     a previous friend from school. I couldn't believe that I had done that myself. Well, they had brought a fingerprint kit out and they were just...they were printing the front door, you know, to see if they could match any prints. And I told them, of course, you know that my...my prints would be on there cause I had been in and out of the house all week. And actually at the point that I had told them I had been in and out just ah, at that point I had changed my story to we were just friends. And I had been in and out letting her dog out and stuff like that, while she was at work. And ah, and I...I think...yeah because I had even told them that I'd hadn't even stayed there, cause I had thrown my suitcase back in the corner, so they wouldn't see my suitcase. Because she didn't want them to know that I was staying there.

JP:     Uh huh.

KK:     So anyways, they pulled print kit out and asked for my prints, I think...I think I just gave them a thumbprint ah, they said just for a comparison. And at that moment, I thought; this isn't looking good on me. Now it's looking...if...if...if I was investigating this, I would be looking at this as; shit, maybe this...maybe this guys just broke into her house and she's covering for him. So, then I started feeling like I had...I had done something wrong.

JP:     Uh huh.

KK:     And that's when ah, the Trooper ah, gave me a ride home and I left my vehicle there. Ah, he gave me a ride home and...and I just started opening up to him ah, on the way home. I said that it's not...that's not right. I can't believe she's doing...this is what happened. And that's when I kind of told him everything that I remembered.

39

D000941

JP: Ok, so you basically told him everything that you told me today then?

KK: Yeah, uh huh.

JP: Now you...you mention the fact that the one Trooper that was dusting for ah, latent fingerprints ah, took a thumbprint from you?

KK: I want to say took a thumbprint from me, yes.

JP: Do you recall how he did that? Did he use ink or what...what...what

KK: Ah, it was a...it was an inkpad. I just rolled my thumb on the inkpad. And I don't know...I don't know how that works, we use powder. I don't how the inkpad works.

JP: Ok so what...what did you...you rolled...you rolled an inkpad and then did you roll it on a piece of paper or something? Or?

KK: (sigh) I want to say it was just...(sigh) did I roll it on paper? I want to say it was just like an inkpad that I rolled thumb in and it preserved the print. But I...I don't know if that's...I don't know if that's a even possible or I may have rolled it on a piece of paper, but I don't remember that.

JP: Do you know

KK: I just remember

JP: Do you remember which Officer took the thumbprint from you?

KK: Ah, (sigh) I want to say...I don't know names but I want to say it was a big ah, a big Corporal. I think there was Corporal and seemed...real...real...real huge guy.

JP: Well was it...let me ask you, you know who Argo was, right?

KK: Yeah, I know who Argo was.

JP: It wasn't Argo?

KK: It wasn't Argo, no.

D000942

JP:     Ok, and how about the guy that took you home? That's Corporal Csapo, was that the guy who did it?

KK:     I don't think it was him either. I think there was another Corporal there.

JP:     Ok.

KK:     Ah, I think there was three Troop...three or four, I think four Troopers there.

JP:     There were four Troopers there?

KK:     Three or four, yeah.

JP:     Ok.

KK:     Ah, but I...rolled...rolled the print, I...I don't recall whether they put it on paper or if they just preserved it in ink. I don't...I don't recall that.

JP:     Ok. Ah, so you...you tell the Trooper, at that point...I'm not going to go through everything that you told him again. I mean...I think we have pretty much come to the understanding that you told him, what occurred. What really occurred that night ah, not what you had told them originally, correct?

KK:     Right, I just remember telling him like, this is the deal, I can't believe I sat there and lied trying to save her ass. This is the deal. Ah, because at that point I started thinking...I...I started feeling like I was being looked at like a suspect. Like this, you know, this guy...like I just broke into her house and she's covering for me and

JP:     Uh huh.

KK:     why am I hiding in the bedroom and...and I was like; I've got to let it go I can't hold all that.

JP:     Ok.

KK:     So I gave him the whole run down on that. And we stood outside my sisters for probably, gosh, fifteen-twenty minutes and talked about it.

D000943

JP:    Ok. Now ah, and it's my understanding that at some juncture, you respond back to Dempsey's house?

KK:    Ah yes, my brother-in-law took me back.

JP:    About when was that?

KK:    Ah, I had gone in. Of course, I'd hide…actually I think I hid my suitcase in the corner; in the closet or something. Cause I didn't want the troopers to know I was staying there because that's what she wanted.

JP:    Uh huh.

KK:    Ah, so I went in the house and I…I remember being upset and talking with my sister and brother-in-law. And of course, their floored, they can't believe this is happening because she fit in with my family and everybody loved her. Ah, so we talked for a while and I explained to them what happened. And then probably…it's probably a good hour, hour and a half after I got dropped off ah, I realized that my stuff was still over there; all my belongings. So, my brother-in-law drove me back over. Ah, and ah, we drove over there, we went upstairs ah, he accompanied me. Went to the front door, knocked, she didn't answer ah, turned the knob, it was un…no actually, you know what, I think I had a key. Yes, I still had her key. Ah, I was going to say the door was unlocked but I still had her key because she had given me a key earlier in the week ah; to get in and out. So, we go in, the whole time I'm telling her; it's me, it's me, it's me. Cause I'm…you know, I don't want her to come out and freak out on me.

JP:    Uh huh.

KK:    Ah, so I walked in the bedroom, she was in bed asleep. Ah, there's a nightlight on, she rolled over, saw me, I said; I'm just here to get my stuff and I'll be gone. Ah, I went in ah, got my suitcase, grabbed a couple shirts that was laying around, whatever and just ah, I think…I think I laid the key on the nightstand and walked out.

JP:    So, did you guys have any conversation then?

D000944

KK: No, we didn't...no we didn't discuss anything at that point. She just...she gave ah, (chuckle) the most hateful look when I walked in and she saw it was me. And I figured well she's pissed off at me for whatever reason.

JP: Other than the interviews that ah, you'd been conducted by Corporal Csapo that night; the officer that you took...talked to that night. Ah, was Sergeant Hudson who called you on the phone I think it was a few weeks ago and myself. Have you been contacted by anyone else by the Delaware State Police to get your account of this ah, incident?

KK: Ah, Christy, she'd ah text messaged me and we talked on the phone; one time.

JP: Uh huh.

KK: Ah, I hadn't...of course when I left and flew back home, in October ah, of course I had called her three or four times; hey, you know, I don't know what's going on but, you know, can you call and talk to me? I want to...you know, I want to understand what happened last night; type deal. And I had called ah, probably three or four time over it about a two-month period. And she would never call back, so I assumed she didn't want to be friends anymore. Ah, well ah, probably...it was right before...lets see...I think it was right before ah, Sergeant Hudson called me ah, yeah it was right before he had called me and I got a text message from her. And I didn't even...you know, I take her number out of my phone and I didn't even know who it was. But the message said; if your...something...something to the effect; that if you...if you still want to talk with me, call me. Or something like that, or I'm ready to talk if you are; Something like that.

JP: Uh huh.

KK: Well I replied and I think my reply was; ok. Cause I didn't know who it was. (chuckle) Ah, or it...I think it said; can I call you right now...I'm ready to talk if you are. Can I call you now? Or something like that and I was like; ok. I sent her a message back, ok. Well the phone rings and low and behold it's her. (chuckle)

JP: Uh huh.

D000945

KK:   And I didn't even realize who it was. So, that kind of floored me and ah, so we...we talked a little bit. And of course, I told her, you know, one of the first things I asked her was; why now? Why are...why do you call me now after all this time? And ah, that's when she said that there's going to be Internal and that everything is brought back up and ah, the whole incident was going to be investigated. And she asked me what...what my take was going to be on this? And more or less ah, asking me what I was going to say? And I just told her, I said; the only thing that...that they are going to get out of me is the truth. I said; I...I'm going to tell the truth about what happened. I'm not going hide anything.

JP:   Uh huh.

KK:   And ah, and she didn't try to tell me, you know, don't tell them...she didn't tell me to lie or anything. She just said; I just wanted to know what you were going to say. And I...and I just stuck to my guns and told her; I'm going, you know, tell the truth. And ah, I told her, I said, you know; if I can give you any advise, as...as an old friend. I said; be honest and...and tell the truth about what happened. Because there's nothing worse than...than getting caught up in lies.

JP:   Right.

KK:   And she just said; ok. She said; I just wanted to know. We...we talked about fifteen-twenty minutes, you know, I asked about how she was doing and, you know ah, ah, just about her personal life. You know, if...if her car...ah, work had been effected by all this and what not. And after about fifteen-twenty minutes we hung up and I hadn't heard from her since.

JP:   Ok, but no one else from the Department...then no other investigators or no follow up investigation?

KK:   No. (cleared throat)

JP:   No one's ever contacted you?

KK:   (cleared throat) Excuse me, hold on. (cough) Sorry about that. Ah, no. I had called ah, an...and I'll be honest with you that...that kind of surprised me. I couldn't believe that this had gone without investigation.

44

D000946

JP:    Uh huh.

KK:    And ah, I had called ah, I was concerned for her because the next day after this incident, my brother-in-law was going to town and he went by her house. And ah, of course, he comes back home and he says; hey, what…what kind of truck was that guy driving? And I told him. And he said ah; well it's parked out at her place now. He said; the windows all boarded up and…or card boarded up. And he says ah, you know; the trucks out there. Well, then I started getting concerned for her. And I thought; gosh, you know, maybe he came back. Well later on that night, my brother-in-law went by again and low and behold the truck was still there. So I made a call to ah, Troop 3 and I asked to speak with Alex and ah, they passed the number, Alex called me back and I said; hey, can you just get somebody to go check on her? I said; I'm…I'm concerned because, you know, this whole deal happened, now he's at her house all day. And I said, you know, it's not a jealousy thing, I want to see if he's there. I said; I want to make sure she's ok, that he didn't come back to hurt her. And ah, I don't think…I don't remember getting off the phone and feeling reassured that they were going to go look on her. I just remember Alex saying; she'll…she'll be ok, you know ah, type deal.

JP:    Ok.

KK:    But I don't think they sent anybody out there to check on her.

JP:    Ok. Ah, what was…what…what kind of description; I don't think I ever asked you, the truck? What…what kind of truck was it?

KK:    I remember ah, ah, silver ah, GMC mod…or GM model…GMC or Chevy, extended cab ah, pick up truck.

JP:    Ok.

KK:    Ah, and I can…I can picture him leaving out of it, yelling at me, again ah, and then spinning his wheels and heading off.

JP:    Ok.

KK:    Ah, I think…I mean I never got the license plate or nothing like that.

45

D000947

JP:    Uh huh.

KK:    Ah, but my...my brother-in-law had gone by he...he...he had said; he had written down the license plate and stuff but I had just...when he had gave it to me, I had just threw it away.

JP:    Ok. Now did you ever ah, consider filing criminal charges against this person, Brian?

KK:    Ah, I'll be honest with you at that point...at that night...at that point, I did. I mean, I can overlook banging on the windows. I can overlook a lot of things but when you come into the house, that's where I thought, this is wrong. I...I can't believe he's doing this.

JP:    Uh huh.

KK:    And I had contemplated ah, criminal charges, and I thought at that point that ah, cause I had...I had kicked around that was Saturday...I had kicked...I had left on Monday...I had kicked around on Sunday, the idea of going up to Troop 3 and just filing a report. You know ah, I had considered going up there, speaking to a Desk Sergeant and saying hey, this is the deal. I want something done. Ah, but I didn't do that. And you know, I...I looked at it, as I'm going back home, I'm fifteen-hundred miles away and I'll be out of here. And you know, her and him can have each other and their lives. Their lies and whatever, you know? That was fine with me. But I...I honestly believe, at that point, that someone would be calling me.

JP:    Uh huh.

KK:    Because I couldn't perceive this going uninvestigated. I said; well, somebody'll be calling me in the next couple weeks wanting to know what happened. And then that'll...that'll suffice for me but I never heard anything.

JP:    Ah, what are your feelings ah, at this point?  Do you feel that ah, ah, he should be arrested?

KK:    Can I ask you what...what offense does that meet? Does that meet burglary offense?

46

D000948

JP:   Well, from...from what you're telling me ah, in Delaware ah, the...the...the fact that the person...in Delaware, you have...you not...if somebody broke into your home and that's all they did? That would be considered a burg...or, I'm sorry a criminal trespassing. If somebody broke into your home and committed a crime, they're in, then...then you have a burglary. And in this case, what you're telling me is ah, he came in the house and he said; I'm going to kick your ass...he said he's going to kick your ass outside. And I think he's said he's going to kick your ass from the bedroom door also.

KK:   Uh huh.

JP:   So, he has committing a crime of what we call ah, terroristic threatening. So that would be considered ah, the crime would actually be...technically would be a burglary,

KK:   Right.

JP:   terroristic threatening, criminal mischief with window being broken. So, those would be the crimes that would be...would have been committed in this particular case.

KK:   Yeah ah, and that's...that's pretty much what it is down here. I mean, if you...you know, break in with the intent to commit a felony theft or an assault. You know, I...I was...as far as I saw, he broke into the house with the intent to assault me.

JP:   Uh huh.

KK:   And possibly her. I don't...I have mixed feeling on it. Ah, you...you know, one part of me wants to say this guy committed a felony offense.

JP:   Uh huh.

KK:   And it's wrong. You...I mean, we're held to a higher standard. And another part me says I don't want to jep...you know, I don't want to ruin somebody's career.

JP:   Right.

47

D000949

KK:  Ah, but I...I keep going back to the fact that I sure as hell wouldn't want this guy from...from...and I...I understand he was intoxicated too. I'm assuming he's intoxicated. Ah, I don't...I don't know him other than that meeting. And that was one of the things I asked Christy, I said you know; I hope if you're with this guy, that's fine. I hope you're happy. But I hope he's...he's does...he not the kind of person that he was that night; because that's embarrassing.

JP:  Uh huh.

KK:  And from that meeting that night. The only time that I know him, I would be...I would be ashamed to work with him. And I sure as hell wouldn't feel comfortable, him coming to my house, when I'm engaged in a domestic dispute. I wouldn't feel comfortable in him coming and solving it. Ah, and I just...I don't know, I just...there was no...I think we need to be, you know, I think law enforcement personnel need to be professional even when you're not on duty. And I think that's been proven over time that, you know, that you have to...you have to hold a higher standard.

JP:  Uh huh.

KK:  And ah, regardless of the fact that, you know, he made...he may have committed a felony, it's...it's just his actions thing. That's...that's what bothered me the most, was his actions. That, you know, someone in...in his profession is going to come at me like that. So, I...I...I guess if you want a...a yes or no answer for criminal charges, I don't...I don't know.

JP:  Ok.

KK:  Ah, if ah, certainly I would be cooperative in anything you guys decide. You know, I don't if you're getting information for the DA's office and you know, certainly if I were to get...ever get subpoenaed and have to testify by what happened, I would be truthful and honest. But I don't know that I would want to be the one to initiating an...and, you know, initiating the cha...the charges getting filed against him. (coughed, cleared throat) But ah, regardless of...of the criminal aspect, you know, I...I certainly hope...and I believe that there's going to be an internal action taken against him. And that, you know, I think that's evident.

D000950

JP:  Ok ah, I don't think I'm going to have any further questions. Is there anything that you can think of ah, that maybe relevant to my investigation that I may not have asked you or we haven't covered up to this point? I know we've talked almost an hour and fifteen minutes ah, regarding this incident and I think we've covered it pretty well.

KK:  Right.

JP:  I told you I was a little bit more long winded than ah, Sergeant Hudson. (chuckle)

KK:  (chuckle)

JP:  Ah, but ah, I just want to make sure everything's covered because this is very important, we have a lot of ah, things that have happened in this case that ah, there's...there's going to be some...could be some consequences for...for different individuals, from within our department. And I...I...I...I want to be very though and make sure that I can cover from all...from all the angles I can think of as to what...what went on that...that night. Why certain things happened. And ah, not only be able tell the facts, but maybe give a little insight to as to why...why things occurred as they did. And I think that's very important when you're conducting administrative investigations. Not always just, black and white, there is some gray that gets thrown in there too. So ah, that's why I wanted talk to you in depth and I think we've done that, covered everything pretty well ah, this morning. And I appreciate you taking the time out ah, to do that. Ah, is there anything else that you can think of?

KK:  No ah, you know, I...I kind of have the same thoughts that you have, as to why certain things did get done. Ah, I was ah, I...I guess just in closing, I was...I guess I was a little upset that nothing had ever gotten done. Nothing...I was never contacted. There was no investigation and I...I...I concluded that...I figured there was no report taken. Ah, at that point, I figured...I figured all the information was gathered and as soon as I left the area, everything got thrown in the trash.

JP:  Uh huh.

KK:  And it was under the covers and...and I could be wrong, maybe it did. I guess it did get documented. But ah, that...that was a let down to me

49

D000951

because I, you know, I don't know...I just...there's that line we cross and...and you don't...you know, I'm not going...I'm not going hide...cover anybody else. Basically, is what I want to say. (cut off) But, if you do wrong, it needs to be come out and...and you're going to handle it, you know, and be held accountable for what you did wrong.

JP:     Alright, well listen; I'm going ahead and conclude this interview. It's approximately 12:15 hours. And I'm going to go ahead and shut this tape down.

KK:     Ok.

50

# INTERNAL AFFAIRS INVESTIGATION

### Transcribed Interview

CASE NAME:             Dempsey, Cpl. Elizabeth C.

CASE #:                No. 12-04

PERSON INTERVIEWED:    Trooper Alexander V. Argoe
                       Troop 3

DATE:                  May 4, 2004

LOCATION:              Delaware State Police, Troop 3

INTERVIEWER:           Captain James Paige
                       Internal Affairs Section

TRANSCRIBED BY:        Elizabeth B. Seay
                       Office of the Superintendent
                       Delaware State Police

TRANSCRIPTION CODE:    A:   Trooper Alexander V. Argoe
                       P:   Captain James Paige

D000999

IA Case: Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                              05/04/2004
Tapes 1 and 2 of 2
Page 1 of 24

Okay. This is Captain James Paige, Delaware State Police Internal Affairs Division. Today is May 4, 2004. The current time is approximately 1920 hours. I'm conducting a tape-recorded interview with Trooper Alex Argoe, Delaware State Police, Troop 3. The interview is being conducted in the small conference room, first floor of Troop 3.

P:   Alex, if you would, please state your full name, rank and IBM number for the tape, please.

A:   My name is Alexander Argoe. I'm a Trooper. IBM is 3391.

P:   And how long have you been employed by the Delaware State Police?

A:   A year and 10 months, Sir.

P:   And prior to your employment with Delaware State Police, do you have any previous police experience?

A:   Yes, Sir. Millsboro Police Department for four and a half years.

P:   Uh, this evening I want to interview you regarding an incident that occurred back on October 26th down in Frederica. The specific address was 1715B Frederica Road. The incident occurred approximately 1:42, 1:30, 1:42, sometime in that time frame, on that morning. It was a Sunday morning. Uh, the victim in this case was Christine Dempsey, who was a Trooper with the Delaware State Police. Uh, I'm interviewing you tonight as a witness, as a witness only. If for some reason during the course of this interview you say something that would tend to make me believe that you might be a principal in this incident, I will stop the interview. Okay?

P:   And we will, uh,

A:   Yes, Sir.

     make written notification as to any alleged violations that you may have been involved with.

A:   Yes, Sir.

P:   I don't suspect that that's going to be the case, but I'm just making you aware if that is the case, I will, I will stop the interview.

A:   Yes, Sir.

P:   and make certain you were afforded, if you were a principal in this incident you would be afforded certain rights. At this point, I don't see any reason why you would be a sus or

D001000

IA Case:  Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                    05/04/2004
Tapes 1 and 2 of 2
Page 2 of 24

principal in this, uh, investigation, only a witness as to what, what events occurred that night and any subsequent conversations that may have occurred that night as to why and how this report was written up, as such.

A:    Yes, Sir.

P:    Okay?

A:    Yes, Sir.

P:    Okay.  So, that night you're working regular, regular patrol?

A:    Yes, Sir.

P:    And shift was?

A:    I believe my shift that evening was either 19 to 07 or 18 to 06.

P:    Okay.  And do you recall the specific, uh, dispatch to this complaint, that night?

A:    Uh, Kentcom dispatched us to, uh, the residence for a, uh, it came in as a burglary in progress.  Uh, subject breaking a window to gain entry.  On our way down there, they advised that the, uh, RP was a Delaware State Trooper and that she was armed with her handgun and she was, she had locked herself in the bedroom.

P:    Okay.  Was there any dispatch, other than the, the fact that she was armed with the, with a handgun, was there any other, uh, mention, in any other dispatch, regarding that firearm?

A:    Not that I'm aware of, Sir.

P:    Were you the first Trooper to arrive on scene?

A:    Yes, Sir, I was.

P:    Okay.  And who did you contact upon your arrival?

A:    Uh, upon arrival I contacted, uh, Christy Dempsey.

P:    And where was she?

A:    She was located on the exterior stairwell, which leads up to the entry, her entrance door on the second floor of the building.  She was about halfway up the staircase.

P:    Was she going up, coming down, or

A:    Uh, she was coming down; she met me.  She saw me pull up and she met me half way up the staircase.

P:    At that point, did you conduct an interview with her to find out what happened?

D001001

IA Case: Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                 05/04/2004
Tapes 1 and 2 of 2
Page 3 of 24

A:    Yes, Sir. I asked her, uh, what was going on. Uh, she appeared to be very reluctant, uh, she stated that she, uh, you know, everything was fine and she didn't want to make a big deal out of the situation.

P:    Now, when you say she was very reluctant – reluctant to answer your questions or did

A:    Reluctant to, uh, reluctant to answer my questions and once I asked her where the damage to the residence was, she said it was the exterior window and I asked her to show it to me. It took me several times, you know, asking her. She didn't want to let me. It appeared she didn't want to let me up the staircase, you know, to the top of the stairs. Like I said, she stated again, that she didn't want to make a big deal out of it.

P:    So, at that point, did you conduct sort of a formal interview as to the events?

A:    … once, once that occurred, I asked her, you know, what had happened. She said she heard something outside and that the window was broken. I asked her to show me where the window was, uh, walked to the top of the staircase and there's railings on both sides and as you're walking up the staircase on the right-hand side, if you step over the railing, you're actually stepping onto the porch roof. We walked onto the porch roof and walked around to the front of the residence. It's got a wrap-around porch. Walked to the, uh, front of the residence and I observed the window that was broken, you know, and she stated again, that, you know, it wasn't a big deal and she didn't want anything done.

P:    Now, which. On this photograph, I believe it's photograph number 3, which shows the front of the residence, which one of those four windows was broken. Do you recall?

A:    Oh, it was the first one, Sir.

P:    First window?

A:    Yes, Sir. First window that you come to.

P:    So, as you're you're facing it. As you're facing the house, looking at the picture, it would be the left-most window?

A:    Yes, Sir. The left-most window upstairs.

P:    And, was, what portion? Was the top part broken out, the bottom part? Whole thing?

A:    The bottom part, Sir.

P:    Okay. And what was the situation with the window? Was there a screen on that window?

D001002

IA Case: Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                    05/04/2004
Tapes 1 and 2 of 2
Page 4 of 24

A:    Uh, I can't recall if there was a screen. If, if it was a screen, it was up. It was probably one of the half screens. It was up, but I, I, I can't recall right off hand. I know it was, there was no screen in it at that time. It was, the window was busted out and it was. It was, uh, the curtains were, uh, the sheer curtains were closed on the inside, you know. I did observe that.

P:    Okay. Uh, was the window, uh, was the window up all the way? I mean, it can only go half, halfway up, but was it halfway up or was it up just partially? Or, can you, do you recall?

A:    Uh, I don't recall. Sir, I, I want to believe that the window was up. I want to believe the window was up because I, I observed the glass. I can't rem, I don't remember, you know, observing glass around the frame. I believe the window was fully up.

P:    Or, the window was up or was the window just completely broken out?

A:    It's possible that the window was completely broken out. Uh,

P:    Do you recall taking a look at that window? Do you recall there being a lot of glass or was there just …

A:    Yes, Sir, there was a lot of glass located on the front porch roof, and there was a lot of glass on the inside of the residence also, on the floor, under that.

P:    Now, did you ever go back into the house?

A:    Yes, Sir.

P:    Okay. When you went in the house, uh, and you observed the glass on the floor, can you tell me anything about the glass? Was it, were there large pieces, small pieces? Did it appear like possibly that the glass was trampled on, like somebody went through the window and then walked on it and broke it even more? Could you tell?

A:    There was, there was several spots where it was broken into, appeared broken into small pieces. Uh, to say that it was, you know, walked on, I, I can't say that, but there was, I did observe several large pieces and then there was numerous small pieces of glass, you know, right in front of the window.

P:    So, okay, you're up on the roof. You're looking at the damage. Uh, is there anything else that you saw on the roof that was –

D001003

A000455

IA Case:  Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                    05/04/2004
Tapes 1 and 2 of 2
Page 5 of 24

A:    No, Sir, I didn't, I didn't observe anything else on the roof except for the glass, you know, right on the, the shingles.  While I was on the roof, Corporal Gygrynuk and, uh, Corporal Csapo arrived on the scene

P:    Okay.

A:    and once we walked back around to the staircase and come down, uh, Corporal Gygrynuk, being the senior officer, you know, the senior Trooper there, I, it was turned over to him. The investigation was turned over to him.

P:    And, just, in your own words, describe what occurred from that point.

A:    I remember we were outside, uh, with Corporal Gygrynuk on the ground next to the roadway, right in front of the house, you know, looking up at the window and he was talking with uh, with uh, Christy Dempsey.  They

P:    Was he with her alone at this point?

A:    No.  Corporal Csapo was

P:    Okay.

A:    was there also.  Uh, they went to go upstairs.  I advised them that I was going to check the area just for, you know, see if there was any suspects still in the area, if there was, uh, you know, if I could locate maybe what they had broken it with, you know, rock or anything like that.  Uh, I know while I was on the roof, uh, Christy Dempsey made the statement that, you know, she didn't want to uh make a big deal out of this and that's when I advised her. We have to do something here because there's a marked patrol car not 50 yards away where this window was broken and, because her marked partrol car was sitting right in the driveway of the residence.  And I believe, at that point, she kind of understood that, you know, we had to, we had to investigate.  Uh, I searched the area around, uh, all behind the residence and back down the road, which goes – I'm not familiar with what this name of this road right here is.  It's the little road that cuts right behind the residence.  I walked back in there and walked around the vehicle just to see if there was any damage maybe to the vehicles and, uh, I didn't observe any.

P:    Speaking of vehicles, uh, other than the police car, were there any other vehicles in the driveway that night?

D001004

A:   Uh, yes, there was and I seem to recall there was —I believe there was a pick-up in the drive, or, a pick, an older pick-up located off the driveway, or off the parking lot there and I believe there was a Blazer.  And, of course, uh, Christy Dempsey's vehicle and her patrol vehicle.

P:   What kind of vehicle does she have now?

A:   I, it's, uh, I believe it's a 4-door Dodge or something to that affect.  It's, it's a 4-door passenger car.

P:   All right.  So, you, you do a, uh, a scene of the periphery of the, a crime scene check of the periphery of the, of the residence, you don't locate anything.

A:   Yes, Sir.

P:   From that point, what do you do?

A:   I go back in.  I go back up the stairs and into the residence.

P:   And what's going on at this point?

A:   Corporal Gygrynuk and Corporal Csapo were conducting an interview of, uh Christy Dempsey.

P:   And can you relay anything that you heard?

A:   Uh, I was basically checking the area, you know, just looking at the, the scene.  I wasn't paying too much attention to the interview, but during the interview, I remember Corporal Gygrynuk saying that, you know, asking if anyone was there, and she advised there was no one there.  Uh, and no one else had been there.  And then I can't recall how much of a time frame it was, but she, she made the statement that someone, someone else was in the residence.  And I remember Corporal Gygrynuk saying, basically, something to the effect, of, do what?  You know, you said there was nobody else here.  Where are they?  Uh, she said they were in the bedroom.  And that's when Corporal Gygrynuk opened the door and located Kevin Keller inside of the residence, or inside of the bedroom.

P:   Uh huh.  And did you observe him in the bedroom?

A:   I didn't observe him in the bedroom.  I observed him coming out.

P:   Okay.  And what, what happened when he came out of the bedroom?

A:   Uh, they started questioning him, you know, what was going on?  What had happened?  Uh, during that time Corporal Csapo was, uh checking the residence and he located a, uh,

he, he located what appeared to be a print on the glass storm door, at the, up, at the top of the stairs. Uh, and I was, you know, looking at that with him and Corporal Gygrynuk was conducting the interview.

P:    Okay. So, did you overhear any of the interview with Keller?

A:    No, Sir, I didn't.

P:    Okay. Uh, so from that point then, what, what did you do?

A:    I basically just stayed in the area. Uh, I can't recall how long we were in the area, you know, in the, at the, at the scene. But we got called to another complaint. I believe it was a Domestic-in-Progress, and, uh, Corporal Gygrynuk and I had to, had to clear the scene pretty quick to respond to the Domestic-in-Progress.

P:    Okay. You had some contact with Christine Dempsey that night then, correct?

A:    Yes, Sir.

P:    And, and how close a proximity were you with, to her when you …

A:    Uh, several feet.

P:    Okay. Did she appear to have been drinking that night?

A:    Yes, Sir.

P:    Did she appear to be intoxicated?

A:    I, I believe she was probably intoxicated, yes.

P:    And why would you say that?

A:    Uh, when first talking with her, uh, I believe she slurred, you know, slurred her words a couple times. She wasn't completely intoxicated but I could tell that she had been drinking. You know, I smelled the odor of alcohol and, and observed her, you know, heard her slur several words during the, uh, my first contact.

P:    Any other, any other indicators that she might have been drinking?

A:    No, Sir. I never saw her, uh, you know, stumble or anything like that. She was, uh, she was just uh – and I can't, I don't know  if it was maybe she was, uh, upset or what it was, but, I, you know, I could, I could see that, you know, she was, uh, she had been drinking. You know, bloodshot, glassey eyes, also, but, you know, I, I couldn't, I couldn't tell if that was maybe part of the, part of her being upset or, or what.

P:    Okay. On a scale of one to ten, one not drinking and 10 being pretty drunk,

D001006

A000458

IA Case: Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                    05/04/2004
Tapes 1 and 2 of 2
Page 8 of 24

A:    Uh huh.

P:    Where would you put her?

A:    At probably about a six.

P:    Okay, so she's a little bit more than mid-point? She's

A:    Yes, Sir.

P:    Okay. Now, uh, did she appear to be upset?

A:    At first, at first, no, Sir, she didn't. She didn't appear to be upset at first. Uh, she was, like
      I said, when I first contacted her, on the stairs, she was -- I just got the impression that she
      was very reluctant to give information and basically let me upstairs. You know, like I said,
      when I asked her to show me where the window was, she, I had to ask her several times
      and she stood just blocking the stairwell. And, uh, you know, it wasn't until I, you know,
      almost insisted that I, I see where the window was that was broken that we finally, you
      know, she finally turned and we went up. It appeared she got more upset as the interview
      was conducted with, you know, as Corporal Gygrynuk conducted the interview it appeared
      that she was, you know, upset.

P:    Was she getting upset as far as mad, or was she starting to cry, or

A:    I never saw her cry. No, Sir. She just appeared to be upset.

P:    Okay. I've just read over your narrative of your, uh, supplement report, and the only thing
      that I see that, it's not anything glaring, but I just want to, I want to touch base to, to clarify
      it. Because we talked about the window being open

A:    (positive sound)

P:    or was completely broken out. I notice in your report, it says I also observed the window
      was open.

A:    Yes, Sir. Okay.

P:    Uh, would that, is that more of an accurate statement?

A:    Yes, Sir.

P:    Okay.

A:    Yes, Sir.

P:    I just wanted to clarify it because it, it may appear to be open if the glass was completely
      broken out

D001007

A000459

IA Case:  Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                05/04/2004
Tapes 1 and 2 of 2
Page 9 of 24

A:    (positive sound)

P:    And I don't know.  Nobody's told me that it was completely broken out yet, but it sounds like there's a lot of glass.

A:    Yes, Sir.

P:    So,

A:    It was a, it was a, the newer style window.  I mean, it's an old residence but it was a newer style window, so

P:    (positive sound)

A:    uh, the window was, the window was a double paned window, so, you know, there was quite a bit of glass when it was broken, but

P:    I, I, and I don't want to put words in your mouth, but I, may, let me just ask you the question rather than put words in your mouth.  Uh, did you, did you happen to get close and maybe stick your head into the window?  Uh, just out of curiosity, do you recall doing that maybe?  Or would you had actually get down on your hands and knees, I don't know.

A:    I remember – it's been so long ago, it.

P:    Yea.  I understand.

A:    Talking with you, I, I'm pretty sure that I looked inside of the residence.  I didn't, you know, was careful not to touch anything because I knew it was, you know, if it was something they wanted dust, but I remember.  I'm positive the window was open all the way.

P:    You don't recall, do you recall any, any, you know, like if this was the window, there may be some sharp — if somebody broke the middle, there may be some sharp pieces

A:    Right.

P:    still in the frame.  Did you no, do you recall seeing that?

A:    I recall the window being open because I, the sharp pieces, now that you say that, sharp pieces I could see them through the top pane of the window.  Yes, Sir, I'm, I'm almost positive that the window was, was completely, you know, slide all the way up because looking though the top pane, I could see jagged pieces of glass in there.

P:    Uh, when you, you said that you were in the living room kind of looking around, checking out, checking out the scene, did you notice on the other three windows if the windows were locked or open?

D001008

IA Case:  Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                                    05/04/2004
Tapes 1 and 2 of 2
Page 10 of 24

A:    No, Sir.  I don't.  I didn't check any of those.

P:    At any time that you were at the, at the, uh, crime scene, uh, did Dempsey make any
      statements to you or any of the officers that you may have overheard stating that she knew
      who broke into her home?

A:    No, Sir.

P:    Did you, did you hear anybody ask, did you ask her that question?  Did you ever ask her
      that question, if anybody broke in, do you know who broke into your home?

A:    I remember Corporal Gygrynuk asking her if she had a boyfriend.  She stated no.  He
      asked her do you, do you have, I remember, I remember his exact words, do you have
      somebody that thinks they're your boyfriend?  And she stated no.  And he said so, you
      know, basically, you don't know who did this, and she stated no.

P:    And I think, in your statement, so far you, you, somebody, I don't know if you asked the
      question, but it, you were lead to believe that she was home alone at the time of this
      incident.

A:    Yes, Sir.  Corporal Gygrynuk asked her if she was, you know, if anyone else was there,
      and she stated no.

P:    Did you ever hear her mention her having conversation with the person who broke into the
      house, while the person broke into the house?

A:    No, Sir.

P:    Did you learn of any confrontation that may have occurred between Dempsey and this
      person that broke into her house or Keller and the person that broke into the house?

A:    No, Sir.  Through, through rumors of just, you know, everything going on around, I, I heard
      that it was another Trooper that had broke into the residence, but I didn't, I never heard of
      any altercations going on during the, uh, during the time he was in the residence.

P:    Okay.  Now, the dispatch mentioned firearm.

A:    (positive sound)

P:    That she had armed herself.  You knew she was a Trooper.  When you, when you arrived
      did she still have the firearm in her possession?

A:    No, Sir.  She ....

D001009

IA Case: Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                    05/04/2004
Tapes 1 and 2 of 2
Page 11 of 24

P:    Okay. Did she tell you anything about she conducted a search of the residence prior to
      your arrival and found that nobody was there?

A:    I believe when I asked her if any, if there was, you know, if she had checked everything
      else out, she stated yes, she had checked the, checked the residence and everything was,
      you know, nothing else was damaged or there was no one else there.

P:    Did she mention to you, when you arrived, that the suspect had just left or had fled or?

A:    No, Sir. I asked, because I remember asking her if she saw anything, seen a vehicle or
      anything, she, I believe she stated no.

P:    From the time of dispatch, and I know this is six months ago, or better, and just give me a
      ballpark figure. From the time that you got the dispatch, to the time you got to the
      residence, time, time frame?

A:    Uh.

P:    Do you recall where you were when you got the dispatch?

A:    I believe I was in the Magnolia area, Sir.

P:    So, you,

A:    And my response was a very high rate. I was southbound on 113 at a very high rate of
      speed because once I learned it was a Trooper and I'm familiar with her residence, I know
      that there's a marked patrol car sitting there. She works opposite shifts that we do, so
      when I'm working I come, if I come through Frederica, I see see the marked patrol car.
      And what was going through my mind was that someone's trying to break into this
      residence with a marked patrol car sitting in the, in, and I, it couldn't have been more than
      five minutes, Sir.

P:    Okay. Uh, now you mentioned the fact that you knew she lived there?

A:    Yes, Sir.

P:    All right. You know Christine Dempsey?

A:    Ah, yes, Sir, I, I've, I know her from, uh, high school. I graduated high school with her
      brother.

P:    Okay.

D001010

IA Case:  Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                          05/04/2004
Tapes 1 and 2 of 2
Page 12 of 24

A:    Uh, I can't remember if she graduated, if she was in high school when I was.  I, I don't
      know what year she graduated.  But I also remember her from, uh, Shooter's Choice.  She
      used to work in Shooter's Choice and I've talked to her on occasion there.

P:    Okay.

A:    It's been several years since I've, you know, since I've talked with her.

P:    So, how would you classify your relationship with her?  Friend, acquaintance?

A:    Acquaintance.

P:    Okay.

A:    Yes, Sir.  I am also, uh, familiar with Captain Keller also.

P:    How's that?

A:    I graduated high school with his brother and, uh, Kevin Keller and Christy Dempsey dated
      in high school as, if I recall correctly.

P:    Okay.  At the end of the interview, I want to ask you some questions on that then.  Okay?

A:    Yes, Sir.

P:    Uh, at any time, during your conversation with, with, uh, Dempsey, or you overheard
      because of the other interviews going on by Gygrynuk, or, or, uh, Csapo, did you ever hear
      Dempsey make the comment that she had called Keller and told him to come over to the
      house after the break-in?

A:    I recall, uh, I recall Corporal Gygrynuk stating that, but I, I don't recall hearing her say that.

P:    Do you know if Keller had a vehicle there?

A:    I believe one of the vehicles outside was his.  And, I believe it was, uh, like an S10 blazer,
      something to that effect, but I can't re – I can't directly recall which vehicle it was.

P:    I mean, how would you have thought that that was his vehicle?

A:    Uh, because he was – I remember Corporal Csapo stating that he was, he had been
      drinking and he had to give him a ride home, which I just, was led to believe that, you
      know, he had driven up there and

P:    Do you know if Dempsey had reported anything missing?

A:    No, Sir.

P:    Any, any other damage besides the window?

A:    No, Sir.

D001011

IA Case:  Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                    05/04/2004
Tapes 1 and 2 of 2
Page 13 of 24

P:    The latent fingerprint was lifted by Csapo?

A:    Yes, Sir, but that was done after I'd already

P:    After you left?

A:    Yes, Sir.

P:    So, you were aware -- you mentioned something about locating a fingerprint on the ....

A:    He located what appeared to be a fingerprint on the, uh, I don't recall if it was the exterior
      or interior of the window.  I remember looking at it and he said, you know, I'm going to try
      and lift this print and I remember looking at the door and seeing a print on the door.  And I
      can't recall if it was on the inside of the do, you know, on the inside of the door or the
      outside, the exterior of the door.  I don't recall.

P:    Uh, did you learn later that night or did you have conversation either that night or the next
      door with Csapo and did he tell you that he lifted a fingerprint?

A:    Yes, Sir.

P:    And did he tell you what he did with the fingerprint?

A:    Uh, speaking with him later, he, he put it in, you know, and sent it to SBI.

P:    Okay. Are you aware that that fingerprint is now missing?

A:    I had heard rumors of that, Sir, yes.

P:    Uh.

A:    And I believe that was from – I believe that was from Csapo, told me that, that he was, I
      believe that come up to him during his interview with, uh,

P:    Detective Hudson?

A:    Detective Hudson.  Yes, Sir.

P:    Now, do you have any information as to what might have happened to that fingerprint
      card?

A:    No, Sir.

P:    Have you heard anything through the rumor mill as to what happened?

A:    No, Sir, I haven't.

P:    Other than the fact it's just missing?

A:    It's just missing.

P:    And that wasn't the rumor mill. You heard it from Detective Hudson.

D001012

IA Case: Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                    05/04/2004
Tapes 1 and 2 of 2
Page 14 of 24

A:  I heard it – and I heard it from, uh, Trooper Csapo or Corporal Csapo.

P:  Who had heard it from Hudson or did he hear it through --

A:  I believe he heard it from Hudson. Yes, Sir.

P:  So, you really never had any contact with Keller that night?

A:  No, Sir.

P:  Even though – did you recognize him?

A:  Yes, Sir.

P:  Did you guys realize you knew each other?

A:  Yes. Sir.

P:  Did you guys have any words at all?

A:  Uh, I just asked him, you know, just said, you know, during the, uh, when Corporal Gygrynuk was interviewing, uh, Christy Dempsey, I asked him, you know, how he was doing, you know. He said he was okay and, you know, he, he told me that he was working as a police officer in Texas.

P:  Okay. Woo, how, what was his demeanor? Was he upset? Was he calm? Was he

A:  He appeared to be --

P:  jittery?

A:  He appeared to be calm.

P:  Did you get close enough to, to him to see, to, to pick up any signals that he might have been drinking also?

A:  Yes, Sir.

P:  Well, what's your take on that?

A:  I believe he was, he, he had been drinking also. I smelled, you know, I smelled an odor of alcohol on him and on a scale of one to ten, I would say he was probably around a six also.

P:  About the same

A:  Yes, Sir.

P:  as Dempsey then?

A:  Yes, Sir. And, uh, one, one thing that did strike me as kind of odd, with all of this, is I know just from my, myself. If, if I'm a police officer and I'm in a girl's house and somebody's

D001013

IA Case:  Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                    05/04/2004
Tapes 1 and 2 of 2
Page 15 of 24

breaking in and the person's gone and the police show up to investigate, I would be out there. I, you know, I would be giving as much information as I could and that was the one thing that struck me odd that he was sitting in the bedroom while – I mean we had to be in the house for probably 10, 15 minutes, you know, if not more, before we learned that he was inside the room, you know, inside the bedroom.  So, that just, that just struck me as odd is why he was sitting in the bedroom when there's police work going on outside, you know, right outside.

P:    Right.  Did you have any conversations, at the scene with Gygrynuk or Csapo, regarding what was going on and what you had observed and what you felt?

A:    Ah, we, we discussed it outside, uh, before we even, when we went to go upstairs. I remember us standing there saying, this, something's not right.  You know, I just.

P:    Before you even went upstairs to?

A:    It, well, like I said, Corporal Gygrynuk was conduct, you know, he was talking with, uh, Christy Dempsey outside and then we went to go upstairs and we just ....

P:    Well, what was, what was the conversation?  What, what wasn't right about this?

A:    It, it just. I. Corporal Gygrynuk, was, was talking with her more and, uh, you know, and I told them what, how I felt when I got there about her hesitation to let me at the top of the stairs, her reluctance to give information, uh, you know, her statement that everything was fine and she didn't want to make a big deal out of this. Uh, Corporal Gygrynuk, you know, he said, something, just something doesn't seem right here.  You know, there's more to this story than what we're getting.

P:    So, other than your just general conversation with Keller then you didn't ask him any questions specifically, at no time, then?

A:    No, Sir.

P:    While you were at the scene, did you hear anybody mention that, uh, the suspect gained entry into the entrance by breaking the window?

A:    No, Sir.  Ah, I, I specifically recall Corporal Dempsey stating that she, that no one got in, they just broke the window.

P:    So, you didn't hear that there was, there may have been a, uh, an argument?

A:    No, Sir.

D001014

IA Case:  Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                          05/04/2004
Tapes 1 and 2 of 2
Page 16 of 24

P:    Didn't, you didn't hear of anything mentioned about verbal, physical threats?

A:    No.  No, Sir.  Not, not at the scene.

P:    You learned of it later?

A:    Yes, Sir.

P:    You had conversations later with Csapo that evening or that morning I guess it would have been?

A:    I had, uh, I spoke with, uh, (tapping noise) I spoke with Larry Keller, who is ah, Kevin Keller's brother, and this was just two days ago and he, he made the statement that there was an argument going on and I knew that I was going to be interviewed with you and I was going, you know, I wanted to bring that up with you, but I just, he, no never from anyone else did I hear that from – never from Csapo or never from, uh –

P:    What did uh, what did Larry Keller tell you then?  Did he say anything specific?

A:    No, Sir.  No, Sir.

P:    Only there was an argument between?

A:    There was an argument between the suspect that broke in and, and Keller

P:    Kevin?

A:    (Positive sound)

P:    And, did it get physical?

A:    No, Sir.

P:    It was just verbal,

A:    (Positive sound)

P:    verbal barrage?

A:    Yes, Sir.

P:    Was there threats made?

A:    No, Sir.  He didn't state, he didn't state there was any threats.  No, Sir.

P:    And he had learned that from?

A:    His brother.

P:    Okay. Did he mention anything else that might be of any importance?

A:    He made the statement that, you know, Kevin was, I guess, trying to start dating Christy again.  You know, that was, that was the statement that he made, you know.  He was,

D001015

IA Case: Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                    05/04/2004
Tapes 1 and 2 of 2
Page 17 of 24

when he was back up there, he was, he was trying to start dating Christy again, and, you know, that's why he was over there.

P:     (clearing throat) So, you clear the scene, you go to another domestic with Gygrynuk and, uh, you come back that evening, or, I guess, I keep saying evening, that morning, uh, you, are you question – are you okay?

A:     Yes, Sir.

P:     Do you have any question, uh, were you ever questioned by Sergeant Houdek as to what, what went, what occurred out there that night?

A:     Uh, I don't recall ever being questioned with him, uh, you know, I come back, and, and told him what -- I told Sergeant Houdek my take on the, on the situation.

P:     (Positive sound). And what did he say?

A:     Uh, I, I guess he had more information than what we did and he basically said it was already being – he had already turned it over to the Captain.

P:     Now, he had gotten more information from who?

A:     Well, the information that I got was that someone, with everything going on, they had called the Captain and advised him of the situation and.

P:     Who, who had called the Captain?

A:     The Sergeant. I believe that Sergeant Houdek --

P:     Mike had called Sergeant,

A:     Yes, Sir.

P:     er, Captain.

A:     Captain, (positive sound)

P:     Okay. And he told you that he had talked to the Captain then?

A:     I be, yes, Sir, I believe so.

P:     Okay. And did he get any sort of direction or?

A:     Last I heard that it was being turned over to Troop 3's DV Unit.

P:     Okay.

A:     And, with only having not even two years on, Sir, I, uh, I didn't ask questions.

P:     Okay.

D001016

IA Case: Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                     05/04/2004
Tapes 1 and 2 of 2
Page 18 of 24

A:     ... you know, honestly, I, I didn't, I knew that this was probably going to go somewhere and I didn't, I didn't want to learn any more information than what I, then what I had at the scene

P:     Right.

A:     because somebody was – it was turned over to the detectives and they, you know, I was going to let them handle it and I didn't want to get into it.

P:     Okay. Are you surprised it's taken this long for this thing to come to light?

A:     Ah, yes, Sir.

P:     At any time during this course of the investigation, that would have would been, during that night, or maybe the next day, uh, cause actually the investigation was closed that, from Csapo's point anyway, when he turned that report in that morning, it was

A:     (positive sound)

P:     to be followed up by CI, uh, but at, at any of that point, did you, did you learn who the suspect was?

A:     Yes, Sir.

P:     When was that?

A:     I, I don't recall how long it was. Uh, it was, it come through the rumor mill.

P:     But, I mean, it, it wasn't that night?

A:     No, Sir.

P:     It was down the pike?

A:     It was several, it was a month or so later. It had to be.

P:     Okay. That what's my question was, did you learn that night or the next day

A:     No, Sir.

P:     Did you, did you, were you able to identify who the suspect was?

A:     No, Sir.

P:     Okay. You, during the course, now in Csapo's report, he mentions the fact that, uh, Keller tells him it's a guy by the name of Bobby.

A:     (positive sound)

P:     That name comes up. Did that ring any bells for you as to who it might have been?

A:     No, Sir.

D001017

A000469

IA Case: Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                    05/04/2004
Tapes 1 and 2 of 2
Page 19 of 24

P:    Okay. I haven't talked with Corporal Dempsey in years and, I, wasn't familiar who, who she was dating or anything like that. I had no knowledge of that.

P:    So, when you left that -- When you left that scene that night, uh, to go to the other domestic, you were under the impression that someone, somebody had broke into the residence. You weren't sure who it was.

A:    (positive sound)

P:    You had no inclination, at that point, or, I'll ask you this question. Did you have an inclination, at that point, that it was a Trooper involved?

A:    No, Sir.

P:    What was your inclination?

A:    My inclination was that somebody gained entry; there was probably a domestic, due to the fact that she had Kevin Keller at the house. And it probably, it was probably a verbal, if not a terroristic threatening. That was just my, my thoughts. Somebody's going to go through the, the, the, uh, problem of climbing out onto the roof, breaking in a window, they're not going to just run away. They're probably going to gain entry and there was probably a domestic, a verbal domestic inside the residence and they left. I had absolutely no idea that this person was a Trooper.

P:    Did you find it odd that this was written up as, uh, just a regular crime report, Attempted Burglary and domestic related, no?

A:    From the information that we had received, I would say, you know, from the information that we have received, I, I, to be honest with you, Sir, I didn't know if it was written up as a, uh, non-domestic. I thought it was written up as a – I be, I thought it was written up as a Criminal Mischief to be honest with you. I thought that's all, you know, all that they had written it up as because they said that there, you know, because she kept stating that no one got into the house. I was under the impression that it was just a Criminal Mischief.

P:    Okay. But, at the time this was investigated, you didn't know who the suspect was. You had inclination it may be a domestic, but you really had no substantial evidence to suggest

A:    Yes, Sir.

D001018

IA Case:  Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                                05/04/2004
Tapes 1 and 2 of 2
Page 20 of 24

P:    it was a domestic because both Keller and Dempsey said that they were in the residence,
      or, no, Keller didn't even say.  Keller said he was home and got a phone call later.  She
      was home alone

A:    Right.

P:    and this thing went down and she said nobody got in.  She didn't know who it was.

A:    Right.

P:    She just heard, heard tires, tires squealing as they left.

A:    Right.

P:    Okay, and the report reflected her statement

A:    (positive sound)

P:    even though there was some contradictory stuff uncovered later by Csapo?

A:    (positive sound)

P:    But he included that in the report also.  Did you ever read his report?

A:    Yes, Sir.

P:    Okay.  Does his report reflect accurately from what you

A:    Yes, Sir.

P:    From, from your knowledge of being at the scene?

A:    Yes, Sir.

P:    That that's what occurred?

A:    Yes, Sir.

P:    Is there anything else about what occurred at the scene that night, uh, that sticks out in
      your mind that we haven't covered tonight as far as Dempsey's actions, Keller's actions?
      Anything that might have been at the crime scene or anything that you saw or heard that
      we haven't talked about tonight that you feel may be important?

A:    Nothing right off the top of my head, Sir.  I, I, uh.  The one thing that struck me as, you
      know, like I said, the one thing that struck me as odd is when I got there she was very, just
      very hesitant.  Uh, she didn't want anything done.  You know, we checked the front of the
      residence, checked the window.  That's when Corporal Gygrynuk and, uh, Csapo arrived.
      Uh, no, Sir, I, I can't.  I can't recall anything that would, uh, that we haven't gone over.

D001019

IA Case:  Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                    05/04/2004
Tapes 1 and 2 of 2
Page 21 of 24

P:  The last thing I want to cover and just last note, Kevin Keller.  You stated that you knew
    him.

A:  (positive sound)

P:  Uh, what can you tell me about the guy?

A:  If I recall correctly, he was in, uh.  He was a wrestler in high school; he's always been real
    decent.  You know, uh, we had a mutual friend and, you know, I would see him over to his
    house.  Uh, I believe Kevin was in the, uh.  I believe it was the Army or the Army Reserve
    or National Guard or something like that.  I believe he was in an MP Unit, uh, because I
    talked with him about that several times.  Uh, I knew that he was trying to get into law
    enforcement.  This was several years ago.  Uh, I didn't, but, we were never ones, you
    know, we were never really close friends.  We just, you know, we would talk if we saw
    each other out and, uh, and that was it.  I was surprised to learn that he had gone all the
    way to Texas to be a police officer.  You know, that's what I found out that night.  Uh, I was
    more friends with his brother, Larry Keller, and Larry's the one that – Where I contacted
    Larry, I was actually just at the gas station down in Camden, the Carl King gas station.  I
    had stopped in there and I saw Larry.  And he asked me what was going on with this and,
    of course, I, I didn't divulge any information, you know, because I knew it was this and, you
    know, I remember and Larry said, well, you know, this is a, you know, he had come back
    and, you know, him and Christy were talking.  Uh, I believe Larry made the comment that,
    you know, Kevin stated to him that, you know, he was trying to get back with Christy
    because this is a girl that he could move back to Delaware for and, you know, he, he was
    just.  I remember him telling me that he was pretty scared that night that it did happen.  So.

P:  As far as truthfulness goes, now, obviously, we have some contradictory statements made
    by Dempsey that you're aware of from reading the report.  And Keller also, from your
    reading the report that Csapo submitted.  Do you have any – after reading that report and
    from your, your experience at that scene that night, and, and your cop instincts that kick in
    as to what, you know, you always have that gut instinct

A:  Yes, Sir.

P:  and that's usually, not always right, but a lot of times it points you in the right direction
    anyway.  Who do you think, who think is more believable in this incident?

D001020

A000472

IA Case:  Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                    05/04/2004
Tapes 1 and 2 of 2
Page 22 of 24

A:    I, I don't know, Sir.  Kevin Keller, I believe the reason he was doing,  I believe the reason
      he come clean after he left the residence, with Csapo, was because he was trying to cover
      for Christy Dempsey.  I believe he wasn't being completely truthful with us at the scene
      and I believe he come clean, after he left the scene, with Csapo.  Uh, I know that, I mean,
      after the rumor mills and everything else, I know that, uh, Christy Dempsey was not truthful
      with, with us at all that night.  Didn't appear to be.

P:    Okay.  Do you have any reason to disbelieve Keller's second statement made to Csapo?

A:    No, Sir.

P:    Does that, what he told him, make sense, as to what may have occurred at the scene that
      night?

A:    Yes, Sir.  To be honest with you, I don't remember exactly what the statement was in, in,
      uh Corporal Csapo's report.

P:    Okay.

A:    And I, I read it, you know, several months ago.  I haven't, I haven't read it since then.

P:    Okay.

A:    Uh, but at the time when I read it, I was pretty sure that, you know, that was probably
      pretty close to, pretty close to the truth.

P:    Uh, I don't believe I have any further question at this point.  We're going to go ahead and
      conclude this interview.  It is approximately 2004 hours.


      This is Captain Paige.  We're back on tape.  It's approximately 2007 hours.  Just have a
      couple of follow-up questions.  Uh, were you, at any time after this incident occurred,
      contacted by anyone in the troop administration.  When I say troop administration, a
      Sergeant or higher, regarding this incident?

A:    I was contacted by the Captain, I believe it was a month or so ago and advised that I
      would be contacted by Internal Affairs reference, reference this incident.  Uh, I was
      surprised to be contacted by, uh, Sergeant Hudson, with Troop 4, you know, and he
      advised that it was a criminal investigation.  I, I was shocked to hear, hear that.  But, yes, I
      was contacted by Captain, Captain Hawkins.

D001021

IA Case: Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                05/04/2004
Tapes 1 and 2 of 2
Page 23 of 24

P:    But prior to that though, as far as any time during the time frame immediately afterward,
      within a week after this occurred, were you contacted by anybody

A:    No, Sir.

P:    within the troop?

A:    No, Sir.

P:    Anybody of any rank above, any, anybody of higher


                              END OF TAPE 1 OF 2

-------------------------------------------------------------------------------------


                                TAPE 2 OF 2


        Okay, this is Captain Paige.  We're back on tape after the first tape expiring. It's
2008 hours.

P:    Uh, I just want to clarify post-incident at Dempsey's house.  Have you been
      contacted by anyone, uh, from the Division, of higher rank, inquiring as to what
      occurred, in, at, at this -- what you learned from your investigation?

A:    (inaudible)

P:    other than Captain Hawkins telling you that you're going to be interviewed, has
      anybody

A:    Other than, other than Detective Hudson, no, Sir.

P:    Okay.  Uh, now you, you mentioned that you were surprised to be contacted by
      Sergeant Hudson, surprised that there was a criminal investigation into the
      events that night.  Why, what, what would surprise you about it?

A:    Uh, I, I was under the impression that it was, it was handled, you know, it was
      already investigated.  Uh, like I said, I was , you know, I was contacted by the
      Captain, advised that it was going to be a, uh, Internal Affairs investigation, and
      when I was contacted by Detective Hudson, I was just a little surprised that it,
      you know, it was actually being investigated again.


                                                              **D001022**

IA Case:  Dempsey, Corporal Elizabeth C.
Interview of Trooper Alexander Argoe V                    05/04/2004
Tapes 1 and 2 of 2
Page 24 of 24

P:    In your opinion, was there criminal activity that occurred there at Dempsey's house that night?

A:    I, at least Criminal Mischief.  Yes, Sir.

P:    Okay.  Do you have any knowledge or any information that would lead you to believe that there's been any sort of, uh, cover-up, as to what occurred that night, to avoid any criminal prosecution against either Dempsey and/or the Trooper that was involved in this case?

A:    No, Sir.

P:    Okay.  And I think this time I will be true to my word and this will conclude the interview, if you don't have anything else to add?

A:    No, Sir.

P:    All right.  We're going to wrap this thing up.  It is 20, 2010 hours.

D001023

# INTERNAL AFFAIRS INVESTIGATION
## Transcribed Interview

**CASE NAME:**            IA12-04

**PERSON INTERVIEWED:**   Cpl/1 Walter Gygrynuk

**DATE:**                 May 4, 2004

**LOCATION:**             Delaware State Police
                          Troop 3

**INTERVIEWER:**          Captain James Paige
                          Internal Affairs

**TRANSCRIBED BY:**       Brenda Lee Unruh
                          Delaware State Police

**TOTAL PAGES:**          28

D001024

Ok, this is Captain Paige, Delaware State Police Internal Affairs Division. Today's date is May 4th, 2004 and the current time is approximately 20:21 hours. Conducting a tape-recorded interview at Delaware State Police Troop 3 in the small conference room, first floor. And that interview will be conducted with Corporal Grade One Walter Gygrynuk, Delaware State Police Troop 3.

JP:   Ah Walt, is it ok if I call you Walt?

WG:   Yeah. Yes, sir.

JP:   Ok. Ah, if you would please state your full name, rank and IBM for tape.

WG:   Ah, Walter James Gygrynuk ah, Corporal Grade One and 885.

JP:   How long have you been employed by the division?

WG:   Since November of '94.

JP:   Ok, and what capacity have you been...what...what have been some of your assignments?

WG:   Road Trooper, GTF ah, Road Trooper at Troop 9 and back here as Road Trooper, Troop 3.

JP:   Alright ah, what I want to talk to you about tonight is I'm going to interview you as a witness, ah, ah, as to the events, which occurred back, I think, it was Oct...October 26th, 2003. The event occurred sometime around 1:30 quarter till 2:00 in the morning ah, at 1715B Frederica Road or otherwise ah, Christine Dempsey ah, who was Trooper with the Delaware State Police as her residence at that time. Ah, and my understanding that there was a dispatch and that you were part of the...part of the three people that were dispatched to that. Or at least volunteered to...to roll to this complaint. And the first thing I want to know from you is what...what do you recall about the dispatch?

WG:   That there was a burglary in progress involving a Trooper. And while in route at ah, ab...well above and beyond the ah, speed limit ah, cause it was involving a Trooper. Ah, it was my understanding that ah, there was a gun involved ah, with this incident. And later I found out that Dempsey was telling Kentcom that she had her gun. And off the cuff I thought that was a

2

stupid thing to say. We all have our guns. Why...why is she telling Kentcom that she has her gun? That didn't make sense to me but while in route ah, that was stated. That's what I was thinking. I arrive, I was the last one to arrive; out of three of us. And ah, when I arrived ah, Dempsey was ah, talking with ah, Csapo and Argo. They were at the top of the steps where her apartment is. Do I continue?

JP:    Sure. Uh huh.

WG:    Ok. Ah, ah, when I went inside the apartment I saw the broken glass ah, of the window in the living room; it's a small apartment. Ah, she...she started getting asked questions by all three of us ah, during the interview. I would ask her questions ah, Alex was asking her questions, Csapo was asking her questions; Alex meaning Argo. Ah, and when I had asked her some questions ah, and she started answering questions from ah, either ah, Argo or Csapo and she contradicted what she had stated to me. Ah, meaning; I had asked her if she was home? And she said; no. And then she's telling ah, Argo and Csapo that she was home. And I caught that right away and...and I...I said; what do you mean? And then she's changing her story during...during the interview from all three of us. Ah, and it just wasn't making any sense to me. And what she was telling me about where she was...she was telling, she's washing her face and she hearing a banging on the door. And she ignores it because she's not expecting anybody. And I thought that was kind of odd. And then she's telling me, she's hearing ah, footsteps on the ah, the...the roof. There's a roof ah, I guess, part of the porch of the house; that ah, butts up to her apartment and the floor of her apartment. She's telling me she's hearing that, which doesn't make any sense to me. That she can hear that while she's washing her face. And then she hears the broken glass but doesn't see anybody. Ah, and then she...and then she tells us that there's a guy named Kevin; and recall that name, just from looking at my ah, supplement. But I remember her telling us; there's...there's a guy in one of the rooms. And I'm like; what do you mean there's a guy in a room? And we'd...we'd been there, in...in my opinion, a good five or ten minutes. And we had all...we went out on the roof, we were...were looking at all ah, angles, we're treating it as if...if it was a burglary that occurred...a, you know, a legitimate burglary. And then she tells us that there's a guy in a room. And that...I was...that made no sense to me why she would just now tell me...tell us that. So I go in the room. And this guy is sitting there, like a puppy that just got beaten. Bright eyed, sitting down, wouldn't move and I basically flat it out, I'm like; who are

3

D001026

you? What are you doing here? And he's wasted; he's a 7-7 (inaudible). Ah, and he's just telling me that he'd been asked over by ah, ah, Dempsey. And ah, to be honest with you Captain, I ah, I didn't per...push it hard with her because she was a Trooper. I'd have definitely ah, would have interviewed her a little harder if she wasn't a Trooper. And everything she was telling me and...and what I was hearing...what she was telling Csapo and Argo was not making sense to me. I'm getting the gut feeling this is a domestic. She knows who did this. And ah, and during the course of our ah, interviewing ah, I had seen ah...and we all had seen ah, a...a latent on the front door. So I asked Csapo to ah, process that and ah, also to take the initial on it because we had to take off, because there was another domestic ah, on South State Street that we cal...that we got called to. And as soon as I got in my car, I called Sarg; Sergeant Houdek, my ah, Shift Sergeant. I called him up, I said; this is not right. This is hinkey. Ah, this is a...this...this feels like a domestic to me. And he told me, he says ah; your suspicions are correct, 10-19. But I had told him what we were going to first. And he said; well, as soon as you get done that, you come back. And ah, I found out later that ah, Sergeant Houdek was ah, knew more about it than we did. Ah, before we completed our ah, investigation. Ah, but during the whole time that we're ah, talking to her, she's got kind of a bug eye to her ah; like an airiness. Um, do you understand what I mean? An airhead type, response.

JP:     She's being...would you say, she's being evasive?

WG:     Yes. She's ah...she's not cooperating. Ah, she's not acting like someone that ah, this really actually occurred in her house. If someone had broke in. Ah, she's not...she's not giving her own opinion; as a Trooper. As someone that would be investigating this ah, with someone else. We're...we're pulling...we're having to pull things out of her. And she's ah, and she's changing...and she's...she's clearly changing her story; during the course of the investigation. And that was pissing me off. It was also pissing me off that we almost killed ourselves getting there because of the initial ah, call out. An I knew something was wrong and ah, and after I had found out ah, after I had got back, talking to Sergeant Houdek, it just, you know, inflamed me even more knowing that it was...that my suspicions were correct. Ah, and...and that's it.

JP:     Ok. There's a couple specific questions on that. Ah, on your dispatch where...where'd you have to come from to get to the scene? Do you recall?

4

D001027

WG:  Camden area.

JP:  Ok, so

WG:  I took ah, South State Street and ah, straight down. Ah, that was the quickest route, non…non-twisty route.

JP:  So your estimate time to get there was?

WG:  As fast as I was driving, just a few minutes and we were…I was going code.

JP:  Five to ten minutes you were there?

WG:  Oh, less than that.

JP:  Argo was there already?

WG:  Yes.

JP:  And when you arrived, do you recall where Argo was?

WG:  Ah, I…I believe I saw…it was either him or Csapo at the top of the steps; at the door.

JP:  Ok.

WG:  At the best of my recollection.

JP:  And what did you learn? Did you talk to Argo or…or Csapo before you talked to Dempsey?

WG:  No.

JP:  You went right to Dempsey? Where was she at?

WG:  Captain, I can't recall if she was down in…in her parking lot or ah…she was outside. I do know she was outside. And ah, they were talking to her and I'm like well let…let me see what's…what's happened here. So, I go in the living room and I see ah, the broken window. And they're talking and then I stepped in to talk to her. I didn't pull her aside to talk to her.

5

D001028

JP:    So you never talked to her alone?

WG:    No.

JP:    Per se?

WG:    We talked to her; all three of us were…were there. Interviewing her. And she was basically being bombarded by all three of us.

JP:    Ok. (paper flipping) Ah, bring your attention to photograph three here; the front of the residence. Can you tell me which window was broken?

WG:    This one.

JP:    Ok the left most window, as you look at the house?

WG:    Yes, this one right here.

JP:    Ok.

WG:    And it was the bottom; right there.

JP:    Tell me about the window. Did you go up on the roof and look at it?

WG:    Yeah, we walked around.

JP:    Ok and what…what did you notice about the window?

WG:    That all the glass was in…in the inside.

JP:    Was the entire glass broken out?

WG:    Ah, yeah for the most part. Yes sir.

JP:    Ok. Was the window up or down?

WG:    Ah, the best I recall it was down.

6

D001029

JP:    Ok. But all the…did it appear…could you tell if anybody had crawled through that window? Was there any way to tell?

WG:    No, no sir. There was nothing…there was no tear of any clothing. We were looking for evidence on the outside. Ah, still thinking that it was still a legitimate burglary. Ah, we were treating it as such. And we were looking for any evidence, anything dropped, cigarette butt, anything outside that…that roof line. We looked in the gutter on the edge here.

JP:    Uh huh.

WG:    And we saw nothing. And we also walked on the road…jus…just to see what it would be like for someone to do that. And it was pretty simple from ah, from where these wooden steps go up. It's easy to get on that roofline.

JP:    Ok. Did you notice when you were walking across that roof; was it kind of noisy?

WG:    (sigh) We were yapping, Captain. We…we were talking ah, nothing any more normal than you would walk on your roof if you were cleaning your gutters or getting on your own personal roof. It wasn't

JP:    But if you were inside, you would probably hear it then? If somebody's on

WG:    It's possible. Well, it's possible but that roofline is not connected to…it's not over her apartment. I mean, I would hear somebody walking on my roof, in my house, if I was in the second floor of my house and they were walking. I could hear that. That roof's not. It's…it's over a porch, so. I would think it would be difficult to hear footsteps on that.

JP:    Unless though maybe the person was running or something like that?

WG:    That is cor…well, if he was running he would probably fall and bust his butt.

JP:    So you asked Dempsey if she was home when the incident occurred and she originally told you that

WG:    No.

7

D001030

JP:    No, I came home and found

WG:    Found.

JP:    glass on the floor

WG:    Right.

JP:    and noticed the broken window.

WG:    Right.

JP:    And you asked her if there was anything missing from her apartment and she told you, no?

WG:    Correct.

JP:    And you asked her if she has a boyfriend, she told you, no?

WG:    Yes, that's correct.

JP:    And you asked her if she has a male friend, who thinks he's her boyfriend and she told you, no?

WG:    Yes.

JP:    Ok. How well do you know Christine Dempsey?

WG:    Only saw her ah, briefly when she was here at Troop 3. Ah, when she came to Troop 3, I was...I believe I was a GTF. And at that time I hardly saw anybody that was new. I was a GTF because we were constantly working nights; differently from what they do now. And then I believe shortly there after I went to Troop 9. So I never worked with her.

JP:    Ok. Then you conducted the scene inside and outside the apartment ah, didn't...didn't locate any physical evidence other than the print on the door. Correct?

WG:    That's correct.

8

D001031

JP:   Ah. Later in your report you go on to state that ah, in the front yard of the house while you...while you were conducting interview ah, you overheard ah, Dempsey state to Argo or Csapo that she heard a knock on the front door and the shattering of the window.

WG:   Yes.

JP;   And that's when you approached her and said; you weren't

WG:   Right.

JP:   home at the time.

WG:   Exactly.

JP:   And what did she...what was her reaction when you approached her?

WG:   Sa...her...her...her reaction was the same throughout the entire night that we were there, in...in my opinion. Ah, indifferent. Not upset. Ah, I knew she had been drinking that night but she was not drunk; in my opinion. Ah,

JP:   What...what gave...what lead you to believe she was drinking?

WG:   I...I could smell it.

JP:   Was she doing anything else to indicate anything...any other indicators?

WG:   No.

JP:   Scale from one to ten, one being not drunk and ten being drunk.

WG:   I think either a three or four, in my opinion.

JP:   Ah, she states she's washing her face, she heard footsteps on her roof while she's in the bedroom and then she heard the window shatter.

WG:   Uh huh.

JP:   And this was after you had...had confronted her about

9

D001032

WG: Right.

JP: Ok.

WG: Changing her story.

JP: Ok. Then…then the part about ah, she then admits that somebody's in the bedroom.

WG: Yes.

JP: Go back to the bedroom ah,

WG: And…and from my understanding this guy is a police officer in another state. And you know and I know cops are the nosiest people in the world. And this guys sitting there like a puppy that just got kicked. Sitting in the chair, not moving, while we're there. And we're there for a good while. And I'm putting this all together, especially after later on, like this is totally ridicules for him to sit in there, not move, not even saying a word. Not even to come out and say; hey guys, how you doing? Nothing. And her to not even to tell us, until the end, that there was someone else in the apartment. Just didn't make any sense.

JP: He made the statement to you that Christine had called him?

WG: Yes.

JP: And did she confirm that story to you?

WG: No. I asked him that when he ah…when I had shut the door.

JP: Ok. At any time that you were at the residence and conversing with Dempsey or…or Keller, did she make the statement that she knew who broke into her residence?

WG: No.

JP: Did anybody specifically ask her; do you know who broke…who might have done this?

10

D001033

A000485

WG:  Oh, I believe we all done that. It's...it's a basic question you ask somebody.

JP:  And her response was?

WG:  No.

JP:  She mention anything about a black male?

WG:  No.

JP:  Did she ever mention that she had any conversation with the suspect? After she had admitted that she was home?

WG:  I don't recall her ever saying that to me.

JP:  Did you ever learn that there might have been a confrontation between Dempsey and the suspect or Keller and the suspect?

WG:  I...I...I learned that later. After I had left.

JP:  But at the scene?

WG:  No. No.

JP:  Did she mention anything about the use of firearm during this incident?

WG:  No.

JP:  What did she say...did you ever talk to her about the firearm?

WG:  No, I did not.

JP:  Did she...she did not tell you about calling Keller over there? After the incident occurred.

WG:  No.

JP:  Did you assume that he was there for the entire incident or you didn't...what was your take on that then?

D001034

WG:  Well, if he was there when it happened, why didn't he get involved? And that's the questions I asked myself at the scene. Obviously, I knew the answers afterwards and it made sense. But ah, the guy was scared to death.

JP:  What do you think he was scared of?

WG:  Well, afterwards...learning the information afterwards, of the person that did come into the house.

JP:  You...you made the state...now...not...let's try to forget that you know, what you know, at this point. But

WG:  Right.

JP:  that night you...you made the statement, he looked scared.

WG:  Yeah, I told him...like...he...he looked like a beat dog. He's sitting in there, his eyes are bug-eyed, he's sitting in that chair and he's not moving. And he's drunk. And

JP:  What

WG:  when I opened the door, you know, I'm like; what are you doing here? You know, like; what's going on? Cause I...I mean, I've already realized, she lying to me. So I'm already a little ticked. But I'm not pushing it with her because she's a Trooper. And then I go to him, I'm like; what are you doing here? And then he tells me; he came over because Dempsey called him. Not because of the ah, the burglary.

JP:  On a scale of one to ten, how drunk do you think he was?

WG:  Oh he was...he was a ten. He ah, he was well beyond a 7-7.

JP:  Is that right?

WG:  Absolutely.

JP:  Is that right?

WG:  Absolutely.

12

D001035

JP:     What...what kind of indications was he giving?

WG:    Glassy eyes ah, this...the...the...the alcohol was very strong with him. And just sitting there, you know, scared to death. If he was...to me, and he tells me he's a police officer, I mean, if he's a sober cop, you know, he'd...he'd be up and around. He wouldn't be sitting in that room, sitting in that chair. It was just

JP:     Do you notice if he was drinking at that time? Did he have a bottle of booze or

WG:    I didn't see any alcohol.

JP:     drink in hand?

WG:    No. No sir.

JP:     Did you notice that he...he had any belongings in that room? Suitcase?

WG:    No sir.

JP:     Nothing?

WG:    No.

JP:     Ok. The glass in the residence; you said there's a lot of glass.

WG:    Uh huh.

JP:     Would you say there's more glass inside or outside?

WG:    Inside.

JP:     Ok, the glass that was inside the residence; did you take a look at it?

WG:    Yeah, I looked at it.

JP:     Ok. Could you tell if the glass had been sort of trampled on? Or was it just kind of was there a lot of big pieces? Or could you tell?

13

D001036

WG:   (poof) The best that I can recall, Captain, it was big pieces and...and it wasn't it wasn't little bitty pieces like someone had stepped on it. It did not look like that.

JP:   You noticed...all three of you noticed the ah, fingerprint on the door?

WG:   It...it

JP:   Or the storm door?

WG:   it was pointed out to me.

JP:   Pointed out to you? Ok. And ah, to your knowledge was that print lifted?

WG:   I told Csapo to do it.

JP:   Do you know if he did, do it?

WG:   To the best of my knowledge, he did do it.

JP:   Do you know if he forwarded a print to SBI?

WG:   Oh yeah. We had all talked about it when we got back.

JP:   So you knew that he lifted a print?

WG:   Yeah.

JP:   And do you know if he put it in the envelope and sent it away to SBI?

WG:   I'm sure...I...I...I can only assume that he followed proper procedure.

JP:   Did you know that that print is now missing?

WG:   I do now, yeah. Not from you, I had found out prior.

JP:   Who told you that it was missing?

D001037

WG: (poof) Who said that to me? I don't know if it was Sergeant Houdek or ah, Csapo and Alex...we all dis...one of those two had mentioned it to me.

JP: Ok.

WG: But ah, I do recall when they mentioned it, I mean, that bullcrap. That...that was processed, cause I told them to. And I know he would do it.

JP: Do you have any knowledge as to who might have pulled that print?

WG: No sir.

JP: Heard anything through rumor mill on that?

WG: No sir.

JP: Ok.

WG: I mean, you know how it is when...when you hear rumors and someone asks you who...who said it and you can't remember who said it. I'm...I'm not trying to be evasive.

JP: You had an opportunity to talk with Csapo later that night?

WG: Yeah, we...we all came back and talked about it.

JP: Ok, so at that point then that you knew...you had learned that ah, Keller had changed his story? And had been...gave a statement that maybe...I'm not going to say he was more truthful or not but gave his statement that maybe fit what actually occurred there.

WG: Yeah, Csapo gave him a ride home and ah, Csapo said that ah, ah, paraphrasing, you know; hey can I talk to you? You know and then he basically told Csapo what had occurred. And ah, he didn't know the guys name, he made an assumption on the name, partial name and everybody was like; who's that, who's that? And it turned out ah, it wasn't that person.

JP: You talking about Bobby?

15

D001038

WG: Yes. We were just...just trying to make assumption of who it was, cause I don't know...I don't know those guys down south. And I believe it was a younger guy so I definitely don't know him. And it turned out that ah, when we came back ah, it's not him. So.

JP: Ok. So you came back and you...you made...you made reference earlier that ah, when you left the scene and you were going to the other burglary in progress you called your...your supervisor, Mike Houdek.

WG: Yes sir.

JP: And he made...he made the statement that he already knew more than you knew or...or something that effect.

WG: No, he told me that ah, my suspicions are correct, 10-19. I explained to him; I can't 10-19 right now I'm going to another domestic on South State Street. As soon as I clear that I...I will. I called him on the cell phone. And ah, he wouldn't elaborate on anything other than my suspicions are correct. You know, that was all that was said.

JP: Ok.

WG: Prior to me getting back here.

JP: Ok. So you came back talked to him then?

WG: Yes sir.

JP: And what did you learn at that point?

WG: Ah, he received information from ah, well he...when he first told us, he said you know, I'm not suppose to discuss it with you. Ah, about what happened. And ah, I don't want to get Sergeant Houdek in trouble. Would I be getting him in trouble?

JP: Well I'm...I'm going to ask you to be truthful with me and tell me what you know. Ok? I'm not...I'm not...my role here is not to get people in trouble but if people did something wrong and it has to be addressed. But I need you truthful and tell...I need to know what happened so it can be addressed in the right manner. And if I don't have the truth it may not get

16

D001039

A000491

addressed…somebody could get wrongfully accused of something, instead of…so if I have the truth, we can deal with the truth, ok?

WG:  Ok. He…he got a call from the Captain.

JP:  Ok.

WG:  Ah, Captain ah,

JP:  He got a call while you were at the scene?

WG:  Yes.

JP:  Ok.

WG:  Ah, well prior to me getting back he had…well…obviously cause when I call him, he…he said your assumptions are correct. So he already…already knew. He already knew more about it than I did about…he knew more about the truth. So he got a call from the Captain. Ah, Captain told him who had done it. Ah, according to Sergeant Houdek. And ah, we…we conducted the investigation. We were told to conduct the investigation, to do…to complete the work. And I told Sergeant Houdek that Csapo's doing the paper on it. And ah, he was advised to write it up ah, as if it was a normal burglary. And…and I mean, Sergeant Houdek said; you know, I'm not suppose to tell you who…who it was ah, but I started putting two and two together. And it made sense. You know, why that person would call the Captain right away ah, after I, you know, learned his name. I said; that makes absolute sense.

JP:  And when did you learn his name?

WG:  Well, Sergeant Houdek told us, who the perpetrator was.

JP:  I want to back up here cause I want to make sure I have this right. You get back to the Troop, Mike tells you that he got a call from Captain Hawkins and Captain Hawkins told him that he received a call from Brian Maher?

WG:  Yes sir.

JP:  Ah, and Brian Maher had told him what had happened?

17

D001040

WG:   That's...I'm...I'm assuming.

JP:   Did you ever learn what had happened that night?

WG:   Yeah.

JP:   From...what...what was told to you?

WG:   That ah, Brian Maher was the one that busted the window. Came in the apartment and ah

JP:   Came in the apartment?

WG:   Yeah that's

JP:   And Captain Hawkins told that to

WG:   Yeah.

JP:   to Mike? Mike

WG:   Well Mike didn't...Mike did not tell us ah, excuse me, Sergeant Houdek did not tell us what the Captain told him verbatim. Other than the fact that it was Brian and ah, I said; that makes sense cause he's on the Scuba Team. That's...call him right away. And...and ah, and it's my understanding that ah, he explained to him what...what he did ah, didn't...didn't hold anything back and...and told him right away, you know, that he made a mistake. And ah, we were advised by Sergeant Houdek to ah...everybody write down everything you did. You know and write it up like your conducting a normal investigation and we turned it over to ah, the Captain.

JP:   Ok. But at...at the point prior to this report being written and you all knew who the suspect was?

WG:   Yes sir.

JP:   Ok. But there's yet...from the report submitted there's no suspect listed. It's listed as

18

D001041

WG: We were...we were...we were advised to write it up as if we don't know who it is. And that's what we did. And we referred to the chain of command and let them do what they have to do in regards to ah, because it was involving a Trooper. And then that's...that's how we did it, so we were...we all write our supplements and the initials were done that night.

JP: So Sergeant Houdek was instructed by Captain Hawkins to complete a report

WG: I can't say that...that that's what Captain Hawkins told him, sir. I...all...all I can do is tell you is what Sergeant Houdek told us. That ah, he said; he was advised.

JP: How...how...to your best of your recollection, what did he tell you? As specific as you can.

WG: We were advised to write up as...as a unknown suspect. And ah, we'll...it's going to be forwarded and any changes have to be made, it'll be made...it'll be made at the higher level. Not...not by us. We were...were not to put Brian's name on there. And when I say that Captain, it was...I mean, he wasn't suppose to tell us who...who it was. And it was off the cuff and it was...and it was just...and we were ordered...and it was just us three. It wasn't the whole shift in...in the room. We were...we were told to say nothing and we did, we said nothing. We said nothing about it. And people were...people would come up to us, you know, a couple days later. I can't remember if this was a weekend or not and we're not saying anything. And then that's how it was treated. And ah, I mean, we did what we were told. We didn't hide anything. We didn't ah, we didn't leave anything out of our reports. Ah, I know I didn't.

(pause)

JP: So then what you're telling then is that you were...you were ordered to exclude the name of Brian Maher off this report?

WG: I remember Csapo asking ah, Sergeant Houdek, you know, well do I...do I put his name on the suspect ah, block and then Sergeant Houdek, you know, started thinking. Said; well, just write it up like you don't know. Alright? Just write it up, suspect unknown. We'll forward everything to change of command, meaning; C.I. here and I mean the Captain knows who did it. If he wants to put him in that suspect block, then let...let...let the higher chain of command do it. That's how it was left. It wa...Sergeant Houdek was not

D001042

hiding...trying to hide anything. He was thinking the best way to write this up ah, initially because it...it involved two Troopers. We're thinking and...and...and I myself; we're like well, which...which is the best way to handle it? And ah, we assumed that it would go to you guys immediately. That was our assumption. And it didn't work out that way.

JP:    And what were your feelings about writing the report up as it's...as it's written in this format?

WG:    Personally or Professional, sir?

JP:    Both.

WG:    (sigh) Well, professionally, I wasn't sure. Ah, because it involved two Troopers. Ah, I mean I don't have any ill will towards either one of them. I'm tired of this incident. Ah, it's that old adage if, you know, if you're not sure, you know, you ask your chain of command what's the best way to write it up. And when I mean the best way, the proper way to write this up. And in no sense meaning, hiding anything; and I'm talking about this incident. What's the best way to...to handle it? And we all came to the understanding that...that was the best way to handle that. Cause we weren't sure. I mean, it's not something that you deal with everyday. Personally, I was pissed! I was pissed that she never came up to me or any...any of us that were there and...and told us; I made a mistake. This is what happened. We killed ourselves...almost killed ourselves getting there, cause when you here Trooper, that's what you do. And she lied! And that really pissed me off! Because you've been my Sergeant and you know how I can be. Sometimes I get...I get the public making a complaint against me because I raise my voice too much. I'm direct; I'm not going to lie. And I feel like I get wrung through the wringers on certain occasions and...and this...and this person is lying calling in a...a false complaint. And I was pissed! That's how I felt about it, personally. I wanted her butt to hang! To be honest with you Captain. I was pissed! But ah, I thought we did the right thing.

JP:    But you sought the advise of your Supervisor as to how this report should be written?

WG:    Well, I...I wasn't writing the paper.

JP:    But you were there when the decision was

D001043

WG:   Mark…Mark

JP:   handed down.

WG:   Mark Csapo ah, he said; well, how should I write this up? We were all like, you know, how do we write this up? Cause we finding out the information…if Sergeant Houdek hadn't told us, we…it had been written up just exactly how it was written up. No different.

JP:   But you

WG:   Now I don't want to get Sergeant Houdek in trouble, Captain. That's why I mentioned it

JP:   I

WG:   in the beginning.

JP:   I…I under…I understand that.

WG:   It's…it's…he had…he said; I'm not suppose to tell you. And ah

JP:   Well, it sounds like he had direction, from above, also. So he's just directing you to what he's been told. Whether that's right or wrong. He's just doing that. Ah, but did it concern you that this report was being submitted in a fashion that it was incorrect? It was…it was…it was false. Because you knew who the suspect was. It was a domestic incident. It's not being recorded as such. And it's not an attempted burglary, it probably is a burglary, because it sounds like there's a domestic that goes on in the residence. So there's probably ah, some sort of altercation that goes on in the residence. Ah, did…was there thought that was given to that? That you guys are possibly submitting a report that's false?

WG:   (sigh) That's a tough question. We thought we were doing the right thing.

JP:   Ok, let me ask you this question then. Why did you think you were doing the right thing?

21

D001044

WG:   In my opinion, and I can't speak for everybody that was in the room, in my opinion we all felt that the right thing was going to happen.

JP:   Now, what was that right thing that was going to happen?

WG:   That those two were going to be investigated. What had happened that night. And they were going to be questioned, someone's going to answer why som...why they lied. Well, why she lied. And quite frankly we weren't looking at it as if it was, again in my opinion, that we were submitting a false report.

JP:   So you submitted the report as you were directed?

WG:   I submitted my supplement as correct as I...as...as directed, yes.

JP:   (sigh)

WG:   May I add something?

JP:   Pardon me?

WG:   May I add something?

JP:   Yes you may.

WG:   Alright then, I honestly felt it was in the best interest of the Division that it was written up the way it was. And let the chain of command deal with it.

JP:   Ok.

WG:   Because it was involving two Troopers.

JP:   Well did the chain of command, in your opinion, do what they were supposed to do?

WG:   I'm only a Corporal, Captain. So, my opinion doesn't really mean a whole lot.

JP:   Well, actually it does. Was the situation handled correctly? In your humble opinion.

D001045

WG: You're asking me to something negative against my chain of command and I have a problem with that Captain. I don't like to say anything negative about the Division.

JP: Let me ask you a direct question. Was the situation handled?

WG: No. In my opinion. I was upset the way it was handled.

JP: Alright, I think I'm going to get ready to conclude this...this interview ah, I don't think I have any further questions. Prior to us concluding, do you have anything further that you'd like to add?

WG: No sir.

JP: It's approximately ah, 21:00 hours. This is going to conclude the interview.

JP: Ok, this is Captain Paige ah, we're back on tape. It's approximately 21:10 hours. Walt, I just want to go over a couple things. I know we've talked about this in-depth but I just want to make sure because of ah, it's been a long day and I just want to make sure I got the facts ah, correct. Cause this is very important. Ah, and...and where I want start is at the point where you came back to the Troop and yourself, Argo, Csapo and Sergeant Houdek met to discuss the incident. Ah, won't you just kinda go through that step by step. Ah, and just as descriptive as you can, as to what was told, what you learned and how the decision was reached. And what direction you received from your Sergeant as to how this was going to be reported and recorded. Ok?

WG: When I came back ah, Sergeant Houdek made mention that ah, he's really not suppose to tell us, you know, who the person was that did it. And he...he got a call from the Captain and he knew what...knew the truth of the matter, prior to us even coming back. Ah, and ah, he mentioned ah, Brian's name. And then ah, since Csapo was writing the paper on it, the initial one, we were all...whoever was there, it was just three, we were writing supplements to coincide with ah, Csapo's initial. And ah, Mark simply stated; how do you want me to write this up? You know, do you want me put Brian in as suspect one? And ah, Sergeant Houdek made the decision to ah, leave it...just leave it as unknown at this time. And ah, we all wrote our supplements meaning, me and ah, Argo. And then ah, we'll submit it to the Captain and ah, and ah,

D001046

I assume that it would...it would go to the Captain. Ah, and ah, it would be taken care of. Properly.

JP:    Ok.

WG:    That's how...that's how we did it.

JP:    Was there any discussion as to whether to record this as a domestic incident or not?

WG:    That's the best that I can recall ah, we were to treat it ah, like we investigated it. And while we were there because we had asked her; is it ah, somebody that you might her know? Ah, is this a boyfriend or anything like that? All the indications were, it was not a domestic. Though my gut feeling was, at...at the scene, that it was a domestic. Just the way it was...I was getting the read off of her. Ah, so that's why it was written up, not a domestic.

JP:    Ok. So your impression from your conversation with Sergeant Houdek was the fact that you were going to rep...you were going to record this as it was reported to you by Christine Dempsey.

WG:    Yes.

JP:    You were going to include the facts that you had learned ah, during the course of your investigation, but you were directed to leave Maher's name off the report?

WG:    That is correct, Captain.

JP:    And it was in your impression that from Hou...from Sergeant Houdek's conversation to you that this matter was going to be handled by the Troop Administration or someone within the Division was going to look at this situation and

WG:    We assumed that it would go directly to you.

JP:    Did

WG:    I.A., meaning.

24

D001047

JP:    Did Sergeant Houdek make reference that I.A. was going to get involved in this?

WG:    No, I just made that assumption.

JP:    You just assumed it. Ok. Did he make mention the fact that the Troop Administration was going to look at it?

WG:    It's difficult to say because of learning everything as...I mean, it happened in October. Ah, all I know...I can't...I can't say, if C.I. wa...if...if we told that C.I. was going to be handling it. I know that they did involved; I learned that immediately, within days. And ah, we were told that the matter is done. We were told a few days later.

JP:    You were told personally?

WG:    Yeah.

JP:    Who were you told by?

WG:    Sergeant Houdek.

JP:    Ok, so he told you that the matter was

WG:    Is done.

JP:    Done.

WG:    We turned it in, he says you...we did what we were suppose to do; we investigated it, we turned in a report. Ah, I learned later that ah, C.I. did their thing. What they did I don't know. And that the matter has...it...it's done.

JP:    Ok.

WG:    It...it's not going any further.

JP:    Ok, did you ah....so, were you ever contacted by...by anybody in C.I. as to...any questions or anything regarding the (inaudible)?

D001048

WG:    No sir.

JP:    Are you familiar with the reporting procedures? I'm going to go ahead and change to the...to the next tape. It's ah, 21:16 hours.

JP:    Ok, back on tape it is 20:16 hours still. And ah, I want ah, pick up right I left off ah, asking you are you familiar with the reporting procedures for domestic reports? Or domestic incidents involving Divisional members? What you are supposed to do? What **you** are supposed to do as...as a Trooper on the street?

WG:    (sigh) You're suppose to write it up ah, write the information up and then you forward it to the chain of command. With the information on there.

JP:    So, it sounds to me like your guessing, correct? You're not familiar with the policy?

WG:    No, but it makes sense. That's...that's...that's what...that's what's suppose to happen.

JP:    If I were to read you policy and maybe I'll do that.

WG:    That's why I'm still a Corporal One.

JP:    Well, that's ok. There's nothing wrong with that. (pause) Ok. When a sworn division member is involved as a suspect or the victim in a domestic incident within the jurisdiction of the Delaware State Police, the on duty supervisor working in that patrol area shall respond to the scene. Ascertain the facts of that complaint, preserve the scene and notify the on call C.I.U. Administrator. The on call C.I.U. Administrator or his/her designee will notify the officers Troop Commander in the appropriate field in the officers...Field Operations Officer. The Field Operations Officer will make the determination initiating action by the Internal Affairs Unit. Criminal Sergeant or Lieutenant will be assigned to direct or conduct a criminal investigation. A Detective from the Domestic Violence Unit may assist the Criminal Sergeant or Lieutenant. The Internal Affairs Unit Commander will direct the administrative investigation. When sworn division members involved ah, I'm not going to get into outside the jurisdiction. So ah, that's...that's our policy, ok? As you can see there's a chain of command involved in that. Your...your...your basic action, what you need to do, is

26

D001049

you needed to notify your on duty supervisor. Did you notify your on duty supervisor that night?

WG:  He knew before we did.

JP:   Did you notify your on duty supervisor that night?

WG:  Yes sir.

JP:   In your opinion, did you do what you were supposed to do then?

WG:  Yes sir.

JP:   In the position that you hold as a Corporal Grade One, as you just said, did you feel that it was appropriate to question the direction that you were given by your Sergeant?

WG:  (sigh) Questioning, meaning, thinking that it was wrong?

JP;   Well if you thought it was wrong, did you feel that it would appropriate for you to question it? If you're told to do something, by your supervisor.

WG:  Not at…not at that moment, because we were all in…including Sergeant Houdek, we were all under the impression that it was going to be dealt properly.

JP:

WG:  I did…I did not question it…that it wasn't written correctly. That we're supposed to put the names on there as we know it. So we were not under the impression that we were doing any wrong in the sense that we were hiding information. We were advised of information we weren't supposed to be advised of. That…that's the bottom line on that. And when we were advised that why Corporal Csapo said; well, how do you want me to write this up? And I'm not…I'm not throwing any responsibility away on a…on a Corporal Csapo based on…for his questioning; of how we were to write this up. We just…we followed direction of…of our supervisor.

27.

D001050

JP:   Ok. Ok, I want to get back to the question then, do you…do you…in the position that you hold, do you feel that it's appropriate for you to question the direction that you're given by someone of a higher rank?

WG:   We all have that responsibility. All of us. Yes, I would have to say, yes.

JP:   But it was your impression…you didn't question it that night because it was your impression that this was going to be looked into. Is that correct?

WG:   That is correct.

JP:   Ok. And how did you…how did you get that impression?

WG:   Because the Captain knew about it; of who the real person is.

JP:   Uh huh.

WG:   And I trust my Captain.

JP:   Alright. Prior to us concluding this interview, and I am concluding this interview ah, is there anything else that you would like to add? On your behalf or anything else that we may not have covered? Is there any statement that you would like to make here at the end?

WG:   That when this incident occurred I felt that all three of us that were there, we did our jobs. We did our jobs properly. Well enough to know that something wasn't right. And we were given the proper information; our suspicions were correct. And that when we did our…we wrote our report, we were all in the impression and I…and I think I can speak for everybody in that room, that the proper thing was going to get done. And by no means were any of us thinking of covering up, cause we were all and we had mentioned this, something I hadn't stated yet, we're not going to hang for anybody. Regardless. And what we did never, never, ever, ever mentioned…entered our minds that we were covering up anything. That's all I have to say on that.

JP:   Ok. Alright ah, it is 21:24 hours and this will conclude the interview.

28

D001051

A000503

# INTERNAL AFFAIRS INVESTIGATION

Transcribed Interview

CASE NAME:                      DEMPSEY, CPL ELIZABETH C.

CASE #:                         12-04

PERSON INTERVIEWED:             Corporal Mark K. Csapo
                                Troop 3

DATE:                           May 3, 2004

LOCATION:                       Delaware State Police, Troop 3

INTERVIEWER:                    Captain James Paige
                                Internal Affairs Section
                                Delaware State Police

TRANSCRIBED BY:                 Elizabeth B. Seay
                                Office of the Superintendent
                                Delaware State Police

TRANSCRIPTION CODE:      C:     Corporal Mark K. Csapo
                         P:     Captain James Paige

D001052

This is Captain James, Delaware State Police, Internal Affairs Division. Today's date is May 3, 2004, and the current time is approximately 2016 hours. Conducting a tape-recorded interview, Delaware State Police Troop 3, in the small conference room on the first floor with Corporal Mark K – is it Chopo?

C:     Yes.

P:     Okay. Of Delaware State Police, Troop 3. Mark, before I start in questioning, I just want to let you know on tape we discussed earlier that you're being interviewed as a witness with regards to a criminal investigation that took place at 1715 B Frederica Road in Frederica, Delaware, back on October 26, 2003, at approximately 0142 hours. Would you please state your full name, rank, and IBM number for voice identification.

C:     Mark K. Csapo, rank Corporal, IBM 3295.

P:     Okay. Prior to, prior to me asking any questions, do you have any questions for me before we go forward?

C:     No, Sir.

P:     Okay. Do you recall the dispatch? Were you just on routine patrol when you got the complaint or were you, did you get a phone call, or how did you get dispatched?

C:     It was routine patrol.

P:     Okay. And you got a radio dispatch?

C:     Yes, Sir.

P:     And do you recall the specifics of that radio dispatch?

C:     Initially came in as a Burglary in Progress. The victim was, uh, advised on secure channel, was a member of the Delaware State Police. Uh, turned out she was a classmate of mine. Uh, I responded. I believe my location, Carpenter Bridge Road at 13, Harrington area. That's where I responded to the call from. I believe there were two other Troopers that were initially called. I responded in just because of my relationship with the victim. Uh, and also to provide support and upon arrival, I believe I was the second officer 10-2 location.

P:     Now, I, you just stated, I also noticed that in your report that Kentcom had you switch over to secure, secure channel. What was the reason for that?

C:     More or less to inform us who the victim was. They also advised that the victim was armed with a handgun. I guess to provide more information for us.

D001053

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 2 of 22

P:     What, was there anything specific said about the firearm?

C:     That it was a handgun.  I believe that was the only specifics that I picked up.

P:     Okay.  Was there any dispatch about the possible suspect or description, vehicle description, or anything of that nature?

C:     Not initially no.  Not that I picked up.

P:     Okay.  So, you arrived on scene and who was on scene already.

C:     It was Trooper Argoe.

P:     And, where was he when you arrived on scene?

C:     He was outside.  I believe he was either in the parking – I believe he was in the parking area, with the victim.  The parking lot on the exterior of the house.

P:     Okay.  I want to show you four pictures of the residence.  Uh, and I don't know if, you were there at night, but maybe you have driven that by that particular residence in the daytime.  Is this, would these be accurate representations of

C:     Yes.

P:      the residence in question?

C:     Yes.

P:     Okay.  So, when you speak of the parking lot, you're looking at photograph #1, uh, that area

C:     Yes. ...

P:     Okay.  And they were just down in – were they down by the bottom of the steps, or?

C:     I believe they were actually on the asphalt itself.

P:     Okay.  So, what did Argoe – was Argoe with Dempsey at that time?

C:     Yes.

P:     or was – okay.  And did Argoe come up to you separate?  Did he kind of separate himself from you and fill you in on the details or did you just talk as a group, or?

C:     We, we kind of talked as a group.  We kind of checked the exterior of the house, uh, for any, any suspects or anything.  And once we cleared the exterior of the house, I believe we actually walked around just to look for any kind of footprints or anything like that and once we cleared the exterior, uh, that's when we were informed of the situation.  We took

D001054

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 3 of 22

a walk upstairs. We actually saw the – we walked up these wooden steps. We saw the, the breakage to the exterior window, which I believe was one of these front windows.

P:    Do you recall which one it was?  Which window was broken of the four in front?

C:    I want to say it was either.  I believe it was actually this one, the first one.

P:    First one down.

C:    If it was not the first one, it was the second one,

P:    Okay.

C:    but, I believe it was the first one.

P:    Okay.  When you first arrived on the scene, and you, you stated that you were a classmate with Christine Dempsey.

C:    Yes.

P:    And how would you describe your relationship with her, at this point?

C:    Uh, I mean, we don't talk on a regular basis, just I guess the only bond we really have is that we were classmates.

P:    So, you don't see her any particular times or anything like that.

C:    No.  I mean, not since, she, she did work at Troop 3 for a while.

P:    Okay.  When you arrived, spoke with, uh, Argoe and, and Dempsey's there, what's, what's her demeanor like?

C:    Uh, she appeared a little upset.  Uh, at times, it actually appeared that she was slightly confused a little bit, nothing out of the ordinary.  I just kind of, kind of chalked that off to just the whole situation at hand, just from what she described was going on.

P:    What did she tell you what happened?  What?

C:    Uh, she said that she was in the bathroom.  She had just gotten home; she was at a hayride.  She said she had a couple, um, I'm not sure if she said beer.  I know she said she had a couple alcoholic beverages, at this hayride.  Uh, she got home; she went upstairs to I guess clean, or clean herself up and go to bed.  She said she was in the bathroom.  She heard knocking on the door.  She disregarded the knocking because she wasn't expecting anybody.  Uh, she, while either washing her face or brushing her teeth, she then went into the bedroom and, at that point, she said she thought she could hear footsteps or, either on the roof or coming or up the steps.  While she was in the bedroom,

D001055

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 4 of 22

she advised that she heard glass break.  She said that she picked up her weapon.  She went back into the liv, or like the living, living room or common area.  She cleared that.  She, she advised there was no one inside.  She said she heard tires squealing.  She really couldn't tell in what direction that they were squealing or, or headed towards.  And then, she, once she cleared the ext or the interior of the house, she said she informed Kentcom of the situation.

P:    Did she appear to be evasive at all?

C:    I wouldn't say evasive, no.

P:    Did she appear to be intoxicated?

C:    No.

P:    On a scale of one to ten, one not being intoxicated and ten being very intoxicated, where would you place her?

C:    Like a three.

P:    Now, when.  I'm just going over the statement, as written in your report.  One of the areas that, uh, I want to talk about is that, she was in the bathroom washing her face, you said, maybe brushing her teeth.

C:    (Positive sound)

P:    She disregarded the noise, the knocking on the door because she wasn't expecting anyone.

C:    Correct.

P:    Did you find it unusual that at 1:42 in the morning that you're getting a knock on the door and just of sort of disregarding it?  Did you ask her about that?

C:    I'm not sure if I exactly asked her about it, um, it did stick out in my mind.  I didn't really pry too much about that, but it did stick out in my mind.

P:    Then she said that she heard the footsteps, possibly up on the roof, maybe on the steps, uh, and then she heard glass breakage.  When she heard the glass breakage, she was in the bedroom?

C:    Yes.

P:    Did she have the bedroom door closed?

C:    I bel, I believe so.

D001056

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 5 of 22

P:    She did not come out when she heard the glass breakage?

C:    Not initially.  She said that she re, she obtained her weapon, which was inside her bedroom and then once the weapon was in hand, she checked the living room area.

P:    And she said, when did she tell you that she contacted 911 then?

C:    She said that she contacted 911 after she cleared the interior of the house.  Whether she called 9-1 prior to that, I can't really say.

P:    Well, I'm reading – according to your report, uh, she stated to you that she armed herself with her handgun and contacted 911, via public service.  She stated within seconds she heard a vehicle peal wheels from the front area of her residence, possibly traveling east bound towards 113.  Then she goes on to state that she checked the interior and determined that same was clear and then she re-contacted Kentcom and dis, and advised them, of that situation.  Does that

C:    Yes.

P:    make sense?

C:    Yes.

P:    Okay.  At any time while you were interviewing her that evening, did she tell you she knew who broke into her home?

C:    (Negative sound)

P:    What did she say about – did she have any suspects, or

C:    (Negative sound)

P:    any reason why anybody would be breaking into her home?

C:    No.

P:    Did you specifically ask her if she had any suspects?

C:    It, it's.  Yes, I did.  Even if I didn't include it in there, it's kind of a normal question I ask.

P:    And her response was?

C:    Unknown.

P:    Did she ever mention about a black male, anything about a black male?

C:    No.

D001057

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 6 of 22

P:  Now, an original statement, in reading even from your report, uh, she states that prior to arriving home she was out on a hayride.  And she arrived home alone and was alone at the time of the incident.  Is that correct?

C:  Correct.

P:  Okay. Did she specifically tell you that she was home alone

C:  Yes.

P:  when the time of the incident

C:  I, I believe so.  Uh, I'm not sure if she – if, if it's on the report, uh.  I can't recall if I exactly asked her.  Argoe.  I know Argoe was talking to her and I know Corporal Gygrynuk showed up as well.  She did not tell me that anyone else was in the house.  I'm not sure if that was a question that I asked her, personally.

P:  Okay.  I want to get – cause you confuse me a little bit here.  In your report you have written veh, I want to say vehicle 1, victim 1 stated she arrived home alone

C:  Okay.

P:  and was alone at the time of the above incident.

C:  Okay.

P:  Okay.  Is that?

C:  Yes.  I'm – if it's in the report, yes.

P:  Okay.  I just want to make sure because – kind – little bit deviating from that a little bit.  I want to make sure that that's correct.  Did she mention to you, at any time, that she had conversation with the suspect when the suspect was breaking into the house prior to him breaking in the house

C:  (Negative sound)

P:  or after the person was in the home?

C:  No.  The suspect, as far as it was known to me, was, it was unknown.  The suspect was unknown.

P:  Did you learn of any confrontation that may have taken place between Dempsey and the suspect?

C:  After I made contact with a third party that was in the house.

P:  Okay.  But that was – was that at the residence or later?

D001058

IA Case: Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 7 of 22

C:    It was at the residence.  Correct.

P:    You learned at the residence.

C:    I'm sorry.  It was later that I learned.  Yes.

P:    Okay.  And I'll, I'll follow up on that in a little bit.  Did she mention to you anything about the firearm, use of firearm during this incident?

C:    When you say use of a firearm, what do you mean?

P:    That she had to use her firearm?  Did she mention that to you?

C :    Discharge?

P:    No.  Just had it out.

C:    Yes, she said that she obtained her weapon, cleared the inside of the house.  I'm assuming that she had the weapon in hand.  Checked her, checked the inside of her house and then once it was cleared, she returned that weapon to either a safe or I guess a secret location.

P:    Now, also in the report it mentions that she called Kevin Keller, who was the male subject at the residence, at his sister's home and he responded to the scene?

C:    Yes.

P:    Did she say why she called him?

C:    She was upset.

P:    Did he – was his vehicle there?  Do you know if his personal vehicle was there or there was – he had transportation there?

C:    I believe he said he drove there.

P:    Do you recall any other cars being out in the park – in that parking area?

C:    Not off the top of my head, no.

P:    Okay.  Did she report anything missing from the residence?

C:    No.

P:    Other than the damage to the window, was there anything else damaged?

C:    No.

P:    Now, you mentioned initially that you, you conducted a, a, an exterior search of the residence.

C:    Yes.

D001059

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 8 of 22

P:    Uh, and I'm assuming that it was dark that night.  Is it well, is it well lighted or is it fairly dark around that area?

C:    I think there's kind of one light in the – either it's in the parking area.  It's on one of the houses.  I think,  I'm almost positive there was one light.

P:    Is there any photographs that, uh, appears that there's a light above on the eve of the house there,

C:    Okay.

P:    in picture 1.  Nothing in picture 3.  And picture 2 doesn't show anything.  It's pretty far away.  And neither does picture 4, so there's something that lights the, uh, the steps that lead up to her door and might illuminate enough that – to light the parking lot a little bit.

C:    Correct.

P:    Uh, so did you conduct this exterior search with your flashlight then?

C:    Flashlight, yes.

P:    ... Did you observe anything?

C:    Not on the exterior, no.

P:    Is there a, a separate apartment below

C:    Yes.

P:    where Dempsey lived?

C:    Yes.

P:    Was that person at home that evening?

C:    I don't think we made contact.  Either he wasn't home or – I'm not sure if he – I'm not sure if he was home.

P:    Okay.  Did you, uh, conduct a, uh, examination of the crime scene itself?

C:    Yes.

P:    And what, what did that reveal?

C:    Uh, the window leading from the roof, uh, there was glass inside the house as well as a little bit on the roof.  Uh, It was unable to proc, lift any kind of prints.  I believe the glass – the window was open.  There was a screen.  The screen was off.  Uh.

P:    Where was the screen?

C:    I, you know, I can't say for sure.

D001060

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 9 of 22

P:    Was it still, was it pushed up or was it removed completely, do you recall?

C:    I don't recall.

P:    As far as the glass breakage in the residence, did, uh, big pieces, little pieces?  Did there appear to be, the glass appear to be trampled on?

C:    I couldn't tell.  I, I think it was just a variation – there were large pieces and small pieces.

P:    Did it appear to you that entry was made into the residence?

C:    Based on the fact that the window was actually opened, pushed up, it's possible that entry could have been made, but it's unknown if, if it actually was, at that point.

P:    Okay.  What else did you do as part of your crime scene …?

C:    Uh, well, I checked the, like the front access door leading on the wooden steps.  I, I noticed a fresh print on the front of the glass of the storm door.  Uh, and I actually lifted that print.  And, uh, forwarded it to SBI.

P:    Okay.  When you forwarded that to SBI, when did you send that off?

C:    Prior to the end of my shift.

P:    And what's the normal procedure for that?f

C:    Interoffice mail.

P:    … so you put it in the, in the card

C:    like a little

P:    fill out the card?

C:    Correct.

P:    Put it in the interdepartmental mail, send it up.

C:    Just put SBI on it.

P:    Have you received any correspondence from SBI indicating that there was a match or no match or anything about the, uh

C:    No correspondence whatsoever.

P:    Have you called to check on that print to see if there was a hit?

C:    No.

P:    And you're sure you sent the print?

C:    Yes.

D001061

IA Case: Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 10 of 22

P:  to SBI?  Do you know if anybody held that print from going up to see, up to SBI?  Do you know if anybody removed that print from the mail to hold it from going up to SBI?

C:  (Inaudible sound) Unknown.

P:  Do you know that SBI has no record of that print?

C:  I was, I was informed that.

P:  Can you think of any explanation why they may not have that print?

C:  Uh, you mean, if I were to guess?  Possible suspect, uh, who the suspect, uh, or who the suspect might be or the agency that suspect might work for, whether it was personally done by somebody, by him or by someone else, it's, that's unknown.

P:  I noticed, from your report, that you also had an opportunity to have – prior to getting into that, is there anything else at the crime scene that you discovered that is pertinent to the investigation?

C:  Uh, I personally didn't, didn't discover, but there was that third party that was discovered by Corporal Gygrynuk.

P:  Okay.  We're working our way to that, so.

C:  Okay.

P:  I want to talk to you about, but, uh, it's obvious that you interviewed Kevin Keller, uh, that night at Dempsey's residence, and then, I guess, you talked to him as you took him to his sister's home.

C:  Yes.

P:  And, the initial interview with, with Kevin Keller that night.  Uh, did you have an opportunity to interview him by himself or was Dempsey there present when you interviewed him, or?  Tell me.

C:  Dempsey was present

P:  Okay.

C:  during my contact.

P:  Uh, and at that point then, what did Keller tell you?

C:  More-or-less that he was at his sister's house.  Uh, he responded over when he was, from a phone call that he received from Dempsey, about the situation.

D001062

A000514

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 11 of 22

P:    Didn't make any specific – did he, when, when he received the call, did he, did she tell
      him that somebody had broke into the residence or what was the story.

C:    I'm not sure if he, he really went into specifics.  I can't recall.

P:    According to report, uh, Keller stated he received a call from Dempsey, who advised him
      that an unknown suspect damaged the front window of the residence and possibly
      attempted to gain access.  Does that recollect your memory at all?

C:    Yes.

P:    Okay.  And he responded to the residence to support her.  Uh, they are apparently long-
      time friends and he was in Delaware to seek future employment.

C:    Do you know anything about the future employment?  Did he say?

P:    He, he said he was, uh, actually, he was, he's in a law enforcement.  I believe he's in a
      department in Texas.  I don't really recall the name.  Uh, he came up here to take – I
      think he tested for Dover Police Department and he was going to test for us, but there's
      something in his background that wouldn't allow him.

C:    Okay.

P:    Now, you mentioned too that they are long-time friends.  Did you ever inquire as to what
      that relationship meant, long-time friends?

C:    At the scene, no.  When I drove him home, he started to talk and he, the gist that I got,
      was that they were kind of getting back or they were kind of dating, semi-dating.  They've
      been talking and, uh, that was another reason why he wanted to come back here is for
      her.

P:    Did he, uh, did he allude to how serious their relationship was?

C:    No.

P:    Didn't ask him?

C:    No.

P:    He didn't mention the fact that, uh, there was any, uh, uh, sexual interlude going on that
      night

C:    No.

P:    when this incident took place that might have made it worse then it was already when the
      other subject got there?

D001063

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 12 of 22

C:    No.

P:    So, at some point, and I guess, if, if you would expound upon this.  At some, prior to you
      interviewing him, you had no idea he was in the residence?

C:    No.

P:    And Dempsey didn't make any reference to him being in the residence?

C:    No.

P:    How did – how was he discovered?  Did he come out and say, hi, or

C:    Uh, when I noticed the print, on the, on the exterior glass, I, uh, I talked to Corporal
      Gygrynuk about it.  He said, go grab your kit and lift the print.  When I came back, that's
      when I discovered, or that's when I saw the third party, Mr. Keller.  And, I was advised by
      Walt, or by Corporal Gygrynuk that he went into the bedroom and I believe he was just
      sitting there reading on the bed, just like nothing happened.  Kind of just real nonchalant,
      reading.

P:    So you, you finish your investigation at the scene, uh, and you decide to take him home?

C:    Yea.  He was, uh.  As I was processing the front door, Dempsey was sitting on the step
      or she was sitting in that area, and they were out  talking, and he said, he alluded, he
      said that he had been drinking at his sister's house, uh, and, if possible, he didn't really
      feel comfortable driving home, driving back home and he was either going to call for a
      ride or I'm not sure if he asked Dempsey to give him a ride, and I just offered to give him
      a ride.  It wasn't that far.

P:    And I asked you the scale of intoxication from one to ten with Dempsey.  What about
      Keller?

C:    Uh, I'm going to say maybe like a four or five.

P:    So, he's not.

C:    I didn't sss, I didn't see slurred speech, or I didn't, uh, I could, it really, I know that there
      wasn't slurred.  There was no slurred speech.  His movements were steady.  He wasn't
      losing his balance or anything like that.  Uh, he was talking in full sentences.  Uh.

P:    Was he upset when you initially contacted him?

C:    No.

P:    Not crying or –

D001064

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 13 of 22

C:   No.  Not that I can recall.  I don't believe so, no.

P:   ... appeared to be sh, shaking or anything like that?

C:   No.

P:   You said, I think you said earlier, he was kind of nonchalant about the whole thing?

C:   (Positive sound)

P:   When you first interviewed him, anything he say make you, uh, think that maybe he wasn't being truthful to you, at that point?

C:   Initially, no.

P:   Okay.  So, you, you take, uh, Keller home and at – I don't know how far it is from his residence, or her residence to his, where he was staying, but, uh – back up a little bit.  Uh, did you get the indication that he was – at that point, you didn't have, you didn't get any indication you didn't – did you notice that he had any belongings there or suitcase or anything like that?

C:   During my whole time there, I did not enter the bedroom.

P:   Okay.  Right.  So, you were driving home.  Tell me what goes down in the car then.

C:   He, I believe we were just talking about the hiring process.  He was taking a test for Dover.  He couldn't test with us based on something in his background.  And, I think, when were almost there,  when we were in the driveway of his sister' s house, he said that he had information.  He'd like to talk to me off the record.  And, I said, okay.  He said, no, can we talk outside?  I exited my vehicle and we talked.  I stood on the passenger side of my vehicle; he stood outside.  And then he began to tell me what really happened, according to him, at the, at Dempsey's house.

P:   Okay.  And do you recall.  If, if  you need to look at your, your report, go ahead, but do you recall what he told you?

C:   He, he, he was – they, they had been out.  Uh, either they went out to dinner prior to that night.  He didn't say anything about a hayride, I don't believe.  Uh, I could have sworn about maybe possibly being at Friday's or but he was out with Dempsey.  They had a couple drinks.  They came back to his house.  While they were at the house, somebody was on the outside, banging on a door.  Uh, he was not granted access by Dempsey.  He respon, this suspect, or the subject responded to the front window of the house via the

D001065

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 14 of 22

roof, kicked open, entered the house, and at, he apparently, I believe, at that point, Dempsey called 911 and he made a reference to Keller, that, uh, you're lucky she's here or something like that.  No, no real verbal threat was made to him.  Not that I can recall, but after she was on the phone with 91 he exited.  I, I'm not sure if he said he exited back out the window or through the front door and then departed.  He said he didn't know the person's name.  He described the person as a while male.  Uh, he gave me a description of the vehicle, I believe it was ... a silver or white in color pickup truck.  He resembled Charlie Sheen, according to Kelher or Keller and he worked at one of the southern troops, with us, with Delaware State Police.

P:    Okay.  So, he makes reference – he sees

C:    Yes.

P:    the suspect come into the residence, through the window?

C:    Yes.

P:    He's out in the living room when this happens?

C:    I belileve so, yes.

P:    And then there's a confrontation?

C:    Correct.

P:    And, does it get physical?  Is ... physical?

C:    No.

P:    There's a few verbal exchanges?

C:    Yes.

P:    Uh, and during these verbal exchanges, uh, is there any specific threats made to, to Keller or Dempsey, from the suspect?

C:    Not that I can recall.  I don't believe so, no.  If there were, I – they would have been inside the, uh, statement.

P:    And it was at this point when he, when he made it inside and those words were exchanged that Dempsey then called 911?

C:    Yes.

P:    In the comment that you have in your report is:  Witness 1 stated at said point unknown suspect advised him that Dempsey just saved ass.  And he exited the residence, so he

D001066

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 15 of 22

said something about he saved ass or she, she saved your ass, or do you recall what it was or?

C:      It was something alone those lines, either saved, saved your ass or I probably, it's probably a typo-o right there.  I probably … .

P:      Okay.  When he made the second statement to you, did he tell you why he changed his statement?

C:      I, he, he said it was – he's kind of – he said something about he's, uh, he was, he's looking out for, for Dempsey.  Uh, that's, that's more-or-less why he said it.  He said, I'm, I, I want her.  You know, I'm just looking out for her.  You know, I don't want her to get hurt or anything like that.  That's why I'm making this statement.

P:      Do you have any reason to discredit his second statement?

C:      No.

P:      What do you find more believable, his first statement or his second statement?

C:      I find the second statement more believable just based on the fact of the situation itself at the house.  Uh, the demeanor of Dempsey, uh.  Before, you asked if she was evasive.  I don't believe she was evasive.  I believe that there were certain things that she was leaving out.   Certain things that didn't add up and upon consulting with Corporal Gygrynuk and Trooper Argoe, at the scene, we, we pretty much all concurred that there was something missing.

P:      Did you approach her about that?

C:      No.

P:      Any particular reason why not?

C:      I didn't feel it was my place to, to do that.  I, I already clear, cleared the scene.  Uh, once I spoke with Keller, I immediately responded back here and consulted with, uh, my supervisor.

P:      From the second statement that he made, Keller made to you, were you able to determine that the relationship was more than just a friendship?

C:      Yes.

P:      Did he allude to that?  And what, how, what?

D001067

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 16 of 22

C:   Based on the fact that they were out having drinks, uh, that he wanted to relocate back here because of her.

P:   He said that?

C:   Yes.

P:   Specifically said he wanted to come back to the area because of her?

C:   It was one of the reasons.  It wasn't the main reasons but it was one of the reasons.

P:   One of the reasons.  Okay.

C:   I just put two and two together.

P:   At that point, did he mention to you that he actually knew who the officer was?

C:   He didn't specifically know.  Uh, he tried the name Bobby.  He might, the person's first name might be Bobby, but he didn't know.  Uh, but he did describe the vehicle, uh, who the person resembled and I believe his rank.  He said something about a Corporal or a high Corporal or something.

P:   Did Dempsey or Keller ever mention to you that the suspect had threatened to kick their ass or kill, kill either one of them?

C:   No.

P:   So, Keller was aware that this suspect was a Trooper, correct?

C:   Yes.

P:   And he learned that from Dempsey?

C:   I'm not sure where he learned it from.  He didn't, he didn't kind of elab; he didn't elaborate on that.

P:   And you've already stated that you did not recontact Dempsey upon learning this information?

C:   No.

P:   And you went immediately to the troop and contacted your supervisor?

C:   Yes.

P:   Which was, at that time, that night, who was

C:   Sergeant Houdak.

P:   Okay.  And then you wrote the report up as a burglary.  I believe as  an attempted burlary.  Correct?

D001068

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo   05/03/2040
Tape 1 and 2 of 2
Page 17 of 22

C:    Yes.

P:    And a criminal mischief.

C:    Yes.

P:    And what was your reasoning for writing that up as an attempted burglary?

C:    Uh, based on the victim's statement.

P:    Even with the information that you had in hand though?  Nothing swayed you to change that?

C:    No.  It, it was agreed upon by, by myself as well as well as my Sergeant that that's how we would write it up, just how it is.  How it appeared by the victim.

P     Okay.  So, you came back to the troop and you spoke with Sergeant Houdak, and you told him everything that you learned.  Everything that you told me already, you've told to Sergeant Houdak, correct?

C:    Yes.  Correct.

P:    And what did he tell you to do?

C:    He just said to write it up based on the victim's statement but include Keller's statement as a witness statement.

P:    Did Sergeant Houdak mention to you that he'd been contacted by anybody else regarding this incident?

C:    Uh, I believe.  I think Walt was, Corporal Gygrynuk made it back prior to me arriving back.  Whether he was, uh, kind of made aware by, by him, I'm almost positive he was.  Uh, that's pretty much it.  That's all I know.

P:    Did, uh, Sergeant Houdak receive a phone call from anybody else, anybody from within the Division, that might have been a higher rank, directing him on what he should do with the complaint?

C:    I don't, I'm, I can't recall.  I don't believe so.

P:    Did at anytime during the course of your investigation did you learn that the suspect was Corporal Brian Maher, from Troop 7?

C:    I learned it was him, uh, after my report was written.  I can't exactly recall who it was.  Uh, I might just have to say through the rumor mill.

P:    Can you give me a time frame of that?

D001069

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 18 of 22

C:    Uh, it was within -- it was either within the next day or the next couple days.

P:    Did you pass this information on to anybody?

C:    No, Sir.

P:    You heard it through the rumor mill?

C:    Yes, Sir.

P:    Do you recall who you spoke with on that?

C:    No, Sir.

P:    What did you specifically hear through the rumor mill regarding his actions that night?

C:    Uh, I bas, basically that he was a suspect.  That's all I heard.  That, that's all I really remember.  That's all I really kind of put to kind of associated with the, with the complaint, with the incident.

P:    Okay.  When you finished your report and turned it in that night, turned it into your Sergeant, he approved the report.  Did you personally take this report down to anyone of the detectives downstairs for follow-up.

C:    No, Sir.

P:    Do you know if your Sergeant contacted anybody, within the troop, for follow-up?

C:    I'm not sure.

P:    Sergeant Mullet ever contact you regarding this incident?

C:    No, Sir.

P:    Lieutenant Donaway?

C:    No, Sir.

P:    Lieutenant Huttie?

C:    No, Sir.

P:    Under normal circumstances, if you had went to a complaint, and learned what you learned, is there anything different that you would have done?  Barring that it wasn't on a Trooper involved?

C:    Uh, I probably would have handled it either two ways because of the, because it was a burglary.  All burglaries go down to CI.  Our CI detective handles that.  I'd have either written it up the same way and, uh, contacted somebody personally, just let them in on

D001070

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 19 of 22

the information or if I had time, uh, or if time allowed it and permitted it, I would have went back to the victim and confronted the victim with the information.

P:    At the time that you wrote this report, you knew that there was a suspect in this complaint, correct?

C:    Correct.

P:    And at the same time, you knew that that suspect was another Trooper.

C:    Correct.

P:    Through that, through your investigation up to that point, were you able to determine what the relationship was between Dempsey and the unknown Trooper?

C:    I assumed that it was some type of intimate relationship,

P:    Is there any reason why you would not have documented that on a domestic incident report then?

C:    I believe – like I said, the conversation I had with my supervisor, uh, I explained to him the situation.  And he told me to write it up how Dempsey advised me and then it was going to be forwarded downstairs.

P:    Okay.  So, he told you to write it on a regular crime report

C:    Yes.

P:    or?

C:    Yes.  Based, I believe cause we both, we both agreed at the time it was an unknown suspect, uh, even though we, the witness said that it was a male, he worked for us.  The relationship basically, at that time, was undetermined.

P:    But you included all that into your narrative portion of the report?

C:    Yes.

P:    Including the nickname of, or the possible name of Bobby?

C:    Correct.

P:    Was there any conversation between yourself and Sergeant Houdak regarding the potential problems it would be if it was a Trooper involved?

C:    I'm not sure if we had that conversation.  I just think I – it's kind of common sense.

P:    But you didn't discuss that and come to the conclusion that well, maybe we'd better not put his name on there because he is a Trooper?

D001071

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 20 of 22

C:     No, Sir.

P:     That didn't come up?

C:     No, Sir.

P:     Do you, do you know, in fact, that this investigation was ever followed up by anyone within the troop?  In CI?

C:     Yes.  I'm not sure of the outcome.  I know that Sergeant Mullett was handling it.

P:     But he made no contact with regarding the events that night?

C:     No physical, or no face-to-face contact.  And there's no e-mail contact.

P:     You didn't have to submit a memo or anything to him?

C:     No, Sir.

P:     I'm going to ahead and switch tapes.  It's approximately 9 o'clock.  We're almost finished with this interview, but we're going to run out of tape here, so we're going to go ahead and change tapes.


END OF TAPE 1 OF 2


TAPE 2 OF 2


P:     Okay.  We're back on tape.  It is approximately, uh, 2102 hours, 2101 hours.  Uh, I guess just the one thing I want to clarify, Mark, regarding this, this, because I'm, I'm still just a little bit foggy as to, and I know, I know it's a difficult situation.  Your thrown into this situation.  You're you're a classmate of of, of Dempsey, you go to the scene, there's obviously, there's some, there's been, uh, there's been a burglary or somebody's broken into her residence, whether it's a burglary or criminal trespass, or – some, something's occurred.  There's glass broken.  She's upset; she's evasive.  Uh, Keller makes a statement to you and then recants that and makes a statement tells you something that makes more sense as to what occurred in the residence and from that you learn that basically someone did break in the house.  It's unclear whether there's any threats, per se, but somebody definitely did get into the residence.  Uh, you learn through that investigation that it is a Trooper, again, which makes it a little bit even more difficult, uh,

D001072

IA Case: Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 21 of 22

but none-the-less, uh, you now developed a suspect or potential suspect. It's just a matter of running down who it is and, and, recontacting Dempsey to find out, get the truth from her. And I guess, at that point, I'm, I'm, I'm concerned about two things, either one that you didn't go back and make contact with her, or two there wasn't a call made to CI, uh, detective that night to go out and find out what, what occurred. And, I guess, what I'm looking for is the thought process behind that. If, if it was a decision that your Sergeant made, which you're telling me that he basically instructed you to, to write it up as reported by Dempsey, including all the facts that you learn, but just not filling out the date sheet of the report in probably the most correct way. Would that be a fair

C:    Yes.

P:    assessment of that?

C:    Well, yes, it was directed by me, by my Sergeant. He was aware of the situation. Nothing was left out. I explained to him the situation just as I – it's explained in the report. Uh, he advised me to write it up the way it is, because technically I believe we, even though we had a suspect, we had no pos, we had no real name on a suspect. He just said to kind of write it up how it as, and include the witness statement inside and that it was going to be TOT'd down to CI.

P:    Okay. Do you know if he made any contacts to any of the administration here at the Troop that night?

C:    I can't recall. No. I do not know.

P:    Okay. Are you aware of our policy regarding, uh, domestic violence?

C:    Yes.

P:    And domestic violence involving Troopers?

C:    Yes.

P:    And what does that policy state?

C:    Uh, I'm going to say suspension. I, I don't know exactly.

P:    No, I'm not asking what the outcome would be if, if it happened. Well, what, do you know what you need to do, ah, if you're dispatched to a, to a possible domestic, with a Trooper involved? Do you know what you need to do as far as your responsibilities are?

C:    When you say, a Trooper, just –

IA Case:  Corporal Elizabeth Dempsey
Interview of Corporal Mark Csapo  05/03/2040
Tape 1 and 2 of 2
Page 22 of 22

P:      When you, when you are dispatched to an incident like this, what is your duty?  What do
        you have to do once you determine that, ah, we've got a domestic.  There's a Trooper,
        two Troopers.  In this case, two Troopers involved.  What do you need to do?

C:      Contact my supervisor.

P:      And did you do that?

C:      Yes.

P:      Okay.  And you were instructed.  You were given instruction from your supervisor as to
        what to do?

C:      Yes.

P:      Did you challenge those instructions?

C:      No, Sir.

P:      Is there any particular reason why you did not?

C:      I, I don't feel I have any reason to challenge it.

P:      Prior to us concluding this interview, is there anything else that you would like to add.  Is
        there anything that we haven't covered that you feel is important to this investigation that
        I'm conducting, as to the events of that night?

C:      No, Sir.

P:      At this point, I'm going to go ahead and conclude the interview.  It's, uh, 2106 hours and
        we're going to conclude the interview.

D001074

1

                    DELAWARE STATE POLICE

2    In Re:  Disciplinary Hearing for Christine Dempsey
                    - - - - -

3

                         January 13, 2005

4                        9:12 a.m.

5                        Delaware State Police Headquarters
                         Dover, Delaware

6

     BEFORE:

7

       MAJOR JOSEPH PAPILI, HEARING OFFICER

8      CAPTAIN ALBERT HOMIAK
       CORPORAL LARRY WELCH

9

     PRESENT:

10

     INTERNAL AFFAIRS:

11

       CAPTAIN JAMES PAIGE

12

       MICHAEL W. TUPMAN, ESQ.

13     Department of Justice
          102 West Water Street

14        Dover, Delaware  19904-6750
          for the Board

15

       RALPH K. DURSTEIN, III, ESQ.

16     DEPARTMENT OF JUSTICE
          Caravel State Office Building

17        820 North French Street
          Wilmington, Delaware  19801

18        Prosecuting Attorney for Internal Affairs

19     ROBERT C. McDONALD, ESQ.
       SILVERMAN, McDONALD & FRIEDMAN

20        1010 North Bancroft Parkway, Suite 22
          Wilmington, Delaware  19805

21        for Christine Dempsey

22

23                        WILCOX & FETZER

     1330 King Street - Wilmington, Delaware 19801

24                        (302) 655-0477



W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

A000527

2

```
 1    APPEARANCES (Continued):

 2      JOHN J. MALIK, ESQ.

 3

 4            HEARING OFFICER:  Today's date is January

 5    13th, 2005.  It's currently 9:12 hours in the morning.

 6    We are going to resume the second day of the Trial

 7    Board that was originally started December the 1st,

 8    2004, State versus Christine Dempsey, Corporal

 9    Dempsey.

10            I think the last time we left off, you

11    were --

12            MR. McDONALD:  It's for me to call my

13    witness, which would be Corporal Dempsey.

14            MR. TUPMAN:  Before we start,

15    Mr. McDonald, could we discuss the issue of the

16    transcripts for the record?

17            MR. McDONALD:  Sure.  Actually, if you

18    don't mind, we will discuss two things.  You asked for

19    a letter from the doctor for return to duty.  It's in

20    the Troop documents, but I want to make sure the Board

21    record is complete on it.  I think it's on his

22    letterhead and it is typed so we can all read it.

23            MR. TUPMAN:  Yes.

24            MR. McDONALD:  When we left, Mr. Tupman
```



1    was asking you about the records.  I had asked for

2    production in this case, and I don't think there is

3    any dispute in the time effect for the Policemen's

4    Bill of Rights, and as you know, at the time I spoke

5    with Captain Paige, there were a number of statements

6    that I believed were taken in connection with this

7    investigation that were not produced.  And that

8    brought up the dispute:  Did I believe all statements

9    that were taken have to be produced?  My answer is all

10   of them that are relevant have to be produced and I

11   will offer a couple discussions to you based on the

12   evidence you have heard so far.

13          We know that Sergeant Houdek had some

14   conversation with three troopers that were on the

15   scene that night in October.  We know that Captain

16   Hawkins had a conversation regarding Corporal Maher's

17   presence that night at Corporal Dempsey's home.  We

18   know that Major Hughes was aware of the -- Captain

19   Hughes.  Now, there are some other issues that you

20   have not heard here today and really aren't relevant

21   to the case in point, but those pertinent parts of the

22   conversation, I believe, are relevant to us and should

23   have been produced.

24          I don't see it as any different than in a



4

1    civil matter where if I have asked for production, it

2    exists, you ask for a protective order, or Brady

3    material, there should be some kind of a -- you get it

4    all the time, reports, statements, police reports,

5    they are all redacted. None of that was offered.

6    And, frankly, we weren't sure they existed until the

7    day of the hearing.

8            For that reason, I believe that we have

9    been prejudiced. I can't tell you to what extent.

10           Following that discussion on December 1st,

11   we were to receive from Mr. Durstein, the prosecutor

12   in this particular incident, a copy of or an

13   identification of the transcripts and records that

14   were reviewed or available. And, frankly, I had not

15   received it. And I don't dispute that Dirk sent it to

16   me because he has an e-mail, but there is some

17   question whether or not it was sent, but it was never

18   received.

19           So, consequently, there had been no

20   discussion between Mr. Durstein and myself regarding

21   this thing that's dated December 10th, 2004. So, if

22   it was gone to Wilmington, it should have made it to

23   me by January 13th. It just didn't go.

24           But I will speak to that not anymore

**W&F**

5

1    specifically but in the general terms when I close to

2    the Board.   That's -- I believe that those are records

3    that would be exculpatory or some of those statements

4    may be exculpatory to the conduct which is alleged to

5    be wrong by Corporal Dempsey.   We will go from there.

6              MR. TUPMAN:   Mr. Durstein.

7              MR. DURSTEIN:   What I think I'd like to do

8    is I have taken a draft letter that we were able to

9    obtain this morning that I had intended to send to

10   Mr. McDonald, and I can't say that it was sent either,

11   so what I have done is scratched out the date that was

12   on there, December 10th, and put in today's date, but

13   I would like to hand it forward to make it a part of

14   the record for the Board because it does reflect what

15   we have attempted to do is set out the ten different

16   tape-recordings of interviews that were provided, 11

17   -- listed 11 documents -- actually, it ends up being

18   more documents than that.

19              I have listed that an additional seven

20   transcripts of interviews that were presented --

21   provided, and then I have listed a series of 15

22   individuals who were interviewed pursuant to a

23   different investigation, which I think is what

24   Mr. McDonald is alluding to, and they have not been



6

1    provided on the grounds they don't relate to this

2    investigation, they are not exculpatory and would not

3    be discoverable, and I indicate why we believe that

4    they would not be discoverable.

5           So, for purposes of the record, it does at

6    least reflect what was provided in two different

7    instances and what has not been provided and why.  And

8    I would just hand that forward and ask that be part of

9    the record.

10          HEARING OFFICER:  There is no objection to

11   this?  It's the same document you have?

12          MR. McDONALD:  It's the same document that

13   was delivered to me and I have no reason to doubt

14   Mr. Durstein's representation to the Board that that's

15   what is available and what was produced was and what

16   wasn't, wasn't.

17          MR. TUPMAN:  Take it under advisement.

18          HEARING OFFICER:  Yes, we will.  Any other

19   preliminary --

20          MR. McDONALD:  I think that takes care of

21   the preliminary matters.  I call Corporal Dempsey.

22          CORPORAL CHRISTINE DEMPSEY,

23          the witness herein, having first been

24          duly sworn on oath, was examined and

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A000532**

7

```
 1          testified as follows:
 2     BY MR. McDONALD:
 3        Q.    Thank you.
 4               Corporal Dempsey, what is your rank today
 5     and what was your rank on October 26th, 2003?
 6        A.    Corporal for both.
 7        Q.    And where were you assigned, duty wise, in
 8     October of 2003?
 9        A.    Troop 5.
10        Q.    And you were here on December 1st during that
11     whole period of testimony regarding an event that
12     occurred at your house on October 2003?
13        A.    Yes.
14        Q.    And during that period of time, that is, when
15     this potential altercation takes place at your house,
16     are you on duty or off duty?
17        A.    Off duty.
18        Q.    When did you come off duty with the State
19     Police, if you know?
20        A.    I had been on vacation for at least a week.
21        Q.    And that night of this event, had you been
22     drinking?
23        A.    Yes, sir.
24        Q.    When you were drinking, did you have your
```



8

1    firearm with you?

2    A.    No.

3    Q.    Did you have your I.D. with you, police I.D.

4    with you?

5    A.    I believe it was in my purse.  I normally carry

6    some of my credit cards in there, so I do normally

7    keep that in my purse.

8    Q.    During that evening, either before, during, or

9    after this event at your house, did you exercise any

10    of your official duties; that is, did you act in the

11    capacity of a State Police Officer?

12    A.    No.

13    Q.    Did you ever identify yourself as a State

14    Police officer for the benefit of effecting an arrest

15    or anything along that line?

16    A.    No.

17    Q.    Did you ever discuss the events of October 26th

18    with any superior officer?

19    A.    Yes.

20    Q.    And who was the very first superior officer you

21    spoke with?

22    A.    Captain Hawkins.

23    Q.    And when did you speak with Captain Hawkins?

24    A.    Monday, the 27th.



9

1     Q.   Just so the Board remembers, this is either

2   very late Saturday night, very early Sunday morning?

3     A.   Correct.

4     Q.   And then Monday morning, the captain calls you?

5     A.   Sometime Monday.  I don't believe it was first

6   thing in the morning, but yes, sometime on Monday, the

7   27th.

8     Q.   And did he call you or did you call him?

9     A.   He contacted me.

10     Q.   At your house?

11     A.   I am not sure if it was on my house phone or on

12   my cell phone, but I was at my residence, yes.

13     Q.   By telephone?

14     A.   By telephone.

15     Q.   And what do you recall the conversation with

16   the captain being?

17     A.   Just verified that I was all right.  Briefly

18   discussed the incident.  He just wanted to make sure

19   that I was all right; that I was comfortable with the

20   outcome; that I didn't need any further assistance

21   and --

22     Q.   And did you -- I am sorry.

23     A.   Go ahead.

24     Q.   Did you suggest to him that you wanted somebody



1    prosecuted?  That you needed assistance?  You wanted

2    to talk to anyone from Victim Services or anyone like

3    that?

4        A.    No.

5        Q.    What did you tell the captain?

6        A.    I told him that I was fine, that it was a

7    personal matter, that Brian and I would handle it from

8    there.

9        Q.    "Brian" being Corporal Maher?

10       A.    Sorry, yes, Corporal Maher.

11       Q.    Now, when the captain called you, was Brian

12   there at the residence for that conversation?

13       A.    For that conversation on Monday, no.

14       Q.    Did you receive a call from the Troop on Sunday

15   when Brian was in the window, that you talk about in

16   your statement?

17       A.    No.  Captain Hawkins contacted Brian by cell

18   phone, Corporal Maher by cell phone while he was at my

19   residence boarding up the window area.

20       Q.    Did you hear that conversation or could you

21   just hear Brian's responses?

22       A.    Pretty much, I could just hear Brian's side of

23   the conversation.  I mean, I could hear Captain

24   Hawkins speaking, but --

11

1    Q.    On Monday when you talked to the captain, does

2    the captain suggest to you that anything is going to

3    be done in terms of a criminal investigation or an

4    administrative investigation?

5    A.    No.

6    Q.    Does he tell you that perhaps a sergeant from

7    the C.I. will be speaking you with regarding this

8    matter?

9    A.    Not that I recall.

10   Q.    Could have said that, you just don't recall it

11   now?

12   A.    Correct.

13   Q.    Did you ever speak with anybody during 2003

14   from the division other than Captain Hawkins regarding

15   this matter?

16   A.    No.

17   Q.    Did you ever speak with anyone from the

18   division in 2003 regarding this event from the

19   criminal section?

20   A.    No.

21   Q.    Did you ever speak with anybody in authority,

22   the Attorney General's Office, about this matter in

23   2003?

24   A.    No.



12

1    Q.    Did you ever receive a subsequent call from

2    anybody in the division regarding whether or not an

3    investigation was being conducted and had been

4    conducted in 2003?

5    A.    No.

6    Q.    Did you ever receive any communication from

7    Captain Hawkins that whatever the dispute was between

8    you and Brian, it was over with and this matter

9    closed?

10    A.    The only conversation with Captain Hawkins was

11    that Monday.

12    Q.    And that was it?

13    A.    Yes.

14    Q.    Now, as I understand the record that's been

15    developed so far, after October 26th or 27th,

16    depending on what day we are in, 2003, the next

17    knowledge you have that there is an investigation,

18    either criminal or administrative, is when?

19    A.    Corporal Maher and I were actually on vacation

20    together in San Diego and he received a call from

21    Captain Nolte advising him that there would be a

22    criminal and Internal Affairs investigation.

23            CAPTAIN HOMIAK:    Who that was from?    I am

24    sorry.



13

1          MR. McDONALD:   Captain Nolte, Troop 7.

2    BY MR. McDONALD:

3        Q.    Do you remember what time period that would be?

4        A.    That was the last couple days of March of '04.

5        Q.    And, in fact, Corporal Maher was arrested on

6    Memorial weekend, correct, 2004?

7        A.    Correct.   I believe -- I want to say May 28th.

8        Q.    Were you interviewed regarding that arrest,

9    whether or not you wanted prosecution?

10       A.    Prior to his arrest?

11       Q.    Yes.

12       A.    No.

13       Q.    Did anybody ever ask you if you wanted Corporal

14   Maher prosecuted?

15       A.    The Victim Service lady from the A.G.'s Office

16   in Kent County contacted me by telephone, and she was

17   unaware of the specifics, the intricacies of the

18   complaint.

19       Q.    Did you ever, at any point, say you wanted to

20   prosecute, that you felt somebody should be

21   prosecuted?

22       A.    No.   No.

23       Q.    So they prosecuted without your approval, so to

24   speak?

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters
A000539

14

1    A.    Correct.

2    Q.    Now, at some point, probably by the record I

3    look at here, April of 2004, is when Internal Affairs

4    is coming into contact with you?

5    A.    I believe that's correct.

6    Q.    Six months after this event?

7    A.    Correct.

8    Q.    Do you know how I.A. special stance became

9    aware of this event?

10    A.    I was made aware when I returned from vacation

11    by Captain Dickenson, Troop 5, and through some other

12    areas, that a couple different things came into play.

13    There was a Troop -- Troop 5 Troop party and rumors

14    were circulating.  Captain Dickenson -- excuse me.

15    Rodney Workman and the lieutenants at Troop 5 got wind

16    of the incident that had occurred in October, and also

17    Captain Dickenson spoke with his neighbor while he was

18    doing yard work and that neighbor happens to be a

19    friend of Kevin Keller's family.

20          Those two forces coming together,

21    lieutenants going to the captain, the captain speaking

22    with his neighbor, he was, as I was told, insulted

23    that he had not been contacted in October and he

24    wanted something done about it.

15

1     Q.   So, that's your understanding of how it gets to

2   headquarters and ultimately to Internal Affairs?

3     A.   Yes.

4     Q.   Now, let's go to the night of October 26th or

5   the early morning hours of the 27th, whichever is

6   easier for you, and I'd like just --

7     A.   It would be the 25th or 26th.

8     Q.   Let's pick it up in the house.  If you will

9   allow me, I will lead you a little bit.  You had been

10   out earlier with Keller, I forget what his name was

11   today, you had been out with Keller, with some social

12   friends from home.  Mr. Keller is at the house with

13   you and you are only there a short period of time?

14     A.   Correct.

15     Q.   Comes the knock on the door?

16     A.   I was in the bathroom, correct.

17     Q.   Now, before that knock on your door, had you

18   received any communication from Brian by telephone?

19     A.   I had spoken with him when we were still at TGI

20   Friday's, yes.

21     Q.   What was the nature of that conversation?

22     A.   I told him I was not coming to see him that

23   night.

24     Q.   And, so, it was real clear that he was unwanted



16

1   at your place that night?

2       A.    Oh, it was definitely cut and dry, black and

3   white, that we were not seeing each other that night.

4       Q.    He was aware that you were out with Mr. Keller?

5       A.    Yes.

6       Q.    He was aware when you were picking him up at

7   the hospital earlier that day?

8       A.    Yes.

9       Q.    You tell us you had been drinking?

10      A.    Yes.

11      Q.    I think we have asked everybody else to

12  testify, at least we asked the troopers that were on

13  the scene that night, zero to ten, ten you are

14  crawling out of your skin, zero, you are not drinking

15  at all, give a number to yourself?

16      A.    A good six.

17      Q.    Solid six.

18            Based on that, what do you remember

19  happening that night?

20      A.    Like we have already said, we had come home, we

21  had only been home a few minutes.  I had gone into the

22  bathroom to use the rest room, started washing my

23  face, brushing my teeth, preparing for bed.  It had

24  been a long day, a long night.  It was time for bed.

17

1    I came out of the bathroom.  Kevin was -- as you can

2    see, the apartment is very small, Kevin was standing

3    kind of in the living room around the bedroom door

4    area, and he said something about somebody was outside

5    or something along those lines.  And I just kind of

6    brushed it off.  I didn't -- I didn't think he was

7    correct.  It was late.

8         I believe I proceeded into the bedroom,

9    again, preparing for bed, started hearing more noise,

10   more noise outside.  Start putting two and two

11   together and come to the realization that not only is

12   somebody outside but it sounds like it could be Brian,

13   Corporal Maher.

14   Q.   And this what you hear outside is what?  And,

15   Chris, let me excuse the question.  I don't know

16   whether you have given us a collage of what you have

17   put together or are you telling us specifically of

18   what you recall at that particular moment in time?

19   A.   It's very hard to recall everything

20   step-by-step.  One, it was a long time ago.  Two, I

21   was intoxicated.  I have spoken with several people

22   regarding this.  Brian -- Corporal Maher and I have

23   discussed it, so I am giving you an overview of --

24   yes.



18

1    Q.    To the extent that you can, for the Board, try

2    to be as specific to that particular event at that

3    particular time, and if you can't be, just say you

4    don't know so we know what you are talking about.    So

5    you can hear Brian.    You know it's Brian.    Can you

6    hear what he is saying?

7    A.    No.

8    Q.    Is it more than normal conversation or is he

9    hollering?

10    A.    He is -- he is loud, yes.

11    Q.    And I don't know the answer, so I probably

12    shouldn't ask it, but I will anyway:    You know it's

13    Brian, you know he is not a burglar, he is not a

14    stranger.    Why don't you go to the door and say, Go

15    away?

16        MR. TUPMAN:    I think a little latitude in

17    terms of leading questions is fine, but I think you

18    are really -- she is not even testifying at this

19    point.

20        MR. McDONALD:    I am sorry.

21    BY MR. McDONALD:

22    Q.    My question is, you know there is somebody

23    outside the door.    You know it's Brian.

24        Do you go to the door?



19

1     A.    No.

2     Q.    Why not?

3     A.    Because I made it clear to him that he and I

4    were not seeing each other that evening.

5     Q.    What do you do next?

6     A.    Kevin and I went in the bedroom and closed the

7    door.

8     Q.    Next?

9     A.    Still hear noises outside.  At some point, I

10   hear footsteps on the roof area.  They don't have the

11   nice picture of my house up.  There is a -- a roof

12   around --

13             MR. DURSTEIN:  It's downstairs.

14             MR. TUPMAN:  This will do.

15             HEARING OFFICER:  Whatever one is --

16             THE WITNESS:  Right.  That's fine.  I just

17   wanted to show that there is a roof around -- I lived

18   upstairs and there is a roof out there.  I hear

19   footsteps.

20             HEARING OFFICER:  Right in there?

21             THE WITNESS:  Yeah.  That's where I

22   believe the noise was coming from, not the actual

23   roof.

24             THE WITNESS:  Right.  Hear noises out

1   there.  Kevin begins yelling at me, you know, What is

2   going on?  Why is he here?  What are you doing?  Just

3   yelling at me.

4   BY MR. McDONALD:

5       Q.   And since we pointed at this picture, there are

6   four windows at the top.  One is marked, "Window Maher

7   breaks."

8            The first two windows, are they bedroom

9   windows?

10      A.   No.   They are living room windows.

11      Q.   Is it the distant two that are the bedroom

12  windows?

13      A.   Yes.

14      Q.   So we know this window is broken; correct?

15      A.   That is a window that ultimately, yes, was

16  broken.

17      Q.   I am sorry.  I didn't mean to interrupt you.

18           You hear pounding on the -- walking on the

19  roof and what happens next?

20      A.   Some banging, some loud noise outside, some

21  yelling, Kevin yelling.

22      Q.   Do you hear the glass break?

23      A.   Kevin is yelling at me to call 911.  It's

24  obvious Brian is not going away.  And, yes, at some

```
 1    point, the glass breaks and Kevin had said, "You call

 2    911 or I am."

 3         Q.   At any point during this stage, has anybody

 4    threatened you or, Come out here, I will kick your

 5    butt?

 6         A.   No.

 7         Q.   Are the comments, if there are any comments,

 8    are they directed to you or are they directed to

 9    somebody else?

10         A.   I don't recall what he said.

11         Q.   Did you --

12         A.   Are you talking about Brian, Corporal Maher?

13         Q.   Corporal Maher first.

14         A.   No.  I do not recall what he said.

15         Q.   Would you have recalled if he was threatening

16    you?

17         A.   Yes.

18         Q.   Do you remember him threatening you?

19         A.   No.

20         Q.   What about Kevin, did he threaten you in any

21    way?

22         A.   Not with physical harm, no.  He was just

23    insistent that I was going to do something or he was

24    going to do something.
```



1    Q.   And we heard Kevin talk about looking for a

2  gun.

3              Do you recall that?

4    A.   Today, no.  No, I don't recall that today.  I

5  know he wanted to go outside and I told him that that

6  was not going to be a good idea.

7    Q.   The conversation you hear that's now loud that

8  you described as Kevin hollering and Brian hollering,

9  are they hollering at each other?

10    A.   Oh, Kevin is definitely hollering at me.  Kevin

11  is definitely yelling at me.

12    Q.   Is Brian hollering at Kevin or is Kevin

13  hollering at Brian?

14    A.   Kevin is yelling at me.  Brian is just outside

15  making noise, yelling.  Kevin was right in front of

16  me.  Unfortunately, that, not that I didn't know Brian

17  was outside, but Kevin is right in front of me

18  yelling, I am concentrating on what he's saying.

19  Brian is just outside yelling.

20    Q.   Did you have any concern for Brian -- I am

21  sorry, did you have any concern for Kevin if he had

22  gone outside?

23    A.   Yes.

24    Q.   And what concern was that?

23

1      A.    I told him that's not going to be a good idea.

2    You have two intoxicated males who, obviously, are not

3    happy over a woman, a girl, a person, a woman.  It

4    just didn't seem like it was going to be a very good

5    situation.

6      Q.    At any point did you believe there would be

7    violence?

8      A.    I believed there -- like I said, two males,

9    both intoxicated, there was a potential for an

10   altercation, yes.

11              HEARING OFFICER:  Can I -- how did you

12   know Brian was intoxicated if you hadn't talked to him

13   or you hadn't seen him?

14              THE WITNESS:  When I talked to him at TGI

15   Friday's over the telephone, over the cell phone, he

16   was intoxicated.

17              MR. TUPMAN:  Do you know where he was when

18   you talked to him at Friday's on the phone?

19              THE WITNESS:  I believe he was at the

20   Starboard.

21              HEARING OFFICER:  Sorry.

22   BY MR. McDONALD:

23      Q.    Now we are to the point where Kevin says you

24   call 911 or he will call 911?



24

```
1      A.    Right.

2      Q.    Do you make the call?

3      A.    Yes.

4      Q.    You call 911?

5      A.    No.

6      Q.    Who do you call?

7      A.    I called the toll free line.  It took me a

8   minute because, just under the -- in that situation, I

9   was having a hard time remembering the phone number.

10     Q.    Do you remember what you told the dispatcher?

11             CAPTAIN HOMIAK:  You called the dispatch

12  center but just on the toll free line?

13             THE WITNESS:  Yeah, 739-4863.

14             CAPTAIN HOMIAK:  You didn't call the

15  Troop, the 911 center?

16             THE WITNESS:  The 911 center.

17             HEARING OFFICER:  But not 911, you called

18  the police number?

19             THE WITNESS:  Correct, the police number.

20             MR. McDONALD:  Sometimes they call it the

21  back line?

22             HEARING OFFICER:  Yes.

23             MR. McDONALD:  Up north, they called it

24  the back line.
```

25

BY MR. McDONALD:

Q.   They wouldn't say police emergency?

A.   I believe so.

Q.   What did you tell the dispatcher -- I know there is a statement here, but what do you remember telling them?

A.   Just conveying to them that somebody had broken a window to my house and that, you know, I needed somebody to come down, telling them my address, and I believe I told him my IBM number.

Q.   But you knew it was Brian that broke your window?

A.   Yes.

Q.   Why didn't you tell them it was Brian?

A.   At this point in time, I was very confused. I didn't know what to do. I have Kevin there yelling at me that, "Do something, making some happen." So I just knew that -- I needed somebody to start that way in case things got anymore out of hand.

Q.   Why didn't you tell them it was Brian?

A.   I am a trooper. He is a trooper. I -- I didn't want that going out over the air that there is two troopers in a, you know, a possible altercation and -- I just didn't think that was going to be good

1    going over the air.

2        Q.    You are looking for help; is that why you call?

3        A.    Looking for help.  Looking for the situation to

4    get under control.

5        Q.    Now, you make the call; obviously, they make

6    the dispatch.

7              Do you know where Brian is at this point

8    when you are making the call?

9        A.    No.

10        Q.    Are you aware whether he was -- I am sorry.

11    Are you aware whether he is in the house, out of the

12    house, or had left your property?

13        A.    I mean, listening to the tape, you know, since

14    then, listening to the tape, I mean, it sounds like he

15    was leaving, just from what I have said to -- said to

16    Kevin and --

17        Q.    At some point, are you confident, after you

18    have made the first phone call, that Brian is no

19    longer there?

20        A.    Yes.

21        Q.    Do you call the COM center a second time?

22        A.    Yes.

23        Q.    Why do you do that?

24        A.    The situation is getting somewhat back under

1   control, so I felt it wasn't necessary for everyone to

2   come.  I just thought, you know, maybe if just one

3   person is still coming just to make sure everything

4   stays under control and fine, then that was all I

5   needed at that point.

6       Q.   Did you give any thought --

7       A.   Everything was de-escalating.

8       Q.   It's de-escalating; is that what you just said?

9       A.   Right.

10      Q.   Did you give any thought at that time or since

11  then to the type of response that would be provoked by

12  those police officers coming to the response of that

13  call?

14      A.   At that point in time?

15      Q.   Yeah.

16      A.   At that point in time, everything just seemed

17  way out of control, way out of my control, and I

18  didn't want anybody to get hurt.  I didn't want

19  anybody to get hurt.

20      Q.   Well, you know you made the second call.  You

21  tell us that.

22           And then three troopers show up; do you

23  remember those three?

24      A.   The first one that arrived, I believe, was Alex.



28

```
 1    Argo.
 2         Q.    Who was next?
 3         A.    I believe, I am almost positive, Csapo.
 4         Q.    And the last one would be?
 5         A.    Corporal Gygrynuk.
 6               CORPORAL WELCH:  Very good.
 7    BY MR. McDONALD:
 8         Q.    What rank were they?
 9         A.    Alex, at the time, I believe, was fairly new
10    out of the academy.  I am not even sure he was a TFC
11    at that point.  Csapo and Gygrynuk were both
12    corporals.
13         Q.    Same as you?
14         A.    (Witness nods.)
15         Q.    Who is the lead investigator?  Let me back up.
16               The first officer comes, what happens?
17         A.    I was sitting outside.  I just -- I needed to
18    be away from Kevin, I needed some air.  I went out on
19    the, just the little landing area right outside my
20    door just to, like I said, get some air.
21               Alex arrived, I met him somewhere on the
22    steps.  I am sorry, what was the question?
23         Q.    What's the conversation between you and Alex?
24         A.    Oh, I told him, at that point, that everything
```

29

```
 1    was fine and that he could leave.
 2        Q.    He could leave?
 3        A.    (Witness nods.)
 4        Q.    Did he leave?
 5        A.    No.
 6        Q.    Why not?  What did he do?
 7        A.    He kind of stood there on the steps and looked
 8    at me.
 9        Q.    Did he go into your house?
10        A.    At that point, no.
11        Q.    What did he do, if you recall?
12        A.    Oh, we -- we stood there on the steps.  I was
13    -- I was saying -- I wasn't, like, blocking his way,
14    like, you are not getting around me, but I was just
15    standing there, saying, "Everything is fine; I don't
16    need anything done; I am good."
17        Q.    He doesn't leave?
18        A.    No.
19        Q.    Now, the next officer arrives, and who would
20    that be?
21        A.    Csapo.
22        Q.    He is a classmate?
23        A.    Yes.
24        Q.    Csapo arrives.  Did you have a conversation
```



1    with him?

2    A.    We were -- Alex and I walked down the steps and

3    were kind of at the bottom of the steps in the parking

4    lot area when Csapo arrived, and I told him,

5    "Everything is fine; I don't need anything."

6    Q.    What did they do next, if anything?

7    A.    They just start asking questions, just throwing

8    them out there.

9    Q.    Why aren't they leaving?  You told them you

10    didn't want anything done.

11    A.    I don't know.

12    Q.    Corporal Gygrynuk shows up.

13            What does he do?

14    A.    Went into homicide investigation mode.  He just

15    started hammering me with questions, just attacking

16    me.

17    Q.    Can you be a little more specific about that?

18    A.    He wanted to know what was going on.  What

19    happened.

20    Q.    What did you tell him?

21    A.    I told him I didn't see who it was.

22    Q.    Did you see who it was?

23    A.    I did not.

24    Q.    But you knew who it was, didn't you?



1      A.   I knew who it was.  I did not see who it was.

2      Q.   Playing a little word game with him?

3      A.   He asked the question.  I answered it.

4      Q.   You wanted him to leave; that's what you told

5  him?

6      A.   Yes.

7      Q.   He wasn't leaving?

8      A.   No.

9      Q.   At some point, did they end up in your house?

10     A.   Well, we were standing down in the driveway,

11  Alex started walking around just to make sure, I

12  believe, make sure nobody was around, and I thought

13  that was fine.  That's fine, you know, seemed like

14  Brian was gone, so that was fine.  Gygrynuk and Csapo

15  were standing there, Gygrynuk, really, hammering me

16  with questions.  And it -- something was said about

17  Kevin, Was there somebody else there?  And I said,

18  "Kevin is up there in the bedroom," and Gygrynuk just

19  stormed off, just marched right up the steps.  I was

20  like, Wait a minute.  He just marches up the steps,

21  walks in the house, and proceeds, I guess, to have a

22  conversation with Kevin.

23      Q.   Kevin is in the bedroom?

24      A.   Yes.



32

1     Q.   Kevin wanted the police called.  You called the

2    police.

3           Did Kevin ever tell you why he didn't come

4    out and talk to the police?

5     A.   No.

6     Q.   So there is a conversation between Gygrynuk and

7    Kevin?

8     A.   Inside.

9     Q.   Are you party to that conversation?

10     A.   No.

11           CORPORAL WELCH:  Did you tell Kevin to

12    stay in the bedroom?

13           THE WITNESS:  I told him -- I told him

14    just -- I was going outside, just stay in here, and,

15    you know, I will deal with this.

16           CORPORAL WELCH:  So you told him to stay

17    in the bedroom?

18           THE WITNESS:  I don't know if I

19    specifically said, "Sit here in the bedroom," but,

20    yes, I said, "Stay inside and I will take care of

21    this."

22    BY MR. McDONALD:

23     Q.   So Gygrynuk goes out, he has a conversation,

24    you didn't invite him into the house.  He goes on his

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A000558**

33

1    own?

2       A.    Yes.

3       Q.    At some point, the facts that are known to you,

4    at least as I hear you testify, is that Brian is

5    there, Brian breaks the window.   There is an exchange,

6    whatever you want to describe it, between Kevin and

7    Brian.   The police are there.

8             Why don't you just tell the three

9    troopers, It's Brian, he's half banged up and that's

10   all this is; why didn't you just tell them that?

11      A.    No. 1, it was very embarrassing.   To stand

12   there and tell three -- two people that you know on a

13   personal levels and a total of three that you know on

14   a professional level that, Hey, here -- here I am a

15   female, a coworker of yours, with one guy in my

16   bedroom and another one trying to get in my bedroom.

17   It was very embarrassing and that was my personal life

18   and I didn't want them to know about it because I knew

19   what that would mean.

20      Q.    What would it mean?

21      A.    DSP is a rumor mill.   We all work hard.   We all

22   do a good job.   But everybody loves to gossip.   And

23   that little situation there, big situation there just

24   had Christy is a big fat slut written all over it, and



34

```
 1    it was not something I particularly wanted to

 2    advertise, especially not to three coworkers who then

 3    would tell the rest of the division.

 4        Q.    Forgive me if I ask it this way, but you didn't

 5    think that they were professional enough or

 6    compassionate enough for them to handle your

 7    situation --

 8              MR. DURSTEIN:   That's not only leading but

 9    argumentative.

10              MR. McDONALD:   I will strike the question.

11    BY MR. McDONALD:

12        Q.   So you didn't tell them for that reason that

13    you just explained to the Court?

14        A.    That was the main reason, yes.

15        Q.    Again, none of those activities that night were

16    directly related to your duties as a police officer?

17    In other words, you weren't acting as a trooper, were

18    you?

19        A.    No, definitely not.

20              MR. McDONALD:   That's all I have.   Thank

21    you.

22              MR. TUPMAN:  Mr. Durstein.

23    BY MR. DURSTEIN:

24        Q.    I will try to keep this to a minimum.
```

1    Correct me if I am wrong, but I think it

2    should be clear to the Board that you are saying today

3    you knew who that was that night, that it was Brian

4    Maher; correct?

5    A.    Correct.

6    Q.    And I think you said that, at least initially,

7    you did not want to call 911; is that fair to say,

8    because you knew who it was?

9    A.    Because I knew who it was and I did not want my

10   personal laundry aired.

11   Q.    Now, it sounds as if the situation escalated

12   somewhat and Kevin became involved in terms of the

13   yelling back and forth?

14   A.    I guess that's what I said.

15   Q.    Now, you recall when Kevin was here, I think

16   it's fair to say his testimony, in part, was that he

17   was scared, he was frightened by what was going on.

18         Would you agree with that?

19   A.    Are you asking me if that's what he said?

20   Q.    What he said or how he acted?  You were there

21   and I wasn't.

22         Do you think he was scared?

23   A.    He was mad at the situation.

24   Q.    And he felt, is it fair to say, that Kevin felt



36

1    that you should make that call to 911?

2        A.    Kevin voiced to me that I needed to make the

3    call to 911.

4        Q.    And you did or you called on the back channel,

5    the back number?

6        A.    Yes.

7        Q.    And that was after the window had -- you knew

8    the window had been broke; is that correct?

9        A.    I believe, yes, the actual call was made when

10    the window was broken.

11        Q.    And I want you to look at it for a moment in

12    the standpoint of the call center and from the

13    responding officers.

14              Is it fair to say that what you reported,

15    in essence, was a burglary in progress?

16        A.    Yes.

17        Q.    Unknown suspect attempting to break into your

18    residence?

19        A.    If you look at the transcripts, it will tell

20    you exactly what I said.

21        Q.    But in terms of a response, if you are one of

22    the officers out there in the field, essentially,

23    that's the information they are going to get; correct?

24    They are going to get your address, that it's a

37

1    burglary in progress, and an unknown suspect involved?

2    A.    Yes.

3    Q.    And in terms of whoever would be responding,

4    what does that mean in terms of --

5    A.    I am sorry.

6    Q.    What does that mean in terms of what they would

7    be doing from whatever point, point A, wherever they

8    are, to point B, your residence, given that

9    information? They are going to respond rapidly, in

10   other words?

11   A.    Yes.

12   Q.    And you knew that, and that's one reason you

13   made the second call later; is that correct?

14   A.    Correct.

15   Q.    And the purpose of the second call, as I

16   understand it, you can tell me if I am wrong, is that

17   you realized they would be, one or more would be

18   racing to the scene and you wanted them to stand down

19   or slow down their response; is that fair to say?

20   A.    That's fair to say because the situation was

21   de-escalating.

22   Q.    At that point, you believed Brian had left and

23   the situation was not as critical as it had been?

24   A.    Correct.



38

1    Q.    Now, again, and I realize this may be difficult

2    because this wasn't the role you were playing that

3    night and you weren't on duty, but as officers

4    responding to a situation, what are their obligations?

5    A.    What are their obligations?

6    Q.    Well, they made contact with the victim, which

7    was you; correct?

8    A.    Are you talking when they arrived at the scene?

9    Q.    Sure.   They need to investigate; right?

10   A.    They need to make contact with the victim, the

11   reporting person.

12   Q.    Now, as I understand when they arrived and we

13   were talking three different officers, as each of them

14   arrive, at that point, nothing had been said about

15   Kevin Keller to them; is that fair to say?

16   A.    No.   They didn't just walk up and I say, Oh,

17   not even say hi, and, by the way, there is somebody in

18   my bedroom.

19   Q.    What I am actually asking you is in your calls,

20   your two different calls to the 911 center, you did

21   not mention that there was another individual in there

22   with you?

23   A.    No.

24   Q.    So Kevin's name or Kevin had not been

39

1     identified as a potential second victim or witness or

2     person there; is that correct?

3     A.    No.

4     Q.    And when the officers arrived, at least

5     initially, you did not mention Kevin?

6     A.    No.

7     Q.    And he was not present outside?

8     A.    Correct.

9     Q.    At some point, one of the officers, is it

10    Corporal Gygrynuk, learns that there is another

11    individual outside?

12    A.    Correct.

13    Q.    And I gather you said something to the effect

14    that the individual inside is not a suspect who was

15    attempting to enter the residence?

16    A.    I am not sure exactly what I said, but I did

17    not say, He was the one who did it, no.

18    Q.    Is it fair to say you conveyed, in some sense,

19    that Kevin was not -- you knew Kevin was with you and

20    was not the suspect? He is a --

21    A.    Correct.

22    Q.    In other words, these guys arriving would have

23    no way of knowing if a person is in the dwelling,

24    whether that's the burglar or somebody who was in the



1  dwelling with you unless you tell them; correct?

2  A.    Sure.

3  Q.    So, when, if it's Corporal Gygrynuk or one of

4  the other officers finds out there is another

5  individual who was present during this incident, they

6  then go and attempt to make contact with that

7  individual; is that correct?

8  A.    Are you asking what he did or what I would do

9  as a trooper?

10  Q.    What did he do?

11  A.    He marched inside my residence.

12  Q.    So, he is trying to talk to someone who was

13  present during this incident at that point?

14  A.    I don't know what he was trying to do.

15  Q.    You sound like you had a problem with what he

16  did?

17  A.    I do.

18  Q.    And what is your problem with what he did?

19  A.    He entered my residence without my permission.

20  Q.    Why would he need your permission to enter your

21  residence?

22  A.    Because it's my residence.

23  Q.    You have reported a burglary in progress at

24  your residence, you had told him that a person who was

41

1    present during the attempted break in is still inside

2    your residence, and you have a problem with the police

3    officer going upstairs to talk to that person?

4        A.    When did I say that that person was present to

5    them?

6        Q.    Well, he is present in your residence when the

7    officers arrive; is that correct?

8        A.    Correct.

9        Q.    Did you say to them, He is not a witness; he

10    arrived after the fact?

11        A.    I don't believe they asked that.

12        Q.    Now, at no time when these three officers are

13    at the scene that night, and maybe we can get a time

14    frame, do you have a recollection how long they were

15    at your residence that night before everybody left?

16        A.    At this point, it's difficult to say.

17        Q.    I understand.

18        A.    If you wanted me to guesstimate, I would say I

19    believe, from the time Argo arrived to when, I

20    believe, Csapo was the last one to leave, because I

21    believe Gygrynuk and Argo left for another complaint,

22    half hour.

23        Q.    However long it was, but we will take a half an

24    hour as your best estimate, understanding that it was



42

1   late, you were upset and had been drinking?

2   A.   Quite a while ago.

3   Q.   Right.  And it was a while ago.  But however

4   long it was, at no point during the time those three

5   officers were there did you give them Brian Maher's

6   name; correct?

7   A.   No, sir.

8   Q.   I think you said you did try to discourage

9   them, in a sense, from the need to investigate because

10  you felt the situation was under control?

11  A.   Discourage them?

12  Q.   Yes.

13  A.   I told them they were not needed.

14  Q.   But, in fact, you have reported this, and they,

15  apparently, felt they had some obligation to figure

16  out what had happened?

17  A.   I had reported it, yes.

18  Q.   At some point during the time you were there,

19  you understood that they were going to make some kind

20  of a report, that there was going to be an

21  investigation of the incident; is that fair to say?

22  A.   I had told them that they were not needed and I

23  did not want anything done.

24  Q.   Well, as a police officer, you know that when a

**W&F**

43

1    crime is reported and there is evidence of a crime,

2    the victim or the purported victim does not

3    necessarily control whether or not a crime is reported

4    or an incident is included in the report; is that fair

5    to say?

6         A.    In physical domestic, when there is physical

7    injury to the victim, physical injury to the victim,

8    yes.

9         Q.    Well, this was a domestic situation, was it

10   not?

11        A.    Sir, I did not believe it to be, no.

12        Q.    Well, it involved you and a, if not a

13   boyfriend, a male acquaintance of yours -- actually,

14   it involved two male acquaintances, I guess, to be

15   fair, but are you saying you did not, based on what

16   you knew, you did not think this was a domestic

17   situation?

18        A.    Yes, sir.

19        Q.    So you believed there was some set of facts

20   under which officers, three of them, could respond to

21   a burglary in progress, find evidence of a burglary,

22   to wit, a broken window, two individuals there,

23   potential victims, and walk away from the scene, not

24   reporting it in any fashion, simply because a police

44

1    officer was involved?

2        A.    No.    Because the victim told them they were not

3    needed.

4        Q.    And in that scenario, and, again, when there is

5    a burglary in progress, high speed response, broken

6    window, evidence of the burglary, two individuals

7    there, one of whom says, "You are not needed," the

8    officer's obligation at that point is just to walk

9    away, not file a report as if the incident never

10   happened?

11       A.    Upon arrival of the first officer, I told him

12   he was not needed.

13            MR. TUPMAN:    Corporal, could you try and

14   answer the question.    If you don't understand it,

15   maybe Mr. Durstein can rephrase it.    But your answer

16   was non-responsive.

17   BY MR. DURSTEIN:

18       Q.    Let me try to shorten it.    When there is a

19   report of a burglary in progress and evidence of a

20   burglary in progress, officers respond, they are told,

21   by one of the individuals there, I don't want to

22   pursue this or the situation is okay, are you saying

23   it's their obligation of those facts just to walk

24   away, no report, no action, no investigation?

1    A.    Sir, how I felt at that moment was that it was

2  my personal life that I did not want dragged through

3  the mud, that I did not need a report, I no longer

4  needed the officers there, and that I did not want

5  them there.

6               HEARING OFFICER:  Can I interrupt for a

7  second?

8               MR. DURSTEIN:  Sure.

9  BY THE HEARING OFFICER:

10    Q.    I am going to ask you a question.  You have

11  handled a lot of domestic complaints in your career?

12    A.    Yes.

13    Q.    And have you ever experienced a domestic called

14  in by a battered woman and you respond and the first

15  thing she says is, Everything is fine here; I don't

16  want anything done because of why, she wants to

17  protect her husband, her source of income, whatever

18  the case is; have you ever had that experience?

19    A.    A battered woman?  Yes.

20    Q.    Did you walk away because she says, I don't

21  want anything, or did you investigate that case

22  because you were called there for a domestic and, an

23  assault or whatever the case is, and you did what you

24  are required to do as a police officer, investigate

1    that case, even though she, at that point, is trying

2    to protect her accuser, or the accused person because

3    there is a need to protect them; correct?

4    A.    I was taught that if I see physical injury on a

5    male or a female that I believed to have been caused

6    by anyone, whether it be a domestic or not, that I

7    need to investigate that whether they say I don't want

8    anything done or not.

9    Q.    So you are going to pursue the investigation?

10    A.    When someone has physical injury, yes.

11    Q.    Regardless if there is physical injury?

12    BY CORPORAL WELCH:

13    Q.    If you don't see any physical injury, are you

14    going to NPR there, you don't tell SUSCOM, you just do

15    an NPR on that?

16    A.    It depends on the situation.

17    Q.    You told us first only if you saw injury.  I am

18    saying you don't see any physical injury.  You can

19    tell the lady is upset, like the Major was saying, she

20    is protecting the accuser or she is afraid later on he

21    is going to come back and kick her ass.  Now, you

22    don't see any injury to her, and this is the scenario

23    that he brought up and this is the scenario that you

24    could be at, you go to that scene, you don't see any

1    physical injury, what are you going to do?  Are you

2    going to NPR it or are you going to investigate it?

3        A.    If the woman is safe -- or the male or the

4    female is safe and she does not want any further

5    contact with the police, I cannot force her to have

6    any further contact with the police.

7        Q.    So are you saying you are going to NPR it?

8    BY CAPTAIN HOMIAK:

9        Q.    How do you determine that she's safe?

10        A.    Speak with her.

11        Q.    Anything else?

12        A.    I am sorry?

13        Q.    Anything else?

14        A.    Depending on the situation, survey the scene.

15    BY THE HEARING OFFICER:

16        Q.    What these guys have done in this particular

17    case, same thing they are doing for you?

18        A.    They spoke with me.  I told them I was fine, I

19    no longer needed them.

20        Q.    Surveyed the scene, find damage that's

21    consistent with your report of a burglary in progress,

22    and they are just supposed to walk away, or you would

23    just walk away?

24        A.    Depends on what the victim was telling me.



1        HEARING OFFICER:  Thank you.

2   BY MR. DURSTEIN:

3        Q.   Did they ask you, any of the officers, whether

4   or not the suspect gained entry to your dwelling?

5        A.   I don't recall.

6        Q.   Do you remember what you told them about

7   whether this suspect was inside?

8        A.   No.  At this point, no.

9        Q.   You knew at the time that Brian was inside, did

10  you not?

11       A.   Sorry.  I thought you were going to ask a

12  question.

13            HEARING OFFICER:  I am just confused by

14  the question.

15            MR. TUPMAN:  How about -- did Brian ever

16  enter your apartment that night?

17            THE WITNESS:  Is he asking a question?

18            MR. McDONALD:  Sure.

19            MR. TUPMAN:  I thought he was running

20  things.

21  BY THE HEARING OFFICER:

22       Q.   Did Brian ever enter your apartment that night?

23       A.   After the -- after it de-escalated, I exited my

24  bedroom, I saw obvious signs that he had been in the

49

1    apartment.

2    BY MR. DURSTEIN:

3        Q.    And that would have been when you and Kevin

4    were in the bedroom with the bedroom door closed?

5        A.    That he had entered the residence?

6        Q.    Yes.

7        A.    Yes.

8        Q.    So, you didn't actually see him in the

9    residence?

10       A.    Correct.

11       Q.    But is it fair to say you heard him in the

12   residence?  You knew he was in the room?  Part of that

13   room is adjacent to the bedroom.

14       A.    There was a lot of noise going on.

15       Q.    And, now, Kevin testified he is in the bedroom,

16   back against the door, afraid that Brian is going to

17   enter.  You were in the bedroom at the same time;

18   correct?

19       A.    Trying to call 10 COM.

20       Q.    Maybe to cut through this a little bit, you

21   have testified, and I think we all understand the

22   reason you did not want investigation or prosecution

23   to proceed is that you knew a fellow officer was

24   involved, and as you very eloquently described it to,



1    in your statement, it was a shitty situation.  I don't

2    think anybody would quarrel with that.

3            Why didn't you tell any of the officers

4    responding that was the problem, that another trooper

5    was involved?

6    A.    Again, it was my personal shitty situation that

7    I did not want everyone to know about.  And that's

8    what I knew would happen.  Unfortunately, that is what

9    did happen eventually.

10   Q.    So, I guess what you are telling me is you felt

11   that mentioning that another officer was involved,

12   even not giving a name, would not cause the

13   investigation to cease, would not make them go away?

14   A.    I am sorry.  If I did not tell them --

15   Q.    Let me rephrase that.  That was a double

16   negative.  We start with the proposition you want them

17   to leave, you want the officers to leave; correct?

18   A.    Yes.

19   Q.    What you did was simply tell them to leave,

20   tell them the situation was okay, you didn't want to

21   pursue it; correct?

22   A.    Correct.

23   Q.    That didn't work, as it turns out?

24   A.    Correct.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

51

1    Q.    Did it occur to you that another option was to

2    tell them another officer was involved and that's why

3    I don't want this pursued?  Don't even have to mention

4    his name.

5    A.    I believe that and still believe that that

6    would have made things worse.

7    Q.    So you considered it that night and concluded

8    it was not a good idea, it would just make things

9    worse?

10    A.    Correct.

11    Q.    So they investigated or they were there half an

12    hour, and when they left, you knew that the status of

13    the matter would be they are investigating a burglary

14    involving an unknown suspect?

15    A.    Actually, I don't believe so.

16    Q.    What part of that do you not believe was

17    accurate?

18    A.    I am sorry?

19            MR. McDONALD:  I am sorry.  I missed the

20    question.

21    BY MR. DURSTEIN:

22    Q.    The question was:  When the officers left,

23    after they completed their investigation at the scene,

24    was she aware that they would be reflecting a burglary



52

1  investigation with an unknown suspect?

2  A.    An unknown suspect, yes.

3  Q.    Now, from their point of view, there would be

4  no reason to believe this was a domestic incident when

5  they left that night, based on what you had told them;

6  is that fair to say?

7  A.    Fair to say.

8  Q.    But from your point of view, based on what you

9  knew, are you saying you did not consider what Brian

10 did that night, the circumstances, your relationship

11 with him, you did not consider that to have been a

12 domestic type incident?

13 A.    No, sir.

14 Q.    You know that as a police officer, you have a

15 right -- I am sorry, you have an obligation to report

16 a domestic incident?

17 A.    Do I know that now?

18 Q.    Yes.

19 A.    Do I know that now, yes.

20 Q.    Did you know it then?

21 A.    No.

22 Q.    But you are saying even if you had known it

23 then, you would not have considered what you know to

24 have happened that night to have been a domestic

53

1   incident?

2      A.   No, sir.

3      Q.   And you are saying it's not domestic because of

4   Brian and it's not domestic because of Kevin either?

5      A.   Correct.

6      Q.   Why not?  Why is it not a domestic incident in

7   your mind?

8      A.   Because I was not boyfriend/girlfriend with

9   either one of them.

10  BY THE HEARING OFFICER:

11     Q.   What was your relationship with Brian at that

12  time?

13     A.   More than acquaintance, less than

14  boyfriend/girlfriend.  We were friends.  We hung out.

15     Q.   You vacationed together, you said?

16     A.   Oh, that was later.  This happened in October

17  and that was not until April that we vacationed

18  together.

19     Q.   But that vacation, I mean, vacationing together

20  is not, you just decided to get together --

21     A.   We progressed after the incident.

22  BY MR. DURSTEIN:

23     Q.   Let me try that question one more time but I

24  will try to do it in the abstract so we don't



54

1    necessarily have to go with your personal situation.

2    A.    Okay.

3    Q.    If, it could be male or female, but if a person

4    is out socially with a member of the opposite sex and

5    is now at their residence with that person, and a

6    different person, with whom they have been out

7    socially, of the opposite sex, arrives at the dwelling

8    and is attempting to break in, under those facts,

9    would you still say that's not a domestic situation?

10    A.    I did not feel my situation was a domestic

11    situation.

12    Q.    Was there anything of the one I described that

13    was inaccurate in terms of your situation, you know,

14    with respect to Kevin and Brian as of that night?

15    A.    Are you saying I had been out with both of them

16    socially that evening?

17    Q.    No.  You had been out with Kevin socially that

18    evening, nothing more.  You had been out with Brian

19    socially in the past.  Brian is attempting to break

20    into a dwelling where you and Kevin are located?

21    MR. TUPMAN:  Mr. Durstein, I think the

22    Board will make its independent determination about

23    whether this qualifies as a domestic incident if that

24    term is defined or not defined for purposes of the

55

1    administrative manual.  Trying to get her to admit it

2    I really think is not helpful.

3              MR. DURSTEIN:  Well, I am concerned that

4    her consciousness or recognition of that might be, if

5    not an element, a consideration for the Board, but I

6    think she's answered my question.  I am satisfied.  I

7    have no further questions.

8    BY MR. McDONALD:

9        Q.    That night, as Brian is on the porch, Brian is

10   on the roof, Brian is breaking a window, does Kevin

11   inside know that it's Brian?  Does he know the name

12   "Brian Maher"?

13       A.    He knew that Brian was a friend of mine, yes.

14       Q.    Did he also know that Brian was a police

15   officer?

16       A.    Yes.

17       Q.    How did he recall that?  How does he know that

18   he is a police officer?

19       A.    Well, Kevin and I spoke, we conversed, you

20   know, when he was in Texas, conversed over the phone,

21   you know, several times.  He knew that I had a friend

22   named Brian, and then that day, Saturday, the 25th, he

23   knew that I was at the hospital with Brian.

24       Q.    So he knows --



56

1     A.    Sorry.   And that he was, somewhere along the

2     line, he knew it came up that I knew him through work

3     and that he was a trooper, fellow trooper.

4     Q.    Now, Mr. Durstein asked you if Kevin seemed

5     frightened, that was the word he used "frightened"

6     that night?

7     A.    I would not use "frightened" to describe

8     Kevin's demeanor at all.   He was mad.   He was pissed

9     off.   He -- he wanted to -- he wanted to confront

10    Brian.

11    Q.    And then, as you described, Corporal Gygrynuk

12    arrives and storms upstairs and he confronts Kevin;

13    correct?

14    A.    Yes.

15    Q.    Do you know if there was a police report

16    written where Kevin believed he was a victim of

17    terroristic threatening, a burglary in progress, a

18    potential assault, an act of domestic violence, any

19    crime report written for Kevin that you know of?

20    A.    Correct.

21    Q.    In fact, Kevin didn't even tell the truth after

22    the fact; isn't that an accurate statement?

23    A.    As I know it, correct.

24    Q.    Now, when you call to the COM Center, did you

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

57

1    expect that you would get a rapid response from the

2    police officers?

3        A.    Sure.

4        Q.    Is that what you wanted, a rapid response from

5    the police officers?

6        A.    Right.  I mean, I wanted somebody there to make

7    sure the situation didn't get any worse and --

8        Q.    In your estimation, what did you think would

9    have happened had the police officers not made a rapid

10   response and this matter had been allowed to develop a

11   little more?

12       A.    There was definitely the potential there for

13   Kevin to confront Brian.

14       Q.    And you thought there would be more than words

15   exchanged at that point?

16       A.    At this point in time, right.  Kevin and --

17   Kevin had made mention that he would go out there and

18   handle the situation.

19       Q.    And, again, I want to make sure I am clear on

20   your testimony, at any point did either Kevin or Brian

21   direct any of this conversation to you in a

22   threatening way or suggest that you were next in line

23   to get your butt kicked, anything like that?

24       A.    No.



58

Q.    This conversation, as I hear it, this
hollering, as you have described it, is between these
two men?

A.    Kevin is yelling at me a lot.  Brian is just
outside yelling a lot also.  But I was not threatened.

Q.    But the yelling was, What's he doing here?
Call the cops?

A.    Kevin to me, yes.  Yes.

Q.    I have tried to get my arms around this
domestic violence policy and I am not even going to go
there today, but the Corporal asked you whether you
attended PR or NPR, I think the Major asked if you go
and there is a call of domestic violence and that's
how you are dispatched, do you do that -- "NPR" means
no paper required; correct?

A.    Correct.

Q.    There used to be a form that you would fill out
that you were justified being at the scene, ECR law,
would you have filled one of those out?  Bad question.

            HEARING OFFICER:  They don't have that
anymore.

            CORPORAL WELCH:  It's been a long time
since you have done that.

BY MR. McDONALD:

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

59

Q.   We don't do ERCs anymore.  Do you write a piece
of paper for every complaint that you are dispatched
to as a matter of course, not you individually but you
in the Troop level up?

A.   There is something documented, whether it be an
NPR sheet or an actual paper.

Q.   An NPR sheet is something that stays at the
Troop?

A.   Correct.  Everywhere I have worked, we put them
in the numerical order, complaint number order.

Q.   And what would that NPR sheet information have?
Would it have the location where the event was?

A.   Yes.

Q.   Would it have the name of the victim?

A.   Probably.

Q.   Would it have a phone number?

A.   Yes.

Q.   Does it get a Troop number assigned to it or
complaint number assigned to it?

A.   Correct.

Q.   And it has your name on it?

A.   The officer's name on it.

Q.   Yes.

A.   Yes.

60

```
 1      Q.   The date and time, the events as reported?

 2      A.   Correct.

 3      Q.   Now, if it's PR, and it has been a long time,

 4   that's all done in the computer now in the car;

 5   correct?

 6      A.   Correct.

 7      Q.   State wide?

 8      A.   Yeah.

 9      Q.   Now, when you called the COM Center, did you

10   report an event of domestic violence?

11      A.   No.

12      Q.   This officer responding, were they responding,

13   in their mind, if you can guess or speculate, to an

14   act of domestic violence?

15      A.   I would assume no since that's not what was

16   reported.

17      Q.   As I understand your testimony, when they get

18   there, you don't want anything, do a 10-8, go away;

19   correct?

20      A.   Yes.

21      Q.   And Mr. Durstein asked you, you were aware of

22   -- that they were going to write a burglary report?

23      A.   Some type of report with an unknown suspect,

24   correct.
```

61

1    Q.    Could it have been criminal mischief?

2    A.    Could have been.

3    Q.    Could have been property damage?

4    A.    Could have been.

5    Q.    Could have been NPR?

6    A.    Could have been.

7    Q.    In your mind, was it ever domestic violence?

8    A.    No.

9          MR. McDONALD:  That's all I have.  Thank

10   you.

11         MR. DURSTEIN:  Nothing further

12   BY CAPTAIN HOMIAK:

13   Q.    If you told them Brian Maher was involved in

14   this incident, how do you think they would have --

15   what report would they have prepared, do you think?

16   A.    I am sure the unknown suspect would have

17   changed to a known suspect.

18   Q.    What do you think it would have been classified

19   as?

20   A.    Either the criminal mischief or a burglary.

21   Q.    Given the circumstances if you were a

22   responding trooper, identical to yours, with the

23   trooper and another trooper involved with an incident,

24   how would you have prepared that report?



62

1    A.   It -- if the victim told me that, you know, it

2    was --

3    Q.   Put yourself in the position of a responding

4    trooper, but they were made aware that it was another

5    trooper involved, Brian Maher?

6    A.   I would say the sergeant would be contacted at

7    the least.

8    Q.   Would you just make a burglary report up on

9    that?  You wouldn't do it on a domestic form or

10   anything like that?

11   A.   That would depend on what the victim told me.

12   Q.   You mentioned that Kevin was mad, not afraid,

13   but didn't you mention earlier that he was asking you

14   about your weapon, or was that -- was that out of

15   anger or was he -- your perception that he was afraid?

16   A.   Looking back on the things that he said to me,

17   I still believe he was angry, mad, pissed off.  I

18   don't know how to put it properly.  I never felt in

19   fear for physical injury to myself, and as long as we

20   stayed in there, as long as he stayed in there, I

21   didn't feel that he was in harm for physical injury.

22   Now, if he went outside, that would have been a whole

23   another ball game.  I did not feel that he needed to

24   find a weapon.

63

1    Q.    We have heard Kevin's testimony and yourself,

2    he mentioned he saw a weapon.

3          Did you think he was going to get a weapon

4    and shoot Brian or did you think he was getting a

5    weapon to defend himself?

6    A.    Shoot Brian.

7    BY CORPORAL WELCH:

8    Q.    I got a couple questions.

9    A.    Sure.

10   Q.    At the time of the incident, you worked at

11   Troop 5; correct?

12   A.    Yes.  Yes.

13   Q.    And Captain Hawkins was the captain at Troop 3;

14   is that correct?

15   A.    Correct.  Where I --

16   Q.    When you got a call from him, I guess it was on

17   that Sunday at your house; was that correct?

18   A.    Monday.  Monday.

19   Q.    What did you think about that call?  Did you

20   think that call was because -- that he was concerned

21   for you?  Did you know Captain Hawkins at all?

22   A.    I don't believe I worked under him.  When I was

23   at Troop 3, Captain Warren was still there.  I know I

24   had had an occasion to meet him, I couldn't pinpoint



64

1    when, but I am sure, because I can visualize him, I

2    knew what he looked like, I am sure I had met him

3    somewhere.

4        Q.    Did you think it was kind of strange that he

5    called you?

6        A.    No.    Well -- because I had been made aware that

7    he would.

8        Q.    By?

9        A.    Well, just to tell you the course of events I

10   guess we haven't covered, that early morning, night,

11   after the incident, Brian had called me and apologized

12   later and he stated to me that he had spoke with

13   captain and said, you know, If you need me to answer

14   up for what I did, then I will.

15       Q.    Now, that captain, that was -- Captain Hawkins

16   wasn't -- was Captain Brians captain or --

17       A.    No.    Captain of the County.    Yeah.    The

18   captain --

19       Q.    Yeah.    I got you.

20       A.    So, and then, like I said, later that morning,

21   Brian came to board up the window.    I didn't have

22   anything, I didn't have anything to do that, that he

23   came to board up the window, and I believe Captain

24   Hawkins called him, I remember he had a conversation

**W&F**

65

1    with Captain Hawkins while he was at my residence

2    later that morning, late that morning, on the 26th.

3        Q.    So you didn't know Brian was coming to do the

4    window?

5        A.    Yes.  I am sorry.  I did know.

6        Q.    Did Brian call you or was that by Captain

7    Hawkins saying Brian was coming?

8        A.    No.  Brian had made contact with me and offered

9    to come do that.  Did that answer your question?

10       Q.    Yes.

11             You stated earlier, too, that night that

12   you called -- that you guys talked to each other,

13   Brian, you and him, that he might have been at the --

14   one of the bars down, I guess, in Dewey or whatever,

15   and did -- how do you think he reacted when you told

16   him that you didn't want him to come home -- or to see

17   you that night?  Did he seem okay with it?  Did he

18   seem upset?  Did he seem -- did he know that you were

19   with Kevin?

20       A.    Yes.  He was disappointed.  Disappointed.

21   There was never anything about him coming to my house.

22   We never discussed that.  It was I was either coming

23   to the beach or I wasn't.  And I called and told him

24   that I was not.

**W&F**

1     Q.   So he just seemed disappointed?  He didn't get

2   angry at you or yell or anything like that?

3     A.   No.

4     Q.   Did you ever talk to Brian on the cell phone

5   when he was out on the roof when you heard the window

6   break or anything like that?  Was there ever a point

7   at all where you were on the cell phone with Brian?

8     A.   I believe I had turned my cell phone off, yeah.

9   Does that answer your question?

10     Q.   So you don't --

11     A.   When he was out on the roof, no.  I was not on

12   the cell phone with him.

13     Q.   So, any time that he was on your property, you

14   never talked to him that night, the night of the

15   incident?

16     A.   I don't believe so.

17     Q.   I am not saying either your cell phone or your

18   phone at the house, I didn't -- did you have any

19   communication at all, when all this stuff was going

20   on, when Kevin was screaming at you, you knew that

21   there was a problem with him being out there, somebody

22   being out there and you figured it was Brian because

23   you really didn't see him, was there any point, at

24   that time, when that situation was going and it was

67

1   escalating into something bigger and better, was there

2   any time at all that you ever talked to Brian?

3       A.   Today, not that I recall.   I believe -- I

4   believe either on the way home or when I first got

5   home, I believe we exchanged a text message, but, I

6   mean, I never wavered from, We are not seeing each

7   other tonight.

8       Q.   When you had the three troopers come, you had

9   Argo, Csapo, and Gygrynuk?

10          MR. McDONALD:   Gygrynuk.

11  BY CORPORAL WELCH:

12      Q.   Thank you, sir.

13          Did any of those officers, at any time

14  during the investigation, ever ask you:   Do you know

15  who broke the window?

16      A.   No.   They asked me --

17      Q.   Or do you know who would break this window?   In

18  that investigation, did any one of those three

19  troopers, did they ever ask you --

20      A.   They asked me if I saw who it was.

21      Q.   But did any of them ever say, "Do you know who

22  broke the window"?

23      A.   No.

24          CORPORAL WELCH:   Okay.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A000593

1    BY THE HEARING OFFICER:

2        Q.    I have a couple questions.

3              You had mentioned that there was

4    conversation between yourself and Brian earlier in the

5    evening, you were out with Kevin, Brian was out

6    wherever he was at, and there was some thought that

7    you may be getting together that night, or, in his

8    mind, he thought that you guys may have been getting

9    together that night?

10       A.    He had asked me earlier in the day when we

11   concluded at the hospital, we had lunch, he asked me

12   earlier to get together that night.   And I told him

13   that I had plans and that that would probably not

14   happen.   He said -- well, I am sure he tried to talk

15   me into it or whatever, and I said, Look, I have plans

16   that are probably going to run late, so, no, we are

17   probably not going to get together.   So he said just

18   called -- he had planned, I think his cousin was

19   coming down from Jersey, he said just call and let me

20   know, verify.

21       Q.    At this point, your relationship was considered

22   social acquaintances or was there some expectation of

23   a dating relationship between the two?   Why would he

24   call you and get upset to the point where you are not

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A000594**

69

1    going to see him if it's just a social relationship to

2    that point?  What is your relationship at that point

3    with him?

4        A.   Like I said, he was disappointed and I told

5    him --

6        Q.   I am not asking whether he was disappointed or

7    not.

8        A.   You said he was upset, so I just wanted to

9    clarify that.

10       Q.   Your relationship at that point between

11   yourself and Brian, what type of relationship was it?

12   Was it casual dating?  Was it more serious?  Was it

13   just social friends that occasionally you went out

14   together?

15       A.   Social friends that occasionally went out

16   together that sometimes it was just he and I.  I am

17   sorry, this has been a question that was asked and I

18   have tried to find the best way to explain it.

19       Q.   I am just trying to figure out why he would be,

20   if it's not more than just a social acquaintance, why

21   he would be upset to the point where he would come to

22   your house?

23       A.   The million dollar question.

24       Q.   That's something we have got to decide here.



70

1    This is a pretty significant situation that you are

2    involved with.

3        A.    Yes.

4        Q.    And we are trying to get as much knowledge as

5    we can to make a concerned decision as to how we are

6    going to handle this.   That's why we are asking these

7    questions.

8        A.    I completely --

9        Q.    You are the only one that can answer them.   We

10   can't answer them for you at this point.   That's why

11   we are asking you the questions.

12       A.    More than acquaintances, but we were not in an

13   exclusive dating relationship.

14       Q.    Thank you.

15            You did mention, in your direct testimony,

16   that, I believe it was your direct testimony, that

17   even though the situation, you felt, was under

18   control, you asked for, when you called the second

19   time to the 911 center, you asked for one person to

20   come so that the -- to keep control of the situation.

21   It de-escalated at that point but you wanted to make

22   sure that it kept under control; do you remember

23   saying that?

24       A.    Right.



1    Q.    What did you mean at that point?  Was there

2    still some thought that something could happen even

3    though he had left at this point, that he could come

4    back?  Was there some thought --

5    A.    I never thought he would arrive, so, right, I

6    was just wondering, you know, Okay, did he leave for

7    good?  You know, what's going to happen from here?

8    Q.    But he had already left because you called back

9    and said --

10    A.    Right.  His truck was not anywhere --

11    Q.    You said he had already left.  You called back

12    to say, Well, send someone, and I don't know if it was

13    Mr. McDonald or Dirk asked why, and you said, because

14    you wanted to make sure that the situation didn't --

15    it was de-escalated but you wanted to make sure it was

16    kept under control?

17    A.    Sure.

18    Q.    So then --

19    A.    You are still asking me why?  Like I said, I

20    never anticipated, never, in a million years, thought

21    he would just come there, do what he did, and I just

22    wanted to make sure it stayed that way, that he stayed

23    gone and didn't come back.

24    Q.    Then why would you, when a trooper responded,

72

1    when a trooper got there, at your request, to make

2    sure that things are under control, why would you say,

3    I don't need you, everything is fine, and not allow

4    them to continue with their investigation?  On the one

5    hand, you are telling me you wanted them there.   On

6    the other hand, when they got there, you are saying, I

7    don't want you here.   On the one hand, you are

8    argumentative with them, I don't want you here; go.

9    To me, it doesn't make sense.   You are asking for

10   something, they are giving it to you, and when they

11   get there, you tell them to leave?

12   A.    I will try and explain it the best way I can.

13   The situation had de-escalated.   I wanted to make sure

14   that he was gone and he stayed gone.   By the time they

15   arrived, it appeared that he was not coming back, he

16   was gone.   And at that point in time, I was still

17   intoxicated but I was sobered up a little bit and I am

18   like, This is crazy; this is, one, my personal life;

19   two, this is two troopers, this situation cannot go --

20   or is not going well.

21   Q.    Let me ask this question.

22   A.    Right.

23   Q.    Were you truthful that night with everyone that

24   you had contact with?

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

**A000598**

73

1　　A.　　I was not candid, no.

2　　Q.　　Were you truthful with the 911 center when you

3　　made the call to them?

4　　A.　　I felt I was giving them the information that

5　　they needed, that someone had broke in my window and

6　　that I needed assistance.

7　　Q.　　Were you truthful?　Is that actually what was

8　　happening?　When you called in, did you know that that

9　　was not happening, but that's what you -- you reported

10　　to them?　We listened to the tape.

11　　A.　　Right.

12　　Q.　　I don't know if we have the transcript.

13　　　　　　MR. TUPMAN:　We have the transcript in the

14　　trial book.

15　　　　　　THE WITNESS:　That is what occurred.

16　　BY THE HEARING OFFICER:

17　　Q.　　Do you think you were truthful when you called

18　　in the 911 center and reported the situation?

19　　A.　　Telling them that someone had broke into my

20　　window, my residence?

21　　Q.　　We can go through the transcript if you want.

22　　A.　　Okay.

23　　Q.　　If we can pull it out.　Do you have it there?

24　　　　　　MR. McDONALD:　I know where it is.

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

**A000599**

74

```
 1              HEARING OFFICER:  I just want to make sure
 2      that we are using all the same.
 3              MR. McDONALD:  State Police, can I help
 4      you, is that where you are?
 5              HEARING OFFICER:  Yes.  911 call.  If you
 6      look about halfway down there, you will see -- do you
 7      have it, Dirk?
 8              MR. DURSTEIN:  Yes.
 9              HEARING OFFICER:  Dispatcher says, "Okay,
10      what's going on?", about the 8th or 9th line there.
11              MR. McDONALD:  Got you.
12          BY THE HEARING OFFICER:
13      Q.    And then your response is, "Somebody just broke
14            into my house"?
15      A.    Okay.
16              "Are they in your residence"?
17              "I think they have left".
18              "You don't have a clue who it is"?
19              "No."
20      Q.    Do you believe that that was a truthful
21      statement?
22      A.    That's not completely truthful, no.
23      Q.    And then, obviously, there is some, you know,
24      conversation on the tape with Kevin, and then down, or
```

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A000600**

75

1    Kevin, Kevin, so you knew Kevin was there --

2    obviously, Kevin was in the residence, and when the

3    troopers get there, they start their interview, you

4    tell them nobody is in the residence.  That was direct

5    testimony from Csapo, Argo, and Gygrynuk.

6    A.    I told Gygrynuk that he was there.  That's why

7    he went in my residence.

8    Q.    But the first responding officers, I think they

9    asked you:  Anybody else in the residence?

10   A.    I told them that I had cleared the residence,

11   that nobody -- the suspect was not in the residence.

12   Q.    One last question.  Did you, that night, is it

13   safe to say that you put your personal issues, your

14   personal concerns, whether it be your reputation, your

15   position with the division, whatever, over the

16   personal concerns of the officers who were either

17   investigating or responding to your call for help?

18   A.    I don't know if that's just such a black and

19   white yes or no answer.

20   Q.    Well, I mean, you had said that you had -- you

21   had concerns about, you know, them finding out about

22   your personal affairs --

23   A.    Sure.

24   Q.    -- that evening?



76

1    A.   Sure.

2    Q.   And you didn't want that to happen, and that's

3    why you had some concerns about calling the 911 center

4    and reporting it and then subsequently telling them

5    that the truth, that, you know, you may have known who

6    was there, another person was involved, meaning Brian,

7    or another boyfriend, two boys fighting over the same

8    woman, that type of thing.  I mean, there was,

9    certainly, you had some personal concerns for yourself

10    that night.

11         And my question is:  Is it fair to say

12    that those personal concerns were put over the

13    position that the police officers were put into when

14    they responded to your residence in a call for assist

15    and/or their safety in getting there?

16    A.   I mean, I guess the answer is yes, but I don't

17    think it's just that black and white.  I mean, I

18    didn't want anybody to get hurt.  Would it have made

19    any difference if I said it was Brian?  Would they

20    have come any faster or any less?  Would that have

21    made a difference?

22    Q.   I don't think I have the answer to that

23    question.

24    A.   Okay.  You are absolutely right.  I am sorry.

77

1    I don't -- I am just trying to tell you how I am

2    feeling at this point in time.  I felt -- I wasn't on

3    duty.  I was a citizen who needed assistance.

4    Q.    Okay.

5    A.    And when I felt that need for assistance was

6    less, I called back and let them know that -- or

7    called back -- was still on the phone with them.

8    Q.    You called back.

9    A.    Sorry.

10    Q.    I am not trying to get you upset.

11    A.    Sorry.

12    Q.    I know it's a situation that's not -- it's not

13    comfortable for you and --

14    A.    I just don't like the implication that I would

15    put my coworkers, who I know, at risk purposely and

16    hurtfully.

17            HEARING OFFICER:  Do you have anything

18    else?

19            MR. McDONALD:  Rest.

20            MR. DURSTEIN:  We don't have anything

21    further to present.

22            MR. TUPMAN:  I need a break.

23            MR. DURSTEIN:  Can I do one thing on the

24    record because maybe we can release the court reporter



1    if she is not going to take the summation.  I just

2    want to make sure the Trial Boards are in evidence.

3              MR. TUPMAN:  I believe they were entered

4    into evidence about without objection.

5              MR. McDONALD:  No, there were objections,

6    actually.  The standard objections.  What I see

7    coming in is notification of departmental charges,

8    initial crime report and supplement, incident --

9              MR. TUPMAN:  Can you do them by tab?

10             MR. McDONALD:  Tab one, notification of

11   departmental charges.  Two, initial crime report and

12   supplemental report, fine.  Tab three, incident

13   maintenance, I don't know what that is, but that's

14   fine.  May she be excused, Major?

15             HEARING OFFICER:  Yes, that's fine.

16             MR. McDONALD:  The floor plan of the

17   residence, no objection.  The transcript of Corporal

18   Dempsey's criminal, I have an objection to that.

19   That's not relevant to what the Board is hearing

20   today.  The transcript of the interview with Corporal

21   Dempsey and I.A., that's relevant.  That's here.

22   Transcription with Corporal Maher, I object, he is not

23   here, his testimony has been offered and he is

24   available to testify.

79

1          Transcription of Keller, he was here, he

2    is sworn, he is under oath, you have the record, I

3    would oppose that.  The transcriptions of the three

4    troopers, Csapo, Argo, and Gygrynuk, they were here

5    testifying under oath, I would object to those three,

6    and the transcribed 911 calls, and I understand the

7    only one there is the first one.  There is some radio

8    communication that didn't come in.  Those were my

9    objections.

10          MR. TUPMAN:  You object to the 911?

11          MR. McDONALD:  No.  No.  There was the

12   second part of the 911 which I think was a telephone

13   call.

14          HEARING OFFICER:  I think they were

15   both --

16          MR. McDONALD:  Apparently, there was a

17   phone call that we had some argument over that hadn't

18   been produced and it wasn't going to be produced.

19   Just to make sure it didn't get confused.  Those were

20   my only objections.

21          MR. TUPMAN:  They are noted for the

22   record.

23          MR. McDONALD:  I appreciate that.

24          MR. TUPMAN:  Also, I want to make sure



1    that it's in evidence, it's a black ring binder with

2    the photographs.

3              MR. McDONALD:  Yes.

4              MR. TUPMAN:  Any objection?

5              MR. McDONALD:  Let me just take a quick

6    peek.  None, just to note that this may or may not

7    have been what the inside of the house looked like,

8    but certainly the composition of the layout of the

9    house is consistent with the floor plan you have seen.

10             MR. TUPMAN:  Mr. McDonald, for the record,

11   I will assure you, as the Trial Board scribe, that in

12   their findings of fact, it will be based on, really,

13   the live testimony that was presented and not simply

14   on the basis of a witness statement, whether the

15   witness was here or not, unless the witness statement

16   was used for impeachment purposes on

17   cross-examination.

18             MR. McDONALD:  I have always been

19   comfortable on that.

20             MR. TUPMAN:  I understand.  I know you are

21   preserving.

22             Does that take care of all evidentiary

23   issues?

24             MR. DURSTEIN:  The only other issue was

81

1    the blown up photograph.  I think there was no

2    objection.

3                MR. McDONALD:  No objection.

4                HEARING OFFICER:  Is that here?

5                CAPTAIN PAIGE:  It's downstairs.  If you

6    need it, I can get it.

7                MR. TUPMAN:  Major, can we take a break?

8                HEARING OFFICER:  I'd like to take a

9    ten-minute break if that's possible.  I apologize.

10               MR. McDONALD:  It happens.

11               HEARING OFFICER:  We will come back at 11

12   and come back for summations.

13               (The hearing testimony was concluded at

14   10:45 a.m.)

15

16

17

18

19

20

21

22

23

24



82

State of Delaware      )
                       )
County of New Castle )

C E R T I F I C A T E

I, Renee A. Meyers, Registered
Professional Reporter and Notary Public, do hereby
certify that the foregoing record, pages 1 to 82
inclusive, is a true and accurate transcript, to the
best of my skill and ability, of my stenographic notes
taken on January 13, 2005, in the above-captioned
matter.

IN WITNESS WHEREOF, I have hereunto set my hand
this 11th day of February, 2005, at Wilmington.

Renee A. Meyers
Certification No. 106-RPR
(Expires January 31, 2008)

DATED:  February 11, 2005



**WILCOX & FETZER LTD.**
Registered Professional Reporters