## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,      )
        Plaintiff,          )    C.A. No. 04-456 SLR
                    )
v.                        )
                    )
STATE OF DELAWARE,       )
DEPARTMENT OF PUBLIC SAFETY,   )
        Defendant.         )

### PLAINTIFF'S SUMMARY JUDGMENT STATEMENT
### PURSUANT TO COURT'S ORDER OF FEBRUARY 13, 2008

On February 13, 2008 this Court issued an Order directing Non-Movant (Plaintiff herein)

to respond in kind to the Movant's Statement to be filed on February 29, 2008 setting forth:

     a.      The material facts as to which the moving party (Defendant) contends there is no
            genuine issue to be tried; and,

     b.      The legal issues upon which judgment is sought.

Plaintiff's response shall be "in kind," with the content of the numbered paragraphs of the

Responsive Statement corresponding to the content of the numbered paragraphs of Movant's

Statement.

### (A)     Plaintiff's Response to Defendant's Recitation Of Material Facts To Which Defendant Contends There Is No Genuine Issue To Be Tried

1)      Plaintiff, Elizabeth C. ("Christy"[1]) Dempsey is a female Delaware State Trooper,

who is currently, and was on October 23, 2003, employed by Delaware State Police (DSP) with

the rank of Corporal. **Admitted.**

2)      Brian Maher was on October 26, 2003 employed by Delaware State Police (DSP)

with the rank of Master Corporal. Maher has since retired. As of October 26, 2003, Maher and

---

[1] Plaintiff's nickname is "Crysti" rather than "Christy" as stated throughout Defendant's Statement.

Dempsey were involved in a consensual dating relationship. (A-60).[2] **Denied that Maher and Plaintiff had a "boyfriend/girlfriend" relationship at the time of this incident. (B-008).[3]**

 3) In the early morning hours of October 26, 2003, Plaintiff, while off duty, placed a call to the Kent County Emergency Dispatch Center (KENTCOM) to report a burglary in progress at her home in Frederica, Delaware. (A-385-88). **Denied that Plaintiff contacted "911" or the "Emergency Dispatch Center." Rather, Plaintiff called the non-emergency number for Kent County Communications. (B-073). Also, denied that Plaintiff reported a "burglary in progress." Instead, Plaintiff calmly reported that someone had broken into her house and, by the time of Plaintiff's telephone call, they had left the property. (A-000385). Plaintiff provided her identity to the dispatcher, including her Trooper Identification Number and her cell phone from which she was making the report. (A-000386). Plaintiff then advised the dispatcher that she heard the person drive away, but that she did not have a description of the vehicle nor did she see the intruder at any time. Id. Next, Plaintiff reported that she and Keller were in the home and they were "fine." The dispatcher responded that he would send an officer over there to talk to her "just to make sure." (A-000387). Shortly after her first telephone call to the dispatcher and before any State Troopers arrived at her home, Plaintiff called again and spoke with the dispatcher whose name was Melvin. (A-000387). Plaintiff asked Melvin to "make sure you could tell the trooper to slow down their response, I am fine." Id. Plaintiff, again, cautioned the dispatcher that the officers "can just totally slow their response," to which the dispatcher said he would let them know. (A-000388).**

---

[2] "A-___" references are to pages included in Defendant's Appendix in support of their previously filed Motion for Summary Judgment. (D.I. 40).
[3] Defendant did not take Plaintiff's deposition. Attached hereto as Exhibit A is Plaintiff's interview with Internal Affairs dated June 25, 2004 and will be cited as "B-00_."

4)    At the time of the call and the alleged break-in Plaintiff had a friend, Kevin Keller, with her in her home. (A-181; 409-10; 425-26). **Admitted.**

5)    The person who was banging on Plaintiff's door and broke a window to gain access to the home was Brian Maher. **Admitted. In addition, although not acknowledged in Defendant's Statement, Maher began by banging on the door and window to get Plaintiff's attention. When he received no response, he "mule-kicked" a window leading into her apartment breaking the window. (A000069). After breaking the window, Maher entered the residence calling out for her and threatening her male companion, Kevin Keller. Maher threatened Keller to "kick his ass." (A000410).**

6)    Maher fled the scene when he overhead Plaintiff calling KENTCOM. **Admitted.**

7)    Plaintiff told KENTCOM, during two separate recorded calls, that she did not know the identity of the intruder. (A-385, 387). **Denied; Plaintiff responded during the first call to the dispatcher that she did not have a "clue" as to who broke into her home. In fact, she never saw Brian Maher at the time of this incident. (A-000385).**

8)    Plaintiff admits that she, in fact, knew at the time she placed her emergency calls that the intruder was Brian Maher. (A-000561). **Denied that Plaintiff made any emergency calls to report the incident. (A-000385-88).**

9)    Three Delaware State Troopers, traveling separately, raced to Dempsey's house upon receiving a 1:00 a.m. "burglary in progress" call for Plaintiff, a fellow trooper. (*See* A-453). **Denied that there was any reason for the State Troopers to "race" to Dempsey's house, nor was there a report of a "burglary in progress." While Sergeant Houdek was advised that there was a "subject attempting to break-in and that [Officer Dempsey] got her gun" (A000055), this was a result of the miscommunication of the dispatcher of who**

3

took the non-emergency reports from Plaintiff and mischaracterized the nature of the incident. Sergeant Houdek acknowledged that he was upset with Plaintiff because she placed his officers "in harm's way." (A000061). Houdek further testified that he was not aware that Plaintiff had called dispatch and said not to send anyone. (A000065). Houdek acknowledged that if he knew that the Trooper had said "don't worry," they would have still responded, but not at a fast pace. (A000065).

10)    During the Troopers' investigation at the scene, Plaintiff withheld material information about the "burglary" she had reported. (A-24, 248-54). **Denied; Plaintiff acknowledged that the only information she withheld at the scene of the incident was the identity of the Trooper who burglarized her home, Brian Maher. When asked why she did not advise the dispatcher as to the identity of the subject, Plaintiff noted that she was "confused, hurt, angry and mad and that she did not know what to do." (B-060). Plaintiff was off-duty at the time and had just returned home with Kevin Keller, a former high school friend and Texas police officer, with whom she had consumed numerous rum drinks that evening. (A000412).**

11)    During the Troopers' investigation at the scene, Plaintiff gave a series of false statements to the Troopers. (A-24, 248-54). **Denied. Plaintiff advised the investigating Troopers that she "did not see who broke in." (Emphasis supplied). (B-070).**

12)    Plaintiff told Kevin Keller not to come out of the bedroom when police arrived, even though he had been a witness to the alleged burglary. (A-432-34). **Denied. Plaintiff told Officer Gygrynuk that Kevin Keller was upstairs in her apartment at the time of the investigation. (B-069).**

13)     Cpl. Brian Maher, as he was driving away from Plaintiff's residence, placed a
phone call to Captain Robert Hawkins, the troop commander for the area in which the incident
had taken place, and told him what he had done. (A-71). **Denied. Maher told Hawkins who
was his friend from the SCUBA team and not a supervising officer of Hawkins that there
had been an incident at Plaintiff's residence. (A000072). Maher did not advise Hawkins
that he had entered the property after breaking the window and had threatened bodily
injury to Mr. Keller. Hawkins acknowledged that, as a result of this conversation with
Maher, he was not aware that the incident involved more than just breaking a window.
(A000005). Maher did not tell Hawkins that he made threats and improperly entered
Plaintiff's residence. Id. Hawkins was not aware of Maher's deficient reporting until he
read the initial police reports the next morning. (A000009).**

14)     Captain Hawkins advised the Troop 3 Sergeant, Sergeant Michael Houdek, that
Maher was involved with the Dempsey incident. Hawkins told Houdek to have the responding
troopers write up a report of the incident as Dempsey had reported it, for Hawkins' review the
next day. (A-7, 12). Houdek did so. **Denied that Hawkins told Houdek to have the
responding Troopers write up the report of the incident "as Dempsey had reported it."
Sergeant Houdek testified that he had no discussion with Captain Hawkins regarding the
write-ups of the incident. (A000056). Investigation Officer Csapo wrote a report wherein
he listed the suspect as "unknown." This report was approved by his supervisor, Sergeant
Houdek, who knew, following Captain Hawkins call shortly after the incident occurred,
that Brian Maher was the unidentified suspect. (A-000248-251). Csapo acknowledged that
he learned that Brian Maher was the suspect either the next day or the next couple of days
following the incident. (A-000521). Csapo made no attempt to do a supplemental report to**

5

advise as to the identity of the suspect. Id. Csapo told Internal Affairs that he left nothing out of his report. (A-000525). Captain Hawkins, who reviewed the approved investigating reports of Csapo and Gygrynuk, saw that the suspect was unnamed. Captain Hawkins advised that he also could have done a supplemental report to advise of the real name of the suspect, but he did not do so. (A000023). Trooper Gygrynuk, who acknowledged that he was very upset with Plaintiff and wanted her "butt to hang," knew at the time he filed his supplemental report immediately following Csapo's investigating report that Brian Maher was the suspect. (A000492). Gygrynuk knew or discovered that Maher was the suspect when he got back to the Troop before writing his report. (A000493). He was advised by his supervisor, Sergeant Houdek, to write the report as if "they didn't know." (A000494). Gygrynuk said that, "we didn't hide anything. We didn't leave anything out of our reports." When questioned further by Internal Affairs as to whether Gygrynuk had indeed filed a false report, his response was that was a "tough question" because they (the investigating Troopers) thought they were doing the right thing by leaving Maher's name out of the report. (A000494).

15)    Hawkins advised Houdek that the Criminal Investigations (CI) unit would follow up on the incident. (A-8). **Admitted.**

16)    The same day or the next day, Captain Hawkins called Plaintiff to discuss what had happened to find out what she wanted done with the case. (A-00009-10). Dempsey told Hawkins she did not want Maher arrested and did not want anything else done. (A-10, 24). **Admitted.**

17)    The next day, Monday October 27, 2003, Captain Hawkins met with and assigned the case to Troop 3 Criminal Investigations for follow up. (A-263). Sgt. Charles Mullett of CI

changed the disposition of the report to "unfounded," noting that the victim (Dempsey) "desires no further action in this case ... Victim feels that no crime was committed." (A-8, 18-19; A-253). **Admitted, but Sergeant Mullett acted contrary to the direction of Captain Hawkins, who directed that the disposition should be "exceptionally cleared because Plaintiff did not wish any prosecution." (A000011). Instead of clearing this matter, which would have required the name of the suspect being identified on the report (Sergeant Mullett knew that Brian Maher was the suspect), Sergeant Mullett chose to "unfound" the matter, meaning that the incident never occurred and therefore no suspect was listed. (A000011).**

18)    Both Captain Hawkins and his superior, Major Hughes, to whom he reported the incident, admitted in hindsight that they did not follow a DSP policy on domestic incidents involving troopers, in the disposition of the October 26, 2003 incident. (A-11; A-37). **While it is admitted that Hawkins and Hughes acknowledged that they had not followed DSP policy, there is a dispute between Hawkins and Hughes as to what occurred during the incident. Hawkins insisted that he advised Major Hughes that Brian Maher was the suspect when it was reported to Hughes on the day after the incident. (A000012). Hughes, however, is "absolutely positive" that he was not aware that Maher was the suspect, nor was he aware that any trooper was alleged to have been a suspect in this incident. (A000034).**

19)    The testimony is undisputed that the incident was handled the way it was at the express request of Plaintiff Dempsey herself – that nothing further be done about the incident. **Admitted that Plaintiff did not wish any prosecution. It is further acknowledged that Captain Hawkins believed that Plaintiff was being "completely honest with him." (A000010). Further, Hawkins believed that Plaintiff was guilty of only one misstatement to**

the effect that Kevin Keller was not at her home at the time of Maher's burglary.

(A000022).

20)     Nothing further took place, and no person requested any action in connection with the incident, until April 2004. **Admitted.**

21)     In April 2004, another DSP Captain (Dixon) learned of the incident and advised Major Randall Hughes (Captain Hawkins' superior) about this incident involving two troopers. (A-33-35). **Admitted.**

22)     Major Hughes referred the matter to the Lt. Colonel and they agreed that criminal and internal affairs (IA) investigations should be commenced into the October 26, 2003 incident. (A-35, 43). **Admitted.**

23)     As a result of the criminal investigation, Brian Maher pled to a misdemeanor charge of Criminal Trespass, and successfully completed a court-issued Probation before Judgment. (A-324-25). **Admitted that Brian Maher pled guilty only to a misdemeanor charge, although he acknowledged that he was guilty of first degree burglary by breaking into Plaintiff's residence and threatening bodily harm to her guest. (A000079). Captain Page, the head of Internal Affairs for the Delaware State Police, also acknowledged that because Brian Maher was guilty of terroristic threatening, he was therefore guilty of burglary due to his breaking and entering into Plaintiff's residence. (A000447). As a result of Maher's plea to a misdemeanor and his plea to probation before judgment, the charges stemming from his first degree burglary do not appear on his criminal record. (A-000324-325).**

24)     DSP Internal Affairs investigated the conduct of Plaintiff Cpl. Dempsey, Cpl. Maher, the responding troopers, Sgt. Houdek, Captain Hawkins, Sgt. Mullett, and Major Hughes,

and interviewed all of these persons, and other witnesses. **Admitted that investigations were conducted of these various officers. It is also acknowledged that there were no investigations done of the false reporting of the incident by Troopers Gygrynuk and Csapo, both officers acknowledged that they were aware that Brian Maher was the suspect, but failed to note this on the police reports they filed. (A000248-252). Sgt. Houdek was not charged with any violations, although he acknowledged that he reviewed and signed off on the police reports of Gygrynuk and Csapo while knowing that Maher was the suspect identified to him by Cpt. Hawkins. (A000061). Sgt. Houdek was also not charged with a violation of policy wherein Major Hughes testified that he should have been disciplined for failure to go to the scene of the incident at Plaintiff's residence. (A000038). Cpt. Hawkins and Sgt. Mullett were not charged with falsification of police reports, although each acknowledged that they were aware that Brian Maher was the suspect involved in the incident.**

25)     As a result of the IA investigation, the Plaintiff was charged with violations of DSP Rule and Regulation ("R&R") #15 (making a false statement or false written or verbal report) and Job Performance Standard ("JPS") #14 (domestic incident). (A-331-32; A-209, 212). **Admitted that Plaintiff had a trial board before three members of the Delaware State Police. Defense counsel's suggestion in their Brief that the three person trial board is tantamount to a jury is disingenuous. The suggestion that three troopers are as disinterested and objective as a jury drawn from the community cannot be given any credence.**

26)     Plaintiff, Corporal Dempsey, invoked her right to a three-member Divisional Trial Board which conducted an evidentiary hearing on the charges against her, at which Plaintiff was

represented by counsel. **Admitted. However, it is noted that Plaintiff was denied access to the Internal Affairs interviews of Maj. Hughes, Capt. Hawkins and Sgt. Houdek for the defense of her case before the Trial Board. (A000529).**

27)    The charge of violation of JPS #14 (failure to report a domestic incident was found to be unsubstantiated, but the trial board substantiated Dempsey's violation of R&R #15 (making false statements), finding in its written opinion that "Dempsey made a series of false statements when she called 911 and to the Troopers investigating her criminal complaint." (A-367-68). **Admitted that Plaintiff's testimony that she was not having a relationship with Maher at the time of incident resulted in the unsubstantiation of the failure to report a domestic incident charge. Admitted that while the Trial Board found the Plaintiff made false statements, it is specifically denied by Plaintiff that she made any incorrect or false statements other than the fact that she did not know the identity of the suspect. Indeed, while she never saw Maher or his car at the time of the incident, she made an identification by his voice.**

28)    The Trial Board unanimously recommended that Dempsey be suspended with pay with intent to terminate, finding in its written opinion that the trustworthiness and credibility of an officer is a critical component of their ability to perform the duties of law enforcement. (A-370). **Admitted that the Trial Board entered this finding, determining that Plaintiff should be suspended with intent to terminate.**

29)    Plaintiff Dempsey exercised her right of appeal to the Secretary of Public Safety, who held a hearing and found that there was substantial evidence to support the Trial Board's finding that Dempsey had violated DSP R&R #15, but found that the proposed penalty of termination was disproportionate to the severity of the infraction under the circumstances. (A-

10

377-80). The Secretary ordered reduced discipline of reduction in rank; 15 days suspension without pay and one year's probation. Id. **Admitted that the Secretary of Public Safety found that the proposed penalty of termination was disproportionate to the severity of the infraction under the circumstances and that Plaintiff's termination was therefore reversed following the Secretary's decision.**

30)    Plaintiff was never actually terminated from her employment with DSP, and was restored to her original rank after serving her disciplinary demotion. **Denied that Plaintiff was never terminated. Indeed, she was terminated from the time of the Trial Board's decision and the upholding of same by the Superintendent until such time as the Director of Public Safety made his determination finding that the penalty of termination was disproportionate to the severity of the infraction. (A-000379).**

31)    Plaintiff has been made whole as to all back wages owed during the pendency of her appeal/suspension without pay, and calculation of wage differential during her adjusted demotion dates. (A-240-42). **Admitted.**

32)    Plaintiff was reassigned to Troop 4 from Troop 7 when she returned to work following her successful appeal to the Secretary. **Admitted. However, it is noted that Cpl. Maher remained at Troop 7 and did not get transferred. (A000080).**

33)    Although Plaintiff complains of this action, she admits that "DSP Troopers are not guaranteed to be assigned to a specifically requested trooper or a specifically requested rotation/shift." (A-183). The DSP Divisional Manual provides that "all members of the Division are subject to reassignment, at any time ... to any location in the State of Delaware." (A-231). **Admitted.**

34)    As a result of the IA investigation, Cpl. Brian Maher was charged with violations of DSP Rule and Regulation ("R&R") #4 (conduct unbecoming an officer) and Job Performance Standard ("JPS") #14 (domestic incident). (A-312-13; A-207, 212). **Admitted that Maher was charged with two violations of DSP Rules, but it is acknowledged that despite the fact that he was admittedly guilty of first degree burglary, his penalty was much less severe than Plaintiff's and Plaintiff was the victim of Maher's crime. Maher received a demotion, 15 days suspension without pay and one year's probation. (A000273).**

35)    Cpl. Maher opted for a Superintendent's Hearing instead of a trial board, at which he pled no contest. As a result of the hearing, the Superintendent imposed discipline of a three-rank demotion; 15 days suspension without pay and one year's probation. (A-326). **Admitted and it is also acknowledged that, unlike Plaintiff whose position as a Trooper was terminated (prior to later reinstatement by the Secretary of Public Safety), Maher did not lose his position as Assistant Shift Commander for his Troop following his discipline and did not have to transfer to another Troop, as did Plaintiff. (A000080, A000054). In addition, Maher was able to continue his work in the Special Units, the motorcycle unit and the SCUBA unit. (A000080). Maher applied for and received terminal leave that began on February 23, 2007, but continued to be paid until October 3, 2007. (A000083, A000080). Following the completion of his terminal leave in October 2007 he received his full pension for serving twenty years with DSP. (A000080).**

36)    As a result of the IA investigation, Captain Robert Hawkins was charged with violation of JPS #12 (neglect of duty). (A-309). Internal Affairs recommended, and then-Lt.

Colonel Thomas MacLeish approved, the imposition of Summary Discipline[4] against Hawkins,

consisting of 24 hours suspension. (A-310-110). **Admitted.**

37)    As a result of the IA investigation, Major R.L. Hughes was charged with violation

of JPS #12 (neglect of duty). (A-309). Internal Affairs recommended, and Lt. Colonel

MacLeish approved, the imposition of Summary Discipline against Hughes consisting of 16

hours suspension. (A-302-03). **Admitted.**

38)    On or about April 6, 2005, Plaintiff filed a Charge of [gender] Discrimination

with the EEOC/Delaware Department of Labor. The DDOL, on February 28, 2006, issued a "no

cause determination" finding no reasonable cause to believe that DSP engaged in gender

discrimination against Cpl. Dempsey. (A-384). **Admitted that while the DDOL made a**

**determination, that determination, whether positive or negative, is not admissible in this**

**Court. Defendant is well aware of this prohibition and attempts to unfairly prejudice the**

**Court against Plaintiff's cause of action.**

**(B)    The Legal Issues Upon Which Summary Judgment Is Sought.**

39)    Plaintiff cannot establish a *prima facie* case of Title VII gender discrimination

under the three-step, burden-shifting inquiry laid out in <u>McDonnell Douglas Corp. v. Green</u>, 411

U.s. 792, 802-803 (1973). **Denied; Defendant has not provided any analysis to support its**

**statement that Plaintiff cannot establish a *prima facie* case of Title VII gender**

**discrimination. Plaintiff has demonstrated that, as a female and the only female involved**

**in this incident, the discipline she received in no way compared to the discipline, or lack**

**thereof, issued to her various male comparators. The Secretary of Public Safety**

**acknowledged her disproportionate discipline. Although Plaintiff was found guilty of**

---

[4] A Trooper's acceptance of summary discipline is equivalent to a guilty plea to the charge. Summary discipline is only available for charges of a less serious nature than those which would require a trial board. (A-230).

13

**making a false report, her direct male comparators, the two Corporals investigating the**

**incident both knew that Brian Maher was the perpetrator of the burglary and neither**

**reported same in the police reports filed by each officer, the knowledge of Maher as**

**perpetrator was also known by Sgt. Houdek, Sgt. Mullett and Captain Hawkins and none**

**of these individuals, all of whom had reporting responsibilities, listed Maher as the suspect**

**in any of the paperwork. Cpl. Brian Maher was the perpetrator of the crime against the**

**Plaintiff and while he acknowledged his guilt of first degree burglary, he was found guilty**

**of a much lesser crime that is not on his record and received divisional discipline that did**

**not take away any of his responsibilities or privileges.**

40)    Defendant admits that Plaintiff, a female, is within a Title VII protected class.
**Admitted.**

41)    There is no evidence in the record to show that the Delaware State Police treated

any similarly situated male Troopers more favorably, or otherwise to support an inference that

the State took disciplinary or other adverse action against Dempsey because of her gender.

**Denied for the reasons set forth in our response to #39, *supra*.**

42)    There is no evidence in the record of, any similarly situated male comparators

who were more favorably treated/less harshly disciplined than Plaintiff for similar misconduct.

**Denied for the reasons set forth in our response to #39, *supra*.**

43)    The discipline imposed on other male troopers involved in the October 26, 2003

incident/reporting is not a valid basis for comparison, as the charges against these troopers are of

an entirely different nature than the charges against Plaintiff Dempsey. These troopers are not

similarly situated to Plaintiff. **Denied that the other male comparators acknowledged in**

**answer to #39, *supra*, were not similarly situated. In addition, Defendant's Statement does**

14

not take into consideration the two investigating Corporals who filed false police reports regarding the incident.

44)    The proposed discipline of termination was recommended by a three-member Trial Board, not involved in the underlying incident, at a hearing in which Dempsey received full due process and other rights, pursuant to the Delaware Law Enforcement Officers' Bill of Rights (LEOBOR), 11, Del. C. Ch. 92. **Denied for the reasons set forth in our responses to #25 and # 26, *supra*.**

45)    Dempsey's discipline was reduced to demotion and suspension following her appeal to the Secretary. **Admitted.**

46)    Even if Plaintiff could establish a *prima facie* case, there is no question that the State had a legitimate, non-discriminatory reasons to discipline Dempsey – a State Trooper – for making false statements to and withholding material information from the 911 Center and Troopers responding to an emergency call about a burglary at her home in the early morning hours. **Denied for the various reasons set forth in numerous responses herein.**

47)    The Trial Board cited, in support of their decision, a 1998 letter from former-Attorney General Jane Brady, addressing police officer credibility and the obligation to disclose information about an officer's lack of creditability as Brady material in criminal cases. **Denied as not being relevant to any of the issues in this case.**

48)    There is no evidence in the record which could support a conclusion that any action taken toward Dempsey by the State was a pretext for gender discrimination. **Denied for the various reasons set forth in numerous responses herein.**

15

49)    There is no evidence in the record of any gender-based animus on the part of any person involved in the events of this case. **Denied for the various reasons set forth in numerous responses herein.**

50)    Plaintiff has suffered no loss of back pay or other actual damages which are compensable under Title VII. Punitive damages are not available under Title VII against government employers. **Denied. Plaintiff has suffered emotional distress damages and has suffered extensive damages to her reputation as a State Trooper. Denied as to the viability of punitive damages in the absence of any citation of legal authority.**

51)    Plaintiff's pendent state law claim against her State Employer is barred by the Eleventh Amendment. Pennhurst v. Halerdman, 465 U.S. 89, 106 (1984) ("Pennhurst II"). **Admitted.**

52)    Plaintiff's pendent state law claim against her State Employer is barred by the exclusivity provision of the Delaware Workers' Compensation Act. 11 Del. C. Ch. 92. **Denied, but see response to #51, *supra*.**

53)    This Court should decline to exercise supplemental jurisdiction over a pendent state law claim to the extent Plaintiff's federal claim is dismissed. **Denied as moot.**

54)    **Defendant relies upon unsworn statements (Internal Affairs interviews) to support its Motion for Summary Judgment. Unsworn statements fail to meet the requirements for summary judgment practice pursuant to Fed. R. Civ. P. 56, Small v. Lehman, 98 F.3d 762, 764 n.5 (3d Cir. 1996).**

WHEREFORE, for the foregoing reasons, there are genuine issues of material fact that must preclude Defendant's Motion for Summary Judgment.

MARTIN & WILSON, P.A.

JEFFREY K. MARTIN, ESQUIRE
Del. Bar. I.D. No.:  2407
1508 Pennsylvania Avenue
Wilmington, DE  19806
(302)  777-4681
E-mail -  jmartin@martinandwilson.com
*Attorney for Plaintiff*

Dated:  March 20, 2008

17

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,           )
        Plaintiff,               )       C.A. No. 04-456 SLR
                             )
v.                               )
                             )
STATE OF DELAWARE,               )
DEPARTMENT OF PUBLIC SAFETY,     )
        Defendant.               )

## PLAINTIFF'S SUMMARY JUDGMENT STATEMENT
## PURSUANT TO COURT'S ORDER OF FEBRUARY 13, 2008

On February 13, 2008 this Court issued an Order directing Non-Movant (Plaintiff herein) to respond in kind to the Movant's Statement to be filed on February 29, 2008 setting forth:

    a.    The material facts as to which the moving party (Defendant) contends there is no genuine issue to be tried; and,

    b.    The legal issues upon which judgment is sought.

Plaintiff's response shall be "in kind," with the content of the numbered paragraphs of the Responsive Statement corresponding to the content of the numbered paragraphs of Movant's Statement.

    **(A)**    **Plaintiff's Response to Defendant's Recitation Of Material Facts To Which Defendant Contends There Is No Genuine Issue To Be Tried**

    1)    Plaintiff, Elizabeth C. ("Christy"[1]) Dempsey is a female Delaware State Trooper, who is currently, and was on October 23, 2003, employed by Delaware State Police (DSP) with the rank of Corporal. **Admitted.**

    2)    Brian Maher was on October 26, 2003 employed by Delaware State Police (DSP) with the rank of Master Corporal. Maher has since retired. As of October 26, 2003, Maher and

---

[1] Plaintiff's nickname is "Crysti" rather than "Christy" as stated throughout Defendant's Statement.

Dempsey were involved in a consensual dating relationship. (A-60).[2] **Denied that Maher and Plaintiff had a "boyfriend/girlfriend" relationship at the time of this incident. (B-008).[3]**

     3)    In the early morning hours of October 26, 2003, Plaintiff, while off duty, placed a call to the Kent County Emergency Dispatch Center (KENTCOM) to report a burglary in progress at her home in Frederica, Delaware. (A-385-88). **Denied that Plaintiff contacted "911" or the "Emergency Dispatch Center." Rather, Plaintiff called the non-emergency number for Kent County Communications. (B-073). Also, denied that Plaintiff reported a "burglary in progress." Instead, Plaintiff calmly reported that someone had broken into her house and, by the time of Plaintiff's telephone call, they had left the property. (A-000385). Plaintiff provided her identity to the dispatcher, including her Trooper Identification Number and her cell phone from which she was making the report. (A-000386). Plaintiff then advised the dispatcher that she heard the person drive away, but that she did not have a description of the vehicle nor did she see the intruder at any time. Id. Next, Plaintiff reported that she and Keller were in the home and they were "fine." The dispatcher responded that he would send an officer over there to talk to her "just to make sure." (A-000387). Shortly after her first telephone call to the dispatcher and before any State Troopers arrived at her home, Plaintiff called again and spoke with the dispatcher whose name was Melvin. (A-000387). Plaintiff asked Melvin to "make sure you could tell the trooper to slow down their response, I am fine." Id. Plaintiff, again, cautioned the dispatcher that the officers "can just totally slow their response," to which the dispatcher said he would let them know. (A-000388).**

---

[2] "A-___" references are to pages included in Defendant's Appendix in support of their previously filed Motion for Summary Judgment. (D.I. 40).

[3] Defendant did not take Plaintiff's deposition. Attached hereto as Exhibit A is Plaintiff's interview with Internal Affairs dated June 25, 2004 and will be cited as "B-00_."

4)    At the time of the call and the alleged break-in Plaintiff had a friend, Kevin Keller, with her in her home. (A-181; 409-10; 425-26). **Admitted.**

5)    The person who was banging on Plaintiff's door and broke a window to gain access to the home was Brian Maher. **Admitted. In addition, although not acknowledged in Defendant's Statement, Maher began by banging on the door and window to get Plaintiff's attention. When he received no response, he "mule-kicked" a window leading into her apartment breaking the window. (A000069). After breaking the window, Maher entered the residence calling out for her and threatening her male companion, Kevin Keller. Maher threatened Keller to "kick his ass." (A000410).**

6)    Maher fled the scene when he overhead Plaintiff calling KENTCOM. **Admitted.**

7)    Plaintiff told KENTCOM, during two separate recorded calls, that she did not know the identity of the intruder. (A-385, 387). **Denied; Plaintiff responded during the first call to the dispatcher that she did not have a "clue" as to who broke into her home. In fact, she never saw Brian Maher at the time of this incident. (A-000385).**

8)    Plaintiff admits that she, in fact, knew at the time she placed her emergency calls that the intruder was Brian Maher. (A-000561). **Denied that Plaintiff made any emergency calls to report the incident. (A-000385-88).**

9)    Three Delaware State Troopers, traveling separately, raced to Dempsey's house upon receiving a 1:00 a.m. "burglary in progress" call for Plaintiff, a fellow trooper. (*See* A-453). **Denied that there was any reason for the State Troopers to "race" to Dempsey's house, nor was there a report of a "burglary in progress." While Sergeant Houdek was advised that there was a "subject attempting to break-in and that [Officer Dempsey] got her gun" (A000055), this was a result of the miscommunication of the dispatcher of who**

3

took the non-emergency reports from Plaintiff and mischaracterized the nature of the incident. Sergeant Houdek acknowledged that he was upset with Plaintiff because she placed his officers "in harm's way." (A000061). Houdek further testified that he was not aware that Plaintiff had called dispatch and said not to send anyone. (A000065). Houdek acknowledged that if he knew that the Trooper had said "don't worry," they would have still responded, but not at a fast pace. (A000065).

10)    During the Troopers' investigation at the scene, Plaintiff withheld material information about the "burglary" she had reported. (A-24, 248-54). **Denied; Plaintiff acknowledged that the only information she withheld at the scene of the incident was the identity of the Trooper who burglarized her home, Brian Maher. When asked why she did not advise the dispatcher as to the identity of the subject, Plaintiff noted that she was "confused, hurt, angry and mad and that she did not know what to do." (B-060). Plaintiff was off-duty at the time and had just returned home with Kevin Keller, a former high school friend and Texas police officer, with whom she had consumed numerous rum drinks that evening. (A000412).**

11)    During the Troopers' investigation at the scene, Plaintiff gave a series of false statements to the Troopers. (A-24, 248-54). **Denied. Plaintiff advised the investigating Troopers that she "did not see who broke in." (Emphasis supplied). (B-070).**

12)    Plaintiff told Kevin Keller not to come out of the bedroom when police arrived, even though he had been a witness to the alleged burglary. (A-432-34). **Denied. Plaintiff told Officer Gygrynuk that Kevin Keller was upstairs in her apartment at the time of the investigation. (B-069).**

4

13)    Cpl. Brian Maher, as he was driving away from Plaintiff's residence, placed a phone call to Captain Robert Hawkins, the troop commander for the area in which the incident had taken place, and told him what he had done. (A-71). **Denied. Maher told Hawkins who was his friend from the SCUBA team and not a supervising officer of Hawkins that there had been an incident at Plaintiff's residence. (A000072). Maher did not advise Hawkins that he had entered the property after breaking the window and had threatened bodily injury to Mr. Keller. Hawkins acknowledged that, as a result of this conversation with Maher, he was not aware that the incident involved more than just breaking a window. (A000005). Maher did not tell Hawkins that he made threats and improperly entered Plaintiff's residence. Id. Hawkins was not aware of Maher's deficient reporting until he read the initial police reports the next morning. (A000009).**

14)    Captain Hawkins advised the Troop 3 Sergeant, Sergeant Michael Houdek, that Maher was involved with the Dempsey incident. Hawkins told Houdek to have the responding troopers write up a report of the incident as Dempsey had reported it, for Hawkins' review the next day. (A-7, 12). Houdek did so. **Denied that Hawkins told Houdek to have the responding Troopers write up the report of the incident "as Dempsey had reported it." Sergeant Houdek testified that he had no discussion with Captain Hawkins regarding the write-ups of the incident. (A000056). Investigation Officer Csapo wrote a report wherein he listed the suspect as "unknown." This report was approved by his supervisor, Sergeant Houdek, who knew, following Captain Hawkins call shortly after the incident occurred, that Brian Maher was the unidentified suspect. (A-000248-251). Csapo acknowledged that he learned that Brian Maher was the suspect either the next day or the next couple of days following the incident. (A-000521). Csapo made no attempt to do a supplemental report to**

5

advise as to the identity of the suspect. Id. Csapo told Internal Affairs that he left nothing out of his report. (A-000525). Captain Hawkins, who reviewed the approved investigating reports of Csapo and Gygrynuk, saw that the suspect was unnamed. Captain Hawkins advised that he also could have done a supplemental report to advise of the real name of the suspect, but he did not do so. (A000023). Trooper Gygrynuk, who acknowledged that he was very upset with Plaintiff and wanted her "butt to hang," knew at the time he filed his supplemental report immediately following Csapo's investigating report that Brian Maher was the suspect. (A000492). Gygrynuk knew or discovered that Maher was the suspect when he got back to the Troop before writing his report. (A000493). He was advised by his supervisor, Sergeant Houdek, to write the report as if "they didn't know." (A000494). Gygrynuk said that, "we didn't hide anything. We didn't leave anything out of our reports." When questioned further by Internal Affairs as to whether Gygrynuk had indeed filed a false report, his response was that was a "tough question" because they (the investigating Troopers) thought they were doing the right thing by leaving Maher's name out of the report. (A000494).

15)    Hawkins advised Houdek that the Criminal Investigations (CI) unit would follow up on the incident. (A-8). **Admitted.**

16)    The same day or the next day, Captain Hawkins called Plaintiff to discuss what had happened to find out what she wanted done with the case. (A-00009-10). Dempsey told Hawkins she did not want Maher arrested and did not want anything else done. (A-10, 24). **Admitted.**

17)    The next day, Monday October 27, 2003, Captain Hawkins met with and assigned the case to Troop 3 Criminal Investigations for follow up. (A-263). Sgt. Charles Mullett of CI

changed the disposition of the report to "unfounded," noting that the victim (Dempsey) "desires

no further action in this case ... Victim feels that no crime was committed." (A-8, 18-19; A-

253). **Admitted, but Sergeant Mullett acted contrary to the direction of Captain Hawkins,**

**who directed that the disposition should be "exceptionally cleared because Plaintiff did not**

**wish any prosecution." (A000011). Instead of clearing this matter, which would have**

**required the name of the suspect being identified on the report (Sergeant Mullett knew that**

**Brian Maher was the suspect), Sergeant Mullett chose to "unfound" the matter, meaning**

**that the incident never occurred and therefore no suspect was listed. (A000011).**

18) Both Captain Hawkins and his superior, Major Hughes, to whom he reported the

incident, admitted in hindsight that they did not follow a DSP policy on domestic incidents

involving troopers, in the disposition of the October 26, 2003 incident. (A-11; A-37). **While it**

**is admitted that Hawkins and Hughes acknowledged that they had not followed DSP**

**policy, there is a dispute between Hawkins and Hughes as to what occurred during the**

**incident. Hawkins insisted that he advised Major Hughes that Brian Maher was the**

**suspect when it was reported to Hughes on the day after the incident. (A000012). Hughes,**

**however, is "absolutely positive" that he was not aware that Maher was the suspect, nor**

**was he aware that any trooper was alleged to have been a suspect in this incident.**

**(A000034).**

19) The testimony is undisputed that the incident was handled the way it was at the

express request of Plaintiff Dempsey herself – that nothing further be done about the incident.

**Admitted that Plaintiff did not wish any prosecution. It is further acknowledged that**

**Captain Hawkins believed that Plaintiff was being "completely honest with him."**

**(A000010). Further, Hawkins believed that Plaintiff was guilty of only one misstatement to**

7

the effect that Kevin Keller was not at her home at the time of Maher's burglary.
**(A000022).**

     20)    Nothing further took place, and no person requested any action in connection with the incident, until April 2004. **Admitted.**

     21)    In April 2004, another DSP Captain (Dixon) learned of the incident and advised Major Randall Hughes (Captain Hawkins' superior) about this incident involving two troopers. (A-33-35). **Admitted.**

     22)    Major Hughes referred the matter to the Lt. Colonel and they agreed that criminal and internal affairs (IA) investigations should be commenced into the October 26, 2003 incident. (A-35, 43). **Admitted.**

     23)    As a result of the criminal investigation, Brian Maher pled to a misdemeanor charge of Criminal Trespass, and successfully completed a court-issued Probation before Judgment. (A-324-25). **Admitted that Brian Maher pled guilty only to a misdemeanor charge, although he acknowledged that he was guilty of first degree burglary by breaking into Plaintiff's residence and threatening bodily harm to her guest. (A000079). Captain Page, the head of Internal Affairs for the Delaware State Police, also acknowledged that because Brian Maher was guilty of terroristic threatening, he was therefore guilty of burglary due to his breaking and entering into Plaintiff's residence. (A000447). As a result of Maher's plea to a misdemeanor and his plea to probation before judgment, the charges stemming from his first degree burglary do not appear on his criminal record. (A-000324-325).**

     24)    DSP Internal Affairs investigated the conduct of Plaintiff Cpl. Dempsey, Cpl. Maher, the responding troopers, Sgt. Houdek, Captain Hawkins, Sgt. Mullett, and Major Hughes,

and interviewed all of these persons, and other witnesses. **Admitted that investigations were**

**conducted of these various officers. It is also acknowledged that there were no**

**investigations done of the false reporting of the incident by Troopers Gygrynuk and Csapo,**

**both officers acknowledged that they were aware that Brian Maher was the suspect, but**

**failed to note this on the police reports they filed. (A000248-252). Sgt. Houdek was not**

**charged with any violations, although he acknowledged that he reviewed and signed off on**

**the police reports of Gygrynuk and Csapo while knowing that Maher was the suspect**

**identified to him by Cpt. Hawkins. (A000061). Sgt. Houdek was also not charged with a**

**violation of policy wherein Major Hughes testified that he should have been disciplined for**

**failure to go to the scene of the incident at Plaintiff's residence. (A000038). Cpt. Hawkins**

**and Sgt. Mullett were not charged with falsification of police reports, although each**

**acknowledged that they were aware that Brian Maher was the suspect involved in the**

**incident.**

25)    As a result of the IA investigation, the Plaintiff was charged with violations of

DSP Rule and Regulation ("R&R") #15 (making a false statement or false written or verbal

report) and Job Performance Standard ("JPS") #14 (domestic incident). (A-331-32; A-209, 212).

**Admitted that Plaintiff had a trial board before three members of the Delaware State**

**Police. Defense counsel's suggestion in their Brief that the three person trial board is**

**tantamount to a jury is disingenuous. The suggestion that three troopers are as**

**disinterested and objective as a jury drawn from the community cannot be given any**

**credence.**

26)    Plaintiff, Corporal Dempsey, invoked her right to a three-member Divisional Trial

Board which conducted an evidentiary hearing on the charges against her, at which Plaintiff was

represented by counsel. **Admitted. However, it is noted that Plaintiff was denied access to the Internal Affairs interviews of Maj. Hughes, Capt. Hawkins and Sgt. Houdek for the defense of her case before the Trial Board. (A000529).**

27)     The charge of violation of JPS #14 (failure to report a domestic incident was found to be unsubstantiated, but the trial board substantiated Dempsey's violation of R&R #15 (making false statements), finding in its written opinion that "Dempsey made a series of false statements when she called 911 and to the Troopers investigating her criminal complaint." (A-367-68). **Admitted that Plaintiff's testimony that she was not having a relationship with Maher at the time of incident resulted in the unsubstantiation of the failure to report a domestic incident charge. Admitted that while the Trial Board found the Plaintiff made false statements, it is specifically denied by Plaintiff that she made any incorrect or false statements other than the fact that she did not know the identity of the suspect. Indeed, while she never saw Maher or his car at the time of the incident, she made an identification by his voice.**

28)     The Trial Board unanimously recommended that Dempsey be suspended with pay with intent to terminate, finding in its written opinion that the trustworthiness and credibility of an officer is a critical component of their ability to perform the duties of law enforcement. (A-370). **Admitted that the Trial Board entered this finding, determining that Plaintiff should be suspended with intent to terminate.**

29)     Plaintiff Dempsey exercised her right of appeal to the Secretary of Public Safety, who held a hearing and found that there was substantial evidence to support the Trial Board's finding that Dempsey had violated DSP R&R #15, but found that the proposed penalty of termination was disproportionate to the severity of the infraction under the circumstances. (A-

377-80).  The Secretary ordered reduced discipline of reduction in rank; 15 days suspension without pay and one year's probation.  Id.  **Admitted that the Secretary of Public Safety found that the proposed penalty of termination was disproportionate to the severity of the infraction under the circumstances and that Plaintiff's termination was therefore reversed following the Secretary's decision.**

30)    Plaintiff was never actually terminated from her employment with DSP, and was restored to her original rank after serving her disciplinary demotion.  **Denied that Plaintiff was never terminated.  Indeed, she was terminated from the time of the Trial Board's decision and the upholding of same by the Superintendent until such time as the Director of Public Safety made his determination finding that the penalty of termination was disproportionate to the severity of the infraction.  (A-000379).**

31)    Plaintiff has been made whole as to all back wages owed during the pendency of her appeal/suspension without pay, and calculation of wage differential during her adjusted demotion dates.  (A-240-42).  **Admitted.**

32)    Plaintiff was reassigned to Troop 4 from Troop 7 when she returned to work following her successful appeal to the Secretary.  **Admitted.  However, it is noted that Cpl. Maher remained at Troop 7 and did not get transferred.  (A000080).**

33)    Although Plaintiff complains of this action, she admits that "DSP Troopers are not guaranteed to be assigned to a specifically requested trooper or a specifically requested rotation/shift."  (A-183).  The DSP Divisional Manual provides that "all members of the Division are subject to reassignment, at any time ... to any location in the State of Delaware."  (A-231).  **Admitted.**

11

34)   As a result of the IA investigation, Cpl. Brian Maher was charged with violations of DSP Rule and Regulation ("R&R") #4 (conduct unbecoming an officer) and Job Performance Standard ("JPS") #14 (domestic incident). (A-312-13; A-207, 212). **Admitted that Maher was charged with two violations of DSP Rules, but it is acknowledged that despite the fact that he was admittedly guilty of first degree burglary, his penalty was much less severe than Plaintiff's and Plaintiff was the victim of Maher's crime. Maher received a demotion, 15 days suspension without pay and one year's probation. (A000273).**

35)   Cpl. Maher opted for a Superintendent's Hearing instead of a trial board, at which he pled no contest. As a result of the hearing, the Superintendent imposed discipline of a three-rank demotion; 15 days suspension without pay and one year's probation. (A-326). **Admitted and it is also acknowledged that, unlike Plaintiff whose position as a Trooper was terminated (prior to later reinstatement by the Secretary of Public Safety), Maher did not lose his position as Assistant Shift Commander for his Troop following his discipline and did not have to transfer to another Troop, as did Plaintiff. (A000080, A000054). In addition, Maher was able to continue his work in the Special Units, the motorcycle unit and the SCUBA unit. (A000080). Maher applied for and received terminal leave that began on February 23, 2007, but continued to be paid until October 3, 2007. (A000083, A000080). Following the completion of his terminal leave in October 2007 he received his full pension for serving twenty years with DSP. (A000080).**

36)   As a result of the IA investigation, Captain Robert Hawkins was charged with violation of JPS #12 (neglect of duty). (A-309). Internal Affairs recommended, and then-Lt.

Colonel Thomas MacLeish approved, the imposition of Summary Discipline[4] against Hawkins, consisting of 24 hours suspension. (A-310-110). **Admitted.**

37)    As a result of the IA investigation, Major R.L. Hughes was charged with violation of JPS #12 (neglect of duty). (A-309). Internal Affairs recommended, and Lt. Colonel MacLeish approved, the imposition of Summary Discipline against Hughes consisting of 16 hours suspension. (A-302-03). **Admitted.**

38)    On or about April 6, 2005, Plaintiff filed a Charge of [gender] Discrimination with the EEOC/Delaware Department of Labor. The DDOL, on February 28, 2006, issued a "no cause determination" finding no reasonable cause to believe that DSP engaged in gender discrimination against Cpl. Dempsey. (A-384). **Admitted that while the DDOL made a determination, that determination, whether positive or negative, is not admissible in this Court. Defendant is well aware of this prohibition and attempts to unfairly prejudice the Court against Plaintiff's cause of action.**

(B)    **The Legal Issues Upon Which Summary Judgment Is Sought.**

39)    Plaintiff cannot establish a *prima facie* case of Title VII gender discrimination under the three-step, burden-shifting inquiry laid out in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.s. 792, 802-803 (1973). **Denied; Defendant has not provided any analysis to support its statement that Plaintiff cannot establish a *prima facie* case of Title VII gender discrimination. Plaintiff has demonstrated that, as a female and the only female involved in this incident, the discipline she received in no way compared to the discipline, or lack thereof, issued to her various male comparators. The Secretary of Public Safety acknowledged her disproportionate discipline. Although Plaintiff was found guilty of**

---

[4] A Trooper's acceptance of summary discipline is equivalent to a guilty plea to the charge. Summary discipline is only available for charges of a less serious nature than those which would require a trial board. (A-230).

making a false report, her direct male comparators, the two Corporals investigating the incident both knew that Brian Maher was the perpetrator of the burglary and neither reported same in the police reports filed by each officer, the knowledge of Maher as perpetrator was also known by Sgt. Houdek, Sgt. Mullett and Captain Hawkins and none of these individuals, all of whom had reporting responsibilities, listed Maher as the suspect in any of the paperwork. Cpl. Brian Maher was the perpetrator of the crime against the Plaintiff and while he acknowledged his guilt of first degree burglary, he was found guilty of a much lesser crime that is not on his record and received divisional discipline that did not take away any of his responsibilities or privileges.

40) Defendant admits that Plaintiff, a female, is within a Title VII protected class. **Admitted.**

41) There is no evidence in the record to show that the Delaware State Police treated any similarly situated male Troopers more favorably, or otherwise to support an inference that the State took disciplinary or other adverse action against Dempsey because of her gender. **Denied for the reasons set forth in our response to #39, *supra*.**

42) There is no evidence in the record of, any similarly situated male comparators who were more favorably treated/less harshly disciplined than Plaintiff for similar misconduct. **Denied for the reasons set forth in our response to #39, *supra*.**

43) The discipline imposed on other male troopers involved in the October 26, 2003 incident/reporting is not a valid basis for comparison, as the charges against these troopers are of an entirely different nature than the charges against Plaintiff Dempsey. These troopers are not similarly situated to Plaintiff. **Denied that the other male comparators acknowledged in answer to #39, *supra*, were not similarly situated. In addition, Defendant's Statement does**

14

not take into consideration the two investigating Corporals who filed false police reports regarding the incident.

44) The proposed discipline of termination was recommended by a three-member Trial Board, not involved in the underlying incident, at a hearing in which Dempsey received full due process and other rights, pursuant to the Delaware Law Enforcement Officers' Bill of Rights (LEOBOR), 11, Del. C. Ch. 92. **Denied for the reasons set forth in our responses to #25 and # 26, *supra*.**

45) Dempsey's discipline was reduced to demotion and suspension following her appeal to the Secretary. **Admitted.**

46) Even if Plaintiff could establish a *prima facie* case, there is no question that the State had a legitimate, non-discriminatory reasons to discipline Dempsey – a State Trooper – for making false statements to and withholding material information from the 911 Center and Troopers responding to an emergency call about a burglary at her home in the early morning hours. **Denied for the various reasons set forth in numerous responses herein.**

47) The Trial Board cited, in support of their decision, a 1998 letter from former-Attorney General Jane Brady, addressing police officer credibility and the obligation to disclose information about an officer's lack of creditability as Brady material in criminal cases. **Denied as not being relevant to any of the issues in this case.**

48) There is no evidence in the record which could support a conclusion that any action taken toward Dempsey by the State was a pretext for gender discrimination. **Denied for the various reasons set forth in numerous responses herein.**

15

49)    There is no evidence in the record of any gender-based animus on the part of any person involved in the events of this case. **Denied for the various reasons set forth in numerous responses herein.**

50)    Plaintiff has suffered no loss of back pay or other actual damages which are compensable under Title VII. Punitive damages are not available under Title VII against government employers. **Denied. Plaintiff has suffered emotional distress damages and has suffered extensive damages to her reputation as a State Trooper. Denied as to the viability of punitive damages in the absence of any citation of legal authority.**

51)    Plaintiff's pendent state law claim against her State Employer is barred by the Eleventh Amendment. Pennhurst v. Halerdman, 465 U.S. 89, 106 (1984) ("Pennhurst II"). **Admitted.**

52)    Plaintiff's pendent state law claim against her State Employer is barred by the exclusivity provision of the Delaware Workers' Compensation Act. 11 Del. C. Ch. 92. **Denied, but see response to #51, *supra*.**

53)    This Court should decline to exercise supplemental jurisdiction over a pendent state law claim to the extent Plaintiff's federal claim is dismissed. **Denied as moot.**

54)    **Defendant relies upon unsworn statements (Internal Affairs interviews) to support its Motion for Summary Judgment. Unsworn statements fail to meet the requirements for summary judgment practice pursuant to Fed. R. Civ. P. 56, Small v. Lehman, 98 F.3d 762, 764 n.5 (3d Cir. 1996).**

WHEREFORE, for the foregoing reasons, there are genuine issues of material fact that must preclude Defendant's Motion for Summary Judgment.

MARTIN & WILSON, P.A.

JEFFREY K. MARTIN, ESQUIRE
Del. Bar. I.D. No.: 2407
1508 Pennsylvania Avenue
Wilmington, DE 19806
(302) 777-4681
E-mail - jmartin@martinandwilson.com
*Attorney for Plaintiff*

Dated: March 20, 2008

17

# EXHIBIT A

# INTERNAL AFFAIRS
## INVESTIGATION
Transcribed Interview


**CASE NUMBER:**   12-04


**PERSONS INTERVIEWED:**  Corporal Elizabeth C. Dempsey


**LOCATION:**     Internal Affairs Office


**DATE:**   June 25, 2004


**INTERVIEWERS:**     Captain James Paige, Internal Affairs
Lt. Robert M. Coupe, Internal Affairs


**TRANSCRIBED BY:**     Laurie Robbins
DSP Administration


**TOTAL PAGES:**  83

KEY:

| | |
|---|---|
| JP: | Captain James Paige |
| RC: | Lt. Robert M. Coupe |
| ED: | Corporal Elizabeth C. Dempsey |
| RM: | Mr. Robert McDonald |

1

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 1 of 83

JP:    OK. This is Captain James Paige, Delaware State Police Internal Affairs Division. Today's date is June 25th 2004. The current time 1335 hours. Gonna be conducting at tape recorded interview at the Delaware State Police Internal Affairs Office located on McKee Road in Dover Delaware. Present for the for this interview will be uh Lt. Robert Coupe, Mr. Robert McDonald, and Corporal Elizabeth C. Dempsey of Delaware State Police Troop 7. Um, I'm just kinda go around the room here we'll get everybody's voice on the tape. I'll start with Lt. Coupe.

RC:    Lt. Rob Coupe

JP:    Mr. McDonald

RM:    Bob McDonald

JP:    Christy

ED:    Corporal Elizabeth Dempsey

JP:    Christy, if you would just uh give me your IBM number please.

ED:    3296

JP:    Do you understand that this interview will be tape recorded?

ED:    Yes.

JP:    Uh, at this point I'm gonna inform you of the nature of the of the allegation if you I've given you a copy

ED:    (Positive sound)

JP:    ...read. I'm gonna read it into the record. It's (cleared throat) addressed to yourself. It's from myself today today's date June 25th 2004. This is to inform you that the Internal Affairs Division is conducting an investigation to allegation of violation of Delaware State Police Rule and Regulation Number 15 False Statements in Delaware State Police Job Performance Standard 14 Domestic Incidents Involving Sworn Division Members. The allegation states it is alleged that you made false statements to emergency reporting center dispatchers and/or investigating troopers regarding an incident which occurred on at 1715 B Frederica Road, Frederica, Delaware on or about October 26th 2003. It is also alleged that you failed to report a domestic incident that you were involved in on

D000812

October 26th 2003 to the on-duty supervisor at your assigned troop. This substantiated the allegation ... violation of Delaware State Police Rule and Regulation Number 15, which states "No member shall knowingly make a false statement falsifying any written or verbal report made to a superior officer or willingly and intentionally withhold material matter from such report or statement" ..... Performance 14 Standard 14 which states "When a sworn division member is involved as a suspect or a victim in a domestic incident it is his or her responsibility to make immediate notification to the on duty supervisor of his or her assigned troop section, the supervisor or his or her designee will notify the on call CIU administration or notify the officer's troop commander and appropriate field operations officer". This is an administrative investigation, not a criminal investigation. Your signature below only acknowledges receipt of this notice. It is not a admission of guilt. Do you have any questions on that form?

ED:    No sir.

JP:    OK. If you would, please signed uh ......signature....and date it. And Mr. McDonald, your copy.

RM:    And while she's doing that I might as well put an object on the record just get it out of the way, um, it's our belief that this entire um or the events of October 26th 2003 are purely personal nature ...the scope of the police department. Uh, but more importantly is you may be aware the Attorney General's Office is under an inquiry as to um what they my believe is criminal conduct on the part of uh Corporal Dempsey. So, for that reason, I'm gonna impose her Fifth Amendment privilege here, now. Having said all that, I'm sure I'm gonna get a direct order here in a second to do that and uh if I hear that I'll direct my client to answer any questions narrowly and specifically tailored to her official duties.

JP:    Um, we're gonna, I'm gonna keep my sequence we will get to the

RM:    Oh, I'm sorry.

JP:    That that's fine. And I that you're you're uh point is is noted. Um, I'm gonna kinda stay on key here. I got things in order here and then we'll ...

RM:    Didn't need to jump off that .... I'm sorry.

JP:    Um, you are the subject of an administrative investigation and as such uh you are afforded certain rights. You have the right to have an attorney present, which you've exercised already this this afternoon. Uh or a representative of your choice and you may request a break at any time during the interview. So, if you need to use the restroom, uh you wanna get uh refill on your water, need to stretch your legs um just lets us know and we can

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 3 of 83

ED:     Thank you.

JP:     Stop stop things, OK. Um, I'm gonna provide an opportunity to read three things.
        Uh, the first will be the alleged violations in the Divisional Rules and Regulations
        that were stated in the notice. Um, the second thing will be the complaint
        disciplinary procedures outlined in the Divisional Manual. And the third thing
        will be a copy of the Policeman Bill of Rights. Uh, I allow you an opportunity to
        review those documents if you wish. Uh, if you feel comfortable with what those
        items pertain to we can you can waive that. We can move forward. That's up to
        you.

RM:     I'm fairly comfortable with what those three documents and the Rules and
        Regulations provided. We look like we're moving off the reservation, I'll stop
        and and talk to her about it. So we'll waive that right at the moment. … (cleared
        throat)

JP:     And at this point based upon what Mr. McDonald raised just a few minutes ago,
        I'm gonna read you the Component Statement Form uh regarding the nature of
        our investigation, what we're gonna we're gonna order you to answer our
        questions, OK? I advising you that the you are being questioned as part of an
        official investigation of the Delaware State Police. You will be asked questions
        specifically related to the performance of your official duties or fitness for office.
        In an interview related to a criminal investigation, you would be entitled to all the
        rights and privileges guaranteed by the laws and constitution of this state and the
        Constitution of the United States including the right not to be compelled to
        incriminate yourself. However, in this case, the Delaware State is conducting an
        administrative interview related to an internal investigation. At this time, I'm
        advising you that you must answer questions posed to you. If you refuse to
        answer questions relating to the performance of your duties or fitness for duty,
        you will be subject to departmental charges which could result in your dismissal
        from the Delaware State Police. Neither the statement that you make nor any
        information or evidence which is gained by reason of statements can't be used
        against you in any subsequent criminal proceeding. However, these statements
        may be used against you in in a relation, excuse me, how these statements may be
        used against you in relation to subsequent departmental disciplinary hearings.
        OK? Do you understand that? Would you like an opportunity to read that?

RM:     We understand the statement and again um we don't believe any of what
        happened on October 26th is a commenced with her official duties. I realize
        that's not something can be resolved here today just note the objection. And I I
        also note that you've given us a direct order to answer, so we will. I just want to
        ….. my objections.

JP:     Any questions before we proceed?

D000814

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 4 of 83

ED:    No.

JP:    Having all your rights in mind, uh you ready to proceed with the interview?

ED:    Yes.

JP:    One last item that we have to cover is one of the waivers of the Policeman Bill of Rights pertaining where the interview is conducted.

ED:    Right.

JP:    Um, and under in in this case there was two op two options. We could have it at Headquarters or at Troop 3 cause that's where the incident occurred in Troop 3's uh jurisdiction. Or you can waive that right and have the interview here. It is my presumption, we've set this interview up ahead of time but you still have to get the waiver in writing.

ED:    Right.

JP:    And I'll read that in for the record. And I'll I'll give you copies so you can read along. (paper shuffling) This limitation's on political activity law enforcement officer ..... rights of officers under investigation C which states whenever a law enforcement officer is under investigation or subject subjected to any questioning for any reason which could lead to disciplinary action, demotion, or dismissal, the investigation or questioning shall be conducted under the following conditions. Questioning shall take place at the agency Headquarters or at the office of the local troop or police unit which the incident allegedly occurred as designated by the investigating officer or unless otherwise waived in writing by the officer being investigated. I've been made aware of my right to have this interview conducted at the agency headquarters or at the local office at the office of the local troop in which the incident allegedly occurred. I waive this right and elect to have this interview conducted at the Delaware State Police Internal Affairs Office at the McKee Business Park. If there is no objections to that,

RM:    .....

JP:    please sign that and you will

RM:    (cleared throat)

JP:    ...copy. And I think we'll be ready to proceed finally. .....formalities. Um, Christine basically what I would like to how I'd like to start this this interview off this afternoon would would is as detailed as you can recall so we can try to limit up eliminate all the follow-up questions as many as we can. I'm sure there'll still be many. Um, but I'd keep it as detailed as possible as to what happened on

D000815

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 5 of 83

October 26th at your residence um the incident between yourself and Corporal Brian Maier of the Delaware State Police.

RM:     Did you want her to start on the 26th or the 25th?

JP:     Well, …yeah, prior to the events what where you were. It's kinda good start at your day. How your day, what you did that day and how it and proceed right into the events of the early morning hours of October 26th.

ED:     Starting Saturday?

RM:     Yes

JP:     Yes. Uh which would have been uh October 25th.

ED:     Um, (sigh)

JP:     Got up,

ED:     (laugh)

JP:     Got breakfast.

ED:     Uh, probably not but um, at some point during that day um late morning early afternoon I went to Kent General ER (sniffle) and sat with Brian in the hospital for a while. Um, we left there had um a late lunch at a restaurant in Dover. Uh, I returned um to to my residence at at some point and time. And um, the proceeded out uh for the evening with several friends. We first went to um a hay ride. And then we went to a restaurant in Dover and had um some drinks and um some appitizers. (sniffle) And then I returned home um to my residence with a friend of mine, Kevin Keller. (sniffle) Who was visiting from Texas. Um, once I got home I went into my bathroom and uh began getting ready for bed. Um, used the restroom, washed my face, brushed my teeth, and um when I came out of the bathroom um Kevin said someone is banging on your door. And um I I guess I kinda dismissed it because I didn't hear it and I didn't think he was correct. But um some point I heard noises outside. Came to realize there was someone outside. Um, some point came to realize that it was Brian. Um, Kevin began asking me questions. He was getting a little upset. I wasn't sure what what to do. (sigh) I'd um, we went in the bedroom, closed the door thinking Brian would go away. (laugh) And at some point I heard um heard a crash. A window of mine I know now know. A window of mine was was broken and (sniffle) at the insistence of Kevin I called 911. (sniffle) While on the phone with 911, I came to realize that Brian was no longer there. I didn't hear anything. Kevin may have said, he's gone. (sniffle) Um, I believe I told I told Kentcom they were no longer needed. I I may have called them back. It may have been on the initial call. Um,

D000816

believe they told me that that troopers were still coming and (sniffle) I waited outside. Kevin was upset with me. I needed some air. (laugh) I waited outside for them, whoever was coming. And um, believe Trooper Argo showed up first. And um, I told him that everything was fine. That I no longer needed them. (sniffle) Um, he was insistent on staying. Um, Trooper Csapo and Corporal Gygrynuk (sniffle) um arrived. Uh, I again told them that they were not needed. They were insistent on staying. Uh Corporal Gygrynuk even at one point went into my house with out me. Um, he spoke with Kevin. And uh, I'm not sure if it was Corporal Csapo or Trooper Argo, I believe it was Corporal Csapo, um, dusted for fingerprints outside. I told him that it wasn't necessary. (sniffle) Um, again he was insistent. And um Corporal Gygrynuk and um Trooper Argo had to leave. Trooper Csapo stayed or I'm sorry Corporal Csapo and um he ended up taking taking Kevin back to his sister's house. (sniffle) Continue? Yeah?

JP:     If there's more.

ED:     Um, (paper shuffling) I'm not sure how long after Csapo left I would guesstimate within an hour, um Brian called my cell phone and um immediately said he was sorry and please don't hang up on me. And he he said he had already spoken with Captain and um he told the Captain that uh what had basically happened. And that if he needed him to he would you know answer answer up to what what he had done. Do you want me to go further in Sunday or?

JP:     Yes.

ED:     OK. Um, didn't get much sleep that night. (laugh) Um, got up the next day and uh I think Brian had told me on the phone that that night early in the morning when he called to apologize (sniffle) he may have called me that morning also later in the morning. Um, but anyway I I knew he was going to come board up my window. (sniffle) Um, came to the house with board and tools. (sniffle) And um, while he was at the house, he spoke with who I now know is Captain Hawkins. Um, he told him he was there with me. That he was not fixing the window but board you know boarding it up. And um, told Captain that everything was fine. That he was, you know, taking care of the window (sniffle) And uh, I know he asked if so of course I could only hear Brian's side of the conversation but asked if um he wanted to speak with me in talking to Captain Hawkins asking if he wanted to speak with me (sniffle) and Brian relayed to me that Captain would speak with me on Monday. That as long as long as I was alright, Brian was alright, the window was going to be alright, that he was fine. (sniffle) Um, Captain Hawkins did call me Monday. I'm not sure what time. And I'm not sure if he called on my home phone or my cell phone. Um, asked me if I was OK. If I needed anything. If I wanted anything done about the incident. I told him no. I was fine. The window was being fixed. And uh Brian and I would handle our relationship from there. He said that was fine. Not to talk about it.

D000817

Nobody needed to know that as long as I was fine, he was fine and considered the incident a (sniffle)  And that that's

JP:    ......

ED:    No, I guess that's unless you want me to

JP:    Well, we'll go back and we'll we'll

ED:    (sniffle)

JP:    ....upon what you told us.....  (noises)  How long have you been employed with the division?

ED:    Um, just shy of five years.

JP:    And your current positon?

ED:    I'm sorry?

JP:    Current position of the division.

ED:    Uh, Corporal, patrol, Troop 7.

JP:    Have you held any other positions within the Division?  Besides Patrol?

ED:    No sir.

JP:    The residence at 1715 B Frederica Road, how long did you live there?

ED:    Um, (paper shuffling) summer of um summer or fall of '02 until um bout January, February of this year.

JP:    Did anyone else live there in your apartment with you?

ED:    At one time, yes.

JP:    Was that Brian?

ED:    No.

JP:    Boyfriend, girlfriend?

ED:    Boyfriend.

D000818

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 8 of 83

JP:    OK. How long have you known Brian?

ED:    Um, I met him July 3rd of last year.

JP:    July 3rd?

ED:    Yes.

JP:    When did you begin dating Brian?

ED:    Well we we talked about our relationship after this incident and uh decided we would like to be together exclusively.

JP:    OK. Well prior to prior to the the incident were you dating? Were you going out on dates or seeing each other?

ED:    We had we had gone out to dinner and to a movie or two.

JP:    Do you recall when you actually started doing those types of activities?

ED:    Mmmm August, September

JP:    Would you classify your relationship as boyfriend girlfriend? How would you how would you classify it? At the at the time of the incident?

ED:    Friends, more than an acquaintance less than boyfriend girlfriend?

JP:    How much time would you say you spent together from that time period of Jan or um excuse me

ED:    July

JP:    July through uh actually you said you began dating August September of '03 til the end of August. In on your off-duty time was did your shift's coincide that you had off-duty time together or were you on

ED:    Yes at uh uh at that point and time he was on C Shift and I was on D shift so we we had the same days off. Um, we didn't work the exact same time so, like if I was working days he was working nights. That kinda thing. Um, it varied. I mean uh I went out on dates with other people. I assumed he did also. Um, we really didn't discuss that. Um, but as far as the time we spent together, it it varied, yeah. He's a busy person.

RM:    (cleared throat)

D000819

Corporal Elizabeth C. Dempsey
TA Case # 12-04
Interviewed June 25, 2004
Page 9 of 83

ED:     (sniffle)

JP:     Alright. At the time of the incident, how how well did you know Brian? At the time that this incident occurred?

ED:     ... on a scale of 1 to 10 or I'm

JP:     However you want to put it.

RM:     Do you want her just characterize the relationship .....

JP:     That would be fine, just kinda how how well did you know him? I mean

ED:     I mean we had really just been in social settings together. You know, we like I said we'd go out and have dinner and you don't really get to know somebody that well sitting in a movie but I mean we we were friendly.

RM:     I I I don't mean to step on your question, but but I've learned that there's a difference between a social outing to dating and cause I'm way old. I think what the Captains asking you is is is your relationship with Brian a serious relationship? Where it's starting to become exclusive type of a relationship.

ED:     We had not had a discussion about where our relationship was going, if anywhere. At at that point and time I mean, we even teased each other that there was other people in our lives and that we were casual. Is that any better, no?

JP:     OK. Does Brian normally carry his firearm when he's off duty?

ED:     No. Well not that I know of. No. (sniffle) Knowing him more now, and being out with him

JP:     .....

ED:     OK. Sorry.

JP:     define our timing at right at this point to

ED:     Oh prior prior to that

JP:     ...to that timeframe ......

ED:     OK. Prior prior to that, I did not know him to carry his

JP:     At this point

D000820

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 10 of 83

ED:   At this point, no.

JP:   OK.

ED:   .....

JP:   Had you gone out with him on a date or to a social event where he carried his firearm?

ED:   No.

JP:   Prior to October 26th 2003, did Brian ever spend the night at at your residence.

RM:   I'm object to the question.  Uh

JP:   I understand your objection but I'm still trying to

ED:   (sniffle)

JP:   formulate the extent of this relationship.  And I need to do that for this case.

RM:   I understand

JP:   And I understand the reluctance and but I have to ask the question.

RM:   And I'm just gonna put on the record cause I really believe and I and I mean this sincerely I believe that's a purely First Amendment protected ..... and and has nothing to do with any of her official duties whether or not she has a uh live in relationship with this man.  I think what you're trying to characterize whether or not it qualifies as domestic relations type of complaint.  I think there's another way of asking that.  But that's my objection

JP:   I'm gonna continue with my question.

ED:   Um, not that I recall, no.

JP:   Did you ever spend the night at his residence?

ED:   At that point and time, possibly.

JP:   But you're not sure.

ED:   I am not positive, no.  I I can not say for sure on October 1st I spent the night at his residence, no.  I can not say that. (sniffle)

B011

D000821

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 11 of 83

JP:   Did you have a key to his residence?

ED:   No.

JP:   Getting back to the to that week, the timeframe of October 26th, was Brian aware that Kevin Keller was going to be in the area.  That you were going to be spending some time with him?

ED:   Yes.

JP:   What did you tell him about Kevin Keller?

ED:   That he was a friend of mine from Texas and that we had gone to school together. (sniffle)

JP:   Did you get any reaction from him?

ED:   No.

JP:   … Did he appear to be jealous or upset or anything like that?

ED:   No.

(?):   (sneeze) Excuse me.

ED:   He still hasn't.  (sniffle)

JP:   Was Brian aware that you were going out with Kevin?

ED:   That

JP:   On that on that evening?

ED:   Yes.

JP:   The 25th?

ED:   Yes. (sniffle)

JP:   And how was he aware?  That you just told him?  Or did it come up in conversation or how did this come up?

ED:   We talked about it.

JP:   And what was what was his reaction about it.

D000822

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 12 of 83

ED:     ....um, he asked me if we would see each other that night and I told him no and he said I'd really like to see you tonight and I said well I have plans.   (sniffle)

JP:     He seem upset?

ED:     Not really.

JP:     Now was Keller staying at your residence that week?

ED:     No.  His sister lives right around the corner.

JP:     So he never spent, other than that one night that he was at your residence, he never spent the night there that week the week proceeding?

ED:     The night before he had spent the night at his sister's house because his nieces wanted him to.  They had been to the football game at Lake Forest.

JP:     How about the other nights that he was here that one week?  Do you recall when he got in town?

ED:     We got back the same day cause I drove him back from the airport but I don't remember what day that was.  I thought it was Thursday.   Thursday or Friday.

JP:     So then he wasn't spending

ED:     (sniffle)

JP:     He didn't sleep over at your residence during the week?  He didn't keep any belongings over at your residence that week?

ED:     I think he had some things a couple things there um I guess from when he picked me up that night.  But

JP:     Picked you up ....you've got me confused.  I'm sorry.  He picked you up where?

ED:     At my house.   Before we went out.

JP:     On Saturday.

ED:     Correct.

JP:     The 25th

ED:     Right.

D000823

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 13 of 83

JP:     OK.

ED:     (sniffle)

JP:     My question is though did he spend any evenings at your residence during the
        timeframe that he was in the area, did he spend the night at your residence?

ED:     The the night before we had gone he had gone to the football game and spent the
        night at his sister's house. And then Saturday night.

JP:     So your answer is no?

ED:     Right.

JP:     How would you describe your relationship with Keller?

ED:     We had gone to high school together. We um dated af right after high school.
        Not long after high school. (sniffle) Um, we were friends. We had just come
        back in contact with each other not very long before this. (sniffle)

JP:     Was Keller aware that you were in a relationship or were dating was the you were
        dating um Brian at the time. When he came.

ED:     Kevin knew I had a friend named Brian, yes.

JP:     Did he know you were dating Brian?

ED:     Did he know that I had gone out to dinner and done social things with Brian, yes.
        (sniffle)

JP:     Said in your statement you made the uh comment that you had gotten a call from
        Brian that day that he was in the hospital?

ED:     Right. He was um I believe he had spent the night before at his parents house or
        somewhere in New Castle County (sniffle) and uh when he was driving I guess I
        believe possibly all week he was having pains in his stomach and um he felt that
        his something was swollen. Um, he called his I guess on-call doctor and um and
        that doctor recommended that he go to the ER. And he was already southbound
        from New Castle County and decided to go to Kent General. He called me and
        told me and uh I said well I'll meet you there.

JP:     Why did you go to the hospital?

D000824

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 14 of 83

ED:    He was a friend (paper sounds) that was going to the emergency room and his parents were up in New Castle County.

JP:    Did he ask you to come up to the hospital or

ED:    No.

JP:    just go up on your own?

ED:    I mean I told him that I was coming but I mean I went on my own. (sniffle)

JP:    And you went out to lunch. Had lunch. Uh, you returned to your residence and then you got ready to go out with your friends and Kevin that evening, correct?

ED:    With my friends, yes.

JP:    OK.

ED:    Kevin being one of them.

JP:    And who who else did you go out with that night?

ED:    Um, um my best friend and her husband and uh two other people.

JP:    Do you have their names? You know their names?

ED:    (positive sound) Um, Kristin Holemo, Martin Holemo

MD:    ......

JP:    Kristin with a K?

ED:    K r i s t i n

JP:    And how you spell that last name?

ED:    H o l e m o. Her husband's name is Martin (sniffle)

JP:    And

ED:    ...It's horrible. Uh, Kristin's brother Cory (paper noise) Wyatt. W y a t t. And his now fiancée Janelle, I think that's J a n e l Dennis.

JP:    And you went on a hay ride?

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 15 of 83

ED:     (sniffle) Yes.

JP:     And then you guys, what time then, I'm just trying to get a time frame here. Was it dark out? Still light out when you went on the hay ride or

ED:     It was early evening. I believe when when we left. I know we waited quite a while for the hay ride. Longer than I wanted to. Um, hay ride wasn't that long and then we left and went to TGI Friday's. (sniffle)

RM:     (cleared throat)

JP:     Do you recall what time you got to TG TJI

ED:     TGI

JP:     TJI Friday, that doesn't sound right.

RM:     TGI Friday's

JP:     TJIF's or whatever it is

ED:     TGI

JP:     Friday's

ED:     Right. Um, not specifically. I mean I I'm I would guess at least 9. Guesstimate.

JP:     And how long did you stay there?

ED:     I would guess two hours.   We were there we were there for a while, just taking our time. Had a couple drinks and talking, catching up. (sniffle)

JP:     How much do you recall how much you had to drink that night?

ED:     (sigh) A little bit. Um, I don't know how to tell you how many. No. How many specifically, no.

JP:     What were you drinking?

ED:     (sniffle) I know at the beginning of the evening I was drinking Captain and Coke.

JP:     OK. That's the beginning of the evening, what were you drinking later in the evening?

B016

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 16 of 83

ED:    I don't remember specifically, if I had to guess I would say probably still Captain
       and Coke but I'm not positive.  (sniffle)

JP:    Now you you made the comment you had a little bit to drink but I kinda took that
       as mean I I don't want to read that wrong but you were being a little facetious.

ED:    Well not not facetious I'm

RM:    Didn't want to know if you thought you were under the influence.

ED:    I was under the influence.

JP:    OK.

ED:    Maybe the comment should have been a little too much.

JP:    Well, that's what I was just trying to clarify.

ED:    Sorry.

JP:    Uh, so you left TJ Friday's

ED:    Friday's.  (sniffle)

JP:    And you go home to your house or somewhere else?

ED:    I think we just went straight to my house.

JP:    And just you and Kevin

ED:    ....

JP:    or you still with your friends?

ED:    No, they went they went on home.  Or, they were not with us.  I assume they went
       home.  (sniffle)

JP:    When you arrive home, uh do you notice Brian's vehicle in the area?

ED:    No.  (sniffle)

JP:    Do you have any idea that he may show up at the house that night?

ED:    No.

D000827

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 17 of 83

JP:    Did you have any phone conversation with him during the night while you were out?

ED:    Yes.

JP:    Calling the cell phone?

ED:    Um, I know I called him at some point.

JP:    You called Brian? Do you recall about what time that was?

ED:    Before we left TGI Friday's but uh what what time specifically, no. (sniffle)

JP:    OK. Um, why did you call Brian?

ED:    He had like I said earlier, when we were at the hospital and having lunch, he had asked to see me that night. (sniffle). Um, I told him that I definitely had plans for most of the evening and that we probably would not be getting together. No, we would not be getting together. He wanted me to call and just say hey, definitely yea or nea, you're coming or you're not coming down. Um, and it got to be later in the evening and so I called him and said, you know I'm definitely not coming down.

JP:    And (tapping sound) reaction from Brian?

ED:    Disappointment? Maybe he wanted to see me that night. It was (sniffle) I don't know if you guys know this, but he was in motorcycle training all week and you know he was home for two days and then he was going back to motorcycle training. He was home. Um, he wanted to see me. Wanted to go out. (sniffle)

JP:    Did Brian call you at any time prior to him responding to your residence?

ED:    (sigh) I'm not positive. Um

JP:    Well I need you to think about it cause

ED:    Well I have thought about it (laugh).

JP:    OK. Well, go ahead and

ED:    I'm not positive.

JP:    Why ... then there's some doubt whether he did or didn't. What what why do you have why why can you expand upon that at all?

D000828

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 18 of 83

ED:   Well, that was a while ago. As I've already said I was under the influence. Since since then I mean I've talked to him about the incident. I've had a conversation with Kevin about the incident. (sound). There are things I think I remember. There are things I've tried to remember. Things I've tried to forget. (laugh) It's not really easy to remember something that happened (laugh)

JP:   Well, try to refresh your memory a little bit, you gave a statement to

ED:   (sniffle)

JP:   Sergeant Hudson back on April 23rd of of this year. Do you recall making the statement?

ED:   Two months ago, yes, I remember speaking with him. Or being interviewed by him. (sniffle)

JP:   And he's asking during that interview he asked you questions about uh what occurred that night and during that one of the questions he asked you was uh recognizing a voice at your front door and at that point you you responded back that you did receive a phone call from Brian Mayer. You didn't recall if it was on your cell phone

ED:   (sniffle)

JP:   or on your house phone.

ED:   OK. (sniffle)

JP:   Does that help at all?

ED:   I …. I guess.

RM:   I'm I'm confused. Are you asking if if she received a phone call from Brian before he got to the house and he ….. or that night after he's gone?

JP:   Prior to the events unfolding.

RM:   OK. (cleared throat)

ED:   OK.

JP:   So, do you recall the phone

ED:   (sniffle)

D000829

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 19 of 83

JP:    call?  Does that help

ED:    (sigh)

JP:    jingle your memory at all or still kinda vague on it?

ED:    Vague.

JP:    OK.  Um, do you recall

ED:    (sniffle)

JP:    anything about the phone call conversation?

ED:    No.

JP:    You mentioned to Detective Hudson

ED:    (sniffle)

JP:    that you answered the phone call Brian was angry with you

ED:    (sniffle)

JP:    because you didn't go down and see him.

ED:    (sigh)

JP:    Because he wanted to go out that night.

ED:    Was it that phone call or the phone call when I was still at TGI Friday's?  (sniffle)

JP:    (paper shuffling)  Well, that's what I'll find out.

ED:    (sniffle)

JP:    Detective Hudson asked you about the banging on the door, I know we haven't gotten to that part …..specifics. Um, OK you weren't really aware of who it was or even if there was a knock at the door.  Like you said you did hear a voice and recognized it.  Um, but you didn't see the person, so you weren't positive and then right after that you received a phone call.  (paper shuffling)

(?):    (sounds of someone drinking)

B020

D000830

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 20 of 83

ED:    It's it's very fuzzy. OK. If if, you know, two months ago I said he uh he made a
       phone call or I received a phone call then.

JP:    Well after the knocking of the door, do you recall him calling on the cell phone?
       Calling you? After he was at the residence, do you recall him calling you?

ED:    I believe at some point and time I turned my cell phone off and I turned my cell
       phone off.

JP:    Why would you turn your cell phone off?

ED:    Maybe he was calling.

JP:    Well, if you're turning your cell phone off, do you normally I mean do you
       normally tell turn your cell phone off all the time? Or do you leave it on most of
       the time? Or did you turn it off because the phone kept ringing and you turned it
       off? You were tired of hearing it ringing?

ED:    I don't remember.

JP:    At some point you realized Brian's at your front door knocking or banging?

ED:    I really realized Brian was, yes, outside. (sniffle)

JP:    And how did you realize that?

RM:    (cleared throat)

ED:    When I came out, Kevin said there's someone banging at your door. I didn't hear
       the banging. I proceeded to believe I walked into the bedroom, not very many
       places to go in that apartment, um, at some point and time I heard or ....heard
       things outside I don't remember if it's I heard the banging on the door first or if I
       heard the the footsteps, noises, out on the roof, heard his voice, started to put two
       and two together (sniffle)

JP:    OK. So you're in the bathroom, you're you're we're running out of time. OK.
       We're gonna go ahead and and uh stop, change tapes. It is

ED:    (sniffle)

JP:    1420 hours.

TAPE 2

JP:    OK. We're back on tape. Um, 1424

D000831

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 21 of 83

ED:    (sniffle)

JP:    hours. Uh, Christy, I just wanna in a break here

ED:    (sniffle)

JP:    between tapes and I had a chance to go back over some of my notes here. Getting
       (paper shuffling) back to the phone call, and try to make some sense out of your
       previous statement and what you're and I realize time has gone by um, try and
       just make the best sense we can out of this. It appears from your your earlier
       statement that you you had phone contact um with Brian prior to the events really
       unfolding. He was basically at your door knocking at this point. And the the
       attempts to contact you. Um, and you make mention in your earlier statement that
       you do have conversation but you're you're today you're not sure of that?

ED:    Correct. I remember specifically talking to him before I left TGI Friday's.

JP:    ...we've already talked about that.

ED:    Right, we talked about that.

JP:    But this would be another

ED:    (sniffle)

JP:    subsequent call. (noise)

ED:    Right. After I get home, things get a little fuzzy. I believe I received a text
       message from him, not a phone call. I do not recall what exactly that said. But I
       know he was not happy that I hadn't come down to the beach.

JP:    So there was something in that message to lead you to believe that he was upset?

ED:    Right. I believe he asked me to call him.

JP:    Did you call him back?

ED:    I do not believe so, no. Because at that point, I had made it clear that he and I
       were not seeing each other that night. And so, in my mind, I'm done.

JP:    ....And when ....

ED:    And I believe I even told him when I was at TGI Friday's I will you know if you
       would like to do something tomorrow, you know, I'll call you in the morning.

D000832

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 22 of 83

JP:    And his response to that was

ED:    Like I said, disappointment. He

JP:    Did he say did he like say oh come on Christy you know

ED:    Oh, I'm sure he probably tried to

JP:    plead with you to

ED:    Right.

JP:    convince you to come down.

ED:    Right. I mean I couldn't tell you exactly what he said but

JP:    So Brian's knocking on the front door, banging on the front door, let's get into
       that. Is he beating on the what's what's what's going on at the front door? At
       some point you get your attention turns to that. Kevin Keller tells you that
       somebody's at the front door. There's banging or or there's knocking, what what
       is it? What do you hear?

ED:    When I came out of the bathroom, I didn't hear anything. I wasn't sure if Kevin
       had flipped his lid  or (laugh) or what. Um, and then at some point as when I go
       into the bedroom I hear something outside that alerts me that hey there is someone
       out there. And then uh I don't know if if Brian said something something made
       me realize that hey it is Brian.

JP:    The banging on the door, was it loud? Was he banging or knocking?  (paper
       shuffling)  Initially. When you first noticed it. (paper shuffling)

ED:    I really remember hearing things on the roof. Footsteps on the roof.  I don't know
       if by the time I got out of the bathroom he was done banging on the door or not.
       Knocking .....

JP:    But Kevin makes you aware that there's somebody at the front door? You don't
       go to answer it? You don't go check?

ED:    Correct.

JP:    Why not?

ED:    Well, like I said at first I had thought he was wrong. (laugh) Um, second, I'm in
       for the evening. I've had people stop by or had when I lived there, people stop by

D000833

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 23 of 83

the apartment um looking for police officer. Normally asking for my husband. Or looking for a police officer. And uh, you know, at whatever time it was, very late in the night after having some drinks, I was not in the mood to entertain anybody's state police questions.

RM:     (cleared throat)

ED:     I was off duty.

JP:     OK. In your in your earlier conver conversation with Sergeant Hudson, you acknowledged that you did hear banging on the door.

ED:     OK.

JP:     Um,

ED:     Like I said, something outside alerted me to some noises outside alerted me to somebody was out there.

JP:     I the further conversation um Sergeant Hudson and this gets back to the phone conversation which I thought we might of cleared up but maybe we didn't. Uh, you go on and tell him that on the phone Brian asked you to come outside. And you and you told him that you weren't gonna come outside cause you're going to bed. So does that help re make you remember anything more?

ED:     At this point and time, I do not remember that conversation. But if (noise) Brian asked me to come outside, yes, I probably told him no I was not coming outside. Because I wasn't.

JP:     (sigh) So you make the decision that you're just going to ignore the knocking at the front door, um, and you go to the bedroom?

ED:     Correct.

JP:     Did you have any conversation with Brian while he was at the front door knocking?

ED:     Not that I remember, no.

JP:     Do you recall him yelling?

ED:     Yelling, I remember things, like I said noises outside. I knew it was him. I became aware that it was him. I'm inside with somebody in front of me yelling at me. (sigh) And

D000834

Corporal Elizabeth C. Dempsey
·IA Case # 12-04
Interviewed June 25, 2004
Page 24 of 83

JP:     Yelling at you?  He's yelling Keller's yelling at you?

ED:     He was not happy with me.  Or not happy with the situation.

JP:     Why?

ED:     (sounds) (sigh) Mean, there's another guy or a guy man you know outside at that
        point probably walking on my roof.

JP:     OK.  And he's not happy about that?  Or the fact that there's another man coming
        to your house at one o'clock in the morning?

ED:     Well, both.

JP:     Everything.

ED:     Right.

JP:     Just upset

ED:     The whole

JP:     about the whole.  OK.  I well maybe I need you ask you this question then, why
        why is he you told me earlier that you're basically just friends.

ED:     Right.

JP:     So why would he be upset if another of your friends came to to the house to see
        you or talk to you?

ED:     That may be a better question for Kevin.

JP:     Well why do you think?  I'm asking you the question.  Why

ED:     I don't know.  Maybe he felt uh Brian was interrupting something or interrupting
        his chances of something.  I don't know.  I know he wanted it to stop.  And
        wanted him to go away.

RC:     Could, um, you said when Brian picked you up he dropped off some things of his
        own.

ED:     I'm sorry.

JP:     Kevin

D000835

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 25 of 83

RC:   Kevin, thank you sir. Kevin. When Kevin picked you up to go the hay ride, he
      dropped off some things of his own.

ED:   I know Kevin came back

RC:   No, you said that, today.

ED:   OK.

RC:   I'm not reading from any statements, you already said that today. Because he had
      to come back later and pick up his things. And the first night he went to the
      football game and he stayed with his family.

ED:   Right.

RC:   So you said the night

ED:   I said I said I assumed that he brought some things with him earlier.

RC:   OK.

ED:   Right.

RC:   So, if he brought some things, he was planning on spending the night? Are they
      the kind of things he brought? They....night bag?

ED:   I thing he changed I think he changed his clothes at my house before we went out.

RC:   Before the hay ride?

ED:   Right.

RC:   OK. When you were saying it would be better to ask him, you said he was yelling
      at you. Was he yelling at you

ED:   It was

RC:   because of the situation he felt you put him in? That there's another man out
      there. You've invited me to stay and now you've put me in this situation. Who is
      this other man out here? Are you seeing him? Are you dating him? Is he your
      boyfriend? What kind of things

ED:   Those questions had come out, yes.

RC:   That's the kind of things he's asking?

B026

D000836

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 26 of 83

ED:     Right.

RC:     And what did you tell him?

ED:     Uh, I told him its Brian the guy I went to see in the hospital today. Um, as far as
        he is he my boyfriend, I told him no. He said, have we gone out? I said yes.
        Which um, he already knew that, but

RC:     So he didn't go say well then go answer the door? He said call 911?

ED:     He said I'm going to go out there. And I said no, you're not. Nothing good could
        have come of that and that's exactly what I told him. I said why are you going to
        go out there and start something? I said you're not going out there. That's
        ridicules. So, then he said, well then call 911 .

RC:     If Brian's just a guy that you've gone out with on social things, you think this is
        normal for him to be at your door at this time of night?   Were you shocked by
        his presence?

ED:     Oh, yes. Oh, I was totally shocked.

RC:     Were you afraid that he was out there?

ED:     I wouldn't say afraid. No.

RC:     How well did you think you knew him? Did you think he was dangerous?

RM:     You mean Brian?

RC:     Yes. Brian.

RM:     ….

ED:     Oh, dangerous, no.

RC:     And why didn't you think he was dangerous?

ED:     I'm sorry? Why

RC:     Why didn't you think he was dangerous?

ED:     I mean I think I knew him I mean I wouldn't have gone to a movie theatre or you
        know to dinner by yourself if I you know if I thought somebody was dangerous?

B027

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 27 of 83

RC:    Is it because you knew him well enough that the next day you sat down and defined your relationship?

ED:    I mean if that's the way you want to put it?

RC:    No, that's how you put it.  It when the Captain was asking you about where this relationship was, you said it was very just a social thing.  When he went on, we went to a movie, went to a dinner.

RM:    (cleared throat)

RC:    We were just friends.

ED:    Right.

RC:    But then you said that um after this incident you sat down and you defined where your relationship was going to go.

ED:    After the incident, right.

RC:    After the incident.  The the day after?

ED:    Mmmm I don't think it was the day after.

RC:    OK.  But he came back to your house.  You welcomed

ED:    Right.

RC:    him in.    After this incident.

ED:    Yes.

RC:    And you defined where your relationship was gonna go?

ED:    At some point after, I I don't remember the exact day.  He was gone all the next week.  At some point we talked.  We talked on the phone while he was gone that week.

RC:    (positive sound)

ED:    Then it started

RC:    What

ED    to be hammered out.

D000838

Corporal Elizabeth C. Dempsey
TA Case # 12-04
Interviewed June 25, 2004
Page 28 of 83

RC:    And one of those

ED:    started

RC:    one of those things would be that you're not gonna see other people?  Is that the comment?

ED:    Right.

RC:    Perimeters you set for the relationship.

ED:    We had set, yes.  We had started to say hey you know

RC:    Is that normal for someone that you have had dinner with twice and gone to a movie?  Did they tell ...

ED:    Well, I didn't say I had dinner with him twice.

RC:    Well, you you you sound like you're trying to minimize the relationship.  When the Captain was asking you how how well you knew Brian, how close you were to Brian, you said we had dinner a couple of times and a movie.  It was just social.

ED:    OK.  It was social.  It was casual.

RC:    OK.

ED:    But I didn't say we had just gone to dinner twice.

RC:    OK.  Well, that's what I inferred when you said

ED:    OK.

RC:    It sounded ...try to minimize

ED:    Well, I I can't tell you how many times we had dinner.  I can't tell you how many

RC:    I I guess

ED:    times we just hung out with friends, you know, at a bar or at somebody's house or

RC:    OK.  My my confusion is that if you're saying it's just a social, it's someone that you've been with a few times, and then you're sittin down, you're settin rules for your relationship or perimeters for your relationship however you want to

B029

D000839

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 29 of 83

articulate it. To me it sounds strange that that's just a social relationship. To me, it sounds like there's something more there that you're closer with Brian and for whatever reason, you don't want to share that here today.

ED:    Well, (sigh)

RM:    For the record, you guys ... and but I understand what you're asking

ED:    Right. I I definitely do not and sorry but I don't feel I don't need to discuss how I handle starting a relationship with someone with you guys. I'm sorry. I've gotten out of a very bad relationship

RC:    (positive sound)

ED:    And Brian had gotten out of a long term relationship. And so yeah, both of us were very guarded about how much we shared with each other about our feelings and what we wanted. And I knew Brian's reputation. I knew my reputation. And we were both very guarded. (sigh)

RC:    OK. I'm not trying to upset you.

ED:    Yeah well thanks.

RC:    I'm just saying that to me it's confusing that if it's not a close

ED:    (sniffle)

RC:    relationship, someone's at the front door asking you to come to the door. Asking you to come to the door.

ED:    (sniffle)

RC:    You mentioned at that time he's probably on the roof. You have

ED:    (sniffle)

RC:    a gentleman inside that you feel that comfortable

ED:    (sniffle)

RC:    trying to resolve this. To me it sounds like there's a closer relationship with Brian at that point.

ED:    OK. I've told you what our relationship was. I don't know how many other ways you want me

D000840

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 30 of 83

RC:     OK.

ED:     to say it.

RC:     That's fine.

RM:     What I think, and I may have this wrong, and I'm not trying to step in the question.

ED:     (sniffle)

RM:     I think it what this the Lieu the Lieutenant wants to know what you think the nature of the relationship is not necessarily what Brian thinks it is at that moment.

ED:     And I've said that. (sniffle) I mean, like I said, we hung out. We had gone out to dinner. We had gone to the movie. We we may have even watched a movie at his house. (sniffle) But at that point and time, he and I were casual. We had not set any boundaries. I was seeing other people. I believed him to be have been seeing other people. And at that point and time, we were friends. We were not boyfriend and girlfriend.

RC:     OK.

ED:     (sniffle)

JP:     I'm gonna get I'm and I know you're object to my next question but I think it's gonna settle this matter before we get to

ED:     (sniffle)

JP:     and then we can leave it. Um, prior to October 26th were you intimate with Brian?

ED:     What what does that mean?

JP:     That you had sexual relations with Brian.

ED:     I'm not answering that. It is none of their business.

JP:     OK.

RM:     And she's not gonna answer that, Captain. And I understand that you're gonna have to to argue that that's …. But that's way way beyond

D000841

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 31 of 83

ED:     (crying sounds)

RM:     official duties.

ED:     (crying sounds)

JP:     Well, we're trying to what we're trying and I I don't I don't particularly want to
        ask it but we're having difficulty

ED:     (crying sounds)

JP:     understanding why this event unfolded

ED:     (sniffle)

JP:     as it did if Brian and and her are just these casual

ED:     (sigh, sniffle)

JP:     social relationship.  It doesn't make sense.

ED:     (sound)

JP:     And that's what we're trying what did Brian get upset because there was more to
        this relationship than than what we're being lead on to?  ....

ED:     I didn't ask him to come there.

RM:     :.... And and that's ...

JP:     .....

RM:     And I'm not trying to minimize it.  But I have a a client who's in her own house
        with a friend, who for whatever reason is now being confronted with somebody
        who must think he has a much more serious

ED:     (crying sounds)

RM:     relationship with her.  Whatever their personal relationship is, whether it's
        intimate or otherwise, really doesn't run into

ED:     (sniffle)

RM:     anything that's being alleged here today.   And she not gonna answer the question.

D000842

Corporal Elizabeth C. Dempsey
TA Case # 12-04
Interviewed June 25, 2004
Page 32 of 83

ED:     (crying sounds) I need a break. (crying sounds)

RM:     I'll come out in just a second.

ED:     (crying sounds)

RC:     The time now is 1441 hours.

JP:     OK. We're back on tape. Uh, 1450 hours. Um, I think what I would like to do is just define a couple of things and maybe that will satisfy my. When you go out when you go out with somebody to dinner, to a movie. Do you consider that a date? Or is that just going out to dinner?

ED:     (crying sounds)

JP:     Trying to maybe

ED:     It can not

JP:     bridge bridge a generation gap here maybe

ED:     Right. And and maybe no offense but maybe that is where we are. I did not have to ask. We were not exclusive. If I was doing something else, if I was going out with my friends, if I was going out on a date, if I was on the phone and didn't answer Brian's phone call because I was on the phone with another guy, I did not have to give Brian any explanations.

(?)     ….. (paper shuffling)

JP:     OK. We've got to the point where we acknowledge that somebody's outside.

ED:     Right.

JP:     OK. Um, and we know it's Brian, correct?

ED:     Correct.

JP:     OK. And at this point, you direct Kevin to the bedroom or how does how how do we move from the bathroom, living room area to the bedroom? How does that transpire?

ED:     Yeah, I I believe I said hey come in the bedroom and and uh we'll stay in here. (noise) The the only (paper shuffling) I said come in here.

JP:     And you go in the bedroom because

B033

D000843

ED:    Well all the blinds were closed. I mean Brian couldn't see in. And

JP:    Just put yourself just a little bit more distance from Brian?

ED:    Right. I mean, yes.

JP:    Kevin, at this time,

ED:    Not happy.

JP:    Not happy. What's he wearing. Do you recall what he's wearing?

ED:    In my mind, I can not picture Kevin right then and say this is what he had on, did
       not have on.    I have been told since then that he did not have his shirt on. Did I
       remember that myself, no I do not.

JP:    OK. At this point, you've also said that that Kevin was upset, um, was there any
       conversation about going and opening the door?

ED:    Like I said, uh Kevin said he would go out and handle this. I'm I'm going out
       there. And I told him he wasn't. I mean that not that it necessarily was going to
       be a problem if he went outside. But I mean let's face it, there's two guys outside
       or you know potentially two guy outside, there's a potential for a problem. And I
       did not think it was wise ... that point and time for him to go outside.

JP:    Did you know that Brian had been drinking prior to him coming up to your
       residence?

ED:    Yes.

JP:    Did you think that might add fuel to the fire? Since everybody had been
       drinking?

ED:    I think it. Right I was gonna say it might added to the fire that everyone had been
       drinking.

JP:    You go in the bedroom and shut the door?

ED:    I believe so, yes.

JP:    Is there a light on in the bedroom?

ED:    I'm sure, yeah. Yeah.

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 34 of 83

JP:     And when you're in your bedroom, what's transpiring....

ED:     Kevin's yelling at me. Brian's outside walking on the roof. Um, Kevin's saying call 911 or I'm gonna go out and handle this. And I'm telling you no your (laugh) not. I believe I told him look he'll go away. I mean this is this is rrr this is ridiculous. He'll go away.

JP:     Brian banging on the windows at this point?

ED:     (sigh) Yeah. At at some point. Yeah. There was there was banging .

JP:     Is he banging on the bedroom windows, living room windows, both?

ED:     (sigh) I definitely don't remember the sequence. I believe at some point, yes, there was banging at the windows that we were near the bedroom windows. Um,

JP:     So, bedroom windows he was, he knew you were in the bedroom is banging on the window or is he just

ED:     Oh,

JP:     banging on there's four windows in the front of the house, correct?

ED:     Correct.

JP:     Is he banging on all four? Do you recall? Or is there just banging on one in the living room. Does he come back to the bedroom and bang, or vise versa? Do you have any specific recollection?

ED:     Specific, no. Uh but (sigh) but I don't remember him just, you know, banging on the the bedroom window.

JP:     Is he yelling through the bedroom window?

ED:     There was noises outside. I know I could hear his voice. What he was saying or yelling, talking, I don't remember.

JP:     Is he making threats to you or to Kevin?

ED:     Pretty sure I would remember that. No. I didn't I did not feel threatened. And I do not remember hearing anything threatening said, like

JP:     You you you

D000845

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 35 of 83

ED:    I'm going to hurt you. I'm going to kill you. I'm gonna kick your ass, no.
       Nothing like that.

JP:    But you just told me in the sentence before that you didn't recall what was said.
       So but now you're telling me those things were definitely not said.

ED:    Right. I would remember if somebody threatened my life.

JP:    While you're in the bedroom, Brian call on the phone? Phone ringing? House
       phone ringing?

ED:    Like I said, at at some point I had shut my phone off. Cause I remember the
       reason I remember that is because when I went to call 911, I had to turn my cell
       phone back on.

JP:    And you had turned it off sometime while you were in the residence?

ED:    Correct. I, yes. I believe so.

RC:    What about the house phone? Was that on?

ED:    Nnnn normally (sigh) I I normally kept that unplugged unless I needed to make a
       local call. The only reason I ever got the phone was to make local calls. And
       even now, I use pretty much just my cell phone. Um, when I would have the
       home phone on, I would

RM:    ........I'm sorry

ED:    Oh, I would uh receive phone calls all the time. Hours all hours of the day and
       night for people that weren't me (laugh).

RC:    That's OK. But all I asked was

ED:    Oh,

RC:    if your phone was on. Your house phone.

ED:    Oh, no. I had I had it unplugged, I believe. (phone ringing in background)

JP:    Was there any conversation between yourself and Brian or Kevin and Brian
       through the window?

ED:    I don't remember a conversation, no.

B036

D000846

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 36 of 83

JP:    Did you tell Brian to go away?  You'd talk to him tomorrow?  Anything of that nature?

ED:    Possibly but again, I do not remember specifically.  I can see me out of frustration, yes maybe saying that but do I remember specifically saying that, no.

JP:    Are there screens on on the windows of that house?

ED:    Shew, I don't live there now.  I would imagine so, yes.   Because Frederica, flies are horrendous.

JP:    Well did you open those windows or have an occasion to open those windows while you lived in that residence for a year or longer.

ED:    There's marsh on both sides (laugh) of that residence, so no, I didn't open the windows very much.  I mean it the marsh stunk.

JP:    So you're not sure if there's screens or not screens?

ED:    I am not positive, no.

JP:    OK.  You never had an occasion to open a window because you were cleaning and had to get the fumes out of the house or something …

ED:    ….. smoke detector off a couple times.  Um, again, I I'm sorry.  I do not remember specifically.  Would I if I had to guess, I would say sure there was screens in there.  If I had to guess.  But I do not remember specifically.

JP:    OK.

ED:    I'm trying to think if there's screens in my windows at the house now.  The house (laugh)  I live in now (laugh).

(?)    (cough)

JP:    Is Brian loud?  Is he yelling?  Is he screaming?  Uh,

ED:    I know there was noise outside.  I had someone right in front of me.  Angry with me or upset with me.  Yelling at me, talking to me, hollering at me.  Whatever you want to call it.  I mean, that's what was right in front of me.  I mean yes I heard noise outside.  What specifically it was, what what specifically he said, I don't know.

JP:    Why would Brian

D000847

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 37 of 83

ED:    Or at this point and time, I don't remember.

JP:    OK.  Why wouldn't Brian go away?

ED:    (sigh)

JP:    You told him to go away.  You you

ED:    OK.

JP:    did plead with him to leave?  Did you tell him go away ….

ED:    Like I said, I don't remember specifically telling him that, no. (noise) Again, if I
       had to guess, yes I probably was frustrated and said or yelled or whatever go
       away, go home or.  What was

JP:    Do you

ED:    the question?  I'm sorry.

JP:    Do you recall do you recall him giving you an ultimatum to open up the door?  Or
       he's gonna kick it in.  Gonna give you give you the count to the count of ten or
       give you a count of five?

ED:    I I don't not remember that, no.

JP:    At this point, up to this point, do you have any fear that

ED:    ( sounds)

JP:    he may break in your residence?  Was he doing anything to make you feel that he
       might come in?

ED:    No, I don't remember being fearful at all.  No.

JP:    You're not fearful at all?

ED:    No.

(?):   …….

ED:    (sounds) (cleared throat) (sounds)

JP:    At what point does the window get broken?

D000848

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 38 of 83

ED:     Are you looking

JP:     Are you in bed

ED:     for

JP::    still in the bedroom?

ED:     Right. Right. We were still in the bedroom. Yes. I do know that. Because we were basically in the bedroom the whole the whole time.

JP:     And what happened? So you hear glass breaking?

ED:     Right.

JP:     And what's your reaction then?

ED:     Shock.

JP:     OK.

ED:     Shock

JP:     And Kevin's reaction?

ED:     He he said you better call 911 now.

JP:     Is this when you called 911?

ED:     Yes.

JP:     And why did you call 911?

ED:     Well, I was shocked. At that point and time I didn't know where things were going? I mean I never foresaw them getting to that point. And like I said, Kevin still in front of me, yelling, you better call 911 now.

JP:     Well why does he want you to call 911? Is he saying is is this guy's gonna hurt me. Or he's gonna hurt you or what why is he making you call 911? Is he afraid?

ED:     You're gonna have to ask him if he was specifically afraid. I did, again, I know he was not happy. I kept telling him he'll go away, it will be fine. I'm sure at some point and time I said you don't know Brian. Alright. Well he's not not that I'm his mother and and knew him that well but I mean Kevin didn't know him at

D000849

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 39 of 83

all. And so I'm trying to calm him down. Sorry, I lost my train of thought. What was the question?

JP:    Why did Kevin want you to call 911? Was there some sort of fear between one and one or both of you that you had to call 911?

ED:    I didn't have

JP:    Why did you feel you had to call 91? You called 911 for a reason. Why did you call them?

ED:    ....I mean I've said that. It he's telling me to. He's upset. He's yelling at me. I didn't know where it was going from that point.

JP:    So did you feel that you needed assistance from the police at that point?

ED:    Right. I mean that's isn't that what we're taught? I mean we're taught you need assistance, you call for assistance. At at that point and time, him outside walking out around on my roof was was one thing. OK. But breaking my windows, you know, taking things a step further. And at that point and time obviously I wasn't going to be able to control the situation. I mean I's felt like I was getting things were getting out of hand. And and yeah, I needed assistance.

JP:    So you you hear the breaking of the window. Do you hear Brian come in? How do you know he's in the residence?

ED:    I never saw him in the residence. Now, I think my my thought was I mean those were small windows. I I don't think I thought he could really get through those windows. I mean I mean they're small. You've seen 'em. Not that Brian's a big guy.

JP:    Well did you hear him inside the residence?

ED:    (sigh) (paper shuffling)

JP:    And we know he's in the residence.

ED:    Right. I mean it like I told you before, its hard to know exactly what I just remembered just Christy just remembering just what she remembers. And not OK Kevin's Kevin has said this, when we've talked and Brian has said this when we've discussed it. I mean yes, now I know Brian was in the residence. I know that positively because its been said.

JP:    Did you hear his voice, when he was in the residence?

B040

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 40 of 83

ED:     (sigh) I was on the phone with 911.

JP:     Did he knock on the bedroom door?

ED:     I don't remember that?

JP:     Did he try to did he jiggle the the was the door was the bedroom door locked?

ED:     Mmmm I I would assume it was I I don't remember.

JP:     Why why would you've locked the bedroom door?

ED:     It's kinda of a joke. I I not a joke. I lock every door. I I don't care if I'm walking into my house for two seconds, seriously. I lock the door before I walk away from it. It's locked. Any time I walk in a room, that door's locked.

JP:     Do you recall Brian saying anything?

ED:     I do not.

JP:     You don't recall Brian pushing in the door?

ED:     I do not.

JP:     Did you direct Kevin to sit in front of the door?

ED:     I did not.

JP:     Did Kevin sit in front of the door?

ED:     Yes.

JP:     Why did he sit in front of the door?

ED:     You'll have to ask Kevin that. I do not know.

JP:     Well, as as Kevin was sitting was sitting in front of the door was the door being pushed on? Was he pushing the door back to keep it closed?

ED:     I just remember Kevin Kevin sitting in front of the door.

JP:     Prior to the glass breaking, was he sitting in front of the door?

ED:     I don't remember. I can picture him sitting in front of the door.

B041

D000851

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 41 of 83

JP:     When you're on the phone with 911?

ED:     Right. I know I know he was there at that point and time, yes.

JP:     Why do you recall that, specifically? Has to be some some reason?

ED:     Just cause I can I can picture visualize or you know picture where I was, and looking at him. And I remember …. But in my mind I can't picture

JP:     So there's no

ED:     where he was in the room prior to that. Or if or if he walked right in and just sat down in front of the door. I I do not remember that.

JP:     You don't recall Brian knocking on the bedroom door?

ED:     (sigh)

JP:     Banging on the door? Trying to get in? Pushing on the door? Anything? Yelling at the door?

ED:     Like I said, I was on the phone with 911 at that point. I (sigh) I don't I'm sorry.

JP:     Was the bedroom door damaged?

ED:     From from him? No, there was no further damage to that door after this incident. There was damage to the door prior

JP:     Now do you

ED:     ….

JP:     did did you uh

ED:     Prior to my living there…

JP:     Did you um tell Brian to leave once he was inside the residence? Do you recall yelling at him to to get out of the residence to leave?

ED:     Nnnn I was on the phone with 911. I was as far as I know I was just talking to them.

JP:     How long were you on the phone with 911?

ED:     I don't know.

D000852

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 42 of 83

JP:   You said you were on the phone with them twice?

ED:   That's a little fuzzy also. I I am not positive. I kinda thinking yes it was twice or
      maybe if the conversation was so long I was able to say that he wasn't there and
      or nobody was there and that you know I was fine and you know, no need for
      anybody. It may it may have been two conversations.

JP:   But you're sure you're on the phone with 911 when Brian was in the residence?

ED:   If I remember correctly, the glass broke, Kevin's yelling, I turn on my phone, I
      call. (coughing, cleared throat)

JP:   While this is transpiring, while you're still in the bedroom, the glass is broke, um,
      you're starting to get on the phone with 911, uh what does Kevin do about your
      weapon? Does he try to get your weapon? Or is he does he ask you for your
      weapon? Tell me about that.

ED:   I don't remember where my firearm was.

JP:   Did Kevin ask you about your firearm?

ED:   I don't remember.

JP:   Do you retrieve your firearm?

ED:   I don't remember.

JP:   According to the officers that respond to the scene uh and also on your 911 tape,
      you made comments that you were armed. You had your firearm.

ED:   OK. That I don't remember that.

JP:   But you don't remember anything? ...

ED:   I'm not saying I don't remember

JP:   any conversation about Kevin uh

ED:   and a fire in my

JP:   looking for your firearm, asking for your firearm

ED:   No, I don't.

B043

D000853

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 43 of 83

JP:    And you don't recall retrieving your firearm?

ED:    No, I don't.

JP:    Where do you normally keep it in your room?  Or do you keep it, where do you keep it in the residence?

ED:    In in that house I had um um a closet, there was two closets in my bedroom and normally I had um in the one closet um it wasn't a normal sized closet, the door wasn't a normal size it was um probably  only the door might have been maybe as tall  as me, not quite.   And I had in over the hook, you know you buy them like at Walmart.  It it um  you know square at the top so it sits on the I'm not explaining this very well, (laugh) on the door  and then it comes down and it has has hook. And I was able to I think a little uh ….suicide straps hook, the little silver, um  I think I was able to hook that over the hook and my whole belt hung there.

JP:    So you hung it in a closet.

ED:    There we go.  Thanks.  Sorry.

RM:    On the Sam Brown hook.

ED:    On the Sam Brown hook.  Thank you.

RM:    Generation gap.

ED:    Sorry.  I'm a little tired.

JP:    Were there any indication that Brian was armed at the time of this incident?

ED:    No.

JP:    Did you later learn that he was armed at during the time of the incident?

ED:    No.

JP:    Recall making any comments to uh Kevin regarding uh that he didn't want to confront Brian cause Brian would kick his ass?

ED:    I don't believe that's exactly how it was said.

JP:    Well, tell me

B044

D000854

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 44 of 83

ED:    I mean I'm aware I think we're all aware of what Brian's physical capabilities are. And I believe I made that clear to him that not that he would but probably that he could.

JP:    Do you recall what you told him specifically?

ED:    Specifically, no. (sniffle)

JP:    At what point does Brian leave then? Does (paper shuffling) how does he leave? I mean, you're on the phone with 911

ED:    Right. Um, I just know Kevin made me aware that he was he was not there. Uh that he believed he left or

JP:    But how do

ED:    I'm not

JP:    you how did he come to that belief? That he was gone. Did things get quiet? Did um

ED:    I remember things getting quiet. (sigh) I don't remember at what point Kevin really made me aware of that. I know at I know at some point obviously we walked outta the bedroom. But I think we were fairly clear before that that he was gone. Like I said, things got quiet.

JP:    But you don't really recall what the noise was beforehand? Whether it was screaming, banging on the door or, you can't be specific as to what what the racket was?

ED:    It was racket.

JP:    Pardon me?

ED:    It was a racket. I mean it

JP:    But you don't recall what the racket was as far as Brian yelling or pushing

ED:    Well

JP:    beating on the door or that's that's unclear.

ED:    The the pushing on the door I don't remember. I mean ... you know when he was outside I remember that yes there was some talking but again I'm

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 45 of 83

JP:     Are we talking

ED:     conversing.

JP:     Are we talking or yelling or

ED:     When

JP:     is he is he upset?  I mean does he want to get in that bedroom?

ED:     I mean I could I guess I could hear his voice so I mean I guess that was louder
        than just have, you know, you and I sitting here having a conversation.  I mean it
        had to go through the walls and the windows and not that the house was that
        insulated but

JP:     So was he talking louder than us or was he

ED:     (laugh)

JP:     yelling?  I mean that that's what I'm trying

ED:     (laugh)

JP:     to find out.  I mean

ED:     Again, I'm talking to Kevin.  I'm having back and forth with Kevin.

JP:     And over that conversation with Kevin can you hear Brian?

ED:     I can I can yes I can hear noises outside, right.

RM:     Can I ask a question?

JP:     Sure.

RM:     I think the Captain wants to ask you and I'm less polished than he is so I'll ask
        you my way, does the guy on the roof sound pissed off?

ED:     Not happy.

JP:     OK.

RM:     The guy in the bedroom sound pissed off?

ED:     Most definitely not happy.

B046

D000856

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 46 of 83

JP:     Are those two yelling back and forth to one another?

ED:     Mmmm (sigh) if so, I don't remember what Kevin said or what

JP:     When you say not happy, go ahead

ED:     Sorry, no go ahead. No that's fine.

JP:     When you say not happy, are we uh just do you remember any of the specifics of
        the not happy part? Cussing, yelling

RM:     (cleared throat)

JP:     uh or you calling you a no good whatever, I mean.

ED:     Oh, I don't I mean I don't remember

JP:     Why are you doing this to me? Uh, I'm I'm just throwing things out.

ED:     I know. I mean yes I think he was upset with me

RM:     Is that …

ED:     …. Um, no I don't remember ever feeling like you know he's calling me a whore,
        slut, if that's what you were implying. I kinda

JP:     ……I just…

ED:     ….just threw those out there didn't I. Um, no. Was he upset with me and the
        situation. Most definitely the situation. Does that answer part of your question?

RM:     Can I ask two questions? I'm I'm sorry

ED:     No, I'm sorry. You asked me what he said also, go ahead.

RM:     The Captain asked you if there was exchanges back between Kevin and Brian


TAPE 3

JP:     Back on tape. Uh tape just ran out on us. Uh 1520 hours. Mr. McDonald, you
        were making a comment.

D000857

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 47 of 83

RM:    Yeah, I was asking a question and it and the language is is is is fairly basic such
that it doesn't get lost in in the translation. If Brian wherever he was on the roof,
in the house, on the step, had called Kevin out. Come out here, I'll kick your ass.

ED:    (laugh)

RM:    Would Kevin had gone out there? Is that what you were afraid was happening.

ED:    (sniffle) My impression was yes, because he had made mention that (sniffle) he
would go out there. He would take care of this if I didn't. And things like that.
Those were the kinds of things he would say.

RM:    Now flip that question over. If Kevin had challenged Brian to come in and he'd
kick his ass, was there any question in your mind that Brian would come in there
and done that? Or try to do that?

ED:    That's entirely possible.

RM:    Is that what you were trying to keep from happening?

ED:    Sure. I I mean I was afraid that they were going to be (sniffle) an altercation.
And like I said I I mean I never forsa foresaw .....foresaw him coming to the
house. And then I never foresaw him (laugh) walking on my roof. I never
foresaw him breaking my window. I never foresaw Kevin saying I'll I'll go out
there and handle this. I have two guys who you know up until that point are
friends who are now ready to you know or never mind, I'll save that analogy.
(laugh)

RM:    Go at it?

ED:    Well that wasn't what I was gonna say.

RM:    OK. Thank you ...

JP:    It gets quiet. Um,

ED:    It's a biggie.

JP:    Do you follow Brian does Kevin follow Brian outside?

ED:    No. Well, I think I was still on the phone with Kentcom or be no at some point
Kevin walked to the door and opened up the door. (sniffle) And I believe at that
point and time, he said he's gone. I think before we are aware of that I think he
was just verifying that or affirming that.

B048

D000858

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 48 of 83

JP:    Does Kevin go outside?

ED:    Did he actually step outside I I'm not sure. I don't remember.

JP:    Was there any confrontation outside between Brian and Kevin?

ED:    No.

JP:    Does Brian stop his truck in the roadway and start yelling at Kevin?

ED:    No. Not not that I know, no. (sniffle)  I mean Kevin woulda Kevin would of said that I mean if I wasn't right there.

JP:    Does Kevin start drinking after this incident? After Brian was gone, does he start drinking? Do you have a drink?

ED:    I am almost  positive I didn't have a drink. Uh, now that you say that I'm I yeah I believe Kevin I went outside to sit. And yeah I think Kevin said that he made a drink. Again, a little fuzzy. But now that you say that, yeah.

JP:    So what happens from this point?

ED:    Shew, well I mean talking feelings or physically happens or (sniffle)

JP:    As far as what happens next. I mean do does Brian uh or not Brian, does does Kevin um leave and  go home or does do the police arrive or what what's what's next?

ED:    He he was in the bedroom. I went outside to get some air. And I figured this situation is done. OK. I accomplished or the situation accomplished what it needed accomplished. Brian left. That is over. You know. The assistance of actual troopers on duty were no longer nee  was no longer needed. So, I went out to to sit. Get some air. I'm confused. (laugh)  I'm upset. I'm angry. I'm emotional. I I didn't know which way to turn my head. I mean

JP:    Prior to the police arriving, did you tell Kevin to go to the bedroom and stay in there? Don't come out. That you were gonna take care of the situation.   You'd come up with something.

ED:    I I don't know if I said I'd come up with something. I I probably said I'd take care of this. This is over. I don't remember specifically but (sniffle)

JP:    Since this incident has transpired have you had any conversation with Kevin about this incident?

B049

D000859

~~Corporal Elizabeth C. Dempsey~~
IA Case # 12-04
Interviewed June 25, 2004
Page 49 of 83

ED:   Um, he came back later that night. I was in absolute no mood to talk to him. Um, mmmm he was not very nice to me. Um, I told him to get out of my house.

JP:   Why did

ED:   Again. All night long. Tell him (laugh).

JP:   Why did he why did he come to your house again after he left?

ED:   Oh, I don't I don't think he took whatever bag or whatever he had there. Um, with him when he left. And I'm sure there's probably some things he wanted to say to me. ...

JP:   But he just went home? You told him to leave so he left?

ED:   His brother in law was with him. And yeah I I I told him to leave. I mean I told him to leave a couple times but I mean yeah I guess they finally they got the hint. (sniffle)

JP:   Why don't we get ready to move on to another area. Prior to doing that ,do you have any follow-up? We'll take a five minute break or

RM:   If you don't mind, yeah. Cause bout three hours ....

JP:   ....time 14 or excuse me 1527 hours.

JP:   OK. We're back on tape 1537 hours. I think prior to us going on on a break here we're talking about if you had contacted uh Kevin post incident you and you stated that he responded to your residence. Since that point, have you had any con further conversation with him regarding the incident?

ED:   Yes.

JP:   Do you recall when that was?

ED:   Um, he had called a couple times after the incident towards the end of the year. Um, and I didn't return the phone calls. Um, and I know I spoke with him in April just to give him the heads up that all this was going to be occurring. Um, and he already knew.

JP:   Why did you feel the need to call him and give him a heads up?

ED:   I didn't want him to be blind sided like I was blind sided.

JP:   And he already knew?

D000860

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 50 of 83

ED:    (positive sound)

JP:    How did he know?

ED:    Well since then I've run into a couple of things. Um, I've learned that a close
       family friend of his is neighbors to Captain Dixon. Um, he wouldn't he told me
       that's how he found out was through his family friend.

JP:    Kevin's family friend told him?

ED:    Correct.

JP:    And who's his family friend? Do you know?

ED:    Believe it's Mark Dyer. That him and uh Captain Dixon were discussing it over
       mowing their lawn. While they were out doing yard work.

JP:    Had he called any other time? Or did you call him at any other time?

ED:    Um, I talked to him, well it's been a couple weeks ago. And um give him an
       update on what was happening here. That Jane Brady was looking at criminal
       charges against Brian and I. Um, (sigh) then I spoke with him briefly um, no I
       was thinking no I'm .... I was thinking I spoke with him the day after Brian was
       arrested. But I'm wrong on that. I didn't. Sorry.

JP:    And why did you feel it was important to contact him uh regarding the criminal
       investigation with Jane Brady?

ED:    I mean the same reason that I contacted him when I knew there was gonna be an
       IA investigation. Just to give him a heads up that this is what's happening. This
       is where this is going. You probably I mean you hear first but ...you'll be
       contacted by Internal Affairs probably. And then you know you may be contacted
       by somebody else in the AG's Office. Or

JP:    Did you ask him if he was gonna come up and testify as to what occurred?

ED:    (positive sound)

JP:    And what did he say?

ED:    Um, well he kinda talked outta both sides of his mouth. (laugh) Like a politician.
       Um, I believe he said something along the lines of uh I don't want to do anything
       to hurt you. Um, but if I'm subpoenaed, I don't know I don't know if I could not
       respond or ... think he said he didn't know what his (sigh) how'd he put it,

B051

D000861

Corporal Elizabeth C. Dempsey
TA Case # 12-04
Interviewed June 25, 2004
Page 51 of 83

basically that he thought a subpoena was a subpoena no matter whether he was in Texas or not. And if he was subpoenaed he didn't know if he was required to respond or not. I think he made mention that he would have to talk to someone down there. I don't if someone from his department or a lawyer or what. Just to see what his oblig obligation was. …. (laugh) …

JP:     Did you tell him that you didn't want him to come up and testify?

ED:     I don't know if I specifically said that. (laugh) I'm ….. I mean.

JP:     Was that the purpose of your phone call, to convince him not to come up?

ED:     Oh, no. Again, I didn't want to be blind sided. I wanted to know what was going on. What his thoughts were. Wanted him to know what was going on up here.

JP:     What do you what do you think you were supposed to do when you are involved in a domestic situation? What are your responsibilities as a member of this Division? Do you know what they are?

ED:     Now?

JP:     At that time, did you know what they were?

ED:     At that time, no I did not know what they were or I don't know what they were. Um, and I wasn't necessarily classifying it as a domestic incident.

JP:     Did you at any point notify uh anyone at Troop 5 regarding this incident?

ED:     At Troop 5, no.

JP:     Anywhere else?

ED:     Well, I was made aware that Captain Hawkins knew and that Captain Hawkins would be contacting me.

JP:     Did you call did you call Brian the next morning or did he call you?

ED:     I

JP:     You stated that he called you.

ED:     I think I said I I didn't remember. I I know at some point we had or I know I was understanding the he was gonna come at some point on Sunday to board up the window. I don't know if that was decided in the early morning hours when he called to apologize. Or if we talked even later that morning. I I don't remember.

B052

D000862

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 52 of 83

JP:     Captain Hawkins called you?

ED:     Correct.

JP:     And that was on Monday.

ED:     Right.  Sometime on Monday

JP:     And that would have been the 20 sss

ED:     7th.

JP     7th.  And do you recall what time of day it was?

ED:     I really don't.  I'm sorry.

JP:     Um, tell me about the conversation with Captain Hawkins.

ED:     Um, excuse me, sorry.  Um, I know he asked me if I was alright.  I know he
        talked that you know the window was was boarded up and that Brian understood
        that he was you know getting it fixed.  Brian had taken the actual window, (sigh)
        um, to get the glass replaced.  Um, I knew asked me if I was alright.  If I needed
        anything else done or wanted anything else done.  If I needed any other
        assistance.  Um, I know I told him no.  Um, (paper shuffling) he told me not
        (paper shuffling)  told me everything was OK.  Worry about it.  Um, that the the
        situation was taken care of.  Um, and not to discuss it with anyone.

JP:     Did you give uh Captain Hawkins um (paper shuffling) a synopsis of what
        occurred that night?  Did he get all the information?  Did he get a full briefing as
        to facts as they occurred that night from you?  Did you give him a version?

ED:     (cough)  I don't think we went over everything um the entire night.  Um,

JP:     He didn't ask you for like we've sat down uh we've talked about this in great
        depth.  But did he ask you

ED:     .....

JP:     Christy, tell me what happened that night, from start to finish.  Did I mean did
        you give

ED:     From (sigh)

D000863

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 53 of 83

JP:     did you give him an account of what occurred that night in your residence?  Or
        did he just ask you couple questions like you've already said and that was it?

ED:     It was fairly brief.  It was fairly brief.  I mean I was under the understanding that
        he already knew everything.

JP:     How would he have known everything?

ED:     Because Brian told him.

JP:     Did was it your impression that Captain Hawkins knew Kevin Keller was in the
        residence when this happened?

ED:     I believe that was an assumption I made.  Um, I don't I don't remember if his
        name actually came up, specifically.

JP:     And and in your

RM:     (cleared throat)

JP:     conversation with Captain Hawkins, you never brought  up the fact you never
        brought up the fact that Kevin was at the residence when this transpired?

ED:     I don't believe so.  Like I said, I was under the assumption that he he knew what
        had occurred.

JP:     Just from Brian?

ED:     Right.

JP:     Did did Captain Hawkins ask you if you wanted to have Brian arrested?

ED:     (sigh) I don't I don't know if he posed it exactly like that.  Um, I think he said is
        there anything else we need to do or anything else you want done.  I think it was
        kind of said …. that way.

JP:     Inferred that that's what he meant then?

ED:     (sigh) Right.

JP:     Did it seem to you that Captain Hawkins didn't want to pursue this?

ED:     Did not?

JP:     Did not want to pursue this.

D000864

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 54 of 83

ED:     Yes.

JP:     How so? I mean

ED:     Mmm … see how I put in into wor um, I mean he didn't ask me a lot of questions. I mean he was just kinda like you know you're OK, Brian's OK, the window's OK. You know, anything else you need done, want done. Um, I mean he he told me not to talk about it. And that everything was fine. I mean it doesn't really give me the impression that he wants it to continue or …..

JP:     Did he make any attempts to pursue

MD:     Pursue is this word.

ED:     Pursue

JP:     Did he make any uh attempt to talk you out of having anything done as far as far as uh, maneuver you around to having him arrested or anything like that? Try to coach you to say … we'll take care of this, we'll you don't worry about it. It will all be OK. Or or that was just you were satisfied, that you didn't want to do anything and that wasn't it didn't it didn't have to be pursued by Captain Hawkins as far as talking to you out of wanting him to be

ED:     He did not have to talk me out of

JP:     Right.

ED:     not wanting something done. There OK.

JP:     Thank you.

ED:     (laugh)

RC:     Did did Captain Hawkins every ask you the question what happened?

ED:     I I don't believe so. I

RC:     And did he ever mention to you about a report on this incident or how the report was gonna be resolved?

ED:     (sigh) I don't I don't believe so.

RC:     OK. I mean you've been pretty clear beginning of your statement

D000865

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 55 of 83

ED:    Right.

RC:    right now the basically the questions that Captain Hawkins asked you.

ED:    Right.

RC:    And that's why I'm just ddd you didn't mention anything about a report. I'm just
       asking you if you recall him saying anything to you about, you know, we'll take
       care of the report or if there was any mention to you about a report.

ED:    And and that becomes a little fuzzy because (sigh) I was relayed information. I
       know Brian and I discussed it. So, I don't remember if Captain Hawkins
       specifically told me on the phone on that during that conversation that you know
       it it would be cleaned up. But um, you know, somebody in CI would be you
       know, just writing us up on that report or whatever on to to clean it up. And and

RC:    Are you trying to say that you you've you've since discovered that but you don't
       know if Captain Hawkins said anything ....

ED:    Specifically said it me.

RC:    on that day.

ED:    During that conversation, ...

RC:    Did anyone else call you about the report? Anyone from the DV unit? Any
       sergeants?

ED:    (negative sound) No.

RC:    The initial officers that read the first report? Did any of them ever

ED:    No.

RC:    call you with

ED:    No.

RC:    follow up.

ED:    No.

RC:    OK. .... (paper shuffling) When when Captain Hawkins said to you um and
       again you you're real consistent on this, uh you said beginning you've just

B056

D000866

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 56 of 83

        repeated it again, that he said to you uh, not to talk it, nobody needed to know.
        How did you take that? What do you think he meant by that?

ED:    That (laugh) I didn't need to talk about it. Not I mean, not to discuss it with
        anyone. It was

RC:    Meaning that

ED:    And

RC:    Meaning that he .....

ED:    I mean that was a (sigh) that was a personal situation that I unfortunately felt the
        need to have assistance in route in case it got out of hand. .... But underneath all
        that, it was still a personal thing, a personal situation. It it was not (sigh) work
        related. I mean, yes this was someone I knew from work. And unfortunately had
        to call co-workers but it was not work related. And for him to say that, don't talk,
        you don't need to talk about it, and it's done, that's all I wanted. The situation
        was over. The situation was over and that was all I wanted. Was my personal life
        to go back to just being personal.

RC:    OK. Did did the thought ever occur to you that you needed to notify your
        supervisor of this?

ED:    No.

RC:    ... was

ED:    It di

RC:    was there any discussion with Captain Hawkins at that point, where he said when
        when you said you don't need to talk about it, nobody needs to know. Did he
        expand on that and say Christy, you don't have to tell your supervisor about it,
        you don't have to tell your administration about it, you've told me and we've
        taken care of it? Did he ever expand on that?

ED:    Not, no. It was pretty cut and dry. As I remember it that it's taken care of, we
        don't need to talk about it.

RC:    OK. Did he ever mention that um, you know, he had passed it up the chain and
        he had gotten their blessing on that?

ED:    That is again fuzzy for the same reason that information was relayed to me by
        Brian. And I don't know if I just know it from Brian or if Captain actually said it.

D000867

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 57 of 83

RC:     OK. Can you put

ED:     To to me.

RC:     Can you put Brian's information into the timeline and then tell me what Brian told you?

ED:     Oh,

RC:     If if Brian told you something to answer the question I just asked you about when did he tell you and then what did he tell you. ....My question was

ED:     No, it's fine.

RC:     Did the Captain

ED:     I got it.

RC:     assure you that he had already passed this up the chain and they're OK with this, don't talk about it, no one needs to know?

ED:     Brian had a conversation with the Captain in front of me on the phone. So, I didn't hear Captain's side of the conversation. That was Sunday. Late morning, early afternoon. (sigh) Brian then assured me and and Brian's side of the conversation was do you want to talk to her, I am here with her now, I'm fixing the window. Um, Brian relayed back to me that no, he will talk to you on Monday. Um, Brian also relayed other information to me after after the phone call after the phone call ended. Um, that it was it was taken care of. Um, I believe the Captain had talked to um Sergeant Houdek the night before um morning before, I guess. Um, that he'd spoken with um, Major Hughes um and again just that that it was taken care of and and not to talk about it. That things were handled, were being handled. And that everything was fine.

RC:     And that was ssss

ED:     That was Sunday.

RC:     Sunday, so Brian's at the house, gets off the phone, and then he he explains to you what what he heard on the phone.

ED:     Cor correct.

RC:     But you couldn't pick up from what he was saying?

ED:     Right.

D000868

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 58 of 83

RC:    So, he explained all that to you. Um, you spoke to Captain Hawkins the next day. Was that on the telephone?

ED:    (sigh) Yes.

RC:    I'm not sure if we verified that.

ED:    Yes.

RC:    OK. Did you ever have a face to face with Captain Hawkins?

ED:    No.

RC:    OK. So it was resolved on Monday on the telephone with Captain Hawkins?

ED:    Correct.

RC:    OK. And then that's when he made the comment at the end after he checked on you, asked if you wanted anything else done, OK, don't talk about it, no one else has to know about it.

ED:    Correct.

RC:    OK.

JP:    Captain Hawkins never mentioned to you anything about domestic incidents? Sworn members? Any of that, anything of that nature?

ED:    I'm sorry. (sound)

JP:    Did Captain Hawkins ever mention to you about having this report this reported to Internal Affairs?

ED:    No sir.

JP:    Do you know why this incident was never investigated by Internal Affairs until now?

ED:    Wwww (laugh) I mean I can make some assumptions. But I mean

JP:    What would your assumptions be?

ED:    Well, I mean, first and foremost, that you (laugh) guys didn't know about it. .... Mean that it was never passed on to you.

D000869

JP:    Do you know

ED:    I know that may sound kinda simple but

JP:    Do you know if that in fact is true?

ED:    No.

JP:    Alright. Let me get into the specifics of the 911 call. Um, I'm gonna start asking some questions. If you feel a need, uh we may go back and play the tape if you need if you need to hear it. Um, I gonna just play that by ear. Is that OK? Um, when you reported in the 911 call that someone had broken into your residence. Is that correct? Or do you want to listen to the you wanna listen to

ED:    I was gonna say, I

JP:    I'm gonna before asking any questions just to give

ED:    Yeah, cause I don't know if

JP:    you a chance to you may have to listen to it, it's not that long so you may want to listen to it once or twice.

(?):    OK?

LISTENING TO 911 TAPE (not audible)

RM:    Its good to know the tapes at the Comm Center the same are the same usual quality.

JP:    Well it's a tape of what he did was he actually they can send it via the internet and its

(?)    ....

JP:    very clear. Um

(?)    Kentcom ...

JP:    but when we copy it it gets turns into that, so. That's the best we could do in this room. (sound of tape recorder rewinding) Do you need, do you want to hear it again? Follow through with the uh transcription? Or you good to go? Or?

ED:    I ...know I could probably ... the transcription, it's fine. If

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 60 of 83

RC:    No, it's up to you. He's asking

ED:    Oh, oh, (laugh)

RC:    He's asking if you want to hear it again or you just wanna keep that as a reference
       or?

ED:    I can keep that as a reference. (paper shuffling)

JP:    And so you reported that someone had broken in your residence? Correct?

ED:    Correct.

JP:    OK. And you were asked by the dispatcher, are they in your inside your
       residence and you responded, I think they've left. The dispatcher states, you
       don't have a clue who it was, and you responded, no, correct?

ED:    Correct.

JP:    Even though at that time you knew that Brian was the one who had broken in your
       residence? Is that correct?

ED:    Correct.

JP:    So why did you um tell that to the dispatcher? When if fact you knew Brian had
       was the one who broke in your residence, why didn't you say, yes, I know who
       did it?

ED:    Like I said before I was confused, hurt, angry, mad. I didn't know what to do.

JP:    The dispatcher goes on and asks you how many people were in the residence.
       And you responded there was just one. Now, I want you to think about that. Are
       you talking about you were home alone at the time or just one person broke in .....
       when you responded one, did you mean that you were home alone or did you
       mean that that you were (noise) that one person broke into your residence?

(?)    Did you find it?

ED:    (positive sound)

(?)    ......

ED:    It's OK. Mmmm Well the way it, I mean the way it's written here when when
       you played it back, the way I took it when we're just what she said, I thought she

B061

D000871

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 61 of 83

said how many people were in the residence. And this this says how many people in the residence. I I actually thought she said how many people were in the residence. So, this point and time I take it, how many people were in the residence, like how many people broke in the residence.

JP:    So, you're saying how many people broke into the residence?

ED:    Correct.

JP:    And your answered one?

ED:    Right.

JP:    OK. That's what I wanted to clarify…. You also made the statement to the dispatcher that he came in to the house, correct?

ED:    Right. I I don't see it actually on here but yeah, I believe I remember hearing that, and you're saying that now, so. … Uh, that's drive away.

JP:    And then confirm the second time that the person had entered your residence, correct? So, you you confirmed that several times that somebody had broken into your residence?

RC:    Might be on the first page.

ED:    Right. (paper sounds) OK.

JP:    Now, I want you to make sure, these are very im this very important, so I don't want you to just take it for granted …

ED:    She says are are they in your residence, or are they in your inside your residence. I I said I think they've left. Mmmm (paper shuffling, somebody sneezes)

RM:    (cleared throat)

ED:    Oh, did you hear someone inside the house. And I say, he came in the house. And she says, he came in the house, and I said, yes.

JP:    Prior to the police arriving at your residence at that at that time, after the 911 call was placed, did you did you and Kevin discuss anything as far as what you were gonna tell the police?

ED:    I don't remember.

JP:    Did you ask Kevin to leave at that point?

D000872

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 62 of 83

ED:    Mmmm I don't know.

JP:    Did you just direct him to the bedroom and say go to the bedroom and shut the door and don't come out?

ED:    Like I said before, I don't know if that's exactly how I put it. I just remember feeling like I need space. I need to be away from everybody. Now this is over, (laugh)

JP:    Were you mad at Kevin because he he made you call 911?

ED:    Oh, sure. (laugh)

JP:    And now the police were there and now

ED:    Now they were coming and still, again, I have absolutely no control over the situation still. Everybody else (laugh, sigh) frustrated, there's a word for it.

JP:    So, you not don't recall how you told him to get to the bedroom or if you told him? But he ended up in the bedroom with the door closed when the police arrived? Is that correct?

ED:    Correct.

JP:    OK. Did you ever tell him or any did you ever allude to him that um, that you were going to try to take care of this matter. And you might have to to sway the truth a little bit to to resolve the matter?

ED:    I don't remember really what I said to him after I hung up and was waiting.

JP:    Who was the first trooper to arrive?

ED:    Pretty sure Trooper Argo. Yeah, I believe Alex was the the first one there.

JP:    And do know know him? How did you know him?

ED:    Went to high school with him.

JP:    Did you go through the Academy or anything like that, no? What did you tell him?

ED:    I know I told him that things were fine and that … everything was taken care of and you know, he could leave.

D000873

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 63 of 83

JP:     Did you give the impression that you didn't want him to be there?

ED:     Yes.

JP:     Did he appear to want to come up and investigate?

ED:     (sigh)  I think Alex I mean, yes, I I think he probably was a little confused.  Mean he was I don't even think at that point, he was a TFC.  You know.  Just kinda got the impression he didn't know exactly what to do.

JP:     And why's that?

ED:     … He just kinda stood there. (laugh) And I'm telling him, you know, everything's fine.

JP:     Did you tell him what happened?

ED:     I don't remember exactly what I told him, regarding the actual incident.

JP:     Would you say you're trying to be give him as little information as possible.  Just wanna be get rid of him?

ED:     Did I say that?

JP:     No.

ED:     Oh.

JP:     I'm just saying, is that what's going through your mind is you

ED:     Oh,

JP:     really don't want the police to be here so are you getting him you're not giving him a blow by blow description as to what occurred …. Are you giving him minimum information to minimize what occurred so he would leave?

ED:     Correct.

JP:     But you don't recall specifically what you told him?

ED:     No.

JP:     Cause I don't I don't want to put words in your mouth. ….

ED:     No, that's a very good

D000874

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 64 of 83

JP:    ... trying to get you

ED:    I'm not always the

JP:    I don't wanna I don't wanna put words in your mouth.  I want you to tell me
       what you ...

ED:    I remember feeling like this is done. I do not need him.  I do not need any
       troopers here.  Troopers in uniform actually working.  I do not need them here.
       They need to go away.  And remember I probably was even using my.... You can
       leave ....

JP:    The other troopers arrive shortly thereafter then?

ED:    I think we were down in the I think we were down in the driveway at that point
       and time.  I think we had gone down the steps.

JP:    Did you say you were re reluctant to to cooperate with the investigation? Or just
       cooperate just in general .....?

ED:    Oh, I was rr

RM:    Are you OK? Sorry.

ED:    I was reluctant to be talking to them period.  Sure, I I was embarrassed. I mean
       here's somebody not (laugh) not only co-workers but I mean Chappa was my
       classmate.  I mean he's 295, 296, I mean we stood next to each other the entire
       Academy.  And and then Alex, I mean I went to high school with him.  He was
       friend of mine..... couple years older.  He's a friend of my brothers.  I'm (laugh)

JP:    So you knew you knew these guys then?

ED:    Yeah.  I mean Gygrynuk I didn't know very well I he had never been very
       (sniffle) pleasant around me when I did work at Troop 3.  I mean

(?)    Or anybody ....

ED:    it wasn't like I mean not that he has to be all warm and fuzzy but I mean he was
       never (sniffle) somebody that I'd had a conversation with. I mean my impression
       of him always was he's very gruff.  And, you know, the that's not me.  I'm the
       warm fuzzy kinda person.  So, I I mean here huh here I just had a personal
       incident.  My private life and you know, I'm like laying there like a dead deer
       with my guts out.  I mean I I didn't want to I didn't want to have to explain that to
       them. (sniffle)

D000875

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 65 of 83

JP: Do you now you stated that you knew knew the troopers I don't know how well but you you they were you were acquainted with them. And and comfortable with them and you you didn't have any problems with them or anything like that. Gygrynuk you kinda …

ED: (laugh)

JP: little gruff and

ED: Right. Right.

JP: Um, with that being said, um, what did do you think think it would have been possible to tell one of those one of the two officers, maybe Chappa since you were a classmate that this

ED: (sigh)

JP: this is what happened tonight. This is really embarrassing but did did that occur to you that maybe I should just ask to talk to him alone and tell him what happened to get this all out in the open? Or

ED: No.

JP: did you just that's what I'm trying to figure out here.

ED: It

JP: I I'm just asking the question.

ED: Oh, oh, I know. I know. No. No. I was if I could write embarrassed in great big huge letters and put 50 exclamation points after it. I was embarrassed. (sniffle) To to have to to have been put in that situation by and I consider it by two people that I cared about. You know that were my friends that I I knew. I mean, it wasn't probably everybody in this room may dis disagree with me. And and I'm not saying it wasn't Brian's fault but I was put in that situation by both of them. (sniffle)

JP: By both Brian and

ED: Brian and Kevin

JP: OK.

B066

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 66 of 83

ED:    I mean yes, Brian you know 95% of it was him but I mean Kevin's yelling at me.
       (sound) I mean huh I was embarrassed. I was pissed off. I was angry. I was
       hurt.

JP:    I'm gonna go ahead and change tapes. 1615 hours.

TAPE 4

JP:    It's 1617 hours back on tape. Christy, um, getting back to um, at this point, up to
       this point um, with Brian coming to your residence and and knocking on the door
       and and coming into the residence, and breaking the window, every all everything
       that went on, you hadn't done anything wrong, correct? I mean, had you done
       anything wrong?

ED:    Well, no. But, I mean, that doesn't mean that you know in some way you don't
       feel like that. I mean, you know, why why is this happening to me. Why is this
       happening? What, you know,

JP:    Like

ED:    But I mean no, technically, no I hadn't done anything

JP:    Up to this point

ED:    wrong.

JP:    you're basically a victim. Correct?

ED:    Right.

JP:    OK. So, the police arrive and and two of the troopers that you knew now are
       there uh and you do know them, one's a classmate. Um, you hadn't done
       anything wrong at this point. Um, why not instead of becoming evasive, why not
       why not come out and say this is what happened tonight.

RM:    (cleared throat)

ED:    (sigh)

JP:    Other than ...

ED:    I I know you're just asking a question.

JP:    other than being embarrassed. I know you

B067

D000877

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 67 of 83

ED:    You're not

JP:    I know. I understand that. I understand that. But I mean is is the reason that
       you're not coming out and saying because you're trying to protect Brian?

ED:    I'm trying to protect myself.

JP:    From

ED:    I know you're just asking a question (laugh). Everybody knows answer.
       Delaware State Troopers are notorious for running their mouth. Any little piece
       of information somebody knows, it's out there. Its out there for the entire state to
       know. If I had said hey, I'm Christy Dempsey and I'm up in my bedroom with
       one guy and another guy's out crawling around my roof. I mean, I know what the
       rumors are now. Unfortunately, it has gotten out. And that's exactly what I was
       trying to avoid. I I know I can't believe you guys haven't heard the rumors. I
       mean that's how this, all that started again, it's people running their mouth.
       (sniffle)

JP:    OK.

ED:    I knew exactly how it would look. Christy's a big slut. You know, she's up with
       one guy and another guy is out there and I mean it'd be all well and good for you
       guys or Bob to be up having one woman in your room and another woman
       beating. I mean that's just great. That's great for you guys. That's makes you a
       stud. Well, it makes me a Goddamn whore. And no, I did not want people that I
       worked with (sniffle) knowing what happened. It was embarrassing. (sniffles)
       .....

JP:    You OK? I know this tuff, but I gotta ask the questions. Sorry but I have to ask
       the questions.

ED:    (sniffle) I can tell you how embarrassed I was.

JP:    I think.

ED:    I can

JP:    I think you've uh ...

ED:    No, I can sum it up really really well. Kristen Holemoe is my best friend in the
       world. (Tape becomes filled with static) She is I don't' know where I'd be today
       without her. She has meant the world to me. And I did not tell her this
       happened. That's how embarrassed I was. (sniffle)

D000878

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 68 of 83

JP:  Now I'm gonna go through the um actually we're getting to the end. Believe it or not.

ED:  Oh thank God.

JP:  Um,

(?)  ....

JP:  I gotta I gotta go, this is actually we're getting to the to the meat of the matter now. Regarding the

(?)  .....

JP:  Why don't we take a five minute break. Cause ..... this rain coming down.

ED:  ....

JP:  It's 1622 hours.

JP:  Back on tape. It is 1637 hours. Um, we're gonna try to continue with this interview, even though the rain's not cooperating. Um, Corporal Gygrynuk in his report, he inquired from you if you were home when the this incident occurred. And you replied, now I'm taking a qu direct quote from the report, and I can supply you with a copy of the report if you wish. Do you want a copy?

RM:  No.

JP:  Um, no I came home and found the glass on the floor and noticed the broken window. Do you recall making that statement?

ED:  No.

JP:  ....

ED:  No.

RM:  You don't recall or you didn't make it?

ED:  I didn't make it.

JP:  So, if you didn't make that statement, then you're saying Corporal Gygrynuk fabricated that statement?

D000879

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 69 of 83

ED:     Well, (laugh) I mean I'm not gonna sit here and call Corporal Gygrynuk a
        fabricator or a liar. I mean he very well may have forgot what I said and or just
        took what I said or actually, he wasn't even there for like I said Argo was there.
        And then Csapo was there. And Argo went to walk around. Gygrynuk wasn't
        even there for part of the conversation. I don't know where he would get that
        from.

JP:     Do you recall him asking if you had boyfriend?

ED:     Yes.

JP:     And your answer was?

ED:     No.

JP:     You didn't consider Brian your boyfriend at that time?

ED:     No.

JP:     You were also questioned initially by the troopers if there was any else anyone
        else present at your residence, uh, at the time of this incident. Is that correct?

ED:     I don't remember that.

JP:     According to the reports, um, you were as you were asked if there was any else
        anyone else present at your residence. And you told them no. Um, Keller was
        later in fact found in the

ED:     Keller was not found. If if the way you're saying it is implying that you know
        they went through my house like an Easter egg hunt and found him. That is not
        how it happened. Something I believe was was said about him and I said, he's
        upstairs. Because we downstairs in the the parking lot of our parking lot
        driveway, if I remember correctly. And Gygrynuk took it upon himself to walk
        up into my house, without me. And went into my bedroom, without me.

JP:     And why did he do that?

ED:     Because I had said Kevin was up there.

JP:     You were also questioned about the suspect gaining entry and you responded that
        the window was broken but no one gained entry.

ED:     Is that, I'm sorry.

D000880

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 70 of 83

JP:   You were questioned by the troopers about the suspect whether the suspect gained entry and you responded the window was broken, but no one gained entry. Is that correct?

ED:   I I don't recall saying that, no.

JP:   If I told you I had three troopers that I've interviewed and they've told told me the same thing, would that change your mind?

ED:   No.

JP:   You were questioned about who may have damaged the window. And you told the troopers that you did not know who may have broken the window. Is that true?

ED:   I believe what I said the entire time was that I did not see who did it. I did not see the person who did it.

JP:   Well what was your intent with that answer? Were you trying to avoid the question? Or with a technicality? Or were you just not telling the truth?

ED:   I I was telling the truth. I did not see who did it. I did not see the person who did it.

RM:   The other part of the question was were you trying to avoid answering the troopers questions.

ED:   At that point and time, I had told them they were not needed. At that point and time, they insisted on questioning me. They insisted on still being there. I was trying to get out of the situation. I was trying I was trying to not give them as much information as maybe they wanted.

JP:   Did you understand at that point though they had a job to do. Even though you did not want them to be there. They were put in a situation. That they probably didn't want to be there also?

ED:   Did I understand that, sure. Because that was the same situation I was in.

JP:   Did you understand that they had a job to do. And they had to ask certain questions. Just like we have to do that today? We have a job to do. Whether it's pleasant or not. We have to do it. Did that enter your mind at all? (paper shuffling)

ED:   Did that enter my mind. It entered my mind that it was my house, it was my situation. And at that point and time, I had had no control over it. I was still

B071

D000881

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 71 of 83

continuing to have no control over it. I was embarrassed. I was upset. And I wanted control back over it. Over my situation. I wanted these men, these people, these troopers, Kevin, Brian, I wanted them all away from me. Cause it at that point and time, I had had enough.

JP:     Did you tell the troopers that were there that you that you called Kevin after the incident occurred and have them to respond to the residence?

ED:     That I believe I did say, yes.

JP:     And why did you tell him that?

ED:     Because again, I didn't want them knowing that I had a guy up there. I knew, you know, they would start adding two and two and getting 5 and 9 and 15. And I didn't want them knowing anything about my personal life. The situation was over. I had gotten the result I needed. That being Brian away from my house. Away from me. My next step was to get troopers away from me. And then my third step was going to be to get Kevin away from me. And eventually, that's what I accomplished.

JP:     Even if it meant not telling the truth?

ED:     Not not telling the whole truth. But answering their questions.

JP:     Looking back at your actions that night, would it be fair to say that you didn't tell the truth? To to some of the officer's questions and dispatchers in the who were involved in this incident?

ED:     Yes.

JP:     And I think you've pretty much explained the reasons why.

ED:     Well, I I I mean I hope that's understood. (Laugh) I

JP:     Well, I I I

ED:     I mean maybe you don't agree with it. That that's fine but.

JP:     I understand. I understand.

ED:     OK.

JP:     Yes. I (writing sounds) I wanna clarify um one of the statements that you made in Sergeant Hudson's interview back in April. Um, he had asked you during the questioning whether Brian was in fact inside the residence. And he asked you

D000882

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 72 of 83

> (loud rain sound)  that's in quotes, And you are not sure of whether or not he
> entered your residence or not. Is that correct? And you responded, correct.

ED:   You want me to explain

JP:   Yes

ED:   why I said that?

JP:   Yes.

ED:   Well, the door was closed. I did not see him. I mean, the window breaks, I'm
      calling 911, up until that point, there was noise around outside, there was noise
      going on. Kevin yelling. Things are going on. I can not be positive that Brian
      was absolutely I can not say with absolute certain that Brian was inside the house.

JP:   And you maintain that today?

ED:   Yes.

JP:   Even though you earlier stated that there was quite a racket?

ED:   There had been quite a racket ever since he had been there.

JP:   But you couldn't tell if that racket was still outside or inside the residence?

ED:   Correct. I was on the phone.

JP:   Well, it appears to me from the phone conversation with 911 dispatch that I don't
      hear Brian yelling in the background. It sounds to me that you're yelling at Kevin
      to get back in the residence. Is that correct?

ED:   I think at some point, yeah.

JP:   Pretty much

ED:   I mean I

JP:   Pretty much the beginning.

ED:   OK.

JP:   So that tells me that Brian's already gone when you're on the phone with 911.

ED:   I couldn't remember the phone number. I do remember that.

B073

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 73 of 83

JP:     You couldn't remember the phone number?

ED:     (positive sound)  I didn't call 911.

JP:     Oh, you called the 4865 or 4863

ED:     3

JP:     whatever it is.  OK.

ED:     And I had to turn on my phone.

JP:     But the fact of the matter is at that point, you're telling the dispatch center that
        somebody had broke into your house.  So you told them that somebody broken in
        your house.  But then you're telling the troopers and then you're telling Sergeant
        Hudson that you're not sure.   When at that time, when it just occurred, when it
        should have been fresh on your memory, cause it just occurred, you're saying, yes
        he was in my house, that is correct.  They asked you twice as a matter of fact.
        And then later when the troopers arrive, you're evasive and then the Sergeant
        Hudson statement, you're again evasive.  And that's what I'm trying to clarify.

ED:     Well, ......

RM:     Oh, I'm sorry .....

ED:     (sounds)

RC:     Christy, we understand that night your reason for not wanting to tell the troopers
        what happened.

ED:     OK.

RC:     But that's not the issue today.  The issue today is that we have an investigation
        here just as Detective Hudson had an investigation.  If you made those statement
        to a dispatcher at that time, you can read your own words or we can play it again

ED:     OK.

RC:     The the simple thing I'm saying, someone broke into my house, it's not someone
        broke my window, someone broke in to my house.  Which is implying that
        someone made entry.  And you've heard these statements yourself as an
        investigator.  And then on the next page you you simply said that they were in the
        house.  The dispatcher even (paper shuffling) clarifies it with you.  They came in
        the house and you said yes.  Now it now it looks like you're trying to protect

D000884

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 74 of 83

Brian. The first night you told us that it was it was yourself. It was your
embarrassed .... reputation that you were trying to protect. But now by avoiding
these questions or or suddenly you you can't recall things, it looks like you're
trying to protect Brian. And what we want you to do is we want to impress upon
you that it's important that you're forthcoming, your straight forward with these
answers, at this point. OK?

ED:     OK.

RC:     So don't don't make these questions more complicated than they are.

ED:     OK.

RC:     OK.

ED:     Sorry forgot where exactly where we were. You you asked me, I said what to
Sergeant Hudson and and then this on the tape. And

JP:     I'm what I'm

RM:     (cleared throat)

JP:     trying to fff to find out is trying to hone in on this fact whether Brian was in
inside the residence or not. You you state to the dispatcher right up front when it
occurs, or as you say he's on the phone. If you're on the phone when Brian's in
the residence with the dispatcher and you say

ED:     (sigh)

JP:     he's breaking in he's broken in to my residence, um, you have the exact words

ED:     Right.

JP:     and they're not right in front of you at this point. Um seems to me that he's
broken into your residence or he's done something to make you aware that he's
inside your residence.    Yet as time goes on, you're not sure. And I I don't
understand. That's what I'm trying to clarify. Was he in your residence or not?
Because you're saying to the dispatcher that he is, then you tell the troopers that
uh the window was broke but nobody got inside. Um, then I'm not sure if
anybody was in the residence. And then when Sergeant Hud Hudson interviews
you in April, you tell him that you're not sure whether in fact he was inside or
not.

ED:     Well. At that point and time, I did not have this. When I was interviewed by
Sergeant Hudson. OK?

D000885

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 75 of 83

JP:    (positive sound0

ED:    That was six months after the incident. Six months after our I was completely sober. And now we're eight months.

JP:    So, (laugh) I understand there is a time lapse and everything, but

ED:    So it's very difficult

JP:    It it

ED:    to remember exactly what happened. I mean the window broke. Window broke. Kevin's yelling at me. You better call 911 now. So I grabbed my cell phone. Trying to turn it on, Kevin's still yelling at me. Trying to remember the number. I finally get them on the phone.

JP:    But my point is is during that conversation with 911, I don't hear Kelling Kevin yelling at you. I hear you yelling for Kevin to come back inside. Which means that that that commotion is already over with. That's gotten quite. He's left. Uh, maybe it maybe during the time that you were getting your cell phone out and turning it on and and remembering it, he had left. But all that is was over and now you're telling when all was quiet, you're telling the dispatcher that yes, someone broke into my residence.

ED:    I mean it (sigh) I guess all I can say to that is that emotions are running wild. Everything had as you're saying I guess, everything was as you're looking at it as everything was was over.

JP:    Well, it had quieted down. I'm not saying it's over, but

ED:    Right.

JP:    things had

ED:    Right

JP:    ...

ED:    the win the window was already broke. You're you're right. I didn't start trying to call until I guess the the window was broke. And now, I'm on the phone. I've already called. Have them on the phone. What what do you say? Yelp, never mind, I'm sorry. (laugh)

D000886

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 76 of 83

JP:     Well you know as a trooper, that happens all the time. We have 91 dis
        911disconnects or people say oh

ED:     That that is true.

JP:     ...now

ED:     That is true.

JP:     But you didn't try to do that. You you said that somebody broke into my
        residence.

ED:     Forgive me for being a little emotional and a little I don't know what to do.

RM:     Can I ask a question?

JP:     Sure.

RM:     I read the tape. It's the first time I've seen it. And I understand you're telling
        everybody here that you're emotional and your upset. All that seems to make
        sense and reasonable. He came in the house. You responded he came in the
        house. And they've got a period so it could be a question mark. But at at that
        moment, whether you were actually aware of it or not, do you have because it's
        then and now, do you have the impression that Kevin could be in the house?

ED:     Brian could've been in the house?

RM:     ....Brian, Kevin's already there, I'm sorry. Now I'm doing it. That is is there
        something that gives you cause you're like upset .... You have some impression
        that he was in the house. And if you and if that's why why do you think that?
        ...lead you a little bit.

ED:     ....

RM:     door open when you opened your bedroom door? Is is something kicked over? Is
        there mud stains across the rug or something?

ED:     Oh, well, there there's glass everywhere.

RM:     But do you understand what the Captain's asking you? And frankly I don't care
        what you tell the troopers. I don't even, the Captain has a different point of view.
        But what'd you tell Kentcom? What made you think that he was in the house?
        Whether ....side walled him or not. What made you think he was there?

ED:     Kevin believed he was in the house.

D000887

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 77 of 83

RM:    Kevin say that to you?

ED:    Uh, yeah. I believe so.

JP:    And why did what what made him think that. Uh, and I know you can't get in his brain

ED:    ....

JP:    but was something going on to make him think that?

ED:    I don't know if he assumed the the glass breaking meant he's coming in. And came in.

RM:    And at some point later, Brian told you he was in the house?

ED:    (positive sound)

RM:    You have to say yes or no.

ED:    I'm sorry, yes.

JP:    Do you recall one of the troopers lifting fingerprint off the front storm door?

ED:    I thought it was off the window.

JP:    Off the bedroom window that broke?

ED:    The the window that broke.   That was actually the living room window but yeah.

JP:    OK.

ED:    I that's where I thought it was it was from. And again that may just be bad memory.

JP:    Were you out on the roof when he lifted the fingerprint?

ED:    (sigh) I walked out on the roof with Csapo. I I can't remember. I'm sorry. I

JP:    Do you recall the screen the screen from the window laying on the on the roof anywhere?

ED:    I don't know.

D000888

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 78 of 83

JP:     You read the report on that Csapo and Gygrynuk and Argo and

ED:     (cleared throat)

JP:     I think that was all that that submitted

ED:     (sound)

JP:     supplements to this incident, correct?

RM:     There was a supplement from a Sergeant I saw too.

JP:     Uh, Mullett. Sergeant Mullett.

ED:     Right.

JP:     You had an opportunity to read those reports?

ED:     Right.

JP:     OK. So you know that there was a fingerprint that was lifted from the scene? Correct?

ED:     At this point and time, I don't remember specifically reading it. But if you say it's in there. Yeah, I guess I I read that, yeah.

JP:     Um, you are aware that a print was lifted? Correct? I'm gonna, you've read

ED:     Now

JP:     the report

ED:     Right.

JP:     I'm gonna ...

RC:     ....say you thought it was lifted from the window.

ED:     Right. I know information now that

RC:     ..... this conversation

JP:     There was a fingerprint lifted

ED:     Right.

D000889

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 79 of 83

JP: somewhere. OK. Um, do you have any knowledge as to what happened to that fingerprint?

ED: No.

JP: You haven't heard anything? Any rumors? Or what happened to that fingerprint?

ED: I've heard the rumor that it is MIA.

JP: And that's all you you don't have who took the fingerprint?

ED: No. Not at all.

JP: Any follow-up?

RC: Just one. Um, knowing that or at the time maybe you didn't think about it, but um what you told the dispatcher when you were in need of assistance, what you told the troopers when

ED: ...

RC: you wanted to take control of the situation again, um, is different. The scenario you created for the troopers was basically that an unknown subject has broken your window and tried to break into your house. When they left and the took Kevin, did you give any thought to what you had just created as far as you are a victim of a burglary by an unknown suspect and what course of action you could have put in place as far as searching the area for a suspect or alerting the neighbors that there was a burglar on the loose that's breaking into the house of a young lady. Had you had you given any thought as to at some point this report was gonna was gonna grow into the point that someone was gonna have to come back and do follow-up and there was gonna be more to it? Had you ever

ED: I don't believe

RC: sat there and thought about that?

ED: I I don't believe that when the when the troopers were there and I thought they were taking it as a criminal mischief. That someone had broke my window.

RC: But didn't you discuss that someone had been on the roof? Someone was beating on the door. And then someone was on the roof? And then someone broke a window?

ED: I don't believe so, no.

D000890

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 80 of 83

RC:    No?

ED:    No.

RC:    OK. OK. So the

JP:    I

RC:    so the scenario I laid out, you never thought about? What I just said about did
       you ever think that this was gonna go

ED:    Oh, mmm

RC:    any further? Before Brian Mayer called you and said I just called Captain
       Hawkins. That that's what I meant and that and that window, did you ever
       consider that at some point, I'm gonna have to come clean on what I just told
       everybody? Before Brian Mayer called you and said I've already talked to
       Captain Hawkins.

ED:    My thoughts after they left were

RC:    (positive sound)

ED:    were flooded. Um, I didn't know what, when they left things were were things
       were fine. Things were calm. They were they were leaving. It I mean two
       troopers had already left, Csapo was the only one there. I mean it wasn't like they
       said oh we're getting a helicopter and dog and , I mean that wasn't going into into
       action.

RC:    OK.

ED:    So, no I didn't I I didn't think that hey they're out banging on doors. I mean they
       never as far as I now contacted the neighbors downstairs. Never made mention
       hey does somebody else live down here. I mean that (sigh) in my mind it wasn't
       getting out of hand. Or that going in that direction.

RC:    OK.

ED:    Um, I'm sorry. Should I just stop?

RC:    No.

ED:    Did that answer your question?

                                    D000891

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 81 of 83

RC:     Answered my question, thank you. This tape is close to the end Captain.

JP:     Alright why don't we go ahead and and stop this tape 1658 hours. And we'll finish up the interview on a fresh tape.

TAPE 5

JP:     OK. We're back on tape 1700 hours. (paper shuffling) Uh, Christy, if you were dispatched to a complaint and confronted with the circumstances that um were presented here today, uh how would you have handled the situation?

ED:     That's tough. Um, I don't know if it's just because of the person I am or because I'm a female. I think I, no fault to them but, a little more sensitive. I think maybe I would have seen that I can smell alcohol, why don't I sit her down and talk to her calmly, one on one. Not have Gygrynuk standing there badgering me. Or

JP:     OK. But how would you how would you handled it as far as paperwork, um possible arrests, documentation, that sort of thing. What would what would you have done?

ED:     Just given information that I've gave them at the scene or given the entire account. (sigh) Because un unfortunately with this I mean the Captain was involved fairly quickly and and and set his all own ball in motion. So, I mean if if I was Csapo or Gygrynuk or or Argo, then I mean his being involved in it would certainly I I would think would sway how things went. I mean I don't exactly what was said between the Captain and the Sergeant and the Sergeant's through the the younger guys. But

JP:     Do you think you would have sought direction from your supervisor on how to handle the situation?

ED:     Oh, I I'm pretty sure I would have.

JP:     If you were sent to handle a complaint of this nature and you had a wrote it up, would you classify this as a domestic related incident? Under the under the Policies and Procedures of the Division?

ED:     … Again, given what I told them at the scene, or given what

JP:     Let me rephrase the question. Based upon your relationship with Brian at that time, on that date, do you consider that being a domestic related

ED:     No.

JP:     incident? Why not?

D000892

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 82 of 83

ED:     Because we were not in a serious relationship.

JP:     Is that what our policy states? You have to be in a serious relationship?

ED:     I I can't quote it. I'm sorry.

JP:     If you went if you went to a domestic where there was a a boyfriend girlfriend
        involved in in just an arugu just a male and a female involved in involved in an
        argument and they stated to you that they had been had had casual relationship
        where they went out to dinner, went out to a few movies, and the socialized,
        would that be considered a domestic?

ED:     To me no. But I mean if you're here to inform me that our policy says that any
        male female relationship that it's a domestic then

JP:     Are you familiar with our policy on this?

ED:     Well I thought I was but maybe (laugh) I'm not.

JP:     No it's

ED:     I mean if you ...

JP:     That's what I'm trying

ED:     .....

JP:     I'm trying to grasp your understanding

ED:     I mean most domestics I go to are he is my boyfriend, she is my girlfriend, he is
        my wife, or yeah, he is my wife, he is my husband, my wife, my ex, my ex-
        husband.

JP:     Well one of the definitions would be dating relationship regardless of living. And
        dating we're gonna get into sss to semantics what is a dating

ED:     Right.

JP:     .....

ED:     Right.

JP:     I don't believe I've got any further questions.

D000893

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 83 of 83

(?):     No.

JP:      Mr. McDonald? You have anything to add prior to us concluding?

RM:      I don't. Do you have anything Cris

JP:      Christy, do you have anything that you would like to to add prior to uh concluding
         this interview?

ED:      Um, (sigh) I mean there's a lot that I feel that may be you guys aren't clear on or
         or don't understand and I I don't know how many other ways to say it. I'm not
         (sniffle) at that point and time, Brian and I were not in a serious committed
         relationship. We had we had gone out. We were casual. I was seeing other
         people. At that point and time, no I did not feel it was a domestic. And I've been
         on a few. Troop 3 was domestic haven. (sigh) As far as nnn yeah, I guess that
         that's ..... I I did not feel it was a domestic incident. Now going back I'm not
         sure how well we covered you you guys asked me if if I'd if I'd spoken with
         Kevin. I I just want to make it clear that I I never tried to get Kevin to not come
         back and and testify. I didn't try to to to sway him at all. I did try to give him a
         heads up that hey this is being brought back up again. You are going to be
         contacted. I I'm serious. I did not want him to be blind sided. I was blind sided
         when Brian and I were on vacation. Well Brian was blindsided and then then told
         me. I was not allowed to know about it until I got back from vacation. And was
         blind sided again by the severity of the situation. And I didn't want Kevin to be
         blind sided like that. Course then I was blind sided again because you already
         knew way more than I knew. I just wanted to make it clear that I wasn't trying to
         influence him.

JP:      If there's nothing else to add, we going to con cude conclude the interview 1707
         hours.

D000894

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,　　　　　)
　　　　　　Plaintiff,　　　　　　)　　C.A. No. 04-456 SLR
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
STATE OF DELAWARE,　　　　　　)
DEPARTMENT OF PUBLIC SAFETY,　)
　　　　　　Defendant.　　　　　)

### CERTIFICATE OF SERVICE

I, Jeffrey K. Martin, hereby certify that I caused a true and correct copy of the foregoing

***Plaintiff's Summary Judgment Statement Pursuant to Court's Order of February 13, 2008*** to

be served via electronic filing to the following:

Stephani J. Ballard, ID #3481
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
Attorney for Defendant

　　　　　　　　　　　　　MARTIN & WILSON, P.A.


　　　　　　　　　　　　　/s/ Jeffrey K. Martin  #2407_____
　　　　　　　　　　　　　Jeffrey K. Martin, Esquire (#2407)
　　　　　　　　　　　　　Timothy J. Wilson (#4323)
　　　　　　　　　　　　　1508 Pennsylvania Avenue
　　　　　　　　　　　　　Wilmington, Delaware 19806
　　　　　　　　　　　　　Telephone: (302) 777-4681
　　　　　　　　　　　　　Facsimile: (302) 777-5803
　　　　　　　　　　　　　twilson@martinandwilson.com
　　　　　　　　　　　　　jmartin@martinandwilson.com

DATED: March 20, 2008