IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELIZABETH C. DEMPSEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-456 SLR |
| | ) | |
| STATE OF DELAWARE, | ) | |
| DEPARTMENT OF PUBLIC SAFETY, | ) | |
| | ) | |
| Defendant. | ) | |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO STATE OF DELAWARE'S MOTION FOR SUMMARY JUDGMENT

MARTIN & WILSON, P.A.

JEFFREY K. MARTIN, ESQUIRE
TIMOTHY J. WILSON, ESQUIRE
DE State Bar I.D. No.: 2407
DE State Bar I.D. No.: 4323
1508 Pennsylvania Ave
Wilmington, De 19806
(302) 777-4681
jmartin@martinandwilson.com
twilson@martinandwilson.com
*Attorneys for Plaintiff*

DATED:      September 8, 2008

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................................................ iii

I.   STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS................................. 1

II.   STATEMENT OF FACTS ..................................................................................... 2

    A.   BURGLARY OF PLAINTIFF'S RESIDENCE BY
        DSP CPL. BRIAN MAHER ................................................................................. 2

    B.   THE REPORTING OF THE BURGLARY: BY THE VICTIM,
        THE PERPETRATOR AND THE INVESTIGATING AND
        SUPERVISING OFFICERS ................................................................................ 5

    C.   DSP DISCIPLINE AS A RESULT OF MAHER'S BURGLARY
        AND THE REPORTING OF SAME ...................................................................... 9

III. ARGUMENT ......................................................................................................... 15

    A.   STANDARD OF REVIEW ................................................................................. 15

    B.   NUMEROUS GENUINE ISSUES OF MATERIAL FACT EXIST AND
        PRECLUDE SUMMARY JUDGMENT ............................................................... 16

    C.   DEFENDANT'S ARGUMENT THAT PLAINTIFF HAS PRODUCED
        NO EVIDENCE TO SHOW THAT ANY MALE TROOPERS WERE
        MORE FAVORABLY TREATED BY THE STATE AS THE
        RESULT OF THEIR GENDER MUST FAIL ...................................................... 23

    D.   IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT,
        DEFENDANT INAPPROPRIATELY RELIED UPON UNSWORN
        STATEMENTS ................................................................................................... 24

IV.   CONCLUSION ..................................................................................................... 25

i

## **TABLE OF AUTHORITIES**

**CASES**

*Adickes v. S.H. Cress & Co.*, 398 U.S. 144, 158 N.17 (1970) ...................................................... 25

*Goral v. Pyramid Healthcare*, 208 WL 144201, (W.D. PA. 2008) ,
(Citing *Small v. Lehman*, 98 F.3d 762, 764 n.5 3d. Cir 1996)...................................................... 25

*Maull v. Division of State Police*, 141 F.Supp. 2d 463 (Del. 2001)............................................. 23

## I.    STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

Plaintiff, Elizabeth C. Dempsey ("Crysti" or "Plaintiff") is a Corporal in the Delaware State Police having serviced as a Delaware State Trooper since her graduation from the Delaware State Police Academy on December 16, 1999.

On October 25, 2003, Plaintiff contacted the non-emergency line at the Kent County Dispatch Center to report that someone had broken into her residence.  The perpetrator was Corporal Brian Maher ("Maher") of the Delaware State Police who was later arrested and pled guilty to criminal trespass.  In addition, Maher was disciplined by the Delaware State Police. Plaintiff was reported to Internal Affairs as having made a false report regarding the incident wherein Maher broke into her home.  Plaintiff was terminated for the offense but was later reinstated to the Delaware State Police.

Plaintiff has filed this action alleging gender discrimination Under Title VII claiming that as a female her discipline with unfair termination far exceeded the other discipline that was handed down by the Delaware State Police.  In addition, Plaintiff has pled a State Law claim by alleging a breach of the covenant of good faith and fair dealing.

Defendant has filed a Motion for Summary Judgment and has submitted an Opening Brief in Support of same.  This is Plaintiff's Answering Brief in Opposition to the State of Delaware's Motion for Summary Judgment.

in the form of affidavits, depositions, and/or pleadings.

## II.    STATEMENT OF FACTS

### A.    BURGLARY OF PLAINTIFF'S RESIDENCE BY DSP CPL. BRIAN MAHER

On the evening of October 25, 2003, Plaintiff returned to her residence late that evening with a male friend and police officer from Texas, Kevin Keller. They had been out with friends that night and both consumed alcoholic drinks.[1]  Sometime after 1:00 am that evening/morning (now October 26, 2003), DSP Cpl. Brian Maher arrived at Plaintiff's residence attempting to contact Plaintiff.  He began by banging on the door and window to get Crysti Dempsey's attention.  When he received no response, he "mule kicked" a window leading into her apartment breaking the window. (B-089-92).  After breaking the window, he entered Plaintiff's residence calling out for her and threatening her male companion, Kevin Keller.  Maher threatened Keller to "kick his ass."  (A- 000410).

At the point that Maher had entered Plaintiff's residence, Keller insisted that Plaintiff call "911." (B-006, 39).  Instead of calling 911, Plaintiff contacted the non-emergency number for Kent County Dispatch at 739-4863 and calmly reported what she had observed ("Kentcom"). (Id.).  A transcript of Plaintiff's call to the Kent County Communications Dispatch is reproduced in Plaintiff's Appendix.  (A-000385-87).

In her call to Kentcom, Plaintiff initially reported her address and advised that "somebody just broke into my house." (A-000385).  Asked by the dispatcher whether the intruder was inside her residence, she said, "I think they've left." (Id.). While Plaintiff was making this call, Plaintiff referred to Kevin Keller as "Kevin" on the telephone call in a few instances acknowledging his presence at her home. (A-000385-87).  Asked whether she had "a

---

[1] Keller told the Internal Affairs investigator that he had consumed six to eight "Captain and Cokes" referring to an alcoholic drink made up of Captain Morgan's rum and Coca-Cola. (A-000412). Plaintiff recalls drinking Captain and Cokes that evening and being under the influence of alcohol (B-016, 17).

clue who it was," Plaintiff, in a gesture of attempting to protect the identity of her fellow trooper Brian Maher, said "no." (A-000385, B-061).

Plaintiff further reported that glass was broken and there had just been one person who entered her residence. (A-000385, 86). Plaintiff advised that she heard the window break and she also heard the intruder in her home. (A-000386). She further reported that she did not believe that anything was taken from the home. (Id.).

Plaintiff then provided her identity including her Trooper Identification Number and cell phone number from which she was making the report. (Id.) Plaintiff advised the dispatcher that she heard the person drive away but that she did not have a description of the vehicle nor did she see the intruder at any time. (A-000386, 87). Plaintiff reported that she and Keller were in the home and they were "fine." (A-000387). She further advised that, "I have my gun, I'm fine." (Id.). The dispatcher's response was that he would send an officer over there to talk to her "just to make sure." (Id.). She was admonished from touching anything if she walked around her residence. (Id.). The dispatcher ended the call by advising that they will send someone over at which point Plaintiff thanked the dispatcher and the call ended. (Id.).

Very shortly thereafter and before any State Troopers arrived at her home, Plaintiff again called the dispatcher whose name was Melvin. (Id.). Plaintiff asked Melvin to "make sure you could tell the trooper to slow down their response, I'm fine." (Id.).Melvin responded by acknowledging that he told them that no one was in the house (referring to any intruders) but that two troopers were enroute to see Plaintiff. (Id.). Plaintiff told Melvin that, "they don't even need to come." (Id.). Melvin asked whether the intruder had taken anything and she said "no" other than the window was broken. (Id.). Plaintiff further explained that after the intruder got into the house he went out the front door while she was locked in the bedroom. (A-000388). Plaintiff

asked about the identity of the troopers responding and was told that Troopers Argo and Gygrynuk were enroute to her residence. (Id.). Plaintiff responded by saying that neither one had to stop by to see her unless one was almost there at that point. (Id.). Plaintiff again cautioned the dispatcher that the officers "can just totally slow their response." (Id.). Melvin advised that he would let them know. (Id.).

It appears that a few details from the two telephone communications between Plaintiff and dispatcher Melvin were grossly misstated to the responding State Troopers from Troop 3 and their desk Sergeant, Sergeant Michael Houdek. Houdek was advised that "there was a subject attempting to break in and that [Officer Dempsey] got her gun." (A-000055). Sgt. Houdek acknowledged that he was upset with Trooper Crysti Dempsey, because she placed the officers "in harm's way." (A-000047). Houdek testified that he was not aware that Crysti Dempsey had called dispatch and said not to send anyone. (A-000065). Houdek acknowledged that if he knew that the trooper had said "don't worry," they would have still responded but not at a fast pace. (Id.).

The senior trooper who responded to Plaintiff's residence was Cpl. Walter Gygrynuk who believed that he was responding to a "burglary in progress involving a Trooper" where there was a "gun involved." (A-000477). The other two responding troopers, Trooper Argo and Trooper Csapo, both believed that they were responding to a "burglary in progress." (A-000453, 505).

Brian Maher admitted during his deposition that his actions in breaking into Plaintiff's residence and threatening bodily harm to her guest constituted First Degree Burglary. (A-000079). He was quick to acknowledge, however, that he was never charged with burglary. (Id.).

Captain Paige, the Head of the Internal Affairs Unit of the Delaware State Police, conducted numerous interviews of witnesses regarding this matter. Capt. Paige acknowledged that because Brian Maher was guilty of terroristic threatening, he was also therefore guilty of burglary due to his breaking and entering into Plaintiff's residence. (A-000447).

## B.    THE REPORTING OF THE BURGLARY: BY THE VICTIM, THE PERPETRATOR, AND THE INVESTIGATING AND SUPERVISING OFFICERS

Trooper Argo was the first to arrive at Plaintiff's residence and contact Plaintiff. Plaintiff assured Argo that everything was ok and that she did not want to make a big deal out of this situation. (A-000454). Argo's response was they had to investigate because of the proximity of Cpl. Dempsey's marked police car to her home where the break-in occurred. (A-000456). Trooper Csapo was next to arrive and the trooper who was designated as the investigator this meant that Csapo had to file the initial police report. Csapo found that Plaintiff was not being evasive but rather she just left out certain things. (A-000519).

Plaintiff was repeatedly asked whether she had seen the suspect and she gave her truthful response that she did not *see* him. (B-071). She admits, however, that she knew that the suspect was Brian Maher, having identified his voice. (B-061). When she was asked during her Internal Affairs investigation why she did not advise the dispatcher that the identity of the subject was Brian Maher, she noted that she was "confused, hurt, angry and mad. [She] did not know what to do." (Id.).

There were a few items that were erroneously reported by the investigating officers from the scene according to Plaintiff. Plaintiff denies that she told Trooper Gygrynuk that she came home and found broken glass indicating that the break-in had occurred before she got home. (B-069). She also denied, contrary to Brian Maher's assertion, that they were girlfriend and

5

boyfriend at the time. (B-009, 70). Further, Plaintiff denied that she said that she was home by herself at the time of the break-in. (B-070). Indeed, Plaintiff advised Trooper Gygrynuk that Kevin Keller was upstairs in her apartment. (Id.).

The only incorrect statement that Plaintiff acknowledges is that she did not identify Brian Maher as the perpetrator of the burglary. (B-061).

After breaking into Plaintiff's residence, Brian Maher overheard Crysti Dempsey's contact with the dispatcher. (B-092). This prompted him to leave quickly and to head southbound on Route 1. (Id.). Shortly after getting into his car, he contacted a personal friend, Troop 3 Commander Captain Robert Hawkins. (Id., A-000072). Maher told Hawkins that there had been an incident at Plaintiff's residence where he broke the window but there was no contact or altercation other than verbal. Following this, he left the incident and began heading home. (Id.).

Capt. Hawkins immediately contacted Sgt. Houdek and advised Houdek that Brian Maher was involved in the incident at Plaintiff's residence. (A-000060). Capt. Hawkins acknowledged that as a result of this conversation with Maher, he was not aware that the incident involved more than just breaking a window. (A-000005, 9). Maher did not tell him that he had made threats and improperly entered Plaintiff's residence. Hawkins was not aware of Maher's deficient reporting until he read the initial police reports the next morning. (Id.). As a result of this new knowledge, Capt. Hawkins called Brian Maher and chewed him out sometime Sunday Morning, October 26. (Id.).

There were two reports written by the investigating officers before they got off duty on the morning of Sunday, October 26. Investigating Officer Csapo wrote a report wherein he listed the suspect as "unknown." (A-000523, 25). This report was approved by his supervisor, Sgt.

6

Mike Houdek, who knew following Capt. Hawkins' call shortly after the incident occurred, that Brian Maher was the unidentified suspect. (A-000060). Houdek did not write a supplemental report or change Cspao's report to reflect that Trooper Brian Maher was the suspect. (A-000062).

Trooper Gygrynuk acknowledged that he was quite upset with Cpl. Dempsey. (A-000495). (G IA at 20). He believed that she was lying by calling in a "false report." Further, he stated that, "I wanted her butt to hang." (Id.).

Csapo acknowledged that he learned that Brian Maher was the suspect either the next day or the next couple of days following the incident. (A-000521, 22). Csapo made no attempt to do a supplemental report to advise as to the identity of the suspect. (A-0522). Indeed, Capt. Hawkins, who only reviewed the approved investigating reports of Csapo and Gygrynuk saw that the suspect was unnamed. (A-000007). Capt. Hawkins advised that he also could have done a supplemental report to advise of the real name of the suspect but did not do so. (A-000023).

Trooper Gygrynuk who acknowledged that he was very upset with Plaintiff and wanted her "butt to hang" knew that Brian Maher was the suspect at the time he filed his supplemental report immediately following Csapo's investigating report. (A-000492, 93). Gygrynuk knew or discovered that Maher was the suspect when he got back to the Troop before writing his report. (Id.). He was advised by his supervisor, Sgt. Houdek, to write the report as if "they didn't know." (A-000494). Gygrynuk said that "we didn't hide anything. We didn't leave anything out of our reports." (Id.). When questioned further by Internal Affairs as to whether Gygrynuk had indeed filed a false report, Gygrynuk's response was that that was a "tough question" because they (the investigating troopers) thought they were doing the right thing by leaving Maher's name out of the report. (A-000496).

7

Capt. Hawkins testified that there was "no doubt" that he had informed his supervisor, Major Hughes, about the incident, including the fact that Brian Maher was the one who broke into Crysti Dempsey's home. (A-000012). Major Hughes denied that Capt. Hawkins had advised him as to the identity of Maher as being the suspect. (A-000034). Indeed, Hughes testified that he was not even aware that the suspect was identified as a trooper. (A-000041). Major Hughes testified that he was "absolutely positive that [he] did not know Brian Maher was the suspect in this." (A-000062).

Hughes also testified that consistent with the policy of the Delaware State Police, the supervisor at the time of the incident should have gone to the scene. (A-000038). He further testified that violation of this policy called for discipline. (Id.). Disciplinary charges were never brought against Sgt. Houdek for his failure to go to the scene. (A-000062).

Capt. Hawkins referred this matter to Sgt. Mullett ("Mullett") on Monday, October 27. (A-000008). Mullett also wrote a report which like the two preceding reports listed that the suspect was "unknown." (A-000021). However, he had been advised by Capt. Hawkins that the suspect was Maher. (Id.). Hawkins gave it to Mullett with the instructions that this matter be "*exceptionally cleared* because Plaintiff did not wish any prosecution." (A-000011). Instead of clearing this matter, as directed by the troop commander, which would have required the name of the suspect being identified on the report, Sgt. Mullett chose to "unfound" the matter meaning that the incident never occurred. (Id.). Capt. Hawkins was later charged with a policy violation for allowing the wiping out of the complaint to have occurred. (A-000021). Capt. Hawkins explained that he accepted the discipline on behalf of Sgt. Mullett because Mullett was under Hawkins' command. (Id.).

**C.   DSP DISCIPLINE AS A RESULT OF MAHER'S BURGLARY AND THE REPORTING OF SAME**

8

Capt. Hawkins, in his capacity as Troop 3 Commander, reviewed the incident reports prepared by the investigating officers and spoke with the crime victim, Cpl. Dempsey, as well as the perpetrator, Brian Maher. (A-000007, 9, 10). Plaintiff insisted to Capt. Hawkins that she wanted no action taken against Brian Maher. (A-000010). Brian Maher had expressed his regret to Capt. Hawkins and had replaced the window he broke. (A-000009). Major Hughes briefed the DSP Superintendent Col. Chaffinch as well as the other executive staff members on Monday, October 26 that an incident had occurred with Cpl. Dempsey on Saturday night but that Cpl. Dempsey was not injured in anyway and did not wish to prosecute the matter. (A-000033). At that point, the parties to the crime as well as the investigating officers to include Capt. Hawkins believed that the matter was over. (A-000016).

Approximately six months later, in April 2004, the matter was suddenly and inexplicably reopened. (A-000033). Capt. Dixon, the Troop Commander of Troop 5 which was the Troop where Plaintiff was assigned at the time of the crime, learned apparently inadvertently from a neighbor about this matter that had occurred in October of 2003.

Capt. Dixon confronted Major Hughes and the term "cover up" was used referring to how the October 26 matter was never investigated and no criminal or divisional charges were ever levied against the perpetrator. (A-000035). Capt. Dixon's report to Major Hughes caused Hughes to immediately report this matter, with the concurrence of Deputy Superintendent, Lt. Col. MacLeish, to Internal Affairs. (A-000036). For the next two months, numerous interviews were conducted by Internal Affairs primarily by the Internal Affairs Chief, Capt. Paige. In addition to Plaintiff and Maher being investigated, Major Hughes, Capt. Hawkins, Sgt. Mullet, Sgt. Houdek, Troopers Argo, Csapo and Gygrynuk were all questioned regarding their role in this matter. (See Appendices).

9

Brian Maher was charged both criminally and divisionally (meaning that DSP pressed disciplinary charges against him). Although Maher acknowledged that he was guilty of burglary in the first degree, a felony, he was charged only with two misdemeanors, criminal mischief and terroristic threatening. (A-000078, 79). Maher pled guilty to criminal mischief and received a nominal fine without any incarceration.    As to the DSP charges, he pled guilty to "Conduct Unbecoming an Officer" in a summary disciplinary proceeding. (A-000079).[2]    Maher pled to the "conduct unbecoming" charge before Col. Chaffinch on the last day that Col. Chaffinch served as Superintendant of the Delaware State  Police. (A-000079). Maher lost rank and was reduced from a Corporal 3 to a Corporal 1. (A-000326, 37). As a result of his discipline, Maher did not lose his position as Assistant Shift Commander for his Troop, meaning that he assisted the Sgt. during the shift and if he did not run the desk at the troop, he commanded the officers on patrol. (A-000080, 54). In addition, Maher was able to continue his work in the special units, the motorcycle unit and the scuba unit. (A-000080). Maher applied for and received terminal leave that began on February 23, 2007 but continued to be paid until October 3, 2007. (A-000080, 83). Following his terminal leave in October 2007 he received his pension for twenty years of service with DSP. (A-000080).

In sharp contrast to Maher who was the perpetrator of the burglary, Plaintiff, the victim of the burglary, was terminated from DSP. (A-000085, 370, 377).  Plaintiff was charged divisionally with making a false report and with failing to report a domestic incident. (A-000342). The latter charge was not substantiated because Plaintiff denied that she had a girlfriend/boyfriend relationship with Brian Maher at the time of the incident in October 2003.

---

[2] Summary discipline is a DSP procedure by which an officer is permitted to plead guilty to a charge without an investigation by Internal Affairs and a hearing. In return, the officer is not allowed to appeal any part of the decision of the summary discipline. (A-000020, 21).

girlfriend/boyfriend relationship with Brian Maher at the time of the incident in October 2003. (A-000367). Plaintiff was found guilty by a trial board consisting of three DSP troopers.[3] (A-000353). The trial board found her guilty of making a false report(s). (A-000367). Specifically, the trial board found that she "made a series of false statements when she called 911 and to the troopers investigating her criminal complaint." (A-000367).

As noted previously, Plaintiff denies that she made any false statements other than failing to identify Brian Maher as the perpetrator. (B-061). The trial board's recommendation was termination. (A-000367). The recommendation was accepted by the DSP Superintendent. Plaintiff was terminated from DSP from January 2005 to August 2005.[4] (A-000380). Plaintiff was able to rejoin DSP because the ruling of the trial board was reversed by the Director of Public Safety (who among other things oversees the Division of State Police) Secretary Mitchell found that, "the penalty of termination is not proportionate to the severity of the infraction considering the circumstances of the violation." (A-000379, 80). He ordered Plaintiff to be suspended without pay for fifteen days.

The three investigating officers Gygrynuk, Csapo and Argo received no discipline. (A-000018). In fact, there were no charges levied against any of these troopers. (Id.). Trooper Gygrynuk wrote the first supplemental report and indicated that the suspect was unknown all the while knowing that it was Brian Maher. (A-000492, 93). When asked whether he made a false report, his response was that it was a "tough question" and "we thought we were doing the right thing." (A-000496). Gygrynuk further noted that he submitted his supplementary report as

---

[3] Defense counsel's suggestion in their Brief that the three person trial board is tantamount to a jury is disingenuous. The suggestion that three troopers are as disinterested and objective as a jury drawn from the community cannot be given any credence.

[4] Defense counsel's suggestion that Plaintiff's termination was extended because she took vacation time before rejoining DSP in August 2005 is incorrect. In fact, Plaintiff rejoined DSP in August 2005 after serving her suspension time rather than forfeiting her vacation time as had been her option.

professes that he did not know Maher's identity at the time he submitted his report, he found out shortly thereafter that it was Maher. (A-000521, 22). He submitted no supplemental report when he learned the identity of the trooper. (A-000007). Trooper Argo submitted supplemental report number three (Maher 4) in April 2004 following Capt. Dixon's discovery of the October 2003 incident. (B-105). Brian Maher's name was not identified as a suspect on this report. (Id.)

Sgt. Houdek, the commanding (highest ranking) officer at Troop 3 at the time of this incident, also received no discipline or any charges of violation of DSP policy. (A-000018). Sgt. Houdek knew right after the incident as a result of his telephone call from Capt. Hawkins that Brian Maher was the unidentified suspect. (A-000060). Sgt. Houdek noted that he had only one brief discussion with Capt. Hawkins and Capt. Hawkins did not provide any guidance with regard to the write-ups or the investigation reports to be done by his investigating officers. (Id.). Sgt. Houdek approved Trooper Csapo's initial investigating report that stated that the suspect was unknown. (A-000061). Houdek also approved the supplemental report filed by Trooper Gygrynuk immediately thereafter. (A-000062, 63). Sgt. Houdek testified that he did not, however, have any recollection of Trooper Gygrynuk's supplemental report that also failed to list Maher as a suspect. (A-000063) Finally, with regard to Sgt. Houdek, Major Hughes testified that Houdek clearly violated departmental policy when he failed to report to Dempsey's home following her complaint. (A-000038). Major Hughes acknowledged that such a violation calls for divisional discipline. (Id.).

Sgt. Mullett picked this matter up on Monday after it was given to him by Capt. Hawkins. (A-000008). Although Capt. Hawkins directed him that he wanted Mullett to "clear" this matter, Mullett, who knew the identity of the suspect, Brian Maher, marked the matter as "unfounded." (A-000011, 21). The marking of unfounded was done without the identification of the suspect

12

and the matter was then closed and remained without scrutiny until Capt. Dixon uncovered the information some six months later. (A-000011, 33). Detective Mullett received no departmental discipline nor any charges of same. (A-000018). However, Capt. Hawkins acknowledged that he accepted discipline for Sgt. Mullett's failings by not properly clearing the case. (A000021).

Capt. Hawkins, the Troop 3 Commander, played an active role in the aftermath of the burglary. He received a call from Brian Maher who reported part of the story to Hawkins. (A-000005). When Hawkins reviewed the reports and realized that Maher had committed a burglary he called Maher and reprimanded him. (A-000009). He also was very concerned about Cpl. Crysti Dempsey and contacted her Sunday to determine how she was doing and whether she wished that any prosecution occur. (A-000010). Hawkins believed that Cpl. Dempsey was being "completely honest" with him. (Id.).

When asked at his deposition in 2007 what discipline was received by Crysti Dempsey, Hawkins said that he did not know. (A-000021). He also admitted that he was "surprised" when he learned that she had been terminated. (A-000028). Capt. Hawkins believed that the only misstatement by Crysti Dempsey was that Kevin Keller was not there at the time of the incident. (A-000021). Capt. Hawkins acknowledged that he could have filed a supplemental report after he reviewed the first two reports and noted that the suspect was listed as "unknown." (A-000023). Capt. Hawkins was charged divisionally with using poor judgment. (A-000021). He received summary discipline and lost some of his vacation time. (Id.).

Major Hughes was also charged with and received divisional discipline for poor judgment. (A-000037). He received a two-day suspension with an option to forfeit his vacation. (Id.). Hughes faulted himself for failing to follow-up the reports from Capt. Hawkins and not referring this matter to Internal Affairs. (Id.)

(Id.).  Hughes faulted himself for failing to follow-up the reports from Capt. Hawkins and not referring this matter to Internal Affairs.  (Id.)

Cpl. Maher testified that Cpl. Dempsey did the right thing by the way she handled the police reports for the sake of her privacy and for the privacy of Cpl. Maher.  (Answering Brief at 14).  (A-000085).

Cpl. Maher did not believe that Cpl. Dempsey should have been terminated because that was not a fair penalty for what had happened.  While she was not forthright about his identity, she did it for certain reasons that were warranted.  (Answering Brief at 14).  (Id.).

## IV.  ARGUMENT

### A.  STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall be rendered" where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome under the governing substantive law. *See Anderson v Liberty Lobby*, Inc., 477 U.S. 242, 255 (1986). A dispute over a material fact must be "genuine", i.e., the evidence is such "that a reasonable jury could return a verdict in favor of the non-moving party." *Id.* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Live Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995). "[E]vidence of nonmovant is to be believed and all reasonable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The matter before the Court is a case of drawing inferences from facts, i.e., the inference that Cpl. Dempsey was treated differently from male Troopers because her divisional discipline for making a false report resulted in termination. Drawing inferences is typically reserved for a jury at trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (holding that drawing inferences is a jury's function so long as competing inferences are reasonable under the law.

**B.     NUMEROUS GENUINE ISSUES OF MATERIAL FACT EXIST AND PRECLUDE SUMMARY JUDGMENT**

Pursuant to the Court's earlier Order, the parties engaged in a process wherein both sides submitted memoranda consisting of various statements either supporting or objecting to Summary Judgment. A copy of Plaintiff's Summary Judgment Statement is attached hereto as Exhibit "1". The following is a list, in no order of importance, of issues of fact that remain in dispute or preclude Summary Judgment in this matter. Some of these can be found in Plaintiff's Summary Judgment Statement ("Statement") and will be so noted and the rest are found in Plaintiff's Answering Brief and will also be noted.

1.      It appears that Plaintiff, Crysti Dempsey, contacted the dispatcher and advised the situation was under control so that the officers could have responded if they wanted to or otherwise take their time and respond. While it is not clear that the dispatcher ever relayed this message to Sgt. Houdek, Sgt. Houdek acknowledged that had he been aware of this, he would have lessened his response to the initial call. (Answering Brief at 3, 4).

2.      While Defendant insists that Plaintiff made emergency calls, Plaintiff adamantly insists that she called the non-emergency line of Kent County Communications. (Statement at 8).

3.      Plaintiff denies that she reported a "burglary in progress" but instead reported that someone had broken into her house but the time of the telephone call they had left the property. (Statement at 2).

4.      Plaintiff reported that she and her male friend were in the home and they were "fine". The dispatcher responded saying that they would send an officer to talk to her "just to make sure." In the meantime, three Delaware State Troopers responded in an urgent manner to Plaintiff's home. (Answering Brief at 2).

16

5.    Plaintiff maintains that she never saw Cpl. Maher at her home that night. Defendant insists that Plaintiff observed Maher. (Statement at 3).

6.    While Plaintiff acknowledged that she was under the influence after consuming numerous rum and cokes, Plaintiff's alcohol status was never assessed by the responding State Troopers. (Answering Brief at 2).

7.    Plaintiff's statement to the dispatcher that she had her gun was misinterpreted by Sgt. Houdek and the responding Troopers as suggesting an increased urgency in response. (Answering Brief at 3).

8.    Sgt. Houdek maintains that Plaintiff put his officers "in harms way" while Plaintiff's recorded conversation with the dispatcher shows that she insisted that the response be lessened dramatically, if at all. (Statement at 9).

9.    Despite Defendant's allegations that Plaintiff "withheld material information about the burglary she had reported," Plaintiff acknowledged that the only information that she withheld at the scene of the incident was the identity of the Trooper who had burglarized her home. (Statement at 10).

10.    The investigating troopers allege that Plaintiff gave a series of false statements to them at the scene. Plaintiff denies this and acknowledged that she advised them only that she "did not *see* who broke in." (Statement at 11). In point of fact, Capt. Hawkins, who supervised the investigation into this matter, believed that the only false statement from Plaintiff was with regard to the whereabouts of her mail companion, Kevin Keller. (Answering Brief at 14).

11.    Defendant has alleged that Cpl. Maher made a complete report to Capt. Hawkins when he called him immediately after the incident to advise him as to what had happened.

17

Instead, Capt. Hawkins acknowledged that he was only aware of Maher breaking the window and was not aware of his entrance into the building and making threats. (Statement at 13).

12.    Defendant alleged that Capt. Hawkins advised Sgt. Houdek to have the write-ups of the incident by the investigating officers written "as Dempsey had reported it." Sgt. Houdek testified that he had no discussion with Capt. Hawkins regarding the write-ups of the incident. (Statement at 14).

13.    The investigating troopers wrote their reports indicating the suspect was unknown although they each were aware that Brian Maher was the suspect. (Statement at 14).

14.    While Cpl. Maher was admittedly guilty of first degree burglary and terroristic threatening, he was never charged criminally with these offenses and he pled guilty only to one misdemeanor. (Answering Brief at 10).

15.    While Cpl. Maher was found guilty criminally and also pled guilty to a divisional charge of conduct unbecoming, he continued to serve as a Delaware State Trooper and continued as an Assistant Shift Commander as well as on extra details of SCUBA and the Motorcycle Units. (Answering Brief at 11).

16.    Although she was the victim of first degree robbery, Plaintiff was found guilty of making false reports and was terminated from the Delaware State Police. (Answering Brief at 11).

17.    The investigating officers who wrote the reports believed that they wrote full reports having left nothing out or hiding anything although they listed the suspect as unknown. (Statement at 14).

18.    Although knowing the identity of the suspect, Sgt. Mullett chose to "unfound" this matter, meaning that the incident never occurred and therefore no suspect was listed. (Statement at 17).

19.    Capt. Hawkins insists that he advised Major Hughes that Brian Maher was the individual who burglarized Cpl. Dempsey's home. Maj. Hughes adamantly denies knowing that a Trooper was involved in the break-in. (Statement at 18).

20.    Capt. Hawkins believed that Plaintiff may have been guilty of only misstatement and that was with regard to the whereabouts of Kevin Keller at the time of the burglary by Maher. (Statement at 19).

21.    All three investigating troopers listed the suspect as "unknown" although knowing that it was Brian Maher. (Answering Brief at 7).

22.    Sgt. Houdek, the investigating troopers' supervisor, told each of the officers to write the report as if "they didn't know" the identity of the suspect. (Answering Brief at 7, 8).

23.    Trooper Gygrynuk said that, "we didn't hide anything. We didn't leave anything out of our reports." (Answering Brief at 8).

24.    Trooper Gygrynuk further responded that the investigating officers thought they were doing the right thing by leaving Maher's name out of the report. (Answering Brief at 8).

25.    Maj. Hughes testified that the policy of the Delaware State Police was that the supervisor at the time of the incident should have gone to the scene. He further testified that violation of this policy called for discipline and disciplinary charges were never brought against Sgt. Houdek for his failure to go to the scene. (Answering Brief at 8).

26.    Sgt. Houdek was not charged with any violations, although he acknowledged that he reviewed and signed off on the police reports of Gygrynuk and Csapo while knowing that Maher was the suspect identified to him by Cpt. Hawkins. (Statement at 24).

27.    Capt. Hawkins and Sgt. Mullett were not charged with falsification of police reports although each acknowledged that they were aware that Brian Maher was the suspect involved in the incident. (Statement at 24).

28.    Sgt. Mullett wrote a report consistent with the two prior reports of the investigating officers that the suspect was "unknown." Sgt. Mullett was never considered for discipline. (Answering Brief at 8).

29.    Capt. Hawkins instructed Sgt. Mullett that this matter be "exceptionally cleared because Plaintiff did not wish any prosecution." However, Sgt. Mullett chose to "unfound" the matter, meaning that the incident never occurred. (Answering Brief at 8, 9).

30.    Prior to her Trial Board, Plaintiff was denied access to the internal affairs interviews of Maj. Hughes, Capt. Hawkins and Sgt. Houdek. (Statement at 26).

31.    Capt. Dixon, upon learning of the incident approximately six months after it occurred, used the term "cover up" with regard to the how the October 26th matter was never investigated and no criminal or divisional charges were ever levied against the perpetrator. (Answering Brief at 9).

32.    The Trial Board substantiated Plaintiff's violation of a policy against making false statements finding in its written opinion that, "Dempsey made a series of false statements when she called 911 and to the Troopers investigating her criminal complaint." (Statement at 27).

33.    Plaintiff admitted before the Trial Board only that she had made a false statement with regard to the fact that she did not know the identity of the suspect. (Statement at 27).

34.     The Trial Board unanimously recommended that Plaintiff be suspended with intent to terminate believing that trustworthiness and credibility of an officer is a critical component of the officer's ability to perform the duties of law enforcement. (Statement at 28).

35.     Plaintiff Dempsey exercised her right of appeal to the Secretary of Public Safety who found that the penalty of termination was disproportionate to the severity of the infraction under the circumstances. (Statement at 29).

36.     While Defendant maintains that Plaintiff was never actually terminated from her employment with Delaware State Police, she was indeed terminated from February through July at which point the Director of Public Safety overturned the penalty of termination. (Statement at 30).

37.     Noting that Defendant was reassigned to Troop 4 from Troop 7 when she returned to work, Cpl. Maher remained at Troop 7 and did not get transferred. (Statement at 32).

38.     Cpl. Maher was charged divisionally with violations of conduct unbecoming an officer and participation in a domestic incident.  While Maher admitted that he was guilty of first degree burglary, his penalty was much less severe than Plaintiff's who was the victim of Maher's crime.  Maher received a demotion, 15 days suspension without pay and one year's probation. (Statement at 34).

39.     Maher did not lose his position as Assistant Shift Commander at Troop 7 following his discipline and was able to continue to work in the Special Units, the Motorcycle Unit and the SCUBA Unit. (Statement at 35).

40.     Maher applied for and received terminal leave that began on February 23, 2007, but he was continued to be paid until October 3, 2007 at which time he retired with a full pension. (Statement at 35).

41.    Capt. Hawkins was charged with neglect of duty and he received a 24-hour suspension. (Statement at 36).

42.    Maj. Hughes was charged with violation of neglect of duty and received 16 hours of suspension. (Statement at 37).

43.    Capt. Hawkins admitted that he was "surprised" when he learned that Cpl. Dempsey had been terminated. (Answering Brief at 13).

44.    Cpl. Maher testified that Cpl. Dempsey did the right thing by the way she handled the police reports for the sake of her privacy and for the privacy of Cpl. Maher. (Answering Brief at 15).

45.    Cpl. Maher did not believe that Cpl. Dempsey should have been terminated because that was not a fair penalty for what had happened. While she was not forthright about his identity, she did it for certain reasons that were warranted. (Answering Brief at 15).

This litany of factual discrepancies and/or inconsistencies clearly demonstrates the divergent view of the facts of the case between Plaintiff and Defendant. There is not even agreement as to what happened, meaning what statement or statements, made at the scene by Cpl. Dempsey were false. Indeed, the commanding officer of Troop 3 who had responsibility for this jurisdiction, Capt. Hawkins, believed that the only false statement may have been the whereabouts of Cpl. Dempsey's male companion, Kevin Keller. This is radically different from what the investigating Troopers said, and further, it is radically different from the findings of the Trial Board. Capt. Hawkins was "surprised" to learn that Cpl. Dempsey had been terminated. In fact, this termination was overturned by the Secretary of Public Safety as being "disproportionate."

It is respectfully submitted that all of these issues need to be submitted to the fact finder (the jury) in order to resolve the numerous inconsistencies.

### C.   DEFENDANT'S ARGUMENT THAT PLAINTIFF HAS PRODUCED NO EVIDENCE TO SHOW THAT ANY MALE TROOPERS WERE MORE FAVORABLY TREATED BY THE STATE AS THE RESULT OF THEIR GENDER MUST FAIL.

Defendant takes issue with Plaintiff's claim of disparate treatment based upon gender. (Opening Brief at 16). Defendant based this argument on Plaintiff's alleged failure to provide comparators. Defendant cites the decision is Maull v. Division of State Police, 141 F.Supp. 2d 463 (Del. 2001) noting that the acts of the compared as must be of "comparable seriousness" or "sufficiently similar."

Defendant similarly  dismisses the prospect of any of the troopers being comparators because they "were investigated simultaneously" and the "investigation drew different conclusions as to the culpability (or lack thereof) of each trooper based upon the different conduct and role of each in the events of that date. (Opening Brief at 17). This standard of determining whether one is a comparator has no legal support. Indeed, Plaintiff considers this a specious argument that totally avoids the facts and the analysis as to the existence of comparators.

There can be no closer comparator than each of the three investigating troopers. Each of whom reported in their investigating reports that the suspect was "unknown" all the while knowing that the suspect was Brian Maher. The transgression ascribed to Cpl. Dempsey was her failure to indentify Maher at the scene during the investigation by her fellow troopers. Thus, the transgressions of Dempsey and the three male troopers were identical albeit that Cpl. Dempsey failed to *verbally* identify Brian Maher while the three male troopers failed to identify Maher *in writing*. Further, these three investigating troopers were all corporals, the same rank as Plaintiff

23

Dempsey at the time of this incident. We submit that what can not be reconciled is the fact that the three male troopers were never divisionally charged with any violations. Plaintiff Dempsey was charged with making a false report that resulted in her termination.

For the reasons stated in the comparator analysis regarding the three male investigating Troopers, a similar argument can be made that Sgts. Houdek and Mullett were also comparators in as much as they wrote or approved false reports that listed the Dempsey burglary suspect as "unknown."

In addition, Cpl. Brian Maher, who although was admittedly guilty of first degree burglary, retained his job duties after having been demoted is perhaps the most striking comparator. Plaintiff Dempsey, the victim of the burglary who attempted to initially shield his identity, lost her job with the Delaware State Police while Maher retained his as well as all of his duties and his troop placement.

While Defendant wants the Court to think that the termination was overturned by the Secretary of Public Safety and therefore had no affect on Plaintiff Dempsey, nothing could be further from the truth. There was approximately a five or six month period of time when Plaintiff Dempsey stood terminated receiving no income or benefits until such time as the termination decision was reversed by the Secretary. The fact that Ms. Dempsey received back pay does not mitigate the damages of no income and great humiliation during this period of time.

In any event, Plaintiff has made her burden showing desperate treatment of her compared with her comparators.

### D. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT, DEFENDANT INAPPROPRIATELY RELIED UPON UNSWORN STATEMENTS.

Defendant has applied to this Court for the remedy of Summary Judgment without having taken any depositions in this matter.

Indeed, Defendant did not even take the deposition of Plaintiff, Crysti Dempsey. In contrast, Plaintiff took four depositions: Maj. Hughes, Capt. Hawkins, Sgt. Houdek and Brian Maher. All four of these depositions are found in the Appendix. Also included in the Appendix are over 125 pages of interviews by the Delaware State Police Internal Affairs Unit. These interviews were of Plaintiff Dempsey, Kevin Keller, Trooper Argo, Trooper Gygrynuk and Trooper Csapo. Defendant relied extensively on these interviews. For example, on the first page of Defendant's Statement of Facts, Defendant cited from 16 different pages from these IA interviews. The IA interviews are unsworn.

The Third Circuit of Court of Appeals has held that the use of unsworn statements in support of a Motion for Summary Judgment "fail to meet the requirement." Goral v. Pyramid Healthcare, 208 WL 144201, *(W.D. PA. 2008) (Citing Small v. Lehman, 98 F.3d 762, 764 n.5 3d. sir 1996). See also Adickes v. S.H. Cress & Co., 398 U.S. 144, 158 N.17 (1970) (attached hereto as Exhibit "2").

Plaintiff respectfully submits that Defendant has not met its burden, in addition to the reasons set forth, supra., because Defendant has failed to support its motion by sworn testimony.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Honorable Court deny

Defendant's Motion for Summary Judgment.

**MARTIN & WILSON, P.A.**

**JEFFREY K. MARTIN, ESQUIRE (#2407)**
**TIMOTHY J. WILSON, ESQUIRE (#4323)**
1508 Pennsylvania Avenue
Wilmington, DE  19806
(302) 777-4681
E-mail -  jmartin@martinandwilson.com
*Attorneys for Plaintiff Elizabeth C. Dempsey*

Dated:  September 8, 2008

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,        )
        Plaintiff,        )    C.A. No. 04-456 SLR
               )
v.             )
              )
STATE OF DELAWARE,       )
DEPARTMENT OF PUBLIC SAFETY,  )
        Defendant.       )

## PLAINTIFF'S SUMMARY JUDGMENT STATEMENT
## PURSUANT TO COURT'S ORDER OF FEBRUARY 13, 2008

On February 13, 2008 this Court issued an Order directing Non-Movant (Plaintiff herein) to respond in kind to the Movant's Statement to be filed on February 29, 2008 setting forth:

a.    The material facts as to which the moving party (Defendant) contends there is no genuine issue to be tried; and,

b.    The legal issues upon which judgment is sought.

Plaintiff's response shall be "in kind," with the content of the numbered paragraphs of the Responsive Statement corresponding to the content of the numbered paragraphs of Movant's Statement.

### (A)   Plaintiff's Response to Defendant's Recitation Of Material Facts To Which Defendant Contends There Is No Genuine Issue To Be Tried

1)    Plaintiff, Elizabeth C. ("Christy"[1]) Dempsey is a female Delaware State Trooper, who is currently, and was on October 23, 2003, employed by Delaware State Police (DSP) with the rank of Corporal.  **Admitted.**

2)    Brian Maher was on October 26, 2003 employed by Delaware State Police (DSP) with the rank of Master Corporal.  Maher has since retired.  As of October 26, 2003, Maher and

---

[1] Plaintiff's nickname is "Crysti" rather than "Christy" as stated throughout Defendant's Statement.

Dempsey were involved in a consensual dating relationship. (A-60).[2] **Denied that Maher and Plaintiff had a "boyfriend/girlfriend" relationship at the time of this incident. (B-008).[3]**

3)    In the early morning hours of October 26, 2003, Plaintiff, while off duty, placed a call to the Kent County Emergency Dispatch Center (KENTCOM) to report a burglary in progress at her home in Frederica, Delaware. (A-385-88). **Denied that Plaintiff contacted "911" or the "Emergency Dispatch Center." Rather, Plaintiff called the non-emergency number for Kent County Communications. (B-073). Also, denied that Plaintiff reported a "burglary in progress." Instead, Plaintiff calmly reported that someone had broken into her house and, by the time of Plaintiff's telephone call, they had left the property. (A-000385). Plaintiff provided her identity to the dispatcher, including her Trooper Identification Number and her cell phone from which she was making the report. (A-000386). Plaintiff then advised the dispatcher that she heard the person drive away, but that she did not have a description of the vehicle nor did she see the intruder at any time. Id. Next, Plaintiff reported that she and Keller were in the home and they were "fine." The dispatcher responded that he would send an officer over there to talk to her "just to make sure." (A-000387). Shortly after her first telephone call to the dispatcher and before any State Troopers arrived at her home, Plaintiff called again and spoke with the dispatcher whose name was Melvin. (A-000387). Plaintiff asked Melvin to "make sure you could tell the trooper to slow down their response, I am fine." Id. Plaintiff, again, cautioned the dispatcher that the officers "can just totally slow their response," to which the dispatcher said he would let them know. (A-000388).**

---

[2] "A-___" references are to pages included in Defendant's Appendix in support of their previously filed Motion for Summary Judgment. (D.I. 40).
[3] Defendant did not take Plaintiff's deposition. Attached hereto as Exhibit A is Plaintiff's interview with Internal Affairs dated June 25, 2004 and will be cited as "B-00_."

4)    At the time of the call and the alleged break-in Plaintiff had a friend, Kevin Keller, with her in her home. (A-181; 409-10; 425-26). **Admitted.**

5)    The person who was banging on Plaintiff's door and broke a window to gain access to the home was Brian Maher. **Admitted. In addition, although not acknowledged in Defendant's Statement, Maher began by banging on the door and window to get Plaintiff's attention. When he received no response, he "mule-kicked" a window leading into her apartment breaking the window. (A000069). After breaking the window, Maher entered the residence calling out for her and threatening her male companion, Kevin Keller. Maher threatened Keller to "kick his ass." (A000410).**

6)    Maher fled the scene when he overhead Plaintiff calling KENTCOM. **Admitted.**

7)    Plaintiff told KENTCOM, during two separate recorded calls, that she did not know the identity of the intruder. (A-385, 387). **Denied; Plaintiff responded during the first call to the dispatcher that she did not have a "clue" as to who broke into her home. In fact, she never saw Brian Maher at the time of this incident. (A-000385).**

8)    Plaintiff admits that she, in fact, knew at the time she placed her emergency calls that the intruder was Brian Maher. (A-000561). **Denied that Plaintiff made any emergency calls to report the incident. (A-000385-88).**

9)    Three Delaware State Troopers, traveling separately, raced to Dempsey's house upon receiving a 1:00 a.m. "burglary in progress" call for Plaintiff, a fellow trooper. (*See* A-453). **Denied that there was any reason for the State Troopers to "race" to Dempsey's house, nor was there a report of a "burglary in progress." While Sergeant Houdek was advised that there was a "subject attempting to break-in and that [Officer Dempsey] got her gun" (A000055), this was a result of the miscommunication of the dispatcher of who**

3

took the non-emergency reports from Plaintiff and mischaracterized the nature of the incident. **Sergeant Houdek acknowledged that he was upset with Plaintiff because she placed his officers "in harm's way." (A000061). Houdek further testified that he was not aware that Plaintiff had called dispatch and said not to send anyone. (A000065). Houdek acknowledged that if he knew that the Trooper had said "don't worry," they would have still responded, but not at a fast pace. (A000065).**

10)    During the Troopers' investigation at the scene, Plaintiff withheld material information about the "burglary" she had reported. (A-24, 248-54). **Denied; Plaintiff acknowledged that the only information she withheld at the scene of the incident was the identity of the Trooper who burglarized her home, Brian Maher. When asked why she did not advise the dispatcher as to the identity of the subject, Plaintiff noted that she was "confused, hurt, angry and mad and that she did not know what to do." (B-060). Plaintiff was off-duty at the time and had just returned home with Kevin Keller, a former high school friend and Texas police officer, with whom she had consumed numerous rum drinks that evening. (A000412).**

11)    During the Troopers' investigation at the scene, Plaintiff gave a series of false statements to the Troopers. (A-24, 248-54). **Denied. Plaintiff advised the investigating Troopers that she "did not _see_ who broke in." (Emphasis supplied). (B-070).**

12)    Plaintiff told Kevin Keller not to come out of the bedroom when police arrived, even though he had been a witness to the alleged burglary. (A-432-34). **Denied. Plaintiff told Officer Gygrynuk that Kevin Keller was upstairs in her apartment at the time of the investigation. (B-069).**

4

13)    Cpl. Brian Maher, as he was driving away from Plaintiff's residence, placed a phone call to Captain Robert Hawkins, the troop commander for the area in which the incident had taken place, and told him what he had done. (A-71). **Denied. Maher told Hawkins who was his friend from the SCUBA team and not a supervising officer of Hawkins that there had been an incident at Plaintiff's residence. (A000072). Maher did not advise Hawkins that he had entered the property after breaking the window and had threatened bodily injury to Mr. Keller. Hawkins acknowledged that, as a result of this conversation with Maher, he was not aware that the incident involved more than just breaking a window. (A000005). Maher did not tell Hawkins that he made threats and improperly entered Plaintiff's residence. Id. Hawkins was not aware of Maher's deficient reporting until he read the initial police reports the next morning. (A000009).**

14)    Captain Hawkins advised the Troop 3 Sergeant, Sergeant Michael Houdek, that Maher was involved with the Dempsey incident. Hawkins told Houdek to have the responding troopers write up a report of the incident as Dempsey had reported it, for Hawkins' review the next day. (A-7, 12). Houdek did so. **Denied that Hawkins told Houdek to have the responding Troopers write up the report of the incident "as Dempsey had reported it." Sergeant Houdek testified that he had no discussion with Captain Hawkins regarding the write-ups of the incident. (A000056). Investigation Officer Csapo wrote a report wherein he listed the suspect as "unknown." This report was approved by his supervisor, Sergeant Houdek, who knew, following Captain Hawkins call shortly after the incident occurred, that Brian Maher was the unidentified suspect. (A-000248-251). Csapo acknowledged that he learned that Brian Maher was the suspect either the next day or the next couple of days following the incident. (A-000521). Csapo made no attempt to do a supplemental report to**

5

advise as to the identity of the suspect. Id. Csapo told Internal Affairs that he left nothing out of his report. (A-000525). Captain Hawkins, who reviewed the approved investigating reports of Csapo and Gygrynuk, saw that the suspect was unnamed. Captain Hawkins advised that he also could have done a supplemental report to advise of the real name of the suspect, but he did not do so. (A000023). Trooper Gygrynuk, who acknowledged that he was very upset with Plaintiff and wanted her "butt to hang," knew at the time he filed his supplemental report immediately following Csapo's investigating report that Brian Maher was the suspect. (A000492). Gygrynuk knew or discovered that Maher was the suspect when he got back to the Troop before writing his report. (A000493). He was advised by his supervisor, Sergeant Houdek, to write the report as if "they didn't know." (A000494). Gygrynuk said that, "we didn't hide anything. We didn't leave anything out of our reports." When questioned further by Internal Affairs as to whether Gygrynuk had indeed filed a false report, his response was that was a "tough question" because they (the investigating Troopers) thought they were doing the right thing by leaving Maher's name out of the report. (A000494).

15)    Hawkins advised Houdek that the Criminal Investigations (CI) unit would follow up on the incident. (A-8). **Admitted.**

16)    The same day or the next day, Captain Hawkins called Plaintiff to discuss what had happened to find out what she wanted done with the case. (A-00009-10). Dempsey told Hawkins she did not want Maher arrested and did not want anything else done. (A-10, 24). **Admitted.**

17)    The next day, Monday October 27, 2003, Captain Hawkins met with and assigned the case to Troop 3 Criminal Investigations for follow up. (A-263). Sgt. Charles Mullett of CI

changed the disposition of the report to "unfounded," noting that the victim (Dempsey) "desires no further action in this case ... Victim feels that no crime was committed." (A-8, 18-19; A-253). **Admitted, but Sergeant Mullett acted contrary to the direction of Captain Hawkins, who directed that the disposition should be "exceptionally cleared because Plaintiff did not wish any prosecution." (A000011). Instead of clearing this matter, which would have required the name of the suspect being identified on the report (Sergeant Mullett knew that Brian Maher was the suspect), Sergeant Mullett chose to "unfound" the matter, meaning that the incident never occurred and therefore no suspect was listed. (A000011).**

18)    Both Captain Hawkins and his superior, Major Hughes, to whom he reported the incident, admitted in hindsight that they did not follow a DSP policy on domestic incidents involving troopers, in the disposition of the October 26, 2003 incident. (A-11; A-37). **While it is admitted that Hawkins and Hughes acknowledged that they had not followed DSP policy, there is a dispute between Hawkins and Hughes as to what occurred during the incident. Hawkins insisted that he advised Major Hughes that Brian Maher was the suspect when it was reported to Hughes on the day after the incident. (A000012). Hughes, however, is "absolutely positive" that he was not aware that Maher was the suspect, nor was he aware that any trooper was alleged to have been a suspect in this incident. (A000034).**

19)    The testimony is undisputed that the incident was handled the way it was at the express request of Plaintiff Dempsey herself – that nothing further be done about the incident. **Admitted that Plaintiff did not wish any prosecution. It is further acknowledged that Captain Hawkins believed that Plaintiff was being "completely honest with him." (A000010). Further, Hawkins believed that Plaintiff was guilty of only one misstatement to**

the effect that Kevin Keller was not at her home at the time of Maher's burglary.
(A000022).

20)     Nothing further took place, and no person requested any action in connection with the incident, until April 2004. **Admitted.**

21)     In April 2004, another DSP Captain (Dixon) learned of the incident and advised Major Randall Hughes (Captain Hawkins' superior) about this incident involving two troopers. (A-33-35). **Admitted.**

22)     Major Hughes referred the matter to the Lt. Colonel and they agreed that criminal and internal affairs (IA) investigations should be commenced into the October 26, 2003 incident. (A-35, 43). **Admitted.**

23)     As a result of the criminal investigation, Brian Maher pled to a misdemeanor charge of Criminal Trespass, and successfully completed a court-issued Probation before Judgment. (A-324-25). **Admitted that Brian Maher pled guilty only to a misdemeanor charge, although he acknowledged that he was guilty of first degree burglary by breaking into Plaintiff's residence and threatening bodily harm to her guest. (A000079). Captain Page, the head of Internal Affairs for the Delaware State Police, also acknowledged that because Brian Maher was guilty of terroristic threatening, he was therefore guilty of burglary due to his breaking and entering into Plaintiff's residence. (A000447). As a result of Maher's plea to a misdemeanor and his plea to probation before judgment, the charges stemming from his first degree burglary do not appear on his criminal record. (A-000324-325).**

24)     DSP Internal Affairs investigated the conduct of Plaintiff Cpl. Dempsey, Cpl. Maher, the responding troopers, Sgt. Houdek, Captain Hawkins, Sgt. Mullett, and Major Hughes,

and interviewed all of these persons, and other witnesses. **Admitted that investigations were conducted of these various officers. It is also acknowledged that there were no investigations done of the false reporting of the incident by Troopers Gygrynuk and Csapo, both officers acknowledged that they were aware that Brian Maher was the suspect, but failed to note this on the police reports they filed. (A000248-252). Sgt. Houdek was not charged with any violations, although he acknowledged that he reviewed and signed off on the police reports of Gygrynuk and Csapo while knowing that Maher was the suspect identified to him by Cpt. Hawkins. (A000061). Sgt. Houdek was also not charged with a violation of policy wherein Major Hughes testified that he should have been disciplined for failure to go to the scene of the incident at Plaintiff's residence. (A000038). Cpt. Hawkins and Sgt. Mullett were not charged with falsification of police reports, although each acknowledged that they were aware that Brian Maher was the suspect involved in the incident.**

25)    As a result of the IA investigation, the Plaintiff was charged with violations of DSP Rule and Regulation ("R&R") #15 (making a false statement or false written or verbal report) and Job Performance Standard ("JPS") #14 (domestic incident). (A-331-32; A-209, 212). **Admitted that Plaintiff had a trial board before three members of the Delaware State Police. Defense counsel's suggestion in their Brief that the three person trial board is tantamount to a jury is disingenuous. The suggestion that three troopers are as disinterested and objective as a jury drawn from the community cannot be given any credence.**

26)    Plaintiff, Corporal Dempsey, invoked her right to a three-member Divisional Trial Board which conducted an evidentiary hearing on the charges against her, at which Plaintiff was

represented by counsel. **Admitted. However, it is noted that Plaintiff was denied access to the Internal Affairs interviews of Maj. Hughes, Capt. Hawkins and Sgt. Houdek for the defense of her case before the Trial Board. (A000529).**

27)     The charge of violation of JPS #14 (failure to report a domestic incident was found to be unsubstantiated, but the trial board substantiated Dempsey's violation of R&R #15 (making false statements), finding in its written opinion that "Dempsey made a series of false statements when she called 911 and to the Troopers investigating her criminal complaint." (A-367-68). **Admitted that Plaintiff's testimony that she was not having a relationship with Maher at the time of incident resulted in the unsubstantiation of the failure to report a domestic incident charge. Admitted that while the Trial Board found the Plaintiff made false statements, it is specifically denied by Plaintiff that she made any incorrect or false statements other than the fact that she did not know the identity of the suspect. Indeed, while she never saw Maher or his car at the time of the incident, she made an identification by his voice.**

28)     The Trial Board unanimously recommended that Dempsey be suspended with pay with intent to terminate, finding in its written opinion that the trustworthiness and credibility of an officer is a critical component of their ability to perform the duties of law enforcement. (A-370). **Admitted that the Trial Board entered this finding, determining that Plaintiff should be suspended with intent to terminate.**

29)     Plaintiff Dempsey exercised her right of appeal to the Secretary of Public Safety, who held a hearing and found that there was substantial evidence to support the Trial Board's finding that Dempsey had violated DSP R&R #15, but found that the proposed penalty of termination was disproportionate to the severity of the infraction under the circumstances. (A-

10

377-80). The Secretary ordered reduced discipline of reduction in rank; 15 days suspension without pay and one year's probation. Id. **Admitted that the Secretary of Public Safety found that the proposed penalty of termination was disproportionate to the severity of the infraction under the circumstances and that Plaintiff's termination was therefore reversed following the Secretary's decision.**

30)    Plaintiff was never actually terminated from her employment with DSP, and was restored to her original rank after serving her disciplinary demotion. **Denied that Plaintiff was never terminated. Indeed, she was terminated from the time of the Trial Board's decision and the upholding of same by the Superintendent until such time as the Director of Public Safety made his determination finding that the penalty of termination was disproportionate to the severity of the infraction. (A-000379).**

31)    Plaintiff has been made whole as to all back wages owed during the pendency of her appeal/suspension without pay, and calculation of wage differential during her adjusted demotion dates. (A-240-42). **Admitted.**

32)    Plaintiff was reassigned to Troop 4 from Troop 7 when she returned to work following her successful appeal to the Secretary. **Admitted. However, it is noted that Cpl. Maher remained at Troop 7 and did not get transferred. (A000080).**

33)    Although Plaintiff complains of this action, she admits that "DSP Troopers are not guaranteed to be assigned to a specifically requested trooper or a specifically requested rotation/shift." (A-183). The DSP Divisional Manual provides that "all members of the Division are subject to reassignment, at any time ... to any location in the State of Delaware." (A-231). **Admitted.**

11

34)    As a result of the IA investigation, Cpl. Brian Maher was charged with violations of DSP Rule and Regulation ("R&R") #4 (conduct unbecoming an officer) and Job Performance Standard ("JPS") #14 (domestic incident). (A-312-13; A-207, 212). **Admitted that Maher was charged with two violations of DSP Rules, but it is acknowledged that despite the fact that he was admittedly guilty of first degree burglary, his penalty was much less severe than Plaintiff's and Plaintiff was the victim of Maher's crime. Maher received a demotion, 15 days suspension without pay and one year's probation. (A000273).**

35)    Cpl. Maher opted for a Superintendent's Hearing instead of a trial board, at which he pled no contest. As a result of the hearing, the Superintendent imposed discipline of a three-rank demotion; 15 days suspension without pay and one year's probation. (A-326). **Admitted and it is also acknowledged that, unlike Plaintiff whose position as a Trooper was terminated (prior to later reinstatement by the Secretary of Public Safety), Maher did not lose his position as Assistant Shift Commander for his Troop following his discipline and did not have to transfer to another Troop, as did Plaintiff. (A000080, A000054). In addition, Maher was able to continue his work in the Special Units, the motorcycle unit and the SCUBA unit. (A000080). Maher applied for and received terminal leave that began on February 23, 2007, but continued to be paid until October 3, 2007. (A000083, A000080). Following the completion of his terminal leave in October 2007 he received his full pension for serving twenty years with DSP. (A000080).**

36)    As a result of the IA investigation, Captain Robert Hawkins was charged with violation of JPS #12 (neglect of duty). (A-309). Internal Affairs recommended, and then-Lt.

Colonel Thomas MacLeish approved, the imposition of Summary Discipline[4] against Hawkins, consisting of 24 hours suspension. (A-310-110). **Admitted.**

37)    As a result of the IA investigation, Major R.L. Hughes was charged with violation of JPS #12 (neglect of duty). (A-309). Internal Affairs recommended, and Lt. Colonel MacLeish approved, the imposition of Summary Discipline against Hughes consisting of 16 hours suspension. (A-302-03). **Admitted.**

38)    On or about April 6, 2005, Plaintiff filed a Charge of [gender] Discrimination with the EEOC/Delaware Department of Labor. The DDOL, on February 28, 2006, issued a "no cause determination" finding no reasonable cause to believe that DSP engaged in gender discrimination against Cpl. Dempsey. (A-384). **Admitted that while the DDOL made a determination, that determination, whether positive or negative, is not admissible in this Court. Defendant is well aware of this prohibition and attempts to unfairly prejudice the Court against Plaintiff's cause of action.**

**(B)    The Legal Issues Upon Which Summary Judgment Is Sought.**

39)    Plaintiff cannot establish a *prima facie* case of Title VII gender discrimination under the three-step, burden-shifting inquiry laid out in McDonnell Douglas Corp. v. Green, 411 U.s. 792, 802-803 (1973). **Denied; Defendant has not provided any analysis to support its statement that Plaintiff cannot establish a *prima facie* case of Title VII gender discrimination. Plaintiff has demonstrated that, as a female and the only female involved in this incident, the discipline she received in no way compared to the discipline, or lack thereof, issued to her various male comparators. The Secretary of Public Safety acknowledged her disproportionate discipline. Although Plaintiff was found guilty of**

---

[4] A Trooper's acceptance of summary discipline is equivalent to a guilty plea to the charge. Summary discipline is only available for charges of a less serious nature than those which would require a trial board. (A-230).

**making a false report, her direct male comparators, the two Corporals investigating the incident both knew that Brian Maher was the perpetrator of the burglary and neither reported same in the police reports filed by each officer, the knowledge of Maher as perpetrator was also known by Sgt. Houdek, Sgt. Mullett and Captain Hawkins and none of these individuals, all of whom had reporting responsibilities, listed Maher as the suspect in any of the paperwork. Cpl. Brian Maher was the perpetrator of the crime against the Plaintiff and while he acknowledged his guilt of first degree burglary, he was found guilty of a much lesser crime that is not on his record and received divisional discipline that did not take away any of his responsibilities or privileges.**

40)     Defendant admits that Plaintiff, a female, is within a Title VII protected class. **Admitted.**

41)     There is no evidence in the record to show that the Delaware State Police treated any similarly situated male Troopers more favorably, or otherwise to support an inference that the State took disciplinary or other adverse action against Dempsey because of her gender. **Denied for the reasons set forth in our response to #39, *supra*.**

42)     There is no evidence in the record of, any similarly situated male comparators who were more favorably treated/less harshly disciplined than Plaintiff for similar misconduct. **Denied for the reasons set forth in our response to #39, *supra*.**

43)     The discipline imposed on other male troopers involved in the October 26, 2003 incident/reporting is not a valid basis for comparison, as the charges against these troopers are of an entirely different nature than the charges against Plaintiff Dempsey. These troopers are not similarly situated to Plaintiff. **Denied that the other male comparators acknowledged in answer to #39, *supra*, were not similarly situated. In addition, Defendant's Statement does**

14

not take into consideration the two investigating Corporals who filed false police reports regarding the incident.

44)    The proposed discipline of termination was recommended by a three-member Trial Board, not involved in the underlying incident, at a hearing in which Dempsey received full due process and other rights, pursuant to the Delaware Law Enforcement Officers' Bill of Rights (LEOBOR), 11, Del. C. Ch. 92. **Denied for the reasons set forth in our responses to #25 and # 26, *supra*.**

45)    Dempsey's discipline was reduced to demotion and suspension following her appeal to the Secretary. **Admitted.**

46)    Even if Plaintiff could establish a *prima facie* case, there is no question that the State had a legitimate, non-discriminatory reasons to discipline Dempsey – a State Trooper – for making false statements to and withholding material information from the 911 Center and Troopers responding to an emergency call about a burglary at her home in the early morning hours. **Denied for the various reasons set forth in numerous responses herein.**

47)    The Trial Board cited, in support of their decision, a 1998 letter from former-Attorney General Jane Brady, addressing police officer credibility and the obligation to disclose information about an officer's lack of creditability as Brady material in criminal cases. **Denied as not being relevant to any of the issues in this case.**

48)    There is no evidence in the record which could support a conclusion that any action taken toward Dempsey by the State was a pretext for gender discrimination. **Denied for the various reasons set forth in numerous responses herein.**

49)    There is no evidence in the record of any gender-based animus on the part of any person involved in the events of this case. **Denied for the various reasons set forth in numerous responses herein.**

50)    Plaintiff has suffered no loss of back pay or other actual damages which are compensable under Title VII. Punitive damages are not available under Title VII against government employers. **Denied. Plaintiff has suffered emotional distress damages and has suffered extensive damages to her reputation as a State Trooper. Denied as to the viability of punitive damages in the absence of any citation of legal authority.**

51)    Plaintiff's pendent state law claim against her State Employer is barred by the Eleventh Amendment. Pennhurst v. Halerdman, 465 U.S. 89, 106 (1984) ("Pennhurst II"). **Admitted.**

52)    Plaintiff's pendent state law claim against her State Employer is barred by the exclusivity provision of the Delaware Workers' Compensation Act. 11 Del. C. Ch. 92. **Denied, but see response to #51, *supra*.**

53)    This Court should decline to exercise supplemental jurisdiction over a pendent state law claim to the extent Plaintiff's federal claim is dismissed. **Denied as moot.**

54)    **Defendant relies upon unsworn statements (Internal Affairs interviews) to support its Motion for Summary Judgment. Unsworn statements fail to meet the requirements for summary judgment practice pursuant to Fed. R. Civ. P. 56, Small v. Lehman, 98 F.3d 762, 764 n.5 (3d Cir. 1996).**

WHEREFORE, for the foregoing reasons, there are genuine issues of material fact that must preclude Defendant's Motion for Summary Judgment.

MARTIN & WILSON, P.A.

**JEFFREY K. MARTIN, ESQUIRE**
**Del. Bar. I.D. No.:  2407**
1508 Pennsylvania Avenue
Wilmington, DE  19806
(302)  777-4681
E-mail -  jmartin@martinandwilson.com
*Attorney for Plaintiff*

Dated:  March 20, 2008

# EXHIBIT 2



Slip Copy                                                                                                Page 1
Slip Copy, 2008 WL 144201 (W.D.Pa.)

**C**
Goral v. Pyramid Healthcare
W.D.Pa.,2008.
Only the Westlaw citation is currently available.
United States District Court,W.D. Pennsylvania.
John M. GORAL, Plaintiff,
v.
PYRAMID HEALTHCARE, Defendant.
**No. 2:06cv1430.**

Jan. 11, 2008.

### *MEMORANDUM ORDER*

DAVID STEWART CERCONE, District Judge.
*1 AND NOW, this 11th day of January, 2008,
after *de novo* review of the record and upon due
consideration of the magistrate judge's report and
recommendation filed on November 29, 2007, and
plaintiff's objections thereto, IT IS ORDERED that
defendant's motion for summary judgment (Docket
No. 14) be, and the same hereby is, granted. The
magistrate judge's report and recommendation
(Docket No. 18) as augmented herein is adopted as
the opinion of the court.

Plaintiff's objections are without merit. Both the
content of plaintiff's affidavit and the unsworn
statements of the co-workers merely cast doubt on
the veracity of the complaining patients and/or the
reliability of the reported incidents concerning
plaintiff. And the report by the physician likewise
speaks only to the physician's subjective evaluation
of the patients' credibility. To be sure, all of this
evidence has probative value in questioning the ac-
curacy of the information defendant reacted to, but
it does not undermine in any meaningful way de-
fendant's explanation as to why it took the adverse
employment actions in question. For example,
plaintiff's evidence does not provide any basis to
question whether defendant received the com-
plaints/reports; nor does it undermine in any pro-
bative way defendant's decisions to investigate the

incidents and take action based upon that investiga-
tion. The evidence also fails to call into question
the central explanation defendant proffered for the
adverse action, namely plaintiff's insubordination.
Merely questioning whether the complaining/report-
ing patients should be believed because of their life
circumstances and general stereotypical assump-
tions associated therewith and commenting on
plaintiff's general character and reputation do not
rise to the level of probative evidence that would
sustain a jury finding of pretext on either of
plaintiff's Title VII claims in the face of defendant's
proffered explanation. See *Kautz v. Met-Pro Corp.,*
412 F.3d 463, 468 (3d Cir.2005) (to be probative of
discriminatory animus the evidence in question
must be capable of showing in some meaningful
way that the defendant's decision "was so implaus-
ible, inconsistent, incoherent or contradictory that it
must be a pretext for something else.") (collecting
cases in support). Plaintiff's evidence falls well
short of meeting this demanding standard. Accord-
ingly, the magistrate judge appropriately recom-
mended that defendant's motion for summary judg-
ment be granted.

### *REPORT AND RECOMMENDATION*

ROBERT C. MITCHELL, United States Magistrate
Judge.

#### I. *Recommendation*

It is respectfully recommended that the motion for
summary judgment submitted on behalf of Defend-
ant, Pyramid Healthcare (Docket No. 14) be gran-
ted and that judgment be entered accordingly.

#### II. *Report*

Plaintiff, John M. Goral, brings this action pursuant
to 42 U.S.C. §§ 2000e to 2000e-17 (Title VII). He
alleges that Defendant, Pyramid Healthcare, his
former employer, engaged in reverse racial discrim-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 144201 (W.D.Pa.)

ination against him and that it retaliated against him when he complained about this reverse racial discrimination when it gave preferential treatment to black staff members, suspended him from his position as a registered nurse because of unsubstantiated allegations of sexual harassment on July 28, 2005 and then discharged him from his employment on September 2, 2005.

**\*2** Presently before this Court for disposition is a motion for summary judgment, filed by Defendant. For the reasons that follow, the motion should be granted.

*Facts*[FN1]

> FN1. These facts are taken from the Statement of Material Facts section of Defendant's brief (Docket No. 15) and they are supported by citations to the record in accordance with Local Rule 56.1(B)(1). Plaintiff has not responded to these statements at all, much less with citations to the record as required by Local Rule 56.1(C)(1). Pursuant to the Local Rules, Defendant's facts should be deemed admitted. W.D.PA.LR. 56.1(E). Moreover, except for a few facts as noted below, Plaintiff does not appear to contest Defendant's facts. Rather, he contends that the allegations of sexual harassment made against him were falsified to justify his suspension. This argument is addressed below.

Plaintiff is a 45 year-old registered nurse who worked at-will for Pyramid Healthcare, Inc. ("Pyramid") for approximately five months between March 28, 2005, and September 2, 2005. (Goral Dep. at 6, 15, 61).[FN2] Pyramid provides inpatient treatment to adult men and women suffering from chemical dependency. (Ward Aff. ¶ 2.)[FN3] Pyramid employed nine nurses including Plaintiff at its Wilkinsburg facility. (Goral Dep. at 9.) Five nurses were white including Plaintiff and the other four nurses were black. (Goral Dep. at 10.) Plaintiff's direct supervisor was Nursing Supervisor Robin Ward. (Goral Dep. at 11; Ward Aff. ¶¶ 1, 3.) Linda Williams was the director of the facility. (Goral Dep. at 9.)

> FN2. Def.'s Br. (Docket No. 15) Ex. A.

> FN3. Docket No. 15 Ex. B.

Plaintiff alleges that he experienced no problems at work in March or April of 2005. (Goral Dep. at 21.) In May of 2005, Plaintiff began to complain to coworkers about various issues, including his belief that white nurses did more work than black nurses, and he called Sue McKewon and Barbara Jenkins at their homes to complain. (Goral Dep. at 21.) After receiving complaints from Ms. McKewon, Ms. Jenkins and Michael Harper about Plaintiff's behavior, supervisor Robin Ward spoke to Plaintiff about complaining to coworkers on June 6, 2005. (Ward Aff. ¶ 8; Goral Dep. at 22.)

Ms. Ward stressed to Plaintiff the importance of being a "team player" and told him that he should bring work-related concerns to her attention rather than to coworkers. Plaintiff's complaints and statements to coworkers allegedly included the following:

> The nurses did not know what they were doing;

> Robin Ward did not know what she was doing;

> All nurses and Robin Ward should be removed and replaced with "Plaintiff's people";

> If anyone crosses Plaintiff, they usually get what they deserve;

> Plaintiff did not like how the facility was run and could run it better himself.

(Ward Aff. Ex. B.)

Pyramid did not discipline Plaintiff at this time. However, Ms. Ward did create a written record of her conversation with him. (Ward Aff. ¶ 10 & Ex.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 144201 (W.D.Pa.)

**B.)**

On July 17, 2005, a female client submitted a written complaint to Pyramid alleging unprofessional behavior and sexual harassment on the part of Plaintiff. The alleged behavior and harassment included locking the client in a room for several hours, threatening to "make sure (the client) sleep(s)" by drugging the client, discussing in a sexual manner the client's piercings and underwear and inquiring about the client's sexual fantasies. (Ward Aff. ¶ 11 & Ex. C; Goral Dep. at 35-37.) A second female client also submitted a written complaint on July 17, 2005, alleging that Plaintiff "talks to us girls about sex and things he shouldn't be saying," and is "very unprofessional, swearing when he talks to us, making us feel very uncomfortable."(Ward Aff. ¶ 12 & Ex. D; Goral Dep. at 35-37.) The client also accused Plaintiff of inquiring about her sexual fantasies and stated that Plaintiff used the phrases "niggers" and "junkies," thereby making the client very uncomfortable. A third female client submitted a written complaint on July 17, 2005 as well, alleging similar inappropriate and harassing behavior by Plaintiff. (Ward Aff. ¶ 13 & Ex. E; Goral Dep. at 35-37.)

**\*3** The same female clients also verbally complained to Dr. Frank M. Kunkel, the Medical Director at Pyramid, during his rounds on July 17, 2005, about sexual harassment and verbal abuse on the part of Plaintiff. Dr. Kunkel wrote a written narrative of the complaints, in which he indicated that one of the female clients felt that Plaintiff was "joking" and that he (Dr. Kunkel) could not attest to the veracity of the complaints. (Ward Aff. ¶ 14 & Ex. F.)

Following Pyramid's receipt of the client complaints, Robin Ward, Linda Williams and Human Resources Coordinator Jill Wharrey met with Plaintiff on July 18, 2005. (Ward Aff. ¶ 15 & Ex. G; Goral Dep. at 38.) Plaintiff denied any inappropriate behavior but admitted to discussing a female client's hair and tongue piercing. He also suggested that the clients' complaints were "typical of ad-

dicts." (Ward Aff. ¶ 16.) Ms. Ward, Ms. Williams and Ms. Wharrey proceeded to review Pyramid's Therapeutic Boundaries policy and Staff Code of Ethics with Plaintiff and reissued additional copies to him. (Ward Aff. ¶ 17; Goral Dep. at 42.) The terms of Pyramid's Therapeutic Boundaries policy and Staff Code of Ethics include the following:

> Refrain from any inappropriate verbal or written communication (i.e., drug related, sexual, e-mail, letters);

> Refrain from deliberately doing harm to a client, either physically or psychologically. Do not verbally assault, ridicule, attempt to subjugate or endanger a client.

(Ward Aff. Ex. G.)

On July 26, 2005, a female client submitted another written complaint alleging that Plaintiff had advised her to "lay in bed at night and fantasize and get crazy with yourself."The client also complained of foul language and racial slurs by Plaintiff and further alleged that Plaintiff had stated, "with a haircut like that, you look like you date the brothers."(Ward Aff. ¶ 18 & Ex. H; Goral Dep. at 44.)

Pyramid received yet another written complaint regarding Plaintiff on July 26, 2005, which contained allegations that were similar to the previous complaints. (Ward Aff. ¶ 19; Goral Dep. at 44.) This complaint demanded that "something be done about (Plaintiff's) sexual harassment."(Ward Aff. Ex. I.) Pyramid subsequently investigated the complaints and determined them to be credible. (Ward Aff. ¶ 20.)

Pyramid suspended Plaintiff for unprofessional behavior from July 28, 2005 to August 2, 2005. (Ward Aff. ¶ 21; Goral Dep. at 46-48; Compl. ¶ 7.) Plaintiff returned to work on August 3, 2005, and Robin Ward issued a written warning, advising Plaintiff that he would receive direct supervision for the next 90 days with performance reviews to be conducted every 30 days. (Ward Aff. ¶ 21 & Ex. J.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 144201 (W.D.Pa.)

After Plaintiff's return to work on August 3, 2005, a client submitted an undated written complaint alleging that Plaintiff had asked the client, "Why did you come here? You should (have gone) to White Deer Run."(Ward Aff. ¶ 22; Goral Dep. at 49-51.) White Deer Run is a facility that competes with Pyramid. (Ward Aff. ¶ 22.) The client also alleged that Plaintiff had advised the client that the facility "is a rat hole." (Ward Aff. ¶ 22 & Ex. K.) Around this time, a second client submitted an undated written complaint alleging that Plaintiff had exhibited abusive and inappropriate behavior and had refused to provide the client's medication. (Ward Aff. ¶ 23 & Ex. L; Goral Dep. at 49-51.) Finally, a third client submitted a written complaint on August 14, 2005, alleging that Plaintiff had advised the client that he would not receive proper treatment at Pyramid's facility because "this place is a shit hole, rat infested, dirty place."(Ward Aff. ¶ 24 & Ex. M; Goral Dep. at 49-51.) Plaintiff also allegedly told the client that the "Afro-American nursing staff is uneducated ... overweight and lazy ... (and) leave shit dirty, bullshit and always have some type of drama going on."(Ward Aff. Ex. M.)

*4 On August 17, 2005, Plaintiff initiated a verbal altercation with several staff members, including the facility's Program Director, Linda Williams. Plaintiff was apparently upset because he believed that Sue Morrissey, a white coworker, had improperly dispensed medication to a client. Plaintiff repeatedly shouted that he was "going to write (Ms. Morrissey) up" for the incident. (Ward Aff. ¶¶ 25-26 & Ex. N; Goral Dep. at 52-55.) When told by Linda Williams that he did not have the authority to discipline a coworker, Plaintiff became belligerent, and stated that Ms. Williams did not know her job or Plaintiff's job. (Ward Aff. ¶¶ 25-26 & Ex. N; Goral Dep. at 56-57.)

Pyramid suspended Plaintiff in light of the incident on August 17, 2005. (Ward Aff. ¶ 27; Goral Dep. at 58.) Pyramid indicates that, after investigating Plaintiff's continued unprofessional behavior and providing Plaintiff with an opportunity to submit a statement, it discharged Plaintiff on or about September 2, 2005. (Ward Aff. ¶ 28; Goral Dep. at 61.) Plaintiff's termination letter states that he was discharged for continued unprofessional behavior and for insubordinate conduct to Program Director Linda Williams. (Ward Aff. ¶ 28 & Ex. O; Goral Dep. at 61.)

Following his discharge, Plaintiff filed a complaint with the Equal Employment Opportunity Commission alleging reverse racial discrimination and retaliation by Pyramid. (Goral Dep. at 62.)

*Procedural History*

Plaintiff filed this action on October 26, 2006. The complaint alleges that Defendant discriminated against Plaintiff on the basis of his race (white) and retaliated against him for complaining about reverse racial discrimination when it gave preferential treatment to black staff members, suspended him from his position as a registered nurse because of unsubstantiated allegations of sexual harassment and then discharged him from his employment on September 2, 2005, in violation of Title VII. On September 2, 2007, Defendant filed a motion for summary judgment.

*Summary Judgment*

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 144201 (W.D.Pa.)

issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty-Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*\*5* Defendant argues that: 1) Plaintiff's complaints about being treated unfavorably as compared to black employees do not constitute adverse employment actions and are without any evidentiary support; 2) with respect to his suspension and termination, he has not established a prima facie case of reverse racial discrimination; 3) even if he has, it has articulated legitimate, nondiscriminatory reasons for the actions it took and he has failed to produce evidence from which a factfinder could conclude that the proffered reasons are a pretext for unlawful reverse racial discrimination; and 4) he cannot state a prima facie case of retaliation discrimination because he cannot demonstrate a causal link between his alleged protected activity and his discharge and even if he can, he has failed to produce evidence of pretext.

*Prima Facie Case of Reverse Racial Discrimination*

Title VII provides that it is an unlawful employment practice for an employer to discriminate against an individual with respect to conditions of employment because of his race. 42 U.S.C. § 2000e-2(a). In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and refined in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252-53, 101 S.Ct. 1089,

67 L.Ed.2d 207 (1981).*Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278-79 (3d Cir.2000).

As the Court of Appeals for the Third Circuit has stated:

> The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court. It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action ...

*Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 797 (3d Cir.2003) (footnote and citations omitted).

If the employee presents a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."*McDonnell Douglas,* 411 U.S. at 802. If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination. *Id.* at 804.The Court of Appeals for the Third Circuit has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

*Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994) (citations omitted).

*\*6* In the case of a plaintiff who is not a member of a protected class, the Court of Appeals has held that:

> a plaintiff who brings a "reverse discrimination"

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 144201 (W.D.Pa.)

suit under Title VII should be able to establish a prima facie case in the absence of direct evidence of discrimination by presenting sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff "less favorably than others because of [his] race, color, religion, sex, or national origin."

*Iadimarco v. Runyon,* 190 F.3d 151, 163 (3d Cir.1999) (quoting *Furnco Const. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)). In that case, Charles Iadimarco, a white male, was not selected for a manager position he had applied for despite being the most highly ranked applicant. Instead, after the two other candidates accepted other positions, the selecting official (Towler) actively-and after the deadline for applications had passed-recruited a black woman (Williams) who had no ranking and then hired her for the position. In addition, Iadimarco had an engineering degree (which he had been told was a prerequisite for the position) and Williams did not. Finally, he pointed to a memo issued by Towler's supervisor asserting the importance of hiring minority candidates to increase diversity and the fact that, out of twenty-seven plant managers hired, 74% of them were white males. The court stated that "a fact finder could ... conclude that Towler tried to manipulate the process to hire Williams because he had already hired many White supervisors."*Id.* at 165.Given the totality of these circumstances, the court concluded that Iadimarco stated a prima facie case of reverse racial discrimination.

In this case, Pyramid argues that nothing about the circumstances surrounding Plaintiff's suspension or discharge could be viewed by the trier of fact as evidence that it was treating him less favorably than others because of his race. Indeed, Pyramid points out that it did not receive client complaints about any staff member other than Plaintiff.

Plaintiff's evidence consists of the following: 1) his own affidavit, in which he contends that he experienced disparate treatment as compared to black staff members and that a nurse (Rebecca Leist) told him that another nurse (Sue Morrissey) was soliciting patients to submit false accusations of sexual harassment against him (Pl.'s Resp. Ex. A) [FN4]; 2) a statement from Sue McKewon, a white nurse, attesting to his character (Pl.'s Resp. Ex. E); 3) a statement from Barbara Jenkins, another white nurse, also attesting to his character (Pl.'s Resp. Ex. D); 4) Dr. Kunkel's letter, in which he states that one of the female clients indicated that she believed that Plaintiff was "just joking" and that he could not verify the veracity of the female clients' complaints against Plaintiff because he would only be guessing (Pl.'s Resp. Ex. C); and 5) a statement from a Pyramid client that she did not believe the accusations made about Plaintiff because one of his accusers "had a tendency to lie about things and she stole my makeup" (Pl.'s Resp. Ex. F).

FN4.Docket No. 16.

*7 With respect to unfavorable treatment, Plaintiff complains that he did not receive the "first shift" (7:00 a.m. to 3:30 p.m.) after completing a thirty-day probation period; that black nurses received better shifts and more overtime; that they were not disciplined for leaving the facility unclean and unstocked, using cell phones for personal reasons, arriving late and leaving early, and knitting and watching television while they should have been working; that they were permitted to use the Internet but he was not; that they were using derogatory language against him; and that white nurses (including him) received a heavier workload including performing more patient admissions. These allegations do not constitute tangible employment actions for purposes of Title VII. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."*Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 144201 (W.D.Pa.)

In addition, Pyramid notes that Plaintiff was not disciplined for talking on a cell phone, knitting or conversing, nor has he pointed to any instance in which black nurses were permitted to do these things while white nurses were not. His only evidence to support the accusation about white nurses having to perform more patient admissions consists of two "PPD logs" indicating that, on certain days, white nurses performed more patient admissions. (Pl.'s Resp. Ex. B.) However, as Pyramid notes, Plaintiff has failed to develop the factual record to place these logs into any context.

With respect to the statements he submits to argue pretext as to his suspension, the Court of Appeals has held that "Rule 56 of the Federal Rules of Civil Procedure states that motions both for and in opposition to summary judgment may be supported by affidavits; unsworn statements ... fail to meet the requirement."*Small v. Lehman,* 98 F.3d 762, 764 n. 5 (3d Cir.1996) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). The unsworn statements made by the Pyramid client and Sue McKewon are insufficient.

Moreover, even if the Court were to consider them, they simply reflect the opinions of these two individuals that Plaintiff was a good nurse and do not make any reference to reverse racial discrimination. Plaintiff admitted this at his deposition. (Goral Dep. at 29.) The statement by Barbara Jenkins was sworn before a notary. However, as Plaintiff admitted at his deposition, nothing in her statement makes any reference to race or discrimination. (Goral Dep. at 29-31.)

With respect to Dr. Kunkel's letter, as Defendant points out, the fact that Dr. Kunkel could not verify the veracity of the allegations made by the female clients against Plaintiff in no way demonstrates that the allegations are false, much less that they were solicited by a nurse in order to fabricate a case against him. In addition, Robin Ward states that Pyramid investigated the complaints about Plaintiff's behavior and concluded that they were credible. (Ward Aff. ¶ 20.)

*8 Plaintiff's evidence is not sufficient to establish a prima facie case of reverse racial discrimination. However, as Pyramid argues in the alternative, the Court should address whether, even assuming Plaintiff could state a prima facie case, he has proffered evidence from which a trier of fact could conclude that Pyramid's proffered reasons for its actions are a pretext for unlawful reverse racial discrimination.

*Defendant's Proffered Reason*

The burden of production shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's suspension and termination. It cites the reasons identified in the record, namely the following: 1) he was suspended from July 28, 2005 to August 2, 2005 because Pyramid received numerous reports of unprofessional behavior from clients, which Pyramid investigated and determined to be credible; and 2) he was terminated on September 2, 2005 for unprofessional behavior including insubordinate conduct to Program Director Linda Williams.

Defendant has met its burden of production. Therefore, Plaintiff is required to point to evidence from which the trier of fact could conclude that Defendant's proffered reason is a pretext for unlawful reverse racial discrimination.

*Plaintiff's Evidence of Pretext*

Plaintiff proceeds along "*Fuentes* prong one" by arguing that he has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason. *Keller v. ORIX Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir.1997) (en banc). Specifically, he contends that: he did not engage in the acts of sexual harassment he was accused of, and he was not given an opportunity to respond regarding the incident on August 17, 2005 that led to his termination. Pyramid contends that this evidence is insufficient to meet his burden.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 144201 (W.D.Pa.)

With respect to his suspension, he contends that Pyramid improperly believed "un-witnessed allegations of sexual harassment of patients."(Goral Aff. at 3.) However, the Court of Appeals has emphasized that "we do not sit as a super-personnel department that reexamines an entity's business decisions."*Brewer v. Quaker State Oil Ref. Co.*, 72 F.3d 326, 332 (3d Cir.1995) (citation omitted). Or, as stated somewhat differently, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."*Fuentes*, 32 F.3d at 765. The issue before the Court is not whether Pyramid conducted the most complete investigation it could have into the matter, or whether it erred by choosing to believe its clients rather than Plaintiff. Rather, the issue is whether he has pointed to evidence from which a finder of fact could conclude that Pyramid's proffered reason for his suspension is a pretext for unlawful reverse racial discrimination. He has not done so.

*\*9* He presents no evidence to dispute the reason proffered for his termination, namely his insubordinate conduct toward Linda Williams. He states that he was not provided with any evidence against him and he was not provided an opportunity to respond to specific allegations. (Goral Aff. at 4.) However, at his deposition, he indicated that he "might have sent a letter." (Goral Dep. at 60.) The letter terminating Plaintiff's employment specifically states that his "statement concerning this incident dated August 28, 2005 admits insubordinate conduct to Ms. Linda Williams, Program Director."(Ward Aff. Ex. O.) At his deposition, he admitted writing a letter in which he indicated that he stated to Linda Williams "you're wrong and you obviously don't know your job or mine."(Goral Dep. at 57-58.)

Plaintiff has failed to point to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitim-

ate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons."*Id.* Therefore, with respect to Plaintiff's reverse racial discrimination claim, Defendant's motion for summary judgment should be granted.

### Retaliation Discrimination

Discrimination against an individual who has opposed a practice prohibited by Title VII or who has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under the statute is itself actionable conduct. 42 U.S.C. § 2000e-3(a).

The Court of Appeals has long held that:

To establish a prima facie case of retaliation, a plaintiff must show that: (1) he or she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneously with the protected activity; and (3) a causal link exists between the protected activity and the adverse employment action.

*Weston v. Commonwealth of Pa.*, 251 F.3d 420, 430 (3d Cir.2001) (citations omitted).

Recently, the Supreme Court altered the analysis for evaluating retaliation claims. The Court rejected the position taken by the Third Circuit and others that an employee must point to an adverse employment action: "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, ---- - ----, 126 S.Ct. 2405, 2412-13, 165 L.Ed.2d 345 (2006). However, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."*Id.* at 2415 (citations omitted).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 144201 (W.D.Pa.)

As summarized by the Court of Appeals, the prima facie case elements are now as follows: 1) the plaintiff engaged in activity protected by the anti-discrimination statute; 2) the employer took action that a reasonable employee would have found to be materially adverse in that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination; and 3) there is a causal connection between the plaintiff's opposition to or participation in proceedings against unlawful discrimination and the employer's action. *Moore v. City of Philadelphia,* 461 F.3d 331, 341-42 (3d Cir.2006).

*10 Defendant does not challenge the first two prongs of the prima facie case for retaliation. It does not deny that he complained about reverse racial discrimination [FN5] and that he was subjected to adverse employment actions when he was suspended and terminated. However, it contends that he cannot demonstrate a causal connection between any protected activity and the decisions about which he complains. In addition, it argues that it has presented legitimate, non-discriminatory reasons for the actions about which he complains and that he has not presented evidence from which the trier of fact could infer that these reasons were a pretext for unlawful retaliation discrimination.

> FN5. Pyramid correctly notes that he could not have been not retaliated against for filing a complaint with the EEOC, because he did not take this action until after he was terminated. (Goral Dep. at 62.)

First, it argues that, although he contends that he was terminated "immediately" after he allegedly complained to management about racism, the record reflects that he was suspended on August 17, 2005, immediately following his altercation with Sue Morrissey and Linda Williams, but that he was not terminated until September 2, 2005, after his conduct was reviewed by Pyramid's Human Resources Department.

The Court of Appeals has explained that a plaintiff

can substantiate a causal connection between the protected activity and an adverse employment action by: 1) showing that the temporal proximity is "unduly suggestive"; or 2) showing "inconsistencies in the defendant's testimony"; or 3) pointing to ongoing antagonism. *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280-81 (3d Cir.2000). The court has noted that, "[w]ith one exception, we have never held that timing alone can be sufficient to establish causation."*Weston,* 251 F.3d at 431 n. 5 (citing a case in which an employee's dismissal two days after the company learned of his EEOC complaint was sufficiently persuasive to satisfy the causation element). In *Weston,* the court held that alleged incidents more than one year apart, without other evidence, were insufficient to establish a causal link).*Id.* at 431-32.

In this case, the delay would only have been sixteen days, which could be considered unduly suggestive. Thus, Plaintiff has stated a prima facie case of retaliation discrimination.

However, as indicated above, Pyramid has proffered a legitimate, nondiscriminatory reason for his termination-his insubordinate behavior toward Program Director Linda Williams-and he has not pointed to evidence from which a trier of fact could conclude that this reason is a pretext for unlawful retaliation discrimination. Therefore, with respect to this claim, the motion for summary judgment should be granted.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Defendant, Pyramid Healthcare (Docket No. 14) be granted and that judgment be entered accordingly.

Within thirteen (13) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                 Page 10
Slip Copy, 2008 WL 144201 (W.D.Pa.)


W.D.Pa.,2008.
Goral v. Pyramid Healthcare
Slip Copy, 2008 WL 144201 (W.D.Pa.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

ELIZABETH C. DEMPSEY,           )
    Plaintiff,           )  C.A. No. 04-456 SLR
        )
v.         )
        )
STATE OF DELAWARE,           )
DEPARTMENT OF PUBLIC SAFETY,           )
    Defendant.           )

## <u>ORDER</u>

IT IS HEREBY ORDERED this _____ day of _____, 2008,

Defendant's Motion for Summary Judgment is denied as set forth in Plaintiff's

Answering Brief dated September 8, 2008.


_____
THE HONORABLE SUE L. ROBINSON
United States District Court

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ELIZABETH C. DEMPSEY, | ) | |
| Plaintiff, | ) | C.A. No. 04-456 SLR |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF DELAWARE, | ) | |
| DEPARTMENT OF PUBLIC SAFETY, | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

IT IS HEREBY ORDERED this _____ day of _____, 2008,

Defendant's Motion for Summary Judgment is denied as set forth in Plaintiff's

Answering Brief dated September 8, 2008.


_____
THE HONORABLE SUE L. ROBINSON
United States District Court