IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELIZABETH C. DEMPSEY,                    )
                                         )
              Plaintiff,                 )
                                         )
       v.                                )        C.A. No. 06-456 SLR
                                         )
STATE OF DELAWARE,                       )
DEPARTMENT OF PUBLIC SAFETY,             )
                                         )
              Defendant.                 )

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## APPENDIX TO PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MARTIN & WILSON, P.A.

JEFFREY K. MARTIN, ESQUIRE (#2407)
TIMOTHY J. WILSON, ESQUIRE (#4323)
1508 Pennsylvania Avenue
Wilmington, DE 19806
(302) 777-4681
jmartin@martinandwilson.com
*Attorneys for Plaintiff*

DATED:      September 8, 2008

*Elizabeth C. Dempsey v. State of Delaware, Department of Public Safety*
C.A. No.: 06-456 SLR
Plaintiff's Answering Brief in Opposition of Defendant's Motion for Summary Judgment

## APPENDIX – TABLE OF CONTENTS

**APPENDIX**               **DOCUMENT**
B – Part 1                 Internal Affairs Interview of Cpl. Elizabeth C. Dempsey, June 25, 2004
B – Part 2                 Internal Affairs Interview of Cpl. Brian Maher, June 18, 2004
B – Part 3                 Troop 3 State Police Report of Incident of October 23, 2003
                                 Reported by Cpl. Argo,  April 20, 2004

# APPENDIX B – PART 1

# INTERNAL AFFAIRS
# INVESTIGATION
Transcribed Interview


**CASE NUMBER:**  12-04


**PERSONS INTERVIEWED:**  Corporal Elizabeth C. Dempsey


**LOCATION:**  Internal Affairs Office


**DATE:**  June 25, 2004


**INTERVIEWERS:**  Captain James Paige, Internal Affairs
Lt. Robert M. Coupe, Internal Affairs


**TRANSCRIBED BY:**  Laurie Robbins
DSP Administration


**TOTAL PAGES:**  83

KEY:

| | |
|---|---|
| JP: | Captain James Paige |
| RC: | Lt. Robert M. Coupe |
| ED: | Corporal Elizabeth C. Dempsey |
| RM: | Mr. Robert McDonald |

1

D000811

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 1 of 83

JP:    OK.  This is Captain James Paige, Delaware State Police Internal Affairs
       Division.  Today's date is June 25th 2004.  The current time 1335 hours.  Gonna
       be conducting at tape recorded interview at the Delaware State Police Internal
       Affairs Office located on McKee Road in Dover Delaware.  Present for the for
       this interview will be uh Lt. Robert Coupe, Mr. Robert McDonald, and Corporal
       Elizabeth C. Dempsey of Delaware State Police Troop 7.  Um, I'm just kinda go
       around the room here we'll get everybody's voice on the tape.  I'll start with Lt.
       Coupe.

RC:    Lt. Rob Coupe

JP:    Mr. McDonald

RM:    Bob McDonald

JP:    Christy

ED:    Corporal Elizabeth Dempsey

JP:    Christy, if you would just uh give me your IBM number please.

ED:    3296

JP:    Do you understand that this interview will be tape recorded?

ED:    Yes.

JP:    Uh, at this point I'm gonna inform you of the nature of the of the allegation if you
       I've given you a copy

ED:    (Positive sound)

JP:    …read.  I'm gonna read it into the record.  It's (cleared throat) addressed to
       yourself.  It's from myself today today's date June 25th 2004.  This is to inform
       you that the Internal Affairs Division is conducting an investigation to allegation
       of violation of Delaware State Police Rule and Regulation Number 15 False
       Statements in Delaware State Police Job Performance Standard 14 Domestic
       Incidents Involving Sworn Division Members.  The allegation states it is alleged
       that you made false statements to emergency reporting center dispatchers and/or
       investigating troopers regarding an incident which occurred on at 1715 B
       Frederica Road, Frederica, Delaware  on or about October 26th 2003.  It is also
       alleged that you failed to report a domestic incident that you were involved in on

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 2 of 83

October 26th 2003 to the on-duty supervisor at your assigned troop. This
substantiated the allegation ... violation of Delaware State Police Rule and
Regulation Number 15, which states "No member shall knowingly make a false
statement falsifying any written or verbal report made to a superior officer or
willingly and intentionally withhold material matter from such report or
statement" ..... Performance 14 Standard 14 which states "When a sworn division
member is involved as a suspect or a victim in a domestic incident it is his or her
responsibility to make immediate notification to the on duty supervisor of his or
her assigned troop section, the supervisor or his or her designee will notify the on
call CIU administration or notify the officer's troop commander and appropriate
field operations officer". This is an administrative investigation, not a criminal
investigation. Your signature below only acknowledges receipt of this notice. It
is not a admission of guilt. Do you have any questions on that form?

ED:     No sir.

JP:     OK. If you would, please signed uh ......signature....and date it. And Mr.
        McDonald, your copy.

RM:     And while she's doing that I might as well put an object on the record just get it
        out of the way, um, it's our belief that this entire  um or the events of October 26th
        2003 are purely personal nature ...the scope of the police department. Uh, but
        more importantly is you may be aware the Attorney General's Office is  under an
        inquiry as to um what they my believe is criminal conduct on the part of uh
        Corporal Dempsey. So, for that reason, I'm gonna impose her Fifth Amendment
        privilege here, now. Having said all that, I'm sure I'm gonna get a direct order
        here in a second to do that and uh if I hear that I'll direct my client to answer any
        questions narrowly and  specifically tailored to her official duties.

JP:     Um, we're gonna, I'm gonna keep my sequence we will get to the

RM:     Oh, I'm sorry.

JP:     That that's fine. And I that you're you're uh point is is noted. Um, I'm gonna
        kinda stay on key here. I  got things in order here and then we'll ...

RM:     Didn't need to jump off that .... I'm sorry.

JP:     Um, you are the subject of an administrative investigation and as such uh  you are
        afforded certain rights. You have the right to have an attorney present, which
        you've exercised already this this afternoon. Uh or a representative of your
        choice and you may request a break at any time during the interview. So, if you
        need to use the restroom, uh you wanna get uh refill on your water, need to stretch
        your legs um just lets us know and we can

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 3 of 83

ED:     Thank you.

JP:     Stop stop things, OK. Um, I'm gonna provide an opportunity to read three things. Uh, the first will be the alleged violations in the Divisional Rules and Regulations that were stated in the notice. Um, the second thing will be the complaint disciplinary procedures outlined in the Divisional Manual. And the third thing will be a copy of the Policeman Bill of Rights. Uh, I allow you an opportunity to review those documents if you wish. Uh, if you feel comfortable with what those items pertain to we can you can waive that. We can move forward. That's up to you.

RM:     I'm fairly comfortable with what those three documents and the Rules and Regulations provided. We look like we're moving off the reservation, I'll stop and and talk to her about it. So we'll waive that right at the moment. ... (cleared throat)

JP:     And at this point based upon what Mr. McDonald raised just a few minutes ago, I'm gonna read you the Component Statement Form uh regarding the nature of our investigation, what we're gonna we're gonna order you to answer our questions, OK? I advising you that the you are being questioned as part of an official investigation of the Delaware State Police. You will be asked questions specifically related to the performance of your official duties or fitness for office. In an interview related to a criminal investigation, you would be entitled to all the rights and privileges guaranteed by the laws and constitution of this state and the Constitution of the United States including the right not to be compelled to incriminate yourself. However, in this case, the Delaware State is conducting an administrative interview related to an internal investigation. At this time, I'm advising you that you must answer questions posed to you. If you refuse to answer questions relating to the performance of your duties or fitness for duty, you will be subject to departmental charges which could result in your dismissal from the Delaware State Police. Neither the statement that you make nor any information or evidence which is gained by reason of statements can't be used against you in any subsequent criminal proceeding. However, these statements may be used against you in in a relation, excuse me, how these statements may be used against you in relation to subsequent departmental disciplinary hearings. OK? Do you understand that? Would you like an opportunity to read that?

RM:     We understand the statement and again um we don't believe any of what happened on October 26th is is a commenced with her official duties. I realize that's not something can be resolved here today just note the objection. And I I also note that you've given us a direct order to answer, so we will. I just want to ..... my objections.

JP:     Any questions before we proceed?

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 4 of 83

ED:     No.

JP:     Having all your rights in mind, uh you ready to proceed with the interview?

ED:     Yes.

JP:     One last item that we have to cover is one of the waivers of the Policeman Bill of Rights pertaining where the interview is conducted.

ED:     Right.

JP:     Um, and under in in this case there was two op two options. We could have it at Headquarters or at Troop 3 cause that's where the incident occurred in Troop 3's uh jurisdiction. Or you can waive that right and have the interview here. It is my presumption, we've set this interview up ahead of time but you still have to get the waiver in writing.

ED:     Right.

JP:     And I'll read that in for the record. And I'll I'll give you copies so you can read along. (paper shuffling) This limitation's on political activity  law enforcement officer ..... rights of officers under investigation  C which states whenever a law enforcement officer is under investigation or  subject subjected to any questioning for any reason which could lead to disciplinary action, demotion, or dismissal, the investigation or questioning shall be conducted under the following conditions. Questioning shall take place at the agency Headquarters or at the office of the local troop or police unit which the incident allegedly occurred as designated by the investigating officer or unless otherwise waived in writing by the officer being investigated. I've been made aware of my right to have this interview conducted at the agency headquarters or at the local office at the office of the local troop in which the incident allegedly occurred. I waive this right and elect to have this interview conducted  at the Delaware State Police Internal Affairs Office at the McKee Business Park. If there is no objections to that,

RM:     .....

JP:     please sign that and you will

RM:     (cleared throat)

JP:     ...copy. And I think we'll be ready to proceed finally. .....formalities. Um, Christine basically what I would like to how I'd like to start this this interview off this afternoon would would is as detailed as you can recall so we can try to limit up eliminate all the follow-up questions as many as we can. I'm sure there'll still be many. Um, but I'd keep it as detailed as possible as to what happened on

D000815

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 5 of 83

October 26th at your residence um the incident between yourself and Corporal Brian Maier of the Delaware State Police.

RM: Did you want her to start on the 26th or the 25th?

JP: Well, …yeah, prior to the events what where you were. It's kinda good start at your day. How your day, what you did that day and how it and proceed right into the events of the early morning hours of October 26th.

ED: Starting Saturday?

RM: Yes

JP: Yes. Uh which would have been uh October 25th.

ED: Um, (sigh)

JP: Got up,

ED: (laugh)

JP: Got breakfast.

ED: Uh, probably not but um, at at some point during that day um late morning early afternoon I went to Kent General ER (sniffle) and sat with Brian in the hospital for a while. Um, we left there had um a late lunch at a restaurant in Dover. Uh, I returned um to to my residence at at some point and time. And um, the proceeded out uh for the evening with several friends. We first went to um a hay ride. And then we went to a restaurant in Dover and had um some drinks and um some appitizers. (sniffle) And then I returned home um to my residence with a friend of mine, Kevin Keller. (sniffle) Who was visiting from Texas. Um, once I got home I went into my bathroom and uh began getting ready for bed. Um, used the restroom, washed my face, brushed my teeth, and um when I came out of the bathroom um Kevin said someone is banging on your door. And um I I guess I kinda dismissed it because I didn't hear it and I didn't think he was correct. But um some point I heard noises outside. Um, some point came to realize that it was Brian. Um, Kevin began asking me questions. He was getting a little upset. I wasn't sure what what to do. (sigh) I'd um, we went in the bedroom, closed the door thinking Brian would go away. (laugh) And at some point I heard um heard a crash. A window of mine I know now know. A window of mine was was broken and (sniffle) at the insistence of Kevin I called 911. (sniffle) While on the phone with 911, I came to realize that Brian was no longer there. I didn't hear anything. Kevin may have said, he's gone. (sniffle) Um, I believe I told I told Kentcom they were no longer needed. I I may have called them back. It may have been on the initial call. Um,

D000816

believe they told me that that troopers were still coming and (sniffle) I waited outside. Kevin was upset with me. I needed some air. (laugh) I waited outside for them, whoever was coming. And um, believe Trooper Argo showed up first. And um, I told him that everything was fine. That I no longer needed them. (sniffle) Um, he was insistent on staying. Um, Trooper Csapo and Corporal Gygrynuk (sniffle) um arrived. Uh, I again told them that they were not needed. They were insistent on staying. Uh Corporal Gygrynuk even at one point went into my house with out me. Um, he spoke with Kevin. And uh, I'm not sure if it was Corporal Csapo or Trooper Argo, I believe it was Corporal Csapo, um, dusted for fingerprints outside. I told him that it wasn't necessary. (sniffle) Um, again he was insistent. And um Corporal Gygrynuk and um Trooper Argo had to leave. Trooper Csapo stayed or I'm sorry Corporal Csapo and um he ended up taking taking Kevin back to his sister's house. (sniffle) Continue? Yeah?

JP:     If there's more.

ED:     Um, (paper shuffling) I'm not sure how long after Csapo left I would guesstimate within an hour, um Brian called my cell phone and um immediately said he was sorry and please don't hang up on me. And he he said he had already spoken with Captain and um he told the Captain that uh what had basically happened. And that if he needed him to he would you know answer answer up to what what he had done. Do you want me to go further in Sunday or?

JP:     Yes.

ED:     OK. Um, didn't get much sleep that night. (laugh) Um, got up the next day and uh I think Brian had told me on the phone that that night early in the morning when he called to apologize (sniffle) he may have called me that morning also later in the morning. Um, but anyway I I knew he was going to come board up my window. (sniffle) Um, came to the house with board and tools. (sniffle) And um, while he was at the house, he spoke with who I now know is Captain Hawkins. Um, he told him he was there with me. That he was not fixing the window but board you know boarding it up. And um, told Captain that everything was fine. That he was, you know, taking care of the window (sniffle) And uh, I know he asked if so of course I could only hear Brian's side of the conversation but asked if um he wanted to speak with me in talking to Captain Hawkins asking if he wanted to speak with me (sniffle) and Brian relayed to me that Captain would speak with me on Monday. That as long as long as I was alright, Brian was alright, the window was going to be alright, that he was fine. (sniffle) Um, Captain Hawkins did call me Monday. I'm not sure what time. And I'm not sure if he called on my home phone or my cell phone. Um, asked me if I was OK. If I needed anything. If I wanted anything done about the incident. I told him no. I was fine. The window was being fixed. And uh Brian and I would handle our relationship from there. He said that was fine. Not to talk about it.

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 7 of 83

Nobody needed to know that as long as I was fine, he was fine and considered the incident a (sniffle)  And that that's

JP:     ......

ED:     No, I guess that's unless you want me to

JP:     Well, we'll go back and we'll we'll

ED:     (sniffle)

JP:     ....upon what you told us….. (noises)  How long have you been employed with the division?

ED:     Um, just shy of five years.

JP:     And your current positon?

ED:     I'm sorry?

JP:     Current position of the division.

ED:     Uh, Corporal, patrol, Troop 7.

JP:     Have you held any other positions within the Division?  Besides Patrol?

ED:     No sir.

JP:     The residence at 1715 B Frederica Road, how long did you live there?

ED:     Um, (paper shuffling) summer of um summer or fall of '02 until um bout January, February of this year.

JP:     Did anyone else live there in your apartment with you?

ED:     At one time, yes.

JP:     Was that Brian?

ED:     No.

JP:     Boyfriend, girlfriend?

ED:     Boyfriend.

B008

D000818

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 8 of 83

JP:    OK. How long have you known Brian?

ED:    Um, I met him July 3rd of last year.

JP:    July 3rd?

ED:    Yes.

JP:    When did you begin dating Brian?

ED:    Well we we talked about our relationship after this incident and uh decided we would like to be together exclusively.

JP:    OK. Well prior to prior to the the incident were you dating? Were you going out on dates or seeing each other?

ED:    We had we had gone out to dinner and to a movie or two.

JP:    Do you recall when you actually started doing those types of activities?

ED:    Mmmm August, September

JP:    Would you classify your relationship as boyfriend girlfriend? How would you how would you classify it? At the at the time of the incident?

ED:    Friends, more than an acquaintance less than boyfriend girlfriend?

JP:    How much time would you say you spent together from that time period of Jan or um excuse me

ED:    July

JP:    July through uh actually you said you began dating August September of '03 til the end of August. In on your off-duty time was did your shift's coincide that you had off-duty time together or were you on

ED:    Yes at uh uh at that point and time he was on C Shift and I was on D shift so we we had the same days off. Um, we didn't work the exact same time so, like if I was working days he was working nights. That kinda thing. Um, it varied. I mean uh I went out on dates with other people. I assumed he did also. Um, we really didn't discuss that. Um, but as far as the time we spent together, it it varied, yeah. He's a busy person.

RM:    (cleared throat)

D000819

Corporal Elizabeth C. Dempsey
TA Case # 12-04
Interviewed June 25, 2004
Page 9 of 83

ED:  (sniffle)

JP:  Alright. At the time of the incident, how how well did you know Brian? At the time that this incident occurred?

ED:  ... on a scale of 1 to 10 or I'm

JP:  However you want to put it.

RM:  Do you want her just characterize the relationship .....

JP:  That would be fine, just kinda how how well did you know him? I mean

ED:  I mean we had really just been in social settings together. You know, we like I said we'd go out and have dinner and you don't really get to know somebody that well sitting in a movie but I mean we we were friendly.

RM:  I I I don't mean to step on your question, but but I've learned that there's a difference between a social outing to dating and cause I'm way old. I think what the Captains asking you is is is your relationship with Brian a serious relationship? Where it's starting to become exclusive type of a relationship.

ED:  We had not had a discussion about where our relationship was going, if anywhere. At at that point and time I mean, we even teased each other that there was other people in our lives and that we were casual. Is that any better, no?

JP:  OK. Does Brian normally carry his firearm when he's off duty?

ED:  No. Well not that I know of. No. (sniffle) Knowing him more now, and being out with him

JP:  .....

ED:  OK. Sorry.

JP:  define our timing at right at this point to

ED:  Oh prior prior to that

JP:  ...to that timeframe ......

ED:  OK. Prior prior to that, I did not know him to carry his

JP:  At this point

D000820

ED:     At this point, no.

JP:     OK.

ED:     .....

JP:     Had you gone out with him on a date or to a social event where he carried his firearm?

ED:     No.

JP:     Prior to October 26th 2003, did Brian ever spend the night at at your residence.

RM:     I'm object to the question.   Uh

JP:     I understand your objection but I'm still trying to

ED:     (sniffle)

JP:     formulate the extent of this relationship.  And I need to do that for this case.

RM:     I understand

JP:     And I understand the reluctance and but I have to ask the question.

RM:     And I'm just gonna put on the record cause I really believe and I and I mean this sincerely I believe that's a purely First Amendment protected ..... and and has nothing to do with any of her official duties whether or not she has a uh live in relationship with this man.  I think what you're trying to characterize whether or not it qualifies as domestic relations type of complaint.  I think there's another way of asking that.  But that's my objection

JP:     I'm gonna continue with my question.

ED:     Um, not that I recall, no.

JP:     Did you ever spend the night at his residence?

ED:     At that point and time, possibly.

JP:     But you're not sure.

ED:     I am not positive, no.  I I can not say for sure on October 1st I spent the night at his residence, no.  I can not say that. (sniffle)

D000821

Corporal Elizabeth C. Dempsey
TA Case # 12-04
Interviewed June 25, 2004
Page 11 of 83

JP:   Did you have a key to his residence?

ED:   No.

JP:   Getting back to the to that week, the timeframe of October 26th, was Brian aware that Kevin Keller was going to be in the area.  That you were going to be spending some time with him?

ED:   Yes.

JP:   What did you tell him about Kevin Keller?

ED:   That he was a friend of mine from Texas and that we had gone to school together. (sniffle)

JP:   Did you get any reaction from him?

ED:   No.

JP:   … Did he appear to be jealous or upset or anything like that?

ED:   No.

(?):   (sneeze) Excuse me.

ED:   He still hasn't.  (sniffle)

JP:   Was Brian aware that you were going out with Kevin?

ED:   That

JP:   On that on that evening?

ED:   Yes.

JP:   The 25th?

ED:   Yes.  (sniffle)

JP:   And how was he aware?  That you just told him?  Or did it come up in conversation or how did this come up?

ED:   We talked about it.

JP:   And what was what was his reaction about it.

B012

D000822

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 12 of 83

ED:    ....um, he asked me if we would see each other that night and I told him no and he said I'd really like to see you tonight and I said well I have plans.  (sniffle)

JP:    He seem upset?

ED:    Not really.

JP:    Now was Keller staying at your residence that week?

ED:    No.  His sister lives right around the corner.

JP:    So he never spent, other than that one night that he was at your residence, he never spent the night there that week the week proceeding?

ED:    The night before he had spent the night at his sister's house because his nieces wanted him to.  They had been to the football game at Lake Forest.

JP:    How about the other nights that he was here that one week?  Do you recall when he got in town?

ED:    We got back the same day cause I drove him back from the airport but I don't remember what day that was.  I thought it was Thursday.   Thursday or Friday.

JP:    So then he wasn't spending

ED:    (sniffle)

JP:    He didn't sleep over at your residence during the week?  He didn't keep any belongings over at your residence that week?

ED:    I think he had some things a couple things there um I guess from when he picked me up that night.  But

JP:    Picked you up ....you've got me confused.  I'm sorry.  He picked you up where?

ED:    At my house.   Before we went out.

JP:    On Saturday.

ED:    Correct.

JP:    The 25th

ED:    Right.

B013

D000823

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 13 of 83

JP:     OK.

ED:     (sniffle)

JP:     My question is though did he spend any evenings at your residence during the
        timeframe that he was in the area, did he spend the night at your residence?

ED:     The the night before we had gone he had gone to the football game and spent the
        night at his sister's house.  And then Saturday night.

JP:     So your answer is no?

ED:     Right.

JP:     How would you describe your relationship with Keller?

ED:     We had gone to high school together.  We um dated af right after high school.
        Not long after high school. (sniffle)  Um, we were friends.  We had just come
        back in contact with each other not very long before this. (sniffle)

JP:     Was Keller aware that you were in a relationship or were dating was the you were
        dating um Brian at the time.  When he came.

ED:     Kevin knew I had a friend named Brian, yes.

JP:     Did he know you were dating Brian?

ED:     Did he know that I had gone out to dinner and done social things with Brian, yes.
        (sniffle)

JP:     Said in your statement you made the uh comment that you had gotten a call from
        Brian that day that he was in the hospital?

ED:     Right.  He was um I believe he had spent the night before at his parents house or
        somewhere in New Castle County (sniffle) and uh when he was driving I guess I
        believe possibly all week he was having pains in his stomach and um he felt that
        his something was swollen.  Um, he called his I guess on-call doctor and um and
        that doctor recommended that he go to the ER.  And he was already southbound
        from New Castle County and decided to go to Kent General.  He called me and
        told me and uh I said well I'll meet you there.

JP:     Why did you go to the hospital?

D000824

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 14 of 83

ED:    He was a friend (paper sounds) that was going to the emergency room and his
       parents were up in New Castle County.

JP:    Did he ask you to come up to the hospital or

ED:    No.

JP:    just go up on your own?

ED:    I mean I told him that I was coming but I mean I went on my own.  (sniffle)

JP:    And you went out to lunch. Had lunch. Uh, you returned to your residence and
       then you got ready to go out with your friends and Kevin that evening, correct?

ED:    With my friends, yes.

JP:    OK.

ED:    Kevin being one of them.

JP:    And who who else did you go out with that night?

ED:    Um, um my best friend and her husband and uh two other people.

JP:    Do you have their names?  You know their names?

ED:    (positive sound) Um, Kristin Holemo,  Martin Holemo

MD:    ......

JP:    Kristin with a K?

ED:    K r i s t i n

JP:    And how you spell that last name?

ED:    H o l e m o.  Her husband's name is Martin (sniffle)

JP:    And

ED:    ...It's horrible.  Uh, Kristin's brother Cory (paper noise) Wyatt.  W y a t t. And
       his now fiancée Janelle, I think that's J a n e l Dennis.

JP:    And you went on a hay ride?

D000825

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 15 of 83

ED:    (sniffle) Yes.

JP:    And then you guys, what time then, I'm just trying to get a time frame here. Was it dark out?  Still light out when you went on the hay ride or

ED:    It was early evening.  I believe when when we left.  I know we waited quite a while for the hay ride.  Longer than I wanted to.  Um, hay ride wasn't that long and then we left and went to TGI Friday's. (sniffle)

RM:    (cleared throat)

JP:    Do you recall what time you got to TG TJI

ED:    TGI

JP:    TJI Friday, that doesn't sound right.

RM:    TGI Friday's

JP:    TJIF's or whatever it is

ED:    TGI

JP:    Friday's

ED:    Right.  Um, not specifically.  I mean I I'm I would guess at least 9.  Guesstimate.

JP:    And how long did you stay there?

ED:    I would guess two hours.    We were there we were there for a while, just taking our time.  Had a couple drinks and talking, catching up. (sniffle)

JP:    How much do you recall how much you had to drink that night?

ED:    (sigh)  A little bit.  Um, I don't know how to tell you how many.  No.  How many specifically, no.

JP:    What were you drinking?

ED:    (sniffle) I know at the beginning of the evening I was drinking Captain and Coke.

JP:    OK.  That's the beginning of the evening, what were you drinking later in the evening?

B016

D000826

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 16 of 83

ED:    I don't remember specifically, if I had to guess I would say probably still Captain and Coke but I'm not positive. (sniffle)

JP:    Now you you made the comment you had a little bit to drink but I kinda took that as mean I I don't want to read that wrong but you were being a little facetious.

ED:    Well not not facetious I'm

RM:    Didn't want to know if you thought you were under the influence.

ED:    I was under the influence.

JP:    OK.

ED:    Maybe the comment should have been a little too much.

JP:    Well, that's what I was just trying to clarify.

ED:    Sorry.

JP:    Uh, so you left TJ Friday's

ED:    Friday's. (sniffle)

JP:    And you go home to your house or somewhere else?

ED:    I think we just went straight to my house.

JP:    And just you and Kevin

ED:    ....

JP:    or you still with your friends?

ED:    No, they went they went on home. Or, they were not with us. I assume they went home. (sniffle)

JP:    When you arrive home, uh do you notice Brian's vehicle in the area?

ED:    No. (sniffle)

JP:    Do you have any idea that he may show up at the house that night?

ED:    No.

B017

D000827

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 17 of 83

JP:     Did you have any phone conversation with him during the night while you were out?

ED:     Yes.

JP:     Calling the cell phone?

ED:     Um, I know I called him at some point.

JP:     You called Brian?   Do you recall about what time that was?

ED:     Before we left TGI Friday's but uh what what time specifically, no. (sniffle)

JP:     OK. Um, why did you call Brian?

ED:     He had like I said earlier, when we were at the hospital and having lunch, he had asked to see me that night. (sniffle). Um, I told him that I definitely had plans for most of the evening and that we probably would not be getting together.   No, we would not be getting together.   He wanted me to call and just say hey, definitely yea or nea, you're coming or you're not coming down.   Um, and it got to be later in the evening and so I called him and said, you know I'm definitely not coming down.

JP:     And (tapping sound) reaction from Brian?

ED:     Disappointment?  Maybe he wanted to see me that night.  It was (sniffle) I don't know if you guys know this, but he was in motorcycle training all week and you know he was home for two days and then he was going back to motorcycle training.  He was home.  Um, he wanted to see me.  Wanted to go out. (sniffle)

JP:     Did Brian call you at any time prior to him responding to your residence?

ED:     (sigh) I'm not positive.  Um

JP:     Well I need you to think about it cause

ED:     Well I have thought about it (laugh).

JP:     OK.  Well, go ahead and

ED:     I'm not positive.

JP:     Why … then there's some doubt whether he did or didn't.  What what why do you have why why can you expand upon that at all?

B018

D000828

ED:    Well, that was a while ago. As I've already said I was under the influence. Since since then I mean I've talked to him about the incident. I've had a conversation with Kevin about the incident. (sound). There are things I think I remember. There are things I've tried to remember. Things I've tried to forget. (laugh) It's not really easy to remember something that happened (laugh)

JP:    Well, try to refresh your memory a little bit, you gave a statement to

ED:    (sniffle)

JP:    Sergeant Hudson back on April 23rd of this year. Do you recall making the statement?

ED:    Two months ago, yes, I remember speaking with him. Or being interviewed by him. (sniffle)

JP:    And he's asking during that interview he asked you questions about uh what occurred that night and during that one of the questions he asked you was uh recognizing a voice at your front door and at that point you you responded back that you did receive a phone call from Brian Mayer. You didn't recall if it was on your cell phone

ED:    (sniffle)

JP:    or on your house phone.

ED:    OK. (sniffle)

JP:    Does that help at all?

ED:    I …. I guess.

RM:    I'm I'm confused. Are you asking if if she received a phone call from Brian before he got to the house and he ….. or that night after he's gone?

JP:    Prior to the events unfolding.

RM:    OK. (cleared throat)

ED:    OK.

JP:    So, do you recall the phone

ED:    (sniffle)

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 19 of 83

JP:     call?  Does that help

ED:     (sigh)

JP:     jingle your memory at all or still kinda vague on it?

ED:     Vague.

JP:     OK.  Um, do you recall

ED:     (sniffle)

JP:     anything about the phone call conversation?

ED:     No.

JP:     You mentioned to Detective Hudson

ED:     (sniffle)

JP:     that you answered the phone call Brian was angry with you

ED:     (sniffle)

JP:     because you didn't go down and see him.

ED:     (sigh)

JP:     Because he wanted to go out that night.

ED:     Was it that phone call or the phone call when I was still at TGI Friday's?  (sniffle)

JP:     (paper shuffling)  Well, that's what I'll find out.

ED:     (sniffle)

JP:     Detective Hudson asked you about the banging on the door, I know we haven't gotten to that part …..specifics. Um, OK you weren't really aware of who it was or even if there was a knock at the door.  Like you said you did hear a voice and recognized it.  Um, but you didn't see the person, so you weren't positive and then right after that you received a phone call.  (paper shuffling)

(?):    (sounds of someone drinking)

B020

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 20 of 83

ED: It's it's very fuzzy. OK. If if, you know, two months ago I said he uh he made a phone call or I received a phone call then.

JP: Well after the knocking of the door, do you recall him calling on the cell phone? Calling you? After he was at the residence, do you recall him calling you?

ED: I believe at some point and time I turned my cell phone off and I turned my cell phone off.

JP: Why would you turn your cell phone off?

ED: Maybe he was calling.

JP: Well, if you're turning your cell phone off, do you normally I mean do you normally tell turn your cell phone off all the time? Or do you leave it on most of the time? Or did you turn it off because the phone kept ringing and you turned it off? You were tired of hearing it ringing?

ED: I don't remember.

JP: At some point you realized Brian's at your front door knocking or banging?

ED: I really realized Brian was, yes, outside. (sniffle)

JP: And how did you realize that?

RM: (cleared throat)

ED: When I came out, Kevin said there's someone banging at your door. I didn't hear the banging. I proceeded to believe I walked into the bedroom, not very many places to go in that apartment, um, at some point and time I heard or ....heard things outside I don't remember if it's I heard the banging on the door first or if I heard the the footsteps, noises, out on the roof, heard his voice, started to put two and two together (sniffle)

JP: OK. So you're in the bathroom, you're you're we're running out of time. OK. We're gonna go ahead and and uh stop, change tapes. It is

ED: (sniffle)

JP: 1420 hours.

TAPE 2

JP: OK. We're back on tape. Um, 1424

B021

D000831

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 21 of 83

ED:     (sniffle)

JP:     hours. Uh, Christy, I just wanna in a break here

ED:     (sniffle)

JP:     between tapes and I had a chance to go back over some of my notes here.  Getting (paper shuffling) back to the phone call, and try to make some sense out of your previous statement and what you're and I realize time has gone by um, try and just make the best sense we can out of this.  It appears from your your earlier statement that you you had phone contact um with Brian prior to the events really unfolding.  He was basically at your door knocking at this point.  And the the attempts to contact you.  Um, and you make mention in your earlier statement that you do have conversation but you're you're today you're not sure of that?

ED:     Correct.  I remember specifically talking to him before I left TGI Friday's.

JP:     ...we've already talked about that.

ED:     Right, we talked about that.

JP:     But this would be another

ED:     (sniffle)

JP:     subsequent call.  (noise)

ED:     Right.  After I get home, things get a little fuzzy.  I believe I received a text message from him, not a phone call.  I do not recall what exactly that said.  But I know he was not happy that I hadn't come down to the beach.

JP:     So there was something in that message to lead you to believe that he was upset?

ED:     Right.  I believe he asked me to call him.

JP:     Did you call him back?

ED:     I do not believe so, no.  Because at that point, I had made it clear that he and I were not seeing each other that night.  And so, in my mind, I'm done.

JP:     ....And when ....

ED:     And I believe I even told him when I was at TGI Friday's I will you know if you would like to do something tomorrow, you know, I'll call you in the morning.

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 22 of 83

JP:     And his response to that was

ED:     Like I said, disappointment. He

JP:     Did he say did he like say oh come on Christy you know

ED:     Oh, I'm sure he probably tried to

JP:     plead with you to

ED:     Right.

JP:     convince you to come down.

ED:     Right. I mean I couldn't tell you exactly what he said but

JP:     So Brian's knocking on the front door, banging on the front door, let's get into that. Is he beating on the what's what's what's going on at the front door? At some point you get your attention turns to that. Kevin Keller tells you that somebody's at the front door. There's banging or or there's knocking, what what is it? What do you hear?

ED:     When I came out of the bathroom, I didn't hear anything. I wasn't sure if Kevin had flipped his lid or (laugh) or what. Um, and then at some point as when I go into the bedroom I hear something outside that alerts me that hey there is someone out there. And then uh I don't know if if if Brian said something something made me realize that hey it is Brian.

JP:     The banging on the door, was it loud? Was he banging or knocking? (paper shuffling) Initially. When you first noticed it. (paper shuffling)

ED:     I really remember hearing things on the roof. Footsteps on the roof. I don't know if by the time I got out of the bathroom he was done banging on the door or not. Knocking .....

JP:     But Kevin makes you aware that there's somebody at the front door? You don't go to answer it? You don't go check?

ED:     Correct.

JP:     Why not?

ED:     Well, like I said at first I had thought he was wrong. (laugh) Um, second, I'm in for the evening. I've had people stop by or had when I lived there, people stop by

D000833

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 23 of 83

the apartment um looking for police officer. Normally asking for my husband. Or looking for a police officer. And uh, you know, at whatever time it was, very late in the night after having some drinks, I was not in the mood to entertain anybody's state police questions.

RM:     (cleared throat)

ED:     I was off duty.

JP:     OK. In your in your earlier conver conversation with Sergeant Hudson, you acknowledged that you did hear banging on the door.

ED:     OK.

JP:     Um,

ED:     Like I said, something outside alerted me to some noises outside alerted me to somebody was out there.

JP:     I the further conversation um Sergeant Hudson and this gets back to the phone conversation which I thought we might of cleared up but maybe we didn't. Uh, you go on and tell him that on the phone Brian asked you to come outside. And you and you told him that you weren't gonna come outside cause you're going to bed. So does that help re make you remember anything more?

ED:     At this point and time, I do not remember that conversation. But if (noise) Brian asked me to come outside, yes, I probably told him no I was not coming outside. Because I wasn't.

JP:     (sigh) So you make the decision that you're just going to ignore the knocking at the front door, um, and you go to the bedroom?

ED:     Correct.

JP:     Did you have any conversation with Brian while he was at the front door knocking?

ED:     Not that I remember, no.

JP:     Do you recall him yelling?

ED:     Yelling, I remember things, like I said noises outside. I knew it was him. I became aware that it was him. I'm inside with somebody in front of me yelling at me. (sigh) And

B024

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 24 of 83

JP:     Yelling at you?  He's yelling Keller's yelling at you?

ED:     He was not happy with me.  Or not happy with the situation.

JP:     Why?

ED:     (sounds) (sigh) Mean, there's another guy or a guy man you know outside at that point probably walking on my roof.

JP:     OK.  And he's not happy about that?  Or the fact that there's another man coming to your house at one o'clock in the morning?

ED:     Well, both.

JP:     Everything.

ED:     Right.

JP:     Just upset

ED:     The whole

JP:     about the whole.  OK.  I well maybe I need you ask you this question then, why why is he you told me earlier that you're basically just friends.

ED:     Right.

JP:     So why would he be upset if another of your friends came to to the house to see you or talk to you?

ED:     That may be a better question for Kevin.

JP:     Well why do you think?  I'm asking you the question.  Why

ED:     I don't know.  Maybe he felt uh Brian was interrupting something or interrupting his chances of something.  I don't know.  I know he wanted it to stop.  And wanted him to go away.

RC:     Could, um, you said when Brian picked you up he dropped off some things of his own.

ED:     I'm sorry.

JP:     Kevin

B025

D000835

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 25 of 83

RC:     Kevin, thank you sir. Kevin. When Kevin picked you up to go the hay ride, he dropped off some things of his own.

ED:     I know Kevin came back

RC:     No, you said that, today.

ED:     OK.

RC:     I'm not reading from any statements, you already said that today. Because he had to come back later and pick up his things. And the first night he went to the football game and he stayed with his family.

ED:     Right.

RC:     So you said the night

ED:     I said I said I assumed that he brought some things with him earlier.

RC:     OK.

ED:     Right.

RC:     So, if he brought some things, he was planning on spending the night? Are they the kind of things he brought? They....night bag?

ED:     I thing he changed I think he changed his clothes at my house before we went out.

RC:     Before the hay ride?

ED:     Right.

RC:     OK. When you were saying it would be better to ask him, you said he was yelling at you. Was he yelling at you

ED:     It was

RC:     because of the situation he felt you put him in? That there's another man out there. You've invited me to stay and now you've put me in this situation. Who is this other man out here? Are you seeing him? Are you dating him? Is he your boyfriend? What kind of things

ED:     Those questions had come out, yes.

RC:     That's the kind of things he's asking?

B026

D000836

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 26 of 83

ED:     Right.

RC:     And what did you tell him?

ED:     Uh, I told him its Brian the guy I went to see in the hospital today.  Um, as far as he is he my boyfriend, I told him no.  He said, have we gone out?  I said yes.  Which um, he already knew that, but

RC:     So he didn't go say well then go answer the door?  He said call 911?

ED:     He said I'm going to go out there.  And I said no, you're not.  Nothing good could have come of that and that's exactly what I told him.  I said why are you going to go out there and start something?  I said you're not going out there.  That's ridicules.  So, then he said, well then call 911 .

RC:     If Brian's just a guy that you've gone out with on social things, you think this is normal for him to be at your door at this time of night?  Were you shocked by his presence?

ED:     Oh, yes.  Oh, I was totally shocked.

RC:     Were you afraid that he was out there?

ED:     I wouldn't say afraid.  No.

RC:     How well did you think you knew him?  Did you think he was dangerous?

RM:     You mean Brian?

RC:     Yes. Brian.

RM:     ….

ED:     Oh, dangerous, no.

RC:     And why didn't you think he was dangerous?

ED:     I'm sorry?  Why

RC:     Why didn't you think he was dangerous?

ED:     I mean I think I knew him I mean I wouldn't have gone to a movie theatre or you know to dinner by yourself if I you know if I thought somebody was dangerous?

B027

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 27 of 83

RC:    Is it because you knew him well enough that the next day you sat down and defined your relationship?

ED:    I mean if that's the way you want to put it?

RC:    No, that's how you put it. It when the Captain was asking you about where this relationship was, you said it was very just a social thing. When he went on, we went to a movie, went to a dinner.

RM:    (cleared throat)

RC:    We were just friends.

ED:    Right.

RC:    But then you said that um after this incident you sat down and you defined where your relationship was going to go.

ED:    After the incident, right.

RC:    After the incident. The the day after?

ED:    Mmmm I don't think it was the day after.

RC:    OK. But he came back to your house. You welcomed

ED:    Right.

RC:    him in.    After this incident.

ED:    Yes.

RC:    And you defined where your relationship was gonna go?

ED:    At some point after, I I don't remember the exact day. He was gone all the next week. At some point we talked. We talked on the phone while he was gone that week.

RC:    (positive sound)

ED:    Then it started

RC:    What

ED:    to be hammered out.

B028

D000838

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 28 of 83

RC:    And one of those

ED:    started

RC:    one of those things would be that you're not gonna see other people?  Is that the comment?

ED:    Right.

RC:    Perimeters you set for the relationship.

ED:    We had set, yes.  We had started to say hey you know

RC:    Is that normal for someone that you have had dinner with twice and gone to a movie?  Did they tell ...

ED:    Well, I didn't say I had dinner with him twice.

RC:    Well, you you you sound like you're trying to minimize the relationship.  When the Captain was asking you how how well you knew Brian, how close you were to Brian, you said we had dinner a couple of times and a movie.  It was just social.

ED:    OK.  It was social.  It was casual.

RC:    OK.

ED:    But I didn't say we had just gone to dinner twice.

RC:    OK.  Well, that's what I inferred when you said

ED:    OK.

RC:    It sounded ...try to minimize

ED:    Well, I I can't tell you  how many times we had dinner.  I can't tell you how many

RC:    I I guess

ED:    times we just hung out with friends, you know, at a bar or at somebody's house or

RC:    OK.  My my confusion is that if you're saying it's just a social, it's someone that you've been with a few times, and then you're sittin down, you're settin rules for your relationship or perimeters for  your relationship however  you want to

D000839

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 29 of 83

articulate it.  To me it sounds strange that that's just a social relationship.  To me, it sounds like there's something more there that you're closer with Brian and for whatever reason, you don't want to share that here today.

ED:    Well, (sigh)

RM:    For the record, you guys ... and but I understand what you're asking

ED:    Right. I I definitely do not and sorry but I don't feel I don't need to discuss how I handle starting a relationship with someone with you guys.  I'm sorry.  I've gotten out of a very bad relationship

RC:    (positive sound)

ED:    And Brian had gotten out of a long term relationship.  And so yeah, both of us were very guarded about how much we shared with each other about our feelings and what we wanted.  And I knew Brian's reputation.  I knew my reputation.  And we were both very guarded. (sigh)

RC:    OK.  I'm not trying to upset you.

ED:    Yeah well thanks.

RC:    I'm just saying that to me it's confusing that if it's not a close

ED:    (sniffle)

RC:    relationship, someone's at the front door asking you to come to the door.  Asking you to come to the door.

ED:    (sniffle)

RC:    You mentioned at that time he's probably on the roof.  You have

ED:    (sniffle)

RC:    a gentleman inside that you feel that comfortable

ED:    (sniffle)

RC:    trying to resolve this.  To me it sounds like there's a closer relationship with Brian at that point.

ED:    OK.  I've told you what our relationship was.  I don't know how many other ways you want me

D000840

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 30 of 83

RC:     OK.

ED:     to say it.

RC:     That's fine.

RM:     What I think, and I may have this wrong, and I'm not trying to step in the question.

ED:     (sniffle)

RM:     I think it what this the Lieu the Lieutenant wants to know what you think the nature of the relationship is not necessarily what Brian thinks it is at that moment.

ED:     And I've said that. (sniffle) I mean, like I said, we hung out. We had gone out to dinner. We had gone to the movie. We we may have even watched a movie at his house. (sniffle) But at that point and time, he and I were casual. We had not set any boundaries. I was seeing other people. I believed him to be have been seeing other people. And at that point and time, we were friends. We were not boyfriend and girlfriend.

RC:     OK.

ED:     (sniffle)

JP:     I'm gonna get I'm and I know you're object to my next question but I think it's gonna settle this matter before we get to

ED:     (sniffle)

JP:     and then we can leave it. Um, prior to October 26th were you intimate with Brian?

ED:     What what does that mean?

JP:     That you had sexual relations with Brian.

ED:     I'm not answering that. It is none of their business.

JP:     OK.

RM:     And she's not gonna answer that, Captain. And I understand that you're gonna have to to argue that that's .... But that's way way beyond

B031

D000841

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 31 of 83

ED:     (crying sounds)

RM:     official duties.

ED:     (crying sounds)

JP:     Well, we're trying to what we're trying and I I don't I don't particularly want to ask it but we're having difficulty

ED:     (crying sounds)

JP:     understanding why this event unfolded

ED:     (sniffle)

JP:     as it did if Brian and and her are just these casual

ED:     (sigh, sniffle)

JP:     social relationship.  It doesn't make sense.

ED:     (sound)

JP:     And that's what we're trying what did Brian get upset because there was more to this relationship than than what we're being lead on to?  ....

ED:     I didn't ask him to come there.

RM:     :.... And and that's ...

JP:     .....

RM:     And I'm not trying to minimize it.  But I have a a client who's in her own house with a friend, who for whatever reason is now being confronted with somebody who must think he has a much more serious

ED:     (crying sounds)

RM:     relationship with her.  Whatever their personal relationship is, whether it's intimate or otherwise, really doesn't run into

ED:     (sniffle)

RM:     anything that's being alleged here today.  And she not gonna answer the question.

B032

D000842

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 32 of 83

ED:    (crying sounds)  I need a break.  (crying sounds)

RM:    I'll come out in just a second.

ED:    (crying sounds)

RC:    The time now is 1441 hours.

JP:    OK.  We're back on tape.  Uh, 1450 hours.  Um, I think what I would like to do is just define a couple of things and maybe that will satisfy my.  When you go out with somebody to dinner, to a movie.  Do you consider that a date?  Or is that just going out to dinner?

ED:    (crying sounds)

JP:    Trying to maybe

ED:    It can not

JP:    bridge bridge a generation gap here maybe

ED:    Right.  And and maybe no offense but maybe that is where we are.  I did not have to ask.  We were not exclusive.  If I was doing something else, if I was going out with my friends, if I was going out on a date, if I was on the phone and didn't answer Brian's phone call because I was on the phone with another guy, I did not have to give Brian any explanations.

(?)    ….. (paper shuffling)

JP:    OK.  We've got to the point where we acknowledge that somebody's outside.

ED:    Right.

JP:    OK.  Um, and we know it's Brian, correct?

ED:    Correct.

JP:    OK.  And at this point, you direct Kevin to the bedroom or how does how how do we move from the bathroom, living room area to the bedroom?  How does that transpire?

ED:    Yeah, I I believe I said hey come in the bedroom and and uh we'll stay in here. (noise)  The the only (paper shuffling) I said come in here.

JP:    And you go in the bedroom because

B033

D000843

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 33 of 83

ED:    Well all the blinds were closed. I mean Brian couldn't see in. And

JP:    Just put yourself just a little bit more distance from Brian?

ED:    Right. I mean, yes.

JP:    Kevin, at this time,

ED:    Not happy.

JP:    Not happy. What's he wearing. Do you recall what he's wearing?

ED:    In my mind, I can not picture Kevin right then and say this is what he had on, did
not have on.  I have been told since then that he did not have his shirt on. Did I
remember that myself, no I do not.

JP:    OK. At this point, you've also said that that Kevin was upset, um, was there any
conversation about going and opening the door?

ED:    Like I said, uh Kevin said he would go out and handle this. I'm I'm going out
there.  And I told him he wasn't.  I mean that not that it necessarily was going to
be a problem if he went outside.  But I mean let's face it, there's two guys outside
or you know potentially two guy outside, there's a potential for a problem.  And I
did not think it was wise … that point and time for him to go outside.

JP:    Did you know that Brian had been drinking prior to him coming up to your
residence?

ED:    Yes.

JP:    Did you think that might add fuel to the fire? Since everybody had been
drinking?

ED:    I think it. Right I was gonna say it might added to the fire that everyone had been
drinking.

JP:    You go in the bedroom and shut the door?

ED:    I believe so, yes.

JP:    Is there a light on in the bedroom?

ED:    I'm sure, yeah. Yeah.

B034

D000844

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 34 of 83

JP:     And when you're in your bedroom, what's transpiring….

ED:     Kevin's yelling at me. Brian's outside walking on the roof. Um, Kevin's saying call 911 or I'm gonna go out and handle this. And I'm telling you no your (laugh) not. I believe I told him look he'll go away. I mean this is this is rrr this is ridiculous. He'll go away.

JP:     Brian banging on the windows at this point?

ED:     (sigh) Yeah. At at some point.   Yeah.  There was there was banging .

JP:     Is he banging on the bedroom windows, living room windows, both?

ED:     (sigh) I definitely don't remember the sequence. I believe at some point, yes, there was banging at the windows that we were near the bedroom windows. Um,

JP:     So, bedroom windows he was, he knew you were in the bedroom is banging on the window or is he just

ED:     Oh,

JP:     banging on there's four windows in the front of the house, correct?

ED:     Correct.

JP:     Is he banging on all four? Do you recall? Or is there just banging on one in the living room. Does he come back to the bedroom and bang, or vise versa?  Do you have any specific recollection?

ED:     Specific, no.  Uh but (sigh) but I don't remember him just, you know, banging on the the bedroom window.

JP:     Is he yelling through the bedroom window?

ED:     There was noises outside.  I know I could hear his voice.  What he was saying or yelling, talking, I don't remember.

JP:     Is he making threats to you or to Kevin?

ED:     Pretty sure I would remember that.  No.  I didn't I did not feel threatened.  And I do not remember hearing anything threatening said, like

JP:     You you you

B035

D000845

ED:    I'm going to hurt you.  I'm going to kill you.  I'm gonna kick your ass, no.  Nothing like that.

JP:    But you just told me in the sentence before that you didn't recall what was said.  So but now you're telling me those things were definitely not said.

ED:    Right.  I would remember if somebody threatened my life.

JP:    While you're in the bedroom, Brian call on the phone?  Phone ringing?  House phone ringing?

ED:    Like I said, at at some point I had shut my phone off.  Cause I remember the reason I remember that is because when I went to call 911, I had to turn my cell phone back on.

JP:    And you had turned it off sometime while you were in the residence?

ED:    Correct.  I, yes.  I believe so.

RC:    What about the house phone?  Was that on?

ED:    Nnnn normally (sigh) I I normally kept that unplugged unless I needed to make a local call.  The only reason I ever got the phone was to make local calls.  And even now, I use pretty much just my cell phone.  Um, when I would have the home phone on, I would

RM:    ……..I'm sorry

ED:    Oh, I would uh receive phone calls all the time.  Hours all hours of the day and night for people that weren't me (laugh).

RC:    That's OK.  But all I asked was

ED:    Oh,

RC:    if your phone was on.  Your house phone.

ED:    Oh, no.  I had I had it unplugged, I believe.  (phone ringing in background)

JP:    Was there any conversation between yourself and Brian or Kevin and Brian through the window?

ED:    I don't remember a conversation, no.

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 36 of 83

JP:    Did you tell Brian to go away? You'd talk to him tomorrow? Anything of that nature?

ED:    Possibly but again, I do not remember specifically. I can see me out of frustration, yes maybe saying that but do I remember specifically saying that, no.

JP:    Are there screens on on the windows of that house?

ED:    Shew, I don't live there now. I would imagine so, yes. Because Frederica, flies are horrendous.

JP:    Well did you open those windows or have an occasion to open those windows while you lived in that residence for a year or longer.

ED:    There's marsh on both sides (laugh) of that residence, so no, I didn't open the windows very much. I mean it the marsh stunk.

JP:    So you're not sure if there's screens or not screens?

ED:    I am not positive, no.

JP:    OK. You never had an occasion to open a window because you were cleaning and had to get the fumes out of the house or something …

ED:    ….. smoke detector off a couple times. Um, again, I I'm sorry. I do not remember specifically. Would I if I had to guess, I would say sure there was screens in there. If I had to guess. But I do not remember specifically.

JP:    OK.

ED:    I'm trying to think if there's screens in my windows at the house now. The house (laugh) I live in now (laugh).

(?)    (cough)

JP:    Is Brian loud? Is he yelling? Is he screaming? Uh,

ED:    I know there was noise outside. I had someone right in front of me. Angry with me or upset with me. Yelling at me, talking to me, hollering at me. Whatever you want to call it. I mean, that's what was right in front of me. I mean yes I heard noise outside. What specifically it was, what what specifically he said, I don't know.

JP:    Why would Brian

B037

D000847

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 37 of 83

ED:     Or at this point and time, I don't remember.

JP:     OK.  Why wouldn't Brian go away?

ED:     (sigh)

JP:     You told him to go away.  You you

ED:     OK.

JP:     did plead with him to leave?  Did you tell him go away ....

ED:     Like I said, I don't remember specifically telling him that, no.  (noise) Again, if I
        had to guess, yes I probably was frustrated and said or yelled or whatever go
        away, go home or.  What was

JP:     Do you

ED:     the question?  I'm sorry.

JP:     Do you recall do you recall him giving you an ultimatum to open up the door?  Or
        he's gonna kick it in.  Gonna give you give you the count to the count of ten or
        give you a count of five?

ED:     I I don't not remember that, no.

JP:     At this point, up to this point, do you have any fear that

ED:     ( sounds)

JP:     he may break in your residence?  Was he doing anything to make you feel that he
        might come in?

ED:     No, I don't remember being fearful at all.  No.

JP:     You're not fearful at all?

ED:     No.

(?):     .......

ED:     (sounds) (cleared throat) (sounds)

JP:     At what point does the window get broken?

B038

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 38 of 83

ED:    Are you looking

JP:    Are you in bed

ED:    for

JP:::   still in the bedroom?

ED:    Right. Right. We were still in the bedroom. Yes. I do know that. Because we were basically in the bedroom the whole the whole time.

JP:    And what happened? So you hear glass breaking?

ED:    Right.

JP:    And what's your reaction then?

ED:    Shock.

JP:    OK.

ED:    Shock

JP:    And Kevin's reaction?

ED:    He he said you better call 911 now.

JP:    Is this when you called 911?

ED:    Yes.

JP:    And why did you call 911?

ED:    Well, I was shocked. At that point and time I didn't know where things were going? I mean I never foresaw them getting to that point. And like I said, Kevin still in front of me, yelling, you better call 911 now.

JP:    Well why does he want you to call 911? Is he saying is is this guy's gonna hurt me. Or he's gonna hurt you or what why is he making you call 911? Is he afraid?

ED:    You're gonna have to ask him if he was specifically afraid. I did, again, I know he was not happy. I kept telling him he'll go away, it will be fine. I'm sure at some point and time I said you don't know Brian. Alright. Well he's not not that I'm his mother and and knew him that well but I mean Kevin didn't know him at

B039

all. And so I'm trying to calm him down. Sorry, I lost my train of thought. What was the question?

JP: Why did Kevin want you to call 911? Was there some sort of fear between one and one or both of you that you had to call 911?

ED: I didn't have

JP: Why did you feel you had to call 91? You called 911 for a reason. Why did you call them?

ED: ....I mean I've said that. It he's telling me to. He's upset. He's yelling at me. I didn't know where it was going from that point.

JP: So did you feel that you needed assistance from the police at that point?

ED: Right. I mean that's isn't that what we're taught? I mean we're taught you need assistance, you call for assistance. At that point and time, him outside walking out around on my roof was was one thing. OK. But breaking my windows, you know, taking things a step further. And at that point and time obviously I wasn't going to be able to control the situation. I mean I's felt like I was getting things were getting out of hand. And and yeah, I needed assistance.

JP: So you you hear the breaking of the window. Do you hear Brian come in? How do you know he's in the residence?

ED: I never saw him in the residence. Now, I think my my thought was I mean those were small windows. I I don't think I thought he could really get through those windows. I mean I mean they're small. You've seen 'em. Not that Brian's a big guy.

JP: Well did you hear him inside the residence?

ED: (sigh) (paper shuffling)

JP: And we know he's in the residence.

ED: Right. I mean it like I told you before, its hard to know exactly what I just remembered just Christy just remembering just what she remembers. And not OK Kevin's Kevin has said this, when we've talked and Brian has said this when we've discussed it. I mean yes, now I know Brian was in the residence. I know that positively because its been said.

JP: Did you hear his voice, when he was in the residence?

D000850

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 40 of 83

ED:    (sigh)  I was on the phone with 911.

JP:    Did he knock on the bedroom door?

ED:    I don't remember that?

JP:    Did he try to did he jiggle the the was the door was the bedroom door locked?

ED:    Mmmm I I would assume it was I I don't remember.

JP:    Why why would you've locked the bedroom door?

ED:    It's kinda of a joke.  I I not a joke.  I lock every door.  I I don't care if I'm walking into my house for two seconds, seriously.  I lock the door before I walk away from it.  It's locked.  Any time I walk in a room, that door's locked.

JP:    Do you recall Brian saying anything?

ED:    I do not.

JP:    You don't recall Brian pushing in the door?

ED:    I do not.

JP:    Did you direct Kevin to sit in front of the door?

ED:    I did not.

JP:    Did Kevin sit in front of the door?

ED:    Yes.

JP:    Why did he sit in front of the door?

ED:    You'll have to ask Kevin that.  I do not know.

JP:    Well, as as Kevin was sitting was sitting in front of the door was the door being pushed on?  Was he pushing the door back to keep it closed?

ED:    I just remember Kevin Kevin sitting in front of the door.

JP:    Prior to the glass breaking, was he sitting in front of the door?

ED:    I don't remember.  I can picture him sitting in front of the door.

B041

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 41 of 83

JP:     When you're on the phone with 911?

ED:     Right. I know I know he was there at that point and time, yes.

JP:     Why do you recall that, specifically? Has to be some some reason?

ED:     Just cause I can I can picture visualize or you know picture where I was, and looking at him. And I remember …. But in my mind I can't picture

JP:     So there's no

ED:     where he was in the room prior to that. Or if or if he walked right in and just sat down in front of the door. I I do not remember that.

JP:     You don't recall Brian knocking on the bedroom door?

ED:     (sigh)

JP:     Banging on the door? Trying to get in? Pushing on the door? Anything? Yelling at the door?

ED:     Like I said, I was on the phone with 911 at that point. I (sigh) I don't I'm sorry.

JP:     Was the bedroom door damaged?

ED:     From from him? No, there was no further damage to that door after this incident. There was damage to the door prior

JP:     Now do you

ED:     ….

JP:     did did you uh

ED:     Prior to my living there…

JP:     Did you um tell Brian to leave once he was inside the residence? Do you recall yelling at him to to get out of the residence to leave?

ED:     Nnnn I was on the phone with 911. I was as far as I know I was just talking to them.

JP:     How long were you on the phone with 911?

ED:     I don't know.

B042

D000852

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 42 of 83

JP:     You said you were on the phone with them twice?

ED:     That's a little fuzzy also.  I I am not positive.  I kinda thinking yes it was twice or maybe if the conversation was so long I was able to say that he wasn't there and or nobody was there and that you know I was fine and  you know, no need for anybody.  It may it may have been two conversations.

JP:     But you're sure you're on the phone with 911 when Brian was in the residence?

ED:     If I remember correctly, the glass broke, Kevin's yelling, I turn on my phone, I call. (coughing, cleared throat)

JP:     While this is transpiring, while you're still in the bedroom, the glass is broke, um, you're starting to get on the phone with 911, uh what does Kevin do about your weapon?  Does he try to get your weapon?  Or is he does he ask you for your weapon?  Tell me about that.

ED:     I don't remember where my firearm was.

JP:     Did Kevin ask you about your firearm?

ED:     I don't remember.

JP:     Do you retrieve your firearm?

ED:     I don't remember.

JP:     According to the officers that respond to the scene uh and also on your 911 tape, you made comments that you were armed.  You had your firearm.

ED:     OK.  That I don't remember that.

JP:     But you don't remember anything?   ...

ED:     I'm not saying I don't remember

JP:     any conversation about Kevin uh

ED:     and a fire in my

JP:     looking for your firearm, asking for your firearm

ED:     No, I don't.

B043

D000853

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 43 of 83

JP:     And you don't recall retrieving your firearm?

ED:     No, I don't.

JP:     Where do you normally keep it in your room?   Or do you keep it, where do you keep it in the residence?

ED:     In in that house I had um um a closet, there was two closets in my bedroom and normally I had um in the one closet um it wasn't a normal sized closet, the door wasn't a normal size it was um probably only the door might have been maybe as tall as me, not quite.   And I had in over the hook, you know you buy them like at Walmart.   It it um you know square at the top so it sits on the I'm not explaining this very well, (laugh) on the door and then it comes down and it has has hook. And I was able to I think a little uh ….suicide straps hook, the little silver, um I think I was able to hook that over the hook and my whole belt hung there.

JP:     So you hung it in a closet.

ED:     There we go.  Thanks.  Sorry.

RM:     On the Sam Brown hook.

ED:     On the Sam Brown hook.  Thank you.

RM:     Generation gap.

ED:     Sorry.  I'm a little tired.

JP:     Were there any indication that Brian was armed at the time of this incident?

ED:     No.

JP:     Did you later learn that he was armed at during the time of the incident?

ED:     No.

JP:     Recall making any comments to uh Kevin regarding uh that he didn't want to confront Brian cause Brian would kick his ass?

ED:     I don't believe that's exactly how it was said.

JP:     Well, tell me

B044

Corporal Elizabeth C. Dempsey
TA Case # 12-04
Interviewed June 25, 2004
Page 44 of 83

ED:     I mean I'm aware I think we're all aware of what Brian's physical capabilities are. And I believe I made that clear to him that not that he would but probably that he could.

JP:     Do you recall what you told him specifically?

ED:     Specifically, no. (sniffle)

JP:     At what point does Brian leave then? Does (paper shuffling) how does he leave? I mean, you're on the phone with 911

ED:     Right. Um, I just know Kevin made me aware that he was he was not there. Uh that he believed he left or

JP:     But how do

ED:     I'm not

JP:     you how did he come to that belief? That he was gone. Did things get quiet? Did um

ED:     I remember things getting quiet. (sigh) I don't remember at what point Kevin really made me aware of that. I know at I know at some point obviously we walked outta the bedroom. But I think we were fairly clear before that that he was gone. Like I said, things got quiet.

JP:     But you don't really recall what the noise was beforehand? Whether it was screaming, banging on the door or, you can't be specific as to what what the racket was?

ED:     It was racket.

JP:     Pardon me?

ED:     It was a racket. I mean it

JP:     But you don't recall what the racket was as far as Brian yelling or pushing

ED:     Well

JP:     beating on the door or that's that's unclear.

ED:     The the pushing on the door I don't remember. I mean ... you know when he was outside I remember that yes there was some talking but again I'm

D000855

JP:    Are we talking

ED:    conversing.

JP:    Are we talking or yelling or

ED:    When

JP:    is he is he upset? I mean does he want to get in that bedroom?

ED:    I mean I could I guess I could hear his voice so I mean I guess that was louder than just have, you know, you and I sitting here having a conversation. I mean it had to go through the walls and the windows and not that the house was that insulated but

JP:    So was he talking louder than us or was he

ED:    (laugh)

JP:    yelling? I mean that that's what I'm trying

ED:    (laugh)

JP:    to find out. I mean

ED:    Again, I'm talking to Kevin. I'm having back and forth with Kevin.

JP:    And over that conversation with Kevin can you hear Brian?

ED:    I can I can yes I can hear noises outside, right.

RM:    Can I ask a question?

JP:    Sure.

RM:    I think the Captain wants to ask you and I'm less polished than he is so I'll ask you my way, does the guy on the roof sound pissed off?

ED:    Not happy.

JP:    OK.

RM:    The guy in the bedroom sound pissed off?

ED:    Most definitely not happy.

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 46 of 83

JP:     Are those two yelling back and forth to one another?

ED:     Mmmm (sigh) if so, I don't remember what Kevin said or what

JP:     When you say not happy, go ahead

ED:     Sorry, no go ahead.  No that's fine.

JP:     When you say not happy, are we uh just do you remember any of the specifics of the not happy part?  Cussing, yelling

RM:     (cleared throat)

JP:     uh or you calling you a no good whatever, I mean.

ED:     Oh, I don't I mean I don't remember

JP:     Why are you doing this to me?  Uh, I'm I'm just throwing things out.

ED:     I know.  I mean yes I think he was upset with me

RM:     Is that …

ED:     …. Um, no I don't remember ever feeling like you know he's calling me a whore, slut, if that's what you were implying. I kinda

JP:     ……I just…

ED:     ….just threw those out there didn't I.  Um, no.  Was he upset with me and the situation.  Most definitely the situation.  Does that answer part of your question?

RM:     Can I ask two questions? I'm I'm sorry

ED:     No, I'm sorry.  You asked me what he said also, go ahead.

RM:     The Captain asked you if there was exchanges back between Kevin and Brian

TAPE 3

JP:     Back on tape.  Uh tape just ran out on us.  Uh 1520 hours.  Mr. McDonald, you were making a comment.

D000857

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 47 of 83

RM:  Yeah, I was asking a question and it and the language is is is is fairly basic such that it doesn't get lost in in the translation. If Brian wherever he was on the roof, in the house, on the step, had called Kevin out. Come out here, I'll kick your ass.

ED:  (laugh)

RM:  Would Kevin had gone out there? Is that what you were afraid was happening.

ED:  (sniffle) My impression was yes, because he had made mention that (sniffle) he would go out there. He would take care of this if I didn't. And things like that. Those were the kinds of things he would say.

RM:  Now flip that question over. If Kevin had challenged Brian to come in and he'd kick his ass, was there any question in your mind that Brian would come in there and done that? Or try to do that?

ED:  That's entirely possible.

RM:  Is that what you were trying to keep from happening?

ED:  Sure. I I mean I was afraid that they were going to be (sniffle) an altercation. And like I said I I mean I never forsa foresaw .....foresaw him coming to the house. And then I never foresaw him (laugh) walking on my roof. I never foresaw him breaking my window. I never foresaw Kevin saying I'll I'll go out there and handle this. I have two guys who you know up until that point are friends who are now ready to you know or never mind, I'll save that analogy. (laugh)

RM:  Go at it?

ED:  Well that wasn't what I was gonna say.

RM:  OK. Thank you ...

JP:  It gets quiet. Um,

ED:  It's a biggie.

JP:  Do you follow Brian does Kevin follow Brian outside?

ED:  No. Well, I think I was still on the phone with Kentcom or be no at some point Kevin walked to the door and opened up the door. (sniffle) And I believe at that point and time, he said he's gone. I think before we are aware of that I think he was just verifying that or affirming that.

B048

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 48 of 83

JP:     Does Kevin go outside?

ED:     Did he actually step outside I I'm not sure. I don't remember.

JP:     Was there any confrontation outside between Brian and Kevin?

ED:     No.

JP:     Does Brian stop his truck in the roadway and start yelling at Kevin?

ED:     No. Not not that I know, no. (sniffle) I mean Kevin woulda Kevin would of said that I mean if I wasn't right there.

JP:     Does Kevin start drinking after this incident? After Brian was gone, does he start drinking? Do you have a drink?

ED:     I am almost positive I didn't have a drink. Uh, now that you say that I'm I yeah I believe Kevin I went outside to sit. And yeah I think Kevin said that he made a drink. Again, a little fuzzy. But now that you say that, yeah.

JP:     So what happens from this point?

ED:     Shew, well I mean talking feelings or physically happens or (sniffle)

JP:     As far as what happens next. I mean do does Brian uh or not Brian, does does Kevin um leave and go home or does do the police arrive or what what's what's next?

ED:     He he was in the bedroom. I went outside to get some air. And I figured this situation is done. OK. I accomplished or the situation accomplished what it needed accomplished. Brian left. That is over. You know. The assistance of actual troopers on duty were no longer nee was no longer needed. So, I went out to to sit. Get some air. I'm confused. (laugh) I'm upset. I'm angry. I'm emotional. I I didn't know which way to turn my head. I mean

JP:     Prior to the police arriving, did you tell Kevin to go to the bedroom and stay in there? Don't come out. That you were gonna take care of the situation. You'd come up with something.

ED:     I I don't know if I said I'd come up with something. I I probably said I'd take care of this. This is over. I don't remember specifically but (sniffle)

JP:     Since this incident has transpired have you had any conversation with Kevin about this incident?

D000859

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 49 of 83

ED:     Um, he came back later that night. I was in absolute no mood to talk to him. Um, mmmm he was not very nice to me. Um, I told him to get out of my house.

JP:     Why did

ED:     Again. All night long. Tell him (laugh).

JP:     Why did he why did he come to your house again after he left?

ED:     Oh, I don't I don't think he took whatever bag or whatever he had there. Um, with him when he left. And I'm sure there's probably some things he wanted to say to me. ...

JP:     But he just went home? You told him to leave so he left?

ED:     His brother in law was with him. And yeah I I I told him to leave. I mean I told him to leave a couple times but I mean yeah I guess they finally they got the hint. (sniffle)

JP:     Why don't we get ready to move on to another area. Prior to doing that, do you have any follow-up? We'll take a five minute break or

RM:     If you don't mind, yeah. Cause bout three hours ....

JP:     ....time 14 or excuse me 1527 hours.

JP:     OK. We're back on tape 1537 hours. I think prior to us going on on a break here we're talking about if you had contacted uh Kevin post incident you and you stated that he responded to your residence. Since that point, have you had any con further conversation with him regarding the incident?

ED:     Yes.

JP:     Do you recall when that was?

ED:     Um, he had called a couple times after the incident towards the end of the year. Um, and I didn't return the phone calls. Um, and I know I spoke with him in April just to give him the heads up that all this was going to be occurring. Um, and he already knew.

JP:     Why did you feel the need to call him and give him a heads up?

ED:     I didn't want him to be blind sided like I was blind sided.

JP:     And he already knew?

D000860

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 50 of 83

ED:     (positive sound)

JP:     How did he know?

ED:     Well since then I've run into a couple of things. Um, I've learned that a close
        family friend of his is neighbors to Captain Dixon. Um, he wouldn't he told me
        that's how he found out was through his family friend.

JP:     Kevin's family friend told him?

ED:     Correct.

JP:     And who's his family friend? Do you know?

ED:     Believe it's Mark Dyer. That him and uh Captain Dixon were discussing it over
        mowing their lawn. While they were out doing yard work.

JP:     Had he called any other time? Or did you call him at any other time?

ED:     Um, I talked to him, well it's been a couple weeks ago. And um give him an
        update on what was happening here. That Jane Brady was looking at criminal
        charges against Brian and I. Um, (sigh) then I spoke with him briefly um, no I
        was thinking no I'm .... I was thinking I spoke with him the day after Brian was
        arrested. But I'm wrong on that. I didn't. Sorry.

JP:     And why did you feel it was important to contact him uh regarding the criminal
        investigation with Jane Brady?

ED:     I mean the same reason that I contacted him when I knew there was gonna be an
        IA investigation. Just to give him a heads up that this is what's happening. This
        is where this is going. You probably I mean you hear first but ...you'll be
        contacted by Internal Affairs probably. And then you know you may be contacted
        by somebody else in the AG's Office. Or

JP:     Did you ask him if he was gonna come up and testify as to what occurred?

ED:     (positive sound)

JP:     And what did he say?

ED:     Um, well he kinda talked outta both sides of his mouth. (laugh) Like a politician.
        Um, I believe he said something along the lines of uh I don't want to do anything
        to hurt you. Um, but if I'm subpoenaed, I don't know I don't know if I could not
        respond or ... think he said he didn't know what his (sigh) how'd he put it,

D000861

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 51 of 83

basically that he thought a subpoena was a subpoena no matter whether he was in Texas or not. And if he was subpoenaed he didn't know if he was required to respond or not. I think he made mention that he would have to talk to someone down there. I don't if someone from his department or a lawyer or what. Just to see what his oblig obligation was. .... (laugh) ...

JP:    Did you tell him that you didn't want him to come up and testify?

ED:    I don't know if I specifically said that. (laugh) I'm ..... I mean.

JP:    Was that the purpose of your phone call, to convince him not to come up?

ED:    Oh, no. Again, I didn't want to be blind sided. I wanted to know what was going on. What his thoughts were. Wanted him to know what was going on up here.

JP:    What do you what do you think you were supposed to do when you are involved in a domestic situation? What are your responsibilities as a member of this Division? Do you know what they are?

ED:    Now?

JP:    At that time, did you know what they were?

ED:    At that time, no I did not know what they were or I don't know what they were. Um, and I wasn't necessarily classifying it as a domestic incident.

JP:    Did you at any point notify uh anyone at Troop 5 regarding this incident?

ED:    At Troop 5, no.

JP:    Anywhere else?

ED:    Well, I was made aware that Captain Hawkins knew and that Captain Hawkins would be contacting me.

JP:    Did you call did you call Brian the next morning or did he call you?

ED:    I

JP:    You stated that he called you.

ED:    I think I said I I didn't remember. I I know at some point we had or I know I was understanding the he was gonna come at some point on Sunday to board up the window. I don't know if that was decided in the early morning hours when he called to apologize. Or if we talked even later that morning. I I don't remember.

D000862

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 52 of 83

JP:    Captain Hawkins called you?

ED:    Correct.

JP:    And that was on Monday.

ED:    Right. Sometime on Monday

JP:    And that would have been the 20 sss

ED:    7th.

JP    7th. And do you recall what time of day it was?

ED:    I really don't. I'm sorry.

JP:    Um, tell me about the conversation with Captain Hawkins.

ED:    Um, excuse me, sorry. Um, I know he asked me if I was alright. I know he we
       talked that you know the window was was boarded up and that Brian understood
       that he was you know getting it fixed. Brian had taken the actual window, (sigh)
       um, to get the glass replaced. Um, I knew asked me if I was alright. If I needed
       anything else done or wanted anything else done. If I needed any other
       assistance. Um, I know I told him no. Um, (paper shuffling) he told me not
       (paper shuffling) told me everything was OK. Worry about it. Um, that the the
       situation was taken care of. Um, and not to discuss it with anyone.

JP:    Did you give uh Captain Hawkins um (paper shuffling) a synopsis of what
       occurred that night? Did he get all the information? Did he get a full briefing as
       to facts as they occurred that night from you? Did you give him a version?

ED:    (cough) I don't think we went over everything um the entire night. Um,

JP:    He didn't ask you for like we've sat down uh we've talked about this in great
       depth. But did he ask you

ED:    …..

JP:    Christy, tell me what happened that night, from start to finish. Did I mean did
       you give

ED:    From (sigh)

D000863

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 53 of 83

JP:     did you give him an account of what occurred that night in your residence?  Or
        did he just ask you couple questions like you've already said and that was it?

ED:     It was fairly brief.  It was fairly brief.  I mean I was under the understanding that
        he already knew everything.

JP:     How would he have known everything?

ED:     Because Brian told him.

JP:     Did was it your impression that Captain Hawkins knew Kevin Keller was in the
        residence when this happened?

ED:     I believe that was an assumption I made.  Um, I don't I don't remember if his
        name actually came up, specifically.

JP:     And and in your

RM:     (cleared throat)

JP:     conversation with Captain Hawkins, you never brought  up the fact you never
        brought up the fact that Kevin was at the residence when this transpired?

ED:     I don't believe so.  Like I said, I was under the assumption that he he knew what
        had occurred.

JP:     Just from Brian?

ED:     Right.

JP:     Did did Captain Hawkins ask you if you wanted to have Brian arrested?

ED:     (sigh) I don't I don't know if he posed it exactly like that.  Um, I think he said is
        there anything else we need to do or anything else you want done.  I think it was
        kind of said …. that way.

JP:     Inferred that that's what he meant then?

ED:     (sigh) Right.

JP:     Did it seem to  you that Captain Hawkins didn't want to pursue this?

ED:     Did not?

JP:     Did not want to pursue this.

D000864

ED:    Yes.

JP:    How so? I mean

ED:    Mmm ... see how I put in into wor um, I mean he didn't ask me a lot of questions.
       I mean he was just kinda like you know you're OK, Brian's OK, the window's
       OK. You know, anything else you need done, want done. Um, I mean he he
       told me not to talk about it. And that everything was fine. I mean it doesn't
       really give me the impression that he wants it to continue or .....

JP:    Did he make any attempts to pursue

MD:    Pursue is this word.

ED:    Pursue

JP:    Did he make any uh attempt to talk you out of having anything done as far as far
       as uh, maneuver you around to having him arrested or anything like that? Try to
       coach you to say ... we'll take care of this, we'll you don't worry about it. It will
       all be OK. Or or that was just you were satisfied, that you didn't want to do
       anything and that wasn't it didn't it didn't have to be pursued by Captain Hawkins
       as far as talking to you out of wanting him to be

ED:    He did not have to talk me out of

JP:    Right.

ED:    not wanting something done. There OK.

JP:    Thank you.

ED:    (laugh)

RC:    Did did Captain Hawkins every ask you the question what happened?

ED:    I I don't believe so. I

RC:    And did he ever mention to you about a report on this incident or how the report
       was gonna be resolved?

ED:    (sigh) I don't I don't believe so.

RC:    OK. I mean you've been pretty clear beginning of your statement

D000865

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 55 of 83

ED:   Right.

RC:   right now the basically the questions that Captain Hawkins asked you.

ED:   Right.

RC:   And that's why I'm just ddd you didn't mention anything about a report. I'm just asking you if you recall him saying anything to you about, you know, we'll take care of the report or if there was any mention to you about a report.

ED:   And and that becomes a little fuzzy because (sigh) I was relayed information. I know Brian and I discussed it. So, I don't remember if Captain Hawkins specifically told me on the phone on that during that conversation that you know it it would be cleaned up. But um, you know, somebody in CI would be you know, just writing us up on that report or whatever on to to clean it up. And and

RC:   Are you trying to say that you you've you've since discovered that but you don't know if Captain Hawkins said anything ....

ED:   Specifically said it me.

RC:   on that day.

ED:   During that conversation, ...

RC:   Did anyone else call you about the report? Anyone from the DV unit? Any sergeants?

ED:   (negative sound) No.

RC:   The initial officers that read the first report? Did any of them ever

ED:   No.

RC:   call you with

ED:   No.

RC:   follow up.

ED:   No.

RC:   OK. .... (paper shuffling) When when Captain Hawkins said to you um and again you you're real consistent on this, uh you said beginning you've just

D000866

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 56 of 83

repeated it again, that he said to you uh, not to talk it, nobody needed to know. How did you take that? What do you think he meant by that?

ED:    That (laugh) I didn't need to talk about it. Not I mean, not to discuss it with anyone. It was

RC:    Meaning that

ED:    And

RC:    Meaning that he .....

ED:    I mean that was a (sigh) that was a personal situation that I unfortunately felt the need to have assistance in route in case it got out of hand. ... But underneath all that, it was still a personal thing, a personal situation. It it was not (sigh) work related. I mean, yes this was someone I knew from work. And unfortunately had to call co-workers but it was not work related. And for him to say that, don't talk, you don't need to talk about it, and it's done, that's all I wanted. The situation was over. The situation was over and that was all I wanted. Was my personal life to go back to just being personal.

RC:    OK. Did did the thought ever occur to you that you needed to notify your supervisor of this?

ED:    No.

RC:    ... was

ED:    It di

RC:    was there any discussion with Captain Hawkins at that point, where he said when when you said you don't need to talk about it, nobody needs to know. Did he expand on that and say Christy, you don't have to tell your supervisor about it, you don't have to tell your administration about it, you've told me and we've taken care of it? Did he ever expand on that?

ED:    Not, no. It was pretty cut and dry. As I remember it that it's taken care of, we don't need to talk about it.

RC:    OK. Did he ever mention that um, you know, he had passed it up the chain and he had gotten their blessing on that?

ED:    That is again fuzzy for the same reason that information was relayed to me by Brian. And I don't know if I just know it from Brian or if Captain actually said it.

D000867

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 57 of 83

RC:    OK. Can you put

ED:    To to me.

RC:    Can you put Brian's information into the timeline and then tell me what Brian told you?

ED:    Oh,

RC:    If if Brian told you something to answer the question I just asked you about when did he tell you and then what did he tell you. ....My question was

ED:    No, it's fine.

RC:    Did the Captain

ED:    I got it.

RC:    assure you that he had already passed this up the chain and they're OK with this, don't talk about it, no one needs to know?

ED:    Brian had a conversation with the Captain in front of me on the phone. So, I didn't hear Captain's side of the conversation. That was Sunday. Late morning, early afternoon. (sigh) Brian then assured me and and Brian's side of the conversation was do you want to talk to her, I am here with her now, I'm fixing the window. Um, Brian relayed back to me that no, he will talk to you on Monday. Um, Brian also relayed other information to me after after the phone call after the phone call ended. Um, that it was it was taken care of. Um, I believe the Captain had talked to um Sergeant Houdek the night before um morning before, I guess. Um, that he'd spoken with um, Major Hughes um and again just that that it was taken care of and and not to talk about it. That things were handled, were being handled.    And that everything was fine.

RC:    And that was ssss

ED:    That was Sunday.

RC:    Sunday, so Brian's at the house, gets off the phone, and then he he explains to you what what he heard on the phone.

ED:    Cor correct.

RC:    But you couldn't pick up from what he was saying?

ED:    Right.

*B058*

D000868

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 58 of 83

RC:   So, he explained all that to you. Um, you spoke to Captain Hawkins the next day. Was that on the telephone?

ED:   (sigh) Yes.

RC:   I'm not sure if we verified that.

ED:   Yes.

RC:   OK. Did you ever have a face to face with Captain Hawkins?

ED:   No.

RC:   OK. So it was resolved on Monday on the telephone with Captain Hawkins?

ED:   Correct.

RC:   OK. And then that's when he made the comment at the end after he checked on you, asked if you wanted anything else done, OK, don't talk about it, no one else has to know about it.

ED:   Correct.

RC:   OK.

JP:   Captain Hawkins never mentioned to you anything about domestic incidents? Sworn members? Any of that, anything of that nature?

ED:   I'm sorry. (sound)

JP:   Did Captain Hawkins ever mention to you about having this report this reported to Internal Affairs?

ED:   No sir.

JP:   Do you know why this incident was never investigated by Internal Affairs until now?

ED:   Wwww (laugh) I mean I can make some assumptions. But I mean

JP:   What would your assumptions be?

ED:   Well, I mean, first and foremost, that you (laugh) guys didn't know about it. .... Mean that it was never passed on to you.

D000869

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 59 of 83

JP:    Do you know

ED:    I know that may sound kinda simple but

JP:    Do you know if that in fact is true?

ED:    No.

JP:    Alright. Let me get into the specifics of the 911 call. Um, I'm gonna start asking some questions. If you feel a need, uh we may go back and play the tape if you need if you need to hear it. Um, I gonna just play that by ear. Is that OK? Um, when you reported in the 911 call that someone had broken into your residence. Is that correct? Or do you want to listen to the you wanna listen to

ED:    I was gonna say, I

JP:    I'm gonna before asking any questions just to give

ED:    Yeah, cause I don't know if

JP:    you a chance to you may have to listen to it, it's not that long so you may want to listen to it once or twice.

(?):    OK?

LISTENING TO 911 TAPE  (not audible)

RM:    Its good to know the tapes at the Comm Center the same are the same usual quality.

JP:    Well it's a tape of what he did was he actually they can send it via the internet and its

(?)    ....

JP:    very clear.  Um

(?)    Kentcom ...

JP:    but when we copy it it gets turns into that, so.  That's the best we could do in this room.  (sound of tape recorder rewinding)  Do you need, do you want to hear it again?  Follow through with the uh transcription?  Or you good to go?  Or?

ED:    I ...know I could probably ... the transcription, it's fine.  If

D000870

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 60 of 83

RC:    No, it's up to you.  He's asking

ED:    Oh, oh,  (laugh)

RC:    He's asking if you want to hear it again or you just wanna keep that as a reference
       or?

ED:    I can keep that as a reference.  (paper shuffling)

JP:    And so you reported that someone had broken in your residence?  Correct?

ED:    Correct.

JP:    OK.  And you were asked by the dispatcher, are they in your inside your
       residence and you responded, I think they've left.  The dispatcher states, you
       don't have a clue who it was, and you responded, no, correct?

ED:    Correct.

JP:    Even though at that time you knew that Brian was the one who had broken in your
       residence?  Is that correct?

ED:    Correct.

JP:    So why did you um tell that to the dispatcher?  When if fact you knew Brian had
       was the one who broke in your residence, why didn't you say, yes, I know who
       did it?

ED:    Like I said before I was confused, hurt, angry, mad.  I didn't know what to do.

JP:    The dispatcher goes on and asks you how many people were in the residence.
       And you responded there was just one.  Now, I want you to think about that.  Are
       you talking about you were home alone at the time or just one person broke in .....
       when you responded one, did you mean that you were home alone or did you
       mean that that you were (noise) that one person broke into your residence?

(?)    Did you find it?

ED:    (positive sound)

(?)    ......

ED:    It's OK.  Mmmm Well the way it, I mean the way it's written here when when
       you played it back, the way I took it when we're just what she said, I thought she

D000871

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 61 of 83

said how many people were in the residence. And this this says how many people in the residence. I I actually thought she said how many people were in the residence. So, this point and time I take it, how many people were in the residence, like how many people broke in the residence.

JP:    So, you're saying how many people broke into the residence?

ED:    Correct.

JP:    And your answered one?

ED:    Right.

JP:    OK. That's what I wanted to clarify…. You also made the statement to the dispatcher that he came in to the house, correct?

ED:    Right. I I don't see it actually on here but yeah, I believe I remember hearing that, and you're saying that now, so. … Uh, that's drive away.

JP:    And then confirm the second time that the person had entered your residence, correct? So, you you confirmed that several times that somebody had broken into your residence?

RC:    Might be on the first page.

ED:    Right. (paper sounds) OK.

JP:    Now, I want you to make sure, these are very im this very important, so I don't want you to just take it for granted …

ED:    She says are are they in your residence, or are they in your inside your residence. I I said I think they've left. Mmmm (paper shuffling, somebody sneezes)

RM:    (cleared throat)

ED:    Oh, did you hear someone inside the house. And I say, he came in the house. And she says, he came in the house, and I said, yes.

JP:    Prior to the police arriving at your residence at that at that time, after the 911 call was placed, did you did you and Kevin discuss anything as far as what you were gonna tell the police?

ED:    I don't remember.

JP:    Did you ask Kevin to leave at that point?

D000872

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 62 of 83

ED:   Mmmm I don't know.

JP:   Did you just direct him to the bedroom and say go to the bedroom and shut the door and don't come out?

ED:   Like I said before, I don't know if that's exactly how I put it.  I just remember feeling like I need space.  I need to be away from everybody.  Now this is over, (laugh)

JP:   Were you mad at Kevin because he he made you call 911?

ED:   Oh, sure.  (laugh)

JP:   And now the police were there and now

ED:   Now they were coming and still, again, I have absolutely no control over the situation still.  Everybody else (laugh, sigh) frustrated, there's a word for it.

JP:   So, you not don't recall how you told him to get to the bedroom or if you told him?  But he ended up in the bedroom with the door closed when the police arrived?  Is that correct?

ED:   Correct.

JP:   OK.  Did you ever tell him or any did you ever allude to him that um, that you were going to try to take care of this matter.  And you might have to to sway the truth a little bit to to resolve the matter?

ED:   I don't remember really what I said to him after I hung up and was waiting.

JP:   Who was the first trooper to arrive?

ED:   Pretty sure Trooper Argo.  Yeah, I believe Alex was the the first one there.

JP:   And do know know him?  How did you know him?

ED:   Went to high school with him.

JP:   Did you go through the Academy or anything like that, no?  What did you tell him?

ED:   I know I told him that things were fine and that … everything was taken care of and you know, he could leave.

D000873

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 63 of 83

JP:     Did you give the impression that you didn't want him to be there?

ED:     Yes.

JP:     Did he appear to want to come up and investigate?

ED:     (sigh) I think Alex I mean, yes, I I think he probably was a little confused.  Mean
        he was I don't even think at that point, he was a TFC.   You know.   Just kinda got
        the impression he didn't know exactly what to do.

JP:     And why's that?

ED:     … He just kinda stood there. (laugh) And I'm telling him, you know,
        everything's fine.

JP:     Did you tell him what happened?

ED:     I don't remember exactly what I told him, regarding the actual incident.

JP:     Would you say you're trying to be give him as little information as possible.  Just
        wanna be get rid of him?

ED:     Did I say that?

JP:     No.

ED:     Oh.

JP:     I'm just saying, is that what's going through your mind is you

ED:     Oh,

JP:     really don't want the police to be here so are you getting him you're not giving
        him a blow by blow description as to what occurred …. Are you giving him
        minimum information to minimize what occurred so he would leave?

ED:     Correct.

JP:     But you don't recall specifically what you told him?

ED:     No.

JP:     Cause I don't I don't want to put words in your mouth. ….

ED:     No, that's a very good

B064

D000874

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 64 of 83

JP:     ... trying to get you

ED:     I'm not always the

JP:     I don't wanna I don't wanna put words in your mouth. I want you to tell me
        what you ...

ED:     I remember feeling like this is done. I do not need him. I do not need any
        troopers here. Troopers in uniform actually working. I do not need them here.
        They need to go away. And remember I probably was even using my.... You can
        leave ....

JP:     The other troopers arrive shortly thereafter then?

ED:     I think we were down in the I think we were down in the driveway at that point
        and time. I think we had gone down the steps.

JP:     Did you say you were re reluctant to to cooperate with the investigation? Or just
        cooperate just in general .....?

ED:     Oh, I was rr

RM:     Are you OK? Sorry.

ED:     I was reluctant to be talking to them period. Sure, I I was embarrassed. I mean
        here's somebody not (laugh) not only co-workers but I mean Chappa was my
        classmate. I mean he's 295, 296, I mean we stood next to each other the entire
        Academy. And and then Alex, I mean I went to high school with him. He was
        friend of mine..... couple years older. He's a friend of my brothers. I'm (laugh)

JP:     So you knew you knew these guys then?

ED:     Yeah. I mean Gygrynuk I didn't know very well I he had never been very
        (sniffle) pleasant around me when I did work at Troop 3. I mean

(?)     Or anybody ....

ED:     it wasn't like I mean not that he has to be all warm and fuzzy but I mean he was
        never (sniffle) somebody that I'd had a conversation with. I mean my impression
        of him always was he's very gruff. And, you know, the that's not me. I'm the
        warm fuzzy kinda person. So, I I mean here huh here I just had a personal
        incident. My private life and you know, I'm like laying there like a dead deer
        with my guts out. I mean I I didn't want to I didn't want to have to explain that to
        them. (sniffle)

D000875

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 65 of 83

JP:     Do you now you stated that you knew knew the troopers I don't know how well
        but you you they were you were acquainted with them. And and comfortable
        with them and you you didn't have any problems with them or anything like that.
        Gygrynuk you kinda ...

ED:     (laugh)

JP:     little gruff and

ED:     Right. Right.

JP:     Um, with that being said, um, what did do you think think it would have been
        possible to tell one of those one of the two officers, maybe Chappa since you
        were a classmate that this

ED:     (sigh)

JP:     this is what happened tonight. This is really embarrassing but did did that occur
        to you that maybe I should just ask to talk to him alone and tell him what
        happened to get this all out in the open? Or

ED:     No.

JP:     did you just that's what I'm trying to figure out here.

ED:     It

JP:     I I'm just asking the question.

ED:     Oh, oh, I know. I know. No. No. I was if I could write embarrassed in great big
        huge letters and put 50 exclamation points after it. I was embarrassed. (sniffle)
        To to have to to have been put in that situation by and I consider it by two people
        that I cared about. You know that were my friends that I I knew. I mean, it
        wasn't probably everybody in this room may dis disagree with me. And and I'm
        not saying it wasn't Brian's fault but I was put in that situation by both of them.
        (sniffle)

JP:     By both Brian and

ED:     Brian and Kevin

JP:     OK.

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 66 of 83

ED:     I mean yes, Brian you know 95% of it was him but I mean Kevin's yelling at me.
        (sound) I mean huh I was embarrassed. I was pissed off. I was angry. I was
        hurt.

JP:     I'm gonna go ahead and change tapes. 1615 hours.

TAPE 4

JP:     It's 1617 hours back on tape. Christy, um, getting back to um, at this point, up to
        this point um, with Brian coming to your residence and and knocking on the door
        and and coming into the residence, and breaking the window, every all everything
        that went on, you hadn't done anything wrong, correct? I mean, had you done
        anything wrong?

ED:     Well, no. But, I mean, that doesn't mean that you know in some way you don't
        feel like that. I mean, you know, why why is this happening to me. Why is this
        happening? What, you know,

JP:     Like

ED:     But I mean no, technically, no I hadn't done anything

JP:     Up to this point

ED:     wrong.

JP:     you're basically a victim. Correct?

ED:     Right.

JP:     OK. So, the police arrive and and two of the troopers that you knew now are
        there uh and you do know them, one's a classmate. Um, you hadn't done
        anything wrong at this point. Um, why not instead of becoming evasive, why not
        why not come out and say this is what happened tonight.

RM:     (cleared throat)

ED:     (sigh)

JP:     Other than ...

ED:     I I know you're just asking a question.

JP:     other than being embarrassed. I know you

B067

D000877

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 67 of 83

ED:    You're not

JP:    I know. I understand that. I understand that. But I mean is is the reason that
       you're not coming out and saying because you're trying to protect Brian?

ED:    I'm trying to protect myself.

JP:    From

ED:    I know you're just asking a question (laugh). Everybody knows answer.
       Delaware State Troopers are notorious for running their mouth. Any little piece
       of information somebody knows, it's out there. Its out there for the entire state to
       know. If I had said hey, I'm Christy Dempsey and I'm up in my bedroom with
       one guy and another guy's out crawling around my roof. I mean, I know what the
       rumors are now. Unfortunately, it has gotten out. And that's exactly what I was
       trying to avoid. I I know I can't believe you guys haven't heard the rumors. I
       mean that's how this, all that started again, it's people running their mouth.
       (sniffle)

JP:    OK.

ED:    I knew exactly how it would look. Christy's a big slut. You know, she's up with
       one guy and another guy is out there and I mean it'd be all well and good for you
       guys or Bob to be up having one woman in your room and another woman
       beating. I mean that's just great. That's great for you guys. That's makes you a
       stud. Well, it makes me a Goddamn whore. And no, I did not want people that I
       worked with (sniffle) knowing what happened. It was embarrassing. (sniffles)
       .....

JP:    You OK? I know this tuff, but I gotta ask the questions. Sorry but I have to ask
       the questions.

ED:    (sniffle) I can tell you how embarrassed I was.

JP:    I think.

ED:    I can

JP:    I think you've uh ...

ED:    No, I can sum it up really really well. Kristen Holemoe is my best friend in the
       world. (Tape becomes filled with static) She is I don't' know where I'd be today
       without her. She has meant the world to me. And I did not tell her this
       happened. That's how embarrassed I was. (sniffle)

D000878

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 68 of 83

JP:     Now I'm gonna go through the um actually we're getting to the end. Believe it or
        not.

ED:     Oh thank God.

JP:     Um,

(?)     ....

JP:     I gotta I gotta go, this is actually we're getting to the to the meat of the matter
        now. Regarding the

(?)     …..

JP:     Why don't we take a five minute break. Cause ….. this rain coming down.

ED:     ....

JP:     It's 1622 hours.

JP:     Back on tape. It is 1637 hours. Um, we're gonna try to continue with this
        interview, even though the rain's not cooperating. Um, Corporal Gygrynuk in his
        report, he inquired from you if you were home when the this incident occurred.
        And you replied, now I'm taking a qu direct quote from the report, and I can
        supply you with a copy of the report if you wish. Do you want a copy?

RM:     No.

JP:     Um, no I came home and found the glass on the floor and noticed the broken
        window. Do you recall making that statement?

ED:     No.

JP:     ....

ED:     No.

RM:     You don't recall or you didn't make it?

ED:     I didn't make it.

JP:     So, if you didn't make that statement, then you're saying Corporal Gygrynuk
        fabricated that statement?

D000879

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 69 of 83

ED:   Well, (laugh) I mean I'm not gonna sit here and call Corporal Gygrynuk a
      fabricator or a liar. I mean he very well may have forgot what I said and or just
      took what I said or actually, he wasn't even there for like I said Argo was there.
      And then Csapo was there. And Argo went to walk around. Gygrynuk wasn't
      even there for part of the conversation. I don't know where he would get that
      from.

JP:   Do you recall him asking if you had boyfriend?

ED:   Yes.

JP:   And your answer was?

ED:   No.

JP:   You didn't consider Brian your boyfriend at that time?

ED:   No.

JP:   You were also questioned initially by the troopers if there was any else anyone
      else present at your residence, uh, at the time of this incident. Is that correct?

ED:   I don't remember that.

JP:   According to the reports, um, you were as you were asked if there was any else
      anyone else present at your residence. And you told them no. Um, Keller was
      later in fact found in the

ED:   Keller was not found. If the way you're saying it is implying that you know
      they went through my house like an Easter egg hunt and found him. That is not
      how it happened. Something I believe was was said about him and I said, he's
      upstairs. Because we downstairs in the the parking lot of our parking lot
      driveway, if I remember correctly. And Gygrynuk took it upon himself to walk
      up into my house, without me. And went into my bedroom, without me.

JP:   And why did he do that?

ED:   Because I had said Kevin was up there.

JP:   You were also questioned about the suspect gaining entry and you responded that
      the window was broken but no one gained entry.

ED:   Is that, I'm sorry.

B070

D000880

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 70 of 83

JP:    You were questioned by the troopers about the suspect whether the suspect gained entry and you responded the window was broken, but no one gained entry. Is that correct?

ED:    I I don't recall saying that, no.

JP:    If I told you I had three troopers that I've interviewed and they've told told me the same thing, would that change your mind?

ED:    No.

JP:    You were questioned about who may have damaged the window. And you told the troopers that you did not know who may have broken the window. Is that true?

ED:    I believe what I said the entire time was that I did not see who did it. I did not see the person who did it.

JP:    Well what was your intent with that answer? Were you trying to avoid the question? Or with a technicality? Or were you just not telling the truth?

ED:    I I was telling the truth. I did not see who did it. I did not see the person who did it.

RM:    The other part of the question was were you trying to avoid answering the troopers questions.

ED:    At that point and time, I had told them they were not needed. At that point and time, they insisted on questioning me. They insisted on still being there. I was trying to get out of the situation. I was trying I was trying to not give them as much information as maybe they wanted.

JP:    Did you understand at that point though they had a job to do. Even though you did not want them to be there. They were put in a situation. That they probably didn't want to be there also?

ED:    Did I understand that, sure. Because that was the same situation I was in.

JP:    Did you understand that they had a job to do. And they had to ask certain questions. Just like we have to do that today? We have a job to do. Whether it's pleasant or not. We have to do it. Did that enter your mind at all? (paper shuffling)

ED:    Did that enter my mind. It entered my mind that it was my house, it was my situation. And at that point and time, I had had no control over it. I was still

D000881

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 71 of 83

continuing to have no control over it. I was embarrassed. I was upset. And I wanted control back over it. Over my situation. I wanted these men, these people, these troopers, Kevin, Brian, I wanted them all away from me. Cause it at that point and time, I had had enough.

JP:    Did you tell the troopers that were there that you that you called Kevin after the incident occurred and have them to respond to the residence?

ED:    That I believe I did say, yes.

JP:    And why did you tell him that?

ED:    Because again, I didn't want them knowing that I had a guy up there. I knew, you know, they would start adding two and two and getting 5 and 9 and 15. And I didn't want them knowing anything about my personal life. The situation was over. I had gotten the result I needed. That being Brian away from my house. Away from me. My next step was to get troopers away from me. And then my third step was going to be to get Kevin away from me. And eventually, that's what I accomplished.

JP:    Even if it meant not telling the truth?

ED:    Not not telling the whole truth. But answering their questions.

JP:    Looking back at your actions that night, would it be fair to say that you didn't tell the truth? To to some of the officer's questions and dispatchers in the who were involved in this incident?

ED:    Yes.

JP:    And I think you've pretty much explained the reasons why.

ED:    Well, I I I mean I hope that's understood. (Laugh) I

JP:    Well, I I I

ED:    I mean maybe you don't agree with it. That that's fine but.

JP:    I understand. I understand.

ED:    OK.

JP:    Yes. I (writing sounds) I wanna clarify um one of the statements that you made in Sergeant Hudson's interview back in April. Um, he had asked you during the questioning whether Brian was in fact inside the residence. And he asked you

D000882

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 72 of 83

(loud rain sound) that's in quotes, And you are not sure of whether or not he entered your residence or not. Is that correct? And you responded, correct.

ED:   You want me to explain

JP:   Yes

ED:   why I said that?

JP:   Yes.

ED:   Well, the door was closed. I did not see him. I mean, the window breaks, I'm calling 911, up until that point, there was noise around outside, there was noise going on. Kevin yelling. Things are going on. I can not be positive that Brian was absolutely I can not say with absolute certain that Brian was inside the house.

JP:   And you maintain that today?

ED:   Yes.

JP:   Even though you earlier stated that there was quite a racket?

ED:   There had been quite a racket ever since he had been there.

JP:   But you couldn't tell if that racket was still outside or inside the residence?

ED:   Correct. I was on the phone.

JP:   Well, it appears to me from the phone conversation with 911 dispatch that I don't hear Brian yelling in the background. It sounds to me that you're yelling at Kevin to get back in the residence. Is that correct?

ED:   I think at some point, yeah.

JP:   Pretty much

ED:   I mean I

JP:   Pretty much the beginning.

ED:   OK.

JP:   So that tells me that Brian's already gone when you're on the phone with 911.

ED:   I couldn't remember the phone number. I do remember that.

B073

D000883

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 73 of 83

JP:    You couldn't remember the phone number?

ED:    (positive sound) I didn't call 911.

JP:    Oh, you called the 4865 or 4863

ED:    3

JP:    whatever it is.  OK.

ED:    And I had to turn on my phone.

JP:    But the fact of the matter is at that point, you're telling the dispatch center that
       somebody had broke into your house.  So you told them that somebody broken in
       your house.  But then you're telling the troopers and then you're telling Sergeant
       Hudson that you're not sure.    When at that time, when it just occurred, when it
       should have been fresh on your memory, cause it just occurred, you're saying, yes
       he was in my house, that is correct.  They asked you twice as a matter of fact.
       And then later when the troopers arrive, you're evasive and then the Sergeant
       Hudson statement, you're again evasive.  And that's what I'm trying to clarify.

ED:    Well, ......

RM:    Oh, I'm sorry .....

ED:    (sounds)

RC:    Christy, we understand that night your reason for not wanting to tell the troopers
       what happened.

ED:    OK.

RC:    But that's not the issue today.  The issue today is that we have an investigation
       here just as Detective Hudson had an investigation.  If you made those statement
       to a dispatcher at that time, you can read your own words or we can play it again

ED:    OK.

RC:    The the simple thing I'm saying, someone broke into my house, it's not someone
       broke my window, someone broke in to my house.  Which is implying that
       someone made entry.  And you've heard these statements yourself as an
       investigator.  And then on the next page you you simply said that they were in the
       house.  The dispatcher even (paper shuffling) clarifies it with you.  They came in
       the house and you said yes.  Now it now it looks like you're trying to protect

D000884

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 74 of 83

Brian. The first night you told us that it was it was yourself. It was your embarrassed .... reputation that you were trying to protect. But now by avoiding these questions or or suddenly you you can't recall things, it looks like you're trying to protect Brian. And what we want you to do is we want to impress upon you that it's important that you're forthcoming, your straight forward with these answers, at this point. OK?

ED:    OK.

RC:    So don't don't make these questions more complicated than they are.

ED:    OK.

RC:    OK.

ED:    Sorry forgot where exactly where we were. You you asked me, I said what to Sergeant Hudson and and then this on the tape.   And

JP:    I'm what I'm

RM:    (cleared throat)

JP:    trying to fff to find out is trying to hone in on this fact whether Brian was in inside the residence or not. You you state to the dispatcher right up front when it occurs, or as you say he's on the phone. If you're on the phone when Brian's in the residence with the dispatcher and you say

ED:    (sigh)

JP:    he's breaking in he's broken in to my residence, um, you have the exact words

ED:    Right.

JP:    and they're not right in front of you at this point. Um seems to me that he's broken into your residence or he's done something to make you aware that he's inside your residence.    Yet as time goes on, you're not sure. And I I don't understand. That's what I'm trying to clarify. Was he in your residence or not? Because you're saying to the dispatcher that he is, then you tell the troopers that uh the window was broke but nobody got inside. Um, then I'm not sure if anybody was in the residence. And then when Sergeant Hud Hudson interviews you in April, you tell him that you're not sure whether in fact he was inside or not.

ED:    Well. At that point and time, I did not have this. When I was interviewed by Sergeant Hudson. OK?

B075

D000885

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 75 of 83

JP:    (positive sound0

ED:    That was six months after the incident.  Six months after our I was completely
       sober.  And now we're eight months.

JP:    So, (laugh) I understand there is a time lapse and everything, but

ED:    So it's very difficult

JP:    It it

ED:    to remember exactly what happened.  I mean the window broke.  Window broke.
       Kevin's yelling at me.  You better call 911 now.  So I grabbed my cell phone.
       Trying to turn it on, Kevin's still yelling at me.  Trying to remember the number.
       I finally get them on the phone.

JP:    But my point is is during that conversation with 911, I don't hear Kelling Kevin
       yelling at you.  I hear you yelling for Kevin to come back inside.  Which means
       that that that commotion is already over with.  That it's gotten quite.  He's left.
       Uh, maybe it maybe during the time that you were getting your cell phone out and
       turning it on and and remembering the number, he had left.  But all that is was
       over and now you're telling when all was quiet, you're telling the dispatcher that
       yes, someone broke into my residence.

ED:    I mean it (sigh) I guess all I can say to that is that emotions are running wild.
       Everything had as you're saying I guess, everything was as  you're looking at it as
       everything was was over.

JP:    Well, it had quieted down.  I'm not saying it's over, but

ED:    Right.

JP:    things had

ED:    Right

JP:    ...

ED:    the win the window was already broke.  You're you're right.  I didn't start trying
       to call until I guess the the window was broke.  And now, I'm on the phone.  I've
       already called.  Have them on the phone.  What what do you say?  Yelp, never
       mind, I'm sorry.  (laugh)

D000886

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 76 of 83

JP:    Well you know as a trooper, that happens all the time. We have 91 dis
       911disconnects or people say oh

ED:    That that is true.

JP:    ...now

ED:    That is true.

JP:    But you didn't try to do that. You you said that somebody broke into my
       residence.

ED:    Forgive me for being a little emotional and a little I don't know what to do.

RM:    Can I ask a question?

JP:    Sure.

RM:    I read the tape. It's the first time I've seen it. And I understand you're telling
       everybody here that you're emotional and your upset. All that seems to make
       sense and reasonable. He came in the house. You responded he came in the
       house. And they've got a period so it could be a question mark. But at at that
       moment, whether you were actually aware of it or not, do you have because it's
       then and now, do you have the impression that Kevin could be in the house?

ED:    Brian could've been in the house?

RM:    ....Brian, Kevin's already there, I'm sorry. Now I'm doing it. That is is there
       something that gives you cause you're like upset .... You have some impression
       that he was in the house. And if you and if that's why why do you think that?
       ...lead you a little bit.

ED:    ....

RM:    door open when you opened your bedroom door? Is is something kicked over? Is
       there mud stains across the rug or something?

ED:    Oh, well, there there's glass everywhere.

RM:    But do you understand what the Captain's asking you? And frankly I don't care
       what you tell the troopers. I don't even, the Captain has a different point of view.
       But what'd you tell Kentcom? What made you think that he was in the house?
       Whether ....side walled him or not. What made you think he was there?

ED:    Kevin believed he was in the house.

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 77 of 83

RM:    Kevin say that to you?

ED:    Uh, yeah. I believe so.

JP:    And why did what what made him think that. Uh, and I know you can't get in his brain

ED:    ....

JP:    but was something going on to make him think that?

ED:    I don't know if he assumed the the glass breaking meant he's coming in. And came in.

RM:    And at some point later, Brian told you he was in the house?

ED:    (positive sound)

RM:    You have to say yes or no.

ED:    I'm sorry, yes.

JP:    Do you recall one of the troopers lifting fingerprint off the front storm door?

ED:    I thought it was off the window.

JP:    Off the bedroom window that broke?

ED:    The the window that broke. That was actually the living room window but yeah.

JP:    OK.

ED:    I that's where I thought it was it was from. And again that may just be bad memory.

JP:    Were you out on the roof when he lifted the fingerprint?

ED:    (sigh) I walked out on the roof with Csapo. I I can't remember. I'm sorry. I

JP:    Do you recall the screen the screen from the window laying on the on the roof anywhere?

ED:    I don't know.

D000888

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 78 of 83

JP:    You read the report on that Csapo and Gygrynuk and Argo and

ED:    (cleared throat)

JP:    I think that was all that that submitted

ED:    (sound)

JP:    supplements to this incident, correct?

RM:    There was a supplement from a Sergeant I saw too.

JP:    Uh, Mullett. Sergeant Mullett.

ED:    Right.

JP:    You had an opportunity to read those reports?

ED:    Right.

JP:    OK. So you know that there was a fingerprint that was lifted from the scene? Correct?

ED:    At this point and time, I don't remember specifically reading it. But if you say it's in there. Yeah, I guess I I read that, yeah.

JP:    Um, you are aware that a print was lifted? Correct? I'm gonna, you've read

ED:    Now

JP:    the report

ED:    Right.

JP:    I'm gonna ...

RC:    ....say you thought it was lifted from the window.

ED:    Right. I know information now that

RC:    ..... this conversation

JP:    There was a fingerprint lifted

ED:    Right.

D000889

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 79 of 83

JP:     somewhere. OK. Um, do you have any knowledge as to what happened to that fingerprint?

ED:     No.

JP:     You haven't heard anything? Any rumors? Or what happened to that fingerprint?

ED:     I've heard the rumor that it is MIA.

JP:     And that's all you you don't have who took the fingerprint?

ED:     No. Not at all.

JP:     Any follow-up?

RC:     Just one. Um, knowing that or at the time maybe you didn't think about it, but um what you told the dispatcher when you were in need of assistance, what you told the troopers when

ED:     ...

RC:     you wanted to take control of the situation again, um, is different. The scenario you created for the troopers was basically that an unknown subject has broken your window and tried to break into your house. When they left and the took Kevin, did you give any thought to what you had just created as far as you are a victim of a burglary by an unknown suspect and what course of action you could have put in place as far as searching the area for a suspect or alerting the neighbors that there was a burglar on the loose that's breaking into the house of a young lady. Had you had you given any thought as to at some point this report was gonna was gonna grow into the point that someone was gonna have to come back and do follow-up and there was gonna be more to it? Had you ever

ED:     I don't believe

RC:     sat there and thought about that?

ED:     I I don't believe that when the when the troopers were there and I thought they were taking it as a criminal mischief. That someone had broke my window.

RC:     But didn't you discuss that someone had been on the roof? Someone was beating on the door. And then someone was on the roof? And then someone broke a window?

ED:     I don't believe so, no.

D000890

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 80 of 83

RC: No?

ED: No.

RC: OK. OK. So the

JP: I

RC: so the scenario I laid out, you never thought about? What I just said about did you ever think that this was gonna go

ED: Oh, mmm

RC: any further? Before Brian Mayer called you and said I just called Captain Hawkins. That that's what I meant and that and that window, did you ever consider that at some point, I'm gonna have to come clean on what I just told everybody? Before Brian Mayer called you and said I've already talked to Captain Hawkins.

ED: My thoughts after they left were

RC: (positive sound)

ED: were flooded. Um, I didn't know what, when they left things were were things were fine. Things were calm. They were they were leaving. It I mean two troopers had already left, Csapo was the only one there. I mean it wasn't like they said oh we're getting a helicopter and dog and , I mean that wasn't going into into action.

RC: OK.

ED: So, no I didn't I I didn't think that hey they're out banging on doors. I mean they never as far as I now contacted the neighbors downstairs. Never made mention hey does somebody else live down here. I mean that (sigh) in my mind it wasn't getting out of hand. Or that going in that direction.

RC: OK.

ED: Um, I'm sorry. Should I just stop?

RC: No.

ED: Did that answer your question?

3081                                                                    D000891

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 81 of 83

RC:    Answered my question, thank you. This tape is close to the end Captain.

JP:    Alright why don't we go ahead and and stop this tape 1658 hours. And we'll finish up the interview on a fresh tape.

TAPE 5

JP:    OK. We're back on tape 1700 hours. (paper shuffling) Uh, Christy, if you were dispatched to a complaint and confronted with the circumstances that um were presented here today, uh how would you have handled the situation?

ED:    That's tough. Um, I don't know if it's just because of the person I am or because I'm a female. I think I, no fault to them but, a little more sensitive. I think maybe I would have seen that I can smell alcohol, why don't I sit her down and talk to her calmly, one on one. Not have Gygrnuk standing there badgering me. Or

JP:    OK. But how would you how would you handled it as far as paperwork, um possible arrests, documentation, that sort of thing. What would what would you have done?

ED:    Just given information that I've gave them at the scene or given the entire account. (sigh) Because un unfortunately with this I mean the Captain was involved fairly quickly and and and set his all own ball in motion. So, I mean if if I was Csapo or Gygrynuk or or Argo, then I mean his being involved in it would certainly I I would think would sway how things went. I mean I don't exactly what was said between the Captain and the Sergeant and the Sergeant's through the the younger guys. But

JP:    Do you think you would have sought direction from your supervisor on how to handle the situation?

ED:    Oh, I I'm pretty sure I would have.

JP:    If you were sent to handle a complaint of this nature and you had a wrote it up, would you classify this as a domestic related incident? Under the under the Policies and Procedures of the Division?

ED:    ... Again, given what I told them at the scene, or given what

JP:    Let me rephrase the question. Based upon your relationship with Brian at that time, on that date, do you consider that being a domestic related

ED:    No.

JP:    incident? Why not?

D000892

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 82 of 83

ED:    Because we were not in a serious relationship.

JP:    Is that what our policy states? You have to be in a serious relationship?

ED:    I I can't quote it. I'm sorry.

JP:    If you went if you went to a domestic where there was a a boyfriend girlfriend involved in in just an arugu just a male and a female involved in involved in an argument and they stated to you that they had been had had casual relationship where they went out to dinner, went out to a few movies, and the socialized, would that be considered a domestic?

ED:    To me no. But I mean if you're here to inform me that our policy says that any male female relationship that it's a domestic then

JP:    Are you familiar with our policy on this?

ED:    Well I thought I was but maybe (laugh) I'm not.

JP:    No it's

ED:    I mean if you ...

JP:    That's what I'm trying

ED:    .....

JP:    I'm trying to grasp your understanding

ED:    I mean most domestics I go to are he is my boyfriend, she is my girlfriend, he is my wife, or yeah, he is my wife, he is my husband, my wife, my ex, my ex-husband.

JP:    Well one of the definitions would be dating relationship regardless of living. And dating we're gonna get into sss to semantics what is a dating

ED:    Right.

JP:    .....

ED:    Right.

JP:    I don't believe I've got any further questions.

D000893

Corporal Elizabeth C. Dempsey
IA Case # 12-04
Interviewed June 25, 2004
Page 83 of 83

(?):     No.

JP:     Mr. McDonald? You have anything to add prior to us concluding?

RM:     I don't. Do you have anything Cris

JP:     Christy, do you have anything that you would like to to add prior to uh concluding this interview?

ED:     Um, (sigh) I mean there's a lot that I feel that may be you guys aren't clear on or or don't understand and I I don't know how many other ways to say it. I'm not (sniffle) at that point and time, Brian and I were not in a serious committed relationship. We had we had gone out. We were casual. I was seeing other people. At that point and time, no I did not feel it was a domestic. And I've been on a few. Troop 3 was domestic haven. (sigh) As far as nnn yeah, I guess that that's ..... I I did not feel it was a domestic incident. Now going back I'm not sure how well we covered you you guys asked me if if I'd if I'd spoken with Kevin. I I just want to make it clear that I I never tried to get Kevin to not come back and and testify. I didn't try to to sway him at all. I did try to give him a heads up that hey this is being brought back up again. You are going to be contacted. I I'm serious. I did not want him to be blind sided. I was blind sided when Brian and I were on vacation. Well Brian was blindsided and then then told me. I was not allowed to know about it until I got back from vacation. And was blind sided again by the severity of the situation. And I didn't want Kevin to be blind sided like that. Course then I was blind sided again because you already knew way more than I knew. I just wanted to make it clear that I wasn't trying to influence him.

JP:     If there's nothing else to add, we going to con cude conclude the interview 1707 hours.

D000894

# APPENDIX B – PART 2

# INTERNAL AFFAIRS INVESTIGATION
## Transcribed Interview

**CASE NUMBER:**            IA 12-04

**PERSONS INTERVIEWED:**    Corporal/3 Brian D. Maher

**LOCATION:**               Internal Affairs Officer

**DATE:**                   June 18, 2004

**INTERVIEWERS:**           Captain James Paige, IA
                            Lieutenant Robert Coupe, IA

**TRANSCRIBED BY:**         E. Krista Gallo
                            DSP Executive Staff

**TOTAL PAGES:**            19

KEY:   JP – James Paige
       RC – Robert Coupe
       BM – Brian Maher
       RM – Robert McDonald

JP:     Okay. This is Captain James Paige, Delaware State Police Internal Affairs Division. Today's date is June 18, 2004. The current time is 9:14 hours. I am conducting a tape recorded interview at the Internal Affairs office on McKee Road. Uh, present during this interview is myself, uh, Lieutenant Robert Coupe. Uh, Rob if you would please state your name for voice identification.

RC:     Lieutenant Rob Coupe.

JP:     Okay. Mr. Robert McDonald, uh, would you please state your name for the tape.

RM:     Sure, Bob McDonald.

JP:     And Corporal Brian Maher from Delaware State Police Troop 7. Brian if you would, would you please state your name, rank, and IBM number, please?

BM:     Corporal Brian Maher, uh triple six (666).

JP:     Brian do you understand that this interview will be tape recorded?

BM:     Yes.

JP:     At this point I am going to read into the record the notification of internal inquiry and it's to you. It's from myself. It's dated today's date, June 18, 2004. This is to inform you that the Internal Affairs Division is conducting an investigation into an allegation of violation of Delaware State Police Rule and Regulation #4, conduct unbecoming and Delaware State Police Job Performance Standard 14 domestic incidents involving sworn division members. The allegation states it is alleged that your conduct during an incident at 1715B Frederica Road, Frederica, DE on or about October 26, 2003. You failed to conduct yourself in a manner as to reflect most favorably upon the Division. It is also alleged that you failed to report a domestic incident that you were involved in on October 26, 2003 to the on duty supervisor at your assigned troop. If substantiated, the allegation will be a violation of Delaware State Police Rule and Regulation #4 which states members shall conduct themselves at all times both on and off duty in such a manner as to reflect most favorably on the Division. Conduct unbecoming as an officer shall include that which tends to bring the Division in disrepute or reflect discredit on the officer as a member of the Division or that which tends to impair the operation and efficiency of the Division or the officer. Job performance standard 14 which states when a sworn Division member is involved as a suspect or victim in a domestic incident, it is his or her responsibility to make immediate notification to the on duty supervisor of his or her assigned troop/section. The supervisor or his or her designee will notify the on call CIU administrator who will notify the officers troop commander and the appropriate field operations officer. This is an administrative investigation. It's not a criminal investigation. Your signature below only acknowledges receipt of this notice and is not admission of guilt. Any questions on those notices?

BM:    No.

JP:    If you would, please sign that and I will hand you this copy.

JP:    Brian you are the subject of an administrative investigation and as such you are offered certain rights.  You have the right to have an attorney present, which I assume you are exercising with Mr. McDonald here this morning.  Um, you may have uh, you may request a break at any time during the questioning if you need to um, use the restroom, need a drink, uh, you need to consult with your attorney, we can take a, take a break at your request.  Okay?

BM:    Yup.

JP:    Um, I am going to provide you an opportunity uh to read any of the following: Uh, the first would be the alleged violations, which I have read into the record in the notice.  Uh and that's those are in the Rules and Regulations.  You get provided an opportunity to read through those if you wish.  The opportunity to read through the complaint uh disciplinary procedures of the Divisional Rules and Regulations if you wish and a copy of the Policemen's Bill of Rights if you wish.  You can take your time to do that now or you can waive that and we can move forward.  That's up to you and your attorney.

RM:    I'm good.

_____

JP:    Um, at this point do you have any questions?

BM:    No, sir.

JP:    Okay.  I believe that you wanted to, to make a statement on record, Mr. McDonald.

RM:    Yeah, I do.  Thank you, Captain.  As you know Mr., Corporal Maher is under arrest for activities associated with this interview today and those charges are still pending in the Court of Common Please and for that reason I'm going to uh assert his Fifth Amendment right.  Um, and for the obvious reasons.

JP:    Okay, Brian at this point, I'm going to um, review _____ and we are going to compel you to talk.  Okay?  And I am advising the, advising you that you are being questioned as part of an official investigation of the Delaware State Police.  You will be asked questions specifically related to the performance of your official duties or fitness for office.  In and interview related to an a criminal investigation you gain title of all the rights and privileges guaranteed by the laws and constitution of this state and the constitution of the United States, including the right not to be compelled to incriminate

yourselves. However, in this case the Delaware State Police is conducting an administrative investigation related to an internal investigation. At this time, I am advising you that you must answer questions posed to you. If you refuse to answer questions related to the performance of your duty or fitness for duty you will subject to departmental charges, which could result in your dismissal from the Delaware State Police. Any of the statements that you make or any information or evidence which is gained by reason of such statements can be used against you in any subsequent criminal preceding. However, these statements may be used against you in a relation to a subsequent departmental disciplinary hearings. Do you understand that?

BM:    Yes.

RM:    Captain, given that statement you just read I'll um, it's my understanding that if he doesn't answer it would be an act of insubordination for which he could be discharged. Is that correct?

JP:    That is correct.

RM:    Given that uh, proviso, um, is being compelled I'll direct my client to answer your questions completely and honestly.

JP:    Okay.

JP:    Uh, one more waiver that we'll need to get through because our office is actually located off the Headquarters complex and the Law Enforcement Bill of Rights stipulates that you will be either interviewed as the Headquarters complex or at the Troop of where the incident occurred. Um, I think that's its by everybody's agreement that we are here today but we still have to read this into the record. It's a waiver of Policemen's Bill of Rights section 9200C2. Whenever law enforcement officers under investigation or subject to questioning for any reason which could lead to disciplinary action, demotion, or dismissal. The investigation or questioning shall be conducted under the following conditions: Questioning shall take place at the agency Headquarters, at the office of a local troop, or police unit in which the incident allegedly occurred as designated by the investigating officer unless otherwise waived in writing by the officer being investigated. I have been made aware of my right to have this interview conducted at the agency Headquarters or at the office of the local troop in which this incident allegedly occurred. I waive this right and would like to have interview conducted at the Delaware State Police Internal Affairs office at the McKee Business Park.

RM:    We understand the waiver and we accept it, sir, by our request.

JP:    If you would just sign that and take a copy for your records.

RM:    Thank you.

B088                4

JP:    Then we'll be ready to proceed. Are you ready to proceed? Ready to proceed?

BM:    Yeah go ahead.

JP:    Okay. Um, I've already read the notice of internal inquiry into the record. Uh, it's pretty obvious why we are here this morning. At this point, I would like to just ask you a few questions for formality purposes and then we'll get into the specifics of the incident. First off is Brian. How long have you been employed by the Division?

BM:    I'll be going into my eighteenth year in August. So 17 today _____

JP:    And what is your current position with the Division?

BM:    Uh, patrol at Troop 7.

JP:    Okay. And how long have you been assigned at Troop 7?

BM:    March of 2003.

JP:    Um, are you assigned to a shift or special unit at the troop?

BM:    Shift, as well as the motor unit.

JP:    And how long have you been assigned to the motor unit?

BM:    October of 2003.

JP:    Okay. Are you presently a assistant shift commander?

BM:    Yes.

JP:    How long have you been an assistant shift commander?

BM:    Since March of 2003.

JP:    Um, On October 26th there was an incident at 1715B Frederica Road uh, in Frederica, Delaware uh, in the early morning hours. At this point I want to ask you just to make a statement as to the facts as they occurred to the best of your recollection. Uh, and then from that point, I'll probably have some follow up questions. But I would like you to be as detailed as possible uh as to what occurred that night. We'll, we'll go from there.

BM:    At which point would you like me to start?

JP:    Well, why don't we start that afternoon. What were you doing that, that afternoon in the hospital? We'll go from there.

5

BM:    I came back uh, I was coming back from New Castle. I was having a problem with um, I don't know what it was with actually. They never determined. I was having a pain like around my diaphragm. Long story short, I a hold of my doctor on the emergency line and he told me to go immediately to the ER. Went to Kent General Hospital spent a better part of the afternoon in uh, KGH getting poked and prodded and getting tests done. Um, during the course of that time, um, I had contacted Christy. Uh, we were dating at the time. I told that I wasn't coming down that morning because I was in the hospital. She came to the hospital and was in the hospital with me for the better part of the day. Um, after that I had some things to do down south. I really _____ actually I suppose that's why I went back south. But I was living in Sussex County at the time. So, I went home. Um, she stayed in Kent County, her, her house in Frederica. Um, it's been so long, I have no idea what I did the rest of that day. That evening, um, I was understood that Christy had a friend in town which was a high school uh friend. Uh, I didn't know who he was. I knew his name was Kevin but I had never met him before and that he was in town from Texas and they were going out to a hay ride and then to dinner with some friends or something to that effect. Um, then she was going to come down later that evening, um, was my understanding or possible understanding of what was going to take place that evening. I went out. I'm not sure where I went. I know at some point I was at Irish Eyes. Um, I don't know. I think I might have been in Dewey at some point during the evening as well. But, I think, I think I spent the better of the evening at Irish Eyes in Lewes. Um, sometime during the evening, I received a phone call um from Christy. When I say Christy, I'm talking about Elizabeth Dempsey. I mean you know she goes by Christy?

JP:    Right, that's fine.

BM:    I got a phone call from Christy. Uh, she said that uh she wasn't going to be able to drive down. She had been drinking too much and that she was going to stay up there. Um, I'm not quite sure what time that was. It was um, uh, if I had to guess at this point I'd probably say like around maybe 11:30, 12:00. Best guess. I mean that's

JP:    Talking midnight that time frame?

BM:    Yeah, 11:30 p.m. Yeah. Um, I stayed I believe I was still at Irish Eyes. I may have been in Dewey. I'm, I'm almost certain I was at Irish Eyes in Lewes. Um, I stayed there for a little while longer and then I made the determination that I wasn't so inebriated that I could drive and that I would drive up there to see her. So I, I tried to call her back a few times to uh make certain it was okay. At that point in our relationship, um, we were still newly dating um, so I just didn't want to show up on her door step. So, I called. Um, couldn't get through to her. While I was on my way up there I continued to try and call. At that time, I didn't have her home phone number either. We never used home phones in communicating. I was living in a town house that belonged to my uh my cousin. I don't even know at that time I knew his home phone number. I always used my cell phone for everything as well as she did. So I didn't have a home phone number.

Um, and it didn't dawn on me to think that it would be listed. So, I continued to try and call her cell a few times. Didn't get any answer. Um, I arrived at her residence, parked. I noticed there was a vehicle there. There was actually two vehicles there I didn't recognize. Um, which wouldn't be unusual. There was some neighbors that lived downstairs. I had no idea who they were. I had seen them in passing from being at her house with her before. It wouldn't be unusual for me not to recognize a car at the house. Um, didn't think a lot of it. Subsequently, I had to walk by it to go to the front door. Noticed it was warm. Thought that was a little unusual. Um, again didn't think much of it. Walked up. Knocked on the door. Knocked on the door. Knocked on the door to hear a male voice. She lives in a uh, she lives in second, lived in a second floor apartment which construction wise grade it's not a real nice custom home. You know its pretty cheaply built. Um, and it is very small. So it's not like you can't hear anything inside I wouldn't think. So I could hear his voice um, on the other side of the door. I heard a male voice. He uh, I don't know who he is. I didn't know who it was. Um, there's a set of uh like on the Colonial door four panels and then there's a set of glass on the top two panels of the uh, of the door. Um, there's a rail, there's a landing and a rail. I just pushed up the rail real quick and looked in and I saw the subject, this male subject talking to a closed bathroom door. I knocked and knocked, knocked and knocked. No one came. After a few minutes I looked again and I noticed the bathroom door was open and the bedroom door was now closed. I again tried the cell phone. I'm, I'm puttin this in a sequence like I know that this is when I used the cell phone. I really don't it's been so long but I know I continued to try to call during this whole time on the cell phone to cell phone. Um, at some point, at some point I went back to my truck and I'm pretty sure that I, there's a hip roof that gives way to this uh landing. Um, yeah I had gone back to get the number. I went over to the uh rail and on it gives access to a hip roof which is at window level to the two side windows to the house well two front windows facing main street in Frederica. I went to the windows banged on the windows trying to get someone to respond to me. Um, again no response. No response. Um, I banged on both the bedroom window and the living room window. Um, which are the only two windows on the front side. No response. At some point I went back to my truck. Um, I'm not sure why maybe I thought that she would call me or answer the phone if I wasn't banging on the windows. So I went back to the truck. Um, I called information from my cell phone and found out that her number under Elizabeth Dempsey is listed in Frederica. So I got her home phone number from information. I tried the home phone a couple of times. No answer. Uh, I went back up banged on the door again. No answer. Again, at this point I'm still trying the cell phone to cell phone routine. Now I'm trying the cell phone to home phone routine. I'm still getting no response. Went back out for some unknown reason I don't know why I didn't bang on the bedroom window again. But I was banging on the window again and was getting no answer. By this time I was agitated and I was confused about what was going. Uh, I stood up and turned and just prior to leaving, stopped, turned after banging on the window and kind of mule kicked like a back kick and broke the window. Um, I don't know if I went back to the front door or if I stayed there at that time. I don't remember. I, I'm pretty certain I stayed right there and I yelled in the window or lack of window now, but yelled into the home you know for her to come out and talk to me or to open the door. Um, again nobody, nobody responded. Um, so I

7

reached in and I'm not sure if it was locked or not but I, I pushed the window up and went through the window. I went to the door which is a Luan door. Um, I don't know if I checked to see if it was secured. I more than likely did. Um, banged on the door a few times. Um, told her to come out, asked her to come and talk to me. Or I think I just said answer your phone. At this point I'm not sure if uh in Hein sight from talking about this, I am not sure if I remember this or if this was repeated to me and I remembered it, but at some point I either was told she's calling 911 by the male or I heard her on the phone. I know I heard her on the phone, I don't know if it was after if she'd actually told she's calling 911 or if I just heard her on the phone. Um, but I know that someone, somewhere said that was stated. And I don't even to be honest with you know how I knew that. Now he might have told me that but I know that I heard her on the phone going this is uh, this is uh Trooper Dempsey with the state police. I live at whatever, whatever Main Street Frederica. Um, and I know I can remember thinking I didn't do. Alright, I gotta get out of here. So I turned around and left. Got in my truck started to drive home. Um, got maybe 5 minutes down the road and said I better call somebody and report this. Um, so I didn't have any numbers with me. Um, the only number that I uh did know that I had from my uh Scuba list was uh Captain Hawkins. So I paged him. His pager considering it was his troop area. I wasn't even sure if Frederica was working if they would come or if it would be our guys. But I figured I better report it to somebody that will know what just happened. I didn't want to put anybody else in more of a position and then have them come looking for me. So I paged Captain Hawkins. I couldn't tell you how long it was before he called back. But he called back and uh I couldn't hear a word he saying. I mean I knew it was him. I could recognize the voice but um, turns out I don't know if I knew at the time or if he told me or if I found out later he was at um Del State's homecoming I believe it was if I remember correctly that time of year. But he was at a homecoming and it was so loud I couldn't even hear him. So I'm trying to communicate with him um I think he might have stepped out because I could hear him and I told him that ya know that I was up in the Frederica area at Christy's house and that a window got broke and I asked him if he wanted me to come back to the Troop. I said I think I'll probably gonna have to answer up to this one. Do you want me to come back. He asked me where I was. I told him. He said give me a number where I can reach you. Let me find out what's going on. Let me see what's going on. Just go ahead, just keep going home and then I'll call you if we need you back here. I drove home. I don't know if I heard from him that night actually again. I may have. Um, no I don't think he called me until the next morning to tell me what was going on. At, at some point I don't know if it was the same night or not. At some point, when I spoke to him again, he told me that our guys had responded, troopers. Now this may have been the next morning when I spoke to him that troopers had responded and that um the supervisor was notified who I didn't know who the supervisor was at the troop 3 was it. I do now but I didn't know at the time and that um they were going to pick this up at Troop 3 at the criminal level on Monday morning and then from there it would be there and she would need to be interviewed. Yidda, yidda yidda stuff like that. I had already been back in touch with Christy. In fact when I talked to Captain Hawkins, I was already at her house. I had already cleaned up the glass. I had already boarded up the window and uh had already made sure everything was alright with her and we discussed the misunderstanding and what had happened and

then uh we spent the rest of that day together. And subsequently the next day I ordered the window. It took two weeks or three weeks to get in and then I replaced the window at my cost.

JP:    Okay. Prior to responding up to the residence on October 26th, how many times had you been to that residence prior to that?

BM:    Sir, I couldn't tell ya. I've been, if you want me to give you a big wild guess,

JP:    I mean, had how long, let me ask you this question - how long had you been dating Christy?

BM:    We actually met in (she's going to give you a different rendition of this) but I think it was in June we actually met. We didn't start dating probably til late July maybe early August. Um, I had probably been to her house, if I had to just guess I'd say maybe a dozen times that would just be a _____. Most of the time it was spent down to the beach obviously because there was a lot more to do down there than the Frederica area. But um, if I had to guess I would say about maybe 10 to 12 times.

JP:    Okay. So you met her in June of 2003?

BM:    I was introduced to her, yes in, in, June or July. Late June or early July. Again like I said she may have a more accurate account of when we actually met and when we first started dating. So.

JP:    Okay. Um, and how would you classify your relationship at during October 26th?

BM:    The relationship was much more serious than her and I had discussed. After the incident we obviously discussed that we were both not conveying how we really were feeling about each other and that we hadn't discussed it. I would say when we were dating um, we were dating but had no understanding that we were not dating other people. Um, at the time it was my understanding that neither of us were. We just hadn't discussed the fact that we were a couple.

JP:    Would you, would you say that you spent a lot of time with her on during your off duty time?

BM:    At that point and time. Pretty much it was kinda understood that if we had a day off that we were spending time together it was ya know while we were still at the phase where we were asking each other did you want to do something. It wasn't just assumed of ya know plans weren't being made without each other having knowledge of the fact we're making plans for each other. We were kinda in the strange kind of phase of the relationship.

JP:    Okay. Intimate relationship?

B093

RM:    I don't believe that's an appropriate question.

JP:    I think it's appropriate to establish um whether we domestic, whether we're talking about a domestic here or not. I think that's appropriate to establish what the relationship is.

RM:    You have my objection. He'll answer it.

BM:    I feel the same way. I don't think it's any of your business whether we were involved in the relationship. But, I'm not sure how much of my personal business is it for the Division to know.

JP:    I think it's important to know.

BM:    Yes we were intimate at the time.

JP:    And you spent the night at that residence in the past?

BM:    Um, that's a good question. I almost have to say yeah, I've had, I've had to have. Yeah.

JP:    Um, did you have a key to the residence?

BM:    No. I'm not sure that she had a key to the residence.

JP:    So you were aware that there was uh, uh a male friend um in the area during that week or during that time frame. You were aware or she made you aware of this fact.

BM:    Yeah, we had she had told me during the week when I was at motor school that cause we were trying to make plans for the weekend that she was going to be doing something on Saturday night um with a friend of hers. That was her friend from Texas and he was a policeman and that um that he was and I don't know why, I don't know if I knew was he was in town until later. But, I knew he was in town for whatever reason. I thought maybe he was uh well I don't know if I knew at the time but I knew was in town from Texas and they were high school friends.

JP:    Okay. Were you aware, were you aware of the fact that he was actually staying with her at her residence?

BM:    No. In fact, well, no at the time. I mean found out later that he was staying with his sister.

JP:    Had you discussed um and I'm going, we're going to use the name Kevin Keller. That's the gentleman's name. Um, had you discussed that with her. Did you have any

reservations about her going out with him or anything like that?

BM:    No.

JP:    That's not a problem?

JP:    So on Saturday during the afternoon you got, you, you did, did Christy, Christy call you or did you call her when you were at the hospital?

BM:    I think I was on the way down, down to her house actually in Frederica when all this took place and the Dr. said now go immediately to the hospital. He was afraid was something was Pancreas or I, I, I, think he was worried about my Pancreas for some reason but he said go directly to the hospital. So the nearest available hospital a the time I was southbound was Kent General so I called her and told her hey look I'm Kent General. I'm going to be tied up here for awhile. Then she said well, I'll come up. I'm like ah it's jut tests, don't ya know don't have to if you have things to do. And then she showed up at the hospital.

JP:    So she actually came to the hospital then? Did she stay the whole time you were there until you were until you were released?

BM:    Yes.

JP:    Do you know about what time that was? General time frame?

BM:    No, I don't sir. I think I got to the hospital it was pretty early it was pretty in the morning. I think it was probably 9:00 I got there. I know I was in there at least four hours maybe five hours. It took forever. I'm saying probably four hours. Maybe 1:00. I kinda remember we left there and we were both hungry. I think we might have even went and got something to eat cause we were starved cause I was stuck in the hospital all day. I think we might have went and got lunch if I remember correctly.

JP:    Okay. And then afterwards you went back down home?

BM:    Yes.

JP:    Okay. And then you said uh earlier during your statement that you went to, you believe you went to Irish Eyes.

BM:    Oh, I know I was there at some point. I jut don't know I remember I stopped in Dewey to see some friends and I was in Irish Eyes in Lewes but I don't know at this far out I don't know when I was where ya know or what time I left to go to Dewey. I know I went to Dewey and I ended up back at Irish Eyes.

JP:    Who were you with at Irish Eyes that night?

11

B095

BM:    Just me. I mean I was with friends. I, I couldn't tell who was there. I mean I know everybody there just from you know hanging out at the fishing dock and having friends in the area. Uh, but I., I have no idea who was in there that night. I mean, Sir, you're talking about 7 months ago, 8 months ago.

JP:    Have any _____ of who you. I mean did you have dinner with anybody there or sit at the table with anybody there?

BM:    No, not, not, not that I know. I mean I could tell you the usual suspects that hang out there but I don't think that's going to help you any. I mean I don't know who I was with there. I, I when I went to Dewey, went down Dewey, I saw a friend of mine, "B" out and I can't remember. I saw "B" um I don't know if Kleckner and those guys were in town. I'm not really sure. I'm not sure. Like I said this far out I'm not sure what I was _____. I know like I said I know I went down there for a little while and then I went back up to Irish Eyes.

JP:    And you were drinking that night?

BM:    Yes.

JP:    Do you recall what you were drinking?

BM:    Beer.

JP:    Do you recall how much you had to drink?

BM:    No, sir.

JP:    You made the statement earlier that you didn't you did not think you were intoxicated that's why you drove up to

BM:    It was my assessment at the time, sir. I mean I don't know, I had been drinking put it to you that way. I mean ya know. I sure it wasn't the smartest thing to drive but I didn't feel like I was over the legal limit should I say I guess.

JP:    You made the statement that you got a phone call from Dempsey around 11:30 or midnight.

BM:    That's a guess on the time, sir. But yeah she called me to inform me that uh she had too much to drink and that she was getting a ride or was being dropped off or what I don't remember exactly what she said, but the gist of the conversation was she really wasn't going to be able to come down because she had too much to drink.

JP:    So at that point you made the decision you were going to go north to see her.

BM:    No, I don't think so. Not right away. Um, if I remember correctly when she told me that the conversation was like oh okay I'll, I'll see you tomorrow or yeah okay whatever. You know and I just stayed where I was for a period of time longer. I couldn't even tell you how long. I'm, I'm guessing from the time the incident occurred from the time I think I got a phone call with was probably another hour maybe hour 20 minutes, 30 minutes. I don't know. I am not sure. I mean I stayed where I was for awhile longer. Then I decided I wasn't intoxicated enough that I couldn't drive up and see her. And I was like well if she's not going to come down, I'll go see her. And then I made, started making the attempt to recontact her to let her know that or make sure that was okay.

JP:    And so you drove up in your personal car?

BM:    Yes.

JP:    to her residence. And what kind of car was that?

BM:    A pick up truck. GMC.

JP:    Color?

BM:    Um, geez. Tan, gold maybe. Uh, it's kinda

RM:    Champagne?

BM:    Yeah actually that would be probably a good guess. Champagne color. Yeah.

JP:    Go up by yourself?

BM:    Yes.

JP:    I think you made the statement when you arrived you observed a vehicle that wasn't normally there.

BM:    I really don't know because I don't know didn't know the neighbors well enough to know what vehicles they may or may not have had. I just noticed that the vehicle wasn't hers. I didn't know whose it was. I didn't even pay attention, as a matter of fact, I didn't even look at the tag or anything to see if it was in state, out of state, I just as I was walking up I saw this vehicle that I didn't recognize

JP:    Do you recall what kind of vehicle it was?

BM:    Yea, I'll take a stab. I can't you know maybe a Jeep Cherokee. Maybe not. I'm, I'm not sure.

B097

JP:    Didn't you check, you said that you noticed it was warm?

BM:    Well, when I walked by I could feel the heat coming off the thing.

JP:    Was it parked near the steps?

BM:    No, I don't think so. I think it was parked um it was parked in the grass area next to where I parked. I parked just kind of just past it a little bit which would be what's that kinda to the west of the house I guess, southwest of the house.

JP:    _____ photograph.

BM:    You can't, you can't see where I, I parked over like these spots were taken if I remember correctly. I parked like there's a this ends there's like a gravel parking area over here like a grass gravel lot. It was parked here. I parked next to it.

JP:    Just for tape identification purposes, we are looking at a photograph of um 1715B Frederica Road. Uh, it's labeled as photograph #1. It shows the front of the residence and the steps leading up to the second floor of the apartment. Now had you, when you, prior to when you arrived there did, did you were you there prior to Christine and Kevin Keller getting there or were they already there when you got there?

BM:    I'm a little confused. I was there, no, I was oh I'm sorry. No I was not there prior to them. When, when I walked up that truck was there when I walked up and knocked on the door I heard a male voice. They were already inside.

_____.

JP:    Prior to you going up, upstairs did you call from your car?

BM:    Not the phone but I called her cell numerous times before I got to the residence. Um, I'm assuming that I probably continued I, I remember calling numerous times. I probably called when I first got there or as I walked up to the door. I know I called, I know I called when I was up by the door to see I could hear the phone ring inside.

JP:    Uh, did you leave a message or just got no response?

BM:    I am pretty sure I left a couple messages at some point.

JP:    Do you recall what those messages were?

BM:    No.

JP:    So you go up, you go up the steps on the side of the building and that's the only entrance/exit to the residence.

BM:    Yes.

JP:    Okay. Um, you stated that you heard a male voice inside.

BM:    No, not right away. I mean I, I banged, knocked on the door and then I heard a male voice. Uh, couldn't tell ____ I should say heard a male tone voice. I didn't know, couldn't tell what was being said or the words being spoken but I could tell that is was a male voice.

JP:    At this point, um, you understand there's a you hear a male's voice, you look in, in the residence.

BM:    Um, huh.

JP:    You see a male voice or you see, you see a male in there standing there, correct?

BM:    Yes, sir.

JP:    Um, had you seen this person before?

BM:    No. In fact, I gotta corner view. I couldn't tell. I didn't know if, if I knew him this one sight I might not even recognize him cause he was, he was talking to the door and then walked back to the back bedroom.

JP:    Okay. Could you tell um was he, what, what he wearing?

BM:    I don't recall, no.

JP:    Uh, had did you see Christy?

BM:    No. I just assumed from the, the, the second that I looked um, was very brief. I just assumed that she was in the bathroom because the door is closed and he was talking to a like in the direction of a closed door. There's nothing else there. He was either talking to a closet or a closed door in the bathroom. I, I just assumed that she was probably in there.

JP:    What's your reaction to this now at this point?

BM:    I, I didn't know what to make of it at the point in time. I was kinda still curious why nobody was responding or know why she wouldn't pick up the phone, um, and talk to me. Um, at that point I was just kinda hurt, a little upset, a little confused about what was going on.

JP:    So you continued knocking on the door?

BM:    Yes.

JP:    Now are you knocking on the door like (knocking sound). Are you banging on the door?

BM:    Um, I think initially I was just knocking on the door. Um, it got to a point where I was banging on the door. I couldn't tell you when exactly.

JP:    Why, why did you elevate from knocking to banging?

BM:    I guess I was getting a little more emotional about it and um, I was wanted to make certain they were hearing me.

JP:    And at did you get any response the louder you banged?

BM:    No.

JP:    Um, did you look back up through the windows again to see what was going on?

BM:    Well, I looked back up again briefly through that window and that's when I stated that I saw that the bathroom door was now ajar and that the bedroom door was now closed.

JP:    So you assumed at this point that

BM:    I, I didn't assume anything. I assumed that I was being ignored. I mean know I wasn't assuming. I was being ignored.

JP:    And it was evident to you that they had gone into the bedroom.

BM:    No, I wouldn't. They could have went into the kitchen for all I, I would have known at that point. No, I didn't wouldn't know that they were there. I, I am sure that that's what I was assuming at the time. But uh, they could have been in the other part of the house that I wouldn't have known of.

JP:    There's no response at this point. Um, Christine's not telling you to go away or leave. I'll call you tomorrow. There's no conversation. She's not responding at all to you?

BM:    I don't remember talking to anyone in that house. The only thing in Hein sight that I recall is that he may have said to me she's calling 911 later down the line. I don't remember having any contact with anyone in that home. Male or female.

_____ okay, you have five minutes.

B100                              16

JP:    Did you make phone contact with Dempsey

BM:    No.

JP:    Or did she call you?

BM:    No.

JP:    You had no phone conversation while she was in the residence and you were trying to

BM:    No.

JP:    make contact with her. Are you sure about that?

BM:    Yes, sir. I would think that that would have alleviated this whole problem. Wouldn't you?

JP:    Did you call her on your cell phone after the incident?

BM:    Yes.

JP:    Do you recall about what time that was?

BM:    Uh, the incident occurred about 1:30, sir. Is that right?

JP:    According to the reports, the report says 0142 is _____ when it was reported.

BM:    Okay, um, I think I, I talked to her as I got back down to the Lewes area or to the area of my residence. So travel time maybe within a half hour , 35-40 minutes later. So, 2:20-2:30.

JP:    Did you threaten to kick Keller's ass?

BM:    No.

JP:    Did you threaten to kill him?

BM:    NO.

JP:    Did you threaten Christine at all?

BM:    No.

JP:    So you, you at some juncture you hop over the um,

17

B101

BM:    Yes.

JP:    decking or railing is what it is on the roof that covers the porch.

BM:    Yes, sir.

JP:    And you walk around the front of the residence?

BM:    Yes, sir.

JP:    And which window do you start banging on?  Do you bang on all of them or just one or?

BM:    I'll be honest.  I don't remember being four windows there but now that you show me a picture.  Um, uh, I don't think I banged on all the windows.  I think I know I banged on this first window.  And I believe that these are I know that these are the two bedroom windows.  I, I, I quite possibly banged on I don't think I banged on this window.  But, I think I banged on this window and this window.  I'm not even sure where that window goes to, to be honest with you.  But I, this must be the, there's only two rooms.  So these two must be in the living area and this, these two must be in the bedroom.  I know I banged on at least one of each of those windows but I don't it is so far out now.

JP:    Okay.  Well just for the tape purposes.

BM:    I know I was banging on window 1 if you want to call that window to the left side of the house.  And I, I, I'm certain that I banged on window 3, which would be the first window in the bedroom.  The other two I couldn't tell you to be honest with you.

JP:    Right.  We are referring to photograph number 1 which is again a frontal view of the uh residence  1715B.  You go knock on that first window, window #1.  Do you get any response at all?

BM:    No, sir.

JP:    There's no conversation.  Are you yelling anything?

BM:    Yes.

JP:    What are you yelling?

BM:    I, I don't, I couldn't tell you verbatim.  I know I was probably saying stuff like Christy, answer your phone.  Christy come to the door.  You know I really don't recall what my exact words 7-8 months later, but it was something to that effect telling her to open the door, answer the phone.

JP:    And you are getting absolutely no response back?

BM:    Sir, I'm telling ya I don't I don't think I ever spoke to anyone in that house unless from what I recall after the incident he said to me she's calling 911. That was probably the only contact I had with anybody the entire time that I recall.

JP:    Um, by you not getting a response is, are you getting angrier, or how, how are you feeling about this at this point?

BM:    Sure.

JP:    Are you using any profanities at this point?  Yelling.

BM:    Not that I recall.  No.

JP:    So you don't get any response at the first window so then you go over to the third window.

BM:    Sequence wise, sir, uh, your guess is a good as mine. I know I banged on both windows _____ response. I know that I ended up at window one banging on window one just before I turned to leave to go back to the truck or the deck. I'm not sure where I was initially heading.

JP:    Okay.  We are going to go ahead and um change up tapes.  It's uh 9:59 hours.

# APPENDIX B – PART 3

## Supplemental Report - #3

Final Occurrence Dates and Times:  N 10/26/2003  0135 thru SUN 10/26/2003  0142    Grid 128-182    Sector 34

Original Location:
1715 B  FREDERICA RD    Frederica, DE 19946

EXHIBIT

PENGAD 800-631-6989    Number 4
8/07

### Original Victim Information

| Victim Number | Name | | | | | |
|---|---|---|---|---|---|---|
| 001 | DEMPSEY, ELIZABETH | | | | | |

| Type | Sex | Race | | | Ethnic Origin | Age | D.O.B. |
|---|---|---|---|---|---|---|---|
| Individual | Female | White | | | Non-Hispanic | 28 | 04/02/1975 |

| Address | | Resident Status | Home Telephone | Employer/School | | Work Telephone |
|---|---|---|---|---|---|---|
| 1715 B FREDERICA RD  Frederica, DE 19946 | | Full Time | (302) 632-8559 | | | |

| Reporting Person? | Victim Injured? | Victim Deceased? | Officer Comments |
|---|---|---|---|
| X Yes  ☐ No | ☐ Yes  ☒ No | ☐ Yes  ☒ No | |

### Original Suspect/Defendant Information

| Sequence | Type | SBI Number | Name | | Nick Name | |
|---|---|---|---|---|---|---|
| 001 | Unknown | | | | | |

| Sex | Race | Ethnic Origin | Age | D.O.B. | Height | Weight | Skin Tone | Eye Color |
|---|---|---|---|---|---|---|---|---|
| Male | White | Non-Hispanic | | | | | | |

| Hair Color | Hair Length | Hair Style | Facial Hair | Voice Speech | Teeth | Build | Glasses |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| Address | | Home Telephone | Employer/School | Work Telephone |
|---|---|---|---|---|
| | | | | |

| Arrest Number | Suspect's Clothing Description |
|---|---|
| | |

### Original Crime and Associated Information

| Victim Number | Crime Seq | Statute | Crime Description |
|---|---|---|---|
| 001 | 001 | DE:11:0826:0001:F:C | Burglary First Degree Dwelling Night Armed With Explosives or Deadly Weapon |

| Location Type | Status | Involvement | General Offense |
|---|---|---|---|
| Residence/Home | Pending-Active | ☐ Alcohol  ☐ Drugs  ☐ Computer | ATPT - Attempt to Commit |

| Suspected Hate/Bias | Crime Code |
|---|---|
| ☐ Yes  ☒ No - N/A | 22025A - Burglary/Forced Entry/Residence |

| Number of Premises | Burglary Force Involved |
|---|---|
| 0 | ☒ Yes  ☐ No |

### Current View of Crime and Associated Information

| Victim Number | Crime Seq | Statute | Crime Description |
|---|---|---|---|
| 001 | 001 | DE:11:0826:0001:F:C | Burglary First Degree Dwelling Night Armed With Explosives or Deadly Weapon |

| Location Type | Status | Involvement | General Offense |
|---|---|---|---|
| Residence/Home | Unfounded 10/29/2003 | ☐ Alcohol  ☐ Drugs  ☐ Computer | ATPT - Attempt to Commit |

| Suspected Hate/Bias | Crime Code |
|---|---|
| ☐ Yes  ☒ No - N/A | 22025A - Burglary/Forced Entry/Residence |

| Number of Premises | Burglary Force Involved |
|---|---|
| 0 | ☒ Yes  ☐ No |

### Investigative Narrative

On 10-26-03 at 0115 hrs I responded to 1715 B Frederica Rd. Frederica for a burglary in progress.  Prior to my arrival KentCom advised the RP, Elizabeth Dempsey, was a Delaware State Trooper and stated she was armed with her handgun.  Upon arrival I contacted RP Dempsey on the exterior stairway.  RP-Dempsey lives in a second floor apartment of a residence and is accessed by the stairway.  Upon contacting RP-Dempsey she advised everything was OK and she did not want to make a big deal out of it.  I asked RP-Dempsey to show me which window was broken.  RP-Dempsey was very hesitant to let me go to the top of the stairway.  RP-Dempsey showed me that you could access the front second story window by stepping over the stairway railing and walking on the porch roof.  I walked on the roof to the front of the residence and observed the window was broken.  I observed glass on the porch roof and inside the residence on the floor.  I also observed the window was open.  While I was on the roof CPL Gygrynuk arrived on scene and CPL Csapo shortly behind him.  RP-Dempsey appeared to be very reluctant in giving information regarding the incident.  I advised RP-Dempsey that this needed to be investigated do to the fact that a suspect had attempted to break into her residence with a marked DSP patrol vehicle parked not 50 yards away.  Upon exiting the roof the investigation was turned over to the senior Trooper CPL Gygrynuk.  I check the exterior of residence and surrounding area on foot for suspects and evidence with negative results.  I then entered the residence were CPL Gygrynuk and CPL Csapo were conducting the interview with RP-Dempsey. During the interview RP-Dempsey advised there was someone else in the residence.  CPL Gygrynuk located W-1, Kevin Keller, in RP-Dempsey's bedroom.  During the interview RP-Dempsey's

## CERTIFICATE OF SERVICE

I, Jeffrey K. Martin, do hereby certify that the attached *Appendix to Plaintiff's*

*Brief in Opposition to Defendant's Motion for Summary Judgment* was electronically

filed via CM/ECF on September 8, 2008 to the following:

Stephani J. Ballard, ID #3481
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801

**MARTIN & WILSON, P.A.**

**JEFFREY K. MARTIN, ESQUIRE (#2407)**
**TIMOTHY J. WILSON, ESQUIRE (#4323)**
1508 Pennsylvania Avenue
Wilmington, DE 19806
(302) 777-4681
jmartin@martinandwilson.com
*Attorneys for Plaintiff*

DATED:        September 8, 2008