IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ELIZABETH C. DEMPSEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 06-456-SLR |
| | ) |
| STATE OF DELAWARE, | ) |
| DEPARTMENT OF PUBLIC SAFETY, | ) |
| | ) |
| Defendant. | ) |

Jeffrey K. Martin, Esquire, and Timothy J. Wilson, Esquire, of Martin & Wilson, P.A., Wilmington, Delaware. Counsel for Plaintiff.

Jennifer Danella Oliva, Esquire, and Stephani J. Ballard, Esquire, of the State of Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: September 30, 2008
Wilmington, Delaware

*[signature]*
ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Elizabeth C.[1] Dempsey ("plaintiff") filed this lawsuit against her employer, the State of Delaware, Department of Public Safety[2] ("DPS"), alleging that DPS violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, by intentionally discriminating against her on the basis of gender. (D.I. 1)[3] Plaintiff alleges that DPS disciplined her more harshly for misconduct than it did male employees that she alleges engaged in similar misconduct.

Pending before the court is DPS's motion for summary judgment. The court has jurisdiction over the Title VII claim pursuant to 28 U.S.C. § 1331. For the reasons discussed hereafter, the court grants DPS's motion for summary judgment.[4]

## II. BACKGROUND

Plaintiff works for DPS's Division of State Police. (D.I. 44 at ¶ 1) She is a female Delaware State trooper with the rank of corporal. (*Id.*) Plaintiff held this same position

---

[1]Plaintiff is referred to throughout the record as "Crysti" or "Christy."

[2]The Department of Public Safety is sometimes referred to in the record as "the Department of Safety and Homeland Security." (*E.g.*, D.I. 40 at 94, 372)

[3]Plaintiff's complaint also alleged that DPS breached the covenant of good faith and fair dealing. (D.I. 1 at ¶ 46) Plaintiff, however, has since conceded that the Eleventh Amendment bars this claim. (D.I. 44 at ¶ 51) Accepting as plaintiff does that DPS is a state agency (D.I. 1 at ¶ 2), and that a claim for the breach of the covenant of good faith and fair dealing derives from state law (D.I. 44 at ¶ 51), the court agrees. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Accordingly, the court dismisses for lack of jurisdiction plaintiff's claim that DPS breached the covenant of good faith and fair dealing.

[4]Plaintiff argues that DPS's motion for summary judgment should be denied because, among other things, it relies on unsworn statements. In granting summary judgment in DPS's favor, the court notes that it has not relied on unsworn statements.

and rank on October 26, 2003. (*Id.*)

### A. The Break-in Incident at Plaintiff's Residence

In the early morning hours of October 26, 2003, plaintiff, while off duty, called the Kent County Emergency Dispatch Center ("Kentcom") to report a burglary at her residence.[5] (*Id.* at ¶ 2) Brian Maher ("Maher"), who at the time was a master corporal employed by DPS and who considered himself to be dating plaintiff, was banging on plaintiff's door. (*Id.* at ¶¶ 2, 5, 32; D.I. 40 at 91) He also broke a window to gain access to plaintiff's residence. (*Id.* at ¶ 5) Maher fled the scene when he overheard plaintiff call Kentcom. (*Id.* at ¶ 6) Plaintiff knew at the time she called Kentcom that Maher was the intruder. (*Id.* at ¶ 8)

In response to plaintiff's call, three Delaware State troopers – Corporal Gygrynuk ("Gygrynuk"), Corporal Csapo ("Csapo"), and Trooper Argo ("Argo") – raced to plaintiff's residence. (*Id.* at ¶ 9; D.I. 40 at 137) The troopers interviewed plaintiff about the incident. (D.I. 44 at ¶ 11) Plaintiff did not disclose that Maher was the intruder. (*Id.* at ¶ 10)

Shortly after he left plaintiff's residence, Maher called Captain Robert Hawkins ("Hawkins"), in whose jurisdiction plaintiff resided. (D.I. 40 at ¶¶ 5, 72) Maher told Hawkins that he had broken a window at plaintiff's residence and had a verbal altercation. (*Id.*) Hawkins called Sergeant Michael Houdek ("Houdek") and told him that Maher was involved in the incident at plaintiff's residence. (*Id.* at 7, 12; D.I. 44 at ¶ 14) Although aware of Maher's involvement, Houdek instructed the responding

---

[5]Plaintiff's friend Kevin Keller was with her at the residence at the time of the call and the break-in. (D.I. 40 at ¶ 4)

troopers to complete their reports for the incident according to plaintiff's account. (D.I. 40 at 60-61; D.I. 44 at ¶ 14) Csapo and Gygrynuk filed their reports on October 23, 2006. (D.I. 40 at 248-52) Houdek subsequently approved both reports. (*Id.*)

Later that day, Hawkins called plaintiff to discuss what had happened and to find out how she wanted to proceed. (D.I. 44 at ¶ 16) Plaintiff told Hawkins that she did not want Maher arrested or the case investigated further. (*Id.*) Hawkins then called his superior, Major Randall Hughes ("Hughes"), and explained the incident to him. (D.I. 40 at 12)

On Monday, October 27, 2003, Hawkins met with Lieutenant Gregory Donaway ("Donaway") and Sergeant Charles Mullett ("Mullett") and assigned the case to Mullett for follow-up. Consistent with plaintiff's request, Hawkins instructed Mullett to "clear the case." (*Id.* at 11) Hawkins intended for Mullett to "exceptionally clear the case," meaning that the case would be closed but that the report would identify Maher as the suspect. (*Id.*) On October 29, 2003, Mullett changed the disposition of the report to "unfounded," which closed the case but did not identify Maher as the suspect. (*Id.* at 11, 253; D.I. 44 at ¶ 17)

### B. The Investigations into Officer Conduct

Nothing further occurred regarding the incident until April 2004 when another police captain learned of the incident and discussed it with Hughes. (D.I. 44 at ¶¶ 20, 21) Hughes referred the matter to Lieutenant Colonel Thomas MacLeish ("MacLeish"), and they agreed that the incident warranted criminal and internal affairs investigations. (*Id.* at ¶ 22)

From the criminal investigation, Maher was charged with and pleaded guilty to a

misdemeanor charge of criminal trespass. (*Id.* at ¶ 23) He successfully completed a court-issued Probation before Judgment. (*Id.*)

As for the internal affairs investigation, the Internal Affairs Division ("IA") investigated the conduct of plaintiff, Maher, Csapo, Argo, Gygrynuk, Houdek, Mullett, Donaway, Hawkins, and Hughes. (*Id.* at ¶ 24; D.I. 40 at 278-80) From that investigation, allegations were made against plaintiff, Maher, Houdek, Mullett, Donaway, Hawkins, and Hughes. (D.I. 40 at 278-80)

Donaway and Mullett were each alleged to have exercised poor judgment in violation of Job Performance Standard ("JPS") # 12, but the allegations were determined to be unfounded. (*Id.* at 284-85) Houdek, Hawkins, and Hughes were alleged to have violated JPS # 12 and JPS # 5, the latter of which concerns neglect of duty. (*Id.* at 281-83) Both allegations against Houdek were determined to be unfounded. (*Id.* at 283) The JPS # 5 allegations against Hawkins and Hughes were also determined to be unfounded, but the JPS # 12 allegations were substantiated. (*Id.* at 281-82) Upon IA's recommendation, MacLeish suspended Hawkins for twenty-four hours and Hughes for sixteen hours. (D.I. 44 at ¶¶ 36, 37)

Maher was alleged to have violated JSP # 14, which concerns an officer's responsibility to report domestic incidents involving state police officers, and Delaware State Police Rule and Regulation ("R&R") # 4, which concerns conduct unbecoming an officer. (*Id.* at ¶ 34; D.I. 40 at 312) Maher had the right to have a three-member Trial Board ("Trial Board") conduct an evidentiary hearing on the allegations against him, but opted instead for a Superintendent's Hearing, at which he pleaded no contest. (D.I. 44 at ¶¶ 26, 35) The superintendent imposed discipline of a three-rank demotion, fifteen

4

days suspension without pay, and one year probation. (*Id.* at ¶ 35; D.I. 40 at 326)

Plaintiff was alleged to have violated JPS # 14 and R&R # 15, the latter of which concerns making a false statement or report. (D.I. 40 at 331-32) Plaintiff opted for a Trial Board hearing to dispute these allegations. (D.I. 44 at ¶ 26) The Trial Board found the JPS # 14 allegation to be unsubstantiated. (*Id.* at ¶ 27) However, it found the R&R # 15 allegation to be substantiated, finding that plaintiff "made a series of false statements when she called 911 and to the Troopers investigating her criminal complaint." (*Id.*; D.I. 40 at 367-68) The Trial Board found that the trustworthiness and credibility of an officer is a critical component of his or her ability to perform law enforcement duties[6] and unanimously recommended that plaintiff be suspended without pay with intent to terminate pending review.[7] (D.I. 44 at ¶¶ 28, 29; D.I. 40 at 370)

Plaintiff appealed. (D.I. 44 at ¶ 29) The Secretary of Public Safety ("Secretary") upheld the Trial Board's finding that plaintiff had violated R&R # 15 but reversed the proposed penalty of termination, reasoning that, under the circumstances, it was disproportionate to the severity of the infraction. (*Id.* at ¶ 29; D.I. 40 at 377-80). The Secretary instead ordered discipline of a one-rank demotion to last one year, fifteen

---

[6]The Trial Board specifically noted that plaintiff's false statements "seriously compromised [her] from ever testifying as a witness in a criminal case" because they could be used for impeachment. (D.I. 40 at 370) The Trial Board categorized testifying in a criminal case as "one of the essential functions of a State Trooper" and concluded that plaintiff, by her conduct, had "so impaired her ability" to testify in a criminal case that "termination is the appropriate recourse." (*Id.*)

[7]Plaintiff insists that she was terminated while her appeal to the Secretary was pending. The record, however, makes clear that plaintiff was suspended without pay, not terminated, during that period. (D.I. 40 at 370-72)

5

days suspension without pay, and one year probation.[8] (*Id.*)

### C. Plaintiff's Return to Work

When she returned to work following her appeal and suspension, plaintiff was reassigned to a different troop. (*Id.* at ¶ 32) MacLeish informed plaintiff that the transfer was a "command decision . . . made due to operational and manpower necessities." (D.I. 40 at 235) While not pleased with being reassigned, plaintiff admits that she was "subject to reassignment, at any time . . . to any location in the State of Delaware." (*Id.* at 231; D.I. 44 at ¶ 33)

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come

---

[8] Plaintiff received back wages for the period during which she was suspended without pay pending appeal of the Trial Board decision. (D.I. 44 at ¶ 31)

forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

"The central focus of the inquiry in [a Title VII case] is always whether the employer is treating some people less favorably than others because of their [protected-class status]." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (internal quotation marks omitted). To prevail on a claim of gender discrimination under Title VII, plaintiff must satisfy the "three-step burden-shifting inquiry" set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006).

Plaintiff must first establish a *prima facie* case of gender discrimination. *Id.* The elements of that *prima facie* case, however, depend on the facts of the particular case. *See Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999) (citing *McDonnell Douglas*, 411 U.S. at 802 n.13). Courts craft the *prima facie* case elements

so as to require the plaintiff to "eliminate the most obvious, lawful reasons" for the employer's action. *Id.* at 352-53. Where a plaintiff alleges disparate treatment on the basis of employer discipline, the two most likely ways in which the employer's discipline does not constitute disparate treatment are that (1) the nature of the plaintiff's misconduct differs from that of other comparably situated employees outside the protected class and (2) the nature of the punishment imposed is comparable to – that is, not disparate from – that meted out to other employees for comparable misconduct. *See Jones v. Gerwens*, 874 F.2d 1534, 1539-40 (11th Cir. 1989); *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985). Since plaintiff here alleges disparate treatment in the form of disparate discipline, it is appropriate to require her to show evidence as part of her *prima facie* case that the nature of her misconduct was comparable to that of male employees, but that the nature of the punishment she received was not. *Cf. Worthy v. U.S. Steel Corp.*, 616 F.2d 698, 702-03 (3d Cir. 1980) (court must examine the treatment of comparable employees to determine whether discipline against members of a protected class was discriminatory). It is also appropriate to require her to show that the male employees were similarly situated, e.g., had similar disciplinary records, were disciplined by the same decision makers, etc., because disparate situations present another nondiscriminatory basis for disparate treatment. *See Maull v. Div. of State Police, Dep't of Pub Safety, State of Delaware*, 141 F. Supp. 2d 463, 478-83 (D. Del. 2001).

Accordingly, in making out her *prima facie* case, plaintiff must show that (a) she is a member of a Title VII protected class, (b) her misconduct was comparable in seriousness to that of comparably situated male employees, or "comparators," and (c)

8

she was disciplined more harshly than were the comparators.[9] *See Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993); *Moore,* 754 F.2d at 1105-06 (in a disparate discipline case, plaintiff establishes prima facie case by showing that plaintiff "engaged in prohibited conduct similar to that of a person [outside plaintiff's protected class]" and that plaintiff was disciplined more severely than the other person). *Cf. Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980) (where plaintiff alleges disparate discipline on the basis of race, plaintiff must show that "he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished similarly"); *Gerwens*, 874 F.2d at 1540 (same); *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 915 (8th Cir. 1986) ("To establish prima facie case, [plaintiff] had to show that he is a member of a protected class, that he was disciplined, and that the discipline imposed was harsher than that imposed on comparably situated whites."). Making out a *prima facie* case is not an onerous burden, *see Scheidemantle*, 470 F.3d at 539, but plaintiff must identify evidence in the record sufficient to create an inference of discrimination. *See Pivirotto*, 191 F.3d at 355 (quoting *Teamsters v. United States*, 431 U.S. 324, 358 (1977)); *see also Maull*, 141 F.Supp.2d at 482.

If plaintiff makes out her *prima facie* case, the burden shifts to DPS to establish a legitimate nondiscriminatory reason for disciplining plaintiff more harshly. *See Scheidenmantle*, 470 F.3d at 539. If DPS establishes such a reason, plaintiff must then

---

[9]The court is not aware of any reported case in which the Court of Appeals for the Third Circuit has articulated *prima facie* case elements for disparate discipline suits under Title VII. The court notes, however, that it has before used *prima facie* case elements consistent with those set forth here. *See Shirley v. James River Corp.*, 1996 WL 250044, at *3 (D. Del. 1996).

show that DSP's "proffered reason is merely a pretext for actual discrimination." *Id*.

As discussed hereafter, the court holds that, on the record at bar, no reasonable jury could conclude that plaintiff has made out her *prima facie* case. Even if plaintiff could, the court holds that DPS has identified a legitimate nondiscriminatory reason for disciplining plaintiff that plaintiff has not shown to be pretext.

### A. Plaintiff's *Prima Facie* Case

The parties do not dispute that plaintiff, as a woman, is a member of a protected class under Title VII. See *Scheidemantle*, 470 F.3d at 539. Thus, plaintiff has satisfied the first element of her *prima facie* case. However, plaintiff has not adduced sufficient evidence in the record to show that her misconduct was comparable in seriousness to that of her alleged comparators or that she was disciplined more harshly than were the alleged comparators.

Plaintiff argues that Csapo, Gygrynuk, Argo, Houdek, Mullett, and Maher are all valid comparators in that each one is a man who falsely reported the particulars of the burglary incident but was disciplined less harshly.[10] As an initial matter, plaintiff cites no evidence in the record regarding these officers' disciplinary histories. Without that information, she cannot establish that, given misconduct comparable to hers, these officers should receive discipline comparable to hers. Consequently, plaintiff cannot establish that these officers are valid comparators. See *Maull*, 141 F.Supp.2d at 479

---

[10]Plaintiff is aware of several Delaware State police officers who have been disciplined for misconduct. (D.I. 40 at 190) However, the record does not provide sufficient information regarding these officers' situations – their disciplinary histories, ultimate punishments, the decision makers involved, etc. – to establish these officers as valid comparators.

(court could not conclude that other police officers were valid comparators where plaintiff could not show that these other officers' circumstances, including disciplinary records, were comparable to plaintiff's). That alone undoes plaintiff's *prima facie* case.

Nevertheless, the court notes that comparing plaintiff with her alleged comparators does not otherwise help create an inference of discrimination. Argo, Csapo, and Gygrynuk are not helpful comparators because they were **instructed** to file their reports according to plaintiff's account. Thus, even if they knew Maher to be the suspect at the time they filed their reports, which is not clear from the record, their omission of Maher as a suspect was not comparable in seriousness to plaintiff's volitional omission.

Mullett is not a helpful comparator because his omission of Maher as a suspect resulted from his method of closing the case. In one sense, Mullett's omission was proper because it conformed with his method – an "unfounded" case does not require identification of the suspect. Also, to the extent that Mullett's omission was improper because Hawkins had intended Mullett to "exceptionally clear" the case, which would have called for identifying Maher as the suspect, the record suggests it came from Mullett's failure to follow Hawkins's ambiguous instructions. The record does not support the conclusion that Mullett "unfounded" the case to hide that Maher was the suspect. Therefore, his conduct is not comparable in seriousness to plaintiff's, which was to intentionally hide from the investigating officers that Maher was the suspect.

Maher is not a helpful comparator because, even if his conduct is comparable in seriousness to plaintiff's, which it arguably is given the criminal violations, he was disciplined more harshly than was plaintiff. Plaintiff received a one-rank demotion,

11

fifteen days suspension without pay, and one year probation. Maher received the same punishment except that he was demoted three ranks.[11] Plaintiff cannot show that the punishment she received was in fact disparate.

Houdek comes closest to being a helpful comparator for plaintiff. Resolving record ambiguities in plaintiff's favor,[12] it appears that Houdek, of his own volition, instructed Csapo and Gygrynuk to write their reports according to plaintiff's account and subsequently approved those reports even when he knew that Maher should be identified as the suspect. Since Houdek knew that Hawkins (his supervisor) already knew of Maher's involvement, however, ordering and approving the reports omitting Maher's name did not perpetrate the same falsehood as did plaintiff when she refused to divulge Maher's identity in response to direct questioning. Houdek's act, then, is not comparable in seriousness to plaintiff's.

For these reasons, plaintiff fails to make out her *prima facie* case of gender discrimination. Accordingly, summary judgment in favor of DPS is appropriate.

### B. DPS's Justification and Evidence of Pretext

Even if plaintiff could make out her *prima facie* case, the record is clear that DPS

---

[11] In her complaint, plaintiff averred that she was aggrieved by her transfer. (D.I. 1 at ¶¶ 34-36) The transfer, however, does not support her claim of disparate discipline. Transfer is not, *per se*, a disciplinary action and, in accordance with the State Police manual, troopers may be transferred at any time to any location in Delaware. Moreover, the record here shows that plaintiff was transferred due to operational needs.

[12] Hawkins testified that he told Houdek to have the responding officers write up their reports according to plaintiff's account. (D.I. 40 at 7, 11-12) Houdek, however, testified that he had no such conversation with Hawkins. (*Id.* at 60) It appears from Houdek's testimony that the idea to write up the reports according to plaintiff's account originated with Houdek. (*Id.* at 60-61)

has identified a legitimate nondiscriminatory reason for disciplining plaintiff as it did: plaintiff's misconduct damaged her credibility as a trial witness, which is an essential job function. To survive summary judgment, plaintiff must show that DPS's proffered reason is pretext.

> To show that DPS's reason is pretext, plaintiff
>
> cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

*Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). In the alternative, plaintiff may point "to evidence in the record which 'allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999) (quoting *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994)).

Plaintiff cites no evidence in the record of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in DPS's proffered reason. Nor, in the alternative, does plaintiff cite evidence in the record from which a reasonable jury could infer that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Indeed, plaintiff does not even address pretext in her responsive brief. Accordingly, summary judgment in favor of DPS is appropriate.

## V. CONCLUSION

For the aforementioned reasons, DPS's motion for summary judgment (D.I. 38)

13

is granted. An appropriate order shall issue.